**VOLUME I OF VII, Pages Appx1-3128**
**2023-1509, -1553**

# United States Court of Appeals
# for the Federal Circuit

ALIVECOR, INC.,

*Appellant,*

– v. –

INTERNATIONAL TRADE COMMISSION,

*Appellee,*

– and –

APPLE INC.,

*Intervenor.*

APPLE INC.,

*Appellant,*

– v. –

INTERNATIONAL TRADE COMMISSION,

*Appellee,*

– and –

ALIVECOR, INC.,

*Intervenor.*

*On Appeal from the United States International*
*Trade Commission Inv. No. 337-TA-1266*

## NON-CONFIDENTIAL JOINT APPENDIX

WILLIAM B. ADAMS
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
williamadams@quinnemanuel.com

SEAN S. PAK
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
(415) 875-6600
seanpak@quinnemanuel.com

*Counsel for AliveCor, Inc.*

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS    (800) 4-APPEAL • (323563)

DOMINIC L. BLANCHI
  *General Counsel*
CATHY CHEN
  *Acting Assistant General Counsel*
PANYIN A. HUGHES
Office of the General Counsel
U.S. International Trade Commission
500 E Street SW, Suite 707
Washington, DC 20436
(202) 205-3042
panyin.hughes@usitc.gov

*Counsel for International Trade
  Commission*

MELANIE L. BOSTWICK
MARK S. DAVIES
ZACHARY J. HENNESSEE
ABIGAIL COLELLA
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 339-8400
mbostwick@orrick.com
mark.davies@orrick.com
zhennessee@orrick.com
acolella@orrick.com

E. JOSHUA ROSENKRANZ
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
(212) 506-5000
jrosenkranz@orrick.com
         – and –
ELIZABETH R. MOULTON
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105
(415) 773-5700
emoulton@orrick.com

MICHAEL A. AMON
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, California 92130
(858) 678-5070
amon@fr.com
         – and –
BENJAMIN C. ELACQUA
FISH & RICHARDSON P.C.
909 Fannin Street, Suite 2100
Houston, Texas 77010
(713) 654-5300
elacqua@fr.com
         – and –
RUFFIN B. CORDELL
FISH & RICHARDSON P.C.
1000 Maine Avenue, SW
Washington, DC 20024
(202) 783-5070
cordell@fr.com

*Counsel for Apple Inc.*

# TABLE OF CONTENTS

**Page**

Protective Order, filed May 26, 2021 ................................................. Appxi

Commission Opinion, filed December 22, 2022 ............................... Appx1

Notice of Commission Final Determination Finding a
 Violation of Section 337, filed December 22, 2022 .................... Appx90

Notice of Commission Determination to Review in Part
 a Final Initial Determination Finding a Violation of
 Section 337, filed September 22, 2022 ...................................... Appx94

Corrected Initial Determination on Violation of Section
 337 and Recommended Determination on Remedy
 and Bond, filed June 27, 2022 .................................................... Appx99

Order No. 12: Construing the Terms of the Asserted
 Claims of the Patents at Issue, filed November 4,
 2021 ...................................................................................... Appx305

Docket for ITC Inv. No. 337-TA-1266 .......................................... Appx339

Amended Complaint Under Section 337 of the Tariff
 Act of 1930, as Amended, filed April 26, 2021 ........................ Appx363

Notice of Institution of Investigation, filed May 20,
 2021 ...................................................................................... Appx396

Apple Inc.'s Opening Markman Brief, filed September
 22, 2021 ................................................................................ Appx409

Apple Inc.'s Pre-Hearing Brief, filed February 22, 2022 ............. Appx456

Apple Inc.'s Post-Hearing Brief, filed April 15, 2022 ................... Appx690

AliveCor, Inc.'s Post-Hearing Brief, filed April 15, 2022 ............. Appx889

i

Apple Inc.'s Post-Hearing Reply Brief, filed April 29,
2022 ...................................................................... Appx1075

Apple Inc.'s Petition for Review of the Initial
Determination on Violation of Section 337, filed July
11, 2022 ................................................................ Appx1194

AliveCor, Inc.'s Combined Petition for Review and
Contingent Petition for Review of the Initial
Determination, filed July 11, 2022........................ Appx1308

Public Comments of Dr. Marco Perez, filed July 27,
2022 ...................................................................... Appx1380

Public Comments of Dr. Richard Milani, filed July 27,
2022 ...................................................................... Appx1383

Public Comments of StopAfib.org, filed July 27, 2022.............. Appx1389

Public Comments of CCIA and Netchoice, filed July 27,
2022 ...................................................................... Appx1392

Public Comments of American Heart Association, filed
July 27, 2022 ........................................................ Appx1399

Public Comments of Dr. Hugh Calkins, filed July 27,
2022 ...................................................................... Appx1408

Apple Inc.'s Opening Brief in Response to the
Commission's Request for Written Submissions on
the Issues Under Review and on Remedy, the Public
Interest, and Bonding, filed October 6, 2022........................ Appx1409

Exhibit 1 to Apple's Opening Brief in Response to the
Commission's Request for Written Submissions:
Declaration of Sumbul Desai, M.D., filed October 6,
2022 ...................................................................... Appx1500

Exhibit 2 to Apple's Opening Brief in Response to the
Commission's Request for Written Submissions:
Declaration of Erika Lietzan, filed October 6, 2022.............. Appx1516

Exhibit 3 to Apple's Opening Brief in Response to the
Commission's Request for Written Submissions:
Declaration of Dr. Rosalind Picard, Sc.D., filed
October 6, 2022 ......................................................................... Appx1556

Exhibit 4 to Apple's Opening Brief in Response to the
Commission's Request for Written Submissions:
Declaration of Aaron Schafer, filed October 6, 2022 ............. Appx1579

Exhibit 8 to Apple's Opening Brief in Response to the
Commission's Request for Written Submissions:
User Letters to Apple, filed October 6, 2022 ......................... Appx1585

Corrected Exhibit 5 in Support of Respondent's Brief in
Response to the Commission's Request for Written
Submissions: Declaration of Christian Dippon,
Ph.D., filed October 11, 2022 ................................................. Appx2626

Corrected Exhibit 6 in Support of Respondent's Brief in
Response to the Commission's Request for Written
Submissions: Declaration of Michael A.M. Davies,
filed October 11, 2022 ............................................................. Appx2699

Apple Inc.'s Reply Brief to AliveCor and OUII's
Response to the Commission's Request for Written
Submissions on the Issues Under Review and on
Remedy, the Public Interest, and Bonding, filed
October 14, 2022 ..................................................................... Appx2732

Letter to the President from Chairman David S.
Johanson, filed December 22, 2022 ........................................ Appx2797

AliveCor's Reply Submission in Response to the
Commission's September 22, 2022 Notice of a
Commission Determination to Review in part ...................... Appx2870

Exhibit 1 in Support of Apple's Opening Markman
Brief: Declaration of Collin Stultz, filed September
22, 2021 ................................................................................... Appx2982

Complainant Alivecor, Inc.'s Submission in Response to the Commission's September 22, 2022 Notice of a Commission Determination to Review in Part, filed October 6, 2022 ...................................................................... Appx3033

Exhibit 1 in Support of AliveCor's Reply Submission in Response to the Commission's September 22, 2022 Notice of a Commission Determination to Review in part: Declaration of Dr. Michael Cragg, filed October 14, 2022 ................................................................. Appx3114

JX-1: U.S. Patent No. 9,572,499 ............................................... Appx10001

JX-2: U.S. Patent No. 10,595,731 ............................................ Appx10041

JX-3: U.S. Patent No. 10,638,941 ............................................ Appx10074

JX-8C: AliveCor-Third Party Design Development and IP License Agreement ............................................... Appx10093

JX-25C: Third Party Pikachu Smart Watch Design Proposal .................................................................. Appx10108

JX-95C: AliveCor Partners with Third Party and Qualcomm to Deliver Smart Watch Reference Design with FDA-Cleared Kardia ECG Capability ............. Appx10120

JX-211: "Apple Unveils Apple Watch—Apple's Most Personal Device Ever," Apple Press Release, September 9, 2014 ................................................................. Appx10126

JX-223C: AliveCor's Counter designations from deposition of David Albert, M.D. ......................................... Appx10133

JX-224C: AliveCor's Counter designations from deposition of Clyde Hosein ..................................................... Appx10436

JX-237C: Respondents' Objections and Counter-Designations of Theodore Framhein .................................. Appx10668

iv

JX-238C: Respondents' Objections and Counter-
Designations of Erno Klaassen ........................................... Appx10990

CX-50C: Design Specification ECG App .................................. Appx11249

CX-51C: Design Specification ECG App 2.0 ........................... Appx11325

CX-53C: Design Specification ECG App 2.0 ........................... Appx11402

CX-370C: Erbium Feature Definition ..................................... Appx11479

CX-375C: Health Sensors Roadmap ....................................... Appx11503

CX-393C: New Atlantis Research LLC Spice Mobile
Medical App, De Novo Classification Request .................... Appx11554

CX-439C: Apple ECG 2.0 App 510(k) Submission, 11.
Device Description ............................................................... Appx11616

CX-470: The Skeptical Cardiologist website ........................... Appx11629

CX-471: EKG-Reading Kardia Band Is First Apple
Watch Accessory To Get FDA Clea ..................................... Appx11632

CX-472: Smartwatch Algorithm for Automated
Detection of Atrial Fibrillation - PubMed ........................... Appx11644

CX-909C: Email from M. O'Reily to Myoung Cha re:
AliveCor band and Afib study with 2500 ........................... Appx11652

CX-911: Email from J. Williams to T. Cook re: Re:
AliveCor ............................................................................... Appx11653

CX-923C: 2021-12-22 Expert Report of Dr. Michael P.
Akemann - Ex. 6 - AliveCor DI Labor ................................. Appx11654

CX-925C: 2021-12-22 Expert Report of Dr. Michael P.
Akemann - Ex. 7b - AliveCor Contractor R&D Labor ......... Appx11655

CDX-5C: Dr. Albert's Demonstrative Exhibits ........................ Appx11656

CPX-48C: Native Excel file: AliveCor P&L by Month,
2016-2018 ............................................................................. Appx11709

RX-2C: DEN180044 .................................................................... Appx11726

RX-4C: DEN180042 .................................................................... Appx11730

RX-46C: Heart Health Notifications on Your Apple
   Watch ................................................................................ Appx11734

RX-47C: Apple Press Release: ECG app and irregular
   heart rhythm notification available today on Apple
   Watch ................................................................................ Appx11738

RX-54C: Taking an ECG with the ECG app on Apple
   Watch Series 4 or later - Apple Support .............................. Appx11748

RX-128C: User Manual for Kardia by AliveCor ....................... Appx11757

RX-134C: Photograph of Domestic Industry Reference
   Product ............................................................................. Appx11795

RX-152C: Photograph of Domestic Industry Reference
   Product ............................................................................. Appx11796

RX-177C: 099-14035-AJ IRN1 Software Requirements
   Specifications .................................................................... Appx11797

RX-179C: 099-15117-W IRN1 Software Design
   Specifications .................................................................... Appx11826

RX-314C: AliveCor KardiaBand Asserted Domestic
   Industry Investments According to Dr. Akemann .............. Appx11926

RX-322C: AliveCor KardiaBand Revenue Analysis ................. Appx11928

RX-400: U.S. Patent No. 7,460,899 ........................................ Appx11930

RX-419: "Amon: A Wearable Multiparameter Medical
   Monitoring and Alert System," Anliker et al ...................... Appx11966

RX-488C: Declaration of Siva Somayajula .............................. Appx11979

RX-562: Asl, Babak Mohammadzadeh, Setarehdan, Seyed Kamaledin, Mohebbi, Maryam, "Support vector machine-based arrhythmia classification using reduced features of heart rate variability signal", Artificial Intelligence in Medicine (2008) ............... Appx11985

RX-564: The AliveCor KardiaBand: A Medgadget Review ................................................................... Appx11999

RX-785C: Notes on Intro meeting re; N38 (Feb. 27, 2013) ................................................... Appx12005

RX-790C: Email string from Waydo to Cha re: AliveCor (Jan. 4, 2018) ......................................... Appx12007

RX-832C: Apple Watch Roadmap Review (Oct. 15, 2014) ................................................... Appx12016

RX-837C: N27a Gold/Erbium DOE2  1 Electronics (Sept. 25, 2013) ......................................... Appx12029

RDX-2C: Demonstratives of Rosalind Picard ........................... Appx12030

RDX-3C: Demonstratives of Dr. Collin Stultz ......................... Appx12103

RDX-6C: Demonstratives of Steve Waydo ............................... Appx12206

JX-009C: Presentation titled, "About AliveCor" .................…..  Appx12209

JX-096C: Consideration for Implementation of SmartRhythm and KardiaBand Pro ....................................................... Appx12257

JX-097C: AliveCor Inc. Office Lease (4/29/2016) ................... Appx12264

JX-100C: AliveCor Inc. Office Lease (5/14/2021) ................... Appx12327

JX-227C: Complainant's Counter designations from deposition of Daniel White Dated December 10. 2021 ................................. Appx12604

JX-235C: Respondents' Objections and Counter-Designations of Roxanne Dash Brittain (December 10, 2021) ................... Appx12797

JX-236C: Respondents' Objections and Counter-Designations of Deidre Caldbeck (December 8, 2021)..........................................Appx13087

JX-240C: Respondents' Objections and Counter-Designations of Stephen Waydo (November 30, 2021)..........................................Appx13343

CX-0024C: AliveCor Submission History............................Appx13695

CX-0025C: Memo from W. Goh to B. Wu, M. Mollazadeh, and S. Waydo re Erbium...............................................................Appx13701

CX-0026C: Things to Avoid / Look Out For..........................Appx13704

CX-0048C: IRN1 Design Specifications...............................Appx13706

CX-0051C: Design Specification ECG App 2.0.....................Appx13806

CX-0054C: Memo from V. Carr to A. Beatty re Cinnamon and Antimony data....................................................................Appx13883

CX-0067C: Memo from S. Waydo to C. Brouse re Cinnamon AWD Metrics...................................................................Appx13893

CX-0073: Take an ECG with the ECG app on Apple Watch...Appx13903

CX-0080: De Novo Classification Request for Irregular Rhythm Notification Feature..................................................Appx13909

CX-0081: De Novo Classification Request for ECG App.........Appx13918

CX-0083: Cleveland Clinic Studies Accuracy of Apple Watch 4 for Atrial Fibrillation Detection.................................................  Appx13933

CX-0431C: Erbium - AliveCor Comparison Alg Ver 5.4..........Appx13989

CX-0432C: 6203438 - A [K130921] Alivecor 510(k): Alivecor Heart Monitor OTC............................................................Appx13991

CX-0433C: 6205436 - A [K142743] AliveCor 510(k): AliveCor Heart Monitor...................................................................Appx14340

CX-0434C: 6201939 - A [K122356] Alivecor 510(k): Alivecor Heart Monitor for I-Phone...................................…..Appx14602

CX-0435C: 6205438 - A [K140933] AliveCor 510(k): AliveCor Heart Monitor....................................................................Appx14796

CX-0436C: FDA Save Request........................................Appx15165

CX-0437C: 6205438 - A [K140933] AliveCor 510(k): AliveCor Heart Monitor....................................................................Appx15354

CX-0438C: FDA Save Request........................................Appx15723

CX-0542C: FDA Clears First Medical Device Accessory for Apple Watch.......................................................................Appx15925

CX-0611: Heart health notifications on your Apple Watch.....Appx15927

CX-0622: ECG app and irregular heart rhythm notification available today on Apple watch........................ Appx15930

CX-0623: Apple Watch Irregular Heart Rhythm Notifications Approved in Australia as ECG Approval Edges Closer....................Appx15937

CX-0626: How to use the Irregular Heart Rhythm notification feature on Apple Watch............................................................Appx15945

CX-0695: The Advent of Clinically useful Deep Learning......Appx15972

CX-0913C: Email from D. Tsay to C. Brouse et al. re: Re: Heatline data..................................................................…..Appx15976

CX-0914C: Presentation: Apple Health- Week of October 21st.......................................................................….Appx15980

CX-0915C: Email from E. Klassen re: Reducing stroke risk through existing Apple Watch function.....................................Appx16009

CX-0918C: 2021-12-22 Expert Report of Dr. Michael P. Akemann - Ex. 2a - AliveCor DI Facilities Expenses.............................…..Appx16012

CX-0919C: 2021-12-22 Expert Report of Dr. Michael P. Akemann - Ex. 2b - AliveCor Mountain View Facilities Expenses.............Appx16013

CX-0920C: 2021-12-22 Expert Report of Dr. Michael P. Akemann - Ex. 3 - AliveCor Equipment Expenses……………………………Appx16014

CX-0922C: 2021-12-22 Expert Report of Dr. Michael P. Akemann - Ex. 5 - AliveCor Headcount by Team - Plant And Equipment Mountain View Headquarters……………………………………………...Appx16015

CX-0924C: 2021-12-22 Expert Report of Dr. Michael P. Akemann - Ex. 7a - AliveCor Internal R&D DI Labor Expenses Balance Sheet Expenses Allocated by DI Headcount………………………...Appx16016

CX-0926C: 2021-12-22 Expert Report of Dr. Michael P. Akemann  - Ex. 8a - AliveCor DI Regulatory Consulting Labor……………...Appx16017

CX-0927C: 2021-12-22 Expert Report of Dr. Michael P. Akemann - Ex. 8b - AliveCor Regulatory Consulting……………………………..Appx16018

CX-0928C: 2021-12-22 Expert Report of Dr. Michael P. Akemann - Ex. 9a - AliveCor Customer Support Labor Investments…………..Appx16019

CX-0934C: 2021-12-22 Expert Report of Dr. Michael P. Akemann - Ex. 12 - KardiaBand Revenues and Unit Shipments………………..Appx16020

CX-0935C: 2021-12-22 Expert Report of Dr. Michael P. Akemann - Ex. 13 - AliveCor Revenues by Product………………………………Appx16021

CDX-0001C: Dr. Akemann's Demonstrative Exhibit…………...Appx16022

CDX-0003C: Dr. Jafari Demonstrative Exhibit…………….…Appx16040

CPX-047C: Spreadsheet- AliveCor P&L by Class 2016 QB thru 2020 Income Statement and Headcount Detail……………………Appx16160

CPX-050C: Spreadsheet- AliveCor 2016 - 2019 Compensation Analysis…………………………………………………………..Appx16190

CPX-052C: Spreadsheet- AliveCor Census Summary- Current & CardioLabs Only Employee Census…………..……………..…Appx16205

CPX-053C: Spreadsheet- KB-Tickets-Monthly, 2017-2021….Appx16214

RX-0484C: AliveCor's Sixth Supplemental Objections and Responses to Respondent's First Set of Interrogatories (Nos. 1-80)………Appx16215

RX-0789C: Feb. 12, 2018 email regarding AliveCor Kardia Apple Watch Band……………………………………………………………….Appx16279

RX-0790C: Jan. 4, 2018 email regarding AliveCor……………Appx16282

CPX-048C: Spreadsheet- AliveCor P&L by Month, 2016-2018…………………………………………………………………….Appx16291

CX-0469: AliveCor - Crunchbase Company Profile & Funding……………………………………………………..……………Appx16319

CX-0538: Dec. 2020 Using Apple Watch for Arrhythmia Detection………………………………………………………………Appx16323

CX-0925C: 2021-12-22 Expert Report of Dr. Michael P. Akemann - Ex. 7b AliveCor Contractor R&D Labor……………………………..…Appx16340

CX-0029: CNN.com Can the Apple Watch take off as a fashion accessory……………………………………... …..…Appx16341

CX-067C: Email re: Cinnamon AWD Metrics……………………………………….…..………………… Appx16346

CX-0910C: Email re; AliveCor ECG Watch Band in Apple Store ..................................... …………………………………..…Appx16356

CX-0914C: Apple Health Week of October 21st …………………………………….. ……………………… Appx16357

CX-0485C Purchase Order ........................................................ Appx16386

JX-152C KardiaBand Pro: State of the Product ..................... Appx16387

March 28, 2022 Trial Transcript ............................................. Appx30001

March 29, 2022 Trial Transcript ............................................. Appx30274

March 30, 2022 Trial Transcript ............................................. Appx30548

March 31, 2022 Trial Transcript ............................................. Appx30828

April 1, 2022 Trial Transcript .................................................. Appx31102

JX-219C: Alivecor's Deposition Designations December
    8, 2021 Deposition of Erno Klaassen ................................... Appx40000

Federal Register Vol. 86, No. 100, Wednesday, May 26,
    2021 Notices .......................................................... Appx40005

Federal Register Vol. 87, No. 135, Friday, July 15, 2022
    Notices ................................................................. Appx40006

Federal Register Vol. 87, No. 187, Wednesday,
    September 28, 2022 Notices ................................................ Appx40008

CX0937C: AliveCor Headcount by Team vs.
    International Headcount by Team ...................................... Appx40011

Statement for Confidential Material:

Pursuant to Federal Circuit Rule 25.1(e) and the Protective Order
issued in the International Trade Commission on May 26, 2021, and
amended on August 18, 2021, AliveCor, Inc. is filing a confidential
version of this appendix that highlights/or brackets the material
marked confidential, and a non-confidential version including
appropriate redactions. In the non-confidential version of this appendix,
confidential material has been deleted/removed on pages Appx10,
Appx15-17, Appx19-21, Appx23, Appx25-26, Appx43-44, Appx51,
Appx55, Appx61, Appx77-80, Appx82-84, Appx110-111, Appx113,
Appx138-143, Appx146, Appx150-158, Appx160-166, Appx201-202,
Appx214-215, Appx218-219, Appx236-242, Appx245-246, Appx259-269,
Appx271-282, Appx284-293, Appx298-300, Appx722-725, Appx751-752,
Appx756, Appx912-917, Appx936-1024, Appx1027-1030, Appx1106-
1110, Appx1220-1297, Appx1375, Appx1447-1448, Appx1465-1466,
Appx1479, Appx1481-1483, Appx1508-1509, Appx1575, Appx1582-1583,
Appx1585-2478, Appx2772-2774, Appx2776, Appx2778, Appx2883-2886,
Appx2915, Appx3072-3073, Appx3086, Appx3122, Appx10093-10125,
Appx10133-11628, Appx11652-11929, Appx11979-11984, Appx12005-
12326, Appx12327-13902, Appx13989-14339, Appx14340-14795,

Appx14796-15353, Appx15354-15926, Appx15976-16189, Appx16190-16314, Appx16340, Appx16346-16410, Appx30090-30102, Appx30155-30163, Appx30197-30226, Appx30302-30487, Appx30563-30569, Appx30738-30814, Appx30839-30972, Appx31012-31029, Appx31150-31162, Appx31200-31218, Appx40000-40004. The general nature of the deleted material is (1) confidential business information of AliveCor, Inc. regarding its finances, product information, and agreements with a third party not involved in this litigation; and (2) confidential business information of Apple Inc. regarding its internal communications and product information.

## UNITED STATES INTERNATIONAL TRADE COMMISSION

### Washington, D.C.

In the Matter of

**CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF**

**Inv. No. 337-TA-1266**

**ORDER NO. 1:     PROTECTIVE ORDER**

(May 26, 2021)

WHEREAS, documents and information may be sought, produced or exhibited by and among the parties to the above captioned proceeding, which materials relate to trade secrets or other confidential research, development or commercial information, as such terms are used in the Commission's Rules, 19 C.F.R. § 210.5;

IT IS HEREBY ORDERED THAT:

1. Confidential business information is information which concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, or other information of commercial value, the disclosure of which is likely to have the effect of either (i) impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions; or (ii) causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained, unless the Commission is required by law to disclose such information. The term "confidential business information" includes "proprietary information" within the meaning of section 777(b) of the Tariff Act of 1930 (19 U.S.C. § 1677f(b)).

2(a).  Any information submitted, in pre hearing discovery or in a pleading, motion, or response to a motion either voluntarily or pursuant to order, in this investigation, which is asserted by a supplier to contain or constitute confidential business information shall be so designated by such supplier in writing, or orally at a deposition, conference or hearing, and shall be segregated from other information being submitted.  Documents shall be clearly and prominently marked on their face with the legend:  "CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER," or a comparable notice.  Such information, whether submitted in writing or in oral testimony, shall be treated in accordance with the terms of this protective order.

(b).  The Administrative Law Judge or the Commission may determine that information alleged to be confidential is not confidential, or that its disclosure is necessary for the proper disposition of the proceeding, before, during or after the close of a hearing herein.  If such a determination is made by the Administrative Law Judge or the Commission, opportunity shall be provided to the supplier of such information to argue its confidentiality prior to the time of such ruling.

3.  In the absence of written permission from the supplier or an order by the Commission or the Administrative Law Judge, any confidential documents or business information submitted in accordance with the provisions of paragraph 2 above shall not be disclosed to any person other than:  (i) outside counsel for parties to this investigation, including necessary secretarial and support personnel assisting such counsel; (ii) qualified persons taking testimony involving such documents or information and necessary stenographic and clerical personnel thereof; (iii) technical experts and their staff who are employed for the purposes of this litigation (unless they are otherwise employed by, consultants to, or otherwise affiliated with a non-governmental

- 2 -

party, or are employees of any domestic or foreign manufacturer, wholesaler, retailer, or distributor of the products, devices or component parts which are the subject of this investigation); (iv) the Commission, the Administrative Law Judge, the Commission staff, and personnel of any governmental agency as authorized by the Commission; (v) the Commission, its employees and Offices, and contract personnel (a) for developing or maintaining the records of this investigation or related proceedings, or (b) in internal investigations, audits, reviews, evaluations relating to the programs, personnel, and operations of the Commission including under to 5 U.S.C. Appendix 3; and (vi) U.S. government employees and contract personnel, solely for cybersecurity purposes.[1]

4.   Confidential business information submitted in accordance with the provisions of paragraph 2 above shall not be made available to any person designated in paragraph 3(i)[2] and (iii) unless he or she shall have first read this order and shall have agreed, by letter filed with the Secretary of this Commission:   (i) to be bound by the terms thereof; (ii) not to reveal such confidential business information to anyone other than another person designated in paragraph 3; and (iii) to utilize such confidential business information solely for purposes of this investigation. The letter shall also include the following acknowledgement:

> I, the undersigned, on behalf of _____, acknowledge that information submitted for purposes of this Investigation may be disclosed to and used:
>
> (i) by the Commission, its employees and Offices, and contract personnel (a) for developing or maintaining the records of this or a related proceeding, or (b) in internal investigations, audits, reviews, and evaluations relating to the programs, personnel, and operations of the Commission including under 5 U.S.C. Appendix 3; or

---

[1] *See* Commission Administrative Order 16-01 (Nov. 7, 2015).
[2] Necessary secretarial and support personnel assisting counsel need not sign onto the protective order themselves because they are covered by counsel's signing onto the protective order.

(ii) by U.S. government employees and contract personnel, solely for cybersecurity purposes. I understand that all contract personnel will sign appropriate nondisclosure agreements.

5. If the Commission or the Administrative Law Judge orders, or if the supplier and all parties to the investigation agree, that access to, or dissemination of information submitted as confidential business information shall be made to persons not included in paragraph 3 above, such matter shall only be accessible to, or disseminated to, such persons based upon the conditions pertaining to, and obligations arising from this order, and such persons shall be considered subject to it, unless the Commission or the Administrative Law Judge finds that the information is not confidential business information as defined in paragraph 1 thereof.

6.  (a). Any confidential business information submitted to the Commission or the Administrative Law Judge in connection with a motion or other proceeding within the purview of this investigation shall be submitted under seal pursuant to paragraph 2 above.  Any portion of a transcript in connection with this investigation containing any confidential business information submitted pursuant to paragraph 2 above shall be bound separately and filed under seal.  When any confidential business information submitted in accordance with paragraph 2 above is included in an authorized transcript of a deposition or exhibits thereto, arrangements shall be made with the court reporter taking the deposition to bind such confidential portions and separately label them "CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER."  Before a court reporter or translator receives any such information, he or she shall have first read this order and shall have agreed in writing to be bound by the terms thereof.  Alternatively, he or she shall sign the agreement included as Attachment A hereto. Copies of each such signed agreement shall be provided to the supplier of such confidential business information and the Secretary of the Commission.

- 4 -

(b).     Submitters[3] are strongly encouraged to encrypt nonpublic documents that are electronically transmitted to the Commission to protect your sensitive information from unauthorized disclosure. The USITC secure drop-box system and the Electronic Document Information System (EDIS) use Federal Information Processing Standards (FIPS) 140-2 cryptographic algorithms to encrypt data in transit. Submitting your nonpublic documents by a means that does not use these encryption algorithms (such as by email) may subject your firm's nonpublic information to unauthorized disclosure during transmission. If you choose a non-encrypted method of electronic transmission, the Commission warns you that the risk of such possible unauthorized disclosure is assumed by you and not by the Commission.

7.  The restrictions upon, and obligations accruing to, persons who become subject to this order shall not apply to any information submitted in accordance with paragraph 2 above to which the person asserting the confidential status thereof agrees in writing, or the Commission or the Administrative Law Judge rules, after an opportunity for hearing, was publicly known at the time it was supplied to the receiving party or has since become publicly known through no fault of the receiving party.

8.  The Commission, the Administrative Law Judge, and the Commission investigative attorney acknowledge that any document or information submitted as confidential business information pursuant to paragraph 2 above is to be treated as such within the meaning of 5 U.S.C. § 552(b)(4) and 18 U.S.C. § 1905, subject to a contrary ruling, after hearing, by the Commission or its Freedom of Information Act Officer, or the Administrative Law Judge.  When such information is made part of a pleading or is offered into the evidentiary record, the data set

---

[3] "Submitters" of confidential business information are the same as "suppliers" of confidential business information as that term is used in the context of this order.  *See* Commission Administrative Order 16-01 (Nov. 7, 2015).

- 5 -

forth in 19 C.F.R. § 201.6 must be provided except during the time that the proceeding is pending before the Administrative Law Judge.  During that time, the party offering the confidential business information must, upon request, provide a statement as to the claimed basis for its confidentiality.

9.  Unless a designation of confidentiality has been withdrawn, or a determination has been made by the Commission or the Administrative Law Judge that information designated as confidential, is no longer confidential, the Commission, the Administrative Law Judge, and the Commission investigative attorney shall take all necessary and proper steps to preserve the confidentiality of, and to protect each supplier's rights with respect to, any confidential business information designated by the supplier in accordance with paragraph 2 above, including, without limitation:  (a) notifying the supplier promptly of (i) any inquiry or request by anyone for the substance of or access to such confidential business information, other than those authorized pursuant to this order, under the Freedom of Information Act, as amended (5 U.S.C. § 552) and (ii) any proposal to redesignate or make public any such confidential business information; and (b) providing the supplier at least seven days after receipt of such inquiry or request within which to take action before the Commission, its Freedom of Information Act Officer, or the Administrative Law Judge, or otherwise to preserve the confidentiality of and to protect its rights in, and to, such confidential business information.

10.  If while an investigation is before the Administrative Law Judge, a party to this order who is to be a recipient of any business information designated as confidential and submitted in accordance with paragraph 2 disagrees with respect to such a designation, in full or in part, it shall notify the supplier in writing, and they will thereupon confer as to the status of the subject information proffered within the context of this order.  If prior to, or at the time of such a

- 6 -

conference, the supplier withdraws its designation of such information as being subject to this order, but nonetheless submits such information for purposes of the investigation; such supplier shall express the withdrawal, in writing, and serve such withdrawal upon all parties and the Administrative Law Judge.  If the recipient and supplier are unable to concur upon the status of the subject information submitted as confidential business information within ten days from the date of notification of such disagreement, any party to this order may raise the issue of the designation of such a status to the Administrative Law Judge who will rule upon the matter.  The Administrative Law Judge may sua sponte question the designation of the confidential status of any information and, after opportunity for hearing, may remove the confidentiality designation.

11.  No less than 10 days (or any other period of time designated by the Administrative Law Judge) prior to the initial disclosure to a proposed expert of any confidential information submitted in accordance with paragraph 2, the party proposing to use such expert shall submit in writing the name of such proposed expert and his or her educational and detailed employment history to the supplier.  If the supplier objects to the disclosure of such confidential business information to such proposed expert as inconsistent with the language or intent of this order or on other grounds, it shall notify the recipient in writing of its objection and the grounds therefore prior to the initial disclosure.  If the dispute is not resolved on an informal basis within ten days of receipt of such notice of objections, the supplier shall submit immediately each objection to the Administrative Law Judge for a ruling.  If the investigation is before the Commission the matter shall be submitted to the Commission for resolution.  The submission of such confidential business information to such proposed expert shall be withheld pending the ruling of the Commission or the Administrative Law Judge.  The terms of this paragraph shall be inapplicable

- 7 -

to experts within the Commission or to experts from other governmental agencies who are consulted with or used by the Commission.

12.   If confidential business information submitted in accordance with paragraph 2 is disclosed to any person other than in the manner authorized by this protective order, the party responsible for the disclosure must immediately bring all pertinent facts relating to such disclosure to the attention of the supplier and the Administrative Law Judge and, without prejudice to other rights and remedies of the supplier, make every effort to prevent further disclosure by it or by the person who was the recipient of such information.

13.   Nothing in this order shall abridge the right of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Commission, its Freedom of Information Act Officer, or the Administrative Law Judge concerning the issue of the status of confidential business information.

14.   Upon final termination of this investigation, each recipient of confidential business information that is subject to this order shall assemble and return to the supplier all items containing such information submitted in accordance with paragraph 2 above, including all copies of such matter which may have been made.  Alternatively, the parties subject to this order may, with the written consent of the supplier, destroy all items containing confidential business information and certify to the supplier (or his counsel) that such destruction has taken place. This paragraph shall not apply to the Commission, including its investigative attorney, and the Administrative Law Judge, which shall retain such material pursuant to statutory requirements and for other recordkeeping purposes, but may destroy such material (including electronic media containing such information) in its possession which it regards as surplusage.

- 8 -

Notwithstanding the above paragraph, confidential business information may be transmitted to a district court pursuant to Commission Rule 210.5(c).

15.    If any confidential business information which is supplied in accordance with paragraph 2 above is supplied by a nonparty to this investigation, such a nonparty shall be considered a "supplier" as that term is used in the context of this order.

16.    Each nonparty supplier shall be provided a copy of this order by the party seeking information from said supplier.

17.    The Secretary shall serve a copy of this order upon all parties.

Cameron Elliot
Administrative Law Judge

- 9 -

Attachment A

NONDISCLOSURE AGREEMENT FOR REPORTER/STENOGRAPHER/TRANSLATOR

I, _____, do solemnly swear or affirm that I will not divulge any information communicated to me in any confidential portion of the investigation or hearing in the matter of *Certain Electronic Devices with ECG Functionality and Components Thereof,* Investigation No. 337-TA-1266, except as permitted in the protective order issued in this case. I will not directly or indirectly use, or allow the use of such information for any purpose other than that directly associated with my official duties in this case.

Further, I will not by direct action, discussion, recommendation, or suggestion to any person reveal the nature or content of any information communicated during any confidential portion of the investigation or hearing in this case.

I also affirm that I do not hold any position or official relationship with any of the participants in said investigation.

I am aware that the unauthorized use or conveyance of information as specified above is a violation of the Federal Criminal Code and punishable by a fine of up to $10,000, imprisonment of up to ten (10) years, or both.

Signed _____

Dated _____

Firm or affiliation _____

- 10 -

**CERTAIN WEARABLE ELECTRONIC DEVICES**                    **Inv. No. 337-TA-1266**
**WITH ECG CAPABILITY AND COMPONENTS**
**THEREOF**

Certificate of Service – Page 1

## PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **ORDER** has been served via EDIS upon the Commission Investigative Attorney, **Whitney Winston, Esq.**, and the following parties as indicated, on **May 26, 2021**.

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC  20436

**On Behalf of Complainant AliveCor, Inc. :**

S. Alex Lasher, Esq.                            ☐ Via Hand Delivery
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**      ☐ Via Express Delivery
1300 I Street NW, Suite 900                     ☐ Via First Class Mail
Washington, DC 20005                            ☒ Other: Email Notification
Email: alexlasher@quinnemanuel.com              of Availability for Download

**Respondents:**

Apple Inc.                                       ☐ Via Hand Delivery
One Apple Park Way,                              ☐ Via Express Delivery
Cupertino, CA 95014                             ☐ Via First Class Mail
                                                 ☒ Other: Service to Be
                                                 Completed by Complainant

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

In the Matter of

**CERTAIN WEARABLE ELECTRONIC**
**DEVICES WITH ECG FUNCTIONALITY**
**AND COMPONENTS THEREOF**

Inv. No.  337-TA-1266

ORDER NO. 7:                **AMENDING THE PROTECTIVE ORDER**

(August 18, 2021)

Complainant AliveCor, Inc. and Respondent Apple Inc. (collectively, "the Private Parties") moved (1266-002) to amend the Protective Order (Order No. 1) that issued on May 26, 2021, to include enhanced confidentiality provisions for source code.  The Private Parties submit that the Commission Office of Import Investigations Staff does not oppose the proposed amendments.  Mot. at 3.

The Private Parties' joint motion (1266-002) is hereby granted.  The provisions set forth in Appendix A to this order shall be incorporated as Paragraph Nos. 18-28 of the Protective Order in this investigation.

**SO ORDERED.**

Cameron Elliot
Administrative Law Judge

# APPENDIX A

18.    **Source Code.**  A Producing Party may designate documents, information, or things that constitute or contain non-public Source Code as "HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER." Nothing in this Order shall be construed as a representation or admission that Source Code is properly discoverable in this action, or to obligate any Party to produce any Source Code.

19.    **Definitions.**

    A.    "Producing Party" shall mean any Private Party or non-party that makes Source Code available for review.

    B.    "Receiving Party" shall mean any Party or non-party other than the Producing Party that reviews Source Code provided by the Producing party.

    C.    "Source Code" shall mean computer code, scripts, assembly, binaries, object code, source code listings (e.g., file names and path structure), descriptions of source code (e.g., descriptions of declarations, functions, and parameters), object code listings and descriptions of object code, Hardware Description Language (HDL) or Register Transfer Level (RTL) files that describe the hardware design of any ASIC or other chip, and Computer Aided Design (CAD) files that describe the hardware design of any component.

20.    **Source Code Qualified Persons.** Unless otherwise ordered by the Administrative Law Judge or permitted in writing by a Producing Patty, materials designated "HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER" shall not be disclosed to anyone except the following persons ("SOURCE CODE QUALIFIED PERSONS"):

    A.    Outside Counsel of Record who have signed the Agreement to be bound by the Protective Order in this Investigation, and staff assisting such counsel who are necessarily incident to the litigation of this Investigation;

    B.    The Commission, the Administrative Law Judge, the Commission Investigative Staff, Commission personnel and contract personnel who are acting in the capacity of Commission employees as indicated in Paragraphs 3 and 4 of this Protective Order;

C.    Court reporters, stenographers and videographers transcribing or recording testimony at depositions, hearings, or trial in this Investigation, who have signed an acknowledgment to be bound by the Protective Order, as indicated in Paragraph 6 of this Protective Order;

D.    Qualified experts or consultants retained by a Private Party for purposes of this Investigation under Paragraphs 11 and 21 of this Protective Order (hereinafter, "Qualified Experts");

E.    Any third parties who are witnesses during a deposition, court hearing, or trial where specific documentary or testimonial evidence establishes that the Highly Confidential Source Code portion of the Highly Confidential Source Code was authored or received by the witness without any violation of any confidentiality obligation owed to any Party in this Investigation; and

F.    Anyone else to whom the Producing Party consents, as long as such individual signs an acknowledgment to be bound by the Protective Order, and, if applicable, the "Certification of Consultant Regarding Protective Order" attached hereto as Exhibit A, and such consent is expressly provided in writing by Outside Counsel of Record for the Producing Party.

G.    Nothing in this paragraph shall prevent a Producing Party from disclosing its Source Code to the Producing Party's own employees or Qualified Experts.

21.    **Qualified Experts**. A Qualified Expert may only review HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER after:

A.    Being expressly identified to the Producing Party as seeking access to HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER at least five (5) business days prior to said Qualified Expert's first inspection of HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER;

B.    Providing the Producing Party with signed copies of acknowledgments to be bound by the Protective Order, and the "Certification of Consultant Regarding Protective Order" attached hereto as Exhibit A;

C.    Complying with the notice provisions of Paragraphs 11 and 22; and

D.    Disclosing the proposed expert's educational and detailed employment history to the Producing Party, which shall include at least

        i.    an up-to-date curriculum vitae of the Qualified Expert (including the Qualified Expert's business/professional title and business address);

        ii.    any previous or current relationship with any of the Private Parties to this Investigation, including direct relationships and relationships through entities owned or controlled by the

Qualified Expert;

    iii.  a list of other cases in which the Qualified Expert has testified (at trial or deposition) within the last five (5) years;

    iv.  a list of all companies by which the proposed Qualified Expert has consulted or by which the proposed Qualified Expert has been employed within the last five (5) years, the dates of the consultancy or employment, a brief description of the subject matter of the consultancy or employment; and

    v.  an identification of all pending patent applications on which the Qualified Expert is named as an inventor, in which the Qualified Expert has any ownership interest, or as to which the Qualified Expert has had or presently anticipates in the future any involvement in advising on, consulting on, preparing, prosecuting, drafting, editing, amending, or otherwise affecting the scope of the claims.

E.  Further, the Party seeking to disclose protected material shall provide such other information regarding the Qualified Expert's professional activities reasonably requested by the Producing Party for it to evaluate whether good cause exists to object to the disclosure of protected material to the Qualified Expert, including but not limited to an identification of any individual or entity with or for whom the Qualified Expert is employed or provides consulting services relating to the functionality, operation, and design of wearable electronic devices with ECG and PPG functionalities for purposes of detecting atrial fibrillation (generally or as described in any patent in suit).

F.  This paragraph does not require the disclosing party to disclose aspects of any expert's business or profession or companies with which the proposed expert has consulted or by which the proposed expert has been employed to the extent such information is confidential or subject to a non-disclosure agreement; in any such instance, the disclosing party will describe the confidential experience in such a manner so as to enable the other parties to determine that no valid concerns exist regarding the disclosing party's retention of that expert.

22.    **Notice.** In accordance with Paragraph 21 of this Protective Order, and if the Producing Party objects to the disclosure of such HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER to a Qualified Expert as inconsistent with the language or intent of this order or on other grounds, it shall notify the Receiving Party in writing of its objection and the grounds therefore no more than 10 business days after the above-described written submission of the Qualified Expert by the Receiving Party, or no less than 3 business days prior

to the initial disclosure of HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER to the Qualified Expert (whichever of the two periods is shorter as measured from the date that the Receiving Party's identification of the Qualified Expert under Paragraph 21). If the dispute is not resolved on an informal basis within five days of receipt of such notice of objections, the Producing Party shall submit immediately each objection to the Administrative Law Judge for a ruling. If the investigation is before the Commission, the matter shall be submitted to the Commission for resolution. The submission of such HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER to Qualified Expert shall be withheld pending the ruling of the Commission or the Administrative Law Judge. The terms of this paragraph shall be inapplicable to experts within the Commission or to experts from other governmental agencies who are consulted with or used by the Commission.

23.    **Production of HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER.** Source code shall be provided with the following additional protections:

A.    Any Source Code that is produced by Complainant shall be made available for inspection in electronic format at the [[_____]] office of its outside counsel, Quinn Emanuel Urquhart & Sullivan, LLP, or any other location mutually agreed by the Parties. Any Source Code that is produced by Apple Inc. will be made available for inspection at the [[_____]] office of its outside counsel, Fish & Richardson, P.C., or any other location mutually agreed by the Parties.  Source Code will be made available for inspection between the hours of 9 a.m. and 6 p.m. local time on business days (i.e., weekdays that are not Federal holidays), although the Parties will be reasonable in accommodating reasonable requests to conduct inspections at other times. Unless otherwise requested or agreed to by the Parties in advance of any inspection of Source Code, all Source Code produced by the Producing Party shall be made available simultaneously at the same review location, and if possible on the same Source Code Computer.  For the avoidance of doubt, this does not require all Parties' Source Code to be made available at a single, same location or on a single, same Source Code Computer.

B.    Prior to the first inspection of Source Code, the Receiving Party shall

4

provide seven (7) days' notice that the Receiving Party intends to inspect the Source Code. The Receiving Party shall provide no fewer than seventy-two (72) hours' notice prior to any subsequent inspections of Source Code. The foregoing first inspection notice period shall not apply in the event that the Producing Party makes Additional Source Code available during an ongoing inspection by the Receiving Party that was not previously produced when the Receiving Party's inspection began—in which case the Producing Party will use best efforts to make the Additional Source Code available to the Receiving Party during the ongoing review or at the soonest time after the ongoing review that is mutually acceptable to the Parties. Permission for access outside of the aforementioned times will not be unreasonably withheld, in light of, and to accommodate for COVID-19 in-person review limitations.

C.    Source Code that is designated "HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER" shall be produced for inspection and review subject to the following provisions, unless otherwise agreed by the Producing Party:

    i.    All Source Code shall be made available by the Producing Party to the Receiving Party's outside counsel and/or experts in a secure room on a secured computer without Internet access or network access to other computers and on which all access ports have been disabled (except for one printer port), as necessary and appropriate to prevent and protect against any unauthorized copying, transmission, removal or other transfer of any Source Code outside or away from the computer on which the Source Code is provided for inspection (the "Source Code Computer" in the "Source Code Review Room"). The Producing Party shall install tools that are sufficient for viewing and searching the code produced, on the platform produced, if such tools exist and are presently used in the ordinary course of the Producing Party's business. The Receiving Party's outside counsel and/or experts may request that commercially available software tools for viewing and searching Source Code be installed on the secured computer, provided, however, that (a) the Receiving Party possesses an appropriate license to such software tools; (b) the Producing Party approves such software tools (with approval not being unreasonably withheld); and (c) such other software tools are reasonably necessary for the Receiving Party to perform its review of the Source Code consistent with all of the protections herein. Such commercially available software tools shall not be capable of compiling, assembling, or building the source code and must otherwise be consistent with the security purposes of this Protective Order and, for example, shall not re-activate the secure computer's ports, reactivate any of its wireless devices or capabilities, re-activate electronic or physical copying, or otherwise defeat the security provisions. The Receiving Party must provide the Producing Party with the CD or DVD containing such licensed software tool(s) at least five (5) business days in advance of

the date upon which the Receiving Party wishes to have the additional software tools available for use on the Source Code Computer.

ii. No recordable media or recordable devices, including without limitation sound recorders, computers, cellular telephones, peripheral equipment, cameras, CDs, DVDs, or drives of any kind, shall be permitted into the Source Code Review Room.

iii. The Receiving Party's outside counsel and/or experts shall be entitled to take notes relating to the Source Code but may not copy or include any portions or sections of the Source Code into the notes and may not take such notes electronically on the Source Code Computer itself or any other computer.

iv. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any Source Code review, but only to ensure that no unauthorized electronic records of the Source Code and no information concerning the Source Code are being created or transmitted in any way.

v. No copies of all or any portion of the Source Code may leave the room in which the Source Code is inspected except as otherwise provided herein. Further, no other written or electronic record of the Source Code is permitted except as otherwise provided herein.

      a. The Producing Party shall make available a laser printer with commercially reasonable printing speeds for on-site printing during inspection of the Source Code. The Receiving Party may print limited portions of the Source Code that the Receiving Party believes in good faith are necessary to understand a relevant feature of an accused product.

      b. Any printed portion that consists of more than fifteen (15) pages of a continuous block of Source Code shall be presumed to be excessive, absent the agreement of the Producing Party or an order from the Administrative Law Judge. The burden shall be on the Receiving Party to demonstrate the need for such a printed copy of continuous block of Source Code in excess of the fifteen (15) page limit. The Receiving Party may print out no more than one-hundred and fifty (150) pages total for any Source Code software release (*i.e.*, version). With respect to both the ten-page limit of continuous block of Source Code and the one-hundred-fifty-page limit of total Source Code referenced in this subsection, the Parties agree to meet and confer in good faith to resolve any dispute should it become evident once review of Source Code starts that these limits are too low. The burden to demonstrate they are too low shall remain with the Receiving Party. One page of printed Source Code shall mean one column of Source Code printed in size 12 font on one single-sided sheet of paper, measuring 8 and 1/2

inches by 11 inches. The Receiving Party shall not print Source Code in order to review blocks of Source Code elsewhere in the first instance, i.e., as an alternative to reviewing that Source Code electronically on the Source Code Computer, as the Parties acknowledge and agree that the purpose of the protections herein would be frustrated by printing portions of code for review and analysis elsewhere, and that printing is permitted only when necessary to prepare court filings or pleadings or other papers (including a testifying expert's expert report). Upon printing any such portions of Source Code, the printed pages shall be collected by the Producing Party. The Producing Party shall Bates number, copy, and label "HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER" any pages printed by the Receiving Party. Within three (3) business days, the Producing Party shall either (i) provide one (1) hard copy set of such pages to the Receiving Party or (ii) inform the Receiving Party that it objects because the printed portions are excessive and/or not done for a permitted purpose. The Producing Party and Receiving Party agree to meet and confer within two (2) business days of service of the Producing Party's objection to attempt to resolve such objection. If the Supplier and Receiving Party cannot resolve such objection during this meet and confer, the Receiving Party may file a motion to compel the production of the requested Source Code. The burden shall be on the Receiving Party to demonstrate that such printed portions are no more than is reasonably necessary for a permitted purpose and not merely printed for the purposes of review and analysis elsewhere. The printed pages shall constitute part of the Source Code produced by the Producing Party in this action.

c. During the review of Source Code, if the Receiving Party believes in good faith that contemporaneous access to print-outs of particular pages of the Source Code is necessary to further the Source Code review, the Receiving Party may request and the Producing Party shall promptly provide one (1) hard copy print out of such pages. All printed copies of such Source Code shall be returned to the supplying party after such contemporaneous access by the Receiving Party, and at a minimum at the end of each day of source code review. The Receiving Party shall limit its requests for contemporaneous access to printouts to those pages actually necessary to conduct the Source Code review. Further, the limits of Section 23(C)(v)(b) of this addendum shall apply to this provision also for purposes of printing on any given day. For the avoidance of doubt, printing under this Section 23(C)(v)(c) shall not apply to the production limit of one-hundred-fifty (150) pages total for printed source code under

Section 23(C)(v)(b).

vi.  All persons who will review a Producing Party's Source Code on behalf of a Receiving Party, including members of a Receiving Party's outside law firm and Qualified Experts, shall be identified in writing to the Producing Party at least five (5) days in advance of the first time that such person reviews such Source Code. Such identification shall be in addition to any other disclosure required under this Order. All persons viewing Source Code shall sign on each day they view Source Code a log that will include the names of persons who enter the locked room to view the Source Code and when they enter and depart. The Producing Party shall be entitled to a copy of the log upon one (1) business day's advance notice to the Receiving Party.

vii.  Unless otherwise agreed in advance by the Parties in writing, following each day on which inspection is done under this Order, the Receiving Party's outside counsel and/or experts shall remove all notes, documents, and all other materials from the Source Code Review Room. The Producing Party shall not be responsible for any items left in the room following each inspection session, and the Receiving Party shall have no expectation of confidentiality for any items left in the room following each inspection session without a prior agreement to that effect. Proper identification of all authorized persons shall be provided prior to any access to the secure room or the computer containing Source Code. Proper identification requires showing, at a minimum, a photo identification card sanctioned by the government of any State of the United States, by the government of the United States, or by the nation state of the authorized person's current citizenship. Access to the secure room or the Source Code Computer may be denied, at the discretion of the supplier, to any individual who fails to provide proper identification.

viii.  Other than as provided above, the Receiving Party will not copy, remove, or otherwise transfer any Source Code from the Source Code Computer including, without limitation, copying, removing, or transferring the Source Code onto any recordable media or recordable device. The Receiving Party will not transmit any Source Code in any way from the Producing Party's facilities or the offices of its outside counsel of record.

ix.  The Receiving Party's outside counsel of record may make no more than three (3) additional paper copies of any portions of the Source Code received from a Producing Party pursuant to Paragraph 23(C)(v), not including copies attached to court filings, used at depositions, or provided to the Commission Investigative Staff, and shall maintain a log of all paper copies of the Source Code. The log shall include the names of the reviewers and/or recipients of paper copies and locations where the paper copies are stored. Upon one (1) business day's advance notice to the Receiving Party by the Producing Party, the

Receiving Party shall provide a copy of this log to the Producing Party.

x.    An additional one (1) copy of printed Source Code received from a Producing Party pursuant to Paragraph 23(C)(v) shall be provided by the Producing Party to the Commission Investigative Staff upon request.

xi.    The Receiving Party's outside counsel of record and any person receiving a copy of any Source Code shall maintain and store any paper copies of the Source Code at their offices in a manner that prevents duplication of or unauthorized access to the Source Code, including, without limitation, storing the Source Code in a locked room or cabinet at all times when it is not in use. The Receiving Party shall limit access to any printed portions of the source code to "Source Code Qualified Persons" and defined above by paragraph 20 of this source code protective order.

xii.    Except as provided in this sub-paragraph, absent express written permission from the Producing Party, the Receiving Party may not create electronic images, or any other images, or make electronic copies, of the Source Code from any paper copy of Source Code for use in any manner (including by way of example only, the Receiving Party may not scan the Source Code to a PDF or photograph the code). Images or copies of Source Code shall not be included in correspondence between the Parties (references to production numbers shall be used instead), and shall be omitted from pleadings and other papers whenever possible.  If a Party reasonably believes that it needs to submit a portion of Source Code as part of a filing with the Court, the Parties shall meet and confer as to how to make such a filing while protecting the confidentiality of the Source Code and such Source Code will not be filed absent agreement from the Producing Party that the confidentiality protections will be adequate. If a Producing Party agrees to produce an electronic copy of all or any portion of its Source Code or provide written permission to the Receiving Party that an electronic or any other copy needs to be made for a Court filing, access to the Receiving Party's submission, communication, and/or disclosure of electronic files or other materials containing any portion of Source Code (paper or electronic) shall at all times be limited solely to individuals who are expressly authorized to view Source Code under the provisions of this Order. Where the Producing Party has provided the express written permission required under this provision for a Receiving Party to create electronic copies of Source Code, the Receiving Party shall maintain a log of all such electronic copies of any portion of Source Code in its possession or in the possession of its retained consultants, including the names of the reviewers and/or recipients of any such electronic copies, and the locations and manner in which the electronic copies are stored.  Additionally, any such

9

electronic copies must be labeled "HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER" as provided for in this Order.

24.    Use of HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO

PROTECTIVE ORDER.

A.    Where absolutely necessary in connection with a filing or expert report, or where required by the Administrative Law Judge, a Receiving Party may make only as many copies, and only of the specific pages, as needed for submission of original Source Code printouts to be included in confidential pleadings, infringement contentions, expert reports, and/or witness statements, where such pleadings, infringement contentions, expert reports, and/or witness statements are designated HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER. If a Producing Party's Source Code is quoted or set forth in a confidential pleading, infringement contentions, expert report, and/or witness statement, the Receiving Party will limit the amount of such Source Code to what is reasonably necessary for the Receiving Party to make its point.

B.    For depositions, a Receiving Party may, on reasonable notice, request that Producing Party provide at the deposition an electronic copy of Producing Party Source Code that it made available for inspection. The computer upon which the Source Code is made available at the deposition shall include appropriate software analysis tools as discussed in Paragraph 23.

C.    A Party that wishes to use any printed copies of Producing Party's Source Code at a deposition or at a hearing may not make copies of the material for this purpose without Producing Party's prior written consent. Absent such consent, the Party must provide Producing Party with five (5) business days' advance notice of its need for printed copies and identify the required pages by production number. Producing Party will then either authorize the Party to prepare copies for use in the deposition or hearing or agree to supply copies itself on the day of the deposition or hearing. At the conclusion of the deposition or hearing, the copies will be returned to Producing Party or destroyed. Copies will not be attached to any deposition transcripts. Any copies prepared for use at a hearing that are not admitted into evidence shall be destroyed or returned to Producing Party. The entire transcript of any deposition at which Producing Party's Source Code is disclosed will be treated as designated HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER for thirty (30) days. During that period, Producing Party may designate any portion of the deposition transcript as HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER by giving written notice to the reporter and all parties.  The court reporter shall separately bind and label transcript pages that Producing Party designates as HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER. Any portions that the Party does not designate during that 30-day period will then be treated as CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER.

D.    A Receiving Party's Outside Counsel of Record will maintain the delivered copy sets of the Source Code in a locked location at the office(s) of Outside Counsel of Record to which they were delivered and where they will not be accessible to persons other than SOURCE CODE QUALIFIED PERSONS. No copy set will be removed from the location to which it was delivered without prior approval from Producing Party. In addition to other reasonable steps to maintain the security and confidentiality of Producing Party's Source Code, printed copies of the Source Code maintained by the Receiving Party must be kept in a locked storage container when not being actively reviewed.

E.    The Receiving Party's Counsel of Record shall keep a log that records the identity of each SOURCE CODE QUALIFIED PERSON to whom each hard copy of the Source Code is provided and when it was provided to that person. Within thirty (30) days after the issuance of a final, non-appealable decision resolving all issues in the Investigation, upon request, the Receiving Party must serve upon Producing Party the log. In addition, any Outside Consultants of the Receiving Party with whom the paper copies of the Source Code were shared must certify in writing that all copies of the Source Code that was shared with them at the offices of Outside Counsel were retained by the counsel, who provided them the information, and that the Outside Consultants will make no use of the Source Code or of any knowledge gained from the Source Code in any future endeavor.

F.    The Commission Investigative Staff shall have the right to review material produced in this Investigation in the same manner that such material is made available to any private party.

G.    **Secure Storage, No Export**. Source Code must be stored and maintained at a location in the United States and in a secure manner that ensures that access is limited to the persons authorized under this Order. To ensure compliance with applicable United States Export Administration Regulations, source code may not be exported outside the United States or released to any foreign national (even if within the United States).

H.    Within sixty (60) calendar days after the determination in this Investigation becomes final (as is understood in 28 U.S.C. § 1659(a)), the Receiving Party must serve upon the Producing Party a certification of the destruction of all copies of the Producing Party's Source Code. Any copies of Source Code shall be destroyed using a secure shredder that will prevent access to the materials by non-SOURCE CODE QUALIFIED PERSONS. The shredded materials shall be disposed of in a manner that will preserve the confidentiality of the contents consistent with this Protective Order. The destruction of Producing Party's Source Code shall be conducted by SOURCE CODE QUALIFIED PERSONS only.

I.    Access to and review of Source Code shall be strictly for the purpose of investigating the claims and defenses at issue in the above-styled case. No person shall review or analyze any Source Code for purposes unrelated to this case, nor may any person use any knowledge gained as a result of reviewing Source Code

in this Investigation in any other pending or future dispute, proceeding, or litigation.

25.    **No prejudice.** The Private Parties agree that seeking entry and entry of this Protective Order Addendum are without prejudice to any party's rights to seek relief from these provisions relating to Source Code production, or to propose, request, or otherwise move for different provisions relating to Source Code production, in this or any other litigation.

26.    This Protective Order Addendum shall not diminish any existing restriction with respect to CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER, as defined in paragraph 2 of the Protective Order. The Private Parties acknowledge and agree that this Protective Order Addendum is a supplement to the Protective Order entered in this action on May 26, 2021. The Protective Order applies to all material designated pursuant to this Protective Order Addendum. To the extent that there is any confusion or conflict between protective orders with respect to designated Producing Party material, this Protective Order Addendum will govern.

27.    **Prosecution and Development Bar**. Absent the written consent of the Producing Party, any person qualified under Paragraph 20(A) or 20(D) of this Protective Order who receives one or more items designated HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER shall not be involved, directly or indirectly, in any of the following activities: (i) advising on, consulting on, preparing, prosecuting, drafting, editing, and/or amending of patent applications, specifications, claims, and/or responses to office actions, or otherwise affecting the scope of claims in patents or patent applications relating to the functionality, operation, and design of wearable electronic device technology with ECG and PPG functionalities for the purpose of predicting atrial fibrillation (generally or as described in any patent in suit), before any foreign or domestic agency, including the United States Patent and Trademark Office;

and (ii) the acquisition of patents (including patent applications), or the rights to any such patents or patent applications with the right to sublicense, relating to the functionality, operation, and design of wearable electronic device technology with ECG and PPG functionalities for the purpose of predicting atrial fibrillation. Nothing in this paragraph limits any individual from participating in any post-grant proceeding, including any *inter partes* review or post-grant review. These prohibitions shall begin when access to HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER materials are first received by the affected individual, and shall end one (1) year after the final resolution of this action, including all appeals, or two (2) years after the time the individual formally withdraws from the Protective Order in this Investigation, whichever of these two periods is shorter.

28.    **Competitive Decision-Making Bar**.  Absent written consent from the Designating Party, any person qualified under Paragraph 20(D) of this Protective Order who receives access to material designated HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER shall not be involved in competitive decision-making for a Party, relating to the subject matter of the protected material accessed by the individual. This bar shall begin upon the individual's first receipt of material designated HIGHLY CONFIDENTIAL SOURCE CODE SUBJECT TO PROTECTIVE ORDER, and shall end one (1) year after the affected individual formally withdraws from the Protective Order in this Investigation.

_____

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

**Before the Honorable Cameron R. Elliot**
**Administrative Law Judge**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN WEARABLE ELECTRONIC DEVICES WITH EGG FUNCTIONALITY AND COMPONENTS THEREOF** | **Inv. No. 337-TA-1266** |

**EXHIBIT A**

**CERTIFICATION OF CONSULTANT REGARDING PROTECTIVE ORDER**

I,_____[print or type full name], of _____ acknowledge and declare that I have received a copy of the Protective Order (Order No. 1), and any supplements thereto ("Order") governing this Investigation, *In the Matter of Certain Wearable Electronic Devices with ECG Functionality and Components Thereof*, Inv. No. 337- TA-1266, and understand and will abide by its terms. I agree to be subject to the authority of the Administrative Law Judge or the Commission in the event of any dispute related to this certification. I state under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Name of individual: _____

Present occupation/job description: _____

_____

_____

2

Name of Company or Firm: _____

Address:_____

Dated: _____

_____

[Signature]

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

In the Matter of

**CERTAIN WEARABLE ELECTRONIC**
**DEVICES WITH ECG FUNCTIONALITY**
**AND COMPONENTS THEREOF**

**Investigation No. 337-TA-1266**

**COMMISSION OPINION**

**Table of Contents**

I. Introduction ........................................................................................................ 3

II. Background ......................................................................................................... 4

    A. Procedural History ...................................................................................... 4

    B. Overview of the Technology ....................................................................... 8

    C. The Accused Products ................................................................................. 9

    D. Domestic Industry Products ...................................................................... 10

III. Commission Review of the ID ......................................................................... 10

IV. Analysis ........................................................................................................... 11

    A. Economic Prong of the Domestic Industry Requirement ......................... 11

        1. Legal Standard ................................................................................... 11

        2. Economic Prong of the Domestic Industry Requirement Under
            Subsection (C) .................................................................................... 15

        3. Economic Prong of the Domestic Industry Requirement Under
            Subsection (B) .................................................................................... 23

    B. The ID's Patent Eligibility Findings Under 35 U.S.C § 101 ..................... 27

        1. Legal Standard ................................................................................... 27

        2. Whether the ID Erred in Finding Claim 12 of the '941 Patent Patentable
            Under Alice ......................................................................................... 28

        3. Whether Claims 16 and 17 of the '499 Patent Are Patentable Under Alice ... 35

    C. The ID's Findings with Respect to Obviousness Under 35 U.S.C § 103 ........... 40

        1. Legal Standard ................................................................................... 40

        2. Analysis .............................................................................................. 42

V. REMEDY ........................................................................................................ 47

    A. Limited Exclusion Order ........................................................................... 48

Appx1

B.    Cease and Desist Order ................................................ 51

C.    The Public Interest ...................................................... 52

    1.    Apple Submission .................................................. 54

    2.    AliveCor Submission ............................................. 63

    3.    OUII Submission .................................................. 67

    4.    Analysis .............................................................. 70

D.    Bond ......................................................................... 82

E.    Suspension of Remedial Orders .................................... 85

VI. CONCLUSION ................................................................... 87

2

## I.    INTRODUCTION

On September 22, 2022, the Commission determined to review in part the final initial determination ("ID") issued by the presiding administrative law judge ("ALJ") on June 27, 2022. 87 Fed. Reg. 58819-21 (Sept. 28, 2022).  On review, the Commission has determined to affirm, with modifications, the ID's finding that there has been a violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337.  Having found a violation of section 337, the Commission has determined to issue a limited exclusion order and a cease and desist order as set forth below.  The Commission finds that the public interest does not preclude the issuance of remedial orders.  The Commission has determined that a bond in the amount of $2 per imported article is required for infringing products imported during the period of Presidential review.[1] The Commission, however, has determined to suspend enforcement of the orders, including the bond provision, pending final resolution of the U.S. Patent and Trademark Office, Patent Trial and Appeal Board's ("PTAB") Final Written Decisions finding all asserted patent claims unpatentable. *See Apple, Inc. v. AliveCor, Inc.*, IPR2021-00970, Patent 9,572,499, Final Written Decision Determining All Challenged Claims Unpatentable (Dec. 6, 2022); *Apple, Inc. v. AliveCor, Inc.*, IPR2021-00971, Patent 10,595,731, Final Written Decision Determining All Challenged Claims Unpatentable (Dec. 6, 2022); *Apple, Inc. v. AliveCor, Inc.*, IPR2021-00972, Patent 10,638,941, Final Written Decision Determining All Challenged Claims Unpatentable (Dec. 6, 2022) (collectively, "Final Written Decisions" or "FWDs").

This opinion sets forth the Commission's reasoning in support of that determination.  The Commission adopts the remainder of the ID that is not inconsistent with this opinion.

---

[1] Commissioners Schmidtlein and Stayin disagree with the Commission's determination regarding the amount of the bond required for infringing products imported during the period of Presidential review as provided in section (V)(D) of the Commission's Opinion concerning bond. *See infra* note 41.

3

## II.    BACKGROUND

### A.    Procedural History

On May 26, 2021, the Commission instituted this investigation based on a complaint filed by AliveCor, Inc. of Mountain View, California ("AliveCor" or "ALC"). 86 Fed. Reg. 28382 (May 26, 2021). The complaint, as supplemented, alleged violations of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain wearable electronic devices with ECG[2] functionality and components thereof by reason of infringement of one or more of claims 1-30 of U.S. Patent No. 10,595,731 ("the '731 patent"); claims 1-23 of U.S. Patent No. 10,638,941 ("the '941 patent"); and claims 1-4, 6-14, 16-20 of U.S. Patent No. 9,572,499 ("the '499 patent"). *Id.* The Commission's notice of investigation named Apple Inc. of Cupertino, California ("Apple") as the sole respondent. The Office of Unfair Import Investigations ("OUII") is named as a party in this investigation. *Id.*

On February 23, 2022, the ALJ issued an initial determination granting AliveCor's motion to terminate the investigation as to (1) claims 1-4, 6-14, and 18-20 of the '499 patent; (2) claims 2, 4, 6, 7, 11, 13, 14, and 17-30 of the '731 patent; and (3) claims 1-11, 14, 15, 17, and 18 of the '941 patent based upon withdrawal of allegations from the complaint as to those claims. Order No. 16 (Feb. 23, 2022), *unreviewed by* Notice (Mar. 18, 2022).

The ALJ held an evidentiary hearing from March 28-April 1, 2022, and received post-hearing briefs thereafter.

---

[2] ECG stands for electrocardiogram.

4

On June 27, 2022, the ALJ issued the final initial determination ("ID"), finding a violation of section 337 as to the '941 and '731 patents, and no violation as to the '499 patent.[3] The ID found that the parties do not contest personal jurisdiction, and that the Commission has *in rem* jurisdiction over the accused products. ID at 18. The ID further found that the importation requirement under 19 U.S.C. § 1337(a)(1)(B) is satisfied. *Id.* (citing CX-0904C (Apple stipulating that it imports the accused products into the United States)). Regarding the '941 patent, the ID found that AliveCor has proven infringement of the asserted claims, claims 12, 13, 19, and 20-23, and that Apple failed to show that any of the asserted claims are invalid. *Id.* at 30-45, 60-98, 187-88. For the '731 patent, the ID found that AliveCor has proven infringement of the asserted claims, claims 1, 3, 5, 8-10, 12, 15, and 16, but that Apple has proven that claims 1, 8, 12, and 16 are invalid for obviousness. *Id.* at 105-108, 113-127, 188. For the '499 patent, the ID found that AliveCor failed to prove infringement of the asserted claims, claims 16 and 17, and that claim 17 is invalid for lack of patentable subject matter under 35 U.S.C. § 101. *Id.* at 129-138, 140-152, 188. Finally, the ID found that AliveCor has proven the existence of a domestic industry that practices the asserted patents as required by 19 U.S.C. § 1337(a)(2). *Id.* at 152-180, 188. The ID included the ALJ's recommended determination on remedy and bonding ("RD"). The RD recommended that, should the Commission find a violation, issuance of a limited exclusion order and a cease and desist order would be appropriate. ID/RD at 190-193. The RD also recommended imposing no bond for covered products imported during the period of Presidential review. *Id.* at 194-95.

On July 11, 2022, Apple filed a petition for review of the final ID and AliveCor filed a

---

[3] The ALJ issued a corrected final ID on July 26, 2022, correcting the table of contents.

5

combined petition and contingent petition for review.[4]  On July 19, 2022, the private parties and

OUII's investigative attorney filed responses to the petitions.[5]

On September 22, 2022, the Commission determined to review the final ID in part.  87

Fed. Reg. 58819-21 (Sept. 28, 2022).  Specifically, the Commission determined to review the

final ID's invalidity findings, including patent eligibility under 35 U.S.C. § 101 and obviousness

under 35 U.S.C. § 103, and the economic prong of the domestic industry requirement for all

three patents.  *Id.*  The Commission requested briefing on certain issues under review and on

remedy, the public interest, and bonding.  *Id.*

On October 6, 2022, the parties filed initial submissions in response to the Commission's

request for briefing.[6]  On October 14, 2022,[7] the parties filed reply submissions.[8]  On October

---

[4] *See* Respondent Apple Inc's Petition for Review of the Initial Determination on Violation of Section 337 ("Apple Pet."); Complainant AliveCor, Inc.'s Combined Petition for Review and Contingent Petition for Review of the Initial Determination ("AliveCor Pet.").

[5] *See* Respondent Apple Inc.'s Response to the Complainant's Petition for Review of the Initial Determination ("Apple Rep."); Complainant AliveCor Inc.'s Response to Respondent Apple Inc.'s Petition for Review of the Initial Determination on Violation of Section 337 ("AliveCor Rep."); Combined Response of the Office of Unfair Import Investigations Response to the Private Parties' Petitions for Review of the Final Initial Determination on Violation ("OUII Rep.").

[6] *See* Respondent Apple Inc.'s Opening Brief in Response to the Commission's Request for Written Submissions on the Issues Under Review and on Remedy, the Public Interest, and Bonding ("Apple Sub."); Complainant AliveCor, Inc.'s Submission in Response to the Commission's September 22, 2022 Notice of a Commission Determination to Review in Part ("AliveCor Sub."); Brief of the Office of Unfair Import Investigations on the Issues Under Review and on Remedy, the Public Interest, and Bonding ("OUII Sub.").

[7] On October 12, 2022, the Chair granted the parties' request to extend the due date for their reply briefs by one day.  *See* Commission Letter Granting Request for Extension of Time to File Replies to the Commission's Request for Written Submissions; *Certain Wearable Electronic Devices with ECG Functionality and Components Thereof*, Inv. 337-TA-1266 (Oct. 12, 2022).

[8] *See* Respondent Apple Inc.'s Reply Brief to AliveCor and OUII's Response to the Commission's Request for Written Submissions on the Issues Under Review and on Remedy, the

21, 2022, Apple moved for leave to file a sur-reply to AliveCor's reply submission.[9]  On October

24, 2022, AliveCor filed an opposition.[10]  OUII filed a response in opposition on November 2,

2022.[11]  The Commission has determined to reject Apple's motion for leave to file a sur-reply to

AliveCor's reply submission.  The Commission finds that Apple has not shown AliveCor's reply

submission contains errors that warrant a sur-reply.

On December 7, 2022, Apple filed an emergency motion, asking "the Commission to

suspend any remedial orders or, in the alternative, extend the December 12, 2022 Target Date of

its Final Determination and stay all proceedings prior to issuance of any Final Determination

pending final resolution of any appeal of the PTAB's decisions."[12]  Apple Emergency Motion at

---

Public Interest, and Bonding ("Apple R.Sub."); Complainant AliveCor, Inc.'s Reply Submission in Response to the Commission's September 22, 2022 Notice of a Commission Determination to Review in Part ("AliveCor R.Sub."); Reply Brief of the Office of Unfair Import Investigations on the Issues Under Review and on Remedy, the Public Interest, and Bonding ("OUII R.Sub.").

[9] *See* Respondent Apple Inc.'s Motion for Leave to File Sur-Reply Brief to AliveCor's Reply to the Commission's Request for Written Submissions on the Issues Under Review and on Remedy, the Public Interest, and Bonding.

[10] *See* AliveCor's Opposition to Apple's Motion for Leave to File Sur-Reply to AliveCor's Reply to the Commission's Request for Written Submissions on the Issues Under Review and on Remedy, the Public Interest, and Bonding.

[11] *See* Response of the Unfair Import Investigations to Respondent Apple Inc.'s Motion for Leave to file Sur-Reply Brief to AliveCor's Reply to the Commission's Request for Written Submissions on the Issues Under Review and on Remedy, the Public Interest, and Bonding.

[12] *See* Respondent Apple Inc.'s Emergency Motion to Suspend any Remedy or Extend the Target Date and Stay Proceedings Pending Resolution of any Appeal of the Patent Office's Decision that United States Patent Nos. 10,638,941, 10,595,731, and 9,572,499 Are Unpatentable ("Apple Emergency Motion").

7

1.  On December 9, 2022, AliveCor filed an opposition to Apple's motion.[13]  On December 16,

2022, OUII filed a response to the motion.[14]

### B.     Overview of the Technology

The technology at issue generally relates to systems, devices, and methods for monitoring

cardiac health and managing cardiac disease.  ID at 3.

The '941 patent entitled, "Discordance Monitoring," issued on May 5, 2020.  '941 patent

(JX-0003).  The patent describes systems, devices, and methods that can be used to

"conveniently sense the presence of an intermittent arrhythmia in an individual."  '941 patent,

Abstract.  The systems, devices, and methods can also "be configured to sense an

electrocardiogram."  *Id.*

The '731 patent entitled, "Methods and Systems for Arrhythmia Tracking and Scoring,"

issued on March 24, 2020.  '731 patent (JX-0002).  The patent describes "a dashboard centered

around arrhythmia or atrial fibrillation."  '731 patent, Abstract.  "The dashboard includes a heart

or cardiac health score that can be calculated in response to data from the user such as their ECG

and other personal information and cardiac health influencing factors."  *Id.*  "The dashboard also

provides to the user recommendations or goals, such as daily goals, for the user to meet and

thereby improve their heart or cardiac health score."  *Id.*

The '449 patent, also entitled, "Methods and Systems for Arrhythmia Tracking and

Scoring," issued on February 21, 2017.  '449 patent (JX-0001).  The patent also describes "a

---

[13] *See* AliveCor's Opposition to Apple's Emergency Motion to Suspend any Remedy or Extend the Target Date and Stay Proceedings ("AliveCor Opposition").

[14] *See* Response of the Office of Unfair Import Investigations to Respondent Apple Inc.'s Emergency Motion to Suspend any Remedy or Extend the Target Date and Stay Proceedings Pending Resolution of any Appeal of the Patent Office's Decision that United State Patent Nos. 10,638,941, and 9,572,499 Are Unpatentable ("OUII Reply to Emergency Motion").

dashboard centered around arrhythmia or atrial fibrillation." '449 patent, Abstract. "The dashboard includes a heart or cardiac health score that can be calculated in response to data from the user such as their ECG and other personal information and cardiac health influencing factors." *Id.*

### C.    The Accused Products

The accused products consist of four generations of Apple smartwatches:

| Apple Model(s) | Category |
|---|---|
| A1975, A1976, A1977, A1978 | Series 4 |
| A2092, A2093, A2094, A2095 | Series 5 |
| A2291, A2292, A2293, A2294 | Series 6 |
| A2473, A2474, A2475, A2477 | Series 7 |

ID at 6.  The parties explained that the "Apple Watch Series 6 is sufficiently representative from a hardware standpoint of all other Accused Products" and they describe the "salient features of the Accused Products via the Series 6 as 'a motion/activity sensor known as an accelerometer, a photoplethysmography ('PPG')[15] sensor, an electrocardiogram ('ECG') sensor, a display screen, a processor, and memory.'"  ID at 6 (citing Hr'g Tr. (Jafari) at 303:19-24; JX-0221C (Waydo) at 207:10-14, 208:14-209:11; CX-0107).  The ID further found that the "software running on these devices is also important, taking the form of Apple's operating system, WatchOS" and that "[a]s with hardware, the parties have agreed that version 7.6.2 of WatchOS is representative of all other versions that contain the diagnostic tools implicated by the Asserted Claims."  *Id.*

---

[15] PPG is used to sense the amount of oxygen in the blood.

## D.   Domestic Industry Products

The domestic industry products include "wearable electronic devices, being developed, manufactured, and/or sold by AliveCor under the tradenames KardiaBand System, [[

]]." ID at 4.  "Each product includes, 'among other things, a smartwatch, activity sensor, PPG sensor, and ECG sensor.'" *Id.* at 4-5. "The KardiaBand System ('KBS') comprises the KardiaBand watch band, and an Apple Watch (Series 1, 2, 3) with Watch OS 5.0 or earlier running a program called KardiaApp." *Id.* at 5 (citing Hr'g Tr. (Jafari) at 385:16-386:15).  Complainant relies on its KBS product for its domestic industry that exists and relies on its [[            ]] products for its domestic industry in the process of being established.

## III.   COMMISSION REVIEW OF THE ID

When the Commission reviews an initial determination, in whole or in part, it reviews the determination *de novo*. *Certain Soft-Edged Trampolines and Components Thereof*, Inv. No. 337-TA-908, Comm'n Op. at 4 (May 1, 2015).  Upon review, the "Commission has 'all the powers which it would have in making the initial determination,' except where the issues are limited on notice or by rule." *Certain Flash Memory Circuits & Prods. Containing Same*, Inv. No. 337-TA-382, USITC Pub. No. 3046, Comm'n Op. at 9-10 (July 1997) (quoting *Certain Acid-Washed Denim Garments & Accessories*, Inv. No. 337-TA-324, Comm'n Op. at 5 (Nov. 1992)).  With respect to the issues under review, "the Commission may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, the initial determination of the administrative law judge." 19 C.F.R. § 210.45(c).  The Commission also "may take no position on specific issues or portions of the initial determination," and "may make any finding or conclusions that in its judgment are proper based on the record in the proceeding." *Id.*; *see also Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984).

10

**IV.    ANALYSIS**

**A.    Economic Prong of the Domestic Industry Requirement**

The Commission determined to review the economic prong of the domestic industry requirement for all three patents and asked the parties for briefing.  87 Fed. Reg. 58819-20 (Sept. 28, 2022).

On review, the Commission has determined to affirm the ID's findings that AliveCor failed to establish the economic prong of the domestic industry requirement as to a domestic industry in the process of being established, and an existing industry under subsections (A) and (B), but proved the existence of a domestic industry under subsection (C).  With respect to the industry in the process of being established and an existing industry under subsection (A), the Commission affirms the ID for the reasons stated therein.  Regarding subsections (B) and (C), the Commission affirms the ID as modified below.

***1.    Legal Standard***

In patent-based proceedings under section 337, a complainant must establish that a domestic industry "relating to the articles protected by the patent . . . exists or is in the process of being established."  19 U.S.C. § 1337(a)(2).  Under Commission precedent, this domestic industry requirement consists of an "economic prong" and a "technical prong."  *See Alloc, Inc. v. Intl Trade Comm'n,* 342 F.3d 1361, 1375 (Fed. Cir. 2003).  To satisfy the "technical prong," the complainant must establish that it practices at least one claim of each of the asserted patents.  *Certain Point of Sale Terminals and Components Thereof,* Inv. No. 337-TA-524, Order No. 40 at 17-18 (Apr. 11, 2005).  To satisfy the "economic prong," paragraph (3) of section 337(a) provides:

> For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned –

11

(A) significant investment in plant and equipment;

(B) significant employment of labor or capital; or

(C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3). Expenditures in each of the above three categories under section 337(a)(3) must "pertain to the complainant's industry with respect to the articles protected by the asserted IP rights." *See, e.g.*, *Certain Television Sets, Television Receivers, Television Tuners, and Components Thereof*, Inv. No. 337-TA-910, Comm'n Op. at 68 (Oct. 30, 2015); *Certain Marine Sonar Imaging Devices, Including Downscan and Sidescan Devices, Prods. Containing the Same, and Components Thereof*, Inv. No. 337-TA-921, Comm'n Op. at 40 (Jan. 6, 2016).

Under subsection (C), a domestic industry will be found to exist if, "with respect to the articles protected by the patent," a complainant can show "substantial investment in *its exploitation*, including engineering, research and development, or licensing." 19 U.S.C. § 1337(a)(3)(C) (emphasis added). For this provision, the Federal Circuit has interpreted "its" to mean the patent (or other enumerated IP right in subsections 337(a)(1)(B)-(E)), so there must be a nexus between the domestic investments and the exploitation of the asserted patents, beyond showing that those investments relate to the protected domestic industry ("DI") articles. *InterDigital Communications, LLC v. Int'l Trade Comm'n*, 707 F.3d 1295, 1297-1301 (Fed. Cir. 2013).[16] To establish the nexus, the complainant must show the connection between its

---

[16] The ID states that "[u]nlike subsections (A) and (B), where a connection is made between an alleged investment and a patent-practicing product, a subsection (C) analysis requires a connection between the R&D investment and the asserted patents (*i.e.*, nexus)." ID at 170 (citation omitted). We clarify that while subsection (C) requires a nexus between the claimed investments and the asserted patents, the requirement that investments be "with respect to articles protected by the patent" applies with respect to subsections (A), (B), and (C). *See* 19 U.S.C. § 1337(a)(3); *see also InterDigital,* 707 F.3d at 1298 ("Thus, just as the 'plant or equipment'

12

investments and the patented aspect(s) of the invention that it is exploiting. *See Certain Integrated Circuit Chips and Products Containing the Same*, Inv. No. 337-TA-859, Comm'n Op. at 49-50 (Aug. 2014) ("As a matter of statutory construction, an investment in the article is not automatically an investment in the asserted patent."). It is not enough for a complainant to assert that it generally conducts research and development, or that its R&D relates to non-patented features incorporated into articles that also practice the patent at issue. *Id.*

Depending on the particular facts of a case, a complainant's domestic industry with respect to articles protected by the asserted IP rights may extend beyond the protected article, to include those additional parts or components that are necessary to use or exploit the patented invention. *See Motorola Mobility, LLC v. Int'l Trade Comm'n*, 737 F.3d 1345, 1351 (Fed. Cir. 2013) (explaining that "nothing in § 337 precludes a complainant from relying on investments or employment directed to significant components, specifically tailored for use in an article protected by the patent"). However, there may be investments that are too far removed from the articles protected by the asserted intellectual property rights to be considered part of the complainant's domestic industry. *See Certain Video Game Systems and Wireless Controllers and Components Thereof*, Inv. No. 337-TA-770, Comm'n Op. at 66 (Oct. 28, 2013) ("[W]e agree with the ALJ that the language of the patent is directed to the toy wand and not the toy wand plus the entire MagiQuest attraction."). Nevertheless, for subsection (C), the focus remains on whether the claimed investments are related to the exploitation of the patent and whether those investments in the exploitation of the patent are substantial.

---

referred to in subparagraph (A) must exist with respect to articles protected by the patent, such as by producing protected goods, the research and development or licensing activities referred to in subparagraph (C) must also exist with respect to articles protected by the patent, such as by licensing protected products.").

13

Whether a complainant satisfies the economic prong is not analyzed according to a rigid mathematical formula. *Certain Male Prophylactic Devices*, Inv. No. 337-TA-546, Comm'n Op. at 39 (Aug. 1, 2007). The Commission decides the domestic industry requirement has been established in each investigation based on "an examination of the facts in each investigation, the article of commerce, and the realities of the marketplace." *Id.* A complainant does not need to show any "minimum monetary expenditure," and does not "need to define or quantify the industry itself in absolute mathematical terms." *Stringed Musical Instruments,* Inv. No. 337-TA-586, Comm'n Op. at 16-17 (May 16, 2008) ("A precise accounting [of the complainant's domestic investments] is not necessary, as most people do not document their daily affairs in contemplation of possible litigation."). The burden is on the complainant to show by a preponderance of the evidence that the domestic industry requirement is satisfied. *See Certain Multimedia Display and Navigation Devices and Systems, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-694, Comm'n Op. at 5 (July 22, 2011).

To satisfy the domestic industry requirement, section 337(a)(3) requires that a complainant's asserted investments must be "significant" or "substantial." The Federal Circuit has held that "qualitative factors alone are insufficient" to show that domestic industry investments are significant or substantial. *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879, 885 (Fed. Cir. 2015). The statute "requires a quantitative analysis to determine whether there is a 'significant' [or 'substantial'] increase or attribution by virtue of the claimant's asserted commercial activity in the United States." *Id.* at 883. "[T]he terms 'significant' and 'substantial' refer to an increase in quantity, or to a benchmark in numbers." *Id.* at 885; *see also Certain Carburetors & Prods. Containing Such Carburetors*, Inv. No. 337-TA-1123, Comm'n Op. at 15-16 (Oct. 28, 2019). While significance may not be established on qualitative evidence alone,

14

"qualitative evidence may still be relied upon to support a finding that a complainant's investments are significant." *Carburetors*, Comm'n Op. at 24; *see also id.* at 23 ("There may be facts and circumstances where, based on an assessment of quantitative information, it remains unclear whether a complainant's investments are significant or not. In such cases, resorting to qualitative factors that may indicate significance could be relevant to the evaluation."). In this regard, the Commission considers the "nature and significance" of a complainant's activities with respect to the protected articles. *Certain Printing and Imaging Devices*, Inv. No. 337-TA-690, Comm'n Op. at 30 (Feb. 17, 2011). The Commission may consider, *inter alia*, whether the "activities were important to the articles protected by the asserted patents in the context of the company's operations, the marketplace, or the industry in question, or whether complainant's undertakings had a direct bearing on the practice of the patent" or "whether and to what extent [] domestic activities added value to the imported products." *Id.*

### 2. *Economic Prong of the Domestic Industry Requirement Under Subsection (C)*

#### a) *Background*

AliveCor is a U.S. company based in California that designs and develops wearable electronic devices to help diagnose heart conditions. *See* Compl. at ¶ 11; CDX-005C.13; Tr. (Albert) at 53:22-54:20; CDX-005C.29; Tr. (Albert) at 77:24-78:14. AliveCor developed the inventions claimed in the Asserted Patents in the United States and introduced the "technology to consumers through the KBS, a system that included an app and watchband accessory for the Apple Watch," clearing the KBS with the U.S. Food and Drug Administration ("FDA") for use in connection with the Apple Watch. ID at 4-5; Tr. (Albert) 83:8-85:19; 199:3-201:21; CDX-0005C.34-36. There is no dispute that the KBS domestic industry product was developed in the United States and the [[          ]] products are also being developed in the United States.

15

Although AliveCor ceased to manufacture and sell the KBS product in 2018, AliveCor continued to invest in the technology of the patents through the date of the complaint filing. Under Commission precedent, past expenditures in R&D can be counted towards establishing a domestic industry in a product that exists but has been discontinued, like the KBS, if there are continuing investments. *See, e.g., Certain Marine Sonar Imaging Devices*, Inv. No. 337-TA-921, Comm'n Op., at 59 (Jan. 6, 2016) (crediting "labor and capital expenditures related to . . . software updates" used in a discontinued but practicing product), *affirmed, Hyosung TNS Inc. v. Int'l Trade Comm'n*, 926 F.3d 1353, 1361-2 (Fed. Cir. 2019) ("[P]ast expenditures may be considered to support a domestic industry claim so long as those investments pertain to the complainant's industry with respect to the articles protected by the asserted [intellectual property] rights and the complainant is continuing to make qualifying investments at the time the complaint is filed.").

### b)    *AliveCor Established the Nexus Requirement for Both Past Investments and Continuing Investments*

AliveCor has established both (1) that its past investments in R&D were directed to each of the asserted patents to develop the KBS and to use the technology of the patents to develop [[                    ]]; and (2) that after AliveCor ceased manufacture and sales of the KBS in 2018, AliveCor continued to make on-going R&D domestic investments directed to exploiting the asserted patents and these continuing investments benefit current users of the KBS.  Moreover, the evidence shows that, since 2018, AliveCor has continued to incur ongoing expenditures to address customers' concerns for the KardiaBand through its customer service contractor iQor which benefits current KBS users.  *See* RX-0484C.48.

AliveCor proffered evidence of its internal costs as well as contractor costs to support its claim that DI was met under subsection (C).  The ALJ did not credit the majority of AliveCor's

CONFIDENTIAL MATERIAL OMITTED

internal labor R&D expenditures because they were not sufficiently reliable to determine the quantitative amount that could be properly allocated to the domestic industry products.  ID at 170-75.  The ID found the evidence of payments to outside contractors to be reliable and sufficient to show AliveCor's investments in R&D of [[          ]] from 2017 through 2020.  The Commission agrees with these findings.

The evidence of record establishes that these payments were directed to exploitation of the patents.  *See, e.g.*, CPX-0048; CX-09236C; ID at 175-76; Tr. (Albert) at 176:22-177:3 ("We didn't just stop KardiaBand. [[




]]; AliveCor Rep. at 3-6.  Accordingly, AliveCor's past R&D expenditures to exploit the patents in the KBS, together with continuing R&D investments in the [[          ]] that benefit KBS users support AliveCor's claim that it has established the requisite nexus exists for purposes of a domestic industry under subsection (C).  Further, as noted AliveCor has made continuing investments in the KBS through its customer service contractor iQor.

Apple persists in its argument that the ID erred in finding that AliveCor established a nexus between the alleged R&D contractor expenditures and the Asserted Patents for purposes of subsection (C).  Apple Pet. at 19; Apple Sub. at 24-26.  We disagree.  In finding the nexus

17

Appx17

requirement for these contractor investments met, the ID stated, with respect to a physical exhibit recording these contractor expenditures, that "CPX-0048C [on its face] provides at least some description of the activity behind each cost that *suggests* a nexus to sensors, circuitry, and housing structure." ID at 175-76 (citing CX-09236C (presenting totals for "DI Contractor R&D Labor"). Under Commission precedent, the nexus requirement can be inferred under these facts. *See, e.g.*, *Certain Integrated Circuit Chips and Products Containing the Same*, Inv. No. 337-TA-859, Comm'n Op. at 42 (Aug. 22, 2014) ("[A] complainant's evidence of its investment in a protected article that practices the patent ordinarily also can support the inference that the investment was itself an exploitation of the patent.").

The record evidence shows that "the core part of the invention" claimed in the Asserted Patents is "technology that measures heart rate and heart rate parameters in the background," that "use[s] … AI [artificial intelligence] and machine learning algorithms to mine that data and" when it "identif[ies] irregularities that are suggestive of atrial fibrillation, provide[s] a trigger to the user to take an ECG" and allows "the user [to] take on-demand ECG on the wrist." Tr. (Jafari) at 292:17-293:2; AliveCor Rep. at 11. As the ID found, the evidence shows that the contractor expenditures are directed to the sensors, circuitry, and the housing structure of the AliveCor wristbands, *i.e.*, the KardiaBands. CPX-0048; CX-09236C; ID at 175-76. Further, as AliveCor explained, this "development work for the SmartRhythm algorithms, described above, is directed to the technology in the KBS that identif[ies] irregularities that are suggestive of atrial fibrillation, provide[s] a trigger to the user to take an ECG." AliveCor Rep. at 11 (citing Tr. (Somayajula) at 198:13-227:20). Moreover, the "development work for KardiaAI is directed to technology that allows [existing] KBS users to take an on-demand ECG." *Id.*; Tr. (Albert) at 64:1-67:8. That is, the record evidence shows that the development work undertaken by the

18

contractors pertains to the patented features of the domestic industry products for the benefit of current users of the KBS. As the Commission has held, "'[e]xploitation' is a generally broad term that encompasses activities such as efforts to improve, develop, or otherwise take advantage of the asserted patent." *Certain Integrated Circuit Chips and Products Containing the Same*, Inv. No. 337-TA-859, Comm'n Op., 2014 WL 12796437, at *21 (Aug. 22, 2014).

            *c)*      ***AliveCor's Investment in Exploiting the Patents is Substantial***

Having found the relevant nexus between the investments and the Asserted Patents, the ALJ found that the investments, totaling [[     ]] for the technology of each of the three patents, were "substantial" under subsection (C).[17] ID at 180-83. We agree for the reasons stated in the ID, as supplemented below.

As stated above, we agree with the ID's finding that payment to outside contractors show R&D investments of [[     ]] from 2017 through 2020. Beyond these contractors' investments, the ID found with respect to continuing investments in exploiting the asserted patents that the "record certainly evidences a qualitative effort on the part of ALC to refine and improve the KBS features like SmartRhythm and KardiaAI—which have a clear nexus to the heart rate and ECG analysis limitations recited in the Asserted Claims of the 941, 731, and 499 patents." ID at 170-171. The quantitative evidence also shows that, since 2018, AliveCor has continued to incur ongoing expenditures to address customers' concerns for the KardiaBand through its customer service contractor iQor, which as discussed above, has a nexus to exploiting the asserted patents. The table below shows the labor costs related to iQor tickets for KardiaBand or AliveCor's Kardia app:

---

[17] We note that DI product for each of the three asserted patents is the KBS and thus there is no need to allocate the investments among the three patents. That is, the DI product for each patent standing alone is the KBS.

CONFIDENTIAL MATERIAL OMITTED

| Year | KardiaBand Tickets | Hardware Unknown Tickets | Total Tickets With Sufficient Information to Code | Cost to AliveCor for KB + Software | Percentage of KB + Software Tickets |
|---|---|---|---|---|---|
| 2018 | [[ | | | | |
| 2019 | | | | | |
| 2020 | | | | | |
| Jan-Sept 2021 (Sept) | | | | | ]] |

RX-0484C.48.

Apple separately argues that the [[          ]] expenditures for R&D contractor expenses includes foreign expenditure. Apple Sub. at 27, Apple R.Sub. at 18. The record, however, does not support Apple's argument. As AliveCor explains, its Chief Financial Officer Clyde Hosein testified at his deposition that "he had reviewed the information underlying his declaration and thought it best to remove some expenses paid to one vendor, [[          ]], because it was 'not clear whether those costs were incurred in United States or all of it was incurred in the United States.'" AliveCor Sub. at 24 (citing JX-0229C (Hosein Depo.) at 90:18-92:11). Mr. Hosein submitted the declaration in question with AliveCor's complaint enumerating "expenses related to United States-based consultants and contractors preforming hardware engineering, testing, development, and support work for AliveCor's DI Products from 2016 through 2020." *Id.* (citing Compl. Ex. 20, Hosen Decl. ¶ 14 (EDIS No. 740374); CPX-048C at tabs 2017 QB & NS 2018-2020). AliveCor states that "[i]n accordance with Mr. Hosein's declaration and testimony, [its] economic expert, Dr. Akemann, removed all payments to [[          ]] from his calculations" and that "[w]ith those payments removed, Dr. Akemann determined that AliveCor incurred [[          ]] in qualifying investments to domestic R&D contractors." *Id.* at 25 (citing CX-0925C ("Excludes expenses with Vendor Name of [[          ]] . . . .")). Apple

20

CONFIDENTIAL MATERIAL OMITTED

points to the ID's statement that "ALC's record of R&D contractor payments do suggest a material amount of foreign payments towards the DI Products in 2016-2020 that have otherwise gone unaddressed in ALC's briefing (see CPX-0048C (Tabs [[



]]" and that "they only add up to [[

]]." ID at 182. Apple misapprehends the ID's statement. The ID was contrasting AliveCor's domestic contractor expenditure to its foreign contractor expenditure. The evidence shows that the ID did not find that the credited [[         ]] in domestic R&D contractor payments included the [[      ]] of payments to foreign contractors as Apple contends. *Id.* Indeed, there is no evidence to support Apple's assertion.

As mentioned above, the ID correctly found that the [[        ]] expenditures for R&D contractor expenses is substantial. As an initial matter, the evidence supports the ID's finding that AliveCor's "R&D labor expenses overall, including for the DI Products, are mostly domestic." ID at 181. The ID pointed to Dr. Akemann's opinion that "over the entire DI period [[    ]] of ALC's total headcount was domestic" and that "[a]fter comparing domestic and foreign R&D headcount, especially for the period 2016-19, it is likely that ALC's internal R&D labor expenses for KBS were overwhelmingly domestic, even without allocation." *Id.* (citing CX-0937C). In addition, the ID observed that of the total R&D contractor payments incurred in the development of the KBS, the foreign payments towards the KBS DI Products in 2016-2020 "only add up to [[                              ]]" and that "[i]f this is the true extent of foreign R&D payments over this time and dedicated to the DI Products, then it only further supports the substantiality of the [[       ]] domestic spend." *Id.* at 181-82 (citing CX-0935C). In other words, a comparison of the domestic contractor expenses to the foreign contractor

21

Appx21

expenses shows that the domestic expenditure is substantial.  The Commission agrees with the ALJ's reasoning.

We note the ID's statement that the "overall analysis here is troubling, to be sure" because "[i]t is no secret that a domestic-to-foreign comparison is at least the preferred method of proving economic prong" and that "[t]he parties were even warned at the end of the evidentiary hearing that 'you need to compare foreign and domestic investments.'"  *Id.* at 182 (citing *Carburetors*, Inv. No. 337-TA-1123, Comm'n Op at 17-19); Hr'g Tr. at 1312:17-18.  The Commission, however, has made clear that a domestic-to-foreign comparison is not a requirement, nor is it "preferred" as a general matter to show significance.  *See Carburetors*, Comm'n Op at 8-9, 17-19.[18]  The appropriate context for evaluating significance may vary depending upon the facts of a particular investigation.  For example, significance may be shown, *inter alia,* by demonstrating the value added by domestic activities, by comparing domestic investments to costs or revenues for DI products, or other contextual evidence of significance to the company's operations, the marketplace, or the industry in question.  *See id.*  Here, the Commission finds that the ID's reliance on the comparison of the domestic contractor expenses to the foreign contractor expenses and Dr. Akemann's "sufficiently detailed and pertinent headcount comparison showing it more likely than not that DI-related R&D labor expenses were substantially domestic" is sufficient to show that AliveCor's domestic expenditure in the exploitation of its patents is substantial under subsection (C) for a domestic industry relating to

---

[18] In the view of Commissioner Kearns, a proper contextual analysis for "significance" requires some comparison of domestic and foreign activities or investments where the domestic industry products benefit from both. This comparison can be through, for example, a comparison of domestic to foreign expenditures or a value-added analysis.  *See Certain Electronic Candle Products and Components Thereof*, Inv No. 337-TA-1195, Comm'n Op. at 38 n.22 (Kearns footnote) (July 14, 2022).

the KBS products that "exists." *See* ID at 183. Moreover, AliveCor's continued activities after the KBS products ceased to be manufactured and sold are sufficient to show an industry that exists as of the date AliveCor filed its complaint.

### 3. *Economic Prong of the Domestic Industry Requirement Under Subsection (B)*

The Commission has determined to affirm the ID's finding that AliveCor failed to establish the economic prong of the domestic industry requirement under subsection (B) relating to the KBS products. In support of its assertion that its [[        ]] investments in R&D labor allocated to the KBS products were significant, AliveCor offered a comparison of these investments to its company-wide labor and capital expenditures, as well as a comparison of KBS sales revenue to its company-wide hardware and total sales revenues. ID at 178. Having found AliveCor's evidence of internal R&D labor expenditures to be unreliable, the ID considered instead AliveCor's domestic R&D contractor, customer support, and regulatory expenditures of [[        ]] to evaluate significance and compared that figure to AliveCor's proffered company-wide labor and capital expenditures.[19] The ID found that these investments by AliveCor totaling [[        ]] from 2016 to 2021 were "closer to [[    ]] of its total labor and capital investments from 2016 to 2020, instead of [AliveCor]'s calculated [[    ]]."[20] *Id.* at 178. Although the ID had misgivings about the relevance of comparing domestic industry investments to total company-wide investments to show significance, the ID, nonetheless, considered it and found that "[t]his is not a significant percentage on its own." *Id.* at 178-79. With respect to the comparison of

---

[19] The Commission agrees with the ID's findings relating to the unreliability of AliveCor's evidence of its internal labor allocations.

[20] It appears that AliveCor expected the ID to credit all of its allocated labor expenses, which would have resulted in a contextual expenditure of [[    ]] of its total labor and capital investments as opposed to the [[    ]] that the ALJ found based on those expenditures supported by reliable evidence.

KBS sales revenue to company-wide hardware and total sales revenues from 2018 to 2019, the ID observed that this proffered contextual analysis "is not material because it does not involve investments at all, and is for a limited range of years." *Id*. at 180.

We find that the contextual analysis relied on by AliveCor fails to support a finding that its domestic industry investments are quantitatively significant. Specifically, AliveCor failed to show how or why its comparison of its domestic labor expenses in the DI product to its overall company-wide labor and capital expenditure showed that its domestic investment was significant. The ID correctly reasoned that "[a] large company with many products may have a domestic industry based on one such product, even though it only accounts for a tiny percentage of the company's expenses; conversely, a small company with a single qualifying product may not have a domestic industry if the bulk of its investments are overseas" based upon the location of its investment. ID at 179. Because of this, while we do not preclude that a complainant may rely on a comparison of its domestic industry investments to company-wide investments in establishing significance given the facts and circumstances of a particular investigation,

CONFIDENTIAL MATERIAL OMITTED

AliveCor has failed to explain or substantiate why such a comparison in the context of this investigation nonetheless demonstrates the significance of its domestic industry investments.[21, 22]

Regarding AliveCor's second proffered basis for showing quantitative significance, we agree with the ID that this also falls short. The ID found this basis – a comparison of KBS sales from 2018 to 2019 to its hardware revenues and its total revenues – inapt as "the percentage of

---

[21] While Commissioner Schmidtlein agrees that AliveCor has failed to demonstrate that the investments as credited by the ID are significant, she does not join the majority's analysis on this point. This is because the majority is applying a recently established additional threshold requirement that complainants must "explain or substantiate" why certain contextual analysis is appropriate before the majority will consider whether that analysis shows the investments are significant. It is a subtle difference, but Commissioner Schmidtlein's decision in this case is based on the failure of AliveCor to demonstrate that its credited investments of approximately [[   ]] percent of company-wide labor and capital investments are significant. In contrast, the majority does not reach whether these investments are significant because AliveCor did not "explain or substantiate" why a comparison of the domestic industry investments to company-wide investments is the appropriate comparison. *See infra* note 22. The majority cites the recent case *Certain Electronic Candle Products and Components Thereof*, Inv. No. 337-TA-1195, Comm'n Op. (Oct. 4, 2022) (Comm'r Schmidtlein dissenting) (Pub. Vers.) as precedent for the Commission requiring a complainant to explain or substantiate the contextual benchmark upon which it relies. There, under its analysis of complainants' investments in plant and equipment, the majority in that case rejected one of complainants' sub-arguments "that their investments as a percent of gross profits show that their investments are significant" because the complainants did not explain the relevance of that particular benchmark. *Id.* at 37- 38. Commissioner Schmidtlein dissented finding the domestic industry requirement to be satisfied. In considering the complainant's proffer of an alternative contextual analysis, she noted that she saw no reason to discount the comparison using gross profit. *See id., Dissenting Views of Commissioner Schmidtlein* at 18 n.7. Similarly, in this case, Commissioner Schmidtlein declines to join the majority in requiring the complainants to "explain or substantiate" why a certain contextual analysis is appropriate.

[22] In response to footnote 21, the Commission is not establishing a new requirement, or affirming a previously established one, for all domestic industry analyses but instead observes the concerns noted by the ALJ with the particular contextual analysis offered by Complainant here and that Complainant has not, in light of those concerns, explained or substantiated why its proposed contextual analysis establishes that its claimed investments are significant. *See, e.g., Certain Electronic Candle Products and Components Thereof*, Inv. No. 337-TA-1195, Comm'n Op. at 38 (July 14, 2022) (declining to find complainants' proffered comparison of domestic industry investments to gross profits as a relevant benchmark to assess significance absent an explanation as to how or why that proffered metric is meaningful in relation to the protected articles).

25

CONFIDENTIAL MATERIAL OMITTED

ALC total revenue provided by KBS, is not material because it does not involve investment at all, and is for a limited range of years. *See* CIB at 160 (highlighting that in 2018-2019, KBS supplied "[[    ]] of AliveCor's hardware revenues and [[    ]] of AliveCor's total revenues.")." *Id.* at 180.

Given that these data are the only contextual framework that AliveCor relied on before the ALJ, it has failed to show a domestic industry exists under subsection (B).  The headcount and regulatory comparisons that AliveCor now presents in its submission to the Commission were never presented to the ALJ and the Commission declines to consider them because they are waived. *Broadcom Corp. v. Int'l Trade Comm'n*, 542 F.3d 894, 901 (Fed. Cir. 2008).

As discussed above with respect to subsection (C), the Commission notes that certain statements in the ID pertaining to subsection (B) suggest that the Commission prefers foreign comparisons in determining domestic significance of an investment. *See* ID at 179-180.[23]  The Commission once again makes clear that it does not require a domestic-to-foreign comparison, nor does it express a general preference for such a comparison to establish significance. *Carburetors*, Inv. No. 337-TA-1123, Comm'n Op at 8-9, 17-19.  Thus, the fact that AliveCor did not offer one is not fatal to its efforts to support its claims of significance under subsection (B). However, as discussed above, AliveCor failed to offer a meaningful contextual analysis by which to evaluate the quantitative significance of its investments and thus failed to establish that a domestic industry exists by virtue of significant investments in labor or capital under subsection (B).

---

[23] Even though the ID contemplated a similar result if AliveCor's investments were compared to its foreign manufacturing costs, the ID did not require such an analysis nor reach its conclusion on that basis.  ID at 178.

26

### B.    The ID's Patent Eligibility Findings Under 35 U.S.C § 101

The Commission determined to review the final ID's invalidity findings, including patent eligibility under 35 U.S.C. § 101.  87 Fed. Reg. 58819-20 (Sept. 28, 2022).

#### *1.    Legal Standard*

Section 101 limits patent-eligible subject matter to "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101.  The Supreme Court has held that the statute excludes laws of nature, natural phenomena, and abstract ideas from patentability.  *Mayo Collaborative Services v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012).  The statute renders these categories unpatentable because "they are the basic tools of scientific and technological work" and "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it."  *Mayo*, 132 S. Ct. at 1293 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

Under Supreme Court precedent, "applications of abstract concepts 'to a new and useful end remain patent eligible."  *Alice Corp. Pty. v. CLS Bank Intern.*, 573 U.S. 208, 217-18, 221 (2014).  A tribunal, however, must determine whether the claims transform the abstract idea into patent-eligible subject matter.  To make this determination, *Alice* prescribes a two-step inquiry: a court must first "determine whether the claims at issue are directed to" a "patent-ineligible concept[]"; if they are, the court must then "determine whether [any] additional elements 'transform the nature of the claim' into a patent-eligible application," requiring an "inventive concept" or "additional features" to "ensure that the patent does not seek simply to monopolize the abstract idea."  *Id.*  The Federal Circuit has explained that "[t]he 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'"  *Enfish, LLC v. Microsoft Corp.*,

27

822 F.3d 1327, 1335 (Fed. Cir. 2016).  To save a patent at the second step, the inventive concept

or additional features must be evident in the claims themselves.  *Synopsys, Inc. v. Mentor*

*Graphics Corp.*, 839 F.3d 1138, 1151-52 (Fed. Cir. 2016).

### 2. Whether the ID Erred in Finding Claim 12 of the '941 Patent Patentable Under Alice

#### a) The ID

The ID found that "claim 12 of the '941[24] patent is not invalid under 35 U.S.C. § 101,

although it is directed to an ineligible concept under *Alice* step one."  ID at 66.  The ID explained

that claim 12 consists of a first portion reciting "the structure of a smartwatch (found to be

limiting, above) loaded with a processor and particular sensors" and a second portion that "refers

to instructions causing analysis of the sensors' data and indicating (by any means) at least one

result to the user."  *Id.* at 67.  The ID stated that "[t]he first portion alone typically would be

---

[24] Claim 12 of the '941 patent recites:

A smartwatch, comprising:
    a processor;
    a first sensor configured to sense an activity level value of a user, wherein the first sensor is coupled to the processor;
    a photoplethysmogram ("PPG") sensor configured to sense a heart rate parameter of the user when the activity level value is resting, wherein the PPG sensor is coupled to the processor;
    an electrocardiogram ("ECG") sensor configured to sense electrical signals of a heart, wherein the ECG sensor comprises a first electrode and a second electrode, and wherein the ECG sensor is coupled to the processor; and
    a non-transitory computer readable storage medium encoded with a computer program including instructions executable by the processor to cause the processor to:
        determine if a discordance is present between the activity level value of the user and the heart rate parameter of the user;
        based on the presence of the discordance, indicate to the user a possibility of an arrhythmia being present; and
        receive electric signals of the user from the ECG sensor to confirm the presence of the arrhythmia.

'941 patent, col. 17, l. 53-col. 18, l. 19.

considered patent-eligible subject matter (as an apparatus), but the second portion alone typically would be questionable (as a set of algorithms)." *Id.* The ID defined the issue as "whether the claim, in view of the specification, is directed primarily to the apparatus or to the instructions" and found that "[t]he intrinsic evidence supports the latter." *Id.* For support, the ID observed that "[t]he majority of '941 patent claims focus on data analysis and returning results of that analysis to a user (941 patent at cls. 2-9, 13-21), while only a handful recite non-algorithmic features (*id.* at cls. 10, 11, 22, 23)." *Id.* The ID further observed that "[t]he specification similarly speaks at length to diagnostic techniques for arrhythmias, and the benefits of a discordance determination preceding an ECG measurement." *Id.* at 67-68 (citing '941 patent, Title, 1:66-2:3, 2:10-3:12, 12:55-65, 12:66-13:7, 13:67-14:8, 14:8, 14:36-42, Fig. 7). The ID surmised that "it is fair to say that claim 12 is directed to the abstract idea of analyzing a combination of heart rate and activity, and then measuring and analyzing ECG electric signals for medical diagnosis, as medical practitioners have routinely done for years" and thus is "directed to non-patent eligible subject matter." *Id.* at 68 (citing *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1314 (Fed. Cir. 2016) ("The Supreme Court has held that 'fundamental . . . practice[s] long prevalent' are abstract ideas.")).

The ID found that "[t]he structural elements within claim 12, however, are sufficient to transform the claim into patent eligible subject matter under *Alice* step two." *Id.* The ID explained that "[t]he claim's recitation of a smartwatch comprising 'a photoplethysmogram ('PPG') sensor configured to sense a heart rate parameter of the user when the activity level value is resting, wherein the PPG sensor is coupled to the processor,' is particularly specific and structural." *Id.* The ID added that "a PPG sensor on a smartwatch is specific and innovative." *Id.* at 69 (citing Hr'g Tr. (Albert) at 66:2-11; Hr'g Tr. (Jafari) at 513:12-15; Hr'g Tr. (Waydo) at

29

823:12-824:1).  The ID reasoned that the "recitation of a PPG sensor within a smartwatch, while not the entire focus of the claim, does move it away from the ineligible concept of data collection/analysis and towards a specific electro-mechanical apparatus." *Id.* (citing *Alice*, 573 U.S. at 217-18 (asking whether the additional elements "transform the nature of the claim" into patent-eligible subject matter)).

The ID stated that "[t]he claim's 'electrocardiogram ('ECG') sensor configured to sense electrical signals of a heart, wherein the ECG sensor comprises a first electrode and a second electrode, and wherein the ECG sensor is coupled to the processor' on the smartwatch adds to this finding." *Id.*  The ID pointed to record evidence showing that "ECG sensors collect data in a certain way and provide a very particular waveform." *Id.* at 69-70 (citing Hr'g Tr. (Albert) at 48:6-49:24; Hr'g Tr. (Jafari) at 291:4-13; Hr'g Tr. (Stultz) at 1058:16-1059:13, 0195:1-10; '941 patent at Fig. 1, 8:l- 9:23).  The ID concluded that "[a]n ECG sensor, in combination with a smartwatch that also includes a PPG sensor, as well as an activity level sensor, amounts to significantly more than a patent on the ineligible concept of analyzing a heart rate and activity, and then measuring and analyzing ECG electric signals for medical diagnosis." *Id.*  The ID acknowledged that "[t]aken individually, each separate component may be conventional," but that "combining all the various sensors on a smartwatch, for a specific function that is not traditional for smartwatches, is sufficiently 'unconventional' to satisfy Section 101 under *Alice* step two." *Id.* at 70.

The ID found unpersuasive Apple's main argument that "it is not enough to implement an abstract idea with 'well-understood,' 'routine,' or 'conventional' technology" and that the combined use of PPG sensor data and ECG sensor data for arrhythmia detection was "well-known and not inventive as of 2013." *Id.* at 70 (citing RIB at 57; RRB at 34-35).  The test, the

30

Appx30

ID stated, "is whether a smartwatch with integrated processor, activity sensor, PPG sensor, and ECG sensor (with at least two electrodes) adds something more than carrying out heart rate discordance determination, user indication of arrhythmia, and arrhythmia confirmation on generic hardware," which, as noted above, the ID found it does. *Id.* at 71.

### *b) Analysis*

The Commission finds that the ID erred in concluding that claim 12 of the '941 patent is directed to an abstract idea under *Alice* step one.[25] As the ID observed, the claim recites "the structure of a smartwatch loaded with a processor and particular sensors." ID at 67. The second portion, referring to instructions, supports the technological advancement of using a smartwatch to detect possible heart defects. *Id.* Indeed, the ID found that the "recitation of a PPG sensor within a smartwatch, while not the entire focus of the claim, does move it away from the ineligible concept of data collection/analysis and towards a specific electro-mechanical apparatus." ID at 68. This finding reflects that the claimed invention passes muster under *Alice* step one. There is no requirement for the entire focus of the claim to be directed to non-abstract concepts. The step-one inquiry is always whether the character of the claims, considered in light of the specification, is directed to excluded subject matter. *Enfish*, 822 F.3d at 1335.

Put differently, the issue is whether claim 12 of the '941 patent is "directed to the abstract idea of analyzing a combination of heart rate and activity, and then measuring and analyzing ECG electric signals for medical diagnosis, as medical practitioners have routinely done for

---

[25] The ID found that "[t]here is no principled distinction between the claims of the '731 patent and those of the '941 patent under Section 101." ID at 114. The Commission notes that claims 1, 12, and 16 of the '731 patent are similar in substance to claims 12, 13, and 16 of the '941 patent, in that each of the claims are directed to a smart watch with a particular arrangement of sensors to detect the presence of an arrhythmia. Thus, the Commission's analysis applies equally to the asserted claims of the '731 patent.

31

years," as the ID found (ID at 68); or whether the claim is directed to technological improvements in cardiac monitoring technology, as AliveCor contends. AliveCor Pet. at 16-17; AliveCor Rep. at 41-46. In our judgment, the claim as a whole, considered in light of the specification, supports AliveCor's argument.

The specification of the '941 patent discloses that diagnosing intermittent arrhythmias using conventional methods was "difficult, because, for example, it is not practical to be prepared to apply one of the aforementioned diagnostic modalities at the exact time that an individual experiences an intermittent arrhythmia." '941 patent col. 1, ll. 49-53. The specification explains that by sensing heart rate parameters and activity level, the smartwatch can "determine the future onset of or the presence of an arrhythmia by identifying discordance between these two parameter values" and "[i]n response to the identification of the future onset of or presence of an arrhythmia an electrocardiogram may be caused to be sensed." *Id*. at col.1 ll.61-66, col.2 ll.1-3. That is, the patented invention solves a concrete problem by implementing a particular configuration of sensors and steps on a smartwatch. As AliveCor's expert, Dr. Efimov, testified, by monitoring the user's heart rate parameter in the background and indicating to the user when an arrhythmia may be present, the claimed device allows users to record an ECG outside clinical settings and "confirm" arrhythmias that a doctor would have otherwise missed. Tr. (Efimov) at 1229:24-1231:6. Contrary to the ID's findings, the claimed invention does not simply analyze a combination of heart rate and activity, and then measure and analyze ECG electric signals for medical diagnosis, as medical practitioners have routinely done for years. ID at 68. Rather, the claims recite a specific system that uses a first sensor to sense an activity level value of a user, and a photoplethysmogram ("PPG") sensor configured to sense a heart rate parameter of the user so as to alert the user of the possibility of an arrhythmia and to

32

enable the capture of an ECG. '941 patent col.1 ll.49-57, claim 12. This technological

advancement enables the capture of ephemeral cardiac events in a way not possible using prior

cardiac monitoring technology. Tr. (Efimov) at 1252:15-1254:18; CDX-002C.45; IA Rep. 22-

23.

We agree with AliveCor that the asserted claims are akin to the claims the Federal Circuit

found pass muster under *Alice* step one in C*ardioNet, LLC v. InfoBionic, Inc*, 955 F.3d 1358

(Fed. Cir. 2020). In *CardioNet*, the patent "describe[d] cardiac monitoring systems and

techniques for detecting and distinguishing atrial fibrillation and atrial flutter from other various

forms of cardiac arrhythmia."[26] *Id*. at 1362. In reversing the district court, the Federal Circuit

stated that "the language of claim 1 indicates that it is directed to a device that detects beat-to-

beat timing of cardiac activity, detects premature ventricular beats, and determines the relevance

of the beat-to-beat timing to atrial fibrillation or atrial flutter, taking into account the variability

in the beat-to-beat-timing caused by premature ventricular beats identified by the device's

ventricular beat detector." *Id*. at 1368. The Court pointed to the specification's disclosure that

the claimed device "more accurately detects the occurrence of atrial fibrillation and atrial

flutter—as distinct from [ventricular tachycardia] and other arrhythmias—and allows for more

---

[26] As the Court stated in *CardioNet*, 955 F.3d at 1365, claim 1 recited:
A device, comprising:
a beat detector to identify a beat-to-beat timing of cardiac activity;
a ventricular beat detector to identify ventricular beats in the cardiac activity;
variability determination logic to determine a variability in the beat-to-beat timing of a
collection of beats;
relevance determination logic to identify a relevance of the variability in the beat-to-beat
timing to at least one of atrial fibrillation and atrial flutter;
and an event generator to generate an event when the variability in the beat-to-beat timing
is identified as relevant to the at least one of atrial fibrillation and atrial flutter in light of
the variability in the beat-to-beat timing caused by ventricular beats identified by the
ventricular beat detector.

33

reliable and immediate treatment of these two medical conditions" and "achieves multiple technological improvements." *Id.* at 1368-69. Here too, the evidence shows that claimed device (smartwatch in claim 12) monitors the user's heart rate parameter in the background and indicates to the user when an arrhythmia may be present, allowing users to record an ECG outside clinical settings to "confirm" arrhythmias that a doctor would have otherwise missed. Tr. (Efimov) at 1229:24-1231:6. That is, the claim is directed to technological improvements in cardiac monitoring.

In any event, even if the claims are directed to an abstract idea under *Alice* step one as the ID found, the Commission agrees with the ID that the claims would be patentable under *Alice* step two. Under *Alice* step two, the asserted claims do not merely claim a "generic environment in which to carry out the abstract idea." ID at 70. Rather, the claimed configuration of sensors and other hardware components implemented in a smartwatch is inventive. *Id.* ("Taken individually, each separate component may be conventional, but combining all the various sensors on a smartwatch, for a specific function that is not traditional for smartwatches, is sufficiently 'unconventional' to satisfy Section 101 under *Alice* step two."). As the ID added, "[t]here may come a time when every smartwatch includes the various claimed sensors, and runs the needed algorithms to practice claim 12, but as of the date of the invention the 'ordered combination' of the claim's elements was sufficiently 'transform[ative].'" *Id.* (citing *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) ("The mere fact that something was disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional.")).

34

### 3. *Whether Claims 16 and 17 of the '499 Patent Are Patentable Under Alice*

#### a) *The ID*

The ID concluded that independent claim 11,[27] from which claims 16 and 17 depend, is directed to the abstract idea of "taking in heart rate data (of any kind), taking in activity level data (of any kind), calculating heart rate variability, comparing that variability with the activity (by any means), and then alerting the user to 'record an electrocardiogram using said mobile computing device.'"[28] ID at 143. In making that determination, the ID observed that the "bulk of the claim is directed to the data analysis algorithms taking place within the 'processor' and

---

[27] While independent claim 11 itself has not been asserted in this investigation, we analyze it because asserted claims 16 and 17 necessarily include the limitations of claim 11, from which they depend.

[28] The claims recite:

11. A system for determining the presence of an arrhythmia of a first user, comprising a heart rate sensor coupled to said first user;
     a mobile computing device comprising a processor, wherein said mobile computing device is coupled to said heart rate sensor, and wherein said mobile computing device is configured to sense an electrocardiogram of said first user; and
     a motion sensor
     a non-transitory computer readable medium encoded with a computer program including instructions executable by said processor to cause said processor to receive a heart rate of said first user from said heart rate sensor, sense an activity level of said first user from said motion sensor, determine a heart rate variability of said first user based on said heart rate of said first user, compare and activity level of said first user to said heart rate variability of said first user, and alert said first user to record an electrocardiogram using said mobile computing device.

16. The system of claim 11, wherein said mobile computing device comprises a Smartwatch.

17. The system of claim 11, wherein said computer program further causes said processor to determine a presence of said arrhythmia using a machine learning algorithm.

35

according to the 'instructions' saved in memory (*i.e.*, ineligible subject matter)" and that the "bit of apparatus recited (*i.e.*, potentially eligible subject matter) is devoid of specificity, such that it can only be considered generic computer hardware—'a heart rate sensor,' 'mobile computing device,' 'a processor,' 'a motion sensor,' and 'non-transitory computer readable medium.'" *Id.* The ID also pointed to the testimony of Dr. Stultz, who testified that "carrying out these steps is common in medical practice." *Id.* (citing Hr'g Tr. (Stultz) at 1058:13-1059:19, 1077:21-1078:15, 1085:15-22). The ID thus found that "claim 11 is directed to ineligible subject matter under *Alice* step one." *Id.*

The ID then considered claims 16 and 17 and found that they "fare similarly" under *Alice* step one. *Id.* at 144. The ID explained that claim 16 recites that the "mobile computing device" is a "smartwatch" and that "does not materially transform the claim as there is no other limitation that benefits or is affected by the computing device being in this form factor." *Id.* (*comparing* '499 patent at cl. 16 *with* '941 patent at cl. 22 ("wherein the PPG sensor is located on a back of the smartwatch")). Regarding claim 17, the ID noted that it requires the processor to further "determine a presence of said arrhythmia using a machine learning algorithm" but that "[t]his is literally just another algorithm and only deepens the connection between the claim and ineligible subject matter." *Id.*

Turning to *Alice* step two, the ID concluded that "claim 11's non-ineligible elements, either individually or as an ordered combination, do not transform the nature of the claim into something more than a patent on the abstract concept." *Id.* (citing *Alice*, 573 U.S. at 217-18). The ID explained that "there are sensors recited ('heart rate,' 'electrocardiogram,' 'motion'), but they are unrestricted as to structure, arrangement, or data output so long as they relate to 'heart rate,' electrical activity of the heart, or 'activity level,' respectively." *Id.* The ID stated that "an

36

ECG sensor is rather specific; but unlike claim 12 of the '941 patent, claim 11 of the '499 patent does not recite the number of leads to further specify the type of ECG sensor, nor does it expressly recite any use for the ECG data—it simply exists within the 'mobile computing device.'" *Id.* The ID added that "[i]n essence the claim covers the addition of generic sensors to an existing ECG machine, and for no particular purpose" and that "[a]lone or as an ordered combination, all this is equivalent to the basic idea of using such sensors." *Id.* The ID found that "[t]he remaining hardware limitations ('mobile computing device,' 'processor,' and 'computer readable medium') are equally generic, if not more so, and perform their generic functions (be configurable, contain and execute instructions)" and that "there is nothing recited that could be viewed as improving the operation of any of these computing elements (*e.g.*, faster, fewer errors, less power consumption, etc.)." *Id.*

With respect to claim 16, however, the ID found the recitation of a "smartwatch" was sufficient to pass muster under *Alice* step two. *Id.* The ID stated that "[u]ndoubtedly claim 16 is more abstract than the claims of the '941 and '731 patents, because no particular kind of heart rate sensor or motion sensor is required" but found that "incorporating even any kind of heart rate sensor into a smartwatch, especially when combined with an ECG sensor, lifts that smartwatch out of the realm of 'well-understood, routine, and conventional.'" *Id.* Regarding claim 17, however, the ID found it failed *Alice* step two because the recited "machine learning algorithm" is an unspecified "algorithmic step." *Id.* at 145.

### a)    *Analysis*

The Commission agrees with the ID that the claims are directed to the abstract idea of "taking in heart rate data (of any kind), taking in activity level data (of any kind), calculating heart rate variability, comparing that variability with the activity (by any means), and then

37

alerting the user to 'record an electrocardiogram using said mobile computing device.'" ID at 143. We also agree with the ID that claims 16 and 17 fare no better under *Alice* step one for the reasons provided in the ID. *Id.* at 144.

The Commission affirms the ID's finding as to claim 17. After finding that claim 11 recited an abstract idea, the ID correctly concluded that "claim 11's non-ineligible elements, either individually or as an ordered combination, do not transform the nature of the claim into something more than a patent on the abstract concept." *Id.* at 144. The ID reasoned that "there are sensors recited ('heart rate,' 'electrocardiogram,' 'motion'), but they are unrestricted as to structure, arrangement, or data output so long as they relate to 'heart rate,' electrical activity of the heart, or 'activity level,' respectively." *Id.* That is, the claims are broad enough to cover any generic and conventional sensor that can carry out those functions. Even when the claims recite a specific sensor, ECG sensor, as the ID observed, "unlike claim 12 of the '941 patent, claim 11 of the '499 patent does not recite the number of leads to further specify the type of ECG sensor, nor does it expressly recite any use for the ECG data—it simply exists within the 'mobile computing device.'" ID at 144.

Under *Alice* step two, the Commission looks for an "inventive concept" or "additional features" to ensure that the patent does not seek simply to "monopolize the abstract idea." *Alice*, 573 U.S. at 221. As the ID found, claim 17 in essence "covers the addition of generic sensors to an existing ECG machine, and for no particular purpose." ID at 144. We adopt the ID's finding that "[a]lone or as an ordered combination, all this is equivalent to the basic idea of using such sensors" in their well-known and conventional manner. *See id.* We further agree with the ID that the "hardware limitations ('mobile computing device,' 'processor,' and 'computer readable medium') are equally generic, if not more so, and perform their generic functions (be

38

configurable, contain and execute instructions).” *Id.* Indeed, “there is nothing recited that could be viewed as improving the operation of any of these computing elements (*e.g.*, faster, fewer errors, less power consumption, etc.).” *Id.*

As to claim 16, however, the Commission disagrees with the ID that simply reciting a “smartwatch” imbues the recited abstract idea with patentable subject matter. As the ID acknowledged, “[u]ndoubtedly claim 16 is more abstract than the claims of the 941 and 731 patents, because no particular kind of heart rate sensor or motion sensor is required.” ID at 145. That is, unlike the asserted claims of the ’941 and ’731 patents that require specific sensors arranged in a specific configuration, claim 16 simply incorporates generic sensors used in their well-known and conventional manner in a “smartwatch.” We disagree with the ID that “incorporating even any kind of heart rate sensor into a smartwatch, especially when combined with an ECG sensor, lifts that smartwatch out of the realm of ‘well-understood, routine, and conventional.’” *Id.* The only difference between claims 16 and 17 is the environment in which the abstract idea is carried out. Under Federal Circuit precedent, this is insufficient to confer patentability on claim 16. *See Intellectual Ventures v. Capital One Bank*, 792 F.3d at 1366 (“An abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as the Internet.”); *Affinity Labs*, 838 F.3d at 1259 (“[M]erely limiting the field of use of the abstract idea to a particular existing technological environment does not render the claims any less abstract.”). Moreover, it would stifle innovation to find that at the relevant time a claim that describes generic sensors used in a conventional way is patentable when implemented in a smartwatch. As the Supreme Court has explained, “the underlying functional concern here is a *relative* one: how much future innovation is foreclosed relative to the contribution of the inventor.” *Mayo Collaborative Servs. v. Prometheus Labs.,*

39

*Inc.*, 566 U.S. 66, 88 (2012) (emphasis in original) (citation omitted).  Accordingly, the Commission reverses the ID's finding as to claim 16 and finds it patent ineligible under section 101.

### C.    The ID's Findings with Respect to Obviousness Under 35 U.S.C § 103

The ID found that Apple failed to show that the asserted claims of the '941 patent are invalid for obviousness.  ID at 60-98.  For the '731 patent, the ID found that Apple failed to prove that asserted claims 3, 5, 9, 10, and 15 are invalid for obviousness, but proved that asserted claims 1, 8, 12, and 16 are invalid for obviousness.  *Id.* at 113-127.  The Commission determined to review the final ID's invalidity findings, including obviousness under 35 U.S.C. § 103, and asked for briefing.  87 Fed. Reg. 58819-20 (Sept. 28, 2022).  On review, the Commission has determined to affirm the ID's invalidity findings with the modification below as to secondary considerations.

#### 1.    *Legal Standard*

"Obviousness is a question of law based on underlying questions of fact."  *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1379 (Fed. Cir. 2008).  The underlying factual determinations include the so-called "Graham factors": "(1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) objective indicia of non-obviousness."  *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).  The U.S. Supreme Court has held that the critical inquiry in determining the differences between the claimed invention and the prior art is whether there is a reason to combine the prior art references.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-21 (2007).  While specific teachings, suggestions, or motivations to combine prior art may provide helpful insights into the state of the art at the time of the alleged invention, "an obviousness analysis cannot be confined by a formalistic conception of the words teaching,

40

suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents." *Id.* at 420.

An obviousness determination should also include a consideration of "secondary considerations," that is, "commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham*, 338 U.S. at 17-18; *see Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 837 (Fed. Cir. 2015). "[I]n order to accord substantial weight to secondary considerations of nonobviousness, the evidence of secondary considerations must have a 'nexus' to the claims, *i.e.*, there must be 'a legally and factually sufficient connection' between the evidence and the patented invention." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019) (internal citations omitted).

Under established Federal Circuit precedent, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product '*is* the invention disclosed and claimed.'" *Teva Pharms. Int'l GmBH v. Eli Lilly & Co.*, 8 F.4th 1349, 1360 (Fed. Cir. 2021) (citing *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366 (Fed. Cir. 2019)). This presumption applies "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (internal citations omitted). "Conversely, '[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process,' the patentee is not entitled to a presumption of nexus." *Id.* (internal citations omitted). The Court stated that it has "rejected attempts 'to reduce the coextensiveness requirement to an inquiry into

41

whether the patent claims broadly cover the product that is the subject of the evidence of secondary considerations.'" *Id.* at 1360-61. As the Court explained, rather, "the degree of correspondence between a product and a patent claim falls along a spectrum. At one end of the spectrum lies 'perfect or near perfect correspondence,' and at the other end lies 'no or very little correspondence.'" *Id.* at 1361 (internal citations omitted). "Although we do not require the patentee to prove perfect correspondence to meet the coextensiveness requirement, what we do require is that the patentee demonstrate that the product is essentially the claimed invention." *Id.* "Whether a product is coextensive with the patented invention, and therefore whether a presumption of nexus is appropriate in a given case, is a question of fact." *Id.*

### 2.     *Analysis*

For the reasons stated herein, the Commission has determined to affirm the ID's findings that Apple failed to prove that claims 12, 13, 19, and 20-23 of the '941 patent are invalid for obviousness. The Commission has also determined to affirm the ID's findings that Apple failed to prove that claims 3, 5, 9, 10, and 15 of the '731 patent are invalid for obviousness for the reasons stated in the ID. The Commission, however, has determined to reverse the ID's findings that Apple proved that claims 1, 8, 12, and 16 of the '731 patent are invalid for obviousness as explained below. In sum, the Commission finds that none of the asserted claims has been shown to be invalid for obviousness.

### a)     *Record Evidence of Industry Praise and Copying Is Sufficient to Overcome the Prima Facie Showing of Obviousness with Respect to Claims 12, 16, 20, 22, and 23 of the '941 Patent*

The ID found that because KBS practices claims 12, 16, 20, 22, and 23 of the '941 patent, AliveCor was entitled to a presumption of nexus where the secondary consideration evidence pertains to KBS. ID at 93. The ID found that AliveCor's evidence and argument as to

commercial success, copying, and industry praise were sufficient to overcome Apple's *prima facie* showing of obviousness.

With respect to commercial success, the ID found that AliveCor's evidence of [[

]] in funding it received did not have a clear connection to the KBS. ID at 95. AliveCor does not challenge this finding. The ID credited certain evidence "show[ing] that KBS 'was selling very successfully,' as ALC's chief financial officer testified." ID at 95 (citing RX-0384C (Hosein Deposition) at 77:24-78:11; CX-0934C; CX-0935C (showing that KBS revenues for calendar years 2017, 2018, and 2019 totaled over [[         ]]"). *Id.* But the ID found that "KBS' profitability is not clear, though, so the evidence of commercial success is not as persuasive as the evidence of industry praise."

Apple challenged the ID's nexus presumption as to commercial success based on the KBS sales revenues because that evidence pertained solely to the KardiaBand, which lacks the PPG and activity sensors required by the asserted claims. Apple Pet. at 86-87. AliveCor acknowledges that "the KardiaBand is but one element of the KBS" and can be used without SmartRhythm. AliveCor Rep. at 67. AliveCor explains that "because each product was sold by separate manufacturers, AliveCor could not produce evidence of the KBS's commercial success as a whole." *Id.* AliveCor, however, contends that "it is equally true that the KardiaBand could not be used without the Apple Watch" and that "Apple produced no evidence suggesting that consumers who purchased the KardiaBand did not use that accessory with the Apple Watch." *Id.* AliveCor points to its former chief technology officer, Mr. Somayajula, who testified that for "whoever was buying [the KardiaBand], it was obvious that it required the KardiaBand System, which comprised of the Apple Watch, for it to be functional" and that "[o]therwise that hardware would be of no use to the customer." *Id.* (citing JX-0226C (Somayajula Dep.) at 43:12-23).

**CONFIDENTIAL MATERIAL OMITTED**

AliveCor also argues that its commercial success evidence as to KardiaBand undervalues the commercial success of KBS as a whole because it does not account for Apple Watch sales that were made to take advantage of the KBS's features, *id.* at 68; however, AliveCor cites no proof as to revenues or profits associated with its theory of additional Apple Watch sales. *Id.* The Commission finds, based on this record, that AliveCor's evidence of commercial success regarding the '941 patent claims is weak and gives it little weight in determining whether the evidence of secondary consideration is sufficient to overcome the *prima facie* evidence of obviousness. Specifically, the Commission agrees with the ID that KBS' profitability is not clear and AliveCor's evidence of [[          ]] in funding it received did not have a clear connection to the KBS. ID at 95.

The Commission, however, finds that the evidence of "industry praise" and "copying" together, even without commercial success, is sufficient to overcome the *prima facie* showing of obviousness.[29] Apple argues that the ID's findings on "industry praise" and "copying" are in error and that even if they were not, the evidence is insufficient to overcome its prima facie obviousness showing. Apple Sub. at 4-7. The ID's findings as to copying and industry praise, however, are amply supported by the record evidence. ID at 93-96. Moreover, the cases that

---

[29] Chairman Johanson would not find that the secondary indicia of nonobviousness outweigh the *prima facie* case of obviousness. The ALJ found that "the prima facie case is strong." FID at 97. With respect to claims 12, 16, 20, 22, and 23 of the '941 patent, he found that "except for one element of independent claim 12, every element of every claim is found in AMON." FID at 97. With respect to that one missing limitation ("based on the presence of the discordance, indicate to the user a possibility of an arrhythmia being present") the ALJ finds that "[i]n essence, AMON discloses a genus (inform the user of the sensed condition in an appropriate form) of which the 'indicate' limitation is a species . . . . AMON itself implies multiple possibilities, but it surely would have been obvious to that skilled artisan to just program the device to display a plain language description of the detected discordance . . . in fact, it likely would have been the simplest implementation." FID at 76. Given the strength of these findings, Chairman Johanson would not find the evidence of obviousness outweighed by the cited evidence of nonobviousness.

44

Apple relies on predate the Court's *Graham* 1966 decision. *See* Apple Sub. at 4 (citing *Dow Chem. Co. v. Halliburton Oil Well Cementing Co.*, 324 U.S. 320, 330 (1945); *Jungersen v. Ostby & Barton Co.*, 335 U.S. 560, 567 (1949)). *Graham* and its progeny make clear "[t]hat evidence is 'secondary' in time does not mean that it is secondary in importance." *Truswal Sys. Corp. v. Hydro–Air Eng'g, Inc.*, 813 F.2d 1207, 1212 (Fed. Cir. 1987). The Federal Circuit has explained that the requirement that courts always consider secondary considerations "is in recognition of the fact that each of the *Graham* factors helps to inform the ultimate obviousness determination." *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016).

 *b)*  ***Secondary Considerations for Claims 1, 12, and 16 of the '731 Patent***

 The ID stated that the elements of claims 1, 12, and 16 of the '731 patent are disclosed in AMON and that "[b]ecause anticipation is 'the epitome of obviousness' [(*Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1373 (Fed. Cir. 2019)], claims 1, 12, and 16 are invalid, without regard to secondary considerations of non-obviousness." ID at 126.

 In its petition for review, AliveCor asserted that the ID's finding is legal error. AliveCor Pet. at 27-29. Specifically, AliveCor argued that the Federal Circuit "has consistently pronounced that all evidence pertaining to the objective indicia of nonobviousness must be considered before reaching an obviousness conclusion." *Id.* at 28 (citing *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1355 (Fed. Cir. 2013); *Stratoflex, Inc. v. Aeroquip Cor.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983) ("[Evidence of secondary considerations] is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.")).

 The Federal Circuit has emphasized that "[t]he significance of this fourth *Graham* factor cannot be overlooked or be relegated to 'secondary status.'" *Plantronics*, 724 F.3d at 1355. The

mere fact that anticipation is the "epitome of obviousness" does not make anticipation and obviousness the same. These are two distinct legal doctrines with distinct bodies of law. While secondary considerations remain relevant in an obviousness inquiry, such considerations are absent from anticipation. Thus, the issue is whether the ID was considering obviousness or anticipation when analyzing Apple's invalidity case as to the '731 patent. As AliveCor points out, Apple did not assert anticipation as a defense at the hearing or in its pre- or post-hearing briefing. AliveCor Pet. at 29 (citing Respondent's Initial Post-HB at 95-104 (asserting only obviousness); Respondent's Reply Post-HB at 55-61 (same)). OUII stated that "to the extent that the ID found that each limitation of claims 1, 12, and 16 is found in AMON, those claims are anticipated and secondary considerations of obviousness do not apply," even though OUII did not assert anticipation before the ALJ. OUII Rep. at 42. But relying on a single reference to show obviousness, as here, does not convert the obviousness inquiry into an anticipation inquiry. Indeed, none of the parties made an anticipation argument.

Apple asserts that the "ID did not commit legal error when it determined that Apple's *prima facie* case of obviousness was so strong that it was equivalent to anticipation, and therefore secondary considerations need not be considered." Apple Rep. at 24. We disagree. Apple cites *Planet Bingo, LLC v. GameTech Int'l,* Inc., 472 F.3d 1338, 1346 (Fed. Cir. 2006), as holding that "if an accused infringer makes a non-frivolous argument that 'each and every limitation of a claim is found, expressly or inherently, in [a] single prior art reference,' the accused infringer generally is entitled to have anticipation decided by the finder of fact." *Planet Bingo,* however, is an anticipation case, and says nothing about obviousness. In any event, the Supreme Court's precedent, *Graham,* is clear that a tribunal must consider secondary

46

considerations of nonobviousness in determining whether an invention would have been obvious to a person of ordinary skill in the art at the time of the invention. *Graham,* 383 U.S. at 17.

We therefore agree with AliveCor that the ID erred in failing to consider the evidence of secondary considerations before concluding the relevant claims of the '731 patent are invalid as obvious. The Commission finds that the ID's secondary consideration findings as to the '941 patent applies to claims 1, 12, and 16 of the '731 patent as well.[30] The Commission thus finds that the secondary considerations of "industry praise" and "copying" are sufficient to overcome the *prima facie* showing of obviousness for claims 1, 12, and 16 of the '731 patent.[31]

## V. REMEDY

Where a violation of section 337 has been found, the Commission must consider the issues of remedy, the public interest, and bonding. Section 337(d)(1) provides that:

> If the Commission determines, as a result of an investigation under this section, that there is a violation of this section, it shall direct that the articles concerned, imported by any person violating the provision of this section, be excluded from entry into the United States, unless, after considering the effect of such exclusion upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, it finds that such articles should not be excluded from entry

19 U.S.C. § 1337(d)(1); *see also Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1358 (Fed. Cir. 2010) ("[T]he Commission is required to issue an exclusion order upon the finding of

---

[30] Chairman Johanson would not find that the secondary indicia of nonobviousness outweigh the *prima facie* case of obviousness as to claims 1, 12, and 16 of the '731 patent. The ALJ found that "claims 1, 12, and 16 are disclosed in AMON" in a manner that is tantamount to anticipation. FID at 126. Commissioner Johanson agrees that the Commission must consider evidence of nonobviousness as to these claims but would not find the strong showing of obviousness to be outweighed by the evidence of nonobviousness.

[31] We note that claims 1, 12, and 16 of the '731 patent are similar in substance to claims 12, 13, and 16 of the '941 patent, in that each of the claims are directed to a smart watch with a particular arrangement of sensors to detect the presence of an arrhythmia.

a Section 337 violation absent a finding that the effects of one of the statutorily-enumerated public interest factors counsel otherwise."). The Commission has "broad discretion in selecting the form, scope, and extent of the remedy." *Viscofan, S.A. v. U.S. Int'l Trade Comm'n*, 787 F.2d 544, 548 (Fed. Cir. 1986). The Commission may issue an exclusion order excluding the goods of the person(s) found in violation (*i.e.*, a limited exclusion order) or, if certain criteria are met, against all infringing goods regardless of the source (*i.e.*, a general exclusion order).

In conjunction with (or in lieu of) an exclusion order, the Commission may also issue orders directing persons found in violation of section 337 "to cease and desist from engaging in the unfair methods or acts involved." 19 U.S.C. § 1337(f). The Commission generally issues a cease and desist order ("CDO") when the evidence shows that the respondent maintains a "commercially significant" inventory of imported infringing products in the United States or has significant domestic operations that could undercut the remedy provided by an exclusion order.[32] *See, e.g.*, *Certain Elec. Skin Care Devices, Brushes & Chargers Therefor, & Kits Containing the Same*, Inv. No. 337-TA-959, Comm'n Op. at 26 (Feb. 13, 2017).

### A.    Limited Exclusion Order

As noted above, the ID included the ALJ's Recommended Determination ("RD") on remedy and bonding. ID/RD at 189-195. In the RD on remedy and bonding, the ALJ recommended that, in the event the Commission finds a violation of section 337, "there is no

---

[32] When the presence of infringing domestic inventory or domestic operations is asserted as the basis for a CDO under section 337(f)(1), Commissioner Schmidtlein does not adopt the view that the inventory or domestic operations need(s) to be "commercially significant" in order to issue the CDO. *See, e.g.*, *Certain Magnetic Tape Cartridges & Components Thereof*, Inv. No. 337-TA-1058, Comm'n Op. at 65 n.24 (Apr. 9, 2019); *Certain Table Saws Incorporating Active Injury Mitigation Tech. & Components Thereof*, Inv. No. 337-TA-965, Comm'n Op. at 6 n.2 (Feb. 1, 2017). In Commissioner Schmidtlein's view, the presence of some infringing domestic inventory or domestic operations, regardless of its commercial significance, provides a basis to issue a CDO.

48

dispute that a limited exclusion order ('LEO') should issue against Apple that covers all infringing products imported by or on behalf of Apple or its agents." ID/RD at 190.  The ALJ recommended that the LEO include the Commission's standard certification as "it has been Commission practice for the past several years to include certification provisions in its exclusion orders to aid CBP [Customs and Border Protection]." *Id.* at 92.

AliveCor and OUII agree with the ID's recommendation.  AliveCor Sub. at 35; OUII Sub. at 8-9.  Apple argues that no remedial orders should issue because it would have an adverse effect on the public interest.  Apple Sub. at 37-64.  Apple also argues that should the Commission issue an LEO, it should "suspend enforcement thereof for at least two years to allow for sufficient production of adequate replacements to Apple Watch and, at a minimum, until final resolution of the Patent Office's Final Written Decisions on AliveCor's Asserted Patents" and "tailor its remedy to allow for support of Apple Watch users, clinical use, certain personal imports, governmental use, and standard certification." *Id.* at 67; Apple Pet. at 98 (citing Apple's Notice of Institution of Petitions for *Inter Partes* Review and noting that "[t]he PTAB's FWDs on each asserted claim is expected December 8, 2022").  We discuss these issues below.

The Commission has determined to issue a limited exclusion order covering the unlicensed importation of wearable electronic devices with ECG functionality and components thereof that infringe one or more of claims 12, 13, and 19-23 of the '941 patent; and claims 1, 3, 5, 8-10, 12, 15, and 16 of the '731 patent that are manufactured abroad by or on behalf of, or imported by or on behalf of, Respondent or any of its affiliated companies, parents, subsidiaries, or other related business entities, or their successors or assigns, are excluded from entry for consumption into the United States, entry for consumption from a foreign trade zone, or withdrawal from a warehouse for consumption, for the remaining terms of the patents, except

49

under license of the patent owner or as provided by law, and except for articles or components imported for use in servicing, repairing, or replacing covered articles that were imported prior to the effective date of this Order pursuant to existing service and warranty contracts.[33]

The Commission agrees that the LEO should include the standard certification provision under which, at the discretion of CBP and pursuant to the procedures it establishes, persons seeking to import articles that are potentially subject to the LEO may be required to certify that they are familiar with the terms of the LEO, that they have made appropriate inquiry, and thereupon state that, to the best of their knowledge and belief, the products being imported are not excluded from entry under the LEO. Certification is only acceptable for those articles that were previously determined not to infringe. *See Automated Teller Machines, ATM Modules, Components Thereof, & Prods. Containing the Same*, Inv. No. 337-TA-972, Comm'n Op. at 27 (June 12, 2017) ("The standard certification language does not apply to redesigns that have not been adjudicated as non-infringing."). As discussed below, the Commission finds that the public interest factors do not counsel against issuance of remedial orders, but warrant an exception for servicing, repairing, or replacing covered articles that were imported prior to the effective date of this Order pursuant to existing service and warranty contracts.

---

[33] Apple also requested an exemption for software updates and personal imports. Apple Sub. at 70-73. Commission exclusion orders, however, do not extend to electronic transmissions. *See ClearCorrect, Inc. v. Int'l. Trade Comm'n*, 810 F.3d 1283 (Fed. Cir. 2015). As to personal imports, the exclusion order here is directed to infringing articles "that are manufactured abroad by or on behalf of, or imported by or on behalf of, Respondent or any of its affiliated companies, parents, subsidiaries, or other related business entities, or their successors or assigns." LEO ¶ 1. Apple has not shown why an exemption for personal imports is warranted.

CONFIDENTIAL MATERIAL OMITTED

### B.    Cease and Desist Order

The ALJ noted that Apple stipulated that it "'will not dispute that it currently maintains a commercially significant inventory of the Accused Apple Products in the United States at the time hearing evidence is submitted in this Investigation.'" ID/RD at 192 (citing CX-0904C.3). The ALJ found that, "[p]er that stipulation, ALC reports 'a domestic inventory of [[          ]] that cumulatively value at over [[          ]]' and argues it is 'commercially significant' as well as an underestimation." *Id.* The ALJ stated that "[g]iven the stipulation referenced above, this inventory requirement is certainly met for Apple, and it is my recommendation that a cease and desist order ("CDO") issue against this respondent." *Id.* at 193 (citing CX-0904C.3).

AliveCor and OUII agree with the ALJ that a CDO is warranted in this investigation. AliveCor Sub. at 39-40; OUII Sub. at 9.  Specifically, OUII notes that "Apple has stipulated that it has an inventory of at least [[          ]] of the Accused Products in the United States valued at over [[          ]]" and that "[t]his inventory is used to support Apple's commercial operations in the United States, and Apple does not dispute that it is commercially significant." OUII Sub. at 9 (citing CX-904C (Import Stip.)).

In light of the undisputed evidence of commercially significant domestic inventory, the Commission has determined to issue a CDO against Apple. [34]  The CDO directs Apple to cease and desist from conducting any of the following activities in the United States: importing, selling, offering for sale, marketing, advertising, distributing, transferring (except for exportation), soliciting United States agents or distributors, and aiding or abetting other entities in the importation, sale for importation, sale after importation, transfer (except for exportation),

---

[34] In light of the undisputed evidence of domestic inventory, Commissioner Schmidtlein agrees with issuing a CDO as to Apple in this case.  *See supra* note 32.

51

or distribution of wearable electronic devices with ECG functionality and components thereof that infringe one or more of claims 12, 13, and 19-23 of the '941 patent, and claims 1, 3, 5, 8-10, 12, 15, and 16 of the '731 patent.

## C.    The Public Interest

Prior to issuing remedial orders under section 337, the Commission must weigh the effect the orders would have on four public interest factors:  (1) the public health and welfare; (2) competitive conditions in the United States economy; (3) the production of like or directly competitive articles in the United States; and (4) United States consumers.  19 U.S.C. §§ 1337(d), (f).  In connection with the statutory public interest requirement and based upon statements on the public interest received from the parties and various third parties, the Commission asked for briefing in its Notice of Review.  87 Fed. Reg. 58819-20 (Sept. 28, 2022).

The private parties and numerous third parties filed public interest statements.  Apple argues that the public interest favors suspension of any exclusion order in particular to avoid any adverse impact on public health and welfare for U.S. consumers and researchers that use the Apple Watch with ECG and IRN[35] for early identification of AFib and other health conditions. *See* Respondent Apple Inc's Public Interest Statement at 4; Apple Pet. at 99.  According to Apple, there are insufficient substitutes for its accused Apple watches.

The following entities submitted public interest statements in support of Apple's position and presented essentially the same arguments as Apple:

- Statement of Third Parties Computer & Communications Industry Association and Netchoice in Response to the Commission's July 15, 2022, Notice of Request for Statements on the Public Interest (July 26, 2022)

- Dr. Marco Perez, Associate Professor in Cardiovascular Medicine, Stanford School of Medicine

---

[35] "IRN" stands for Irregular Rhythm Notification.

- Dr. Calkins, Professor of Cardiology, Johns Hopkins School of Medicine

- Dr. Richard Milani, Chief Clinical Transformation Officer, Ochsner Health System

- Mellanie True Hills CEO and Founder of StopAfib.org, an atrial fibrillation patient advocacy organization and patient-to-patient resource

- Members of Congress: Representatives Eric Swalwell, Zoe Lofgren, Donald Beyer, Anna Eshoo, Jimmy Panetta, Linda Sanchez, and J Luis Correa expressed concern that issuing an exclusion order against Apple's wearable devices would present a significant detriment to American consumers

The American Heart Association ("AHA") submitted a statement "not in support of any party," but their position is consistent with Apple. *See* Statement of Non-Party American Heart Association on the Public Interest of the Recommended Remedial Orders But Not in Support of Any Party (July 26, 2022). The AHA stated that the "recommended remedial orders would harm scientific research, healthcare consumers, and healthcare providers and in the United States. Accordingly, the AHA urges the Commission to tailor any remedial orders to allow researchers adequate time to complete ongoing research projects and transition to new research protocols with devices that are not subject to any exclusion order."

AliveCor asserts that its requests for an LEO and a CDO will benefit the public in that they "will promote intellectual property rights and continued innovation, and prevent a powerful company from holding health technology hostage simply because it is a large company that has successfully excluded competition." Complainant AliveCor, Inc.'s Statement on the Public Interest at 1-2. According to AliveCor, there is a "diverse field of suppliers" of alternative products that offer the health monitoring technologies of the accused Apple watches. *Id.*

The following entities submitted public interest statements in support of AliveCor's position and presented essentially the same arguments as AliveCor:

- Dr. Swerdlow, Professor of Medicine, Cedars Sinai Clinical Professor of Medicine, UCLA Cedars-Sinai Heart Institute

53

- Dr. Topol, Executive VP, Scripps Research and Director, Scripps Research Translational Institute

- Dr. Reynolds, Chief of Cardiovasular Section, the University of Oklahoma Health Sciences Center

- Cardiovascular Research Foundation of Southern California ("The answer could not be more transparent and clear that excluding infringing Apple Watches does not harm the public interest.")

- Medical Device Manufactures Association (The recommended relief is in the public interest given the need to protect the patent rights of medical device innovators from the threat of companies such as Apple who can afford to engage in "efficient infringement" as a business strategy.)

- Members of Congress: Representatives Henry "Hank" Johnson, Jr. and Lucy McBath expressed sentiment that the public interest is best served when the Commission takes action to protect intellectual property, enforce our nation's patent laws, and promote fair and robust competition

### 1. *Apple Submission*

#### a) *Public Health and Welfare*

Apple asserts that the recommended remedy "will seriously harm the public health and welfare" in three ways: (1) it will "reduce early detection of AFib, a prevalent and life-threatening disease that often goes undetected until a patient experiences serious or fatal complications, and may reduce detection of other cardiac conditions"; (2) it will "irreparably disrupt ongoing research into AFib, depriving the American public of potentially 'breakthrough' treatments for this disease and wasting millions of dollars in public and private investment already devoted to medical research using Apple Watch"; and (3) it will "deprive consumers of Apple Watch's numerous other invaluable health, wellness, and safety functions and disrupt ongoing research on these unaccused features." Apple Sub. at 40.

With respect to the first reason, Apple states that it "recognized the potential for Apple Watch to help detect AFib early, before a user experiences a stroke or other major medical

CONFIDENTIAL MATERIAL OMITTED

event" and that after years development, "followed by extensive clinical trials establishing the safety and efficacy of each of ECG app and IRN, Apple received *de novo* FDA authorizations for each separate feature in September 2018." *Id.* at 41 (citing Tr. (Waydo) at 738:6-9). Apple contends that its "ECG app and IRN each help facilitate 'diagnoses that otherwise would have either been diagnosed much later or missed altogether without an Apple Watch.'" *Id.* Apple explains that the "ECG app enables users to record an electrocardiogram on demand using two electrodes on Apple Watch" that "record the electrical activity of the user's heart for a 30-second period." *Id.* at 41-42. The ECG app on Apple Watch then "rapidly analyzes the heart's electrical signals to detect whether signs of AFib are present." *Id.* at 42. Apple points to the FDA's statement in approving its ECG app that "having this 'convenient and readily accessible means to record' an ECG on demand 'is especially valuable for users with recurrent, transient but infrequent symptoms, which can be difficult to catch with traditional cardiac monitors.'" *Id.* Apple further explains that upon activation, the IRN "operates in the background, periodically measuring and analyzing the user's pulse rate using PPG sensors located on the back of Apple Watch to identify irregular heart rhythms" and that "[i]f IRN identifies and confirms heart rhythms suggestive of AFib, IRN will notify the user and prompt them to 'talk to [their] doctor.'" *Id.* at 42 (citing ID at136 (quoting IRN notification)). Once again, Apple notes the FDA's statement that this feature "is an effective device for identifying abnormal pulse rates that may suggest the presence of [AFib]." *Id.* Apple "estimates that there are [[                    ]] Apple Watch users in the United States who have activated IRN on their Apple Watch, and a similar number who have activated ECG app." *Id.* at 43.

Regarding the second reason, Apple asserts that remedial orders "will jeopardize ongoing and planned AFib research, depriving the public of critical advances in medical knowledge." *Id.*

55

at 47.  According to Apple, there are numerous ongoing studies related to heart diseases using the Apple Watch.  *Id.*  As an example, Apple points to the "American Heart Association's collaboration with Northwestern University and researchers from Johns Hopkins University, Stanford University, and the University of California at San Francisco on the REACT-AF study, a seven-year, 5,400-patient research trial that will study the potential of Apple Watch to minimize the amount of time that a patient with AFib needs to take blood thinning medications." *Id.* (citing Kristin Samuelson, *Can Apple Watch reduce patients' reliance on blood thinners*, Northwestern University (Aug. 29, 2022), https://tinyurl.com/bddd9evk).  Apple asserts that "[t]he NIH already awarded researchers $37 million to conduct the study" and that "'government support' for research is an important factor "in determining the importance of a public interest."[36]  *Id.* (citing *Certain Microfluidic Devices*, Inv. No. 337-TA-1068, Comm'n Op. at 16 (Jan. 10, 2020)).  Apple asserts that for ongoing studies using the accused Apple Watches, "the recommended remedial orders could jeopardize their scientific merit and cause waste of resources spent for the studies."  *Id.* at 48.

As to the third reason, Apple contends that a remedial order "would deprive consumers of numerous other important life-saving features wholly unrelated to AliveCor's Asserted Patents [and not accused by AliveCor], and disrupt dozens of ongoing medical studies involving these features.  *Id.* at 49.  As examples Apple asserts that (1) "Apple Watch Series 4 and later offer fall detection, which connects wearers with emergency services after detecting a hard fall that has rendered the wearer immobile"; (2) "Apple Watch Series 6 and later include a blood oxygen monitoring feature that allows users to take on-demand measurements of their blood oxygen saturation—the amount of oxygen the red blood cells carry from the lungs to the rest of the

---

[36] "NIH" refers to National Institute of Health.

body—providing users with insight into their overall wellness; and (3) both Apple Watch Series 8 and Ultra "offer industry-leading crash detection technology," which "can automatically connect the wearer with emergency services, provide dispatchers with the location of the crash, and notify the wearer's emergency contacts." *Id.* at 50.

### b)    *U.S. Consumers*

Apple asserts that the recommended remedy will harm U.S. consumers directly by risking serious harm to consumers' health and welfare as discussed above. *Id.* at 52. Apple argues that remedial orders will also harm U.S. consumers "indirectly by disrupting crucial research and hampering the efficacy of the health care available to them." *Id.* Apple further argues that remedial orders will result in a lack of competition that will further harm U.S. consumers. *Id.*

### c)    *Suitable Alternatives*

Apple asserts that "there are not alternative smartwatches capable of counteracting the grave damage to public health and welfare and to consumers described above that would result from exclusion of the accused Apple Watches" and that "no new or upgraded product could redress that harm in a commercially reasonable time, because development, regulatory clearance, and production of such a product takes years." *Id.* at 53-54. According to Apple, "[t]he only suitable alternatives, for purposes of remedying the harm from exclusion, are wearable devices with both FDA-cleared ECG and IRN functions." *Id.* at 54. Apple argues that there are only "two options that meet those criteria currently available in the United States, but neither would ameliorate the harm to public health from an exclusion order." *Id.* Apple identifies "Fitbit, maker of the Charge 5 and Sense," as the only other company in the United States that "currently offers wearable products with HHRN and both an FDA-cleared ECG and IRN feature." *Id.* at 55. Apple, however, contends that "neither Charge 5 nor Sense could sufficiently compensate

57

for the wide-ranging harms to consumer and public health and welfare in the event of exclusion of Apple Watch from the U.S." *Id.* Apple adds that "[e]ven if Fitbit could ramp up manufacturing to fully meet consumer demand in the event of the sudden shortfall that would occur—which it cannot—the Sense and Charge 5 are markedly inferior to Apple Watch in their functionality, breadth of features, and ability to deliver life-saving cardiac and other benefits." *Id.* Apple further argues that "no other product could take the place of Apple Watch in the groundbreaking research" and that "Apple Watch's prevalence is the actual *subject* of some research, which looks to better understand and measure the public health benefits of a device with such widespread adoption." *Id.* at 57.

Apple observes that "[b]efore issuing an exclusion order, the Commission also considers the ability of AliveCor, its licensees, and third parties to satisfy demand for Apple Watch in the event the recommended remedy issues." *Id.* (citing 19 C.F.R. § 210.8(b)(3)). Apple states that "[n]o one, alone or in combination, can substantially replace the sudden supply shortfall that will arise if Apple Watch is excluded." *Id.* Apple explains that "[g]iven the complexities of engineering new electronic wearables, obtaining FDA clearance, and navigating the fragile and intricate procurement and manufacturing process, companies necessarily plan product launch and output years in advance" and that "[h]ere, where the massive shortfall would result from an external market shock, those companies would be caught flat-footed, unable to meet the enormous demand gap within a commercially reasonable time frame." *Id.* at 57-58.

### a)    *Competitive Conditions in the United States*

Apple contends that remedial orders "will also harm competitive conditions in the United States by harming third-parties reliant on the accused products and reducing market pressure on Apple Watch's competitors to cut costs and deliver innovative new products" and that "[t]hese

competitive harms will not be offset by any benefit to domestic 'production of like or directly competitive articles,' 19 U.S.C. § 1337(d)(1), because neither AliveCor nor any of Apple's primary competitors manufactures their competitive products in the United States." *Id.* at 61. Apple explains that "various U.S.-based components suppliers for Apple Watch 'have invested heavily in manufacturing to Apple specifications, … as Apple represents a large percentage of their business'" and that "[t]hese companies 'will likely experience negative impacts due to an exclusion order.'" *Id.* at 62. Apple adds that "numerous 'healthcare companies, hospitals, medical researchers and research institutions … have all made investments to work on projects … that rely on and sync with the Apple Watch.'" *Id.* Apple states that "removing a product as popular as Apple Watch, with as many sales as Apple Watch has, would 'weaken a primary force that underlies the current competitive environment'—vigorous competition between Apple and others." *Id.* at 63.

According to Apple, "[t]he substantial competitive harms caused by an exclusion order will not be offset by any benefit to 'the production of like or directly competitive articles in the United States'" because "the handheld ECG products that AliveCor does sell are not produced in the United States." *Id.* (citing 19 U.S.C. § 1337(d)(1), (f)(1)). Apple adds that to its knowledge, "Apple Watch's competitors, such as Samsung, Fitbit, and Garmin, do not produce their products in the United States either" and that it "is not aware of any company that manufactures full-featured smartwatches in the United States." *Id.* at 64.

ϵ)    ***Apple's Position***

Against this backdrop, Apple asserts that the Commission should exercise its discretion and decline to issue an exclusion order. Apple Sub. at 65-67. Apple states that "[s]hould the Commission choose to issue a remedy despite the fact that doing so will place American lives at

59

risk, it should: (A) suspend enforcement thereof for at least two years to allow for sufficient production of adequate replacements to Apple Watch and, at a minimum, until final resolution of the Patent Office's Final Written Decisions on AliveCor's Asserted Patents" and "(B) tailor its remedy to allow for support of Apple Watch users, clinical use, certain personal imports, governmental use, and standard certification." *Id.* at 67.

Apple argues that "Fitbit, which is currently the only company with FDA-clearances for an ECG app and an IRN feature," "would have to increase its current production of ECG and IRN-enabled products 'many times over' to replace the excluded Apple Watches." *Id.* at 68. Apple states that "given the existing supply chain issues, chip and neon gas shortages, logistics obstacles, and other issues, there is no reasonable likelihood Fitbit could increase its production to meet that demand in less than two years." *Id.* Apple adds that "[f]or any other company that does not have a current smartwatch with both of the two FDA authorized features in development, releasing such a smartwatch in the United States would require developing a working prototype, receiving FDA authorization, and overcoming the substantial supply chain hurdles currently roiling the global economy." *Id.* Apple states that "just receiving the necessary FDA clearance for any replacement product will likely require at least two years— assuming the product qualifies for the most straightforward FDA clearance pathway, which is no guarantee." *Id.* (citing Ex. 2 (Lietzan Decl.) ¶¶ 24-25). Apple thus asserts that "[d]elaying enforcement by two years is therefore the minimum time necessary for suitable alternative products to become available for sale on a scale sufficient to replace excluded Apple Watches." *Id.*

Apple contends that "[r]egardless of whether the Commission chooses to suspend enforcement of any remedial order until alternatives are ready, it should suspend enforcement

until final resolution of the Patent Office's Final Written Decisions for each of the Asserted

Patents." *Id.* at 69.  Apple states that it "filed petitions for *inter partes* review alleging that all of

the claims asserted in this Investigation are unpatentable and should be cancelled" and that a

final decision is expected by December 8, 2022, "*before* the Commission's target date to issue its

Final Decision." *Id.* (citing *Certain Unmanned Aerial Vehicles*, Inv. No. 337-TA-1133, Comm'n

Op., 2020 WL 5407477, at *21 (Sept. 8, 2020) ("Suspension of [any] remedial orders pending

resolution of the PTAB's Final Written Decision[s]" is fully "consistent with the Commission's

past practice on this issue.").

Apple also argues that the Commission should "tailor its remedy to allow for support of

Apple Watch users, clinical use, certain personal imports, governmental use, and standard

certification." *Id.* at 67.  Apple explains that "[[                    ]] Americans have activated EGC

and IRN on their Apple Watches" and that millions more own Apple Watches but have not yet

activated these features.  *Id.* at 70.  Apple states that "[a]n exception permitting software

maintenance releases and updates for all Apple Watches, including units with the Accused

Features installed" because "[s]uch updates for Apple Watches are important '[t]o make sure that

… Apple devices have the latest bug fixes and security enhancements.'" *Id.* (citing RX-644.1).

Apple further argues that "[a]ny remedial order should permit Apple to honor all service and

repair obligations—including obligations under applicable warranties and law, and other

applicable service and repair obligations—by providing technical support, service, repair, and

replacement for all permissibly obtained Apple Watches, including models with the Accused

Features installed." *Id.* at 71.  Apple explains that "[t]he Accused Products are subject to a

manufacturer's warranty that requires Apple to repair or replace products for one or two years,

depending on the model." *Id.* (citing CX-60C; CX-6; *Certain Liquid Crystal Display Modules*,

61

Inv. No. 337-TA-634, Comm'n Op., 2009 WL 4087135, at *2 (Nov. 24, 2009) (exempting infringing repair parts from remedial orders and allowing importation of service and replacement parts)).

Apple asserts that it "should also be permitted to continue the sale, replacement, or exchange of bands for the Apple Watches at issue" as well as "charging accessories like charging pucks and compatible adapters." *Id.* at 71-72. Apple asserts that "AliveCor's accusations have nothing to do with watch bands, and the bands are articles in commerce which users may choose to purchase or seek to have replaced." *Id.* Apple further contends that "[a]ny remedy should also include an exemption permitting continued sale of new AppleCare service and repair plans." *Id.* at 72.

Apple states that "[a]ny prohibition on 'marketing' or other customer facing communications in the Commission's Cease and Desist Order should expressly permit Apple to continue to provide and update informational and support materials for users of all Apple Watches on its website, including information specifically on ECG app, IRN, and HHRN." *Id.* at 72. Apple explains that "[i]n some instances, such as instructions for use, Apple is obligated by FDA to keep these materials accessible" and that "[i]n other instances, these materials help educate doctors and others about how to use Apple Watch to achieve better health results." *Id.*

Apple asserts that "[s]eparate from permitting support for existing end users, any remedy should also include an exception for products made, marketed, used, or sold solely for uses reasonably related to the development and submission of information under the FDCA." *Id.* at 73. Apple argues that "[a]n exclusion order should also include a personal importation exemption that would cover (i) American Apple Watch users who travel abroad with an accused Apple Watch and then return with that device; (ii) foreign visitors who enter and then depart the

62

United States with a personal Apple Watch; and (iii) U.S. travelers who buy an Apple Watch abroad, or have a watch replaced abroad under warranty." *Id.* According to Apple, "[t]hese exceptions are necessary to avoid harming unwitting consumers who are merely traveling with their Apple Watch products or choose to make a purchase decision abroad." *Id.*

### 2. *AliveCor Submission*

#### a) *Public Health and Welfare*

AliveCor contends that "the requested remedial orders do not raise any public health, safety, or welfare concerns" because there are numerous substitutes (discussed below) available that "will allow consumers to access wearable monitoring devices that can record ECGs and monitor cardiac events." AliveCor Sub. at 48. For support, AliveCor points to the public interest statements submitted by third parties. Specifically, AliveCor points to Dr. Topol's submission that "'[p]ublic health is far more served by encouraging and protecting those who innovate to make better medical technology' rather than by making an exception for large companies like Apple 'because that would be protecting those who use without authorization, simply because they are large.'" *Id.* AliveCor also points to Dr. Reynolds' statement in contemplation of Apple's intended argument that "'as a major seller of smartwatches in the U.S. [that] the public would somehow suffer if the Commission excluded its infringing Apple Watches' is actually 'a situation of Apple's own making'" in that "Apple created this situation by using its power and influence to 'exclude AliveCor and other competitors while Apple simultaneously introduced its infringing Apple Watches.'" *Id.*

In response to Apple's argument, AliveCor asserts that remedial orders will not apply to unaccused watches, including watches from Apple itself. AliveCor R.Sub. at 36. Specifically, AliveCor identifies the Apple Watch SE as a suitable substitute because it "has IRN, HHRN, Low Cardio Fitness Notifications, sleep stages, fall detection, crash detection, cycle tracking,

63

emergency SOS, noise monitoring, and backtrack." *Id.* Regarding Apple's assertion about the ECG, AliveCor states that "the majority of the testimonials that Apple attached to its brief—over 250 of them, *see* Apple Br., Ex. 8—do not appear to mention ECG functionality at all," and "[s]o there is no reason to think an exclusion order would affect the functionalities being touted." *Id.* AliveCor adds that "the nearly 30 million people who already own infringing devices would not be affected by any remedy in this case" and that "all of these Apple Watches—those unaccused, and those already in the stream of commerce—could be paired with relevant accessories, like AliveCor's KBS, to add functionalities." *Id.* at 36-37. AliveCor states that "[i]f Apple would stop its anticompetitive actions and restore access to the raw PPG data and APIs, AliveCor could make updated versions of KBS for the unaccused Apple Watches." *Id.* at 37.

### b)      *Suitable Alternatives*

AliveCor states that "numerous major electronic suppliers market reasonable substitutes for Apple's infringing functionalities." AliveCor Sub. at 44. According to AliveCor, "Apple itself sells and markets the Apple Watch SE series, which, although it provides IRN and HHRN, does not contain an ECG sensor and therefore has not been accused." *Id.* AliveCor adds that "[t]hose unaccused Apple Watches can, moreover, be combined with the KBS to provide ECG functionality" and that "[a]ll Apple needs to do is reverse its anticompetitive changes to watchOS that prevent SmartRhythm from working." *Id.* AliveCor also identifies certain third parties as offering reasonable substitutes. *Id.* Specifically, AliveCor argues that Samsung watches, including Galaxy Watch 5, Galaxy Watch 4, Galaxy Watch 3, and Galaxy Watch Active 2, "provide the capability of an on-demand 30-second ECG that can detect the presence of Afib" and that "[t]hese watches also provide continuous heartrate monitoring using an optical heart rate sensor (*i.e.*, PPG) that detects and keeps track of heart rate and heart rate changes in the

background." *Id.* AliveCor further argues that "Fitbit offers numerous products, cleared by the

FDA, that provide AFib detection capabilities using an ECG app13 and a PPG-based background

detection algorithm," including the Fitbit Sense, the Fitbit Versa, the Fitbit Versa Lite, the Fitbit

Charge 4, and the Fitbit Inspire 2." *Id.* at 45. According to AliveCor, "[t]he substitute Fitbit

devices are also capable of tracking elevated heart rates (similar to Apple's HHRN) as well as

tracking heart rate variability ('HRV'), which is a measure of the time variances in between

heartbeats that can indicate whether the heart is beating irregularly." *Id.* AliveCor also identifies

other "wearable smartwatches on the market that have received FDA clearance and have heart-

rate monitoring capabilities." *Id.* at 46. These include the "Oppowatch, which contains an

optical heartrate sensor and monitors the user's heartrate" and the "Withings Scanwatch, which

not only uses ECG and PPG for Afib detection, but specifically highlights those detection

capabilities to consumers on its website." *Id.*

AliveCor emphasizes that "[t]he infringing Apple Watches that would be subject to the

recommended exclusion order comprise only a subset of Apple's watch offerings; those products

that include both **(1)** PPG-based arrhythmia detection features (*i.e.*, the Irregular Rhythm

Notification feature ("IRN") and the High Heart Rate Notification ("HHRN") feature) and **(2)**

the ECG App." *Id.* at 46. AliveCor states that "Apple offers numerous unaccused Apple Watch

products that lack ECG hardware (and thus do not accommodate the ECG App), but which

nevertheless offer both the IRN and HHRN features" and that "[t]hese unaccused models would

not be subject to the recommended exclusion order." *Id.*

### *c)*      *Competitive Conditions in the United States*

AliveCor asserts that "the requested remedial orders will not, in fact, remove any

competitor from the market." AliveCor R.Sub at 45. AliveCor contends that "Apple can

65

continue offering unaccused watches" and that "Samsung, Fitbit, and others can continue competing with Apple." *Id.* at 46. AliveCor contends that "it is Apple that is engaging in anticompetitive behavior." *Id.* AliveCor explains that "Apple's unfair acts of competition" "are substantial and ongoing: Apple met with, considered acquiring, stole technology from AliveCor and is continuing to infringe AliveCor's patents and exclude AliveCor's products." *Id.* (citing AliveCor Sub at 10-14; OUII Sub at 17 ("This effectively excluded AliveCor from the Apple Watch market," so "[i]t appears likely that the effect of the requested remedial orders would benefit competitive conditions by opening up markets.").

### a)       *AliveCor Position*

AliveCor states that the remedial orders should issue immediately and without carveouts. AliveCor R.Sub. at 48. AliveCor asserts that "[t]here is no need for any exception for software updates" as "[t]he investigation Apple itself cites confirms that Customs does 'not [ ] regulate electronic transmissions.'" *Id.* at 49 (citing *Certain Systems for Detecting and Removing Viruses or Worms*, Inv. No. 337-TA-510, Comm'n Op., 2005 WL 8153587, at *3 (Aug. 23, 2005)). Regarding an exception for service and repair, AliveCor asserts that "Apple's corporate designee confirmed under oath that, under its warranty, it can provide a refund in lieu of repairing a broken watch" and that "[i]n such circumstances, a service and repair exemption is not warranted." *Id.* (citing JX-220C (Rollins) at 162:21-163:3, 167:1-9; CX-0060C; CX-0061; *Certain Light-Emitting Diode Products, Fixtures, and Components Thereof*, 337-TA-1213, Comm'n Op. at 13 (Jan. 14, 2022). Finally, AliveCor argues that "Apple's request that any remedy be suspended for two years is based on a claim that 'there are no suitable alternatives to Apple Watch" but that "[t]he record shows otherwise." *Id.* (pointing to immediately available, FDA-cleared alternatives from Fitbit, Samsung, and even Apple itself).

66

With respect to suspending remedial orders until final resolution of the IPRs, AliveCor states that "[i]n every case Apple cites, the Commission has acted only **after** a FWD decision issues, and only with respect to patent claims actually deemed invalid" and thus "[a] suspension of the remedial orders should therefore not even be under consideration unless every patent claim on which a violation is found has been held invalid in a FWD." *Id.* at 50.

### 3.    *OUII Submission*

#### a)    *Public Health and Welfare*

OUII states that on balance, "the requested remedial orders will not adversely affect the public health and welfare" because "[s]imilar irregular rhythm notification and ECG features are available on a variety of other devices." OUII Sub. at 13. OUII asserts that "consumers may purchase existing alternative devices including the Samsung Galaxy 4 smartwatch, the Samsung Galaxy 3 smartwatch, and the FitBit Charge 5 smartwatch." *Id.* OUII explains that the "Samsung Galaxy Watch 4 allows users to monitor for abnormal or irregular heart rhythm and to take electrocardiograms ('ECG') in real time." *Id.* OUII adds that "ECG technology is likely to be introduced in various existing and future products" and that "Garmin has completed clinical trials for its smartwatch ECG technology and is expected to enable such functionality in certain devices (including the Garmin Venu smartwatches) once it has secured necessary FDA clearance." *Id.* OUII states that "various alternative devices are available on the market to monitor heart health, including AliveCor KardiaMobile Card personal ECG device, Oura Ring Gen 3 smart ring, and Prevention Circul+ smart ring with ECG and blood pressure monitoring capabilities." *Id.* at 14. According to OUII, "[g]iven the wide availability of alternatives, it does not appear to OUII that the public health and welfare would be adversely impacted by the requested remedial orders." *Id.*

67

OUII states that "[w]hile the Apple Watch has certainly been used in various on-going research projects, at this time it has not been shown that alternative products cannot be used in its place." *Id.* OUII contends that "remedial orders would not impact the function of the existing Apple Watch installed base, and would thus appear unlikely to affect on-going research projects in any meaningful way." OUII R.Sub. at 16. OUII observes that "the non-accused Apple Watch SE provides the IRN and HHRN features that work in the background to detect irregular heart rhythms" and that "it appears that all of the research projects identified in public interest comments and briefing could be performed by an Apple Watch SE alone, or in combination with an external ECG device such as AliveCor's KardiaMobile Card." *Id.*

### *b)*       *Competitive Conditions in the United States Economy*

OUII argues that "remedial orders will promote competitive conditions in the United States economy." OUII Sub. at 16. OUII explains that "[i]n 2013, Apple tried unsuccessfully to design a smartwatch with the accused functionality" and that "when AliveCor successfully introduced its technology to the Apple Watch platform, Apple took steps to copy that technology by seeking information from the FDA, by commissioning research on AliveCor's technology, and by requesting meetings and live demonstrations to obtain information from AliveCor." *Id.* at 16-17. According to OUII, "once Apple had successfully implemented the patented technology, Apple revised its watchOS API in a manner such that AliveCor's KardiaBand System was no longer functional," which "effectively excluded AliveCor from the Apple Watch market, leaving consumers with fewer and less effective options." *Id.* at 17 (citing Tr. (Albert) at 83:20-85:19). OUII states that thus "[i]t appears likely that the effect of the requested remedial orders would benefit competitive conditions by opening up markets, allowing wider access to superior

68

technology, and encouraging innovation." *Id.* OUII also notes the availability of alternatives. *Id.* at 16.

### *c)* ***Production of Like or Directly Competitive Products in the United States***

OUII states that it is not aware of any evidence of record regarding the impact of the requested remedial orders on the production of like or directly competitive articles in the United States. *Id.* at 17.

### *a)* ***United States Consumers***

OUII states that on balance, remedial orders will not adversely impact U.S. consumers, pointing to the availability of alternatives for support. *Id.* at 18-19.

### *e)* ***OUII Position***

OUII asserts that based on the evidence provided in Apple's initial written submission, "any remedial order should be tailored to allow support of existing Apple Watch users." OUII R.Sub at 20. OUII also agrees with Apple's request that any remedial orders be tailored to permit Apple "to provide (1) 'software maintenance releases and updates for all Apple Watches, including units with Accused Features installed' and (2) to honor its service and repair obligations." *Id.* at 21. According to OUII, "Apple has demonstrated that 'Consumers who purchased an Accused Product reasonably expected to get the *full* scope of the accompanying warranty or insurance contract.'" *Id.* (citing JX-220C (Rollins Dep. Tr.) at 79:1-9; 160:9-168:21). OUII proposes an exception to the remedial orders as follows: "except for service or repair of wearable electronic devices with ECG functionality that were imported prior to the Commission's determination becoming final within the meaning of 19 U.S.C. § 1337(j)(4)." *Id.* OUII states that the evidence of record does not support any additional tailoring of the requested remedial orders. *Id.*

### 4.    *Analysis*

Under Federal Circuit precedent, "the Commission is required to issue an exclusion order upon the finding of a Section 337 violation absent a finding that the effects of one of the statutorily-enumerated public interest factors counsel otherwise." *Spansion*, 629 F.3d at 1358; 19 U.S.C. § 1337(d)(1) ("If the Commission determines, as a result of an investigation under this section, that there is a violation of this section, it shall direct that the articles concerned, imported by any person violating the provision of this section, be excluded from entry into the United States …"). The Commission finds that issuance of remedial orders in this investigation will not have such an adverse effect on the public interest factors that would warrant denying a remedy. Thus, the Commission declines Apple's invitation to exercise its discretion and deny a remedy.

### a)    *Public Health and Welfare*

The Commission agrees with AliveCor and OUII that remedial orders in this investigation would not raise significant public health or welfare concerns. *See* AliveCor Sub. at 48; OUII Sub. at 13.

Apple identifies three public health and welfare concerns that it contends would be affected by the remedial orders here: (1) the ability of current users to continue to enjoy the health, wellness, and safety features of the infringing Apple watch; (2) the disruption of ongoing research projects into Afib that utilize the infringing watches (no new studies were identified); and (3) curtailing consumer access to unaccused features of the infringing Apple watches and ongoing research projects pertaining to those unaccused features.

With respect to the first concern, the potential impact on existing owners of infringing Apple watches, the Commission finds, consistent with AliveCor's representation, that remedial relief against the infringing Apple watches would not affect current users of Apple's infringing watches as nothing in the relevant remedial orders would prevent them from being able to

70

Appx70

continue using all of the features without interruption, which would include software updates and the like to maintain the functional status of the watches that are in the hands of U.S. consumers.[37] *See* AliveCor R.Sub. at 36 ("the nearly 30 million people who already own infringing devices would not be affected by any remedy in this case"). Moreover, the Commission has determined that the evidence of record supports an exemption for service, repair, and replacement of those infringing watches pursuant to Apple's warranty obligations described below. This exemption would enable consumers who possess infringing watches to continue to benefit from the health, wellness, safety and other features that they have accessed since those watches were purchased prior to the orders becoming final.

With respect to the second concern, the effect on ongoing research projects, the Apple infringing watches used in those ongoing projects would likewise be unaffected by the remedial orders. Apple contends that remedial orders will "irreparably disrupt ongoing research into AFib, depriving the American public of potentially 'breakthrough' treatments for this disease and wasting millions of dollars in public and private investment already devoted to medical research using Apple Watch." Apple Sub. at 40. According to Apple, there are numerous ongoing studies related to heart diseases using the Apple Watch. *Id.* Apple does not identify any new studies that would be impacted by the remedial orders here, but rather the issue pertains solely to studies already underway. Remedial orders will not take Apple Watches away from existing study participants, and Apple does not contend that these studies need additional Apple Watches for additional participants, much less quantify that need. Therefore, infringing Apple watches supplied to research subjects at the commencement of those projects would remain

---

[37] Apple requests an exemption from the orders to account for software maintenance and updates and technical support for current Apple watch owners. Apple Sub. at 70-71. No exemption is necessary as these are not covered by the remedial orders.

available to the persons participating in those studies given that current users can continue to utilize all of the features without interruption as noted above. Moreover, to the extent that study participants' watches malfunction or break, Apple can continue to provide service and repair under its warranty obligations under the Commission's exemption. The service and warranty exception will allow Apple to repair or replace malfunctioning watches for existing participants, and any new studies can utilize any of the numerous alternatives discussed below, including the Apple Watch SE paired with ECG functionality.

As to the third concern, the curtailment of consumer access to non-accused features of infringing watches and ongoing research into those unaccused features, persons who already possess these infringing watches whether for their own use or ongoing research, their continued access is unaffected as explained above. To the extent that Apple's concerns relate to potential new customers of infringing watches, Apple has failed to substantiate or detail its concerns.

With respect to persons who seek to purchase new watches after the orders become final, the parties dispute whether there are suitable substitutes available to address public health, safety, and welfare concerns that may arise due to exclusion of the infringing Apple watches. Apple contends that "suitable alternatives for purposes of remedying the harm from exclusion must (1) include ECG, IRN, and HHRN features; (2) be a wearable; and (3) be FDA-cleared." Apple Sub. at 54. AliveCor responds that "the majority of the testimonials that Apple attached to its brief—over 250 of them, *see* Apple Br., Ex. 8—do not appear to mention ECG functionality at all." AliveCor R.Sub. at 36. OUII states that due to a "wide availability of alternatives, it does not appear to OUII that the public health and welfare would be adversely impacted by the requested remedial orders." OUII Sub. at 14.

The Commission finds that suitable alternatives are available to meet the public health concerns raised by Apple's comments.  As to Apple's first and second points regarding suitable alternatives, Apple explains that for substitutability with Apple's infringing watches, portability is key because a device offering IRN functionality without a readily available ECG app "would mean that wearers concerned about their heart health—either because of an IRN alert or because of how they are feeling—would need to go to the hospital or acquire an inconvenient and separate at-home ECG device to accurately detect AFib, by which time their fleeting symptoms may have passed." Apple Sub. at 44.  Thus, in Apple's view, wearable devices that have an IRN function and a means by which the user can quickly take an ECG would provide a suitable alternative.  In contrast to IRN, Apple explains that HHRN "cannot itself detect any heart conditions, [but] it provides valuable information to users that can encourage them to seek medical care, which can in turn lead to the identification of a range of cardiac conditions that might otherwise have gone undiagnosed.  Id.  AliveCor and OUII concur that a combination of portable devices can readily replace the infringing Apple watches.  AliveCor Sub. at 44-47; OUII Sub. at 12-16.  In view of these comments, the Commission finds that wearable devices that have IRN and HHRN functionality along with portable ECG devices represent a reasonable alternative to the Apple watches to be excluded under our remedial orders.  As discussed in detail below, various portable devices are currently available on the market to provide these functionalities.

With regard to Apple's third point regarding substitutability, FDA clearance, Apple contends that FDA-clearance provides a "rigorous authorization process for software as a medical device (SaMD) [which] requires high-quality validated sensor inputs that have clinical-level accuracy." Apple Sub. at 54.  Apple argues that "[no]n-cleared devices that purport to measure cardiac activity through PPG sensors have not been determined to accurately identify

73

Appx73

potential AFib" and that decisions as to medications and treatments based on these data would be "ill-advised." *Id.* at 55 (citing StopAfib.org Sub. at 3). Apple's assertion, however, is based exclusively upon the conclusory statement that "non-FDA cleared devices are often inaccurate and may lead to ill-advised decisions about medications and treatment." StopAfib.org Sub. at 3. Aside from this general admonition, Apple provides no evidence showing that particular non-FDA cleared portable devices are, in fact, inaccurate or that doctors or patients have made medical decisions on medications and treatments for AFib based solely on data generated by non-FDA cleared software. Absent such factual basis, the Commission does not credit Apple's conclusory assertion that FDA-clearance is mandatory in order for alternative devices to serve as suitable substitutes for the infringing devices.

Even if suitable alternatives were restricted to the three-part definition that Apple advocates, Apple concedes that Fitbit's Charge 5 and Sense are alternatives currently available in the United States. Apple Sub. at 55-56. According to AliveCor, Fitbit offers "numerous products, cleared by the FDA, that provide AFib detection capabilities using an ECG app13 and a PPG-based background detection algorithm," including the Fitbit Sense, the Fitbit Versa, the Fitbit Versa Lite, the Fitbit Charge 4, and the Fitbit Inspire 2" that "are also capable of tracking elevated heart rates (similar to Apple's HHRN) as well as tracking heart rate variability ('HRV'), which is a measure of the time variances in between heartbeats that can indicate whether the heart is beating irregularly." AliveCor Sub. at 45. Apple, however, asserts that Fitbit cannot ramp up manufacturing to fully meet consumer demand in the event of the sudden shortfall that would occur. *Id.* at 55, 68. Specifically, Apple states that "given the existing supply chain issues, chip and neon gas shortages, logistics obstacles, and other issues, there is no reasonable likelihood Fitbit could increase its production to meet that demand in less than two years." *Id.* at

74

68 (citing Exh. 6 (Davies Decl.) ¶¶ 17, 22, 37, 53, 90)).[38]  Again, Apple (including the cited paragraphs of the declaration), provides no evidence to substantiate its assertions that Fitbit presently lacks the manufacturing capability to produce new products that include FDA-cleared ECG, IRN, and HHRN features in a single wearable device to meet the narrow band of consumer demand for products so defined, and Apple's assumption that consumers would forego all other portable devices that provide some or all these features, which are widely available in the U.S. market as discussed below.  In any event, as noted above, the Commission is suspending the remedial orders pending final resolution of the PTAB's final written decisions which will give adequate time for alternatives to be readily available.

Under the Commission's understanding of reasonable alternatives, the record evidence shows that, in addition to Fitbit, there are substitutes that offer a wide range of health, safety, and wellness features including some that "will allow consumers to access wearable monitoring devices that can record ECGs and monitor cardiac events."  AliveCor R.Sub. at 36.  As AliveCor notes, "Apple itself sells and markets the Apple Watch SE series, which, although it provides IRN and HHRN, does not contain an ECG sensor and therefore has not been accused."  *Id.* at 44.  The evidence shows that the Apple Watch SE series can be combined with ECG devices, such as the KBS, to serve as an adequate substitute.  *See* AliveCor Sub. at 44.[39]

---

[38] Apple filed a motion for leave to file "further corrected Exhibits 5 and 6" on October 11, 2022, after omitting these exhibits from its October 6, 2022 opening submission, obtaining leave from the Commission to file these omitted exhibits, then served a first corrected version on October 7, 2022, followed by this second set of corrected exhibits filed and served on October 11, 2022.  *See* Apple Mot. at 1-2 (Oct. 11, 2022).  The Commission has determined to grant Apple's motion.

[39] We note that the KBS was previously pared with the Apple watch series 1-3 to provide ECG functionality in a single device.  That situation ended around December of 2018 when Apple changed its software to no longer support the KBS.  AliveCor Sub. at 41 (citing RX-0047C; Somayajula Tr. at 84:1-84:3, 199:18-200:20).  Apple has not provided evidence that

75

AliveCor also identifies other third parties as offering reasonable substitutes that carry out the same functions, specifically Samsung watches including the Galaxy Watch 5, Galaxy Watch 4, Galaxy Watch 3, and Galaxy Watch Active 2.  The Samsung watches provide "the capability of an on-demand 30-second [FDA cleared] ECG that can detect the presence of Afib" and also "provide continuous heartrate monitoring using an optical heart rate sensor (*i.e.*, PPG) that detects and keeps track of heart rate and heart rate changes in the background."  *Id.*  Apple does not disagree with AliveCor's statement, nor does it contend that Samsung's products are not competitive with its own smartwatches.  Apple R.Sub. at 26.  Rather, Apple responds that Samsung products are not "FDA-cleared to continuously monitor for irregular heart rhythms suggesting potential AFib," albeit Apple concedes that Samsung offers a feature comparable to HHRN.  *Id.*  As discussed above, Apple has failed to substantiate its contention that suitable substitutes must have FDA clearance.  Apple also raises the same high level general supply constraints observations as it raises with respect to Fitbit relating to global supply of semiconductor chips in 2021.  Apple Sub. at 61.

OUII also points out that "ECG technology is likely to be introduced in various existing and future products," noting that "Garmin has completed clinical trials for its smartwatch ECG technology and is expected to enable such functionality in certain devices (including the Garmin Venu smartwatches) once it has secured necessary FDA clearance."  OUII Sub. at 13.  Apple responds that it is unaware of the status of Garmin's FDA application, clinical trials, or IRN-type feature under development.  Apple R.Sub. at 30.

---

changing its software to again allow compatibility with the KBS would require a substantial ramp up period, including in light of the suspension of enforcement of the orders.

# CONFIDENTIAL MATERIAL OMITTED

OUII points to other alternative devices "available on the market to monitor heart health, including AliveCor KardiaMobile Card personal ECG device, Oura Ring Gen 3 smart ring, and Prevention Circul+ smart ring with ECG and blood pressure monitoring capabilities" and states that "[g]iven the wide availability of alternatives, it does not appear to OUII that the public health and welfare would be adversely impacted by the requested remedial orders." *Id.* at 13-14. The table below, submitted by AliveCor, identifies devices that are suitable alternatives:

**TABLE 1: SELECTED SMARTWATCH FEATURES PROMOTED BY DEVICE MANUFACTURERS**

| | Apple | | Competitors | | | | |
|---|---|---|---|---|---|---|---|
| | Apple Watch (Series 8) [A] | Apple Watch (SE 2nd Gen) [B] | Samsung Galaxy (Watch 5) [C] | Fitbit (Sense2) [D] | Fossil (Gen 6) [E] | Garmin (Venu 2 Plus) [F] | Zepp (Amazfit GTS4) [G] |
| GPS | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Emergency SOS Capability | ✓ | ✓ | ✓ | ✗ | ✓ | ✓ | ✗ |
| Water Resistant | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Speaker and Microphone | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ |
| 24+ Hour Battery Life | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| iOS Compatability | ✓ | ✓ | ✗ | ✓ | ✓ | ✓ | ✓ |
| Cellular Connectivity | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Personalizable Design | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Health Functions** | | | | | | | |
| ECG | ✓ | ✗ | ✓ | ✓ | ✗ | ✗ | ✗ |
| BHRN | ✓ | ✓ | ✓ | ✓ | - | ✓ | ✓ |
| IRN | ✓ | ✓ | - | ✓ | ✓ | ✓ | ✓ |
| Low Cardio Fitness Notifications | ✓ | ✓ | - | ✓ | ✓ | ✓ | ✓ |
| Blood Oxygen | ✓ | ✗ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Fall Detection | ✓ | ✓ | ✓ | ✗ | ✗ | ✓ | ✓ |
| Crash Detection | ✓ | ✓ | ✓ | ✗ | ✗ | ✓ | ✓ |
| Wrist Temperature | ✓ | ✗ | ✓ | ✓ | ✗ | ✗ | ✗ |
| Sleep Monitoring | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

AliveCor R.Sub. at 37.

Apple contends that AliveCor and third parties cannot meet demand within a commercially reasonable time if its infringing watches were to be excluded. Apple Sub. at 57 ("No one, alone or in combination, can substantially replace the sudden supply shortfall that will arise if Apple Watch is excluded."). Apple submitted the following IDC data for imports by U.S. retailers of Apple watches (with and without the infringing functionalities) as well as other smartwatch and fitness trackers for the period 2015 through 2021:[[

77

**CONFIDENTIAL MATERIAL OMITTED**

]]  Apple Sub., Exh. 5 (Dippon Decl.)  ¶ 11.  The infringing Apple watches comprise [[

       ]] of the total Apple shipments listed above in 2021, amounting to [[         ]] infringing

Apple watches.  *Id.* ¶ 25.

       As relevant to Apple's public health and welfare arguments focused on U.S. consumers

with Afib, Apple states that of the total number of infringing units sold in the United States, [[

       ]] users have activated IRN and ECG on their infringing watches.  Apple Sub. at 70.

Afib affects up to 6 million people in the United States.  Apple Sub., Exh. 5 (Dippon Decl.) ¶ 49.

These data indicate that consumers, and particularly those affected by Afib, who need portable

devices offering health and safety features discussed above have already purchased and activated

IRN and ECG on their Apple watches, Fitbit, or other devices or if they are new purchasers, they

would be able to obtain devices that meet their needs from third party suppliers.

       Moreover, as noted above, nothing in the remedial orders prevents current users and

researchers from continuing to use their Apple watches.  We also find Apple's argument that

remedial orders "would deprive consumers of numerous other important life-saving features,"

and "disrupt dozens of ongoing medical studies involving these features" unpersuasive and

unsubstantiated.  Apple Sub. at 49.  Moreover, the available substitutes for the infringing

watches can be used for new studies.

CONFIDENTIAL MATERIAL OMITTED

### *b)*      ***Competitive Conditions in the United States Economy***

In our judgment, the evidence of record shows that the remedial orders would not have any adverse impact on competitive conditions in the United States economy. Apple's argument to the contrary depends entirely on its view that there are no suitable alternatives other than Fitbit. As discussed above, the record evidence shows an abundance of suppliers that offer competing products. With respect to market shares of these competitors, Apple offers the following data from IDC regarding U.S. smartwatch and fitness tracker shipment shares in 2021:[[

]] *See* Apple Sub., Exh. 5 (Dippon Decl.) ¶ 24. As shown in the table above, these suppliers of competitive products include Samsung, Garmin, Fitbit, Fossil, and Zepp, among others. Apple itself can remain a competitor in the U.S. market with products that do not infringe such as the Apple Watch SE.

Apple argues that remedial orders will "harm competitive conditions in the United States by harming third-parties reliant on the accused products and reducing market pressure on Apple

**CONFIDENTIAL MATERIAL OMITTED**

Watch's competitors to cut costs and deliver innovative new products." Apple Sub. at 62. This argument, however, is wholly unsubstantiated.

### c) The Production of Like or Directly Competitive Articles in the United States

The record contains no evidence that remedial orders will adversely impact the production of like of directly competitive articles in the United States. We note that neither the infringing products nor the reasonable alternatives are manufactured in the United States.

### d) United States Consumers

As to potential effects on consumers, Apple argues public health considerations relating to consumers that the Commission has discussed above. Apple Sub. at 52. Apple further argues that exclusion would likely result in higher prices and poorer quality alternatives diminishing consumer choice. *Id.* Apple's argument, however, is unsubstantiated. Indeed, Apple does not present evidence of a direct price comparison between and among the competing products to support its allegation. *See Certain Audio Players & Controllers*, Inv. No. 337-TA-1191, Comm'n Op. at 32 (Jan. 6, 2022).

The record evidence indicates that [[                    ]] own infringing Apple Watches. As discussed above, current owners of the infringing Apple watches will be unaffected by the remedial orders here thus alleviating any concerns regarding current users of these products.

While these consumers will not be affected by any remedy in this case, they bought their watches reasonably expecting to get the *full* scope of the accompanying warranty and insurance contract. JX-220C (Rollins Dep. Tr.) at 79:1-9; 160:9-168:21. For this reason, as well as to allow individuals using the Apple Watch to participate in ongoing studies as discussed above, the

80

Commission has determined to tailor the remedial orders to allow Apple "to honor its service, repair, and replacement obligations." *See* OUII R.Sub. at 21.

AliveCor suggests that a refund would suffice. AliveCor R.Sub. at 48. However, AliveCor and OUII have not shown that a refund will be adequate to compensate consumers who are seeking to maintain their Apple Watches or to participate in ongoing health-related studies using the Apple Watch. Accordingly, based upon the reasonable expectations of those consumers who purchased infringing Apple Watches and in consideration of ongoing research projects involving infringing Apple Watches that may malfunction or break, the Commission's remedial orders include the following exemption: "except under license of the patent owner or as provided by law, and except for articles or components imported for use in servicing, repairing, or replacing covered articles that were imported prior to the effective date of this Order pursuant to existing service and warranty contracts."[40]

### *ϵ)*        *Summary*

In sum, the public interest factors do not compel the Commission to decline to issue remedial orders in this investigation. The Commission, however, has determined to include an exemption to allow Apple to honor its service, repair, and replacement obligations. The orders

---

[40] Commissioner Stayin does not believe that a warranty or service exception is justified merely because consumers expect the full scope of their bargain, as this would justify such an exception in every case involving a product sold with a warranty or service agreement. Moreover, in his view, it was Apple's burden to show an exception is necessary, and not AliveCor's burden to show a refund was sufficient. *See Certain Audio Players & Controllers, Components Thereof, & Prods. Containing the Same*, Inv. No. 337-TA-1191, Comm'n Op. at 25 (Feb. 1, 2022) (finding respondent failed to show a warranty exception was appropriate, including because respondent could provide a refund in lieu of repair). Nonetheless, given the specific health-related functionality at issue in this case, Commissioner Stayin believes a warranty and service exception is appropriate so that existing consumers do not bear the burden of switching to a new device for monitoring purposes in the event an issue arises with their previously purchased device after the remedial orders go into effect.

**CONFIDENTIAL MATERIAL OMITTED**

also include an exemption for articles imported by or for U.S. Government use, as usual, and include the Commission's standard certification provision.

### D.     Bond

If the Commission enters an exclusion order and/or cease and desist order, a respondent may continue to import and sell its products during the 60-day period of Presidential review subject to posting a bond. 19 U.S.C. § 1337(j)(3). The amount of the bond is specified by the Commission and must be sufficient to protect a complainant from any injury. *Id.*; 19 C.F.R. §§ 210.50(a)(3), 210.42(a)(1)(ii). "The Commission typically sets the bond based on the price differential between the imported infringing product and the domestic industry article or based on a reasonable royalty. However, where the available pricing or royalty information is inadequate, the bond may be set at one hundred (100%) percent of the entered value of the infringing product." *Loom Kits*, Comm'n Op. at 18 (citations omitted). A complainant bears the burden of establishing its requested bond amount. *See, e.g., Certain Liquid Crystal Display Devices*, Inv. No. 337-TA-631, Comm'n Op. at 28 (July 10, 2009). Should a complainant fail to meet its burden, the Commission may determine to impose no bond for products imported during the period of Presidential review period. *Id.*

The ALJ recommended that the Commission set no bond for entry of infringing products during the period of Presidential review. ID/RD at 194. The ALJ stated that "[i]t is entirely unclear what competitive harm ALC will face during this time as the KBS product has not been sold for some time (Hr'g Tr. (Albert) at 135:14-136:22) and [[          ]] are, at best, in development." *Id.* OUII and Apple agree with the ID's recommendation. OUII Sub. at 74; Apple Sub. at 21.

AliveCor asserts that "[t]he Commission should impose a bond of $13 per imported article." AliveCor Sub. at 40. According to AliveCor, "[t]he amount of bond to be posted during the sixty-day period for Presidential review must be at least sufficient to 'offset any

**CONFIDENTIAL MATERIAL OMITTED**

competitive advantages resulting from the unfair method of competition or unfair act enjoyed by persons benefitting from the importation.'" *Id.* (citing S. Rep. No. 1298, 93 Cong., 2d Sess. 198 (1974); 19 U.S.C. § 1337(e)(1), (j)(3); *see also Certain Semiconductor Chips with Minimized Chip Package Size and Products Containing Same*, Inv. No. 337-TA-432, RD at 7 (Oct. 1, 2001)). AliveCor argues that "Apple's continued patent infringement and unfair competition are harming AliveCor" and that "[t]hrough its unfair acts, Apple excluded AliveCor's KBS from the market." *Id.* AliveCor asserts that the record evidence contains [[

]].

*Id.* at 42 (citing Tr. (Akemann) 638:18-639:24; JX-007C; JX-008C; JX-010C; CX-0872C). AliveCor points to [[

]]." *Id.* (citing Tr. (Akemann) 638:18-639:24; JX-008C.4). Thus, AliveCor argues that the Commission should set the bond at $13 per imported article. *Id.*

The Commission finds that the record evidence supports a bond in this investigation. Apple argues that "AliveCor does not compete with the accused Apple Watches, and has failed to prove that it would be injured by the importation of the accused Apple Watches, or that Apple enjoys a competitive advantage resulting from its alleged infringement," and therefore the Commission should not impose a bond for importation of infringing products during the period of Presidential review. ID at 193. However, Apple is [[

]]. *See* AliveCor Sub. at 40. Thus, the Commission finds Apple's argument self-serving and unpersuasive.

83

# CONFIDENTIAL MATERIAL OMITTED

Regarding the appropriate bond rate, AliveCor asserts that "a bond—$13 infringing import—is consistent with [[

]].'" AliveCor R.Sub. at 50.  As OUII notes, however, the [[

]].  OUII Sub. at 22; *See* JX-008C.4; Tr. (Vander Veen) at 1048:25-1051:4.  The ID also observed that "[w]ith Apple using its own software, the $13 rate is demonstrably too high," and concluded that because AliveCor "has not offered alternative proposals reflecting this reality, it has not met its burden." ID at 194-95.  The record evidence, however, includes [[

]]." AliveCor R. Sub. at 50 (citing CX-0872C.16).  Accordingly, the Commission has determined to set a bond in the amount of $2.00 per unit article for infringing products imported during the period of Presidential review.[41]

---

[41] Commissioners Schmidtlein and Stayin agree the record evidence supports a bond in this investigation, but they disagree with the Commission's determination to set that bond in the amount of $2.00 per unit article.  While various licenses were cited by AliveCor in its briefing before both the ALJ and the Commission as evidence available for considering a reasonable royalty rate, AliveCor has consistently indicated that "[t]he most straight forward and applicable [[                                        ]] *See, e.g.*, AliveCor Sub. at 42.  And as noted by the Commission, AliveCor also contends [[

]] *Id*. (citations omitted).  In Commissioner Schmidtlein and Commissioner Stayin's view, rather than requiring absolute precision, the purpose of the bond determination under the statute and the Commission's Rules is to protect the complainant from harm.  *See* 19 U.S.C. § 1337(j)(3) (". . . bond prescribed by the Secretary in an amount determined by the Commission to be sufficient to protect the complainant from any injury."); 19 C.F.R. §§ 210.50(a)(3) (". . . [d]etermine the amount of the bond to be posted by a respondent . . . taking into account the requirement of section 337(e) and (j)(3) that the amount of the bond be sufficient to protect the complainant from any injury.").  Here, while the cited royalty rate may cover [[                                              ]], on this record they find the $13.00 [[                                        ]] sufficient to protect the complainant from any injury.  *See, e.g., Certain Audio Digital-to-Analog Converters and*

### E.  Suspension of Remedial Orders

As noted above, Apple, on December 7, 2022, filed an emergency motion, asking "the Commission to suspend any remedial orders or, in the alternative, extend the December 12, 2022 Target Date of its Final Determination and stay all proceedings prior to issuance of any Final Determination pending final resolution of any appeal of the PTAB's decisions."  Apple Emergency Motion at 1.  Apple contends that "suspension is consistent with the Commission's routine past practice" and that "[a] stay will simplify the issues and conserve agency and party resources—by avoiding issuance of a merits determination that is likely to be mooted by an affirmance of the PTAB's Final Written Decisions—without causing any harm to Complainant."  *Id.*  Apple states that "either a suspension or a stay accords due deference to the Patent Office's role as the lead agency in assessing patentability and honors Congress's intent that invalid patents should not be enforced."  *Id.*

AliveCor filed an opposition to Apple's motion on December 9, 2022.  AliveCor asserts that "[g]ranting the requested stay would be unprecedented" and that "[t]he Commission has never stayed an investigation that is in this posture pending the appeal of a FWD when the complainant opposes, and Apple cites no authority to the contrary."  AliveCor Opposition at 1.  According to AliveCor, "[a]t most, the Commission could exercise its discretion to suspend enforcement of any remedial orders" but that "Apple's argument for the Commission to do so is weaker than in any past investigation when the Commission has implemented a suspension."  *Id.* at 9.  AliveCor explains that "Apple did not file IPRs on those patents until June 2021, six months" after institution of the investigation and that due to "Apple's delay, the FWDs were

---

*Products Containing Same*, Inv. No. 337-TA-499, Comm'n Op. at 28 (Mar. 3, 2005) (Public Version) ("adopt[ing] the ALJ's finding that a bond of 5 percent is adequate to protect the complainant from injury during the 60-day Presidential review period" where "[t]ypical royalty rates in the semiconductor industry range from 0.75 percent - 5 percent.").

85

expected to issue after the Commission's Final Determination," which was expected on

September 28, 2022, before "the Commission extended the Target Date." *Id.*

On December 16, 2022, OUII filed a response. OUII "supports Apple's motion to the

extent that it requests that any remedy that issued by the Commission be suspended pending

appeal of the PTAB decisions." Otherwise, OUII "opposes Apple's motion." *See* OUII Reply to

Emergency Motion at 4.

The Commission has found a violation and determined that issuance of an LEO and CDO

is warranted. The Commission agrees with AliveCor and OUII that granting a stay would not be

consistent with Commission practice nor has Apple established the requisite showing to justify a

stay of the proceedings. *See Certain Magnetic Tape Cartridges and Tape Components Thereof*,

Inv. No. 337-TA-1058, Comm'n Op. at 61 (Apr. 9, 2019); *Certain Semiconductor Chips with

Minimized Chip Package Size and Products Containing Same*, Inv. No. 337-TA-605, Comm'n

Op. at 3 (July 29, 2009).

However, the Commission has determined to exercise its discretion to suspend

enforcement of those remedial orders pending final resolution of the PTAB's Final Written

Decisions finding all the asserted claims to be unpatentable. *See Viscofan*, 787 F.2d at 548

(finding that the Commission has "broad discretion in selecting the form, scope, and extent of the

remedy"). Suspension of the remedial orders pending resolution of the PTAB's Final Written

Decisions is consistent with the Commission's past practice on this issue. *See, e.g.*, *Certain

Unmanned Aerial Vehicles and Components Thereof* ("*Unmanned Aerial Vehicles*"), 337-TA-

1133, Comm'n Op. at 35 (Sep. 8, 2020); *Certain Magnetic Tape Cartridges and Tape

Components Thereof*, Inv. No. 337-TA-1058, Comm'n Op. at 62-63 (Apr. 9, 2019); *Certain

Three-Dimensional Cinema Systems and Components Thereof*, Inv. No. 337-TA-939, Comm'n

Appx86

Op. at 60 (July 21, 2016).  As the Commission explained at length under similar circumstances in *Unmanned Aerial Vehicles*, suspension of remedial orders is within the Commission's discretion over the form, scope, and extent of its remedy and may be appropriate where, as here, the PTAB issues final written decisions of unpatentability concerning certain claims before the Commission issues remedial orders based on those same claims.  *Unmanned Aerial Vehicles*, Comm'n Op. at 35-38.  The Commission has determined that it is appropriate under the facts in this investigation to suspend enforcement of the limited exclusion order and cease and desist order, including the bond provision, pending final resolution of the PTAB's Final Written Decisions finding the asserted claims of the '941, '731, and '499 patents unpatentable. AliveCor's contention that Apple delayed in filing its case at the Patent Office is not sufficient to overcome the other considerations warranting suspension of the remedial orders in this case.

## VI.    CONCLUSION

For the reasons detailed above, the Commission has determined to affirm the ID's finding of a violation of section 337.  Regarding the issues under review, the Commission has determined to affirm the ID's economic prong of the domestic industry findings with the modifications described herein.  Concerning invalidity, the Commission has determined to affirm the ID's patent eligibility findings under 35 U.S.C. § 101 as modified, but reverse as to one claim; and reverse the ID's decision not to consider objective indicia of non-obviousness for certain asserted claims.  For remedy, the Commission has determined to:  (1) issue a limited exclusion order prohibiting the unlicensed importation of wearable electronic devices with ECG functionality and components thereof that infringe one or more of claims 12, 13, and 19-23 of the '941 patent and claims 1, 3, 5, 8-10, 12, 15, and 16 of the '731 patent that are manufactured abroad by or on behalf of, or imported by or on behalf of, Respondent or any of its affiliated

companies, parents, subsidiaries, or other related business entities, or their successors or assigns, and stating that they are excluded from entry for consumption into the United States, entry for consumption from a foreign trade zone, or withdrawal from a warehouse for consumption, for the remaining terms of the patents, except under license of the patent owner or as provided by law, and except for articles or components imported for use in servicing, repairing, or replacing covered articles that were imported prior to the effective date of this Order pursuant to existing service and warranty contracts; (2) issue a cease and desist order directing that respondent Apple, cease and desist from conducting any of the following activities in the United States: importing, selling, offering for sale, marketing, advertising, distributing, transferring (except for exportation), soliciting United States agents or distributors, and aiding or abetting other entities in the importation, sale for importation, sale after importation, transfer (except for exportation), or distribution of wearable electronic devices with ECG functionality and components thereof that infringe one or more of claims 12, 13, and 19-23 of the '941 patent; and claims 1, 3, 5, 8-10, 12, 15, and 16 of the '731 patent; (3) find that the public interest factors do not preclude the issuance of the proposed remedial orders; and (4) set a bond in the amount of $2 per unit of article for infringing products imported during the period of Presidential review.  The Commission, however, has determined to suspend enforcement of the orders, including the bond provision, pending final resolution of the PTAB's Final Written Decisions finding the asserted claims of the '941, '731, and '499 patents unpatentable.

By order of the Commission.

Katherine M. Hiner
Acting Secretary to the Commission

Issued:   January 20, 2023

88

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN WEARABLE ELECTRONIC<br>DEVICES WITH ECG FUNCTIONALITY<br>AND COMPONENTS THEREOF** | **Investigation No. 337-TA-1266** |

**NOTICE OF THE COMMISSION'S FINAL DETERMINATION FINDING A
VIOLATION OF SECTION 337; ISSUANCE AND SUSPENSION OF A LIMITED
EXCLUSION ORDER AND A CEASE AND DESIST ORDER; TERMINATION OF THE
INVESTIGATION**

**AGENCY:**     U.S. International Trade Commission.

**ACTION:**     Notice.

**SUMMARY:**  Notice is hereby given that the U.S. International Trade Commission
("Commission") has determined that there is a violation of section 337 in the above-captioned
investigation.  The Commission has further determined to issue a limited exclusion order and a
cease and desist order and to set a bond in the amount of $2 per unit of covered articles imported
or sold during the period of Presidential review.  The enforcement of these orders, including the
bond provision, is suspended pending final resolution of the U.S. Patent and Trademark Office,
Patent Trial and Appeal Board's ("PTAB") Final Written Decisions finding the asserted patent
claims unpatentable.

**FOR FURTHER INFORMATION CONTACT:**  Panyin A. Hughes, Office of the General
Counsel, U.S. International Trade Commission, 500 E Street, S.W., Washington, D.C. 20436,
telephone (202) 205-3042.  Copies of non-confidential documents filed in connection with this
investigation may be viewed on the Commission's electronic docket (EDIS) at
*https://edis.usitc.gov*.  For help accessing EDIS, please email *EDIS3Help@usitc.gov*.  General
information concerning the Commission may also be obtained by accessing its Internet server at
*https://www.usitc.gov*.  Hearing-impaired persons are advised that information on this matter can
be obtained by contacting the Commission's TDD terminal, telephone (202) 205-1810.

**SUPPLEMENTARY INFORMATION:**  On May 26, 2021, the Commission instituted this
investigation based on a complaint filed by AliveCor, Inc. of Mountain View, California
("AliveCor").  86 FR 28382 (May 26, 2021).  The complaint alleged violations of section 337
based on the importation into the United States, the sale for importation, or the sale within the
United States after importation of certain wearable electronic devices with ECG functionality
and components thereof by reason of infringement of one or more of claims 1-30 of U.S. Patent
No. 10,595,731 ("the '731 patent"); claims 1-23 of U.S. Patent No. 10,638,941 ("the '941
patent"); and claims 1-4, 6-14, 16-20 of U.S. Patent No. 9,572,499 ("the '499 patent").  *Id.*  The

Commission's notice of investigation named Apple Inc. of Cupertino, California ("Apple") as the sole respondent. The Office of Unfair Import Investigations ("OUII") is named as a party in this investigation. *Id.*

On February 23, 2022, the ALJ issued an initial determination granting AliveCor's motion to terminate the investigation as to (1) claims 1-4, 6-14, and 18-20 of the '499 patent; (2) claims 2, 4, 6, 7, 11, 13, 14, and 17-30 of the '731 patent; and (3) claims 1-11, 14, 15, 17, and 18 of the '941 patent based upon withdrawal of allegations from the complaint as to those claims. Order No. 16 (Feb. 23, 2022), *unreviewed by* Notice (Mar. 18, 2022).

On June 27, 2022, the ALJ issued the final initial determination ("ID") finding a violation of section 337 as to the '941 and '731 patents, and no violation of section 337 as to the '499 patent. The ID found that the parties do not contest personal jurisdiction and that the Commission has *in rem* jurisdiction over the accused products. ID at 18. The ID further found that the importation requirement under 19 U.S.C. 1337(a)(1)(B) is satisfied. *Id.* (citing CX-0904C (Apple stipulating that it imports the accused products into the United States)). Regarding the '941 patent, the ID found that AliveCor has proven infringement of the asserted claims, claims 12, 13, 19, and 20-23, and that Apple failed to show that any of the asserted claims are invalid. *Id.* at 30-45, 60-98. For the '731 patent, the ID found that AliveCor has proven infringement of the asserted claims, claims 1, 3, 5, 8-10, 12, 15, and 16, but that Apple has proven that claims 1, 8, 12, and 16 are invalid for obviousness. *Id.* at 105-108, 113-127. For the '499 patent, the ID found that AliveCor failed to prove infringement of the asserted claims, claims 16 and 17, and that claim 17 is invalid for lack of patentable subject matter under 35 U.S.C. 101. *Id.* at 129-138, 140-152. Finally, the ID found that AliveCor has proven the existence of a domestic industry that practices the asserted patents as required by 19 U.S.C. 1337(a)(2). *Id.* at 152-183. The ID included the ALJ's recommended determination on remedy and bonding ("RD"). The RD recommended that, should the Commission find a violation, issuance of a limited exclusion order and a cease and desist order would be appropriate. ID/RD at 190-193. The RD also recommended imposing no bond for covered products imported during the period of Presidential review. ID at 193-95.

On July 11, 2022, Apple filed a petition for review of the ID, and AliveCor filed a combined petition and contingent petition for review of the ID. On July 19, 2022, the private parties and OUII's investigative attorney filed responses to the petitions.

On September 22, 2022, the Commission determined to review the final ID in part. 87 Fed. Reg. 58819-21 (Sept. 28, 2022). Specifically, the Commission determined to review the final ID's invalidity findings, including patent eligibility under 35 U.S.C. 101 and obviousness under 35 U.S.C. 103, and the economic prong of the domestic industry requirement for all three patents. *Id.* The Commission requested briefing from the parties on certain issues under review. The Commission requested briefing from the parties, interested government agencies, and interested persons on remedy, the public interest, and bonding. *Id.*

On October 6, 2022, the parties filed initial submissions in response to the Commission's request for briefing. On October 14, 2022, the parties filed reply submissions. On October 21,

2022, Apple moved for leave to file a sur-reply to AliveCor's reply submission. On October 24, 2022, AliveCor filed an opposition. OUII filed a response in opposition on November 2, 2022.

The Commission has determined to deny Apple's motion for leave to file a sur-reply to AliveCor's reply submission.

On December 7, 2022, Apple filed an emergency motion, asking "the Commission to suspend any remedial orders or, in the alternative, extend the December 12, 2022 Target Date of its Final Determination and stay all proceedings prior to issuance of any Final Determination pending final resolution of any appeal of the PTAB's decisions" finding the asserted patent claims unpatentable. Apple Emergency Motion at 1. On December 9, 2022, AliveCor filed an opposition to Apple's motion. On December 16, 2022, OUII filed a response in support of Apple's motion, but only to the extent that any remedy the Commission issues be suspended pending appeal of the PTAB decisions. OUII Reply to Emergency Motion at 4.

Upon review of the parties' submissions, the ID, the RD, evidence of record, and public interest filings, the Commission has determined that Apple violated section 337 by reason of importation and sale of articles that infringe asserted claims 12, 13, and 19-23 of the '941 patent; and claims 1, 3, 5, 8-10, 12, 15, and 16 of the '731 patent. Regarding the issues under review, the Commission has determined to affirm the ID's economic prong of the domestic industry findings with the modifications described in the accompanying Commission opinion. Concerning invalidity, the Commission has determined to affirm the ID's patent eligibility findings under 35 U.S.C. 101 as to one claim with modifications explained in the Commission opinion and reverse as to another; and to correct the ID for not considering objective indicia of non-obviousness for certain asserted claims. For remedy, the Commission has determined to issue a limited exclusion order prohibiting further importation of infringing products and a cease and desist order against Apple. The Commission has determined that the public interest factors do not counsel against issuing remedial orders. The Commission has determined that a bond in the amount of $2 per unit of covered articles is required for covered products imported or sold during the period of Presidential review.

The enforcement of these orders, including the bond provision, is suspended pending final resolution of the PTAB's Final Written Decisions finding the asserted patent claims unpatentable. *See* 35 U.S.C. 318(b); *Apple, Inc. v. AliveCor, Inc.*, IPR2021-00971, Patent 10,595,731, Final Written Decision Determining All Challenged Claims Unpatentable (Dec. 6, 2022); *Apple, Inc. v. AliveCor, Inc.*, IPR2021-00972, Patent 10,638,941, Final Written Decision Determining All Challenged Claims Unpatentable (Dec. 6, 2022).

The Commission's vote on this determination took place on December 22, 2022.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in part 210 of the Commission's Rules of

Practice and Procedure (19 CFR 210).

By order of the Commission.

Katherine M. Hiner
Acting Secretary to the Commission

Issued:   December 22, 2022

4

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

In the Matter of

**CERTAIN WEARABLE ELECTRONIC**
**DEVICES WITH ECG FUNCTIONALITY**
**AND COMPONENTS THEREOF**

**Investigation No. 337-TA-1266**

**NOTICE OF A COMMISSION DETERMINATION TO REVIEW IN PART A FINAL INITIAL DETERMINATION FINDING A VIOLATION OF SECTION 337; REQUEST FOR WRITTEN SUBMISSIONS ON THE ISSUES UNDER REVIEW AND ON REMEDY, THE PUBLIC INTEREST, AND BONDING; EXTENSION OF THE TARGET DATE**

**AGENCY:**     U.S. International Trade Commission.

**ACTION:**     Notice.

**SUMMARY:**  Notice is hereby given that the U.S. International Trade Commission ("Commission") has determined to review in part a final initial determination ("ID") of the presiding administrative law judge ("ALJ"), finding a violation of section 337 as to two of the three asserted patents.  The Commission requests written submissions from the parties on the issues under review and from the parties, interested government agencies, and other interested persons on the issues of remedy, the public interest, and bonding, under the schedule set forth below.

**FOR FURTHER INFORMATION CONTACT**:  Panyin A. Hughes, Office of the General Counsel, U.S. International Trade Commission, 500 E Street, S.W., Washington, D.C. 20436, telephone (202) 205-3042.  Copies of non-confidential documents filed in connection with this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov*.  For help accessing EDIS, please email *EDIS3Help@usitc.gov*.  General information concerning the Commission may also be obtained by accessing its Internet server at *https://www.usitc.gov*.  Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal, telephone (202) 205-1810.

**SUPPLEMENTARY INFORMATION**:  On May 26, 2021, the Commission instituted this investigation based on a complaint filed by AliveCor, Inc. of Mountain View, California ("AliveCor").  86 FR 28382 (May 26, 2021).  The complaint alleged violations of section 337 based on the importation into the United States, the sale for importation, or the sale within the United States after importation of certain wearable electronic devices with ECG functionality and components thereof by reason of infringement of one or more of claims 1-30 of U.S. Patent No. 10,595,731 ("the '731 patent"); claims 1-23 of U.S. Patent No. 10,638,941 ("the '941 patent"); and claims 1-4, 6-14, 16-20 of U.S. Patent No. 9,572,499 ("the '499 patent").  *Id.*  The

Commission's notice of investigation named Apple Inc. of Cupertino, California ("Apple") as the sole respondent. The Office of Unfair Import Investigations ("OUII") is named as a party in this investigation. *Id.*

On February 23, 2022, the ALJ issued an initial determination granting AliveCor's motion to terminate the investigation as to (1) claims 1-4, 6-14, and 18-20 of the '499 patent; (2) claims 2, 4, 6, 7, 11, 13, 14, and 17-30 of the '731 patent; and (3) claims 1-11, 14, 15, 17, and 18 of the '941 patent based upon withdrawal of allegations from the complaint as to those claims. Order No. 16 (Feb. 23, 2022), *unreviewed by* Notice (Mar. 18, 2022).

On June 27, 2022, the ALJ issued the final initial determination ("ID") finding a violation of section 337 as to the '941 and '731 patents, and no violation of section 337 as to the '499 patent.[1] The ID found that the parties do not contest personal jurisdiction, and that the Commission has *in rem* jurisdiction over the accused products. ID at 18. The ID further found that the importation requirement under 19 U.S.C. 1337(a)(1)(B) is satisfied. *Id.* (citing CX-0904C (Apple stipulating that it imports the accused products into the United States)). Regarding the '941 patent, the ID found that AliveCor has proven infringement of the asserted claims, claims 12, 13, 19, and 20-23, and that Apple failed to show that any of the asserted claims are invalid. *Id.* at 30-45, 60-98. For the '731 patent, the ID found that AliveCor has proven infringement of the asserted claims, claims 1, 3, 5, 8-10, 12, 15, and 16, but that Apple has proven that claims 1, 8, 12, and 16 are invalid for obviousness. *Id.* at 105-108, 113-127. For the '499 patent, the ID found that AliveCor failed to prove infringement of the asserted claims, claims 16 and 17, and that claim 17 is invalid for lack of patentable subject matter under 35 U.S.C. 101. *Id.* at 129-138, 140-152. Finally, the ID found that AliveCor has proven the existence of a domestic industry that practices the asserted patents as required by 19 U.S.C. 1337(a)(2). *Id.* at 152-183. The ID included the ALJ's recommended determination on remedy and bonding ("RD"). The RD recommended that, should the Commission find a violation, issuance of a limited exclusion order and cease and desist orders would be appropriate. ID/RD at 190-193. The RD also recommended imposing no bond for covered products imported during the period of Presidential review. ID at 193-95.

On July 11, 2022, Apple filed a petition for review of the ID, and AliveCor filed a combined petition and contingent petition for review of the ID. On July 19, 2022, the private parties and OUII's investigative attorney filed responses to the petitions.

Having reviewed the record of the investigation, including the final ID, the parties' submissions to the ALJ, the petitions for review, and the responses thereto, the Commission has determined to review the ID in part. Specifically, the Commission has determined to review the final ID's invalidity findings, including patent eligibility under 35 U.S.C. 101 and obviousness under 35 U.S.C. 103, and the economic prong of the domestic industry requirement.

In connection with its review, the Commission requests responses from the parties to the following questions. The parties are requested to brief their positions with reference to the applicable law and the existing evidentiary record.

---

[1] The ALJ issued a corrected final ID on July 26, 2022, correcting the table of contents.

2

(1) Discuss whether the record evidence of "industry praise" and "copying" is sufficient to establish the requisite objective indicia of non-obviousness. *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

(2) Please explain whether and how the Complainant's investments credited by the ID under subsection 337(a)(3)(B) are quantitatively and qualitatively significant.

(3) Please explain whether and how the Complainant's employment of labor in research and development in the exploitation of the patents under subsection 337(a)(3)(C) are quantitatively and qualitatively substantial. Please state whether the R&D contract labor amount credited by the ID under subsection 337(a)(3)(C) includes foreign contract labor and, if so, please quantify such included amounts.

(4) What is the factual and legal basis for crediting Complainant's investments in the KBP and PRD products toward satisfaction of the domestic industry requirement under subsection (C)?

The parties are invited to brief only these discrete questions. The parties are not to brief other issues on review, which are adequately presented in the parties' existing filings.

In connection with the final disposition of this investigation, the statute authorizes issuance of, *inter alia,* (1) an exclusion order that could result in the exclusion of the subject articles from entry into the United States; and/or (2) cease and desist orders that could result in the respondent being required to cease and desist from engaging in unfair acts in the importation and sale of such articles. Accordingly, the Commission is interested in receiving written submissions that address the form of remedy, if any, that should be ordered. If a party seeks exclusion of an article from entry into the United States for purposes other than entry for consumption, the party should so indicate and provide information establishing that activities involving other types of entry either are adversely affecting it or likely to do so. For background, see *Certain Devices for Connecting Computers via Telephone Lines*, Inv. No. 337-TA-360, USITC Pub. No. 2843, Comm'n Op. at 7-10 (Dec. 1994).

The statute requires the Commission to consider the effects of that remedy upon the public interest. The public interest factors the Commission will consider include the effect that an exclusion order and cease and desist orders would have on: (1) the public health and welfare, (2) competitive conditions in the U.S. economy, (3) U.S. production of articles that are like or directly competitive with those that are subject to investigation, and (4) U.S. consumers. The Commission is therefore interested in receiving written submissions that address the aforementioned public interest factors in the context of this investigation. In particular, the Commission requests that the parties, interested government agencies, and interested persons respond to the following:

(1) Please provide information and argument that responds to the statements on the public interest submitted on the public record by the parties and the various third parties.

(2) Please provide data and factual information that specifically addresses whether and to what extent each of the four public interest factors would be adversely impacted by the remedial orders recommended in the RD, including details regarding the extent to which alternatives to the infringing products would be available to replace the infringing products and address the public health and welfare concerns raised.

3

If the Commission orders some form of remedy, the U.S. Trade Representative, as delegated by the President, has 60 days to approve, disapprove, or take no action on the Commission's determination. *See* Presidential Memorandum of July 21, 2005, 70 FR 43251 (July 26, 2005). During this period, the subject articles would be entitled to enter the United States under bond, in an amount determined by the Commission and prescribed by the Secretary of the Treasury. The Commission is therefore interested in receiving submissions concerning the amount of the bond that should be imposed if a remedy is ordered.

**WRITTEN SUBMISSIONS**: The parties to the investigation are requested to file written submissions on the questions identified in this notice. Parties to the investigation, interested government agencies, and any other interested parties are encouraged to file written submissions on the issues of remedy, the public interest, and bonding and to provide factual information and data requested above with respect to the public interest, including responding to the submissions of the parties and third parties that are in the record of this investigation. Such submissions should address the recommended determination by the ALJ on remedy and bonding.

In its initial submission, Complainant is also requested to identify the remedy sought and Complainant and OUII are requested to submit proposed remedial orders for the Commission's consideration. Complainant is further requested to provide the HTSUS subheadings under which the accused products are imported, and to supply the identification information for all known importers of the products at issue in this investigation. The initial written submissions and proposed remedial orders must be filed no later than close of business on October 6, 2022. Reply submissions must be filed no later than the close of business on October 13, 2022. No further submissions on these issues will be permitted unless otherwise ordered by the Commission. Opening submissions are limited to 75 pages. Reply submissions are limited to 50 pages. No further submissions on any of these issues will be permitted unless otherwise ordered by the Commission.

Persons filing written submissions must file the original document electronically on or before the deadlines stated above. The Commission's paper filing requirements in 19 CFR 210.4(f) are currently waived. 85 FR 15798 (March 19, 2020). Submissions should refer to the investigation number (Inv. No. 337-TA-1266) in a prominent place on the cover page and/or the first page. (*See* Handbook for Electronic Filing Procedures, *https://www.usitc.gov/documents/handbook_on_filing_procedures.pdf*). Persons with questions regarding filing should contact the Secretary, (202) 205-2000.

Any person desiring to submit a document to the Commission in confidence must request confidential treatment by marking each document with a header indicating that the document contains confidential information. This marking will be deemed to satisfy the request procedure set forth in Rules 201.6(b) and 210.5(e)(2) (19 CFR 201.6(b) & 210.5(e)(2)). Documents for which confidential treatment by the Commission is properly sought will be treated accordingly. Any non-party wishing to submit comments containing confidential information must serve those comments on the parties to the investigation pursuant to the applicable Administrative Protective Order. A redacted non-confidential version of the document must also be filed with the Commission and served on any parties to the investigation within two business days of any confidential filing. All information, including confidential business information and documents

4

for which confidential treatment is properly sought, submitted to the Commission for purposes of this investigation may be disclosed to and used:  (i) by the Commission, its employees and Offices, and contract personnel (a) for developing or maintaining the records of this or a related proceeding, or (b) in internal investigations, audits, reviews, and evaluations relating to the programs, personnel, and operations of the Commission including under 5 U.S.C. Appendix 3; or (ii) by U.S. government employees and contract personnel, solely for cybersecurity purposes. All contract personnel will sign appropriate nondisclosure agreements.  All nonconfidential written submissions will be available for public inspection on EDIS.

The Commission has determined to extend the target date to December 12, 2022.

The Commission vote for this determination took place on September 22, 2022.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in Part 210 of the Commission's Rules of Practice and Procedure (19 CFR Part 210).

By order of the Commission.

Katherine M. Hiner
Acting Secretary to the Commission

Issued: September 22, 2022

5

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** | **Inv. No.  337-TA-1266** |

**[CORRECTED] INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND**

Administrative Law Judge Cameron Elliot

(June 27, 2022)

Pursuant to the Notice of Investigation and Rule 210.42(a) of the Rules of Practice and Procedure of the United States International Trade Commission, this is my Initial Determination in the matter of *Certain Wearable Electronic Devices with ECG Functionality and Components Thereof*, Investigation No. 337-TA-1266.

**TABLE OF CONTENTS** **Page**

I.      **INTRODUCTION**..............................................................................1

       A.     Procedural Background..........................................................1

       B.     The Parties...........................................................................2

       C.     The Asserted Patents and Claims.........................................3

       D.     Products at Issue .................................................................4

            1.     Domestic Industry Products ....................................4

            2.     Accused Products ....................................................5

II.      **STANDARDS OF LAW** ......................................................7

       A.     Standing ...............................................................................7

       B.     Claim Construction .............................................................8

       C.     Infringement.......................................................................11

       D.     Domestic Industry .............................................................12

            1.     Technical Prong .....................................................12

            2.     Economic Prong ....................................................13

       E.     Invalidity ...........................................................................15

            1.     35 U.S.C. § 101 .....................................................15

            2.     35 U.S.C. § 102 .....................................................15

            3.     35 U.S.C. § 103 .....................................................16

III.      **IMPORTATION AND JURISDICTION** ..........................18

IV.      **U.S. PATENT NO. 10,638,941** .......................................19

       A.     Level of Ordinary Skill in the Art.....................................19

       B.     Claims-at-Issue .................................................................19

       C.     Claim Construction ...........................................................20

            1.     "A smartwatch, comprising".................................21

            2.     "confirm the presence of arrhythmia"..................22

       D.     Infringement.......................................................................30

            1.     Claim 12.................................................................30

                 a.     [12(f)(i)] "determine if a discordance is present between the activity level value of the user and the heart rate parameter of the user" ...............................................32

                 b.     [12(f)(ii)] "based on the presence of the discordance, indicate to the user a possibility of an arrhythmia being present"..................37

i

          c.     [12(f)(iii)] "receive electric signals of the user from the ECG sensor to confirm the presence of the arrhythmia"........................40

   2.    Other claims...........................................................................45

E.    Domestic Industry – Technical Prong................................................45

   1.    Claim 12.................................................................................45

          a.     [12(f)(ii)] "based on the presence of the discordance, indicate to the user a possibility of an arrhythmia being present"..................51

          b.     [12(f)(iii)] "receive electric signals of the user from the ECG sensor to confirm the presence of the arrhythmia"........................54

   2.    Other Claims..........................................................................55

   3.    Whether technical prong is "in the process of being established"............55

F.    Validity and Other Affirmative Defenses ...........................................60

   1.    Ineligible Subject Matter........................................................61

   2.    AMON in Combination with Almen and/or Kotzin ................................71

          a.     Claim 12.................................................................................72

          b.     Claims 16, 18, 20, 22, and 23 ....................................................82

          c.     Claims 13 and 19 ....................................................................82

          d.     Claim 21.................................................................................91

          e.     Secondary Considerations of Non-Obviousness...........................93

          f.     Summary................................................................................97

   3.    Unenforceability as to Experimental Use ..........................................98

**V.    U.S. PATENT NO. 10,595,731 ....................................................98**

A.    Level of Ordinary Skill in the Art.....................................................98

B.    Claims-at-Issue ............................................................................99

C.    Claim Construction.......................................................................101

   1.    "A smart watch to detect the presence of an arrhythmia of a user".........101

   2.    "confirm the presence of the arrhythmia"......................................102

D.    Infringement..............................................................................105

   1.    Claim 1.................................................................................105

          a.     [1f(ii)] "detect, based on the PPG data, the presence of an arrhythmia" ..........................................................................106

b.      [1f(iv)] "confirm the presence of the arrhythmia based on the ECG data" ...................................................................107

2.      Other Claims .................................................................108

E.      Domestic Industry – Technical Prong.................................108

1.      Claim 1 ..........................................................................109

a.      [1f(ii)] "detect, based on the PPG data, the presence of an arrhythmia" ...............................................................109

b.      [1f(iv)] "confirm the presence of the arrhythmia based on the ECG data" ...................................................................111

2.      Other Claims .................................................................112

3.      Whether technical prong is "in the process of being established"...........112

F.      Validity and Other Affirmative Defenses ...........................113

1.      Ineligible Subject Matter................................................113

2.      AMON in Combination with Almen and/or Kotzin ...............115

a.      Claim 1 ...................................................................115

b.      Claims 2, 7, and 16 ................................................117

c.      Claim 3 ...................................................................118

d.      Claims 4 and 5 .......................................................120

e.      Claim 8 ...................................................................121

f.      Claim 9 ...................................................................123

g.      Claim 10 .................................................................124

h.      Claim 12 .................................................................125

i.      Claim 15 .................................................................126

j.      Summary .................................................................126

3.      Unenforceability as to Experimental Use ........................127

VI.     **U.S. PATENT NO. 9,572,499 ...................................................... 127**

A.      Level of Ordinary Skill in the Art....................................127

B.      Claims-at-Issue ..............................................................127

C.      Claim Construction ........................................................128

D.      Infringement..................................................................129

iii

1. Claim 11 ............................................................................................129

    a. [11e(iv)] "compare [said] activity level of said first user to said heart rate variability of said first user" .........................................130

    b. [11e(v)] "alert said first user to record an electrocardiogram using said mobile computing device" ..........................................133

2. Other Claims ....................................................................................138

E. Domestic Industry – Technical Prong .......................................................139

F. Validity and Other Affirmative Defenses ...................................................140

    1. Ineligible Subject Matter ..................................................................141

    2. AMON in Combination with Almen and/or Kotzin .............................146

        a. Claim 11 ...................................................................................146

        b. Claim 16 ...................................................................................150

        c. Claim 17 ...................................................................................151

        d. Summary ...................................................................................151

    3. Enforceability as to Experimental Use ...............................................152

VII. DOMESTIC INDUSTRY - ECONOMIC PRONG ........................................... 152

A. Domestic Industry in Existence ..............................................................153

    1. Qualifying Expenditures ....................................................................153

        a. Subsection (A) – Plant and Equipment .......................................153

        b. Subsection (B) – Labor and Capital ...........................................164

        c. Subsection (C) – Licensing and Research and Development ......169

    2. "Significant" or "Substantial" .............................................................177

        a. Subsection (B) – Labor and Capital ...........................................178

        b. Subsection (C) – Licensing and Research and Development ......180

B. Domestic Industry in the Process of Being Established .................................183

VIII. CONCLUSIONS OF LAW ........................................................................... 187

IX. RECOMMENDED DETERMINATION ON REMEDY AND BOND .................. 189

A. Limited Exclusion Order ........................................................................190

B. Cease and Desist Order ..........................................................................192

C. Bond ....................................................................................................193

iv

**X.    INITIAL DETERMINATION AND ORDER** ............................................................ **195**

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| CDX | Complainant's Demonstrative Exhibit |
| CIB | Complainant's Revised Initial Post-Hearing Brief |
| CPB | Complainant's Pre-Hearing Brief |
| CPX | Complainant's Physical Exhibit |
| CRB | Complainant's Reply Post-Hearing Brief |
| CX | Complainant's Exhibit |
| Hr'g Tr. | Hearing Transcript |
| JX | Joint Exhibit |
| RDX | Respondents' Demonstrative Exhibit |
| RIB | Respondents' Initial Post-Hearing Brief |
| RPB | Respondents' Pre-Hearing Brief |
| RPX | Respondents' Physical Exhibit |
| RRB | Respondents' Reply Post-Hearing Brief |
| RX | Respondents' Exhibit |
| SDX | Staff's Demonstrative Exhibit |
| SIB | Staff's Initial Post-Hearing Brief |
| SPB | Staff's Pre-Hearing Brief |
| SRB | Staff's Reply Post-Hearing Brief |
| SX | Staff's Exhibit |

Page Intentionally Omitted

# I.    INTRODUCTION

## A.    Procedural Background

Complainant AliveCor, Inc. ("AliveCor," "ALC," or "Complainant") filed the complaint underlying this investigation on April 20, 2021.  The complaint alleged respondent Apple Inc. ("Apple" or "Respondent") imports or sells in connection with an importation certain wearable electronic devices with electrocardiogram ("ECG") functionality that infringe one or more claims of U.S. Patent Nos. 10,595,731 ("the 731 patent"), 10,638,941 ("the 941 patent"), and 9,572,499 ("the 499 patent") (together, the "Asserted Patents").

By publication of a notice in the *Federal Register* on May 26, 2021, the U.S. International Trade Commission ordered that:

> Pursuant to subsection (b) of section 337 of the Tariff Act of 1930, as amended, an investigation be instituted to determine whether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of products identified in paragraph (2) by reason of infringement of one or more of claims 1-30 of the '731 patent; claims 1-23 of the '941 patent; claims 1-4, 6-14, 16-20 of the '499 patent, and whether an industry in the United States exists or is in the process of being established as required by subsection (a)(2) of section 337[.]

86 Fed. Reg. 28382 (May 26, 2021).  In addition to Apple, the Commission named the Office of Unfair Import Investigations as a party (hereafter, "Commission Investigative Staff" or "Staff"). *Id.*

On June 10, 2021, I set a target date of October 26, 2022 for completion of this investigation via initial determination.  Order No. 4.  Also on June 10, 2021, I set a *Markman* hearing date of October 26-27, 2021 and the evidentiary hearing for March 28 through April 1, 2022.  Order No. 5.  On October 15, 2021, the *Markman* hearing was cancelled (Order No. 11), with the parties' disputes resolved on the papers on November 4, 2021 (Order No. 12).

With respect to the asserted claims, on February 22, 2022, ALC moved (1266-010) to terminate claims 1-4, 6-14, and 18-20 of the 499 patent; claims 2, 4, 6, 7, 11, 13, 14, and 17-30 of the 731 patent; and claims 1-11, 14, 15, 17, and 18 of the 941 patent, all by reason of withdrawal. This motion was granted via initial determination on February 23, 2022. Order No. 16. On March 18, 2022, the Commission determined not to review Order No. 16. EDIS Doc. ID 765832.

Finally, a virtual evidentiary hearing using the Commission's videoconference software took place on March 28 through April 1, 2022. At the pre-hearing conference, Apple's motion to amend its witness list as contained within its pre-hearing statement (1266-028) was denied. Hr'g Tr. at 15:19-21. Pursuant to the procedural schedule, the parties submitted initial and reply post-hearing briefs on April 15, 2022 and April 29, 2022, respectively. On April 27, 2022, ALC moved (1266-30) for leave to file a corrected version of its initial post-hearing brief, which was granted on April 28, 2022. Order No. 30. As of the date of this initial determination, no motions remain pending.

### B.   The Parties

Complainant ALC is a U.S. corporation organized in Delaware and with a principal place of business in Mountain View, CA. CIB at 4. ALC was founded in 2011 and develops computerized devices for mobile health monitoring. *Id.*

Respondent Apple is a U.S. corporation organized in California and with a principal place of business in Cupertino, CA. RIB at 2. "Apple designs, manufactures, and markets smartphones, personal computers, tablets, wearables and accessories—including the Apple Watch Series 1-7 and SE." *Id.* at 2-3.

2

### C.    The Asserted Patents and Claims

The 941 patent, entitled "Discordance Monitoring," issued on May 5, 2020 to David Albert, Omar Dawood, and Ravi Gopalakrishnan. JX-0003 (cited as "941 patent"). The 941 patent reports an assignment on its face to AliveCor, and claims priority to a provisional application filed on May 13, 2015.

The 731 patent, entitled "Methods and Systems for Arrhythmia Tracking and Scoring," issued on March 24, 2020 to Ravi Gopalakrishnan, Lev Korzinov, Fei Wang, Euan Thomson, Nupur Srivastava, Omar Dawood, Iman Abuzeid, and David Albert. JX-0002 (cited as "731 patent"). The 731 patent reports an assignment on its face to AliveCor, and claims priority to a provisional application filed on December 12, 2013.

The 499 patent, also entitled "Methods and Systems for Arrhythmia Tracking and Scoring," issued on February 21, 2017 to Ravi Gopalakrishnan, Lev Korzinov, Fei Wang, Euan Thomson, Nupur Srivastava, Omar Dawood, Iman Abuzeid, and David Albert. JX-0001 (cited as "499 patent"). The 499 patent reports an assignment on its face to AliveCor, and claims priority to a provisional application filed on June 19, 2014.

The three patents in suit relate to systems, devices, and methods for monitoring cardiac health and managing cardiac disease. *See* 941 patent at 1:26-33; 731 patent at 1:29-33. The specific cardiac condition addressed by all the asserted claims is arrhythmia, or abnormal heart rhythm. *See* 941 patent at 4:9-10; 499 patent at cl. 1 (preamble). The devices recited in the claims, including in the method claims, are either a smartwatch (for the 941 and 731 patents) or a mobile computing device (for the 499 patent). The smartwatch claims require an electrocardiogram (ECG) sensor and at least one other sensor. *See, e.g.*, 941 patent at cl. 1; 731 patent at cl. 25. For most asserted smartwatch claims one of the other sensors is a photoplethysmogram (PPG) sensor,

CONFIDENTIAL MATERIAL OMITTED

which detects heart rate optically. *See* 731 patent at 8:51-55. The mobile computing device claims require an ECG sensor, a heart rate sensor, and a motion sensor. *See, e.g.*, 499 patent at cls. 1, 11. Whether reciting a method or apparatus, the asserted independent claims generally involve monitoring heart rate (*e.g.*, "sensing a heart rate" (499 patent at cl. 1)), detecting or determining possible arrhythmia or irregularity in heart rate variability ("HRV") (*e.g.*, "detect, based on the PPG data, the presence of an arrythmia" (731 patent at cl. 1)), and either performing an ECG or alerting the user that an ECG is called for (*e.g.*, "receive electric signals of the user from the ECG sensor to confirm the presence of the arrythmia" (941 patent at cl. 12)).

The following patent claims are presently at issue in this investigation, as determined from ALC's briefing:

| Asserted Patent | Infringement Claims | Domestic Industry Claims |
|---|---|---|
| 10,638,941 | 12, 13, **18**, 19, 20, 21, 22, 23 | 12, 16, **18**, 20, 21, 22, 23 |
| 10,595,731 | 1, **2**, 3, **4**, 5, 7, 8, 9, 10, 12, 15, 16 | 1, **2**, 3, 12, 15, 16 |
| 9,572,499 | **11**, 16, 17 | **11**, 16, 17 |

*See generally* CIB at 30, 43, 89, 95, 122, 134. The claim numbers identified in bold are not explicitly asserted for infringement or domestic industry, but are necessary intervening claims to those that are asserted.

### D.    Products at Issue

#### 1.    Domestic Industry Products

The domestic industry products in this investigation are "wearable electronic devices, being developed, manufactured, and/or sold by AliveCor under the tradenames KardiaBand System, ▮▮▮▮▮▮, and ▮▮▮▮▮▮▮▮▮▮" (altogether, the "DI Products"). CIB at 15. Each product includes, "among other things, a smartwatch, activity sensor, PPG sensor, and

CONFIDENTIAL MATERIAL OMITTED

ECG sensor." *Id.* The KardiaBand System ("KBS") comprises the KardiaBand watch band, and an Apple Watch (Series 1, 2, 3) with Watch OS 5.0 or earlier running a program called KardiaApp. *Id.* (citing Hr'g Tr. (Jafari) at 385:16-386:15). There are two important features to KardiaApp—KardiaAI and SmartRhythm (versions 1 and 2). KardiaAI represents ALC's proprietary algorithms to classify ECG recordings. *Id.* at 16 (citing Hr'g Tr. (Somayajula) at 196:17-197:14; CX-0271C at 1, 3, 5; CPX-0021C). ████████████████████████

████████████████████████████████████████

████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

## 2. Accused Products

The accused products consist of four generations of Apple smartwatches. CIB at 7. ALC references a joint stipulation filed earlier in the investigation which collects the particular model numbers. These are reproduced below:

| Apple Model(s) | Category |
|---|---|
| A1975, A1976, A1977, A1978 | Series 4 |
| A2092, A2093, A2094, A2095 | Series 5 |
| A2291, A2292, A2293, A2294 | Series 6 |
| A2473, A2474, A2475, A2477 | Series 7 |

EDIS Doc. ID 758097; CIB at 7; RIB at 10. Accordingly, the accused products in this investigation are those listed in the table above (hereafter "Accused Products"). ALC explains that the parties have further agreed, via that stipulation, that the Apple Watch Series 6 is sufficiently representative from a hardware standpoint of all other Accused Products. CIB at 8 (citing EDIS Doc. ID 758097); *see* RIB at 10 n.22. ALC describes the salient features of the Accused Products via the Series 6 as "a motion/activity sensor known as an accelerometer, a photoplethysmography ('PPG') sensor, an electrocardiogram ('ECG') sensor, a display screen, a processor, and memory." CIB at 8 (citing Hr'g Tr. (Jafari) at 303:19-24; JX-0221C (Waydo) at 207:10-14, 208:14-209:11; CX-0107).

The software running on these devices is also important, taking the form of Apple's operating system, WatchOS. CIB at 7; RIB at 10. As with hardware, the parties have agreed that version 7.6.2 of WatchOS is representative of all other versions that contain the diagnostic tools implicated by the Asserted Claims. CIB at 9; RIB at 10 n.22; EDIS Doc. ID 758097. These tools include Apple's: High Heart Rate Notification feature ("HHRN"), Irregular Rhythm Notification ("IRN"), and Electrocardiogram App/Feature version 2.0 ("ECG"). CIB at 7-8; RIB at 10-14. According to ALC:

(a) The HHRN Feature monitors a user's heart rate in the background using the PPG sensor technology and alerts the user if their heart rate exceeds a threshold level (set to a default of 120 beats per minute ("bpm") by Apple) when the user has

CONFIDENTIAL MATERIAL OMITTED

been sedentary for a period of at least 10 minutes. Tr. (Jafari) 306:19-307:15; JX-221C (Waydo) at 289:24-290:20.

(b) The IRN Feature monitors a user's heart activity in the background using the PPG sensor—initiating measurement opportunities approximately every 2 hours when the user is sedentary—and determines whether the user's heart rate variability (*i.e.*, the instantaneous beat-to-beat variance in the user's heart rate) (hereafter "HRV") shows signs of an irregular rhythm suggestive of AFib. Tr. (Jafari) at 311:11-21; JX-218C (Framhen) at 97:22-98:23; CX-0048C.8-10, 87 (IRN Design Specification); CX-0619 (Using Apple Watch of Arrhythmia Detection); CX-0080 (IRN FDA Clearance)

(c) The ECG App records a 30-second ECG from the user when the user wears the watch and initiates contact with the digital crown using the opposing hand, and the representative ECG 2.0 App will attempt to classify the user's ECG as (*inter alia*) normal sinus rhythm, AFib, AFib with high heart rate, or high heart rate. Tr. (Jafari) at 321:20-322:11; CX-51C.5, 8, 65 (ECG 2.0 Specification); CX-0619; CX-0640C (ECG 2.0 510(k) clearance).

CIB at 9. Apple adds that HHRN uses a feature called Background Heart Rate ("BGHR") "to monitor whether the user's heart rate is above or below the user-set threshold." RIB at 10 (citing Hr'g Tr. (Waydo) at 751:12-24). According to Apple, IRN also uses BGHR to collect heart rate data, ████████████████████████████████, and ECG is unlike either HHRN or IRN in that it is not continuously running, but "requires the user to affirmatively open the ECG App." *See id.* at 11-13.

## II.  STANDARDS OF LAW

### A.  Standing

Commission Rule 210.12 states in relevant part "[f]or every intellectual property based complaint (regardless of the type of intellectual property involved), [the complaint must] include a showing that at least one complainant is the owner or exclusive licensee of the subject intellectual property." 19 C.F.R. § 210.12(a)(7). In determining whether this rule is met, the Commission looks to the standing requirement used by courts in patent infringement cases. *Certain Audio*

*Processing Hardware, Software, and Products Containing the Same*, Inv. No. 337-TA-1026, Comm'n Op. at 9 (April 18, 2018) (citations omitted).

### B.    Claim Construction

"The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000). Although most of the disputed claim terms were construed in an earlier order, some of the issues presented below are only resolvable with additional claim construction.

Claim construction focuses on the intrinsic evidence, which consists of the claims themselves, the specification, and the prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Markman v. Westview Instr., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc). As the Federal Circuit in *Phillips* explained, courts must analyze each of these components to determine the "ordinary and customary meaning of a claim term" as understood by a person of ordinary skill in art at the time of the invention. 415 F.3d at 1313. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning" of particular claim terms. *Id.* at 1314; *see Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In

construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point [ ] out and distinctly claim [ ] the subject matter which the patentee regards as his invention.'").  The context in which a term is used in an asserted claim can be "highly instructive." *Phillips*, 415 F.3d at 1314.  Additionally, other claims in the same patent, asserted or unasserted, may also provide guidance as to the meaning of a claim term.  *Id.*  "Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999).  "[T]he specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs." *Id.* at 1316.

In addition to the claims and the specification, the prosecution history should be examined, if in evidence. *Phillips*, 415 F.3d at 1317; *see Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).  The prosecution history can "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317; *see Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.").

When the intrinsic evidence does not establish the meaning of a claim, then extrinsic evidence (*i.e.*, all evidence external to the patent and the prosecution history, including

dictionaries, inventor testimony, expert testimony, and learned treatises) may be considered. *Phillips*, 415 F.3d at 1317. Extrinsic evidence is generally viewed as less reliable than the patent itself and its prosecution history in determining how to define claim terms. *Id.* "The court may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence." *Elkay M*fg*. Co. v. Ebco M*fg*. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999).

The construction of a claim term is generally guided by its ordinary meaning. However, courts may deviate from the ordinary meaning when: (1) "the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention;" or (2) "the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history." *Edwards L*fesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009); *see GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("the specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."); *Omega Eng'g, Inc, v. Raytek Co*rp*.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender."); *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."). Nevertheless, there is a "heavy presumption that a claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Co*rp*.*, 288 F.3d 1359, 1366 (Fed. Cir.

10

2002) (citations omitted). The standard for deviating from the plain and ordinary meaning is "exacting" and requires "a clear and unmistakable disclaimer." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012); *see Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009) (requiring "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope" to deviate from the ordinary meaning) (citation omitted).

### C.    Infringement

"An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Markman*, 52 F.3d at 976. A patentee may prove infringement either literally or under the doctrine of equivalents. Infringement of either sort must be proven by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988). A preponderance of the evidence standard "requires proving that infringement was more likely than not to have occurred." *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005).

Literal infringement is a question of fact. *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1313 (Fed. Cir. 2016) (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). If any claim limitation is absent, there is no literal infringement of that claim as a matter of law. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

Doctrine of equivalents is also a form of infringement. One rubric for evaluating if a claimed feature is not literally, but nonetheless equivalent to, a claimed feature is known as the

function-way-result test. Under this test, the accused feature is equivalent to the claim limitation when "it performs substantially the same function in substantially the same way to obtain the same result." *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1362 (Fed. Cir. 2019) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)). Another is known as the insubstantial differences test, where "[a]n element in the accused device is equivalent to a claim limitation if the only differences between the two are insubstantial." *Voda v. Gordia Corp.*, 536 F.3d 1311, 1326 (Fed. Cir. 2008) (citing *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1139 (Fed. Cir. 2004)). The Supreme Court has further instructed, "the proper time for evaluating equivalency . . . is at the time of infringement, not at the time the patent was issued." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 37 (1997).

## D. Domestic Industry

In an investigation based on a claim of patent infringement, section 337 requires that an industry in the United States, relating to the articles protected by the patent, exist or be in the process of being established. 19 U.S.C. § 1337(a)(2). Under Commission precedent, the domestic industry requirement has been divided into (i) a "technical prong" (which requires articles covered by the asserted patent) and (ii) an "economic prong" (which requires certain levels of activity with respect to the protected articles or patent itself). *See Certain Video Game Systems and Controllers*, Inv. No. 337-TA-743, Comm'n Op. at 6-7 (April 14, 2011) ("*Video Game Systems*").

## 1. Technical Prong

The technical prong of the domestic industry requirement is satisfied when the complainant in a patent-based section 337 investigation establishes that it is practicing or exploiting the patents at issue. *See* 19 U.S.C. §§ 1337 (a)(2), (3); *Certain Microsphere Adhesives, Process for Making Same and Prods. Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, Comm'n Op. at 8 (U.S.I.T.C. Jan. 16, 1996). "In order to satisfy the technical prong of the

domestic industry requirement, it is sufficient to show that the domestic industry practices any claim of that patent, not necessarily an asserted claim of that patent." *Certain Ammonium Octamolybdate Isomers*, Inv. No. 337-TA-477, Comm'n Op. at 55 (U.S.I.T.C. Aug. 28, 2003). Historically, the Commission permits the complainant's products, and those of its licensees, to be considered for technical prong purposes. *See Certain Magnetic Tape Cartridges and Components Thereof*, Inv. No. 337-TA-1058, Comm'n Op. at 28-29 (April 9, 2019).

The test for claim coverage for the purposes of the technical prong of the domestic industry requirement is the same as that for infringement. *See Certain Doxorubicin and Preparations Containing Same*, Inv. No. 337-TA-300, Initial Determination at 109 (U.S.I.T.C. May 21, 1990), *aff'd*, Views of the Commission at 22 (U.S.I.T.C. Oct. 31, 1990); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1375 (Fed. Cir. 2003). "First, the claims of the patent are construed. Second, the complainant's article or process is examined to determine whether it falls within the scope of the claims." *Certain Doxorubicin and Preparations Containing Same*, Inv. No. 337-TA-300, Initial Determination at 109. As with infringement, the technical prong of the domestic industry can be satisfied either literally or under the doctrine of equivalents. *Certain Dynamic Sequential Gradient Devices and Component Parts Thereof*, Inv. No. 337-TA-335, ID at 44, Pub. No. 2575 (U.S.I.T.C. May 15, 1992). In short, the patentee must establish by a preponderance of the evidence that the domestic product practices one or more claims of the patent.

### 2.    Economic Prong

The "economic prong" of the domestic industry requirement is satisfied when there exists in the United States, in connection with products practicing at least one claim of the patent at issue: (A) significant investment in plant and equipment; (B) significant employment of labor or capital; or (C) substantial investment in its exploitation, including engineering, research and development, and licensing. 19 U.S.C. § 1337(a)(3). Establishment of the "economic prong" is not dependent

13

on any "minimum monetary expenditure" and there is no need for complainant "to define the industry itself in absolute mathematical terms." *Certain Stringed Musical Instruments and Components Thereof*, Inv. No. 337-TA-586, Comm'n Op. at 25-26 (May 16, 2008) ("*Stringed Instruments*").

However, a complainant must substantiate the significance of its activities with respect to the articles protected by the patent. *Certain Printing and Imaging Devices and Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 30 (Feb. 17, 2011) ("*Imaging Devices*"). A complainant can show that its activities are significant by showing how those activities are important to the articles protected by the patent in the context of the company's operations, the marketplace, or the industry in question. *Id.* at 27-28. That significance, however, must be shown in a quantitative context. *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879, 886 (Fed. Cir. 2015). The Federal Circuit noted that when the ITC first addressed this requirement, it found the word "'significant' denoted 'an assessment of the *relative* importance of the domestic activities.'" *Id.* at 883-4 (internal citation omitted) (emphasis added). In general, "[t]he purpose of the domestic industry requirement is to prevent the ITC from becoming a forum for resolving disputes brought by foreign complainants whose only connection with the United States is ownership of a U.S. patent." *Certain Battery-Powered Ride-On Toy Vehicles*, Inv. No. 337-TA-314, USITC Pub. No. 2420, Initial Determination at 21 (Aug. 1991); *see Certain Vacuum Insulated Flasks and Components Thereof*, Inv. No. 337-TA-1216, Notice at 3-4 (Oct. 21, 2021) ("Given the nature and extent of [complainant's] investments in plant and equipment as a whole, [complainant] is not a mere importer.").

Moreover, otherwise qualifying investments must not be aggregated across products that practice different patents, or practice no asserted patents at all. *Certain Electronic Stud Finders,*

*Metal Detectors and Electrical Scanners*, Inv. No. 337-TA-1221, Comm'n Op. at 48 (Mar. 14, 2022). Aggregating investments across domestic industry products that practice different asserted patents "fail[s] to provide the Commission with an adequate basis to evaluate the investments and the significance of those investments with respect to each asserted patent." *Id.*; *see id.* at 50-54 (collecting cases).

### E.     Invalidity

#### 1.     35 U.S.C. § 101

Section 101 states:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101. To determine patent eligibility under § 101, courts apply the two-step *Alice* test and first, "determine whether the claims at issue are directed to a patent-ineligible concept" and then if so, "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice Corp. Pty. v. CLS Bank Intern.*, 573 U.S. 208, 217-18, 221 (2014). "The 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (citing *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015); *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1375 (Fed. Cir. 2016)). To save a patent at the second step, an inventive concept must be evident in the claims. *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151-52 (Fed. Cir. 2016).

#### 2.     35 U.S.C. § 102

Pursuant to 35 U.S.C. § 102, a patent claim is invalid as anticipated if:

15

(1) the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention; or

(2) the claimed invention was described in a patent issued under section 151, or in an application for patent published or deemed published under section 122(b), in which the patent or application, as the case may be, names another inventor and was effectively filed before the effective filing date of the claimed invention.

35 U.S.C. § 102 (post-AIA). "A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention. Moreover, a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citations omitted); *see Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012). "A century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier.'" *Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) (citing *Schering Corp.*, 339 F.3d at 1322). Anticipation, and all other grounds of patent invalidity, must be proved by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95, (2011).

### 3.    35 U.S.C. § 103

Section 103 of the Patent Act states:

A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made.

35 U.S.C. § 103(a) (post-AIA). "Obviousness is a question of law based on underlying questions of fact." *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1379 (Fed. Cir. 2008). The underlying factual determinations include: "(1) the scope and content of the prior art,

(2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) objective indicia of non-obviousness." *Id.* (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)). These factual determinations are often referred to as the "*Graham* factors."

The critical inquiry in determining the differences between the claimed invention and the prior art is whether there is a reason to combine the prior art references. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-21 (2007). In *KSR*, the Supreme Court rejected the Federal Circuit's rigid application of the teaching-suggestion-motivation test. While the Court stated that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does," it described a more flexible analysis:

> Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue . . . . As our precedents make clear, however, the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.

*Id.* at 418. Since *KSR*, the Federal Circuit has announced that, where a patent challenger contends that a patent is invalid for obviousness based on a combination of prior art references, "the burden falls on the patent challenger to show by clear and convincing evidence that a person of ordinary skill in the art would have had reason to attempt to make the composition or device . . . and would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007); *see KSR*, 550 U.S. at 399 ("The proper question was whether a pedal designer of ordinary skill in the art, facing the wide range of needs created by developments in the field, would have seen an obvious benefit to upgrading Asano with

a sensor."). In addition to demonstrating that a reason exists to combine prior art references, the challenger must demonstrate that the combination of prior art references discloses all of the limitations of the claims. *Velander v. Garner*, 348 F.3d 1359, 1363 (Fed. Cir. 2003) (explaining that a requirement for a finding of obviousness is that "all the elements of an invention are found in a combination of prior art references").

An obviousness determination must also include a consideration of "secondary considerations," because "commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham*, 338 U.S. at 17-18. "For [such] objective evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention." *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995); *see Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 837 (Fed. Cir. 2015). "Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011); *see Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034, 1054-1056 (Fed. Cir. 2016).

## III.    IMPORTATION AND JURISDICTION

In its initial post-hearing brief, ALC explains that, "Apple stipulated that it imports accused products into the United States" such that the importation requirement of 19 U.S.C. § 1337 is satisfied. CIB at 20-21 (citing CX-0904C). Apple confirms in its brief that it "do[es] not dispute that the Commission has jurisdiction to adjudicate this Investigation." RIB at 15. The Staff similarly finds the importation requirement met, citing the stipulation entered into by Apple. SIB at 11 (citing CX-0904C).

Accordingly, the importation requirement under 19 U.S.C. § 1337(a)(1)(B) is satisfied, and the Commission has *in rem* jurisdiction over the Accused Products.

**IV.     U.S. PATENT NO. 10,638,941**

**A.     Level of Ordinary Skill in the Art**

A person having ordinary skill in the art of the 941 patent at the time of invention:

> would have had either (1) a bachelor of science degree in electrical engineering, mechanical engineering, biomedical engineering, computer science, or a related discipline, with at least two years of relevant work experience designing wearable devices and/or sensors for measuring physiological signals or parameters of mammals, or (2) a medical degree and at least five years of relevant work experience designing wearable devices and/or sensors for measuring physiological signals or parameters of mammals. Also, relevant experience could substitute for education and vice versa for both categories of skilled artisan

Order No. 12 at 8.  The parties do not challenge this definition and it is applied throughout this initial determination.

**B.     Claims-at-Issue**

Claims 12, 13, 16, and 19-23 of the 941 patent are at issue in this investigation, either through allegations of infringement or domestic industry technical prong.  *See generally* CIB at 30, 43.  They are reproduced below, along with intervening claim 18:

12. A smartwatch, comprising:

a processor;

a first sensor configured to sense an activity level value of a user, wherein the first sensor is coupled to the processor;

a photoplethysmogram ("PPG") sensor configured to sense a heart rate parameter of the user when the activity level value is resting, wherein the PPG sensor is coupled to the processor;

an electrocardiogram ("ECG") sensor configured to sense electrical signals of a heart, wherein the ECG sensor comprises a first electrode and a second electrode, and wherein the ECG sensor is coupled to the processor; and

a non-transitory computer readable storage medium encoded with a computer program including instructions executable by the processor to cause the processor to:

determine if a discordance is present between the activity level value of the user and the heart rate parameter of the user;

based on the presence of the discordance, indicate to the user a possibility of an arrhythmia being present; and

receive electric signals of the user from the ECG sensor to confirm the presence of the arrhythmia.

13. The smartwatch or wristlet according to claim 12, wherein the heart rate parameter comprises an indication of a heart rate variability, and wherein the arrhythmia is atrial fibrillation.

. . . .

16. The smartwatch or wristlet according to claim 12, wherein indicating to the user further comprises: instructing the user to record an ECG using the ECG sensor.

. . . .

18. The smartwatch according to claim 12, wherein the heart rate parameter is a PPG signal.

19. The smartwatch according to claim 18, wherein the heart rate parameter is a heartrate variability ("HRV") value, wherein the HRV value is derived from the PPG signal.

20. The smartwatch according to claim 18, wherein the heart rate parameter is a heartrate, wherein the heartrate is derived from the PPG signal.

21. The smartwatch according to claim 12, the processor further to: display an ECG rhythm strip from the electric signals.

22. The smartwatch according to claim 12, wherein the PPG sensor is located on a back of the smartwatch.

23. The smartwatch according to claim 12, wherein the first electrode is located on the smartwatch where the first electrode contacts a first side of the user's body while the user wears the smartwatch, and the second electrode is located on the smartwatch where the user must actively contact the second electrode with a second side of the user's body opposite from the first side.

941 patent at cls. 12, 13, 16, 18-23.

## C.     Claim Construction

As part of the *Markman* process, the following claim terms of the 941 patent were

construed, either as-agreed between the parties or determined by Order No. 12:

| Claim Term | Construction |
|---|---|
| "arrhythmia" | "a cardiac condition in which the electrical activity of the heart is irregular or is faster or slower than normal" |
| "to confirm a presence of the arrhythmia" / "to confirm the presence of the arrhythmia" | Do not require a comparison of the ECG sensor results to the discordance determination |
| "when the activity level is resting" / "when the activity level value is resting" | Not indefinite |
| "discordance" | Plain and ordinary meaning |
| Order of method steps | the step of "when the activity level is resting, sensing a heat rate parameter of the user with a second sensor on the smartwatch" may be performed after or simultaneously with the step of "sensing an activity level of a user with a first sensor on a smartwatch worn by the user," and the step of "receiving electric signals of the user from an [ECG] on the smartwatch to confirm a presence of the arrhythmia" need not be performed last. |

*See* Order No. 12 at 12, 26, 29, 30, 31. The parties explicitly identify two terms that need additional construction. These are discussed below.

### 1.    "A smartwatch, comprising"

In its initial brief, ALC identifies the preamble of claim 12, "a smartwatch, comprising," as needing construction over whether it is limiting. CIB at 23-24. ALC argues it is, and points to dependent claims 22 and 23 which recite "smartwatch" in their claim bodies. *Id.* at 23. ALC argues this creates a need for an antecedent basis for "smartwatch." *Id.* (citing *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)). Apple agrees with ALC that the preamble is limiting. RIB at 8; RRB at 3. And both ALC and Apple further refer to this investigation's *Markman* order that "if a preamble is limiting for a dependent claim it is also

21

limiting for the associated independent claim, because a dependent claim possesses all the elements of the claim from which it depends." Order No. 12 at 15; CIB at 24; RRB at 4.

Within a discussion of invalidity, the Staff takes the opposite position and argues the preamble is not limiting. SIB at 36. The Staff contends, "the preamble recites no necessary structure, and the preamble could be deleted without affecting the claimed invention." *Id.* (citing, *inter alia*, *Catalina*, 289 F.3d at 809).

ALC and Apple have the more persuasive position. Dependent claim 22's recitation of "wherein the PPG sensor is located on the back of the smartwatch," and the recitation of "the smartwatch" in claim 23, both require an antecedent basis as alleged, and under the rationale provided in the *Markman* order, the preamble of claim 12 is determined to be limiting.

### 2.    "confirm the presence of arrhythmia"

ALC also identifies "confirm the presence of arrhythmia" as needing construction. CIB at 24. ALC contends it means to confirm the "condition" of arrhythmia, as opposed to confirming the particular episode of arrhythmia which may have been previously sensed by the PPG sensor. *See id.* at 24-25 (citing, *inter alia*, Hr'g Tr. (Jafari) at 342:21-343:11, 346:18-348:5, 455:16-456:17, 458:7-11, 461:1-15), 26 (citing, *inter alia*, 941 patent at 3:63-4:15, 1:43-57). ALC argues there is no intrinsic support for requiring the PPG data to overlap with the ECG, as Apple contends. *Id.* at 25-26. ALC further observes that Apple's experts, Dr. Picard and Dr. Stultz, appear to take contradicting positions on the topic. *Id.* at 25 (citing H'r Tr. (Picard) at 887:16-888:13, 890:10-891:1; Hr'g Tr. (Stultz) at 1154:21-1156:3), 27-28 (stating, "it is 'axiomatic that claims are construed the same way for both invalidity and infringement.'"); CRB at 13-14. ALC summarizes, "the '941 and '731 patents provide solutions where a PPG device may opportunistically measure heart parameters in the background, identify irregularities suggestive of arrhythmia, and provide a trigger to the user to take an ECG that can be analyzed on the device to confirm the presence of

the detected arrhythmia." CIB at 26 (citing 941 patent at Fig. 7, 4:65-15:16, 15:27-32, 15:35-43, 15:52-59). ALC also claims Apple's expert eventually admitted that flowcharts showing the sequential, not parallel, testing in the patent are embodiments of the claim. *See id.* at 27 (citing Hr'g Tr. (Picard) at 948:6-25, 952:21-953:3); *see* 941 patent at Fig. 7.

In its reply brief, ALC views Apple as relying entirely on Figure 1 of the 941 patent for its "simultaneous ECG/PPG" construction. CRB at 11. ALC notes, however, that the word "confirmed" does not appear anywhere in the discussion of Figure 1. *Id.* at 11-12 (citing Hr'g Tr. (Picard) at 977:5-979:4). Rather, as ALC argues above, "Figure 7 of the '941 patent (and accompanying disclosures) support numerous embodiments where an ECG is taken after a discordance determination that, itself, may indicate the presence of an arrhythmia . . . teaching that the arrhythmia '*should be confirmed* with the ECG.'" *Id.* at 12 (citing 941 patent at Fig. 7, 14:65-15:16, 15:27-32, 15:35-43, 15:52-59) (emphasis by ALC). ALC also disputes the idea that the "confirm" limitation represents testing or establishing what those in the art call a "ground truth." *See id.* at 12-13. ALC summarizes, "as a POSITA would readily understand, [] the user indeed has a detectable arrhythmia condition—the same condition which triggered the system to indicate the presence of such condition, first detected by the PPG sensor, to the user's attention." *Id.* at 13.

Apple presents its preferred meaning as "the ECG confirmation must be as to the particular arrhythmic event detected by the PPG sensor." RIB at 26 (citing Hr'g Tr. (Picard) at 886:6-887:15); RRB at 10. Practically, it explains, this "requires the ECG sensor to record and analyze data significantly overlapping in time with the data collected by the PPG sensor." RIB at 26-27 (citing Hr'g Tr. (Picard) at 887:16-22). Apple looks to Figure 1 of the 941 patent for support, which allegedly shows a PPG with an ECG trace "sensed from the same individual, over the same period of time" (*id.* at 27; RRB at 11) along with that portion of the specification which states "a

prediction of arrhythmia is more accurate when two or more physiologic parameters are concurrently sensed and analyzed with respect to one another" (*id.* at 11 (citing 941 patent at 10:21-23)). Despite ALC's suggestion to the contrary, Apple claims its experts are in agreement on this issue. *Id.* at 28 (citing Hr'g Tr. (Picard) at 890:8-891:1; Hr'g Tr. (Stultz) at 1121:23-1123, 1177:4-1178:9).

Apple also views ALC's and the Staff's construction as introducing intolerable ambiguity to the claim; specifically, ambiguity over how long the program can wait to take the ECG measurement and still "confirm" the earlier PPG diagnosis. RIB at 32-33; RRB at 14-16. Even if ALC's construction is adopted, Apple contends the claimed system must have "some algorithm that brings together the PPG-based discordance with the ECG measurement result to conduct the 'confirmation' analysis." *Id.* at 14.

The Staff agrees with ALC: "the '941 patent discloses preferred embodiments that take ECGs (steps 712A-D) *after* sensing heart rate and activity level values (step 700)." SIB at 18 (citing 941 patent at Fig. 7); SRB at 6 (citing 941 patent at 14:47-16:53). The Staff also cites the patent teaching that arrhythmias "may occur continuously or may occur intermittently" (SIB at 18 (citing 941 patent at 1:34-35)), and reasons, "[a]n arrhythmia can logically be confirmed at any time that it is still present" (*id.*).

ALC's and the Staff's interpretation of "confirm" is more persuasive, as there is scant intrinsic evidence to support Apple's simultaneous-measurement theory. Apple cites Figure 1 and 10:21-23 from the specification. Yet the patent is clear that Figure 1 (and associated discussion at 4:33-38) is essentially a background explanation of the cardiac monitoring arts. It shows concurrent ECG and heart rate tracings to demonstrate how heart rate variability (HRV) can serve as an indicator of atrial fibrillation. *See* 941 patent at 4:33-46 (explaining how ECG shows an

AFib episode, and during that episode, heart rate rapidly increased). This, accordingly, is used to justify the patent's teaching of continuously monitoring HRV to report or predict cardiac events. *See, e.g.*, *id.* at 4:44-46 ("HRV changes are therefore associated with atrial fibrillation, wherein increased HRV is found during periods of intermittent atrial fibrillation."); 5:11-14 ("For example, a user wearing a smartwatch having a heart rate sensor is alerted by the smartwatch to record an ECG when the HRV of the user increases."), 15:22-27 ("If, as shown in step 704, an increased heart rate is sensed together with an increased heart rate variability, and a normal or resting activity level is sensed. The increased heart rate and HRV are in discordance with the normal or resting activity level, and a presence of a discordance is determined by the device or system processor."). The figure does not, and is not intended to, reflect any embodiment of the invention.

Lines 10:21-23 from the specification fare no better. The excerpt states, "[a] prediction of arrhythmia is more accurate when two or more physiologic parameters are concurrently sensed and analyzed with respect to one another." 941 patent at 10:21-23. Not only does this sentence not mention ECG as one of those parameters "concurrently sensed," but the discussion in which it appears relates to predicting the *onset* of arrhythmia (*i.e.*, before it happens).

> In some embodiments, the devices described herein are configured to predict an onset of an arrhythmia in an individual. The onset of an arrhythmia is, for example, predicted due to a sudden and significant shift in the value of a sensed physiologic parameter such as heart rate. A prediction of arrhythmia is more accurate when two or more physiologic parameters are concurrently sensed and analyzed with respect to one another. For example, sensing of heart rate changes with respect to a sensed activity level provides contextual information for the sensed heart rate.

*See id.* at 10:16-25. There is no fair reading of claim 12, however, which covers predicting the onset of arrhythmia. By its plain language, the recited invention is reactive to arrhythmias—not predictive of them:

> a non-transitory computer readable storage medium encoded with a computer program including instructions executable by the processor to cause the processor to:

25

> determine if a discordance is present between the activity level value of the user and the heart rate parameter of the user;
>
> based on the presence of the discordance, indicate to the user a possibility of an arrhythmia *being present*; and
>
> receive electric signals of the user from the ECG sensor to confirm *the presence* of the arrhythmia.

*Id.* at cl. 12 (emphasis added).

ALC's and the Staff's construction, on the other hand, enjoys plentiful support. The patent repeatedly describes a process where ECG is initiated or sensed in response to (*i.e.*, later in time than) other physiological measured parameters:

> For example, discordance between two sensed values may indicate the future onset of or the presence of an arrhythmia. In response to the identification of the future onset of or presence of an arrhythmia an electrocardiogram may be caused to be sensed.

941 patent at 1:67-2:3;

> Described herein is a method for cardiac monitoring . . . and indicating to said individual with said wearable device to record an electrocardiogram when said discordance is determined to be present.

*id.* at 2:10-21;

> determine if a discordance is present between said activity level value of said individual and said heart rate value of said individual; and indicate that said electrocardiogram be recorded when said discordance is determined to be present.

*id.* at 2:52-56;

> Many arrhythmias occur intermittently and relatively infrequently. Thus, in order to monitor and capture an intermittent arrhythmia, continuous monitoring is typically required. ECGs can be measured continuously in the ambulatory patient using holter monitoring, but this type of monitoring is cumbersome for the patient and is thus not widely used. A device or system configured to take an intermittent ECG is much more convenient for users. Such devices or systems comprise a mobile computing device that includes one or more electrodes that sense an ECG when contacted by a skin surface of the patient. Such devices are light and portable and don't necessarily require the user to be in continuous physical contact with one or more electrodes as they would with a holter type monitor. Intermittent

arrhythmias can be recorded with these devices and systems *when a user is given an indication that an intermittent arrhythmia is occurring.*

*id.* at 4:14-30 (emphasis added);

> The one or more continuously sensed parameters of the user of such a technology as, for example, shown in FIG. 4, are then used to indicate to the user to use a device or system to sense an ECG. For example, a user wearing a smartwatch having a heart rate sensor is alerted by the smartwatch to record an ECG when the HRV of the user increases.

*id.* at 5:8-14;

> An accelerated heart rate of an individual sensed by the device in addition to, for example, a low blood pressure of the individual concurrently sensed by the device, triggers the processor of the device to indicate to the individual to engage with the electrodes of the device in order to sense an electrocardiogram.

*id.* at 9:32-37;

> In some embodiments, an electrocardiogram of an individual may be sensed in response to one or more sensed parameters. For example, an electrocardiogram may be caused to be sensed in response to a heart rate value.

*id.* at 11:18-21;

> The identified discordance may indicate the presence of an arrhythmia. As such, an ECG is caused to be sensed in a step 712A.

*id.* at 14:65-67;

> Once the discordance is determined, an ECG is caused to be sensed in a step 712B as, for example, described herein with respect to step 712A. As shown, in step 716, this particular discordance may be indicative of the presence of atrial fibrillation and it should be confirmed with the ECG 712B.

*id.* at 15:27-32.

> The ECG sensing device may be the device or part of the system used to sense the heart rate and activity level or may be a separate device. For example, a user wearing a smartwatch with heart rate and activity level monitoring receives an audible and/or visual indication from the smartwatch to sense an ECG when a discordance is present between a sensed heart rate value and a sensed activity level value.

*id.* at 15:4-11.

27

The flowchart of Figure 7 is perhaps the most illustrative. Unlike Figure 1, it reflects possible embodiments of the invention, and teaches the recording of an ECG after the sensing of heart rate and activity level:



*Id.* at Fig. 7.

One other specification passage, in particular, uses the term "confirm" and concerns the training of the machine learning algorithm which evaluates for discordances. *See* 941 patent at 13:52-14:42. In this training, sensed electrocardiogram data may be "compared back" to other parameter values. Even then, however, the patent explains that the electrocardiogram data is taken at a later point in time:

> For example, in some embodiments, sensed electrocardiogram data may be compared back to parameter values such as, for example, sensed heart rates and activity levels that triggered the sensing of said electrocardiograms. When, for example, sensed electrocardiograms confirm the presence of an arrhythmia, the presence of which was indicated by, for example, a discordance between other parameter values, the machine algorithm causes the device or system described herein to learn from that data. Similarly, when, for example, sensed electrocardiograms do not confirm the presence of an arrhythmia, the presence of which was indicated by, for example, a discordance between other parameter values, the machine algorithm causes the device or system described herein to learn from that data as well. That is, in some embodiments, the machine learning algorithm correlates the sensed electrocardiogram with the discordance between parameter values that caused it (*i.e.* the electrocardiogram) to be sensed.

*Id.* at 13:63-14:14; *see* Order No. 12 at 26. Altogether, the above passages and figure are more than enough support for reading "confirm the presence of the arrhythmia" to encompass later-in-time ECG measurements.

Admittedly, one passage describes an embodiment where an ECG may be taken simultaneously with another measured parameter, such as heart rate:

> In some embodiments, one or more continuous sensors may sense one or more parameters that cause the initiation of intermittent cardiac monitoring by one or more sensors. . . In some embodiments, an intermittently sensed electrocardiogram is caused to be sensed in response to a continuously measured heart rate of an individual. . . . In some embodiments, an intermittently sensed electrocardiogram is caused to be sensed in response to both a continuously measured heart rate and a continuously measured activity level. In some embodiments, an intermittently sensed electrocardiogram is caused to be sensed in response to a continuously sensed heart rate, a continuously sensed activity level, and a continuously sensed heart rate variability.

941 patent at 11:22-42. The recitation here of an "intermittent" ECG (*i.e.*, sometimes) and a "continuous" sensed heart rate (*i.e.*, always) would logically result in occasional overlap between ECG and heart rate measurements. But there is otherwise no suggestion that this is part of a "confirm[ation]" process for arrhythmias. Thus, this passage, weighed against the other passages listed above, is not enough to limit claim 12 to Apple's interpretation. The proper path is to give the limitation its full plain and ordinary meaning which, covers simultaneous or sequential data

29

readings. *Epistar*, 566 F.3d at 1334 (holding there is "a heavy presumption that claim terms carry their full ordinary and customary meaning, unless it can show the patentee expressly relinquished claim scope."); *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1320 (Fed. Cir. 2016) (holding claims must be interpreted in full view of the specification) (citations omitted).

Accordingly, "confirm the presence of the arrhythmia" does not mean ECG data must be recorded at the same time as PPG data.

### D.     Infringement

ALC contends, "Apple directly infringes claims 12, 13, 19, 20, 21, 22, and 23 of the '941 patent." CIB at 30. Of these, claim 12 is independent and the rest depend from it. For the reasons discussed below, ALC has shown infringement of claims 12, 13, 19, 20, 21, 22, and 23.

### 1.     Claim 12

For reference, claim 12 of the 941 patent requires:

12. [12(a)] A smartwatch, comprising:

[12(b)] a processor;

[12(c)] a first sensor configured to sense an activity level value of a user, wherein the first sensor is coupled to the processor;

[12(d)] a photoplethysmogram ("PPG") sensor configured to sense a heart rate parameter of the user when the activity level value is resting, wherein the PPG sensor is coupled to the processor;

[12€] an electrocardiogram ("ECG") sensor configured to sense electrical signals of a heart, wherein the ECG sensor comprises a first electrode and a second electrode, and wherein the ECG sensor is coupled to the processor; and

[12(f)] a non-transitory computer readable storage medium encoded with a computer program including instructions executable by the processor to cause the processor to:

[12(f)(i)] determine if a discordance is present between the activity level value of the user and the heart rate parameter of the user;

[12(f)(ii)] based on the presence of the discordance, indicate to the user a possibility of an arrhythmia being present; and

30

[12(f)(iii)] receive electric signals of the user from the ECG sensor to confirm the presence of the arrhythmia.

941 patent at cl. 12 (annotated).

As it concerns the Accused Products, only a few limitations are in dispute. ALC explains its view that, "Apple only contests infringement with respect to claim element 12(f)(i) (specifically for the IRN feature) and claim element 12(f)(iii) as to all accused features." CIB at 30 (citing Hr'g Tr. (Jafari) at 327:25-328:19). ALC thus reasons that any other disputes from Apple have been waived pursuant to Ground Rules 9.2 and 13.1. *Id.* And while ALC acknowledges that Apple did present an additional dispute for limitation 12(f)(ii) in its pre-hearing brief with respect to the HHRN feature, it notes that Apple presented no evidence or expert testimony at the hearing on the issue. *Id.* at 38 n.10. ALC argues Apple has thus waived the issue. *Id.*

The Staff contends that claim 12 is infringed. *See* SIB at 14. Apple does not concede the point, and it only addresses the elements of limitation 12(f) in its post-hearing briefs, but it does argue specifically that element 12(f)(ii) is not met. *See* RRB at 4-20.

ALC's position on limitation 12(f)(ii) is not persuasive. It is undisputed that Apple presented the argument in its pre-hearing brief. Thus, no violation of the ground rules occurred, the contention is not waived, and the limitation is discussed below. As to the remaining, undisputed, limitations of claim 12, they are found to be present in the Accused Products in light of the evidence and testimony provided by Dr. Jafari. CIB at 30-32 (citing Hr'g Tr. (Jafari) at 328:22-330:19, 340:16-22). In particular, the representative Apple Watch 6 is a smartwatch having an accelerometer, PPG sensor, ECG sensor, and memory, all coupled to a processor. *See* CDX-0003C.16.

CONFIDENTIAL MATERIAL OMITTED

      **a.**      **[12(f)(i)] "determine if a discordance is present between the activity level value of the user and the heart rate parameter of the user"**

As for "determine if a discordance is present between the activity level value of the user and the heart rate parameter of the user," ALC represents that there is no dispute it is met by Apple's HHRN feature—only IRN is contested. CIB at 32.

For HHRN, ALC argues it meets the limitation by running the ▮▮▮▮▮▮▮▮, which finds discordances "when the user is confidently determined to be in a resting state (as determined by ▮▮▮▮▮▮▮▮ . . . ) for a period of 10 minutes, but where his heart rate is above the high heart rate threshold (default is 120 bpm)." CIB at 33 (citing Hr'g Tr. (Jafari) at 309:13-210:19). Neither Apple nor the Staff contests this point, and the limitation is practiced by HHRN. *See* RIB at 17-21 (discussing only IRN); RRB at 4-9 (same); SIB at 14-16 (same).

For IRN, ALC argues it also meets the limitation through a combination of the ▮▮▮▮▮▮, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ CIB at 33. More specifically, it argues, "the ▮▮▮▮▮▮▮ for the IRN feature ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮" *Id.* at 34 (citing JX-0281C (Framhein) at 97:22-98:23; JX-0221C (Waydo) at 242:2-16) (emphasis in original). Thus, according to ALC, the "future/continued resting condition is used on an ongoing basis to determine a discordance as the heart parameter continues to be collected by the green LEDs of the PPG sensor" (*id.* (citing Hr'g Tr. (Jafari) at 314:12-315:7, 334:24-335:25)) and "the user of the IRN feature ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,



" (*id.* (citing Hr'g Tr. (Jafari) at 336:15-21, 337:2-14, 438:7-13; CX-0080.2; CX-0048C.87). Importantly, ALC reasons:

> By ███████████████████████████, which according to the '941 patent's disclosure could represent a situation where no discordance is present at all (*e.g.*, where the user is exercising, JX-003 at Figure 7, 15:44-48; Tr. (Jafari) at 518:3-16), then any heart parameter measured by the IRN feature would necessarily embody a discordance because ████████████████████████████████ *Id.*

*Id.* at 35.

ALC views Apple's "gatekeeping" arguments as inconsistent with the intrinsic evidence of the 941 patent with its invalidity positions. *See id.* at 36-37; CRB at 4, 9 (citing Hr'g Tr. (Stultz) at 1091:1-14). As to the former, ALC argues "there is no requirement . . . that detection of the presence of an arrhythmia by the claimed system requires that the activity level value be a direct input [to the discordance algorithm]. All that the claim requires is that a discordance is determined between the activity level value and the heart rate parameter." CRB at 5. And to the extent Apple argues activity level and heart rate parameter must be measured concurrently, ALC responds there is no such requirement, but even if there is, it is satisfied by IRN's ████████████████ ████████████████████████████ (*i.e.*, activity level is "brought together" with heart rate data). *See id.* at 6-7, 8-9 (citing RX-0835C.3); *see also* CIB at 36 (citing RX-0835C.3).

The Staff also finds the limitation met for both HHRN and IRN. The Staff argues that "[t]he IRN feature and HHRN feature . . . work in the same general manner – as discussed below, they both determine the possibility of an arrhythmia based on heart rate parameters that are inconsistent (or discordant) with a user being at rest. . . . This is exactly what the '941 patent describes." SIB at 15 (citing, *inter alia*, 941 patent at Fig. 7); *see* SRB at 3-4.

33

In opposition, Apple contends, "IRN does not make a discordance calculation at all." RIB

at 15. Apple explains its "gatekeeping" noninfringement theory as follows:



The IRN algorithm

As Apple's technical
expert, Dr. Picard, testified and as confirmed by Apple's engineers, documents, and
source code, and even by AliveCor's expert (Dr. Jafari), the

, *e.g.*, RPX-4C
(APLALIVE SC 0000089-93) (                                        ); RX-
179C.87; Tr. (Picard) at 848:3-885:19; Tr. (Waydo) at 762:22-763:4; Tr. (Jafari) at
437:16-438:17.

*Id.* at 16. Apple summarizes, "Dr. Waydo, Apple's Director of Health Algorithms, testified

unequivocally



." *Id.* at

18 (citing Hr'g Tr. (Waydo) at 762:19-24); *see id.* at 19 (explaining

"); *see generally id.* at 19-21.

In its reply brief, Apple disputes that the limitation is satisfied "simply when a discordance

exists—*e.g.*, when activity level is normal and the heart rate parameter increases. . . . [because this]

ignores the '941 patent's requirement that there be computer instructions comparing both variables

to '*determine* if a discordance is present.'" RRB at 5 (emphasis in original), 6 ("IRN *never* brings

together activity level and heart rate data to determine a discordance") (emphasis in original).

Apple reasons that because "the [IRN] process code analyzes

,"

it is necessarily true that the                                        *See id.* at 5-7.  It

34

matters not, according to Apple, that these functions serve only IRN—the bottom line is they "██ ██████████████████████████████████ *Id.* at 8. As for its expert's, Dr. Stultz's, testimony on existing "at rest" clinical procedures for diagnosing arrhythmia (*id.* at 8 (citing Hr'g Tr. (Stultz) at 1091:1-14)), Apple claims IRN "operates entirely differently" because ███████████████ ████████████████████████████████ A hypothetical doctor, on the other hand, "is mentally comparing the patent's activity level to the heart rate to determine if there is a discordance that might indicate a possible arrhythmia." *Id.*

The limitation is met. The accuracy of the algorithm shown in RX-0835C is not in dispute:



RX-0835C.3. Apple's technical witness, Dr. Waydo, testified that the process evaluates captured PPG data for "████████████████████████████████." Hr'g Tr. (Waydo) at 758:7-15. It is beyond dispute that the "irregular rhythm" is only "irregular" because of the ██████████ ████████████████████████████████████ *Id.* at 754:1-7, 763:2-4. In this way, the product is ███████████████████████, or "discordance," of low activity but high heartrate (or high HRV). RIB at 19 (██████████

████████████). This meets the claim limitation. Even Apple's expert, Dr. Picard, opines that what is required is simply "a heart parameter and an activity are brought together, and there's a clear determination of a discordance." Hr'g Tr. (Picard) at 876:12-877:15.

Whether or not this process takes place entirely within IRN, or involves IRN plus another algorithm, is immaterial. Apple's internal nomenclature does not control whether an accused product includes executable instructions to "determine if a discordance is present between the activity level value of the user and the heart rate parameter of the user." *See, e.g.*, *Ferring Pharms. Inc. v. Par Pharm., Inc.*, 267 F.Supp.3d 501, 507-9 (D. Del. 2017) (refusing to credit defendant's ANDA characterization of a "spray-coating" process as "wet granulation" to avoid a "spray-coating" claim limitation); Oliver W. Holmes, *Law in Science and Science in Law*, in Collected Legal Papers, 12 Harv. L. Rev. 443, 460 (1899) ("We must think things not words, or at least we must constantly translate our words into the facts for which they stand, if we are to keep to the real and the true.").

And ALC is correct that Apple's invalidity case contradicts its non-infringement position. Apple seeks to differentiate its products from typical medical practice because the former "█
█████████████████████████████████████████████████" RRB at 8. Yet Dr. Stultz persuasively testified that the typical medical practice is also to "ensure the patient is at rest before an exam is done":

> Receiving heart rate data, we obtain vital signs when the patient comes into the room. Sensing activity level, we ensure the patient is at rest before an exam is done. While the patient is at rest, we look at -- we do this assessment, as I've already mentioned, of the rate and the qualitative assessment of heart rate variability. And then we assess these findings in the setting of the patient being at rest.

Hr'g Tr. (Stultz) at 1079:14-20.

Accordingly, the limitation is met in the Accused Products, through both the HHRN and IRN features.

# CONFIDENTIAL MATERIAL OMITTED

**b.      [12(f)(ii)] "based on the presence of the discordance, indicate to the user a possibility of an arrhythmia being present"**

For "based on the presence of the discordance, indicate to the user a possibility of an arrhythmia being present," ALC contends it is met by both the HHRN and IRN features.  CIB at 37.  For IRN, ALC argues it "is configured to surface an indication of alert to the user (after satisfying the requirements of the algorithm) that specifies that an irregular rhythm has been detected suggestive of AFib."  *Id.*  Apple does not dispute this, and the evidence supports it.  *See* RIB at 23; CX-0611.1; CX-0048C.39, 71-72.  For HHRN, ALC contends it "similarly indicates the possibility of an arrhythmia to the user, which may include an abnormal tachycardia . . . or an underlying arrhythmia like AFib manifesting as a discordant high heart rate."  *Id.* at 37-38 (citing CX-0624.2; Hr'g Tr. (Jafari) at 339:5-340:9, 240:10-22, 241:18-242:10).

In its reply brief, for HHRN specifically, ALC considers it "undisputed that the HHRN feature of the Accused Products detects a tachycardia, which is a cardiac condition where the heart is beating faster than normally."  CRB at 10.  ALC also argues that the ██████████ ██████████ makes it "more likely to determine an abnormal or unexpected tachycardia" as opposed to high heart rates due to exercise.  *Id.*  ALC highlights the claim's recitation of "possibility" in "indicate to the user a possibility of an arrhythmia being present" and argues it is met simply because some of the detected high heart rates "indisputably are arrhythmia."  *Id.* at 11 (citing Hr'g Tr. (Jafari) at 339:5-340:9).  Overall, ALC views it as irrelevant the actual message generated by Apple's HHRN does not include the words "tachycardia" or "arrhythmia."  *Id.*

Apple disputes the limitation is met.  For background, Apple suggests that tachycardia is simply an elevated heart rate, due to any number of causes, and therefore not necessarily indicative of arrhythmia.  *See generally* RIB at 22-24; RRB at 9-10.  Thus, Apple contends the "simple statement of fact" coming out of HHRN, that "the user is experiencing an elevated hear rate while

the user appears to be inactive during a ten-minute period," cannot meet the limitation. Apple

contrasts this with the more detailed message coming out of the IRN and ECG apps. RIB at 23

(citing Hr'g Tr. (Jafari) at 442:19-443:6), 24 (citing Hr'g Tr. (Waydo) at 753:2-4; RX-

0046C.0001). Apple notes that the heartrate threshold which HHRN measures against is set by

the user, and as a consequence, "Apple deliberately chose not to provide the user a message about

any possible arrythmia." *Id.* at 24. Apple summarizes:

> Thus, the HHRN's factual notification (*i.e.*, that the user's heart rate is above a threshold while the user seemed to be inactive for ten minutes), and the interpretation of this statement is dependent on the user and their own unique medical history or circumstances. In other words, not all high heart rates detected by HHRN are indicative of an underlying arrhythmia—many are not. Under these circumstances, the statement provided by HHRN does not "indicat[e] to the user, using the smartwatch, a possibility of an arrhythmia" as required by claim 12.

*Id.* at 24. Apple also offers a rebuttal to a doctrine of equivalence infringement theory (RIB at 25-

26), but no such theory is present in ALC's briefing for this limitation (CIB at 37-38), so it need

not be discussed.

In rebuttal, Apple addresses the Staff's reliance on an Apple website support page for

HHRN which includes "a link to the American Heart Association (AHA) website." RRB at 10.

Apple argues that AHA webpage "simply lists the multiple reasons why a user's heart rate may be

high, many of which are not cardiac conditions" and otherwise are not displayed on the watch. *Id.*

(citing Hr'g Tr. (Stultz) at 1070:24-1072:10; Hr'g Tr. (Jafari) at 439:18-440:23, 524:10-525:7).

Thus, according to Apple, "they are not evidence that the accused system has instructions" as

claimed. *Id.* (citing RPX-0004C at -118).

The Staff agrees with ALC, and views Apple's argument as inconsistent with the ordered

construction for "arrhythmia." SIB at 17; SRB at 4-5. The Staff points specifically to the patent's

statement that tachycardia is a type of arrhythmia and Apple's apparent concession that any heart

rate above 100 bpm in a healthy adult is tachycardia. SIB at 17 (citing RPB at 45); SRB at 5 (citing

same). The Staff also finds Apple's support website, with links to AHA content, as further supporting infringement. SIB at 17 (citing Hr'g Tr. (Waydo) at 855:12-24); SRB at 5.

The limitation is met in the Accused Products. The parties' agreed construction for "arrhythmia" is very broad—"a cardiac condition in which the electrical activity of the heart is irregular or is faster or slower than normal." And the topic of the claimed notification is similarly broad—"the possibility of an arrhythmia." Put together, the limitation simply requires a notification of the possibility of faster or slower than normal heart rate or irregularity of any type.

With this in mind, the HHRN notification reads, "[y]our heart rate rose above 120 BPM while you seemed to be inactive for 10 minutes starting at 9:58 AM":



RX-0046C.1. The words "rose above" along with a quantitative heart rate value equates to a notification of a high heart rate. And when combined with the statement of inactivity (which anyone would understand to be associated with a low heart rate), this becomes a notification of an abnormal high heart rate (*i.e.*, arrhythmia) or, at least, the possibility of one.

Accordingly, the limitation is met through both IRN and HHRN in the Accused Products.

CONFIDENTIAL MATERIAL OMITTED

    **c.**    **[12(f)(iii)] "receive electric signals of the user from the ECG sensor to confirm the presence of the arrhythmia"**

For "receive electric signals of the user from the ECG sensor to confirm the presence of the arrhythmia," ALC remarks that it is undisputed the Accused Products include an ECG app such that "the only remaining dispute is whether the accused ECG App is capable of confirming the presence of arrhythmia." CIB at 38. Under the proper construction, in which the PPG and ECG need not be captured simultaneously, ALC argues it is so capable. *Id.*

ALC first explains why ECG "was and remains a superior measurement technique for arrhythmias such as AFib." *See generally id.* at 39-40 (discussing P wave detection); CRB at 15-16. ALC then argues why Apple's ECG feature is "highly accurate in the detection of AFib" (CIB at 40-41) and points to evidence showing ███████████████████████████ ███████████████████████████ (*see id.* at 41; CRB at 17-18 (citing CX-0054C; CX-0370C)). ALC also refers to an Apple support webpage which teaches customers they can "take an ECG at any time" including "when they receive an irregular rhythm notification." CIB at 41 (citing CX-0073). ALC argues this messaging, in particular, "is intended to convey to its users that there is obvious clinical value in a user taking an ECG after receiving an IRN alert regarding irregular heart rhythms, and that value is because ECG is uniquely capable among the two technologies of confirming the underlying AFib." *Id.* at 42; *see* CRB at 18.

In rebuttal, ALC warrants, "to confirm the presence of the arrhythmia" means to confirm the presence of the condition, not an event. CRB at 15 (citing Hr'g Tr. (Jafari) at 343:3-11). ALC disputes there is any requirement for PPG sensor output to act as an input to an ECG sensor algorithm because "[t]he '941 patent specification says nothing about data or data output from the PPG sensor serving as 'input' into the ECG-based confirmation analysis." CRB at 14-15. ALC similarly disputes a need for a link between the two programs, and states that in the Accused

Products "the normal and ordinary operation of the ECG App inherently provides arrhythmia confirmation capability when the App is operated in the customary manner following the prior receipt of a PPG-based indication regarding the 'possibility' of an arrhythmia from either HHRN or IRN." *Id.* at 15. ALC also contends that leaving open the time between PPG and ECG data collection does not create indefiniteness problems. *See* CRB at 16-17.

Apple's opposition to this limitation is first rooted in a construction that requires simultaneous or overlapping PPG and ECG data capture. *See* RIB at 26-29 ("PPG and ECG sensors running at the same time"); RRB at 16-17 ("when ECG App is activated, the PPG sensors are deactivated"). As determined above, the limitation is not so limited.

Beyond this, Apple contends "there are no inputs from IRN to the ECG App such that there could be confirmation of the detected arrhythmia." RIB at 30 (citing Hr'g Tr. (Jafari) at 464:13-15, 462:10-14). Put another way, "there is no separate algorithm that combines the data or analysis from the IRN feature with the ECG App algorithms." *Id.* (citing Hr'g Tr. (Jafari) at 462:22-463:7, 463:11-24). Apple states it is the same situation for HHRN and ECG—they are not connected in any way. *Id.* (citing Hr'g Tr. (Jafari) at 463:25-464:4; Hr'g Tr. (Picard) at 892:19-24); *see id.* at 31-32 ("the ECG App was intentionally designed to not be used in conjunction with other medical devices, medicines, or other medical technologies, including [HHRN]. . . . The same is true of IRN, including use with ECG App."); RRB at 17, 19.

Apple then argues that ALC has, critically, made no showing of any "instructions" that accomplish the supposed confirmation—an alleged break with the claim language (RIB at 35 (citing Hr'g Tr. (Jafari) at 462:10-463:7))—and discounts the relevance of Apple's internal emails and data gathering (*id.* at 36-39 (citing, *inter alia*, CX-0054C; CX-0370C; CX-0073; RX-0183C; CX-0022C; CX-0051C)). Even if relevant, Apple alleges that they show "[t]he concept of linking

41

IRN app and ECG App, such as with a message or button alerting a user to take an ECG following an IRN, *was never implemented*." *Id.* at 37 (emphasis in original) (citing, *inter alia*, JX-0235C (Brittain) at 244:6-248:1; RX-0181C.11; Hr'g Tr. (Waydo) at 859:18-860:18); RRB at 17, 19. As for its support website, Apple notes, "Dr. Jafari admitted that there are no computer instructions on the Apple Watch that launch the website, or that direct the user to the website, or that provide any of the information on the website." RIB at 38 (citing Hr'g Tr. (Jafari) at 475:11-16, 476:18-477:3); RRB at 20. And as for FDA submissions, Apple contends "AliveCor simply cites to the appearance of the word 'confirm,' and hopes the Court will read no further. However, missing in these documents are any descriptions, instructions, or functions describing how Apple Watch confirms *the* arrhythmia first detected by the PPG sensor, as required by the '941 patent." RIB at 39 (emphasis in original). Rather, according to Apple, "AliveCor is forced to rely on the user— and not the system—to mentally confirm the arrhythmia." RRB at 18-19 (citing Hr'g Tr. (Jafari) at 377:2-8, 448:11-17).

The Staff finds the limitation met in the Accused Products on the ground that "confirm" does not mean simultaneous capture of PPG and ECG data. *See* SIB at 18-19 (discussing why Apple's construction is incorrect); SRB at 6-7. The Staff does not address whether there must otherwise be a link or connection between PPG and ECG analyses.

The limitation is met in the Accused Products. The present dispute is essentially the parties' second over the meaning of "confirm." Inasmuch as claim construction is implicated in this dispute, the intrinsic evidence does not support a requirement that PPG data or analytical outcome be involved in the "confirm[ation]" of an arrhythmia.

To begin, "confirm" is used infrequently in the specification.  As reproduced above (and a second time below), it appears in the one context of training machine learning algorithms, where ECG data is "compared back" to sensed heart rates and activity levels:

> For example, in some embodiments, sensed electrocardiogram data may be compared back to parameter values such as, for example, sensed heart rates and activity levels that triggered the sensing of said electrocardiograms. When, for example, sensed electrocardiograms *confirm* the presence of an arrhythmia, the presence of which was indicated by, for example, a discordance between other parameter values, the machine algorithm causes the device or system described herein to learn from that data. Similarly, when, for example, sensed electrocardiograms *do not confirm* the presence of an arrhythmia, the presence of which was indicated by, for example, a discordance between other parameter values, the machine algorithm causes the device or system described herein to learn from that data as well.

941 patent at 13:63-14:10 (emphasis added).  While this is a kind of link between PPG and ECG, it is clear that the comparing-back step only occurs after the arrhythmia has been confirmed or not confirmed by ECG data.  In other words, the ECG "confirms" arrhythmia on its own, and the discordance algorithm is then cross-checked and trained.  This is consistent with the only other usages of "confirm," where after a discordance is found, the conditions of "atrial fibrillation" or "supraventricular tachycardia" "should be confirmed with the ECG" without mention of earlier PPG events.  941 patent at 15:27-59, Fig. 7.  Perhaps tellingly, Apple's briefing is devoid of examples in which "the output of the PPG sensor [is used as] an input to the ECG confirmation analysis"—either from the patent specification or real world.  *See* RIB at 27-39; RRB at 10-14; Order No. 12 at 26 ("the disclosed embodiments associated with Figure 7 (a decision tree describing various combinations of measurements and their associated diagnoses) say nothing about such a comparison.").

Thus, what is required for this element, as relevant here, is simply a smartwatch with a "non-transitory computer readable storage medium" loaded with instructions "executable by the processor to cause the processor" to receive ECG signals, analyze those signals, and conclude (*i.e.,*

confirm) that "the arrhythmia" is present from those signals.  This is the same process, as Respondents put it, as "what medical practitioners have been doing for decades."  RIB at 32 (citing Hr'g Tr. (Stultz) at 1090:8-25); *see* Hr'g Tr. (Stultz) at 1079:3-23; Hr'g Tr. (Albert) at 48:2-49:5, 52:20-53:21, 212:7-21; Hr'g Tr. (Efimov) at 1307:15-1308:3.  The claim does not require the processor to actually confirm the presence of the arrhythmia every time an ECG is measured, so long as the processor is programmed to so confirm the presence of the arrhythmia.

Apple's concern over the amount of time which may elapse between the PPG and ECG data collection (RIB at 33-35; RRB at 15-16) is not persuasive, and also beside the point. Infringement may be momentary or occasional (*Omega Patents, LLC v. CalAmp Corp.*, 920 F.3d 1337, 1344 (Fed. Cir. 2019) (upholding jury verdict of infringement when evidence showed occasional direct infringement "at least under some circumstances")) and it is far more likely than not that at least one user of each Accused Product has, at least one time, taken an ECG just moments after receiving either an HHRN or IRN notification.  Dr. Waydo confirmed as much. Hr'g Tr. (Waydo) at 851:23-852:2 ("Q. ███████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████.").  The evidence further shows the ECG program classifies the result (*i.e.*, "confirm the arrhythmia") and returns that classification to the user.  CX-0050C.5 ("The ECG Apple Watch App analyzes ECG signals and determines the presence of atrial fibrillation (AFib) or sinus rhythm on a classifiable waveform in adults aged 22 and over."); CX-0022.5 (FDA 510(k) clearance).  And again, the claim requires that the smartwatch be programmed to receive ECG signals "to confirm the presence of the arrhythmia," not that it actually do so in every instance.

Accordingly, the limitation is met in the Accused Products.

### 2.    Other claims

Apple does not contest dependent claims 13 and 19-23 in the Accused Products apart from their dependency on independent claim 12. RIB at 39; RRB at 20. Neither does the Staff. SIB at 20-22. These claims are also met by the Accused Products based on the evidence and testimony cited by ALC. CIB at 42-43. In particular, Dr. Jafari testified that all elements of each claim are met, except for intervening claim 18. *See* Hr'g Tr. (Jafari) at 328:4-19. And for claim 18, Dr. Jafari testified that its dependent claims are met, so it, too, is necessarily met. *See id.*

### E.    Domestic Industry – Technical Prong

ALC contends, "KBS, ███████ each practice claims 12, 16, 20, 21, 22, and 23 of the '941 patent literally and at least under the doctrine of equivalents." CIB at 43. Of these, claim 12 is independent and the rest depend therefrom. For the reasons discussed below, ALC has shown practice of claims 12, 16, 20, 21, 22, and 23 by the KBS DI Product. ALC has also shown practice of these claims is "in the process of being established" via the ███████ products.

### 1.    Claim 12

Claim 12 of the 941 patent is presented above in connection with infringement. Apple's initial post-hearing brief discusses limitations 12(f)(ii) and 12(f)(iii) for the KBS and ███ DI Products, and does not expressly dispute any other limitation for those products, although it does dispute whether the ███ is properly an "article" for DI purposes. RIB at 42-48.

For the ███, Apple's position is more expansive:

The ███ does not practice the '941 patent because: (1) it is not a smartwatch (as AliveCor admits); (2) does not have a first sensor configured to sense an activity level of a user; (3) does not have a functioning PPG sensor; (4) cannot determine a discordance; (5) does not have instructions to indicate to the user a possibility of an arrhythmia based on a discordance calculation; and (6) does not receive electric signals of the user from an ECG to confirm the presence of the arrhythmia. Thus, the ███ does not practice all the limitations required of claim 12, either literally or under the doctrine of equivalents.

45

RIB at 53. This position perhaps stems from Apple's overall contention that 

A threshold issue, then, is whether the ███████ DI Products qualify as "articles" for DI purposes. The Commission is adamant that domestic industry is to be assessed at the filing of the complaint absent "very specific circumstances, *i.e.*, 'when a significant and unusual development has occurred after the complaint has been filed.'" *Certain Thermoplastic-Encapsulated Electric Motors, Components Thereof, and Products and Vehicles Containing Same II*, Inv. No. 337-TA-1073, Comm'n Op. at 7 (Aug. 12, 2019) ("*Thermoplastic Motors*") (citing *Certain Collapsible Sockets for Mobile Electronic Devices and Components Thereof*, Inv. No. 337-TA-1056, Comm'n Op. at 15 n.10 (July 9, 2018)). In its reply brief, ALC appears to suggest that such an unusual development has occurred to justify a post-complaint analysis for a domestic industry that "exists." CRB at 82 n.20. But this one-off footnote, on its own, is not sufficient to deviate from the well-accepted standard.

Moreover, the law is clear that an actual article protected by the patent must exist to show that a domestic industry "exists":

> Both Federal Circuit law and Commission precedent require the existence of actual "articles protected by the patent" in order to find that a domestic industry exists. In *Microsoft Corp. v. International Trade Commission*, the Federal Circuit held:
>
> > Section 337, though not requiring that an article protected by the patent be produced in the United States, unmistakably requires that the domestic company's substantial

CONFIDENTIAL MATERIAL OMITTED

investments relate to actual "articles protected by the patent." 19 U.S.C. § 1337(a)(2), (3). A company seeking section 337 protection must therefore provide evidence that its substantial domestic investment—*e.g.*, in research and development—relates to *an actual article that practices the patent*, regardless of whether or not that article is manufactured domestically or abroad. *InterDigital Commc'ns v. Int'l Trade Comm'n*, 707 F.3d 1295, 1299, 1304 (Fed. Cir. 2013).

731 F.3d 1354, 1361-62 (Fed. Cir. 2013) (emphasis added). In view of both *Microsoft* and *InterDigital* (cited in the block quotation above), the Commission has held that "a complainant alleging the existence of a domestic industry under 19 U.S.C. § 1337(a)(3)(C) must show the existence of articles." *Certain Computers and Computer Peripheral Devices, and Components Thereof, and Products Containing Same* ("*Certain Computers and Computer Peripheral Devices*"), Inv. No. 337-TA-841, Comm'n Op. at 40 (Jan. 9, 2014). Thus, to demonstrate that a domestic industry exists, the "existence of articles" requires a physical embodiment of the patented invention. We have clarified that this articles requirement is not "limited to commercial goods." *Certain Non-Volatile Memory Devices and Products Containing the Same*, Inv. No. 337-TA-1046, Comm'n Op. [at] 41 (Oct. 26, 2018) (public version).

*Thermoplastic Motors*, Inv. No. 337-TA-1073, Comm'n Op. at 9; *see id.* at 10 ("Without the existence of an article protected by the patent, *i.e.*, a physical embodiment of the patented invention, the Commission finds that IV cannot establish that a domestic industry 'exists' relating to the articles protected by the patent.").

It is essentially undisputed that the ██████████████████████████ at the time of the complaint. *See* Hr'g Tr. (Jafari) at 490:13-16, 491:21-492:4; Hr'g Tr. (Akemann) at 702:25-703:4; Hr'g Tr. (Somayajula) at 252:23-253:5 ████████████████████ *see generally* CIB at 18-20 (discussing what ███ "will" do), 55 (failing to dispute that ████ ████████████ CRB at 19 (using present tense with ████ is developed to a point where it has been tested to show it practices the Asserted Patents"), 28 (failing to refute Apple's factual assertion that "██████████████████████████████████ 82 n. 19 (failing to rebut that ██████████ at complaint filing, but arguing that is irrelevant

**CONFIDENTIAL MATERIAL OMITTED**

given its current status); SIB at 22-26; SRB at 8 (viewing dispute as whether there were "fully functional prototypes" at time of the complaint), 11 (same). ███████████████████

███████████████████████

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

██████████████████████████████████ Accordingly, ███ cannot be deemed to practice claim 12 of the 941 patent (or any claim of any Asserted Patent) so as to support a domestic industry that "exists" under the statute. Whether practice of this and other claims by the ████ is "in the process of being established," however, is a separate matter and is addressed below.

Whether the ████ DI Product existed at the filing of the complaint to support a domestic industry that "exists" is more complicated. As discussed above, ███████████████ have been introduced in this investigation, ██████████████. Testimony from ALC witness Mr. Somayajula indicates that ████████████████████████████ ██████████████████████ before the April 20, 2021 filing of the complaint. *See* Hr'g Tr. (Somayajula) at 243:11-245:25; RX-0488C (Somayajula Decl.) at ¶ 9. That same witness and ALC's expert, Dr. Jafari, both testified that ███████████████████████

48

Appx154

**CONFIDENTIAL MATERIAL OMITTED**

to the filing of the complaint. Hr'g Tr. (Jafari) at 482:3-14, 486:21-25 ███████████

███████████ Hr'g Tr. (Somayajula) at 244:15-18.

Apple contends, however, that ALC's domestic industry theory relies on ███████████

█████ RIB at 128 ("The █████ that AliveCor relies upon for domestic industry is the █████

███████████ This would be important for determining whether or not the █████

█████ can support a domestic industry that "exists"—███████████ But ALC's

initial brief makes no mention of the ███████████

█████ *See generally* CIB. And what discussion there is only further clouds the issue. ALC

refers to core features the █████ "includes" but also "will have" or "will be able to" do. *Id.* at 18.

Obviously, features that a product "will have" is not terribly supportive of a claim that a product

already practices the patent. This is contrasted with its discussion of technical prong, specifically,

where ALC describes a █████ that "practices" the 941 patent claims. *See id.* at 50-54. This

implies the product has all necessary features.

ALC's reply brief seems to acknowledge different ███████████

███████████ CRB at 25. The discussion then shifts to an evaluation of an industry in the

process of being established (*i.e.* not one that "exists"), and refutes the idea that any DI article

must be commercialized or FDA-approved. *See id.* at 25-27. What the section does not do is make

clear that ███████████ at the time of the complaint, is alleged to practice all

limitations of claim 12 of the 941 patent. *See id.* at 25-27. Even ALC's economic prong arguments

fail to present this basic contention, and instead emphasize ongoing and future development work

on the product. *See* CRB at 82 (arguing an economic prong "at the time of the complaint" standard

is satisfied "regardless ███████████ 82 n.19 (arguing that because

the articles were produced during the investigation, "Apple's various arguments about when

49

prototypes first existed and which prototypes are currently be[ing] worked on are irrelevant"), 83

(arguing investments in ████████████████████ which is what existed at the time the

complaint was filed). In fact, in an explicit discussion of economic prong "in the process of being

established," ALC emphasizes that it is not necessary that completed ███████████ "exist":

> If AliveCor does not have an existing domestic industry, an industry related to the
> ███████████ is in the process of being established. AliveCor Post-HB at 164-
> 69. Here, Apple's arguments about ████████████ bear even less
> weight. The Commission has never squarely held that an article needs exist to
> establish that an industry is in the process of being established. *See Certain
> Thermoplastic-Encapsulated Electric Motors*, Inv. No. 337-TA-1073, Comm'n
> Op., at 11 & n.14 (Aug. 12, 2019). And the Commission has found the domestic
> industry requirement satisfied based on an article that the ALJ characterized as "at
> most a precursor of what may someday be a prototype or an actual article." *Non-
> Volatile Memory Devices*, Comm'n Op., 2018 WL 6012622, at *20, *25-27.

*Id.* at 90-91.

Other record evidence additionally shows it unlikely ALC alleges █████████████

that practices the claims of the 941 patent. As one example, ALC's technology officer, Mr.

Somayajula, mentioned only ████████████████████████ at the hearing.

Hr'g Tr. (Somayajula) at 213:17-214:9, 216:14-217:2. Even then, he testified that ███████

████████████████████████████████████████████████████

████████████████████ *Id.* at 217:13-15, 219:6-11, 222:4-8; *see* Hr'g Tr. (Albert) at 158:21-24

████████████████████████████████████████████████████

███████████████████████████████ *but see* RX-0488C (Somayajula

Decl.) at ¶ 9 ("AliveCor's ECG technology and ████████████████████

████████████████████████████████████████████████████

In another example, Mr. Somayajula testified that █████████████████████

████████████████████████████████████████████████████

████ Hr'g Tr. (Somayajula) at 244:9-14. He mentioned the ████████████████

█████████████████████████████████████████ *Id.* at 245:7-11.  As part of

her inspection of the ████████████, Apple's expert, Dr. Picard, also testified the █████████

██████



Hr'g Tr. (Picard) at 911:2-10.  Nowhere in ALC's briefing do they contest Dr. Picard's and Mr.

Somayajula's testimony that ██████████████████████████████ by the

time of the complaint.

Accordingly, to the extent it is argued, ALC has not shown the ████ product(s) available

at the time of the complaint practiced any claim of the 941 patent.  Whether practice of these claims

by the ████ is "in the process of being established," however, is a separate matter and is addressed

below.

Turning back to the limitations of claim 12, those undisputed limitations are found to be

present in the KBS DI Product in light of the evidence and testimony cited by ALC.  CIB at 45-

46.  In particular, Dr. Jafari testified that each element of claim 12 is practiced by the KBS.  *See*

Hr'g Tr. (Jafari) at 393:11-395:25.

> **a.     [12(f)(ii)] "based on the presence of the discordance, indicate to
> the user a possibility of an arrhythmia being present"**

ALC contends the KBS DI Product "contains instructions executable by the processor to

cause the processor to—based on the presence of the discordance—indicate to the user a possibility

of an arrhythmia being present." CIB at 46 (citing Hr'g Tr. (Jafari) at 396:12-397:23; JX-0096C

at 748, 751, Fig. 2).  This is met by the SmartRhythm algorithm, according to ALC:



*Id.* at 47. ALC continues: ███████████████████, the system notifies the user by displaying the message: 'Unexpected heart Rate. Would you like to take an ECG?" *Id.* (citing CX-0132C; Hr'g Tr. (Jafari) at 396:14-398:9); CRB at 21. ALC alleges the limitation is also met under the doctrine of equivalents, using the function-way-result test. *See id.* (citing Hr'g Tr. (Jafari) at 393:11-395:11).

Apple contests the limitation. It explains the product's operation as:



RIB at 41. Apple provides the following image showing this message:



*Id.* (citing RPX-0016C). Apple contends, "[t]his alert did not indicate to the user the possibility of an arrhythmia. Rather, it merely alerted the user that the system had identified an 'unexpected heart rate' that may be caused by many different factors, including normal factors that are not 'cardiac conditions.'" *Id.* at 42 (citing Hr'g Tr. (Stultz) at 1071:7-20; RX-0128C.12); RRB at 21.

The Staff finds the limitation met. The Staff reasons, "[i]f the system were able to determine with certainty that the detected discordance was or was not an arrhythmia, then there [would] be no reason to confirm that determination with an ECG . . . the message displayed by the KBS when a discordance is detected *is* a notification of the possibility of an arrhythmia." SIB at 24 (emphasis in original); SRB at 9.

The limitation is met in the KBS product. The parties' agreed construction for "arrhythmia" is very broad—"a cardiac condition in which the electrical activity of the heart is irregular or is faster or slower than normal." And the topic of the claimed notification is similarly broad—"the possibility of an arrhythmia." Put together, the limitation simply requires a notification of the possibility of a faster, slower, or in any way irregular heart rate. The word

**CONFIDENTIAL MATERIAL OMITTED**

"unexpected" in "Unexpected Heart Rate[.] Would you like to take an EKG?" (RPX-0016C) fairly communicates a heart rate that is unexpectedly faster or slower than normal.

Accordingly, the KBS DI Product practices this limitation.

> **b.    [12(f)(iii)] "receive electric signals of the user from the ECG sensor to confirm the presence of the arrhythmia"**

ALC contends the KBS "has instructions stored in memory that, when executed by the processing device, cause the processing device to confirm the presence of the arrhythmia based on the ECG data." CIB at 48.  More specifically, it explains, ""[a]fter an ECG recording is complete, the ECG is analyzed to determine ██████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ALC concludes, "[w]hen the ECG is classified as Normal or shows the presence of Atrial Fibrillation, the KardiaBand System has confirmed the presence of the arrhythmia." *Id.* (citing CPX-0021; CX-0110).  ALC adds the limitation is practiced under the doctrine of equivalents as well, with the function-way-result test. *See id.* at 48-49.

Apple contests the limitation, again on claim construction grounds, that is, the limitation requires overlapping ECG and PPG data capture, and some means for the discordance determination to be "brought together" with ECG data.  *See* RIB at 43.  The Staff contends that the limitation is met.  *See* SIB at 24-25.

The limitation is met.  As discussed above in connection with claim construction, there is no requirement for overlapping PPG and ECG data capture.  Nor is there a requirement that the discordance determination be "brought together" with the ECG data for "confirm[ation]."  The record evidence shows it is more likely than not that at least one user of the KBS has, at least one time, taken an ECG just moments after receiving either a SmartRhythm notification. *See, e.g.,* CPX-0021C at 00:34-45; Hr'g Tr. (Albert) at 64:11-25 (detailing clinical studies); JX-0009C.17

████████████████████████████████████████████████████, 27.  The

evidence further shows the ECG program classifies the result (*i.e.*, "confirm the arrhythmia") and

returns that classification to the user.  CPX-0021C at 00:29 (displaying "Possible AF"); JX-0011C

at ("After an ECG recording is complete, the ECG is analyzed to determine if it is at least 30

seconds long, if it is Normal, Unclassified, if Atrial Fibrillation is present, or if it is too noisy to

interpret. . . Presence of Atrial Fibrillation (AF) in you ECG results may present only potential

findings.  If you are experiencing any symptoms or have concerns, contact your physician.").

Thus, the KBS DI Product has a processor programmed to "receive electrical signals . . . to confirm

the presence of the arrhythmia."

Accordingly, the KBS DI Product practices this limitation, and therefore practices all the

limitations of claim 12.

### 2.    Other Claims

Apple does not contest practice of claims 16, 20, 21, 22, and 23 by the DI Products apart

from their dependency on independent claim 12.  *See* RIB at 40-53.  Neither does the Staff.  SIB

at 25.  As ALC has shown practice of independent claim 12, discussed above, the dependent claims

are found to be met in the KBS based on the undisputed evidence and testimony provided by ALC,

particularly the testimony of Dr. Jafari.  CIB at 50; *see* Hr'g Tr. (Jafari) at 393:11-401:12.  As

noted, the ████ and ████ have not been shown to practice any claim at the time of the filing of the

complaint.

### 3.    Whether technical prong is "in the process of being established"

As to whether practice of the 941 patent by the ████ and ████ products is "in the process

of being established," the record supports finding in the affirmative.

Technical prong domestic industry is a nearly identical analysis to infringement.  *Alloc*, 342

F.3d at 1375.  In the more common domestic industry "exists" cases, the analysis involves a

CONFIDENTIAL MATERIAL OMITTED

comparison between claim language and an existing product.  It follows that in "in the process of being established" cases, the analysis should remain as a comparison between claim language and a *future* product.  The Commission has explicitly not foreclosed this approach to establishing technical prong domestic industry (*Thermoplastic Motors*, Inv. No. 337-TA-1073, Comm'n Op. at 11) even though it acknowledges possible problems with "domestic industry analysis as a moving target" (*id.* at 8-9 n.11).  Nevertheless, the Commission has confirmed the complaint filing date standard applies to "in the process of being established" cases as well as "exists" cases, ruling out post-complaint evidence even when the complainant's future likelihood of success is challenged by a respondent.  *See Certain Pouch-Type Battery Cells, Battery Modules, and Battery Packs, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1179, Notice at 2 (Jan. 14, 2021); *see also Thermoplastic Motors*, Inv. No. 337-TA-1073, Comm'n Op. at 13 ("The testimony of IV's domestic industry expert, Ms. Kobe, shows that all of those activities occurred after IV filed the complaint in September 2017. . . . As discussed above, however, the Commission finds that the appropriate date here for determining whether a domestic industry was in the process of being established is September 5, 2017").

ALC makes only cursory references to "significant and unusual developments" that might shift the analysis away from the complaint filing date.  *See* CRB at 82 n.20.  Thus, later constructed ██ and ██ prototypes, or any other post-complaint developments, are not available for consideration as to whether the practice of the 941 patent is "in the process of being established."

Nevertheless, it is still more likely than not that, at the time of the complaint, ALC was taking the necessary and tangible steps to practice claims 12, 16, 20, 21, 22, and 23 of the 941 patent via the ██ and ██ products.  Dr. Jafari testified that the ██ and ██ as planned will practice each element of claims 12, 16, 20, 21, 22, and 23, and his opinion is supported by

descriptions of the planned products.  *See* Hr'g Tr. (Jafari) at 393:11-399:13; JX-0025C; JX-0095C; JX-0096C; CX-0251C; CX-0252C.  For the ▇ Apple only expressly disputes elements 12(f)(ii) and 12(f)(iii), the "indicate" and "confirm" elements, but it is undisputed that the ▇ will display a notification when a high heart rate is detected and that an ECG is then available using the ▇ , so the ▇ will be programmed to confirm the arrythmia the same way the KBS was.  *See* RIB at 47-48; *see also* JX-0025C (showing ECG sensors on the ▇ ).  For the ▇ Apple disputes virtually every element of claim 12.  *See* RIB at 53.  But the ▇ will be implemented on a smartwatch (*see* CX-0252C.5), it will monitor activity level with an accelerometer (*see* JX-0096C.1), it will have PPG and ECG sensors (*see* CX-0252C.5), it will identify a discordance and notify the user to take an ECG (*see id*. at *7), and will "alert" the user when a discordant heart rate is determined (JX-0096C.5).  So the technical documentation shows that the ▇ and ▇ will actually practice the asserted claims, if produced.

Moreover, there is a significant likelihood that the ▇ and ▇ will actually work.  As determined above, ALC's previous product, KBS, has been shown to practice all of these claims.  ALC's expert, Dr. Jafari, supplies persuasive testimony on the transferability of the SmartRhythm (PPG analysis) and KardiaApp (ECG collection and analysis) features—primary software features behind the KBS' practice of the claims—to other portable heart monitors in development.  *See* Hr'g Tr. (Jafari) at 389:1-7, 389:21-25, 390:6-15, 392:3-393:10.   ALC's technical witnesses testified to the same effect.  Hr'g Tr. (Somayajula) at 198:13-19, 202:11-21, 203:19-205:8, 210:19-212:2; 217:13-15, 218:22-219:20, 221:2-222:8; Hr'g Tr. (Raghavan) at 565:4-22, 596:7-599:22 (discussing predicate devices).  And the prior art in this investigation, discussed below, shows that wrist-worn computerized devices containing both PPG and ECG sensors were achievable well

**CONFIDENTIAL MATERIAL OMITTED**

before the invention of the 941 patent.  *See* RX-0419.  So the hardware and software features of 12, 16, 20, 21, 22, and 23 are plainly achievable.

Apple offers two points of opposition here.  The first is that the ███ and ███ are unlikely to become viable commercialized products.  ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████  But practice of an asserted patent claim for technical prong purposes does not depend on commercialization status.  Prototypes are acceptable and do not depend, for instance, on FDA approval.  *Non-Volatile Memory*, Inv. No. 337-TA-1046, Comm'n Op. at 41.

The second, particular to ███, is that "AliveCor's contention that SmartRhythm can simply be repurposed from KBS to ███ ignores the significant technical challenges in applying old source code to new hardware."  RIB at 52; RRB at 27.  Apple emphasizes, "AliveCor must develop and test its hardware and software, run clinical studies, and re-develop its hardware and software to have SmartRhythm functional on AliveCor's new devices."  RIB at 52 (citing Hr'g Tr. (Picard) at 918:21-924:13; JX-0096C at 4; Hr'g Tr. (Somayajula) at 255:2-16).  Apple then refers to the intensive efforts involved with clinical studies and FDA submissions "to demonstrate

sensitivity and specificity." *Id.* at 52-53 (citing Hr'g Tr. (Picard) at 922:8-923:24).  Apple concludes, "it may take years of further development." *Id.* at 53.

Apple's points are well-taken, as discussed below in connection with economic prong, but they do little to show that ALC is not taking the necessary and practical steps to practice a claim, or not likely to succeed at it.  For instance, in contrast to the ██ product, there is no assertion that ALC has abandoned the ██.  ███████████████████████████████

███████████████████████████████████████████

█████████████████████████████  And although the journey towards an FDA-cleared consumer medical device is long, the record indisputably shows it is familiar to ALC.  *See generally* Hr'g Tr. (Albert) at 59:21-83:7; Hr'g Tr. (Raghavan) at 558:13-602:9.  Moreover, to meet the technical prong, the sensors and algorithms need to work, but they do not need to work well.

Relatedly, and in rebuttal, Apple seems to challenge not just the feasibility but the intent of ALC to "repurpose" SmartRhythm for ██ and ██.  RRB at 27 (arguing the only evidence comprises "uncorroborated and conclusory testimony").  But the testimony from Dr. Albert, Mr. Somayajula, and Mr. Raghavan on this point was corroborated by internal planning documents.  JX-0096C; JX-0090C; CX-0252C.5 ██ will "leverage AliveCor algorithms"), 16 ██

███████████████████████████████████████████

███████████████████████████████████████████

CX-0250C.6, 11; JX-0008C █████████████████████████████

█████████████████████  JX-0095C (press release mentioning "AliveCor's ECG recording and AI technology" for ██

Accordingly, ALC has shown it is more likely than not that practice of claims 12, 16, 20, 21, 22, and 23 by the ▮▮ and ▮▮ is "in the process of being established."

### F.    Validity and Other Affirmative Defenses

Apple identifies the following invalidity and unenforceability theories for the 941 patent:

| Claims | Theory |
|---|---|
| 12, 13, 16, 19, 20, 21, 22, 23 | Invalid for lack of patent-eligible subject matter under 35 U.S.C. § 101 |
| 12, 13, 16, 19, 20, 21, 22, 23 | Rendered obvious under 35 U.S.C. § 103 by AMON (RX-0419), alone or in combination with Kotzin (RX-0401) and Almen (RX-0400) |
| All claims | Unenforceable against Apple under experimental use exception |

See generally RIB at 54-86.

As for prior art, Apple argues that an article entitled *AMON: A Wearable Multiparameter Medical Monitoring and Alert System* (RX-0419) ("AMON") published in December 2004, and is therefore prior art to the 941 patent under § 102(a). RIB at 60-61. Neither ALC nor the Staff disputes this prior art status for AMON. *See generally* CIB at 69-87; CRB at 35-49; SIB at 29.

Apple argues U.S. Patent No. 7,460,899 (RX-0400) ("Almen") is a published patent with a filing date of February 25, 2005 and an issue date of December 2, 2008, and is therefore prior art to the 941 patent under § 102(a). RIB at 61. Neither ALC nor the Staff disputes this prior art status for Almen. *See generally* CIB at 69-87; CRB at 35-49; SIB at 29.

Apple also argues international patent application WO 2004/012033 ("Kotzin") has a filing date of July 8, 2003 and a publication date of February 5, 2004, and is therefore prior art to the 941 patent under § 102(a). RIB at 61. Neither ALC nor the Staff disputes this prior art status for Kotzin. *See generally* CIB at 69-87; CRB at 35-49; SIB at 29.

Accordingly, each of AMON, Almen, and Kotzin are determined to qualify as prior art to the 941 patent at least under 35 U.S.C. § 102(a).

### 1.    Ineligible Subject Matter

Apple contends claims 12, 13, 16, and 19-23 of the 941 patent are invalid under 35 U.S.C. § 101 for failure to claim patentable subject matter. To this end, Apple applies the two-step analysis from *Alice*.

Under *Alice* step one, regarding that which the claim is directed to (*Alice*, 573 U.S. at 217), Apple argues "[c]laim 12 is directed to nothing more than the abstract idea of recording patient data, analyzing the data to identify a possible cardiac irregularity, and then confirming that irregularity." RIB at 54 (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016)). Apple refers to the testimony of its expert, Dr. Stultz, to explain that the claim represents the routine steps medical doctors have manually preformed for some time:

> Dr. Stultz—who is the *only medical doctor* in this case, and is the *only expert who has ever diagnosed patients with arrhythmias*—testified that in a routine cardiac exam, a patient comes into the office for assessment, has their pulse measured (*e.g.* by PPG, manual palpation, auscultatory exam), and then an assessment of regular rate and rhythm is done mentally by the physician, *i.e.* considering HRV while the patient is confirmed to be at rest. Tr. (Stultz) at 1076:12-1077:15; *id.* at 1079:11-23; *id.* at 1084:14-17; *id.* at 1090:17-1091:14; RDX-3.21; RDX-3.23; RDX-3.33-3.34. If an irregular arrhythmia is detected, an ECG is ordered and analyzed, usually within minutes, to arrive at a diagnosis. Tr. (Stultz) at 1076:12-1077:15. Dr. Stultz testified in detail that this is the same process he used when he "began [his] training as a physician/scientist over 30 years ago." *Id.* at 1077:16-20.

*Id.* at 54-55 (emphasis in original); *see* RRB at 29. Apple views ALC's expert, Dr. Efimov, and founder, Dr. Albert, as conceding this point. RIB at 55 (citing Hr'g Tr. (Efimov) at 1295:4-1296:21; Hr'g Tr. (Albert) at 17:1-18:5, 38:4-42:3); RRB at 29-30, 33. Apple also disputes that claim 12 represents any improvement to the monitoring devices themselves (RIB at 55-56) and argues that it is instead similar to those claims found ineligible in *CardioNet, LLC v. InfoBionic, Inc.*, 816 F. App'x 471, 472 (Fed. Cir. 2020) ("*CardioNet II*") (*id.* at 56-57). In short, Apple

Appx167

contends, "[c]laim 12 is thus directed at nothing more than automating long-standing clinical practices, which the Federal Circuit has repeatedly found invalid." *Id.* at 56-57 (citations omitted).

If found to be directed to an ineligible idea, Apple argues the remaining claim elements do not significantly add to the invention apart from conventional, routine, or well-understood technology. RIB at 57 (citing *Alice*, 573 U.S. at 221-26; *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018)). It contends the combination of PPG and motion sensors, and the subsequent use of an ECG, were well-known and not inventive as of 2013. *Id.* (citing Hr'g Tr. (Stultz) at 1091:6-1092:8; Hr'g Tr. (Efimov) at 1295:21-1296:18). Apple also reasons that because ALC's expert "admitted that only a doctor can diagnose atrial fibrillation—[] the '941 patent's device is not an advancement in ambulatory identification and diagnosis of arrhythmias at all." *Id.* at 57-58 (citing Hr'g Tr. (Efimov) at 1294:5-12, 1295:4-6), 58 (citing Hr'g Tr. (Efimov) at 1298:11-19, 1295:21-23, 1296:16-17), 59. Apple warrants, "'it is not enough' to point to conventional activities and mental processes 'and say 'do it on a computer.'"" *Id.* (citing *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1243 (Fed. Cir. 2016); *see id.* ("[T]here is nothing specific about the claimed smartwatch that makes it anything but an off-the shelf computer."); RRB at 34. As for dependent claims 13, 16, and 19-23, Apple argues they are directed to the same abstract idea as claim 12, represent common medical practice, recite only generic components, and are generally not inventive. *See* RIB at 59-60; RRB at 33, 36.

In response to ALC, Apple contends claim 12 is nothing like those at issue in *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358 (Fed. Cir. 2020) ("*CardioNet I*") or *Exergen Corp. v. Kaz USA, Inc.*, 725 Fed. App'x 959, 964 (Fed. Cir. 2018). RRB at 29-30, 32, 34. Apple rejects ALC's position that claim 12 is directed to a "'particular combination of sensors and algorithmic instructions'" because, in part, the "'algorithms' merely apply generic functional language that

62

Appx168

doctors have long used as part of [the] diagnostic process." *Id.* at 30-31 (citing CIB at 59), 35-36 ("neither the Asserted Claims nor the specification say anything substantive about signal processing, development of the sensors, or perfection of algorithms that make the claims patent eligible").

Similarly rejected is ALC and the Staff's position that claim 12 "'more accurately detected arrhythmias in ambulatory patients than conventional devices could.'" *Id.* at 31.  Apple explains "[t]here is nothing in claim 12 (or the '941 patent's specification) that limits the device to use in only ambulatory patients" and "patients could already record ECGs in an outpatient setting (via ECG patches and Holter monitors), as well as continuously monitor heart rate and activity level via the Apple Watch." *Id.* (citing 941 patent at 4:59-62); *see id.* at 31-32 (discussing Holter monitor deficiencies).

ALC contends the claims are directed to patentable subject matter, and even if not, they recite inventive concepts sufficient to render them patentable under 35 U.S.C. § 101.  As to *Alice* step one, ALC argues claim 12 "is directed to a particular combination of sensors and algorithmic instructions" and its limitations show it can more accurately detect paroxysmal or asymptomatic arrhythmias than traditional medical practice.  CIB at 59-60 (citing Hr'g Tr. (Efimov) at 1221:3-1236:1; Hr'g Tr. (Stultz) at 1096:22-1097:18).  ALC compares claim 12 to the claim at issue in *CardioNet I*, mentioned above, where the improvements "over existing diagnostic methods" showed direction towards a non-abstract idea.  *Id.* at 60-61; CRB at 30.  ALC adds:

> Indeed, claim 12 is even more clearly directed to an improvement in cardiac monitoring technology than the claims asserted in *CardioNet I* because it adds further specific components and algorithmic instructions to more accurately detect arrhythmias. Whereas the device in *CardioNet I* merely generated "an event" when it detected AFib or atrial flutter, it did not perform any additional steps to "confirm" the presence of those conditions, as does the device of claim 12. *See* JX-003.19, cl. 12. And rather than claiming a "beat detector" and a "ventricular beat detector,"

without specifying which type of sensor should be used, claim 12 requires a processor, a PPG sensor, an ECG sensor, and a motion sensor. *Id.*

CIB at 62.

ALC also disputes that the claim is simply "automating known techniques that doctors routinely used to diagnose arrhythmias such as atrial fibrillation." CIB at 63. The difference, it says, is that traditionally a doctor would have used a 12-lead ECG and even then "could not detect the asymptomatic episodes." *Id.* (citing Hr'g Tr. (Efimov) at 1235:6-1236:1, 1229:24-1230:20). In fact, ALC takes it one step further and reasons, "[b]ecause the claimed device is intended to detect arrhythmias when a doctor is *not* present, Dr. Stultz's testimony about steps doctors performed in clinical settings is irrelevant." *Id.* (emphasis in original); CRB at 33.

As for the dependent claims, ALC contends they "disclose additional limitations that place the claimed inventions even further outside the realm of abstract ideas." CIB at 63. In particular, ALC highlights HRV assessments (claims 13 and 19) which it asserts were previously done qualitatively and thus there is no evidence that "doctors routinely used wearable devices or algorithms running on them to determine HRV from PPG data." *Id.* at 64 (citing Hr'g Tr. (Stultz) at 1077:25-1078:11, 1085:11-22; *McRO Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)).

As for *Alice* step two, ALC points to the "discordance" determination as "innovative" because "it can filter out abnormal PPG readings that are caused by normal activities such as exercise." CIB at 65 (citing Hr'g Tr. (Efimov) at 1240:6-1241:12). This feature, according to ALC, makes the claim similar to that in *Exergen*. *See id.* at 65-66. ALC repeats, "[t]he claimed device is inventive because it can detect arrhythmias when a doctor is *not* present." *Id.* at 66 (emphasis in original). Even then, ALC suggests doctors "did not routinely use PPG sensors" for arrhythmia diagnosis such that "even if PPG sensors were known in the art, they were not used for

64

the specific purpose of detecting arrhythmias." *Id.* (citing Hr'g Tr. (Efimov) at 1236:2-16; *Exergen*, 725 F. App'x at 964-66); CRB at 31-33. ALC draws a sharp distinction between typical clinical practice and claim 12:

> Moreover, Dr. Stultz testified that doctors would qualitatively assess a patient's heart rate while the patient was at rest, which is a different concept than comparing the user's activity level from a motion sensor with a heart rate parameter from a PPG sensor to determine if there is a discordance between the two. Tr. (Stultz) at 1077:25-1078:11; 1085:11-22. Dr. Stultz opined that doctors "assess these findings in the setting of the patient being at rest," but he never testified that doctors compared heart rate parameters with an activity level achieved during normal exercise. Tr. (Stultz) at 1079:11-23.

CRB at 33.

Turning to hardware, ALC contends "the claimed device is not merely a generic computer. It is a unique combination of a processor, a PPG sensor, an ECG sensor, and a motion sensor that is capable of detecting and confirming the presence of arrhythmias . . ." CIB at 66-67 (citing, *inter alia*, Hr'g Tr. (Efimov) at 1238:4-14); CRB at 34. And for the dependent claims ALC argues they "provide further inventive concepts" and refers to the benefits these claims provide. *See id.* at 68-69; CRB at 35.

In response to Apple, ALC suggests the 941 patent is nothing like the invalid claims in *CardioNet II.* CRB at 31. Specifically, ALC argues "[c]laim 12 is different because it recites a specific implementation of an improvement over conventional cardiac monitoring devices." *Id.* ALC adds, "[t]his process of identifying a discordance, indicating to the user that an arrhythmia is present, and confirming the arrhythmia with ECG data is a specific implementation of a technological improvement to cardiac monitoring devices." *Id.* ALC contrasts this with *CardioNet II*'s claims which recited "'conventional processes.'" *Id.* (citing 816 Fed. App'x at 475).

65

The Staff agrees with ALC on each issue. The Staff describes *Alice* step one as "'asking what the patent asserts to be the focus of the claimed advance over the prior art.'" SIB at 27 (citing *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020); SRB at 13. To this question, Staff answers:

> The claims recite specific technical improvements that overcome deficiencies of conventional cardiac monitoring systems by sensing a user's activity level and a heart rate parameter to determine when to alert a user of the possibility of an arrhythmia being present, while also enabling the user to record an ECG to confirm the presence of the arrhythmia.

SIB at 27. The Staff views claim 12 as a specific "'means or method that improves cardiac monitoring technology.'" SIB at 28 (citing *CardioNet I*, 955 F.3d at 1368).

As for step two, the Staff contends:

> The evidence shows that the combination of limitations of the asserted claims supply an inventive concept that is sufficient to transform the nature of the claim to patent-eligible subject matter. *See* Tr. (Efimov) at 1252:15-1254:18; CDX-002C.45. Specifically, those claims recite a specific system that uses a first sensor to sense an activity level value of a user, and a photoplethysmogram ("PPG") sensor configured to sense a heart rate parameter of the user so as to alert the user of the possibility of an arrhythmia and to enable the capture of an ECG. *See* JX-003 ('941 patent) at cl. 12, col. 1:49-57. This technical advance enables the capture of ephemeral cardiac events in a way not possible using prior cardiac monitoring technology. *See* JX-003 ('499 patent) at col. 1:49-57; *see also* Tr. (Efimov) at 1252:15-1254:18; CDX-002C.45.

*Id.* at 28-29.

Claim 12 is not invalid under 35 U.S.C. § 101, although it is directed to an ineligible concept under *Alice* step one. For background, claim 12 recites:

12. [12(a)] A smartwatch, comprising:

[12(b)] a processor;

[12(c)] a first sensor configured to sense an activity level value of a user, wherein the first sensor is coupled to the processor;

66

[12(d)] a photoplethysmogram ("PPG") sensor configured to sense a heart rate parameter of the user when the activity level value is resting, wherein the PPG sensor is coupled to the processor;

[12(e)] an electrocardiogram ("ECG") sensor configured to sense electrical signals of a heart, wherein the ECG sensor comprises a first electrode and a second electrode, and wherein the ECG sensor is coupled to the processor; and

[12(f)] a non-transitory computer readable storage medium encoded with a computer program including instructions executable by the processor to cause the processor to:

[12(f)(i)] determine if a discordance is present between the activity level value of the user and the heart rate parameter of the user;

[12(f)(ii)] based on the presence of the discordance, indicate to the user a possibility of an arrhythmia being present; and

[12(f)(iii)] receive electric signals of the user from the ECG sensor to confirm the presence of the arrhythmia.

941 patent at cl. 12 (annotated). There are essentially two portions to this claim. The first recites the structure of a smartwatch (found to be limiting, above) loaded with a processor and particular sensors (limitations 12(a)-12(e)). The second portion refers to instructions causing analysis of the sensors' data and indicating (by any means) at least one result to the user (limitations 12(f)-12(f)(iii)). The first portion alone typically would be considered patent-eligible subject matter (as an apparatus), but the second portion alone typically would be questionable (as a set of algorithms). *See Yu v. Apple Inc.*, 1 F.4th 1040, 1043 (Fed. Cir. 2021) (in a claim for a digital camera, comparing limitations on lenses, sensors, and circuitry against limitations on image data enhancement).

The issue is then whether the claim, in view of the specification, is directed primarily to the apparatus or to the instructions. *Alice*, 573 U.S. at 217; *Yu*, 1 F.4th at 1043-45. The intrinsic evidence supports the latter. The majority of 941 patent claims focus on data analysis and returning results of that analysis to a user (941 patent at cls. 2-9, 13-21), while only a handful recite non-algorithmic features (*id.* at cls. 10, 11, 22, 23). The specification similarly speaks at length to

67

Appx173

diagnostic techniques for arrhythmias, and the benefits of a discordance determination preceding an ECG measurement. *Id.* at Title, 1:66-2:3, 2:10-3:12, 12:55-65, 12:66-13:7, 13:67-14:18, 14:36-42, Fig. 7. On the other hand, the concept of a smartwatch embedded with all three of an activity sensor, a heart rate sensor, and an ECG sensor is discussed sparingly and in generalities (*see id.* at 2:42-3:12, 4:14-32; *see generally id.* at 5:33-9:37) and, importantly, is not presented as the main contribution to the art (*see id.* at 4:59-5:16 (discussing Apple Watch as an existing device)).

Accordingly, it is fair to say that claim 12 is directed to the abstract idea of analyzing a combination of heart rate and activity, and then measuring and analyzing ECG electric signals for medical diagnosis, as medical practitioners have routinely done for years. "The Supreme Court has held that 'fundamental . . . practice[s] long prevalent' are abstract ideas . . .. The Supreme Court and we have held that a wide variety of well-known and other activities constitute abstract ideas." *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1314 (Fed. Cir. 2016) (citing *Alice*, 134 S.Ct. at 2356). Claim 12 is thus directed to non-patent eligible subject matter.

The structural elements within claim 12, however, are sufficient to transform the claim into patent eligible subject matter under *Alice* step two. The claim's recitation of a smartwatch comprising "a photoplethysmogram ("PPG") sensor configured to sense a heart rate parameter of the user when the activity level value is resting, wherein the PPG sensor is coupled to the processor," is particularly specific and structural. As the 941 patent notes, "numerous sensors are known for measuring heart rate":

> Electronic devices suitable for use with the system 601 include mobile electronic devices such as smartphones, smartwatches, tablets, and laptops. The electronic device 601 comprises one or more sensors configured to sense a physiologic parameter. Numerous sensors are known for measuring heart rate. Non-limiting examples of suitable sensors include light based sensors such as, for example, infrared sensor/emitter, ultrasound sensors, and tactile sensors. Sensors for measuring rhythm include electrodes for measuring electrocardiograms (ECG) and light based sensors for measuring photoplethysmograms.

68

941 patent at 5:41-51.

The claim could have left it at "a sensor" for collecting heart rate, similar to what it did for "[a] sensor configured to sense an activity level." But a PPG sensor on a smartwatch is specific and innovative. ALC's founder, Dr. Albert, described it as "us[ing] a green wavelength. What they do is they shine light into the skin, and that light is modulated by the blood flow in the skin. Then they look at the reflected light, again, that's been modulated by the blood flow, and they get that pulse waveform you see." Hr'g Tr. (Albert) at 66:2-11. Dr. Jafari described it as "light going through the tissue and you get the reflection of it back through the photodiode." Hr'g Tr. (Jafari) at 513:12-15. Apple's engineering witness, Dr. Waydo, also testified to particular technical considerations that influence PPG data collection. Hr'g Tr. (Waydo) at 823:12-824:1 (describing PPG sensor's sensitivity to ambient light). And the 941 patent describes PPG as "provid[ing] cardiac cycle information and may, for example, be analyzed by a processor of a device described herein to determine a presence of a premature ventricular contraction." 941 patent at 9:54-57. Thus, recitation of a PPG sensor within a smartwatch, while not the entire focus of the claim, does move it away from the ineligible concept of data collection/analysis and towards a specific electro-mechanical apparatus. *Alice*, 573 U.S. at 217-18 (asking whether the additional elements "transform the nature of the claim" into patent-eligible subject matter).

The claim's "electrocardiogram ('ECG') sensor configured to sense electrical signals of a heart, wherein the ECG sensor comprises a first electrode and a second electrode, and wherein the ECG sensor is coupled to the processor" on the smartwatch adds to this finding. The claim did not recite any means for collection of any sort of "electrical signals of a heart," but rather an ECG, and one which includes first and second electrodes. The record shows that ECG sensors collect data in a certain way and provide a very particular waveform. *See, e.g.*, Hr'g Tr. (Albert) at 48:6-49:24;

Hr'g Tr. (Jafari) at 291:4-13; Hr'g Tr. (Stultz) at 1058:16-1059:13, 0195:1-10; 941 patent at Fig. 1, 8:1-9:23.

An ECG sensor, in combination with a smartwatch that also includes a PPG sensor, as well as an activity level sensor, amounts to significantly more than a patent on the ineligible concept of analyzing a heart rate and activity, and then measuring and analyzing ECG electric signals for medical diagnosis. *Alice*, 573 U.S. at 217-18. Taken individually, each separate component may be conventional, but combining all the various sensors on a smartwatch, for a specific function that is not traditional for smartwatches, is sufficiently "unconventional" to satisfy Section 101 under *Alice* step two. *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1291 (Fed. Cir. 2018). There may come a time when every smartwatch includes the various claimed sensors, and runs the needed algorithms to practice claim 12, but as of the date of the invention the "ordered combination" of the claim's elements was sufficiently "transform[ative]." *Id*. at 1289; *see Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) ("The mere fact that something was disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional.").

Apple's argument to the contrary is not clear and convincing. *i4i*, 564 U.S. at 95. Apple principally argues "it is not enough to implement an abstract idea with 'well-understood,' 'routine,' or 'conventional' technology" and the combined use of PPG sensor data and ECG sensor data for arrhythmia detection was "well-known and not inventive as of 2013." RIB at 57 (citing, *inter alia*, *Alice*, 573 U.S. at 221-226); RRB at 34-35 (looking for "innovative advancement" and comparing to prior art). But the test is not whether what stands apart from the ineligible subject matter is inventive in the sense of being novel or non-obvious. *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) (distinguishing § 101 inventive concept from § 102 novelty

and § 103 obviousness). The test is whether a smartwatch with integrated processor, activity sensor, PPG sensor, and ECG sensor (with at least two electrodes) adds something more than carrying out heart rate discordance determination, user indication of arrhythmia, and arrhythmia confirmation on generic hardware. *Alice*, 573 U.S. at 225-226; *see* RRB (arguing claim 12 "exemplifies a fundamentally abstract idea implemented on generic computer hardware using generic functional language"). And the answer is that it does, as discussed above.

Even if claim 12 was clearly and convincingly shown to be invalid under 35 U.S.C. § 101, Apple has not met its burden for the dependent claims that add further specificity to the smartwatch structure. Claim 22 recites "wherein the PPG sensor is located on a back of the smartwatch" and claim 23 recites:

> [W]herein the first electrode is located on the smartwatch where the first electrode contacts a first side of the user's body while the user wears the smartwatch, and the second electrode is located on the smartwatch where the user must actively contact the second electrode with a second side of the user's body opposite from the first side.

941 patent at cls. 22, 23. Again, Apple offers little here beyond an assertion that such features would have been obvious, stating, "Dr. Stultz testified that these are effectively the only places that PPG and ECG sensors could be placed on a user's wrist to work effectively—there is nothing inventive about doing so." RIB at 60; *see* RRB at 36. Obviousness is not the test for an inventive concept, however.

Accordingly, none of the asserted claims of the 941 patent have been shown to be invalid for lack of patentable subject matter.

## 2.    AMON in Combination with Almen and/or Kotzin

Apple contends AMON "alone or in combination with two others for minor limitations—renders obvious all of the '941 patent's Asserted Claims in this Investigation, including claims 12-13, 16, and 19-23." RIB at 60. Apple posits that four limitations within claim 12 are in dispute

71

Appx177

under this theory (*id.* at 61) although ALC's briefs discuss only three (CIB at 74-77; CRB at 40-42).  In addition, ALC presents disputes for claims 13 and 21.  CIB at 77-80; CRB at 42-45.

There is a preliminary matter concerning claim 13.  In its opening brief, Apple reasons that "[a]lthough AliveCor contests that heart rate variability is disclosed in AMON, it does not contest limitation 11[f] of the '499 patent . . . in its Pre-Hearing Brief.  Therefore, AliveCor has waived its argument that AMON does not disclose heart rate variability across all three Asserted Patents."  RIB at 72 n.32.  This is not persuasive.  A generalized discussion of claim 13 was contained in ALC's pre-hearing brief.  CRB at 42 n.12; *see* CPB at 84 (citing other pre-hearing brief sections that attack combination of references).  Thus, ALC's position on claim 13 was not waived.

### a.     Claim 12

As noted, three limitations are in dispute for claim 12. As to the remaining, undisputed, limitations, they are found to be disclosed in AMON as alleged.  RIB at 67-69 (citing Hr'g Tr. (Stultz) at 1117:9-1118:7).  In particular, AMON teaches a "wrist-worn device" that tells time, containing "processing devices," an "acceleration sensor . . . capable of detecting the level of user activity," an ECG with one electrode inside the device cuff and a second electrode on top, and flash and random access memory.  RX-0419 at 1-2, 4, 6-7.  Although AMON does not appear to use the term "PPG," it describes such a sensor located on "the top of the wrist," as well as its use for measuring pulse rate.  *See id.* at 3-5.

### i.     [12(f)(i)] "determine if a discordance is present between the activity level value of the user and the heart rate parameter of the user"

Apple contends AMON discloses "determine if a discordance is present between the activity level value of the user and the heart rate parameter of the user."  RIB at 69-70.  In particular, Apple argues:

> As Dr. Stultz testified, AMON discloses "identifying high-risk zones given observations of patient data . . . [which] include[s] the pulse rate, and it tries to determine a high-risk zone based on settings." Tr. (Stultz) at 1118:8-1119:25. As Dr. Stultz explained, "[t]he key point here is that the settings are determined by the activity level" as set forth in Table I. *Id.* Effectively, AMON detects the level of user activity (walking, running, or resting) and correlates it to vital signs, where "the high risk areas . . . signify when the parameters are inconsistent with activity level." *Id.*

*Id.* As compared to the Accused Products, Apple avers AMON discloses this limitation "much more than the accused Apple Watch given that it has a specific table correlating activity to pulse rate." *Id.* at 70 (citing Hr'g Tr. (Stultz) at 1118:8-1119:25). Apple rejects the pre-set nature of the values as irrelevant because "[t]he critical point is that AMON detects user activity and correlates it with vital signs, where pulse limits are set according to the activity level." RRB at 39 (citing Hr'g Tr. (Stultz) at 1119:3-20; Hr'g Tr. (Efimov) at 1282:9-17).

The limitation is disclosed in AMON as alleged. AMON discloses two sets of risk thresholds for a patient's measured pulse, one for nonaerobic user activity and one for aerobic. RX-0419 at 6, Table I. AMON also discloses an acceleration sensor for determining which activity state a user is in. *Id.* at 3 ("AMON monitors pulse . . . and activity via acceleration continuously."), 5 ("Acceleration sensors provide information on the activities of the wearer.") 6 ("The selection of the active state is performed by user command or automatically by the wrist device when activity is detected."), Fig. 6. Thus, AMON teaches an evaluation for inordinately high or low pulse rates given one of two activity levels; *i.e.*, "a discordance is present between the activity level value of the user and the heart rate parameter of the user." And that heart rate can be provided by an optical, or "PPG," sensor. *Id.* at 6, 7 (explaining that an optical sensor runs and measures pulse for 30 seconds every 2 minutes, while other sensors are turned off most of the time). Thus, the limitation is met.

ALC argues that "the AMON device does not directly compare that activity level with the user's measured vital signs (including any heart rate parameter)." CIB at 75 (citing Hr'g Tr. (Efimov) at 1282:4-7); *see* CRB at 40. But the claims do not require a "comparison," they require "determin[ation]" of a "discordance," and that is clearly what AMON does.

Accordingly, the limitation is disclosed in AMON.

### ii.    [12(f)(ii)] "based on the presence of the discordance, indicate to the user a possibility of an arrhythmia being present"

Apple contends "based on the presence of the discordance, indicate to the user a possibility of an arrhythmia being present" is disclosed in AMON, "expressly or inherently"; and if not, it would have been obvious to modify AMON to arrive at this limitation of claim 12. RIB at 70-71. For support, Apple explains, "[t]he clinical algorithm disclosed in AMON also notes that if the pulse is outside the normal range, the user is asked to take an ECG measurement." *Id.* at 70 (citing RX-0419 at 6). Apple continues, "it would have been obvious to a POSITA with their knowledge as of May 2015 to modify the disclosure in AMON to meet this limitation (to the extent it's not expressly or inherently disclosed)." *Id.* (citing Hr'g Tr. (Stultz) at 1120:1-12)). Apple views ALC as admitting that AMON "'informs the user that one of the pre-set parameters may be outside of a normal range'" (RRB at 39 (citing CIB at 75)) and that "a heart rate outside of the normal range based on activity is inherently indicative of possible arrhythmia under AliveCor's and Dr. Jafari's application of the claims for infringement" (*id.* (citing Hr'g Tr. (Stultz) at 1120:1-12)). Apple emphasizes there is no need for the word "arrhythmia" to be displayed explicitly. *Id.*

The limitation is not disclosed, either expressly or inherently. AMON teaches, "[t]he initial analysis starts with a comparison of the pulse and oxygen saturation with predefined patient-specific values." RX-0419 at 3. AMON continues, "[b]ased on the results of this analysis, three different scenarios are possible," with one of those scenarios being, "Parameter out of range: A

remeasurement is performed.  If the outcome is the same as before, the user is informed and additional measurements are required." *Id.*  Another scenario is that more than one parameter is out of range, but "[i]n all cases, the patient is informed as to their own status and that of the device." *Id.*  AMON also teaches that one of its "unique" features is "Online Analysis and Emergency Detection" which includes "an analysis of all measurements online, *presenting them in appropriate form* to both wearer and remote [telemedicine center, or TMC]." *Id.* at 2 (emphasis added).

The clear import of these statements is that when pulse is measured and found to be out of range (*i.e.*, too fast or too slow, the agreed construction of "arrhythmia"), the "user is informed" of that fact.  But AMON does not specify exactly how this is done.  ALC cites to the testimony of Dr. Efimov:  "the alerts are only understood in the sense that the device can send a signal automatically to a hospital or a 9-1-1 call but not to the user."  Hr'g Tr. (Efimov) at 1283:5-18; *see* CIB at 75.  But this is not a reasonable reading of AMON, which states that the "patient is informed" in "all cases," including "[i]n the event of a failure to initiate communication with the [telemedicine center]."  RX-0419 at 3.  That is, direct communication to the user, as well as communication to a health professional at the telemedicine center, are both clearly contemplated by AMON.  No particular method of "inform[ing]" is specified, however.

Nor does AMON expressly disclose the content of the information.  But again, it discloses direct conveyance of information, including when a doctor at the telemedicine center cannot be reached, so it is not limited to a "human being mak[ing] medical judgments," and then expressing a diagnosis, "based on data transmitted" from the device.  CIB at 75.  Instead, the information is described as presented "in appropriate form" to the wearer.  RX-0419 at 2.  "Appropriate form" encompasses a range of possible messages, including messages that do not specifically "indicate" a "possibility of an arrhythmia," such as a directive to simply contact a cardiologist.

75

Appx181

So this limitation is not expressly disclosed in AMON. It is also not inherently disclosed, because it is not "necessarily present." *Schering Corp.*, 339 F.3d at 1377. It is, however, an obvious manner of carrying out what AMON teaches. In essence, AMON discloses a genus (inform the user of the sensed condition in an appropriate form) of which the "indicate" limitation is a species (indicate to the user the possibility of an arrythmia). Any skilled artisan presented with AMON would need to fill in certain gaps to construct the device disclosed, including what method to use to inform the user that heart rate is discordant and exactly what information to convey. As noted, AMON itself implies multiple possibilities, but it surely would have been obvious to that skilled artisan to just program the device to display a plain language description of the detected discordance (in this case high heart rate) on AMON's screen—in fact, it likely would have been the simplest implementation. *See* RX-0419 at 6 ("[o]n each step, a result is displayed"). The testimony of Dr. Stultz, to the effect that it would have been obvious in 2015 to modify AMON to indicate an arrhythmia, is entirely consistent with this. *See* Hr'g Tr. (Stultz) at 1120:13-1121:1. If anything, Dr. Stultz's opinion understates the obviousness of this element, because AMON would not need to be "modified," just specified such that the relevant information would actually be conveyed in a particular, appropriate form. As noted, to a POSITA the most straightforward way of doing that would have been to display "high heart rate" or the like on AMON's screen. And that satisfies the claim element.

ALC agrees that "[t]o the extent the AMON device provides any 'indication,' it informs the user that one of the pre-set parameters may be outside of a normal range," but otherwise disputes this finding. CIB at 75. As explained, however, it would have been obvious to a POSITA to be precise about the out-of-range parameter, and to display that fact on AMON's screen. ALC also argues that AMON's algorithms are for signal processing, not for condition-specific detection.

76

*Id.* This, however, ignores AMON's explicit teaching of a risk threshold lookup table (including faster and slower heart rate ranges) and the parties' agreed construction of "arrhythmia" (faster or slower heart rate than normal). *See* RX-0419 at 6.

The Staff also argues the limitation is not taught. SIB at 33-34. But the Staff's contention that the limitation is not "suggest[ed]" by AMON is conclusory. *Id.* at 33 (stating only "AMON does not disclose or suggest alerting the user of a possibility of an arrhythmia."); SRB at 15 (same).

Accordingly, it would have been obvious to implement AMON in a manner that satisfies this limitation.

### iii.  [12(f)(iii)] "receive electric signals of the user from the ECG sensor to confirm the presence of the arrhythmia"

For "receive electric signals of the user from the ECG sensor to confirm the presence of the arrhythmia," Apple contends, "the 5-step algorithm in AMON describes taking an ECG in step 4 as a confirmatory measurement." RIB at 71 (citing RX-0419 at 6). Apple acknowledges that AMON does not mention arrhythmia by name, and does not dispute that diagnosis of a condition is "done by a clinician, even in AMON," but nonetheless relies on its expert to explain "arrhythmia is certainly a condition a POSITA would have looked for in high-risk cardiac patients, even though it is not expressly stated." *Id.* at 72 (citing Hr'g Tr. (Stultz) at 1120:1-1121:1); RRB at 40. Apple does not view AMON's reporting of its own ECG working poorly as preventing obviousness because AMON also discloses "'[i]mprovements [to] hardware and algorithm-wise are foreseen and should improve the measurements significantly.'" RIB at 72 (citing RX-0419 at 10). Apple further argues "a POSITA would have been motivated to confirm the arrhythmia with ECG data because Kotzin discloses sensing a different characteristic via a different biosensor (such as ECG) to indicate whether the condition is indeed present." *Id.* (citing Hr'g Tr. (Stultz) at 1121:11-22; RX-0401 at 18:10-24); RRB at 40.

The limitation is expressly disclosed in AMON. As determined above, there need be no link between the programming for evaluating discordances and receiving ECG signals for arrhythmia confirmation. And AMON discloses that ECG signals are both received and evaluated against a lookup table for confirmation of an abnormal, out of range, heart rate and QRS duration:

TABLE I
L1 AND H1 REPRESENT DEVIANT ZONE, L2 AND H2 RISK ZONE, AND L3 AND H3 HIGH-RISK ZONE

| vital sign | L3 | L2 | L1 | Normal | H1 | H2 | H3 |
|---|---|---|---|---|---|---|---|
| Systolic (mmHg) | 50-59 | 60-79 | 80-99 | 100-130 | 131-160 | 161-200 | 201-300 |
| Diastolic (mmHg) | 40-44 | 45-49 | 50-59 | 60-85 | 86-90 | 91-110 | 111-140 |
| SpO2 (%) | 65-79 | 80-91 | 92-94 | 95-100 | | | 100↑ |
| Pulse (per minute) | 40-44 | 45-49 | 50-59 | 60-100 | 101-120 | 121-180 | 181-250 |
| QRS duration (s) | 0.01-0.03 | | | 0.04-0.12 | | | 0.121-0.35 |

See RX-0419 at 4, Table I; RX-0419 at 6 (discussing "Fourth Step"). As disclosed, and shown above, AMON "detect[s] and measure[s] a number of medical parameters from the ECG waveform, in particular, QRS complex width," and even employs a sort of machine learning algorithm to improve its detection:

> For QRS detection, a threshold set is computed during an initial learning stage (lasting 8 s): the upper threshold is calculated from 0.4 times the average maximum on the integrated signal; from this, a lower threshold is calculated by another factor of 0.4. During the detection process, the current integrated moving window value is compared with the upper threshold. If this threshold is exceeded, an R wave onset is assumed; QRS is confirmed by scanning backward (up to 100 ms) for a dip below the lower threshold. These threshold values are continually adjusted with each new QRS so as to compensate for variations in ECG baseline.

Id. at 4. Whether this is an accurate or medically reliable determination of an arrhythmia from a given ECG reading is immaterial; it is an evaluation and confirmation of a faster or slower than normal heart rate—i.e., the parties' agreed construction for the condition. Order No. 12 at 12-13. Kotzin's relevant disclosures are redundant with AMON and need not be discussed. Compare RX-0401 at 6:14, 18:21-24 (discussing use of second sensor after particular result with first, including EKG) with RX-0419 at 6 (same).

78

In addition, the fifth step of the medical algorithm begins, "[p]attern recognition of the medical data for clinical diagnosis," and ends with "[o]n each step, a result is displayed and, if appropriate, sent to the TMC for further processing." RX-0419 at 6. Thus, AMON does not simply teach reporting back ECG data, but suggests applying pattern recognition to it with the result of that process displayed. If the result is an arrhythmia, then the device has "confirm[ed] the presence of the arrhythmia" as required. And as claim 12's "confirmation of the arrhythmia" is not limited to any particular process or algorithm, it is convincingly disclosed by AMON.

ALC's argument to the contrary is not persuasive. ALC contends, "AMON never discloses a 'confirmation' step performed on the device" and its five step process "never discloses any analysis performed by the device that could 'confirm' whether an arrhythmia is present." CIB at 76; CRB at 41. But in a plain and ordinary sense, comparing measured ECG values to a lookup table and concluding "high risk" is an analysis "to confirm" the presence of arrhythmia. Similarly, ALC claims, "[a]t best, AMON and Kotzin disclose recording an ECG after a different sensor detects an abnormality." CRB at 41. Again, and setting Kotzin aside, AMON's use of a lookup table *after* ECG signal recording proves this statement false.

ALC also argues AMON is a non-enabling reference, to the extent it is part of an obviousness analysis. CIB at 74. ALC explains, "'if an obviousness case is based on a non-self-enabled reference, and no other prior art reference or evidence would have enabled a skilled artisan to make the claimed invention, then the invention cannot be said to have been obvious.'" CRB at 36 (citing *Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1377 (Fed. Cir. 2021)). ALC refers specifically to the ECG functionality disclosed in AMON:

> Here, AMON itself states that the ECG sensor and algorithms could not reliably calculate heart rate or QRS wave lengths. RX-419.10. AMON's ECG algorithm did not even attempt to identify P-waves, which Dr. Stultz testified are important for

> detecting arrhythmias. Tr. (Stultz) at 1159:13-15. Accordingly, AMON is simply not capable of detecting arrhythmias using ECG sensing, as required by the claims.

*Id.* ALC views Apple's experts, Dr. Picard and Dr. Stultz, as agreeing that the types of sensor design and signal processing changes needed for AMON's ECG are long-term projects, indicating its status as non-enabling. *Id.* at 37 (citing Hr'g Tr. (Picard) at 919:3-920:4; Hr'g Tr. (Stultz) at 1153:8-25).

ALC's position is not persuasive for at least two reasons. First, it depends entirely on AMON's disclosure about its own ECG efficacy. ALC's expert offers none of his own opinions on the matter. *See generally* Hr'g Tr. (Efimov) at 1181:1-1310:10; *Raytheon*, 993 F.3d at 1382 (emphasizing independent expert testimony in enablement). And when AMON's disclosure is taken as a whole, the overall thrust is that reliable heart rate and QRS wavelength will be achieved in due course, that is, without undue experimentation:

B. Conclusion

1) Measurement Results

. . . .

> ECG provides poor or no results. Calculation of reliable heart rate and length of the QRS wave was not made possible. Noise was a problem for all measurements. Improvements hardware and algorithm-wise are foreseen and should improve the measurements significantly.

> The results are close to what we expected but the device needs some improvements. What can be stated is that the use of several sensors in the same device is possible.

. . . .

VI. Conclusion

> We have developed a wearable medical monitoring and alert system aimed at people at risk from heart and respiratory disease. The system combines multiparameter measurement of vital signs, online analysis and emergency detection, activity analysis, and cellular link to a TMC in an unobtrusive wrist-worn device. A prototype of both the wrist device and the medical center software has been implemented. Medical trials were performed on 33 patients. While first prototypes had problems with achieving the required medical accuracy on all the

80

measurement, the tests have provided a clear indication of the feasibility of the concepts and validity of the solutions adapted by the project.

RX-0419.10; *see* RIB at 63-64.

It is only natural that if AMON's statements on its ECG reliability are to be believed, then so must its statements on the foreseeability of achieving improved reliability. And if it is true that there was difficulty in designing wearable deices with reliable ECG measurement, even at the time of the 941 patent (*see* Hr'g Tr. (Efimov) at 1259:16-24), the 941 patent offers essentially no information on how to achieve this (*see* 941 patent at Figs. 4, 5, 5:32-7:62 (discussing hardware in generalities and only at a high level)). In other words, the 941 patent effectively assumes such devices are ordinary:

> FIG. 4 shows available technologies 400 for continuously sensing a heart rate or an activity level. Shown are smartwatches made available by manufactures such as, for example, Apple. A wearer of one of the shown smartwatch technologies 400 may conveniently and continuously wear one or more sensors that are either coupled to or integrated with the watch throughout the day, thus, effectively continuously monitoring one or more parameter values via the one or more sensors that are either coupled to or integrated with the smartwatch. Thus, one of the smartwatch technologies 400 are an example of a type of device in the form of a wearable that conveniently provides continuous monitoring of one or more parameters of a user. Non-limiting examples of wearable devices that may have one or more sensors either coupled to them or integrated with them include watches (e.g. smartwatches), eyeglasses, wristbands, necklaces, and clothing.

Id. at 4:59-5:8.

Second, the actual claim limitation at issue for AMON's enablement is "receive electric signals of the user from the ECG sensor to confirm the presence of the arrhythmia." There is no required degree of performance (*e.g.*, reliability) for the "confirmation." All that is required is reception of ECG sensor signals and an evaluation of a faster or slower than normal heartbeat. On this point, Dr. Stultz offered unrebutted testimony that AMON's disclosure was "workable" as demonstrated by AMON's Figure 4 showing an ECG signal which "one could calculate heart rates

81

Appx187

from." Hr'g Tr. (Stultz) at 1176:13-20. Therefore, AMON's own disclosure, in combination with the only expert testimony on the issue, supports an enabling disclosure.

Accordingly, the balance of the evidence shows AMON's disclosure is enabling for "receive electric signals of the user from the ECG sensor to confirm the presence of the arrhythmia." And the limitation is disclosed in AMON as alleged.

### b.    Claims 16, 18, 20, 22, and 23

Apple contends that dependent claims 16, 20, 22, and 23, and intervening claim 18, are either disclosed in AMON or constitute an obvious modification of it. *See* RIB at 74-76. ALC does not contest Apple's theory on these claims apart from their dependency from claim 12. CIB at 79-81; CRB at 43-45. Neither does the Staff. SIB at 29-39. As Apple has shown the obviousness of claim 12 these claims are also obvious based on AMON's teaching and on the testimony provided by Apple's expert, Dr. Stultz. RIB at 74-76 (citing Hr'g Tr. (Stultz) at 1126:23-1130:9). Specifically, the features added by these dependent claims are expressly disclosed in AMON, so no further obviousness analysis is needed: instructing the user to record an ECG as in claim 16 (RX-0419 at 3 ("additional measurements are required" and are "initiate[d]" by the device, including ECG)); the heart rate parameter is a heart rate derived from a PPG signal as in claims 18 and 20 (*id.* at 3-4 ("pulse" is compared with preset parameters, and is measured using an optical device matching the description of a PPG)); the PPG sensor is located on the back of the smartwatch as in claim 22 (*id.* at 3 (the optical sensor is placed "on the top of the wrist")); and the ECG electrode configuration of claim 23 (*id.* at 4 (describing "Left arm" and "right arm" electrodes)).

### c.    Claims 13 and 19

The most hotly contested obviousness issue, for all three Asserted Patents, is heart rate variability. AMON does not expressly disclose measurement of that parameter, so Apple's

82

obviousness case for claims encompassing HRV relies on multiple references. *See* Hr'g Tr. (Efimov) at 1284:16-1285:1. The 941 patent has two asserted claims covering it: claim 13 recites, "[t]he smartwatch or wristlet according to claim 12, wherein the heart rate parameter comprises an indication of a heart rate variability, and wherein the arrhythmia is atrial fibrillation"; and claim 19 recites, "[t]he smartwatch according to claim 18, wherein the heart rate parameter is a heartrate variability ("HRV") value, wherein the HRV value is derived from the PPG signal." 941 patent at cls. 13, 19.

Apple contends "Dr. Stultz testified that AMON specifically discloses the measurement of R-R distances, which is the equivalent of the instantaneous heart rate. Calculating HRV would have been a 'knee-jerk reaction' to a POSITA from R-R distances." RIB at 72-73 (citing Hr'g Tr. (Stultz) at 1123:17-1124:3). And while these distances were discussed in the context of ECG signals, Apple argues it would have been obvious to a person of ordinary skill to calculate "heart rate data via an optical sensor, also disclosed by AMON." *Id.* at 73 (citing Hr'g Tr. (Stultz) at 1124:7-14); RRB at 41. Overall, according to Apple, "Dr. Stultz testified that most of the published work regarding calculating HRV from PPG data using the R-R interval 'happened a little after 2004 . . . but certainly by 2013 and 2015 this was well-known.'" RIB at 73 (citing Hr'g Tr. (Stultz) at 1125:8-15). To the extent these points are contested, Apple then refers to prior art reference Almen to disclose a "'wrist worn heart rate variability monitor' and 'a heart rate variability test.'" *Id.* (citing RX-0400 at Abstract, 1:18-24, 10:28-35; Hr'g Tr. (Stultz) at 1126:6-16).

In light of the first three *Graham* factors, Apple has demonstrated a prima facie case that claim 13 would have been obvious over AMON in light of Almen. As discussed above, although there is no dispute AMON discloses a PPG sensor that detects heart rate, it fails to disclose

detecting or calculating heart rate variability. It also fails to "specifically mention[]" atrial fibrillation. Hr'g Tr. (Stultz) at 1158:22-1159:2. Almen, however, is focused on heart rate variability measurements, within the context of a smartwatch. *See* RX-0400 at Abstract. Almen also teaches the definition of heart rate variability and why it is valuable to measure:

BACKGROUND OF THE PRESENT INVENTION

Heart rate variability refers to the variability of the time interval between heartbeats and may be mathematically defined as the one-sigma standard deviation of the heart rate about the mean heart rate value. A heart rate variability test is a reflection of a person's current health status. By taking heart rate variability tests over time, an individual is able to gauge improvement or deterioration in their health status. Such improvements or deterioration of health may result from a number of sources including, *e.g.*, changes in lifestyle such as smoking cessation, starting an exercise program, surgery recovery, stressor additions or removals, diet changes. Thus, in this context, the HRV test may be used as a medical motivator. The HRV test may also be used as an early indicator diagnostic tool. For example, the HRV test has been demonstrated to have prognostic associations with future coronary disease and events.

. . . .

In addition, utilization of heart rate, heart rate variability, sleep stage patterns and pattern identification may be used to determine if the user is at risk of suffering from a wide variety of maladies or conditions relating in general to cardiovascular diseases or conditions and sleep breathing disorders or conditions. It would be highly desirable to have a device and method to identify certain maladies, conditions or related events (1) before they occur, (2) during the occurrence of the malady, event or condition, and/or (3) after the malady, event and/or condition has occurred to allow the user and/or health care professional to examine the data, identify the particular malady, event and/or condition, and take appropriate action to correct the problem.

The present invention addresses these concerns.

RX-0400 at 1:18-2:7. The 941 patent makes no claim to the discovery of the utility of monitoring heart rate variability, and it would appear from both the 941 patent's and Almen's definitions that the metric can be derived from the typical heart rate data logged by AMON. *See* 941 patent at 3:63-4:3 ("Heart rate may vary between . . . bradycardia . . . , normal resting heart rate . . . , and tachycardia . . .. Variance of heart rate over a period of time may be referred to as Heart Rate

Variability (HRV).”); RX-0400 at 1:18-21 (“Heart rate variability refers to the variability of the time interval between heartbeats and may be mathematically defined as the one-sigma standard deviation of the heart rate about the mean heart rate value”). Dr. Stultz agreed. Hr’g Tr. (Stultz) at 1058:13-1059:19, 1077:21-1078:15 (clinicians look for “irregularly irregular” heart rate), 1085:19-22 (“using heart rate variability from pulse rate sensing to determine the presence of an arrhythmia is something qualitatively that clinicians do and have done.”).

Thus, the required modification to AMON to sense HRV would have been nothing more than calculation of “the standard deviation of heart beat intervals.” RX-0400 at 1:44. As shown in the heart rate chart from the 941 patent, the data needed to perform this calculation is seemingly readily available from processing “heart rate **202**” measurements:



**FIG. 2**

941 patent at 4:47-53, Fig. 2.

Ironically, the Staff makes a convincing case of this (*see, e.g.*, SIB at 34-35 (providing hypothetical average heart rate and heart rate variability example)) as does ALC's expert, Dr. Efimov (Hr'g Tr. (Efimov) at 1308:4-1309:7 (explaining mathematical operations to obtain HRV). Calculating HRV is certainly within the level of ordinary skill defined above (*e.g.*, heart rate first derivative). And both AMON and Almen disclose the use of an optical sensor within a wrist-worn device to capture heart rate, making these references analogous art. *See* RX-0400 at 6:3-4 ("an infra-red sensor may be used to obtain or measure the heart rate").

In contrast to claim 12, however, where Apple's prima facie case for obviousness is based on a single reference, multiple references require both a reasonable expectation of success, which is discussed above, and a motivation to combine. *See Certain Infotainment Systems, Components Thereof, and Automobiles Containing the Same*, Inv. No. 337-TA-1119, Comm'n Op. at 36 (May 28, 2020) (public version) (citing *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1373-76 (Fed. Cir. 2019)). Apple's substantive argument for such a motivation is terse: "Dr. Stultz explained that a POSITA would have been motivated to use HRV derived from heart rate data because Almen expressly teaches a 'wrist worn heart variability monitor' and '[a] heart rate variability test is a reflection of a person's current health status,'" and Almen expressly discloses that AFib is an arrhythmia. RIB at 73 (citing Hr'g Tr. (Stultz) 1126:6-16). To be sure, Dr. Stultz testified that because of their similarities, combining AMON and Almen "would have been natural to any person of ordinary skill in the art at the time." Hr'g Tr. (Stultz) at 1131:10-17. But Dr. Efimov testified that Almen lacked a teaching for modifying AMON. *See* Hr'g Tr. (Efimov) at 1285:8-21.

Nonetheless, Almen discloses that heart rate variability data "may be capable of detecting and/or assisting in diagnosing various heart maladies and/or conditions. Exemplary conditions

that may be detected or diagnosed comprise *inter alia*, cardiovascular disease such as . . . Arrhythmias [and] Atrial Fibrillation." RX-0400 at 7:26-33. And Dr. Stultz testified that a person of ordinary skill would understand that a rapid increase in heart rate (*i.e.*, high variability) is consistent with atrial fibrillation. Hr'g Tr. (Stultz) at 1125:16-1126:16. Thus, to the extent "indicate to the user a possibility of an arrhythmia being present" is an obvious design specification in implementing AMON (discussed above), it would have further been obvious to indicate atrial fibrillation as the type of that arrhythmia, and to detect it by determining HRV, because Almen explicitly says so. And once the processor is made to evaluate PPG data for the possibility of atrial fibrillation, it would have been natural for the processor to evaluate ECG data for the same purpose (*i.e.*, "receive electric signals of the user from the ECG sensor to confirm the presence of the [atrial fibrillation]."). Almen therefore provides an explicit "reason" to modify AMON to detect atrial fibrillation by determining heart rate variability. *KSR*, 550 U.S. at 418.

Thus, the first three *Graham* factors support obviousness. *Graham*, 383 U.S. at 17-18 (holding factual determinations include: "(1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art . . ."). In opposition, ALC argues that ECG detection of AFib requires identification of P-waves, and this is so difficult that even the AMON authors explicitly left it out of their device:

> The [AMON] algorithm does not, however, even attempt to identify P-waves. The AMON authors acknowledged, and Dr. Stultz agreed, that the PR interval was "left out for this work due to the nontriviality of P wave detection." CX-0664.4; Tr. (Stultz) at 1159:7-1160:1. This is significant because, as Dr. Stultz testified, the presence or absence of P-waves is an important indicator of whether the user has AFib. Tr. (Stultz) at 1159:13-15.

CIB at 78; *see* CRB at 36. But Dr. Stultz testified only that "the presence or absence of a P wave can be informative in diagnosing arrhythmias" (Hr'g Tr. (Stultz) at 1159:13-15), Almen teaches that heart rate variability can be measured by analyzing heart rate without consideration of P-

87

Appx193

waves, and ALC offers no other evidence to support the alleged criticality (*see* CIB at 78 (citing only Dr. Stultz); CRB at 36 (same)).  Thus, the record shows that derivation of heart rate variability from more typical heart rate data was a routine and appreciated determination by those of ordinary skill in the art.  *See, e.g.*, 941 patent at Figs. 1, 2, 4:33-53 (discussing artifacts in ECG data showing atrial fibrillation).

ALC also contends, "Dr. Stultz fails to explain why a POSITA would have been motivated to refine the SpO$_2$ algorithm in AMON to do so, particularly given that the AMON device only uses the SpO$_2$ sensor to detect heart rate and blood oxygenation."  CIB at 78; *see* SIB at 35.  But as explained, refining AMON's algorithm would have been straightforward—simply calculate the first derivative of the heart rate (*i.e.*, rate of change of heart rate)—and Almen discloses use of an optical sensor (like the SpO$_2$ sensor in AMON) to measure heart rate and thereafter process it for determining heart rate variability.  *See* RX-0400 at 6:3-6, 13:33-40.  And Almen refutes ALC's assertion that prior to the 941 patent, it was not known to use PPG sensors for arrhythmia detection. *See id*. at 7:26-53; CRB at 39 (citing Hr'g Tr. (Efimov) at 1236:2-1237:7).  This is all in addition to Dr. Stultz making a similar point:

> Q. We've also heard a fair amount about atrial fibrillation. Is there a common way doctors refer to atrial fibrillation with respect to the rate and rhythm of the heart measured during a physical exam?
>
> A. Yes, there is.
>
> Q. And how is that referred to by doctors?
>
> A. So on the physical exam we are taught to make qualitative assessments of the heart rhythm. This is learned in medical school. And I think this also echoes what Dr. Albert said earlier this week. Irregularly irregular is a description of the heart rhythm, and it's very irregular and it is very suggestive of atrial fibrillation.

. . . .

And on osculatory exam we are taught to assess the heart rate and the heart rhythm. So we report whether the rate is normal or whether it is elevated, tachycardic or bradycardic, and we also report on the regularity of the rhythm.

So in medical school you learn a normal exam is regular, rate, and rhythm. Exams can be described as tachycardic and irregular, or it can be irregularly irregular where the latter clause is suggestive of atrial fibrillation.

If an irregularity is suspected, an ECG is obtained. And this is done -- this is what I learned and what I did as an internal medicine resident. And then, of course, the ECG is analyzed to determine a diagnosis.

. . . .

This is what I learned – this is when I began my training as a physician/scientist approximately 30 years ago.

Hr'g Tr. 1073:9-21 (emphasis added).

ALC also seems to make the argument that AMON is non-analogous art to both Almen *and* the 941 patent itself. CIB at 70-71. ALC argues AMON is meant for patients that have already been diagnosed with heart disease while the 941 patent is meant for "users to detect arrhythmias without the aid of a medical professional." *Id.* at 70 (citing RX-0419 at 1; Hr'g Tr. (Efimov) at 1229:24-1230:20; 1231:7-1232:5; 1235:6-1236:1). This is far from persuasive. Each of AMON, Almen, and the 941 patent involve wrist-worn heart rate monitoring devices—*i.e.*, analogous art. Even then, ALC's supposed dichotomy is no such thing. ALC presents AMON as directed to "people currently confined to the hospital or their homes" (*id.* (citing RX-0419.1), but AMON is envisioned to allow users to escape those places—"[t]he idea is that by using an unobtrusive wrist-worn device, monitoring can be performed without interfering with the patients' everyday activities and without restricting their mobility" (RX-0419 at 1; *see* RX-0419 at 5 (detailing pulse limits set to activity levels of walking, running, or resting)).

ALC additionally suggests that AMON's admission that its ECG sensors as-constructed yielded poor or no results equates to a teaching-away of "wrist-worn device[s] used to capture

89

signals from multiple sensors." CIB at 71-72. This is not a true teaching away, though, because it does not teach away from the combination of AMON with sensing HRV data to detect and confirm atrial fibrillation. AMON's honesty over its system's drawbacks should not be confused with its overall positive outlook on the technology and the concept of wrist-worn medial monitoring. *See* RX-0419 at 9-10 (detailing sensor testing and patient feedback). The final conclusion stands out:

> We have developed a wearable medical monitoring and alert system aimed at people at risk from heart and respiratory disease. The system combines multiparameter measurement of vital signs, online analysis and emergency detection, activity analysis, and cellular link to a TMC in an unobtrusive wrist-worn device. A prototype of both the wrist device and the medical center software has been implemented. Medical trials were performed on 33 patients. While first prototypes had problems with achieving the required medical accuracy on all the measurement, the tests have provided a clear indication of the feasibility of the concepts and validity of the solutions adapted by the project.

RX-0419 at 10; *see id.* at 2 ("for the envisioned target group and application, such 'all-in-one design' is essential [because] the system must be worn on a daily basis and be put on without assistance."). This is a far cry from a "suggest[ion] that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant." *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012) (internal citation omitted); CIB at 72. And again, to the extent there are practical difficulties in a wrist-worn device conducting ECG and other data measurement (CIB at 73-74 (citing RX-0560.2)), the 941 patent offers no solutions of its own (*see* 941 patent at Figs. 4, 5, 5:32-7:62 (discussing hardware in generalities and at a high level)) and claims no particular manner of ECG sensor construction (*see id.* at cls. 1-23). So the 941 patent cannot be said to have solved the "multi-sensor on a wrist-worn platform" problem, if it is alleged to exist.

Accordingly, Apple has made out a prima facie case that the limitations of claim 13 would have been obvious over AMON in view of Almen.

Claim 19 is similar to claim 13, reciting, "[t]he smartwatch according to claim 18, wherein the heart rate parameter is a heartrate variability ("HRV") value, wherein the HRV value is derived from the PPG signal." 941 patent at cls. 19. Because claim 13 already requires the heart rate parameter to be "sense[d]" by the PPG sensor, the combination of AMON and Almen satisfies claim 19 for the same reasons as claim 13. 941 patent at cl. 12. ALC and Apple generally discuss the two together. *See* RIB at 74-75; CIB at 79. And the Staff does not mention claim 19 at all. SIB at 29-39; SRB at 15-17.

Accordingly, Apple has made out a prima facie case that the limitations of claim 19 would have been obvious over AMON in view of Almen.

### d.    Claim 21

Claim 21 recites, "[t]he smartwatch according to claim 12, the processor further to: display an ECG rhythm strip from the electric signals." 941 patent at cl. 12. Apple argues first, as a matter of claim construction, that claim 21 does not require that "the display of the ECG rhythm strip must be on the device itself." RIB at 75; RRB at 42. Nevertheless, Apple continues, "AMON discloses a display on which the ECG rhythm is displayed." RIB at 75 (citing RX-0419.6, Fig. 4). Apple reasons, "Dr. Efimov conceded that as early as 2013, any standard ECG taken would produce a digital cardiac rhythm strip, thus AMON as part of taking a user's ECG, was doing the same." *Id.* (citing Hr'g Tr. (Efimov) at 1296:22-1297:1); RRB at 42-43.

In rebuttal, however, Apple changes tack and states only that "AMON discloses both an ECG rhythm strip in Figure 4, as well as a display" before complaining of a lack of evidence "to say that the rhythm strip of Figure 4 was *not* 'displayed' on the AMON device." RRB at 42 (emphasis added). Apple then notes the disclosure of AMON that "'the distances RR, QRS, and QT are stored for every discovered QRS wave . . . for an overall result—as displayed to the user.'" *Id.* (citing RX-0419 at 4).

91

The limitation is not disclosed in AMON, nor does Apple demonstrate that it would have been obvious. As with claim 12, Apple's obviousness case is based on a single reference, AMON, and AMON does not teach or show an ECG rhythm strip on the display of the wrist-worn device. Indeed, AMON fails to teach or suggest the processor of the wrist-worn device driving *any* display to show an ECG rhythm strip (internal or external to the smartwatch). AMON's Figure 4, reproduced below, is as ALC describes it, a rhythm strip created for publication to demonstrate the efficacy of the single lead ECG sensor ("QT interval and QRS duration can be detected"):



Fig. 4. AMON one lead ECG sample measurement: A digital bandpass filter [0.015 40]Hz has been applied to reduce noise. Heart rate, QT interval and QRS duration can be detected.

RX-0419 at Fig. 4. There is no disclosure in AMON that the rhythm strip illustrated was ever on a device driven by AMON's processor. Apple's assertion that there is a "lack of evidence . . . that the rhythm strip of Figure 4 was not 'displayed' on the AMON device" is incorrect. RRB at 42. What AMON does teach as being displayed to a user are average RR, QRS, and QT distance values: "[t]he distances RR, QRS, and QT are stored for every discovered QRS wave. For an overall result—as displayed to the user—averages are taken over all the valid QRS. Heart rate is

calculated directly from RR." RX-0419 at 4; *see id.* at 6 (discussing a fourth algorithm step calculating pulse rate, and "[o]n each step, a result is displayed"). Average distance values, however, need not be communicated with an ECG rhythm strip.

In addition to non-disclosure in AMON, Apple has not presented any reason why a POSITA would modify AMON's processor to drive a display (internal or external) to show an ECG rhythm strip. As it stands, AMON uses ECG data simply to determine heart rate and QRS durations. RX-0419 at 4, 6 (disclosing five step algorithm and threshold lookup table). These calculations do not require a visual presentation of an ECG rhythm strip, and neither Apple nor Dr. Stultz identifies a benefit for the processor to drive a display with that particular graphic. *See* RIB at 75; RRB at 42-43; Hr'g Tr. (Stultz) at 1129:7-14. It is not otherwise clear on its own why a layperson (as the user of the processor) would ever need to *see* their ECG rhythm strip as opposed to its post-analysis results—other than that it is attractive imagery.

Accordingly, the limitation of claim 21 is not disclosed in AMON, and has not been shown to have been obvious in view of AMON combined with the knowledge of a skilled artisan.

### e.     Secondary Considerations of Non-Obviousness

ALC points to secondary considerations including: industry praise, commercial success, copying, long-fled but unmet need, and failure of others. CIB at 81-87. ALC presents evidence that would support the non-obviousness of a single device which uses PPG and ECG data to monitor health (*e.g.*, the KBS and Accused Products). This, however, is not the issue at hand as AMON already discloses this PPG/ECG sensor combination. And Apple has not made out a prima facie case of obviousness of claim 21, so secondary considerations need not be analyzed for that claim.

ALC has shown that KBS practices claims 12, 16, 20, 22, and 23, and it is therefore entitled to a presumption of nexus where the secondary consideration pertains to KBS. *See Immunex Corp.*

*v. Sandoz, Inc.*, 964 F.3d 1049, 1067 (Fed. Cir. 2020). But KBS does not practice claims 13 or 19, which involve HRV, so there is no presumption of a nexus. *See Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034, 1053-4 (Fed. Cir. 2016) (summarizing evidence of praise directed at slide-to-unlock feature in contravention of argument that praise was merely generic). And ALC's arguments are not presented in the context of any particular claim or claim limitation. *See* CIB at 74-81 (claims 12-23 analysis), 81-87 (secondary considerations analysis); CRB at 40-45 (claims 12-23 analysis), 45-49 (secondary considerations analysis); *see also* SIB at 29-36, 36-39; SRB at 15-16, 16-17. This makes the secondary consideration analysis more difficult. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-9 (Fed. Cir. 1983).

Nonetheless, ALC offers persuasive evidence of industry praise for, and the commercial success of, the KBS, and (by presumption) the claims it practices. The industry praise is notably favorable (*see* RX-0564; CX-0470; CX-0471) and includes a positive technical analysis published in the Journal of the American College of Cardiology (*see* CX-0472), a peer-reviewed journal which Dr. Efimov views as the "topmost, high, impactful journal" in cardiology (Hr'g Tr. (Efimov) at 1198:21-1199:10). Admittedly, the cited exhibits do not offer unqualified praise and generally focus on the ECG function rather than the PPG function, as Apple explains. *See* RIB at 84-85. But each exhibit praises the "KardiaBand" as implemented on the Apple Watch, that is, the KBS, and the mere fact that a peer-reviewed medical journal published a laudatory article on the product is impressive, even if the article's specific focus was on only one of its functions. Taken as a whole, this is strong evidence of industry praise, and the presumption of nexus has not been rebutted. The Staff generally agrees. *See* SIB at 38.

There is also evidence of commercial success. ALC principally relies on funding it received, as opposed to revenues or profits derived from KBS, and on the fact that the Apple Watch

CONFIDENTIAL MATERIAL OMITTED

was commercially successful. *See* CIB at 82-83. But as Apple and the Staff point out, there is no clear nexus between the funding and KBS, especially because KBS was never ALC's biggest selling product, and the Apple Watch's commercial success is likely attributable to any number of factors unrelated to KBS. *See* CX-0469 (citing KardiaMobile but not KBS); CX-0935C (showing KardiaMobile as ALC's biggest revenue producer); SIB at 39; RIB at 81-83. Other evidence, however, shows that KBS "was selling very successfully," as ALC's chief financial officer testified. RX-0384C (Hosein Deposition) at 77:24-78:11. Specifically, KBS revenues for calendar years 2017, 2018, and 2019 totaled over ▮▮▮▮▮▮▮. *See* CX-0934C; CX-0935C. KBS' profitability is not clear, though, so the evidence of commercial success is not as persuasive as the evidence of industry praise.

ALC further argues that failure by others and a long-felt need weigh against obviousness. *See* CIB at 86-87. There is evidence of such considerations as they relate to detection of atrial fibrillation, but there is no clear nexus to the KBS, because the KBS does not practice claim 13. *See id.* (citing CX-0443; CX-0444; CX-0445; CX-0453; CX-0454). So to the extent the KBS is capable of detecting and confirming AFib, it is not clear that the long-felt need and failure by others relates to the claimed invention, as opposed to some other feature of the KBS, and the nexus presumption does not apply. These secondary considerations therefore do not weigh in favor of obviousness. The Staff agrees. *See* SIB at 39.

Lastly, ALC argues that Apple "copied AliveCor's technology." CIB at 83-86. The Staff concurs. *See* SIB at 37-38. Evidence ALC cites in favor of copying includes the fact that Apple had access to ALC's technology (necessarily so to some extent, because it was eventually incorporated into the Apple Watch), had multiple meetings with ALC personnel about KBS prior to KBS receiving FDA approval, and obtained KBS-related FDA submissions via Freedom of

**CONFIDENTIAL MATERIAL OMITTED**

Information Act requests.  *See generally* CIB at 83-86.  Apple is correct that taken individually such evidence is not especially probative.  *See* RIB at 77-80.

But "multiple internal [Apple] presentations" and similar evidence do provide probative evidence of copying.  *Apple*, 839 at 1054.  ██████████████████████████ ███████████████████████████████████████████.  JX-0219C (Klaassen Deposition) at 45:14-48:14.  In March 2016 an Apple presentation characterized the ████████████████" as a "██████████" for its own ECG "██████████."  CX-0375C.22.  In an internal April 2016 email, ████████████████████████████████ █████████████████████████████████████████████████████████████████.  CX-0911C.  In an email chain in April 2017 Apple personnel discussed ██████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████ which was Apple's internal name for what became part of the Accused Products.  CX-0909C.  In September 2017, shortly before KBS received FDA clearance, an Apple presentation described its method of mitigating problems with the Apple Watch as "██████████" (although the problems and solutions seemingly do not pertain to the claim limitations), and ████████████████████████████████ ██████████  CX-0370C.7, .14.  And in Apple's own FDA submissions, it described ██ ████████████████████████████████████████████████████████████████ ██████████████████████  CX-0393C.27, .53; *see also* CX-0439C.11.

Taken as a whole, such evidence is not exactly a smoking gun, but it does point circumstantially to copying by Apple.  So like industry praise and commercial success, copying weighs against a finding of obviousness.

### f.      Summary

In summary, there are three categories of claims: claims 12, 16, 20, 22, and 23, as to which Apple has shown a prima facie case of obviousness over a single reference and which are embodied by the KBS DI product; claims 13 and 19, as to which Apple has shown a prima facie case of obviousness over two references and which are not embodied by any DI product; and claim 21, as to which Apple has not shown a prima facie case of obviousness. For the first category, although the prima facie case is strong—except for one element of independent claim 12, every element of every claim is found in AMON—the secondary considerations are also strong. The nature and volume of industry praise is unusual, particularly the praise published in a respected medical journal, and although the evidence of copying is not especially impressive, some degree of commercial success is evident from the KBS sales data and the testimony of ALC's chief financial officer. On balance, the secondary considerations are sufficient to rebut the prima facie case, and have not been "dispelled" by Apple. *Certain Electronic Device, Including Streaming Players, Televisions, Set Top Boxes, Remote Controllers, and Components Thereof*, Inv. No. 337-TA-1200, Comm'n Op. at 29 (Dec. 3, 2021) (public version).

For claims 13 and 19, the claim from which they depend would not have been obvious, so they would not have been obvious, either, notwithstanding the lack of nexus to secondary considerations. *See Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008) ("But if claim 1 is not obvious [based on secondary considerations] then claims 6–8 also cannot be obvious because they all depend from a nonobvious claim."); *In re Fritch,* 972 F.2d 1260, 1266 (Fed.Cir.1992) ("[D]ependent claims are nonobvious if the independent claims from which they depend are nonobvious."). And the lack of prima facie obviousness for claim 21 necessarily renders it non-obvious.

Therefore, Apple has shown no claim of the 941 patent to have been obvious.

### 3.    Unenforceability as to Experimental Use

Apple presents a third defense pursuant to the experimental use exception of 35 U.S.C. § 271(e)(1).  RIB at 86.  Apple contends "the use of any Apple Watch products, including the IRN and/or ECG App, that were or part of research in one or more clinical trials related to the possible identification of AFib 'reasonably relates' to obtaining FDA regulatory classification or clearance, and is exempt under § 271(e)(1)." *Id.*; RRB at 72.

Apple's understanding of the law may be correct, but it is irrelevant.  Apple offers no suggestion that, should a violation be found in this investigation, it would be based on exempt experimental uses of the Accused Products.  *See* RIB at 86; RRB at 72 ("to the extent AliveCor attempts to rely on any subsequent studies or clinical trials").  Indeed, "AliveCor does not accuse Apple of any acts that fall under the experimental use exception." CIB at 49.  Staff helpfully adds:

> As discussed in the Staff's initial post-hearing brief, the products at issue have already received FDA clearance, and are now being manufactured, imported, and sold as commercial products. *See* CX-904C (Import Stipulation) at ¶¶ 3-6; Resp. Br. at 10. Clearly, the mass production and commercialization of the accused products is not necessary to obtain regulatory approval and thus does not qualify for the experimental use exception of § 271(e)(1). *See Eli Lilly and Company v. Medtronic, Inc.*, 496 U.S. 661, 671 (1990). Apple's defense should thus be rejected.

SIB at 17.

Accordingly, experimental use has not been shown to preclude any finding of infringement in this investigation.

## V.    U.S. PATENT NO. 10,595,731

### A.    Level of Ordinary Skill in the Art

A person having ordinary skill in the art of the 731 patent at the time of invention:

> would have had either (1) a bachelor of science degree in electrical engineering, mechanical engineering, biomedical engineering, computer science, or a related discipline, with at least two years of relevant work experience designing wearable devices and/or sensors for measuring physiological signals or parameters of mammals, or (2) a medical degree and at least five years of relevant work

98

experience designing wearable devices and/or sensors for measuring physiological
signals or parameters of mammals. Also, relevant experience could substitute for
education and vice versa for both categories of skilled artisan

Order No. 12 at 8. The parties do not challenge this definition and it is applied throughout this
initial determination.

### B.      Claims-at-Issue

Claims 1-5, 7-10, 12, 15, and 16 of the 731 patent are at issue in this investigation, either
through allegations of infringement or domestic industry technical prong, with claims 2, 4, and 7
intervening and unasserted. *See generally* CIB at 89, 95. They are reproduced below:

1. A smart watch to detect the presence of an arrhythmia of a user, comprising:

a processing device;

a photoplethysmography ("PPG") sensor operatively coupled to the processing
device;

an ECG sensor, comprising two or more ECG electrodes, the ECG sensor
operatively coupled to the processing device;

a display operatively coupled to the processing device; and

a memory, operatively coupled to the processing device, the memory having
instructions stored thereon that, when executed by the processing device, cause the
processing device to:

receive PPG data from the PPG sensor;

detect, based on the PPG data, the presence of an arrhythmia;

receive ECG data from the ECG sensor; and

confirm the presence of the arrhythmia based on the ECG data.

2. The smart watch of claim 1, further comprising a motion sensor operatively
coupled to the processing device, wherein to detect the presence of the arrhythmia,
the processing device is configured to:

receive motion sensor data from the motion sensor; and

determine, from motion sensor data, that the user is at rest.

3. The smart watch of claim 2, wherein to detect the presence of the arrhythmia, the processing device is configured to input the PPG data into a machine learning algorithm trained to detect arrhythmias.

4. The smart watch of claim 2, wherein to detect the presence of the arrhythmia, the processing device is configured to:

determine heartrate variability ("HRV") data from the PPG data; and

detect, based on the HRV data, the presence of the arrhythmia.

5. The smart watch of claim 4, wherein to detect the presence of the arrhythmia, the processing device is configured to input the HRV data into a machine learning algorithm trained to detect arrhythmias.

. . . .

7. The smart watch of claim 1, wherein the processing device is further configured to:

extract one or more features from the PPG data; and

detect, based on the one or more features, the presence of the arrhythmia.

8. The smart watch of claim 7, wherein the one or more features correspond to an HRV signal analyzed in a time domain.

9. The smart watch of claim 7, wherein the one or more features comprise a nonlinear transform of R-R ratio or R-R ratio statistics with an adaptive weighting factor.

10. The smart watch of claim 7, wherein the one or more features are features of an HRV signal analyzed geometrically.

. . . .

12. The smart watch of claim 1, wherein the processing device is further configured to generate a notification of the detected arrhythmia.

. . . .

15. The smart watch of claim 1, the processing device further configured to display an ECG rhythm strip from the ECG data.

16. The smart watch of claim 1, the processing device further to receive the ECG data from the ECG sensor in response to receiving an indication of a user action.

731 patent at cls. 1-5, 7-10, 12, 15, 16.

### C. Claim Construction

As part of the *Markman* process, the following claim terms of the 731 patent were construed, either as-agreed between the parties or determined by Order No. 12:

| Claim Term | Construction |
|---|---|
| "arrhythmia" | "a cardiac condition in which the electrical activity of the heart is irregular or is faster or slower than normal" |
| "confirm the presence of the arrhythmia based on the ECG data" / "confirming the presence of the arrhythmia based on the ECG data" | Plain and ordinary meaning; no requirement to compare the ECG data to the PPG data |
| Order of method steps | the step of "receiving PPG data from a PPG sensor of the smartwatch" must be performed before the step of "detecting by a processing device, based on the PPG data, the presence of an arrhythmia," and the step of "receiving ECG data from an ECG sensor of the smartwatch" must be performed before the step of "confirming the presence of the arrhythmia based on the ECG data," but there is otherwise no restriction on the order of the steps. |

*See* Order No. 12 at 12, 22, 24. The parties identify two terms that need additional construction. These are discussed below.

#### 1. "A smart watch to detect the presence of an arrhythmia of a user"

As with the 941 patent, the parties dispute the limiting status of the preamble of claim 1 of the 731 patent. ALC contends it is not limiting. CIB at 88. The Staff concurs. SIB at 59 ("the preamble recites no necessary structure"). Apple, on the other hand, asserts that the dependent claims' recitations of "the smart watch of claim 7," for instance, to require antecedent basis for "smart watch" in earlier claims. *See* RIB at 9; RRB at 3. Apple also argues that without the preamble the claim is left without the "essence or fundamental characteristic of the claimed invention, *i.e.*, that all these sensors are incorporated into a smartwatch or wrist-worn device." RIB at 9 (citing *Vizio, Inc. v. Int'l Trade Comm'n*, 605 F.3d 1330, 1340 (Fed. Cir. 2010)); RRB at

4.

ALC and the Staff have the more persuasive position.  Claim 1 recites a complete structure, with the preamble simply repeating the requirement that the PPG sensor "detect . . . the presence of an arrhythmia."  No limitation within the body of claim 1 refers or depends on the structure or attributes that "smart watch" in the preamble confers.  This is in stark contrast to claims 12, 22, and 23 of the 941 patent, discussed above, where sensors were required to be in particular locations within the physical smartwatch structure.  941 patent at cls. 22, 23.  Thus, antecedent basis was needed for "the smartwatch" appearing in the body of those claims, and it could come only from the preamble of claim 12.  *Cochlear Bone Anchored Solutions AB v. Oticon Medical AB*, 958 F.3d 1348, 1355 (Fed. Cir. 2020); *Eaton Corp. v. Rockwell Intern. Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention.").  The term "the smart watch" appearing in the dependent claims of the 731 patent is simply an introductory phrase to make a connection back to independent claim 1 (*i.e.*, not a claim body limitation), and could just as easily be replaced with the term "the apparatus" throughout the claims with no loss of structure or meaning.

Accordingly, the preamble of claim 1 of the 731 patent is not limiting.

### 2.    "confirm the presence of the arrhythmia"

ALC identifies the limitation "confirm the presence of the arrhythmia" as in claim 1 of the 731 patent as needing construction.  CIB at 88.  ALC "incorporates by reference its arguments regarding claim construction for this term from [941 patent discussion] as if the same were fully set forth herein."  *Id.*  ALC further notes that the 731 patent specification, albeit different from the 941 patent's, continues to include no embodiments with "simultaneous ECG and PPG recordings."  CRB at 50.  Rather, "[the] embodiments contemplate ECG being captured at a later time than the

PPG data that identified the possible arrhythmia, and that the indication to the user of the possible arrhythmia would 'trigger' the user to take a confirmatory ECG." *Id.* (citing Hr'g Tr. (Jafari) at 365:10-366:12). Thus, "confirm the presence of the arrhythmia" includes no requirement that "ECG and PPG be captured at simultaneous or substantially overlapping periods of time" according to ALC. *Id.* at 51. The Staff concurs. SIB at 47; SRB at 18-19. Apple does not provide an independent discussion of this construction issue, but similarly to ALC, "incorporates by reference the testimony, evidence, and analysis from [941 patent discussion]." RIB at 88; *see* RRB at 55.

"[C]onfirm the presence of the arrhythmia" in the 731 patent does not require simultaneous measurement of ECG and PPG data. The full claim language in which it appears does require that PPG or ECG data be "receive[d]," but otherwise places no restriction on when or how. *See* 731 patent at cl. 1 ("receive PPG data . . . detect . . . the presence of an arrhythmia . . . receive ECG data . . . confirm the presence of the arrhythmia."). With that said, the specification does teach ECG and PPG measurement "over substantially the same time scale or length," which is then used in "feature ranking" and "detection of atrial fibrillation." *Id.* at 19:65-20:1, 20:18-20, Fig. 6; *see also id.* at 22:3-19. But it also discloses "a person of ordinary skill in the art will recognize many variations based on the teaching described herein. The steps may be completed in a different order" (*id.* at 20:31-37; *see also* 22:50). Importantly, the 731 patent also discloses the two-step measurement technique featured prominently in the 941 patent—*i.e.*, the taking of ECG data pursuant to user prompt following another sensor's detection of a cardiac event:



*Id.* at Fig. 10; *see id.* at 23:3-34. The patent explains that the ECG serves to provide "a more detailed view of the heart" towards "disease diagnosis." *Id.* at 23:5-19. Clearly, in this embodiment the PPG and ECG data are both "receive[d]," but not simultaneously. This is consistent with the specification's sole use of the word "confirm"—"[f]or example, the ECG data can be classified as normal, low risk, moderate risk, high risk, and/or abnormal. The normal and abnormal designation may require health care professional evaluation, diagnosis, and/or *confirmation*." 731 patent at 15:56:60 (emphasis added).

Thus, the intrinsic evidence supports a broad reading of "confirm the presence of the arrhythmia" allowing for simultaneous and non-simultaneous reception of PPG and ECG data; there is no need to consider extrinsic evidence. *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("A court may look to extrinsic evidence so long as the extrinsic evidence does not contradict the meaning otherwise apparent from the intrinsic record."). Accordingly, "confirm the presence of the arrhythmia" does not mean ECG sensor signals must

be recorded at the same time as PPG signals.

### D.    Infringement

ALC contends, "Apple directly infringes claims 1, 3, 5, 8, 9, 10, 12, 15, and 16 of the '731 patent." CIB at 89. Of these, claim 1 is independent and the rest depend therefrom. For the reasons discussed below, ALC has shown infringement of claims 1, 3, 5, 8, 9, 10, 12, 15, and 16.

### 1.    Claim 1

For reference, claim 1 of the 731 patent requires:

1. [1a] A smart watch to detect the presence of an arrhythmia of a user, comprising:

[1b] a processing device;

[1c] a photoplethysmography ("PPG") sensor operatively coupled to the processing device;

[1d] an ECG sensor, comprising two or more ECG electrodes, the ECG sensor operatively coupled to the processing device;

[1e] a display operatively coupled to the processing device; and

[1f] a memory, operatively coupled to the processing device, the memory having instructions stored thereon that, when executed by the processing device, cause the processing device to:

[1f(i)] receive PPG data from the PPG sensor;

[1f(ii)] detect, based on the PPG data, the presence of an arrhythmia;

[1f(iii)] receive ECG data from the ECG sensor; and

[1f(iv)] confirm the presence of the arrhythmia based on the ECG data.

731 patent at cl. 1 (annotated).

The infringement disputes surrounding claim 1 of the 731 patent are similar to those for claim 12 of the 941 patent. ALC perceives Apple as only contesting "infringement with respect to claim element 1(f)(iv). Apple does not contest infringement as to the remaining elements of independent claim 1." CIB at 89. Again, ALC reasons that any other disputes from Apple have

been waived pursuant to Ground Rules 9.2 and 13.1. *Id.* And while ALC acknowledges that Apple did present an additional dispute for limitation 1f(ii) in its pre-hearing brief with respect to the HHRN feature, it argues that Apple's failure to present evidence or expert testimony at the hearing creates waiver of the issue. *Id.* at 91 n.10.

ALC's position on limitation 1f(ii) is not persuasive. It is undisputed that the argument was contained in Apple's pre-hearing brief. Thus, no violation of the ground rules occurred, the contention is not waived, and the limitation is discussed below. As to the remaining, undisputed, limitations of claim 1, they are found to be present in the Accused Products in light of the evidence and testimony provided by Dr. Jafari. CIB at 90-91 (citing Hr'g Tr. (Jafari) at 328:22-330:19, 361:5-364:5). In particular, the representative Apple Watch 6 has a PPG sensor, ECG sensor, display, and memory, all coupled to a processing device, and it is undisputed that the PPG sensor and ECG sensor send their data to the processing device. *See* CDX-0003C.16; RIB at 10-13.

### a.    [1f(ii)] "detect, based on the PPG data, the presence of an arrhythmia"

For this limitation, ALC contends, "the Accused Products contain instructions executable by the processor to cause the processor to detect the presence of an arrhythmia based on the PPG data." CIB at 91 (citing Hr'g Tr. (Jafari) at 362:22-364:5). In rebuttal, ALC remarks that Apple has only incorporated by reference its arguments for limitation 1(f)(ii) of the 941 patent and its own corresponding arguments should be viewed as referenced as well. *See* CRB at 49.

As noted, Apple does incorporate by reference its arguments from the 941 patent into this limitation. *See* RIB at 87; RRB at 53-54. To be clear, Apple repeats its position that "not all high heart rates, much less all high heart rates detected by HHRN, are indicative of an underlying arrhythmia, *i.e.*, they are not all caused by a 'cardiac condition.'" *Id.* at 54 (citing Hr'g Tr. (Waydo) at 753:2-4; 754:20-755:7; Hr'g Tr. (Stultz) at 1070:7-1072:20).

The Staff first remarks that the limitation is not disputed for Apple's IRN feature, only HHRN, similar to claim 12 of the 941 patent. SIB at 45. As with that patent, the Staff finds HHRN meets the limitation, stating, "[d]etecting a high heart rate while a user is at rest *is* detecting the presence of an arrhythmia." *Id.* (citing Hr'g Tr. (Jafari) at 363:6-364:5) (emphasis in original). More specifically, the Staff explains, "HHRN determines when a user's heart rate is unexpectedly high when the user is at rest." *Id.* at 45-46. According to the Staff, an unexpected high heart rate is properly considered arrhythmia under the ordered construction. *Id.* at 46 (citing Order No. 12 at 12).

The limitation is met in the Accused Products. There is no dispute that Apple's IRN feature meets the limitation, and the only difference between IRN and HHRN—as far as this limitation is concerned—is the algorithm applied to observed heart rate. When the user is at rest, IRN applies a more complicated algorithm to detect episodes of irregular rhythm (RIB at 11-12; RX-0004C.1) while HHRN simply compares heart rate to a pre-set threshold over a 10-minute period of time (RIB at 10). Apple's argument that not every 10-minute interval of an above-threshold heart rate is indicative of an arrhythmia or cardiac condition (*e.g.*, caffeine or anxiety) is irrelevant because when the condition exists the device contains the instructions in memory to detect it. *Omega Patents*, 920 F.3d at 1344.

Accordingly, the limitation is met in the Accused Products.

### b.    [1f(iv)] "confirm the presence of the arrhythmia based on the ECG data"

For this limitation, ALC "incorporates by reference the entirety of its argument and evidence presented in connection with the '941 patent limitation 12(f)(iii)." CIB at 92; CRB at 50-51. Apple makes similar incorporation by reference (RIB at 88; RRB at 55), and the Staff repeats its own points on the topic (SIB at 46-47; SRB at 20-21).

107

There is effectively no difference between this limitation and that discussed in connection with claim 12 of the 941 patent. Accordingly, and for the reasons presented above, the limitation is met in the Accused Products.

### 2. Other Claims

In its brief, ALC represents, "nor does Apple contest infringement as to asserted dependent claims 3, 5, 8, 9, 10, 12, 15, and 16 (except because they incorporate contested elements of independent claim 1 by virtue of their dependency)." CIB at 89. Apple does in fact not contest claims 3, 5, 8, 9, 10, 12, 15, and 16 apart from their dependency on independent claim 1. RIB at 88. Neither does the Staff. SIB at 48-51. As ALC has shown infringement of independent claim 1, discussed above, these claims are also found to be met in the Accused Products based on the undisputed evidence and testimony provided by ALC and Dr. Jafari. CIB at 92-95. In particular, Dr. Jafari testified that all elements of each claim are met, except for intervening claims 2, 4, and 7, the additional elements of which are met because their dependent claims are infringed. *See* Hr'g Tr. (Jafari) at 300:6-301:19, 318:5-319:11.

### E. Domestic Industry – Technical Prong

ALC contends, "KBS, ███, and ███ products each practice claims 1, 3, 12, 15, and 16 of the '731 patent both literally and under the doctrine of equivalents." CIB at 95. Of these, claim 1 is independent and the rest depend therefrom. For the reasons discussed below, ALC has shown practice of claims 1, 3, 12, 15, and 16 by the KBS.

As a reminder, it is essentially undisputed that the ███████████████████████ at the time of the complaint. Accordingly, it cannot support a domestic industry that "exists." *Thermoplastic Motors*, Inv. No. 337-TA-1073, Comm'n Op. at 10. And, as with the 941 patent, ALC has not adequately alleged that ████████████████████████ ████████████████████████ Thus it too cannot be

considered to support a domestic industry that "exists." Whether practice of the claims by the

████████ is "in the process of being established," however, is a separate matter addressed

below.

### 1.    Claim 1

Claim 1 of the 731 patent is presented above in connection with infringement. ALC

identifies limitations 1(f)(ii) and 1(f)(iv) as in dispute. CIB at 95-108. Apple's initial post-hearing

brief confirms that it disputes these limitations for the KBS product (RIB at 89, 90) and they are

discussed below. For the remaining, undisputed limitations, they are found to be present in KBS

in light of the evidence and testimony provided by Dr. Jafari. CIB at 95-96, 98. In particular, Dr.

Jafari testified that each element of claim 1 is practiced by the KBS. *See* Hr'g Tr. (Jafari) at

400:16-406:13.

### a.    [1f(ii)] "detect, based on the PPG data, the presence of an arrhythmia"

ALC contends, "[t]he evidence shows that KBS contains instructions executable by the

processor to cause the processor to detect the presence of an arrhythmia based on the PPG data."

CIB at 96 (citing, *inter alia*, Hr'g Tr. (Jafari) at 400:16-406:13; CX-0266C). ALC refers to the

parties' dispute over the similar limitation in claim 12 of the 941 patent (*id.* at 97; CRB at 51) and

explains, "KBS uses SmartRhythm running on an Apple Watch SiP to output a 'record ECG'

notification to the user (*i.e.*, indicated to the user a possibility of an arrhythmia) based on the PPG

data from the PPG sensor" (CIB at 97 (citing Hr'g Tr. (Jafari) at 401:16-22, 404:5-405:9)). In

response to Apple, ALC argues, "[i]f the system were able to determine with certainty that the

detected discordance was or was not an arrhythmia, then there would be no reason to confirm that

determination with an ECG" and "Apple's argument also relies on a misapplication of the law,

which requires capability of accused devices to infringe device claims." *Id.* (citing, *inter alia*, Hr'g

Tr. (Jafari) at 404:14-405:9; CX-0266C at 910-911; *Firjan*, 626 F.3d at 1197). ALC also contends the limitation is met under the doctrine of equivalents, using the function-way-result test. *Id.* at 97-98 (citing Hr'g Tr. (Jafari) at 401:16-404:4).

As with infringement, Apple incorporates its argument from the 941 patent. RIB at 88. Apple specifies, however, "KBS's notification does not 'detect the presence of an arrhythmia,' as required by claim 1(f)(ii), but rather alerts the user that the system has identified an 'unexpected heart rate' that may be caused by many factors, including factors that are not 'cardiac conditions,' such as medication or infection." *Id.* at 89 (citing Hr'g Tr. (Stoltz) at 1070:7-23); RRB at 56. Apple adds its view that simultaneously recorded PPG and ECG data are required as well. *See* RIB at 89.

The Staff, too, largely addresses this limitation with argument taken from claim 12 of the 941 patent. SIB at 51. The Staff repeats its reasoning that "[i]f the system were able to determine with certainty that the detected discordance was or was not an arrhythmia, then there [would] be no reason to confirm that determination with an ECG" and "[t]he message displayed by the KBS when a discordance is detected *is* a notification of the possibility of an arrhythmia." *Id.* at 51-52 (emphasis in original); SRB at 19-20.

The limitation is practiced by KBS. The output of SmartRhythm is "Unexpected Heart Rate[.] Would you like to take an EKG?" RPX-0016C. As determined in connection with the 941 patent, the word "unexpected" in this context communicates a heart rate that is unexpectedly faster or slower than normal, which is a defining feature of a heart rate. This meets the agreed construction for arrhythmia. And it is largely irrelevant that not every 10-minute interval of an above-threshold heart rate is indicative of an arrhythmia or cardiac condition (*e.g.*, medication or

infection), because when the condition exists the device contains the instructions in memory to detect it. *Omega Patents*, 920 F.3d at 1344.

Accordingly, the limitation is practiced by the KBS DI Product.

> **b.     [1f(iv)] "confirm the presence of the arrhythmia based on the ECG data"**

ALC contends "confirm the presence of the arrhythmia based on the ECG data" is met in the Accused Products.  It specifically states, "[a]fter an ECG recording is complete, the ECG is analyzed to determine if it is at least 30 seconds long, if it is Normal, Unclassified, if Atrial Fibrillation is present, or if it is too noisy to interpret. . . When the ECG is classified as Normal or shows the presence of Atrial Fibrillation, the KardiaBand System has confirmed the presence of the arrhythmia." CIB at 98 (citing JX-0011; CX-0266C).  ALC adds that the limitation is also met under the doctrine of equivalents, using the function-way-result test.  *Id.* at 99 (citing Hr'g Tr. (Jafari) at 401:16-22, 405:10-406:13); CRB at 52.

Apple opposes this on familiar grounds; namely, that simultaneous PPG and ECG data capture is required and the "results from the PPG sensor [must be] an input [] to [sic] the ECG algorithm for analysis."  RIB at 89; RRB at 56.  And the Staff finds the limitation met by the KBS on the same grounds as in the 941 patent, that "the [DI Products] confirm the presence of the arrhythmia by taking an analyzing an ECG to determine if the arrhythmia is present."  SIB at 52; *see* SRB at 20-21.

There is effectively no difference between this limitation and that discussed in connection with claim 12 of the 941 patent.  Accordingly, and for the reasons presented above, the limitation is practiced by the KBS DI Product.

### 2.      Other Claims

Apple does not contest practice of claims 3, 12, 15, and 16 by the KBS apart from their dependency on independent claim 1.  *See* RIB at 90-91.  Neither does the Staff.  SIB at 53.  As ALC has shown practice of independent claim 1, discussed above, these claims are also practiced by the KBS DI Product based on the evidence, and particularly on the testimony of Dr. Jafari, with intervening claim 2 practiced based on Dr. Jafari's demonstratives.  CIB at 99-100 (citing Hr'g Tr. (Jafari) at 401:13-406:13); *see* CDX-0003C.108.  As noted, the ██████████ have not been shown to practice any claim at the time of the filing of the complaint.

### 3.      Whether technical prong is "in the process of being established"

As to whether practice of the 731 patent by the ██████████ products is "in the process of being established," the record supports finding in the affirmative.  Like with the 941 patent, the evidence shows that at the time of the complaint, ALC was taking necessary and tangible steps to practice claims 1, 3, 12, 15, and 16 of the 731 patent via the ██████████ products with a significant likelihood of success.  *E.g.*, JX-025C; JX-096C; CX-0252C.  As determined above, ALC's previous product, KBS, has been shown to practice all of these claims.  ALC's expert, Dr. Jafari, has given persuasive testimony on the transferability of the SmartRhythm (PPG analysis) and KardiaApp (ECG collection and analysis) features—primary software features behind the KBS's practice of the claims—to other portable heart monitors in development.  *See* Hr'g Tr. (Jafari) at 389:1-7, 389:21-25, 390:6-15, 392:3-393:10.  ALC's technical witnesses testified to the same effect.  Hr'g Tr. (Somayajula) at 198:13-19, 202:11-21, 203:19-205:8, 210:19-212:2; 217:13-15, 218:22-219:20, 221:2-222:8; Hr'g Tr. (Raghavan) at 565:4-22, 596:7-599:22 (discussing predicate devices).  And the prior art in this investigation, discussed below, shows that wrist-worn computerized devices containing both PPG and ECG sensors were achievable well before the invention of the 941 patent.  *See* RX-0419.  There is little else in claims 1, 3, 12, 15, and 16 outside

**CONFIDENTIAL MATERIAL OMITTED**

of these hardware and software features. Apple offers no argument beyond that discussed in connection with the 941 patent, or the KBS product above. *See* RIB at 90-91; RRB at 56-58.

Accordingly, ALC has shown it is more likely than not that practice of claims 1, 3, 12, 15, and 16 by the ██████████ is "in the process of being established."

F.    **Validity and Other Affirmative Defenses**

Apple identifies the following invalidity and unenforceability theories for the 731 patent:

| Claims | Theory |
|---|---|
| 1, 2, 3, 4, 5, 7, 8, 9, 10, 12, 15, 16 | Invalid for lack of patent-eligible subject matter under 35 U.S.C. § 101 |
| 1, 2, 3, 4, 5, 7, 8, 9, 10, 12, 15, 16 | Rendered obvious under 35 U.S.C. § 103 by AMON (RX-0419), alone or in combination with Kotzin (RX-0401) and Almen (RX-0400) |
| All claims | Unenforceable against Apple under experimental use exception |

*See generally* RIB at 91-104.

As for prior art, AMON published in December 2004, Almen has a filing date of February 25, 2005 and an issue date of December 2, 2008, and Kotzin has a filing date of July 8, 2003 and a publication date of February 5, 2004. All three references are therefore prior art to the 731 patent under § 102(a).

1.    **Ineligible Subject Matter**

As with the 941 patent, Apple contends "[c]laims 1, 3, 5, 8, 10, 12, 15, and 16 of the '731 patent are directed to the abstract ideas and mental processes which cannot constitute patent eligible subject matter." RIB at 91; RRB at 60 (incorporating argument from the 941 patent). As for claim 1, and *Alice* step one, Apple argues it "recites the bare bones, abstract idea of receiving data, detecting an irregularity in the data, receiving additional data, and confirming the

113

irregularity." RIB at 91. In Apple's view, the claim "recites nothing more than what medical doctors have routinely done for decades to diagnose arrhythmias." *Id.*; *see* RRB at 58-59.

As for *Alice* step two, Apple views the recited "smartwatch," "processing device," "a display," and "memory" as "all generic components that are part of a smartwatch, which itself is akin to a 'generic computer' in this context." RIB at 92. Apple adds "a PPG sensor and an ECG sensor with two or more electrodes—are conventional components known to doctors well before the '731 application existed . . . and used for arrhythmia detection before 2013." *Id.* at 93. Apple reasons, "[t]hus, independent claim 1 is directed to patent ineligible subject matter and provides no inventive concept at all." *Id.*

Apple takes a similar position on the abstract nature and/or conventional status for each of the features recited in dependent claims 3, 5, 8, 10, 12, 15, and 16. *See* RIB at 93-95; RRB at 59-61.

Apple has not met its clear and convincing burden here. There is no principled distinction between the claims of the 731 patent and those of the 941 patent under Section 101. So claim 1 is directed to ineligible subject matter through the executable instruction limitations (*i.e.*, "receive . . "detect . . . receive . . . and confirm . . . ."), but at *Alice* step two its recitations of "a photoplethysmography ("PPG") sensor," "an ECG sensor, comprising two or more ECG electrodes," and "a display," as an ordered combination all in a single apparatus, represent hardware that is non-generic and make the overall claim more than a patent on the abstract idea itself, as discussed in connection with the 941 patent. *Alice*, 573 U.S. at 225-26. That these features may otherwise be an obvious combination is irrelevant to the Section 101 inquiry, and the additional limitations of the dependent claims only reinforce the conclusion that Section 101 is satisfied.

Accordingly, none of the asserted claims of the 731 patent have been shown to be invalid for lack of patentable subject matter.

### 2.     AMON in Combination with Almen and/or Kotzin

As with the 941 patent, Apple contends AMON "alone or in combination with Almen and/or Kotzin for minor limitations—renders obvious all of the '731 patent's Asserted Claims, including claims 1, 3, 5, 8-10, 12, [and] 15-16." RIB at 95. Apple argues again that ALC has waived the argument that AMON does not disclose heart rate variability across all three patents because of its failure to be discussed in the context of the 499 patent. RIB at 100 n.35. As before, ALC did contest claim 4, where heart rate variability first appears, in its pre-hearing brief. CPB at 134-135. Thus, no violation of the ground rules occurred, the contention is not waived, and the claim is discussed below.

### a.     Claim 1

Apple contends, "AMON alone or in combination with Almen and/or Kotzin discloses or at least renders obvious claim 1." RIB at 96. ALC contests only limitations 1(f)(ii) and 1(f)(iv) (CIB at 114-117; CRB at 56 (using alternate identifiers)) and Staff only discusses the latter (SIB at 58; SRB at 26). These are addressed below. As to the remaining, undisputed, limitations of claim 1, they are disclosed, as Dr. Stultz explains. RIB at 96-98 (citing Hr'g Tr. (Stultz) at 1132:21-1132:20). Specifically, AMON teaches a "wrist-worn device" that tells time, containing "processing devices," a display, an ECG with one electrode inside the device cuff and a second electrode on top, flash and random access memory, and "evaluation software." RX-0419 at 1-2, 4, 6-7, Fig. 1. Again, although AMON does not appear to use the term "PPG," it describes such a sensor located on "the top of the wrist," as well as its use for measuring pulse rate. *See id.* at 3, 5.

iv.    **[1(f)(ii)] "detect, based on the PPG data, the presence of an arrhythmia"**

Apple argues "detect, based on the PPG data, the presence of an arrhythmia" is disclosed in AMON. RIB at 98 (citing Hr'g Tr. (Stultz) at 1115:5-21, 1134:8-21). Specifically, Apple states "an elevated heart rate detected by PPG data without a corresponding activity level increase is inherently indicative of a possible arrhythmia under AliveCor's and Dr. Jafari's application of the claims for infringement. . . . There is no basis to claim that AMON's comparison of activity level to heart rate data is not inherently indicative of 'detecting' an arrhythmia." RRB at 61-62.

In response to ALC's argument that there need be a separation between PPG detection and ECG confirmation, Apple states, "the clinical algorithm specifically contemplates at Steps 3 and 4, that when previous steps indicate a risk or high risk zone, a 'new measurement set is required,' which could include an ECG measurement." RIB at 98 (citing RX-0419 at 6). Apple adds, "any POSITA would have known that the use of such sensors for high-risk cardiac patients would necessarily include arrhythmia detection." *Id.* (citing Hr'g Tr. (Stultz) at 1120:1-1121:1).

The limitation is expressly disclosed in AMON. As discussed in connection with the 941 patent, heart rate can be provided by an optical, or PPG, sensor. RX-0419 at 6, 7. And AMON's optical sensor runs and measures pulse for 30 seconds every two minutes, whereas temperature, blood pressure, and ECG measurement (*i.e.*, not the optical sensor) are turned off most of the time. *See id.* at 7. According to the five step algorithm, as Apple alleges, that pulse value is compared to a lookup table to determine if it is out of range. *Id.* at 6. This satisfies the ordered construction for an arrhythmia, which is simply "a cardiac condition in which the electrical activity of the heart is irregular or is faster or slower than normal." Order No. 12.

Despite this evidence, ALC claims AMON "makes no mention of . . . any particular condition the system is designed to detect." CIB at 114-115. This is untenable in light of AMON's

use of threshold lookup tables for pulse (bpm) and the broad construction of "arrhythmia." RX-0419 at Table I. ALC also views Dr. Stultz as admitting that AMON does not "perform[] any detection of any medical condition on its own." *Id.* at 115 (citing Hr'g Tr. (Stultz) at 1161:6-9); CRB at 56. While the quotation is accurate—"Q. Okay. The AMON paper also doesn't disclose a wrist monitoring device that performs any detection of any medical condition on its own, right? A. I agree with that statement."—it does not overcome the clear disclosure in AMON that an optical sensor measures pulse and evaluates if it is faster or slower than expected via a lookup table.

Accordingly, the limitation is disclosed in AMON.

### v.    [1(f)(iv)] "confirm the presence of the arrhythmia based on the ECG data"

For "confirm the presence of the arrhythmia based on the ECG data," Apple largely refers to its discussion of the same limitation in claim 12 of the 941 patent. RIB at 99.; RRB at 62. ALC does not explicitly incorporate its previous discussion, but restates the same points. CIB at 115-117. The Staff offers no new rationales either. SIB at 58; SRB at 26.

Accordingly, for the reasons discussed in connection with claim 12 of the 941 patent, this limitation is disclosed in AMON.

### b.    Claims 2, 7, and 16

With respect to intervening claims 2 and 7 and claim 16, Apple contends that AMON discloses the limitations of each. RIB at 99-101, 104. In support of claims 2 and 16, Apple refers to its discussions of claims 12 and 16 of the 941 patent (*see id.* at 99, 104), and for claim 7, Apple relies on the testimony of Dr. Stultz and AMON's detection of out-of-range parameters (*see id.* at 101). ALC does not address or contest Apple's theory for claims 2 and 7, and disputes claim 16

117

only on the ground that it depends from claim 1.  *See* CIB at 114-122; CRB at 55-61.  The Staff does not challenge claims 2, 7, or 16.  SIB at 59-60.

Apple has shown that all the elements of claim 1 are disclosed in AMON, and the elements added by claims 2, 7, and 16 are also disclosed based on the evidence and by the testimony provided by Dr. Stultz.  RIB at 99-101, 104 (citing Hr'g Tr. (Stultz) at 1135:2-1136:1, 1139:9-25, 1142:10-19).  In particular, AMON discloses a motion sensor coupled to a processing device, where the processing device receives motion sensor data to determine that the user is at rest, as in claim 2 (RX-0419 at 5, Fig. 7 ("acceleration sensor" transmitting data to the processing devices for determining a "resting" activity level)), detects arrhythmia by extraction of pulse rate from PPG data, as in claim 7 (*id*. at 3 (describing measurement of pulse rate by "comparing the changes of each wavelength during one pulsation")), and receives ECG data from the ECG sensor in response to receiving an indication of a user action, as in claim 16 (*id*. at 4 ("the patient must touch the [right arm electrode]" for the ECG to be measured)).

### c.    Claim 3

Claim 3 recites, "[t]he smart watch of claim 2, wherein to detect the presence of the arrhythmia, the processing device is configured to input the PPG data into a machine learning algorithm trained to detect arrhythmias."  731 patent at cl. 3.  Apple argues the limitation is disclosed through, as Dr. Stultz characterized them, threshold "learning stages," while also emphasizing that the claim allows for any kind of learning algorithm, simple or otherwise.  RIB at 99 (citing Hr'g Tr. (Stultz) at 1136:8-1137:22; RX-0419 at 3-4); RRB at 62-63.  Apple cites no other reference in support of its obviousness case.  *See* RIB at 99.

The limitation is not disclosed in AMON.  The "simple" learning algorithm referenced by Apple corresponds to the ECG sensor and its ability to recognize QRS widths, RR distances, and QT intervals.  RX-0419 at 4.  Not only is this not the PPG sensor, but it is not an algorithm for

detecting arrhythmias. It is an algorithm for determining characteristics of the wave (because ECG rhythm strips are complicated), with those characteristics then needing subsequent analysis to detect the cardiac condition (*e.g.*, compared to a lookup table (RX-0419 at Table I)). In other words, there is a difference between determining what the signals are and determining whether the signals are a problem. This example in AMON is directed to the former. Claim 3 is directed to the latter.

For AMON's light sensor (*i.e.*, the "PPG data" of claim 3) all that is disclosed is that "[t]he pulse oximeter probe and signal processing algorithms have been developed and manufactured exclusively for the AMON project by SPO Medical Equipment Ltd., Israel based on a specification by MDirect." RX-0419 at 4. Again, not only is machine learning not disclosed for those custom-made algorithms, but even if present they would not be for the purpose of detecting arrhythmia. That is, again, left to AMON's lookup table (RX-0419 at Table I) which is loaded with two sets of pre-set values (a.k.a. risk thresholds):

TABLE I
L1 AND H1 REPRESENT DEVIANT ZONE, L2 AND H2 RISK ZONE, AND L3 AND H3 HIGH-RISK ZONE

| vital sign | L3 | L2 | L1 | Normal | H1 | H2 | H3 |
|---|---|---|---|---|---|---|---|
| Systolic (mmHg) | 50-59 | 60-79 | 80-99 | 100-130 | 131-160 | 161-200 | 201-300 |
| Diastolic (mmHg) | 40-44 | 45-49 | 50-59 | 60-85 | 86-90 | 91-110 | 111-140 |
| SpO2 (%) | 65-79 | 80-91 | 92-94 | 95-100 | | | 1001 |
| Pulse (per minute) | 40-44 | 45-49 | 50-59 | 60-100 | 101-120 | 121-180 | 181-250 |
| QRS duration (s) | 0.01-0.03 | | | 0.04-0.12 | | | 0.121-0.35 |

[M]easurement results are assigned to one of five zones—normal, deviant (abnormal values), risk, high risk, and error.

. . . .

The wrist device has two customizable sets of parameters, which are set by the health-care provider when handing the device over to the patient. The parameter values can be changed by the user's physician, the care provider, or in real time by the medical operator in the TMC via the cellular link.

119

> The two sets represent a nonaerobic state and an aerobic state corresponding to the level of user activity. The parameters are set according to age, gender, fitness, and medical history. The selection of the active set is performed by user command or automatically by the wrist device when activity is detected.

RX-0419 at 6. There is no disclosure here of automated adjustment to the parameter sets (*i.e.*, thresholds), which is the underpinning of any machine learning algorithm. Thus, the limitation is not disclosed, and Apple does not argue it would have otherwise been obvious, in view of any other reference or the knowledge of a skilled artisan. *See* RIB at 99.

Accordingly, claim 3 is not disclosed by AMON, nor would it have been an obvious modification of it.

### d.    Claims 4 and 5

Intervening claim 4 recites, "[t]he smart watch of claim 2, wherein to detect the presence of the arrhythmia, the processing device is configured to: determine heartrate variability ('HRV') data from the PPG data; and detect, based on the HRV data, the presence of the arrhythmia." 731 patent at cl. 4. For this claim, Apple argues it is disclosed in AMON for the same reasons explained in connection with claim 13 of the 941 patent. RIB at 100. Claim 5 recites, "[t]he smart watch of claim 4, wherein to detect the presence of the arrhythmia, the processing device is configured to input the HRV data into a machine learning algorithm trained to detect arrhythmias." 731 patent at cl. 5. Apple contends the limitation is disclosed by AMON (RIB at 100 ("As Dr. Stultz testified, AMON discloses claim 5.")), and refers back to its perceived disclosure of a machine learning algorithm in "whether the detected vital signs (*e.g.*, the PPG data from the SpO$_2$ sensor) are irregular by using data about activity level, age, gender, fitness, and medical history to set high risk and normal thresholds." RIB at 100 (citing RX-0419 at 3, 6).

As determined above, the concept of determining heart rate variability data, although not disclosed in AMON, would have been obvious in view of Almen and its motivation to combine.

120

But also as determined above, AMON does not disclose adjusting its own risk thresholds or any other machine learning algorithm. Adjusting risk thresholds is instead done "by the health-care provider when handing the device over to the patient. The parameter values can be changed by the user's physician, the care provider, or in real time by the medical operator in the TMC via the cellular link." RX-0419 at 6.

Apple continues, "AMON also discloses a machine learning algorithm for detecting the R-R distances . . . for use in determining if vital signs are irregular." RIB at 100. To be sure, AMON discloses continuous threshold adjustment (*i.e.*, machine learning) for identification of the QRS wave. It states, "[d]uring the detection process, the current integrated moving window is compared with the upper threshold. If this threshold is exceeded, an R wave onset is assumed. . . These threshold values are continually adjusted with each new QRS so as to compensate for variations in ECG baseline." RX-0419 at 4. But once determined, that QRS width is, again, compared to a simple lookup table of pre-set values. *Id.* at Table I ("QRS duration (s)"). So the actual detection of arrhythmia by "inputting" or otherwise processing HRV data does not involve machine learning, and the limitation is not disclosed. Dr. Stultz's opinion that AMON discloses a machine learning algorithm is therefore beside the point. *See* Hr'g Tr. (Stultz) at 1136:8-1137:22. And although Apple contends that "AMON discloses *or renders obvious* all the additional limitations of claim 5 of the '731 patent" (RIB at 100), it offers no discussion of obviousness in either of its briefs (*see id.*; RRB at 62-63).

Accordingly, claim 5 has not been shown to be disclosed or rendered obvious.

### e.     Claim 8

Claim 8 recites, "[t]he smart watch of claim 7, wherein the one or more features correspond to an HRV signal analyzed in a time domain." 731 patent at cl. 8. Here, Apple contends, "Dr. Stultz testified that the additional limitation of claim 8, an 'HRV signal analyzed in a time domain,'

was simply a well-known method of analyzing heart rate variability in 2013." RIB at 101 (citing Hr'g Tr. (Stultz) at 1140:1-25; 731 patent at 8:64-9:2); RRB at 63 (citing Hr'g Tr. (Stultz) at 1139:3-1141:7).  Apple also suggests that analysis of heart rate variability is disclosed in AMON (incorrectly, as determined above), and that it would have been obvious through Almen's teaching: "'analysis of 24-hour HRV typically shows a nocturnal increase in the standard deviation of heartbeat intervals.'"  RIB at 102 (citing RX-0400 at 12:66-13:10; Hr'g Tr. (Stultz) at 1141:1-7).

Apple has presented a prima facie case that claim 8 would have been obvious.  Claim 1 and intervening claim 7 are fully disclosed by AMON, the heart rate variability element added by claim 8 would have been obvious in view of Almen, as discussed above in connection with claim 13 of the 941 patent, and Dr. Efimov seems to admit that Almen discloses analyzing heart rate variability with respect to time.  Hr'g Tr. (Efimov) at 1275:9-24 ("What [Almen] states, essentially, is that measurements are done during sleep as shown on the right is heart rate, as you see in the beginning the heart rate is high in the awake state, and then goes down when you sleep. And then during sleep apnea, you have those large oscillations of heart rate . . .. So essentially, this device measures different time intervals.").

In opposition, ALC repeats its argument that AMON, Almen, and the 941 patent (impliedly, the 731 patent as well) are non-analogous.  CIB at 120.  As determined above, this is not persuasive; they are all wrist-worn heart-monitoring devices.  ALC also claims that whatever modifications to AMON's device and its $SpO_2$ sensor would be necessary, they constitute "more complicated analysis" and would not be done on the wrist-worn device but at AMON's remote TMC.  CRB at 58-59.  This is not persuasive, either.  Once AMON is modified to calculate heart rate variability from the $SpO_2$ sensor's pulse rate (as taught by Almen and discussed in connection with claim 13 of the 941 patent), a comparison to thresholds would likely occur on the device

itself—essentially another line in AMON's Table I. And Dr. Stultz offers unrebutted testimony that an HRV signal analyzed in the time domain was a routine and ordinary option. Hr'g Tr. (Stultz) at 1140:1-9; *see* Hr'g Tr. (Efimov) at 1274:17-1275:24.

Accordingly, Apple has made out a prima facie case that claim 8 would have been obvious over AMON in view of Almen.

### f.    Claim 9

Claim 9 recites, "[t]he smart watch of claim 7, wherein the one or more features comprise a nonlinear transform of R-R ratio or R-R ratio statistics with an adaptive weighting factor." 731 patent at cl. 9. Apple states, "Dr. Stultz also testified that the additional limitation of claim 9, a 'non-linear transform of RR ratio or R-R ratio statistics with an adaptive weighting factor,' was simply a well-known method of analyzing heart rate variability in 2013." RIB at 102 (citing Hr'g Tr. (Stultz) at 1140:1-25; RX-0551 at 2-3).

Apple argues that "AMON, alone or in combination with Almen," renders claim 9 obvious. RIB at 102. Claim 7, from which claim 9 depends, is not limited to heart rate variability, and AMON does not disclose measuring that parameter. So AMON alone does not disclose this element. And although Almen discloses measurement of HRV, it does not disclose doing so using a non-linear transform with an adaptive weighting factor. Even accepting Dr. Stultz's opinion that the claimed technique was well-known, the one reference Apple cites as disclosing the transform discusses it as applying to ECG data, not PPG data, as the claim requires. *See* RIB at 102 (citing RX-0551. 3 (describing measurement using "electrocardiography")). And although that reference arguably provides a motivation to combine, that motivation applies to ECG data, not PPG data. *See* RX-0551.0007 (characterizing the technique as "computationally less difficult" and "a good and reliable surrogate" for the technique to which it is compared). In essence, Apple's case for

the obviousness of claim 9 relies on three references, with no identified disclosure of the added element applied to PPG data.

Accordingly, claim 9 has not been shown to be disclosed or rendered obvious.

### g.  Claim 10

Claim 10 recites, "[t]he smart watch of claim 7, wherein the one or more features are features of an HRV signal analyzed geometrically." 731 patent at cl. 10.  Apple states, "Dr. Stultz further testified that the additional limitation of claim 10, 'features of an HRV signal analyzed geometrically,' was simply a well-known method of analyzing heart rate variability in 2013." RIB at 102-103 (citing Hr'g Tr. (Stultz) at 1140:1-25; RX-0563 at 1-3, 5).  Apple adds that Table IV within AMON "discloses a sample density distribution of pulse rates . . . which could easily be HRV as disclosed in Almen. . ..  For example, a density distribution of 64% of the heart rates calculated from the $SpO_2$ sensor were distributed within 5 beats/min, 83% were within 10 beats/min, and 89% were within 15 beats/min." *Id.* at 103 (citing RX-0419 at Table IV; RX-0400 at 1:21-24, 7:26-35, 2:52-58, 8:43-61).

Claim 10 has not been shown to have been obvious.  Claim 7, from which claim 10 depends, is not limited to heart rate variability, and AMON does not disclose measuring that parameter.  Almen does, with a motivation to combine with AMON, as noted, and Apple cites a third reference disclosing Poincaré plots for HRV detection. *See* RIB at 103 (citing RX-0563). As with claim 9, however, the disclosed Poincaré plots are generated from ECG data. *See* RX-0563.1.  Moreover, Apple's contention that Table IV in AMON "discloses a sample density distribution of pulse rates" is irrelevant, because the data is not analyzed geometrically, it is simply a summary of pulse measurements.  RIB at 103; RX-0419 at Table IV.  Like with claim 9, Apple's case for the obviousness of claim 10 relies on three references, with no identified disclosure of the added element applied to PPG data.

Accordingly, claim 10 has not been shown to be disclosed or rendered obvious.

### h.     Claim 12

Claim 12 recites, "[t]he smart watch of claim 1, wherein the processing device is further configured to generate a notification of the detected arrhythmia."  731 patent at cl. 12.  Apple contends, as in claim 12 of the 941 patent, that AMON discloses a message or notification to users when their measured levels are out of range:

> Dr. Stultz testified that AMON discloses that if a vital parameter like pulse is irregular (outside the normal range), then a notification is generated. Tr. (Stultz) at 1141:8-20. Specifically, AMON's clinical algorithm also notes that in steps 1 and 3 that if the pulse is irregular, then a notification is generated to take more measurements. RX-419.3, 6, 10, Abstract (AMON). And "it specifically states in all cases that the patient is informed as to their own status and that of the device." Tr. (Stultz) at 1141:8-20. Dr. Efimov provided no testimony that this claim was not met by AMON at the hearing.

RIB at 103.  According to Apple, Dr. Stultz considers the limitation inherent in AMON's disclosures, even without the word "arrhythmia."  RRB at 63 (citing Hr'g Tr. (Stultz) at 1120:1-2).

Largely for the same reasons presented above in connection with claim 12 of the 941 patent, claim 12 of the 731 patent would have been obvious as a way of actually implementing the device disclosed in AMON.  The optical (PPG) sensor operates every two minutes (RX-0419 at 7) to measure pulse (*id*. at 3), and the measurements are compared to a range of values to "determine if and what new measurement set," including ECG, "is required" (*id*. at 6).  At "each step, a result is displayed," although AMON provides no guidance on the specific content of the displayed "result."  *Id*. at 6.  It surely would have been an obvious method of implementation to display the result of the pulse measurement, which (if in a "risk or high-risk zone") qualifies as a notification of a detected arrhythmia.

ALC argues "AMON does not discuss arrhythmias at all." CIB at 121. But as explained above, an abnormal heart parameter, identified by use of AMON's risk threshold lookup table, meets the parties' agreed construction of the term. ALC also argues that a POSITA would not have considered modifying the device to detect arrhythmias because the ECG signal was too poor. *See id*. But the arrhythmia is "detected" (as opposed to "confirmed") by the PPG sensor combined with a look-up table, not by the ECG sensor. *See* RX-0419 at 6. The Staff states the limitation is not met but offers no explanation. SIB at 59.

Accordingly, claim 12 is disclosed in AMON.

### i.    Claim 15

Claim 15 recites, "[t]he smart watch of claim 1, the processing device further configured to display an ECG rhythm strip from the ECG data." 731 patent at cl. 15. For this claim, Apple largely refers to its discussion of claim 21 in the 941 patent. *See* RIB at 104; RRB at 64. ALC follows suit. *See* CIB at 121; CRB at 61. The Staff avers that the limitation is absent, without elaboration. *See* SIB at 59-60.

For the same reasons presented above in connection with claim 21 of the 941 patent, claim 15 of the 731 patent is neither disclosed in AMON nor an obvious modification to it.

### j.    Summary

To summarize, asserted claims 1, 12, and 16 are disclosed in AMON, Apple has shown a prima facie case of obviousness of claim 8 over AMON in view of Almen, and Apple has not shown either disclosure or a prima facie case of obviousness of claims 3, 5, 9, 10, and 15. Because anticipation is "the epitome of obviousness" (*Realtime Data*, 912 F.3d at 1373), claims 1, 12, and 16 are invalid, without regard to secondary considerations of non-obviousness. And because claims 3, 5, 9, 10, and 15 have not been shown to be prima facie obvious, they are not invalid, also without regard to secondary considerations. As to claim 8, it is not embodied in any DI Product,

126

so ALC is not entitled to a presumption of nexus between the claim and secondary considerations, and it otherwise makes only a cursory effort to prove such a nexus. *See* CIB at 122. Therefore, no secondary considerations weigh against that claim's obviousness, and it depends from claims 1 and 7, which are invalid for obviousness.

Accordingly, claims 1, 8, 12, and 16 have been shown to have been obvious in view of AMON alone or AMON in combination with Almen.

### 3.    Unenforceability as to Experimental Use

As with the 941 patent, ALC's infringement theory does not implicate any Apple experimental activity. *See* RIB at 104. Accordingly, experimental use has not been shown to preclude any finding of infringement in this investigation.

## VI.    U.S. PATENT NO. 9,572,499

### A.    Level of Ordinary Skill in the Art

A person having ordinary skill in the art of the 499 patent at the time of invention:

> would have had either (1) a bachelor of science degree in electrical engineering, mechanical engineering, biomedical engineering, computer science, or a related discipline, with at least two years of relevant work experience designing wearable devices and/or sensors for measuring physiological signals or parameters of mammals, or (2) a medical degree and at least five years of relevant work experience designing wearable devices and/or sensors for measuring physiological signals or parameters of mammals. Also, relevant experience could substitute for education and vice versa for both categories of skilled artisan

Order No. 12 at 8. The parties do not challenge this definition, and it is applied throughout this initial determination.

### B.    Claims-at-Issue

Claims 16 and 17 of the 499 patent are at issue in this investigation, either through allegations of infringement or domestic industry technical prong, as well as claim 11, from which claims 16 and 17 depend. *See generally* CIB at 122, 134. These claims are reproduced below:

11. A system for determining the presence of an arrhythmia of a first user, comprising

a heart rate sensor coupled to said first user;

a mobile computing device comprising a processor, wherein said mobile computing device is coupled to said heart rate sensor, and wherein said mobile computing device is configured to sense an electrocardiogram of said first user; and

a motion sensor

a non-transitory computer readable medium encoded with a computer program including instructions executable by said processor to cause said processor to receive a heart rate of said first user from said heart rate sensor, sense an activity level of said first user from said motion sensor, determine a heart rate variability of said first user based on said heart rate of said first user, compare [said] activity level of said first user to said heart rate variability of said first user, and alert said first user to record an electrocardiogram using said mobile computing device.

. . . .

16. The system of claim 11, wherein said mobile computing device comprises a smartwatch.

. . . .

17. The system of claim 11, wherein said computer program further causes said processor to determine a presence of said arrhythmia using a machine learning algorithm.

499 patent at cls. 11, 16, 17; *see* JX-0001 at Certificate of Correction.

### C.     Claim Construction

As part of the *Markman* process, the following claim terms of the 499 patent were construed, either as-agreed between the parties or determined by Order No. 12:

| Claim Term | Construction |
|---|---|
| "arrhythmia" | "a cardiac condition in which the electrical activity of the heart is irregular or is faster or slower than normal" |
| Preambles of claim 1, 11 | limiting |
| "alerting said first user to sense an electrocardiogram" / "alert" | Plain and ordinary meaning; "alert" is not limited to a message |

| | |
|---|---|
| "heart rate sensor" | Plain and ordinary meaning; heart rate sensors that sense heart rate both directly and indirectly |
| Order of method steps | the step of "sensing an activity level of said first user with a motion sensor" need not be performed after the step of "determining, using said mobile device, a heart rate variability of said first user based on said heart rate of said first user." |

*See* Order No. 12 at 12, 15, 17, 18, 20.  Although there is at least one claim construction dispute within the parties' discussions of infringement and domestic industry (*see, e.g.*, CIB at 127) the issue is already addressed above.

### D.    Infringement

ALC contends, "Apple directly infringes claims 16 and 17 of the '499 Patent." CIB at 122. Again, claim 11 is independent and claims 16 and 17 depend from it, so if claim 11 is not infringed, neither are claims 16 or 17.  For the reasons discussed below, ALC has not shown infringement of claims 16 or 17.

### 1.    Claim 11

For reference, claim 11 of the 499 patent requires:

11. [11(a)] A system for determining the presence of an arrhythmia of a first user, comprising

[11(b)] a heart rate sensor coupled to said first user;

[11(c)] a mobile computing device comprising a processor, wherein said mobile computing device is coupled to said heart rate sensor, and wherein said mobile computing device is configured to sense an electrocardiogram of said first user; and

[11(d)] a motion sensor

[11(e)] a non-transitory computer readable medium encoded with a computer program including instructions executable by said processor to cause said processor to

[11(e)(i)] receive a heart rate of said first user from said heart rate sensor,

[11(e)(ii)] sense an activity level of said first user from said motion sensor,

[11(e)(iii)] determine a heart rate variability of said first user based on said heart rate of said first user,

[11(e)(iv)] compare said activity level of said first user to said heart rate variability of said first user,

[11(e)(v)] and alert said first user to record an electrocardiogram using said mobile computing device.

499 patent at cl. 11 (annotated); *see* JX-0001.40 (certificate of correction).

Only a few limitations are disputed in the Accused Products. ALC understands that, "Apple only contests infringement with respect to claim elements 11(e)(iv) and 11(e)(v) from the independent claim." CIB at 123. So ALC reasons that any other disputes from Apple have been waived pursuant to Ground Rules 9.2 and 13.1. *Id.* ALC's representations are consistent with the disputes identified in Apple's post-hearing brief. RIB at 105-112. The Staff, similarly, addresses no limitations in claim 11 other than 11(e)(iv) and 11(e)(v). SIB at 63-65. For those remaining limitations which are not in dispute, the Accused Products have been shown to meet them as alleged. *See* CIB at 123-125. In particular, Dr. Jafari testified that all elements of each claim are met. *See* Hr'g Tr. (Jafari) at 371:4-372:21.

      **a.**     **[11e(iv)] "compare [said] activity level of said first user to said heart rate variability of said first user"**

For this limitation, ALC incorporates its arguments from claim 12 of the 941 patent. CIB at 125, 127. ALC further explains, "the IRN feature analyzes HRV in determining whether or not there are irregular rhythms suggestive of AFib" by ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████ " *Id.* at 126 (citing Hr'g Tr. (Jafari) at 374:11-24). ALC concludes that the IRN feature satisfies the limitation "because a processor literally ████████████████████████

**CONFIDENTIAL MATERIAL OMITTED**

██████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████." *Id.* at 127 (citing Hr'g

Tr. (Jafari) at 374:21-24).

ALC views Apple's non-infringement argument as identical to that offered against claim

12 of the 941 patent. *See* CIB at 126-127; CRB at 62. Accordingly, ALC counters, "[t]here is no

requirement in the claim that motion sensor data be sensed at the same time as HRV is determined

from the PPG data, nor is there any requirement in the claim that motion sensor data inform the

basis for a determination regarding the detection of an arrhythmia (such as by way of input into

the IRN classification algorithm)." CIB at 127. ALC adds, "[b]y contrast, the '499 patent's

specification provides that the aim of 'comparing measured heart rate changes with measured

activity changes' is to 'minimize[] false alarms'. JX-001 at 25:22-25. Nothing more is required,

and Dr. Picard's insistence to the contrary is unsupported by the '499 patent." *Id.*

Apple argues, "██████████████████████████████████████████████████

██████████████████████████████████████████████." RIB at 105-106.

Apple then incorporates its discussion of claim 12 of the 941 patent to explain why this results in

non-infringement. *Id.* at 106; *see* RRB at 65. Apple adds, "Apple's source code substantiates that

██████████████████████████████████████████████████████████████████████

█████████" and "[a]s Dr. Picard confirmed, there are '████████████████████████████

█████████████████████████████████████████.'" RRB at 65 (citing JX-0237C at 253:1-

256:23; Hr'g Tr. (Picard) at 881:7-11).

The Staff finds the limitation met. Staff refers to the 499 patent's teaching that the activity

level and heart rate variability comparison is simply used to minimize false alarms (SIB at 63-64

(citing 499 patent at 25:17-25)) and finds the products '████████████████████████████

131

███████████████████████████████████████████████████████████████████

███ " (*id.* at 64 (citing Hr'g Tr. (Jafari) at 372:22-374:24)).

The limitation is met in the Accused Products.  Apple readily acknowledges that IRN will only monitor heart rate, compute HRV, and employ its AFib screening algorithms when the ████████████████████████████████████████████████ ."  *See* RIB at 12.  █████████████

████████████████████████████████████████████ .  Hr'g Tr. (Waydo) at 762:25-763:4 ███

████████████████████████████████████████████████████████████████████

███ ).  Thus, at least some of the time, the motion sensor is associating measured heart rate and HRV values with a particular period of low activity.  This association is exactly as the 499 patent describes the "compar[ing]" process, in an excerpt cited by both ALC and Apple:

> An advisory condition for recording an ECG may occur due to, for example, large continuing fluctuations in heart rate. An advisory condition for recording an ECG can also occur when a measured heart rate increases rapidly without a corresponding increase in activity monitored by, for example, an accelerometer. By comparing measured heart rate changes with measured activity changes, the presently disclosed software or "app" minimizes false alarms . . ..

499 patent at 25:17-25; *see* CIB at 126 (citing 499 patent at 25:17-25); RIB at 105 (citing 499 patent at 25:19-25).

It is true that the comparison is simplistic.  █████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ .  *See* CX-0048C.87, .93 ( ██████████████████████████████ ).  But even such a binary comparison qualifies as a comparison.  Apple's contention that "there are 'no instructions that bring together the heart rate or heart rate variability parameter and the motion'" (RRB at 65 (citing Hr'g Tr. (Picard) at 881:7-11) is plainly contradicted by Apple's graphical summary of IRN's "instructions," which show motion and heart rate variability considered together:



RX-0835C.3; *see* CX-0048C.93 (█████████████████).

Accordingly, the limitation is met in the Accused Products.

        **b.**       **[11e(v)] "alert said first user to record an electrocardiogram using said mobile computing device"**

With respect to the claimed "alert," ALC contends it is met literally or under the doctrine of equivalents, "because Apple's IRN feature serves the aim of alerting the user to take a subsequent ECG after being notified regarding the detection of the known serious arrhythmia AFib." CIB at 128. ALC references the claim construction order stating, "'the claims are directed to determining whether or not an ECG is appropriate, and then "alerting" the user to that fact.'" (*id.* (citing Order No. 12 at 15-16; 499 patent at 25:17-25)), and then reasons "[t]he accused IRN feature readily satisfies limitation 11(e)(v) because the IRN's indication provided to a user concerning the background detection of AFib constitutes an advisory condition that triggers an appropriate/opportune moment to capture an ECG to confirm the AFib" (*id.* (citng Hr'g Tr. (Jafari)

CONFIDENTIAL MATERIAL OMITTED

at 375:6-13). ALC emphasizes that the context of the message returned by IRN is important and that context is demonstrated by:

> (1) externally-facing evidence that Apple provides or endorses concerning the nature of the IRN alert and that users take an ECG upon receiving such alert, and (2) internally-facing evidence that Apple has █████████████████████
> ████████████████████████████████████████

*Id.* at 128-129; *see id.* at 129-130 (citing, *inter alia*, CX-0048C; CX-0051C; CX-0073; CX-0623; CX-0626), 130-133 (citing, *inter alia*, CX-0067C; CX-0914C; CX-0026C; CX-0080; CX-0081C; CX-0914C; CX-0054C; CX-0913C); CRB at 66 (internal documents allegedly show the ██████

███████████████████████████████████████████████████

██████████████████

To the extent the limitation is not present literally in the Accused Products, ALC argues infringement under doctrine of equivalents, using the function-way-result approach. CIB at 133. ALC states:

> That is, the IRN alert provides substantially the same function (*e.g.*, to provide a triggering message that something is wrong" and "better observations" are needed via the ECG, Tr. (Jafari) at 376:8-12)) in substantially the same way (*e.g.*, the generation of a "trigger" message to prompt the user to take immediate action, Tr. (Jafari) at 376:17-21)), to achieve substantially the same result (*e.g.*, the user takes the ECG in response to the trigger to "confirm" "verify" or "augment our knowledge of the condition," Tr. (Jafari) at 376:22-377:1)).

*Id.*

In rebuttal to Apple and the Staff, ALC argues that the prior *Markman* order made clear "alert" was "'not limited to a message,'" and "the claims 'are directed to determining whether or not an ECG is appropriate, and then 'alerting' the user to that fact.'" CRB at 63 (citing Order No. 12). ALC finds it immaterial that the message's actual instruction is "'talk to [his or her] doctor'" because "the significant/unexpected 'pop-up' to the user on the watch's face constitutes the 'advisory condition' that indicates that a user should take an ECG, as described in the '499 patent

specification." *Id.* (citing 499 patent at 25:17-25; JX-0221C (Waydo) at 286:3-14); *id.* at 65 (referring to "advisory condition").  ALC continues:

> However, telling a user to talk to [his or her] doctor is not mutually exclusive from taking an ECG upon receipt of an IRN alert, nor has Apple identified any evidence that the IRN alert message (or anything else for that matter) discourages or dissuades a user from taking an ECG upon receipt of an IRN alert. Indeed, the evidence overwhelmingly demonstrates that Apple itself directly encourages users to take an ECG following receipt of an IRN alert.

*Id.* at 64.  Overall, ALC posits, "[t]here is no question that the IRN alert itself alerts the user that 'an ECG is appropriate,' which the ALJ's claim construction order provides is what the '499 patent claims are directed to" and "Apple's instructions regarding the 'triggering' nature of the IRN alert message have been not only received but well understood by Apple's user base."  *Id.* at 64-65 (citing CX-0692.16; CX-0623; CX-0626).

Apple opposes.  Apple views the limitation as requiring, under a plain and ordinary meaning, two distinct features:  "that the system provides a 'trigger message' or somehow prompts the user—*e.g.*, by displaying a 'Take ECG' message—to record an ECG by the Apple Watch"; and "an alert to the user to record an ECG each time there is a comparison of activity level to heart rate variability, and regardless of whether the comparison identifies an 'irregularity.'"  RIB at 106-107 (citing Hr'g Tr. (Picard) at 904:1-17; JX-0223C (Albert) at 42:6-43:20, 44:7-21, 45:1-8).

As to the first requirement, Apple cautions that its support website, press releases, and specifications are not instructions on the Apple Watch itself.  SIB at 107, 109 (citing, *inter alia*, Hr'g Tr. (Jafari) at 476:18-477:3); *see id.* at 110-111 (arguing ███████████████████████████, 112 (tracked usage statistics have nothing to do with operation of the Apps); RRB at 66-67.  And, if considered, it argues its Instructions for Use (IFU) "fail to instruct users to take an ECG right after receiving an IRN," and none of its "onboarding materials, press releases, or support web pages" claim that potential arrhythmias are confirmable by the ECG app.  RIB at 109-110 (citing

**CONFIDENTIAL MATERIAL OMITTED**

RX-0051C).  According to Apple's technical witness, its confidence in the accuracy of its IRN notification is so high that if it triggers, "we would really like their next step to be to discuss that with their physician" ████████████████████████████████████████  *See* RIB at 111 (citing Hr'g Tr. (Waydo) at 859:18-860:18).  As for the specific support page relied on by ALC, Apple highlights its express text that a user can take an ECG "at any time, including randomly during the day, when they feel unwell or symptomatic, or when their doctor recommends it" (*id.* at 110 (citing Hr'g Tr. (Waydo) at 846:1-15)).  Apple also reminds that within the actual message displayed, "[y]our heart has shown signs of an irregular rhythm suggestive of atrial fibrillation . . . if you have not been diagnosed with AFib by a physician, you should talk to your doctor," there is no mention of ECG at all.  *See id.* at 108 (citing Hr'g Tr. (Picard) at 9[0]5:2-16); RRB at 67.

Regarding the second requirement, Apple simply contends it is not met because there is no comparison whatsoever between activity level and HRV, as described in the previous limitation. RIB at 108.  And regarding doctrine of equivalents, Apple argues there is a substantial difference between "take an ECG" and "talk to your doctor" messaging.  *Id.* at 112; RRB at 67.

The Staff also finds the limitation not met.  Staff argues there is no literal infringement, based simply on the text of the IRN alert message, which refers to talking with a doctor as opposed to taking an ECG.  SIB at 64 (citing, *inter alia*, RX-0179C.72); SRB at 28.  As for doctrine of equivalents, Staff agrees that alerting a user to talk with a doctor is "very different than alerting the user to capture an ECG" and "likely to achieve a substantially different result than alerting the user to take an ECG."  SIB at 65.

The limitation is not met literally in the Accused Products. ALC does not cite the actual language of the message displayed to the user after an arrhythmia has been detected by IRN. *See* CIB at 127-129. That message, in its entirety, is below:



RX-0179C.0072. This is not an alert for the user to take an ECG; it is an alert for the user to see their doctor. No further testing of any kind is suggested, and ALC's "externally facing" and "internally facing" evidence is irrelevant in light of this plain language. ALC's expert, Dr. Jafari, acknowledged that this message would send a user to the doctor, and that the desire to take an ECG would need to come from the user asking themselves what else could be done and consulting additional resources:

137

The second part of the message says, consult with a doctor. I'm sitting here testifying, or it might be at nighttime. I will consult with a doctor, I will try to find my cardiologist. Tomorrow I have to make a few phone calls, make an appointment, go see a doctor. I will do that. But is there anything else I can do.

I might try to look up, you know, IRN notification, and it takes me to the Apple website and it says take an ECG. What do I have to lose by taking an ECG. I will take an ECG. And that, effectively, connects also to the example that I provided earlier with the alarm system and how we are going to react to it.

Hr'g Tr. (Jafari) at 380:2-13. Lastly, contrary to ALC's suggestion, Order No. 12's determination that an "alert" is not limited to a message is not implicated here. *See* CRB at 62-63 (alleging this determination is "a crucial framework under which the claims should be interpreted"). ALC identifies nothing other than the message itself that might qualify as such an "alert." *See id.*

As for doctrine of equivalents, ALC's position is not persuasive, either. IRN's message to see your doctor is certainly provided in the same way as a message to take an ECG; that is, text displayed on the watch's screen. And the function could be viewed the same as well; that is, the function of both alerts is to urge the user to take additional action. Yet the results are very different. The intended result of "alert said first user to record an electrocardiogram using said mobile computing device" is for an ECG to be taken using the mobile device's sensors. The intended result of "you should talk to you doctor" is a doctor's office visit where any number of procedures could occur. Thus, infringement under the doctrine of equivalents has not been shown.

Accordingly, the limitation has not been shown in the Accused Products.

## 2.     Other Claims

Apple does not contest dependent claims 16 and 17 in the Accused Products apart from their dependency on independent claim 11. RIB at 112. Neither does the Staff. SIB at 66. While ALC has not shown infringement of independent claim 11, discussed above, the limitations of claims 16 and 17 are determined to be met in the Accused Products based on the undisputed evidence and testimony provided by ALC. CIB at 123, 133-134. In particular, the Accused

**CONFIDENTIAL MATERIAL OMITTED**

Products are smartwatches (claim 16) that employ a machine learning algorithm to determine the presence of arrhythmia (claim 17).  *See* Hr'g Tr. (Jafari) at 312:18-314:11, 320:13-321:19.

### E.    Domestic Industry – Technical Prong

ALC contends, "AliveCor's KBS, ███████████ products each practice claims 16 and 17 of the '499 patent literally and under the doctrine of equivalents."  CIB at 134.  Technical prong for the 499 patent differs from the 941 and 731 patents in that Apple does not dispute practice of any of claims 11, 16, and 17 by the KBS product.  *See* CIB at 134 (citing Hr'g Tr. (Jafari) at 406:14-409:25); RIB at 112-113; RRB at 67-68.  Neither does the Staff.  SIB at 66-68.  Thus, in light of the undisputed testimony and evidence provided by Dr. Jafari (Hr'g Tr. (Jafari) at 406:14-409:25), the KBS is determined to practice asserted claims 16 and 17.

For ██████████, again, the ████ did not exist in any hardware-sense at the time of the complaint.  Accordingly, it cannot support a domestic industry that "exists."  *Thermoplastic Motors*, Inv. No. 337-TA-1073, Comm'n Op. at 10.  And, as with the 941 and 731 patents, ALC has not adequately alleged that ████████████████████████████████████████ ████████ practices any claim of the 499 patent.  *See* CIB at 134-137.  Thus it too cannot be considered to support a domestic industry that "exists."

Nevertheless, the practice of the 499 patent by the ██████████ products is "in the process of being established," for the same reasons as with the 941 and 731 patents.  The evidence shows that at the time of the complaint, ALC was taking the necessary and tangible steps to practice claims 11, 16, and 17 via the ██████████ products with a significant likelihood of success.  ALC's previous product, KBS, indisputably practices all of these claims.  ALC's expert, Dr. Jafari, has given persuasive testimony on the transferability of the SmartRhythm (PPG analysis) and KardiaApp (ECG collection and analysis) features—primary software features behind this

practice—to other portable heart monitors. *See* Hr'g Tr. (Jafari) at 389:1-7, 389:21-25, 390:6-15, 392:3-393:10. ALC's technical witnesses testified to the same effect. Hr'g Tr. (Somayajula) at 198:13-19, 202:11-21, 203:19-205:8, 210:19-212:2; 217:13-15, 218:22-219:20, 221:2-222:8; Hr'g Tr. (Raghavan) at 565:4-22, 596:7-599:22 (discussing predicate devices). And the prior art in this investigation, discussed below, shows that wrist-worn computerized devices that contain both PPG and ECG sensors were achievable well before the invention of the 941 patent. *See* RX-0419. There is little else in claims 11, 16, and 17 outside of these hardware and software features. Apple offers no argument beyond that discussed in connection with the 941 patent, or the KBS product above. *See* RIB at 90-91; RRB at 56-58.

    Accordingly, ALC has shown it is more likely than not that practice of asserted claims 16 and 17 by the ▮▮▮▮▮▮▮ is "in the process of being established."

### F.    Validity and Other Affirmative Defenses

    Apple identifies the following invalidity and unenforceability theories for the 499 patent:

| Claims | Theory |
|---|---|
| 11, 16, 17 | Invalid for lack of patent-eligible subject matter under 35 U.S.C. § 101 |
| 11, 16, 17 | Rendered obvious under 35 U.S.C. § 103 by AMON (RX-0419), alone or in combination with Kotzin (RX-0401) and Almen (RX-0400) |
| All claims | Unenforceable against Apple under experimental use exception |

*See generally* RIB at 113-120.

    As for prior art, Apple argues that because the 499 patent has the same priority date as the 731 patent, discussed above, each of AMON, Almen, and Kotzin qualify as prior art to the 499 patent under § 102(a) for the same reasons. Neither ALC nor the Staff disputes this (*see generally*

CIB at 144-146; CRB at 70-72; SIB at 71) so AMON, Almen, and Kotzin are prior art to the 499 patent at least under 35 U.S.C. § 102(a).

### 1.     Ineligible Subject Matter

As with the 941 and 731 patents, Apple contends "[c]laims 16 and 17—which depend from non-asserted claim 11—are all directed at patent ineligible subject matter." RIB at 113.  As for *Alice* step one, Apple argues independent claim 11 is "directed fundamentally at the abstract idea of sensing heart rate and activity data, processing the data, comparing the data, and then alerting a user to take more data." *Id.* at 114.  Apple claims the steps are "fundamentally the steps clinicians have done historically as part of a routine cardiac exam, and merely automating such a basic human activity is insufficient to convey patentability under § 101." *Id.*  Apple argues claims 16 and 17 are directed similarly.  *Id.*

As for *Alice* step two, Apple views the recited hardware "a hear rate sensor, a processor, a motion sensor, a non-transistory computer readable medium, an ECG sensor, and a [] mobile computing device" as generic.  RIB at 114.  Apple adds, "the '499's inventors did not invent or in any way advance these generic hardware components." *Id.*  Apple contends the "smartwatch" of claim 16 is effectively a generic computing device and "conventional as of 2013." *Id.*  For claim 17, reciting, "determine a presence of said arrhythmia using a machine learning algorithm," Apple argues "a machine learning algorithm without specifics is nothing more than generic, functional language" and "[c]laim 17 recites nothing about how the algorithm is trained." *Id.* at 115.

ALC, on the other hand, contends the claims are subject matter eligible as "[c]laims 16 and 17 both require a specific combination of heart rate, motion, and ECG sensors."  CIB at 142; CRB at 68 ("Apple ignores the specific configuration of sensors and computer-readable instructions executed on the device recited by the claims.").  ALC, in a discussion of *Alice* step one, emphasizes the invention's advantages in early stage disease detection (CIB at 142) and notes the patent's

141

statement "that 'by comparing measured heart rate changes with measured activity changes, the presently disclosed software or 'app' minimizes false alarms.'" *Id.* (citing 499 patent at 25:22-25). Otherwise, ALC views the claims as similar enough to those in the 941 and 731 patents so as to incorporate its previous *Alice* step one discussions by reference. *Id.* at 143.

Continuing under *Alice* step two, ALC argues "the claimed devices of claims 16 and 17 are inventive because they perform functions that doctors or other medical professionals could not do before [so that by] comparing HRV to activity level, the claimed devices can more accurately alert users to take an ECG." CIB at 143; CRB at 68-69 (arguing doctors do not "alert" the user to take ECG, they would order it themselves). Additionally, according to ALC, the claims include inventive concepts because "they can alert the user to record an ECG when an arrhythmia is detected and thus enable users to capture this information even without a doctor present." CIB at 143; CRB at 69 (arguing the invention "allows users to record ECGs in the periods of greatest diagnostic value."). ALC again views the claims as similar enough to those in the 941 and 731 patents so as to incorporate those *Alice* step two discussions by reference. CIB at 144.

The Staff agrees with ALC on both steps of the *Alice* test, and repeats its commentary from the other patent discussions. SIB at 68-71; SRB at 30-33.

Unlike the claims of the 941 and 731 patents, claim 11 of the 499 patent is invalid for lack of patentable subject matter. For background, claim 11 recites:

11. [11(a)] A system for determining the presence of an arrhythmia of a first user, comprising

[11(b)] a heart rate sensor coupled to said first user;

[11(c)] a mobile computing device comprising a processor, wherein said mobile computing device is coupled to said heart rate sensor, and wherein said mobile computing device is configured to sense an electrocardiogram of said first user; and

[11(d)] a motion sensor

142

[11(e)] a non-transitory computer readable medium encoded with a computer program including instructions executable by said processor to cause said processor to

[11(e)(i)] receive a heart rate of said first user from said heart rate sensor,

[11(e)(ii)] sense an activity level of said first user from said motion sensor,

[11(e)(iii)] determine a heart rate variability of said first user based on said heart rate of said first user,

[11(e)(iv)] compare and [sic] activity level of said first user to said heart rate variability of said first user,

[11(e)(v)] and alert said first user to record an electrocardiogram using said mobile computing device.

499 patent at cl. 11 (annotated). The bulk of the claim is directed to the data analysis algorithms taking place within the "processor" and according to the "instructions" saved in memory (*i.e.*, ineligible subject matter). The bit of apparatus recited (*i.e.*, potentially eligible subject matter) is devoid of specificity, such that it can only be considered generic computer hardware—"a heart rate sensor," "mobile computing device," "a processor," "a motion sensor," and "non-transitory computer readable medium." The fact that the preamble describes this as a "system" demonstrates that no particular form factor is envisioned or required. Thus, the claim is clearly directed to the idea of taking in heart rate data (of any kind), taking in activity level data (of any kind), calculating heart rate variability, comparing that variability with the activity (by any means), and then alerting the user to "record an electrocardiogram using said mobile computing device."

Dr. Stultz persuasively testified that carrying out these steps is common in medical practice. Hr'g Tr. (Stultz) at 1058:13-1059:19, 1077:21-1078:15, 1085:15-22. They are also ineligible mental processes. Accordingly, claim 11 is directed to ineligible subject matter under *Alice* step one. *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 71, (2012); *Intellectual*

143

*Ventures I*, 838 F.3d at 1314 ("The Supreme Court has held that 'fundamental . . . practices long prevalent' are abstract ideas.") (citing *Alice*, 134 S.Ct. at 2356).

Claims 16 and 17 fare similarly. Claim 16 specifies that the "mobile computing device" is a "smartwatch." But this does not materially transform the claim as there is no other limitation that benefits or is affected by the computing device being in this form factor. *Compare* 499 patent at cl. 16 *with* 941 patent at cl. 22 ("wherein the PPG sensor is located on a back of the smartwatch"). Claim 17 requires the processor to further "determine a presence of said arrhythmia using a machine learning algorithm." 499 patent at cl. 17. This is literally just another algorithm and only deepens the connection between the claim and ineligible subject matter.

Turning to *Alice* step two, claim 11's non-ineligible elements, either individually or as an ordered combination, do not transform the nature of the claim into something more than a patent on the abstract concept. *See Alice*, 573 U.S. at 217-18. As noted, there are sensors recited ("heart rate," "electrocardiogram," "motion"), but they are unrestricted as to structure, arrangement, or data output so long as they relate to "heart rate," electrical activity of the heart, or "activity level," respectively. 499 patent at cl. 11. Admittedly, an ECG sensor is rather specific; but unlike claim 12 of the 941 patent, claim 11 of the 499 patent does not recite the number of leads to further specify the type of ECG sensor, nor does it expressly recite any use for the ECG data—it simply exists within the "mobile computing device." 499 patent at cl. 11. In essence the claim covers the addition of generic sensors to an existing ECG machine, and for no particular purpose.

Alone or as an ordered combination, all this is equivalent to the basic idea of using such sensors. The remaining hardware limitations ("mobile computing device," "processor," and "computer readable medium") are equally generic, if not more so, and perform their generic functions (be configurable, contain and execute instructions). Moreover, there is nothing recited

144

that could be viewed as improving the operation of any of these computing elements (*e.g.*, faster, fewer errors, less power consumption, etc.). *See, e.g.*, *Enfish*, 822 F.3d at 1336 ("In this case, however, the plain focus of the claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity."). Nor does the addition of a machine learning algorithm, as in claim 17, remove that claim from the category of "well-understood, routine, and conventional." *Berkheimer*, 881 F.3d at 1369.

ALC's arguments to the contrary are unpersuasive. The feature of claim 11 heralded to result in "improved cardiac monitoring technology" is an "algorithmic step," as is the (unspecified) "machine learning algorithm" of claim 17. CIB at 142 (discussing comparison of HRV to activity level). And the concept of alerting a user to take an ECG (by any means) may result in improved early detection of cardiac conditions (*id.* at 142-143), but it is still an algorithm contained in memory and executed by a processor (499 patent at cl. 11). On that point, processors do not "alert" a user themselves; additional, unrecited hardware is necessary (*e.g.*, speaker, LED, vibrating motor, display, etc.). ALC also contends, "the claimed devices of claims 16 and 17 are inventive because they perform functions that doctors or other medical professionals could not do before." CIB at 143; *see* SIB at 70-71. What has been done before, or not, is a novelty or non-obviousness argument, however, distinct from § 101. *Synopsys*, 839 F.3d at 1151.

Accordingly, claim 17 of the 499 patent has been shown to be invalid for lack of patentable subject matter. The same cannot be said of claim 16, however, for the same reason as discussed above for the 941 and 731 patents: it requires a "smartwatch" as at least part of the mobile computing device. Undoubtedly claim 16 is more abstract than the claims of the 941 and 731 patents, because no particular kind of heart rate sensor or motion sensor is required. But incorporating even any kind of heart rate sensor into a smartwatch, especially when combined with

145

an ECG sensor, lifts that smartwatch out of the realm of "well-understood, routine, and conventional." *Berkheimer*, 881 F.3d at 1369. Overall, the system of claim 16 is sufficiently unconventional that it qualifies as inventive at step two of *Alice*. Claim 16 therefore is not invalid for lack of patentable subject matter.

### 2.    AMON in Combination with Almen and/or Kotzin

Apple states, "[j]ust like the '941 and '731 patents, AMON—alone or in combination with Almen and Kotzin for minor limitations—renders obvious all of the '499 patent's Asserted Claims in this Investigation, including claims 11, 16 and 17." RIB at 115-116.

### a.    Claim 11

For independent and intervening claim 11, Apple identifies several limitations it views as disputed, but are otherwise disclosed or obvious in light of AMON. *See generally* RIB at 116-120. In its briefing, ALC identifies limitations 11(e)(iii), 11(e)(iv), and 11(e)(v) as in dispute (CIB at 144-145; CRB at 70-71); and while Staff opposes limitations 11(e)(iii) and 11(e)(iv) it does so on essentially identical grounds to ALC (SIB at 72-75; SRB at 33-35). These are discussed below. As to the remaining, undisputed, limitations of claim 11, they are found to be obvious as alleged by Apple in light of the evidence and testimony provided by Dr. Stultz. RIB at 116-119 (citing Hr'g Tr. (Stultz) at 1142:20-1143:6).

### i.    [11(e)(iv)] "compare said activity level of said first user to said heart rate variability of said first user"

As noted above, AMON does not disclose element 11(e)(iii), "determine a heart rate variability of said first user based on said heart rate of said first user," but the combination of AMON and Almen renders that element obvious, so the following discussion pertains to that combination. As to "compare said activity level of said first user to said heart rate variability of said first user," Apple contends it also would have been obvious. *See* RIB at 119 (citing Hr'g Tr.

146

(Stultz) at 1119:3-25, 1142:20-1143:3). In reply, Apple asserts that the device in Almen monitors HRV even while a user is at rest. *Id.* (citing RX-0400 at Abstract; Hr'g Tr. (Stultz) at 1118:8-1126:16, 1142:20-1144:21).

The limitation would have been obvious over AMON in light of Almen. As determined above in connection with the 941 and 731 patents, AMON discloses the concept of comparing heart rate data (*i.e.*, pulse) against one of two pre-set thresholds depending on the user's activity level (aerobic or anaerobic). RX-0419 at 6, Table I. As further determined above, a person of ordinary skill would have had reason to calculate heart rate variability as a parameter to aid in evaluating arrhythmia, given the teachings of Almen. *See* RX-0400 at 1:61-66, 2:12-20, 7:26-53; *see also* Hr'g Tr. (Stultz) at 1058:13-1059:19, 1077:21-1078:15, 1085:15-22. It is logical to conclude that the device of AMON, once modified, would evaluate heart rate variability in the same manner as its other characteristics—*i.e.*, compare it to one of two pre-set thresholds depending on the user's activity level. After all, detecting when activity is "strenuous" (*i.e.*, aerobic) is the whole point of AMON's acceleration sensor:

D. Acceleration Sensor

Acceleration sensors provide information on the activities of the wearer. Three uses of this information are made: First, the pulse limits are set according to the activity level—*e.g.*, walking, running, or resting.

. . . .

1) Activity Detection: The AMON system requires only very simple activity analysis compared to other wearable activity detection applications, *e.g.*, [24]. What we are interested in is the level of physical activity without being able to distinguish specific actions. The main problem that our analysis has to deal with is the fact that intensive arm motion by itself is by no means an indication of strenuous physical activity. Thus, for example eating, drinking, or just talking and gesticulating involves arm motions that are not particularly strenuous. Our analysis is based on the fact that strenuous activity is mostly associated with (fast) walking or running. This in turn has a characteristic periodic acceleration signature with the frequency indicating the walking speed (*see* Fig. 6). This periodic signature can be

147

detected even if the arms do not follow the walking motion directly through swinging and are engaged in some other activity.

RX-0419 at 5.

ALC's points in opposition are not persuasive.  Beyond those made (and rejected) in connection with claim 13 of the 941 patent, ALC argues "because Almen is targeted toward analysis during sleep cycles of the wearer, it would not be necessary for Almen to even consider the user's motion or activity level, let alone compare it to HRV."  CIB at 144.  Staff makes a similar argument.  SIB at 74-75.  Yet, the combination is to add HRV evaluation to AMON's device, not physical activity evaluation to Almen, and as detailed above, AMON recognizes the importance of noting activity level when determining if heart-centric thresholds have been crossed.

Accordingly, this limitation would have been obvious over AMON in light of Almen as alleged.

### ii.  [11(e)(v)]  "alert said first user to record an electrocardiogram using said mobile computing device"

As to "alert said first user to record an electrocardiogram using said mobile computing device," Apple argues it is both disclosed and obvious.  RIB at 119.  Within AMON, Apple points to statements regarding out of range parameters:

> Dr. Stultz made clear that AMON discloses alerting a user to record an ECG, because "if a parameter is out of range, the user is informed and additional measurements are required, and one of those measurements can be an ECG, and the user is informed to their own status and that of the device." Tr. (Stultz) at 1143:7-14; RDX-3.99. AMON's clinical algorithm also notes in steps 1 and 3 that if the pulse is irregular (outside the normal range), then the user is asked to take an ECG measurement. *Id.* at 420. The user has to actively record the ECG because AMON states "the patient must touch the RA with his left hand" and the RL lead to the abdomen. *Id.* [at] 418; RDX-3.99.

*Id.*  Apple also reminds of AMON's disclosure that "'each step [of the algorithm], the result is displayed . . .' to the user."  RRB at 71 (citing RX-0419 at 6).  If not disclosed, it is obvious, according to Apple, in combination with Kotzin:

148

To the extent that AMON does not expressly disclose an alert, a POSITA would have been motivated to create an alert based on the disclosures in Kotzin that if a preliminary event (*e.g.*, a pulse or HRV signal) occurred outside the normal range thresholds, then it would be beneficial to alert the user to sense an ECG to indicate if the pulse or HRV is a dangerous condition. Tr. (Stultz) at 1143:15-19. RX-401 (Kotzin) 18:10-24; RDX-3.100.

RRB at 120.

The limitation is at least inherently disclosed in AMON.  As noted by Dr. Stultz, AMON discloses a five step algorithm, where in the first step, measured values (*e.g.*, pulse) are compared to risk threshold limits in a look-up table.  RX-0419 at 6.  The third and fourth steps include:

Third Step: When previous steps indicate a risk or high-risk zone, determine if and what new measurement set is required.

Fourth Step: Calculate pulse based on two or three different measurements (SpO$_2$, blood pressure, and ECG). Each measurement is weighted according to its reliability.

*Id.*  In the "System Overview," AMON further explains that when a parameter is out of range, as in the third step, an ECG is called for when appropriate:

Parameter out of range: A remeasurement is performed. If the outcome is the same as before, the user is informed and additional measurements are required. The wrist-worn device determines the type and initiates the measurement. The type of measurement includes SpO$_2$, blood pressure, and ECG. Taking into account combined results of all measurements, the system then decides whether to alert the TMC or not.

*Id.* at 3.  If the device determines that an ECG is called for, the device necessarily must do as the present claim limitation recites—that is, alert the user to take an ECG.  As AMON notes, the device cannot do this itself because ECGs require users to actively position their body to the sensor pads:

[D]uring a measurement, the patient must touch the RA with his left hand. The right leg (RL) electrode is placed on top pointing to the wearer; during measurement, this electrode must be in contact with the abdomen. In order to reduce common mode interference, a right leg drive circuit has been chosen with gain set to 39.

*Id.*

149

And the device would determine that an ECG is appropriate when the out of range parameter is one that an ECG will measure, as opposed to one that an ECG cannot measure, such as blood oxygen concentration ($SpO_2$) or blood pressure. So although AMON does not expressly disclose "alert[ing] said first user to record an [ECG]," that step is necessarily present when AMON analyzes HRV as the out of range parameter.

In opposition, ALC first argues that because the preamble of claim 11 is limiting, "any alert would necessarily require some connection to the limitation of 'detecting the presence of an arrhythmia.'" CIB at 145 (citing *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1345 (Fed. Cir. 2021)). And because AMON does not use the word "arrhythmia," it cannot meet this limitation either, according to ALC. *Id.*; CRB at 71. But the broad construction of "arrhythmia" which encompasses *any* irregularity in electrical activity of the heart, including HRV. Order No. 12 at 12.

Accordingly, Apple has shown independent and intervening claim 11 would have been obvious over AMON in view of Almen; Kotzin need not be considered.

### b.    Claim 16

Claim 16 recites, "[t]he system of claim 11, wherein said mobile computing device comprises a smartwatch." 499 patent at cl. 16. For this claim, Apple refers to its discussion of preambles in both claim 12 of the 941 patent and claim 1 of the 731 patent. RIB at 120 (citing Hr'g Tr. (Stultz) at 1143:23-1144:1). ALC only contests claim 16 to the extent it depends on claim 11. *See* CIB at 145; CRB at 71. Staff finds the limitation disclosed in AMON. SIB at 75.

Accordingly, claim 16 would have been prima facie obvious over AMON in view of Almen.

### c.    Claim 17

Claim 17 recites, "[t]he system of claim 11, wherein said computer program further causes said processor to determine a presence of said arrhythmia using a machine learning algorithm." 499 patent at cl. 17.  For this claim, Apple contends AMON discloses it and refers to its discussion of claim 5 of the 731 patent.  RIB at 120 (citing Hr'g Tr. (Stultz) at 1143:23-1144:1).  ALC similarly contests claim 17 on the same ground as claims 3 and 5 of the 731 patent.  CRB at 71. The Staff finds the limitation is not disclosed in AMON and not otherwise obvious based on Kotzin.  SIB at 76 ("It is not clear that Kotzin even describes a machine learning algorithm, but even if it did, Kotzin fails to teach or suggest using any such algorithm for the detection of arrhythmia.").

As determined in connection with claims 3 and 5 of the 731 patent, the machine learning limitation is not disclosed in either AMON or Almen, and Apple does not identify any teaching in Kotzin of a machine learning algorithm, or of any motivation to combine Kotzin, AMON, and Almen.  *See* RIB at 120.

Accordingly, claim 17 is not disclosed by AMON, and no prima facie case of obviousness has been shown.

### d.    Summary

Apple has not made out a prima facie case of obviousness as to claim 17, so it is not invalid on that basis.  The KBS embodies claim 16, so ALC is entitled to a presumption of nexus to the secondary considerations of non-obviousness, and Apple offers no evidence to rebut that presumption.  *See* RIB at 120.  Essentially for the same reasons as discussed above for claims 12, 16, 20, 22, and 23 of the 941 patent, the secondary considerations here also outweigh the other *Graham* factors, such that claim 16 would not have been obvious over AMON in view of Almen.

Accordingly, Apple has not proven claim 16 or 17 to have been obvious.

151

### 3.    Enforceability as to Experimental Use

As with the 941 and 731 patents, Apple argues that "[its] experimental use does not give rise to infringement liability under the '499 patent." RIB at 120. As determined above, ALC's infringement theory does not implicate any Apple experimental activity. Accordingly, experimental use has not been shown to preclude any finding of infringement in this investigation.

## VII.    DOMESTIC INDUSTRY - ECONOMIC PRONG

In a patent-based complaint, a violation of Section 337 can be found "only if an industry in the United States, relating to the articles protected by the patent ... concerned, exists or is in the process of being established." 19 U.S.C. § 1337(a)(2). Under Commission precedent, this "domestic industry requirement" of Section 337 consists of an economic prong and a technical prong. *Stringed Instruments*, Inv. No. 337-TA-586, Comm'n Op. at 12-14. The complainant bears the burden of establishing that the domestic industry requirement is satisfied. *See Certain Set-Top Boxes and Components Thereof*, Inv. No. 337-TA-454, Initial Determination at 294 (June 21, 2002) (not reviewed in relevant part).

The economic prong of the domestic industry requirement is defined in subsection (a)(3) of Section 337 as follows:

> (3) For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark or mask work concerned --
>
> (A) Significant investment in plant and equipment;
>
> (B) Significant employment of labor or capital; or
>
> (C) Substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3). The economic prong of the domestic industry requirement is satisfied by meeting the criteria of any one of the three factors listed above. Importantly, the Commission has

**CONFIDENTIAL MATERIAL OMITTED**

clarified that investments in plant and equipment, labor, and capital that may fairly be considered investments in research and development are eligible for consideration under subsections (A) and (B), in addition to subsection (C). *See Certain Solid State Storage Drives, Stacked Electronics Components, and Products Containing Same*, Inv. No. 337-TA-1097, Comm'n Op. at 14 (June 29, 2018) ("*Solid State Storage*").

In this investigation, ALC contends economic prong is met under each of subsections (A), (B), and (C) for each Asserted Patent through its investments in "design, development, regulatory, and customer support work." CIB at 146. More specifically, ALC contends a domestic industry "exists" through the KBS, ████████ products; and there is also a domestic industry "in the process of being established" through the ████████ products. *Id.* at 149, 164.

Overall, ALC has shown a domestic industry "exists" for the 941, 731, and 499 patents under subsection (C). ALC has not shown a domestic industry "exists" under subsections (A) or (B). ALC has not shown a domestic industry is "in the process of being established" for any of subsections (A), (B), or (C).

### A.    Domestic Industry in Existence

#### 1.    Qualifying Expenditures

As noted above, ALC claims economic prong is met through subsections (A), (B), and (C). The appropriate amount of investment to be considered under each subsection is discussed below.

##### a.    Subsection (A) – Plant and Equipment

Considering subsection (A), "significant investment in plant and equipment," ALC first presents company-wide investment amounts from April 2016 to the filing of the complaint, April 2021. CIB at 153-154. ALC reports: ████████ in rent for a Mountain View, CA facility; ████████ in additional repairs, utilities, and maintenance; ████████ in equipment expenses, including software, hardware, and office equipment (and, in addition "regulatory, and customer

support teams"); and ▮▮▮ in tooling expenses from "U.S.-based contractors related to KBS." *Id.* ALC argues its "engineers, regulatory specialists, and customer support specialists work on the DI Products" at this facility. *See id.* at 153.

To arrive at investment figures specifically directed to the DI Products, as opposed to others, ALC identified all employees at the facility and the amount of time each worked on the DI Products. *See* CIB at 154-156. This information is sourced from the knowledge and testimony of ALC's founder, Dr. Albert, ALC's current Chief Technology Officer, Mr. Somayajula, ALC's then regulatory manager, Mr. Raghavan, and ALC's Director of Customer Care, Mr. White. *See id.* To support the reliability of these estimates, ALC contends:

> All of these estimates were prepared carefully and diligently. Tr. (Albert) at 96:9-97:24; Tr. (Somayajula) at 222:25-226:8; Tr. (Raghavan) at 574:3-576:22. Mr. Somayajula is AliveCor's current Chief Technology Officer, and he oversees AliveCor's current development work. Tr. (Somayajula) at 193:6-18. Dr. Albert is a company founder, who is familiar with all of AliveCor's development projects going back to 2016. JX-223C (Albert) at 237:7-238:21. Mr. Raghavan is AliveCor's former Vice President of Regulatory and current regulatory consultant, and he personally oversaw or consulted on the applications at issue in his allocation. Tr. (Raghavan) at 571:22-574:11. . . . Even Apple's expert agreed that Mr. Somayajula and Dr. Albert are knowledgeable about AliveCor's R&D activities and that Mr. Raghavan is knowledgeable about AliveCor's regulatory activities. Tr. (Vander Veen) at 1035:12-20.

*Id.* at 154-155. For customer support, ALC asserts it "maintains data showing the products to which each incoming customer support ticket relates." *Id.* at 155 (citing CPX-053C). Thus, uniquely for this activity, ALC relies on "how many tickets within a time frame it had for that specific thing, based on our coding." *Id.* (citing JX-0227C (White) at 141:6-12).

The end result, as calculated by ALC's expert, Dr. Akemann, is "a relative headcount of AliveCor employees who work on DI Products at AliveCor's California Headquarters each year." CIB at 155 (citing Hr'g Tr. (Akemann) at 647:13-657:14). The tabulated results are below:

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| DI % of Headcount (HQ) | | | | | | |
| DI % of Software Headcount | | | | | | |
| DI % of Hardware Headcount | | | | | | |
| DI % of Regulatory Headcount | | | | | | |
| DI % of Customer Support Headcount | | | | | | |

*Id.* at 156 (citing Hr'g Tr. (Akemann) at 645:10-657:14; CDX-0001C.9; CDX-0001C.10; CPX-047C; CPX-050C; CPX-052C; CX-0920C; CX-0922C).

When these allocations are applied to the company-wide plant and equipment totals presented above, the total amount of alleged subsection (A) investment is as follows:

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|
| Allocated Facilities Expenses | | | | | | | |
| Allocated Equipment Expenses | | | | | | | |

*Id.* (citing Hr'g Tr. (Akemann) at 645:10-657:14; CDX-0001C.9; CDX-0001C.11; CPX-047C; RX-0484C; JX-227C; JX-225C; CPX-050C; CPX-053C; CX-0918C; CX-0919C; CX-0920C).

In its reply brief, ALC expresses its view that its continuing investments in the technologies shared between KBS, ███████ allow for consideration of the full six years of plant and equipment investment. CRB at 73-75 (discussing SmartRhythm and KardiaAI), 77-78 ("AliveCor has engaged in continuous efforts to exploit its patented technology through multiple form factors"), 80 ("Even adopting Apple's view—which is contrary to the evidence—that investments in the technology used in the KBS are somehow entirely distinct from investments in the technology in the ██████ the customer support and software update evidence is

undisputed or unrebutted evidence of continuing, qualify[ing] investments in the KBS."). ALC

states in summary, "[t]he KBS is a DI Product. The KBS did not exist before AliveCor developed

it. And that last point alone establishes nexus." *Id.* at 75 (citing *Certain Non-Volatile Memory*

*Devices and Products Containing the Same*, Inv. No. 337-TA-1046, Comm'n Op., 2018 WL

6012622, at *25 n.11 (Oct. 26, 2018) ("*Non-Volatile Memory*"); *Certain Electronic Digital Media*

*Devices and Components Thereof*, Inv. No. 337-TA-796, Initial Determination at 454 (Sept. 14,

2012)).

ALC also takes issue with ignoring, or setting aside, investments in the ██████████

when determining if an industry "exists." ALC repeats its view that "the ██████████ are

articles for which the technical prong of domestic industry requirement can be evaluated." CRB

at 82 n. 19. It matters not, according to ALC, that the products are not ready for commercialization.

*Id.* (citing *Non-Volatile Memory*, Inv. No. 337-TA-1046, Comm'n Op., 2018 WL 6012622, at

*20). All that matters, allegedly, is that the articles "exist":

> The physical embodiments of the ██████████ that were produced during this
> investigation qualify as protected articles under the Commission's reasoning in
> *Non-Volatile Memory Devices*. *Because the articles exist*, and because AliveCor is
> relying on investments that had been made at the time the complaint was filed,
> Apple's various arguments about when prototypes first existed and which
> prototypes are currently be worked on are irrelevant. *See id.* at *27 ("Simply
> because Macronix has not yet arrived at the final stages of commercializing the
> [article] does not mean that Macronix does not have a domestic industry in the
> process of being established with respect to [an article] protected by the asserted
> patents.").

*Id.* (emphasis added). Similar to the discussion of past investment, ALC contends, "these

investments relate to technology that was implemented in the KBS, which existed at the time the

complaint was filed." *Id.* at 83; *see id.* ("But as every AliveCor fact witness explained, the work

on ██████ was continuing development work on the same technologies implemented in the

KBS."). ALC summarizes, "[t]he work does not erase the practicing article that indisputably existed at the time of the complaint." *Id.*

Additionally, ALC disputes that its allocations are unreasonable to the extent Apple has made that argument for subsection (A). ALC asserts, "time estimates from knowledgeable individuals" has been successfully relied upon in prior investigations" (CRB at 85 (citing *Certain Light-Emitting Diode Products, Systems, and Components Thereof (III)*, Inv. No. 337-TA-1168, ID at 121-22 (June 26, 2020))) and also that a precise accounting is not necessary as "most people do not document their daily affairs in contemplation of possible litigation" (*id.* (citing *Stringed Instruments*, Inv. No. 337-TA-586, Comm'n Op. at 26)). ALC then addresses those specific indicia of allocation unreliability proffered by Apple. *See generally id.* at 85-89.

The Staff agrees with ALC. SIB at 81-82; SRB at 39-42. "With respect to allocations," the Staff explains, "AliveCor's allocations appear reasonable . . . and it is not clear that there is a better approach that AliveCor could have taken." SIB at 81. The Staff views Apple's "primary criticism" as that the ▇▇▇▇▇▇▇ products are not "presently on the market" (SRB at 38) and, for the same reasons as ALC, argues commercialization is not a necessity (*id.* (citing, *inter alia*, *Non-Volatile Memory*, Inv. No. 337-TA-1046, Comm'n Op. at 41-42)). More specifically, the Staff argues the ▇▇▇▇▇▇▇ hardware status at the time of the complaint was "sufficient":

> As explained above, the designs of the ▇▇▇▇▇▇▇ products were sufficient before the filing of the Complaint to determine that those designs would implement the next generation SmartRhythm software based on what was originally included as part of the KardiaBand System that worked with the Apple watch. At the time of the filing of the Complaint, implementation of the design had begun but working prototypes in the intended form factor were not yet developed. With respect to the technical prong, the Staff relies on the Complainant's expert's analysis of products in which the hardware aspects were improved in the course of the investigation. While not all design work had been completed, sufficient design work had been completed such that the Commission can determine that those designs practice the claimed invention, *i.e.*, that the hardware would include PPG and ECG sensors, and a processor to run SmartRhythm. With respect to the economic prong, the Staff

relies on Complainant's expert's analysis of investments made relating to these products up to the time the Complaint was filed. Accordingly, references to investments made in 2021 herein are to investments made in 2021 through the date of the filing of the Complaint.

*Id.* at 39 n.3. Thus, according to the Staff, "[a]s there is substantial overlap in the investments of KBS, ████████████, all of AliveCor's claimed investments should be considered as a whole," and that subsection (A) figure is ████████ *Id.*

ALC's investment figures for subsection (A), plant and equipment, are not reliable. Despite its assertion that technology, efforts, and investment are shared between the KBS on the one hand, and ████████ on the other, the fact remains that the ████████ have not been shown to practice any of the asserted patents at the time of the complaint. Thus, any investment directed to these articles under subsection (A) must be allocated out, just as with any other non-practicing products. *Stud Finders*, Inv. No. 337-TA-1221, Comm'n Op. at 48, 50-51 ("[T]his is not the first time that [the Commission] has explained that aggregating investments in articles that *are* protected by a particular patent with investments in articles that *are not* protected by that patent may preclude meaningful consideration of those investments under the statutory framework required by section 337.") (emphasis in original); *Certain Earpiece Devices and Components Thereof*, Inv. No. 337-TA-1121, Comm'n Op. at 17-18 (Nov. 8, 2019); *Certain High-Density Fiber Optic Equipment and Components Thereof*, Inv. No. 337-TA-1194, Comm'n Op. at 61 (Aug. 23, 2021).

The Staff's rationale for keeping ████████ in the calculus is far from persuasive. They suggest technical prong may be somehow established by product design materials, without actual practice, so long as there has been "sufficient" work completed. SRB at 39 n.3 ("While not all design work had been completed, sufficient design work had been completed such that the Commission can determine that those designs practice the claimed invention."). There is no

precedent for this, and it would defeat the purpose of the statute, which is to ensure "an industry . . . relating to the *articles protected* by the patent . . . exists." 19 U.S.C. § 1337 (emphasis added).

Turning back to ALC's subsection (A) investments, they are the combination of KBS, ███████████ activity. *See* CIB at 154 (citing Hr'g Tr. (Albert) at 96:9-97:24; Hr'g Tr. (Somayajula) at 222:25-226:8); Hr'g Tr. (Akemann) at 644:2-657:14; CDX-0001C.5; CDX-0005C.48. Yet ALC does not provide any means to alternatively subtract out activities spent on ███████. *See* CIB at 154; RX-0484C at 112-114, 138-140; CDX-0001C.5. This is a problem according to Commission precedent and may preclude further analysis. With that said, Apple's expert, Dr. Vander Veen, does make an attempt at isolating KBS plant and equipment (RIB at 140 (citing RX-0314C; RX-0323C)) but he acknowledges that the largest year, 2018, cannot reliably be parsed between KBS and ███ (Hr'g Tr. (Vander Veen) at 997:11-18). Even then, there is strong evidence that some 2017 investment should be given to ███, which Dr. Vander Veen does not do (*see* CIB at 19 ████████████████████████████████████ ████████████████████; CX-0250C.2 (███████████████████████████████ ███)), and evidence that some 2018 must be given to ███, which he also does not do. As Dr. Albert explains, "I went to one engineer, Miguel Kirsch, who, as you see, came in 2018 and worked on the ████████████████ at that time . . . [and] Miguel said, where I said he was ████████ percent committed, he said I was ███ percent committed to ███████████ during those time periods. He said I definitely underestimated him." Hr'g Tr. (Albert) at 97:6-20. Thus, it is reasonable to eliminate the years 2018-2021 from ALC's plant and equipment investments as having an unreliable connection to KBS, leaving only 2016-2017.

The testimony of Dr. Albert raises a separate hurdle that ALC has not overcome. Apple contends the alleged subsection (A) investment (and subsections (B) and (C), as well) is ultimately

**CONFIDENTIAL MATERIAL OMITTED**

based on Dr. Albert's recollection "of the percentage of time each employee spent working on the

KBS and ▇ for each quarter from 2016 to Q1 2021 *solely from memory*." RIB at 133 (emphasis

in original). Apple's claim of "solely from memory" is not exaggeration. Dr. Albert consulted no

emails, documents, or persons in developing his percentages:

> Q. Turning to CDX-5C.48, this is information taken out of CX-687C, pages 14-15 for identification purposes only, can you tell us, briefly, what you were asked to do in terms of analyzing the amount of time different people at AliveCor have spent on the domestic industry products?
>
> A. Well, as the common denominator in the company since the beginning, and as I'm very involved in new product development, I was asked last year to estimate the contribution of this list of people to KardiaBand, ▇, and then at the end of this timeline, Q1, ▇. And so I was given a list of names and I was given time, different times. And so I had no time sheets, we don't keep time sheets, I had no emails, I consulted no one. I just came up with what I thought, because I know what these people were working on, I know what their jobs were, I came up with estimates of what their contribution was in terms of time spent. And I submitted that. And I guess it's become part of the record.

Hr'g Tr. (Albert) at 96:9-97:2. While it may be true that ALC employees do not keep time sheets,

there certainly must be documentation of some type—even emails—that could at least partially

corroborate the allocation that is the factual underpinning of ALC's economic prong theory for all

of subsections (A), (B), and (C). That Dr. Albert did not review *any* materials or consult with any

colleagues—especially for the early 2016-2018 years—greatly diminishes the reliability of his

percentages. *See, e.g.*, Hr'g Tr. (Somayajula) at 262:8-11 ("Q. But you do believe that it was

appropriate to collect documents to try to have some data to figure out how much time each person

spent on a project, correct? A. Correct."). And that reliability is not helped by two employees

suggesting to Dr. Albert, after the fact, that their times were underestimations. Hr'g Tr. (Albert)

at 97:6-20. The Commission expects more from a complainant seeking to establish the existence

of an industry worthy of section 337 protection. *See, e.g.*, *Certain Electronic Candle Products

and Components Thereof*, Inv. No. 337-TA-1195, Comm'n Op. at 14 (Sept. 13, 2021) ("*Electronic*

160

*Candles*") ("Complainants must provide credible evidence to show these employees engage in cognizable activity despite their job titles if they want to rely on these labor expenditures to show a domestic industry."); *Certain Light-Emitting Diode Products, Systems, and Components Thereof (III)*, Inv. No. 337-TA-1168, Initial Determination at 122 (June 26, 2020) (recognizing from-memory allocation estimates "corroborated . . . with documents from employees, expenditure documents, calendar entries, project documentation, and discussions with current employees regarding their work on the DI Products.").

There are additional reasons to doubt Dr. Albert's from-memory percentages. To start, it should be difficult for anyone to remember the activities of thirteen individuals for each year of a five year period, as in the below table:

| Name | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 (Q1) |
| --- | --- | --- | --- | --- | --- | --- |



CDX-0005C.48; CX-0932C; RX-0484C at 14-15 (ALC contentions). And these from-memory values are oddly specific, with some individuals reported as contributing ███████ █, of their time. CX-0932C. This is indicative of some undisclosed calculation on the part of

**CONFIDENTIAL MATERIAL OMITTED**

Dr. Albert or, if truly taken from memory, an odd deviation from the expected rounding (*i.e.*, it is not reasonable to recall, from five years ago, a person's quarter of a percentage point of time).

It is also not clear how seriously Dr. Albert took the estimation process, because he was seemingly surprised that his estimations would be used for purposes of this investigation's record. Hr'g Tr. at 96:20-97:2 ("I just came up with what I thought, because I know what these people were working on . . .. And I guess it's become part of the record."). Additionally, 2018 is listed as the most intense for purposes of KBS and ███ activity. Yet, it appears very little was accomplished for ███████ between this time and 2020. *Compare* CX-0250C ███████ project concept document) *with* CX-0252C ███████ concept document, with similar level of detail). And in a discussion of 2019, Dr. Albert could not recall when the "pivot" from KBS to ███ occurred as between 2018 or 2019—even though this is exactly the knowledge needed to provide reliable time estimations. Hr'g Tr. (Albert) at 137:11-140:16.

There was also no confirmation, analysis, or any kind of evaluation of ALC personnel activities by ALC's expert, Dr. Akemann, for any of these times. Hr'g Tr. (Akemann) at 720:8-21 ("Q. And you provided no opinion with respect to nexus, correct? A. That's correct. I assumed AliveCor will be able to demonstrate that here, but I view that largely as a technical issue and I'm not offering any opinions on it. I'm making an assumption that that part of the requirement will be met."). And ALC may have also included the contributions of executives towards the DI Products without also figuring them into total personnel, although it is admittedly unclear if this makes a material difference. See RIB at 135. Taken altogether, there is simply more reason to doubt than to trust this critical allocation.

Accordingly, ALC has not presented sufficiently reliable subsection (A) investment amounts.

CONFIDENTIAL MATERIAL OMITTED

Nevertheless, one of Apple's primary arguments should be addressed.  Apple contends no investment behind the KBS should be counted at all due to its being abandoned in 2019, with only minimal customer support at the time of the complaint.  RIB at 130.  Apple highlights ALC's modest ██ plant and equipment investment in 2021 as an example of this *de minimis* activity.  *See id.* (citing RX-0314C).  Apple also cites *Certain Television Sets, Television Receivers, Television Tuners, & Components Thereof,* Inv. No. 337-TA-910, 2015 WL 6755093, at *38-46 (Oct. 30, 2015) ("*Television Sets*"), where the complainant's business surrounding the article no longer existed and domestic industry was denied.  Apple reasons, "[t]hus, any domestic industry with respect to KBS ceased to exist after KBS was discontinued."  RIB at 131.

Apple is incorrect.  The Federal Circuit confirmed the standard in *Television Sets*, which is "'past expenditures may be considered to support a domestic industry claim so long as those investments pertain to the complainant's industry with respect to the articles protected by the asserted [intellectual property] rights and the complainant is continuing to make qualifying investments at the time the complaint is filed.'"  *Hyosung TNS Inc. v. Int'l Trade Comm'n*, 926 F.3d 1353, 1361-2 (Fed. Cir. 2019) (citing *Television Sets*, Inv. No. 337-TA-910, 2015 WL 6755093, at *36).  There, the complainant had five-to-ten year old research and development investment it wanted to count based on a connection to present-day field service and repair costs.  *Id.*  The Federal Circuit agreed with the Commission that: (1) this was possible; and (2) appropriate given the sufficient nexus between the old research and new service activities.  *Id.*

The situation here is very similar.  For the year 2020, the last full calendar preceding the filing of the complaint, Apple acknowledges ██████ in KBS customer service labor and ████ in associated plant and equipment.  RIB at 139-140.  In the year prior, it was higher still.  That the first four months of 2021 saw ██████████████ is not all that surprising or dispositive.

And there is substantial evidence that *some* amount of R&D was also occurring at the time of the complaint, including research into, for example, ECG sensors and algorithms (KardiaAI) that has an obvious nexus to the ECG limitations of the asserted claims. CRB at 83 (citing Hr'g Tr. (Raghavan) at 567:10-569:12; Hr'g Tr. (Somayajula) at 198:13-19, 202:3-21; JX-0228C at 45:12-46:3); *see* RIB at 142-143 (denying R&D had nexus to the KBS product, not to asserted patent claims); JX-0096C.5-6; *but see* RRB at 75-76 (complaining that KardiaAI had little discovery and is not mentioned by name and thus cannot be "a key piece of patented technology" to supply nexus). Altogether, this is sufficient activity in April 2021 to justify looking back to 2016 in support of an industry that "exists" even though ALC's exact figures are not particularly reliable. As ALC phrases it, "[t]here is no question that, at the time the complaint was filed, AliveCor was engaged in 'some type of current activities related to the domestic industry.'" CRB at 81; *Hyosung*, 926 F.3d at 1361-2.

### b.      Subsection (B) – Labor and Capital

Considering subsection (B), "significant employment of labor or capital," ALC contends it "invests in labor and capital in the United States to develop, support, and obtain regulatory clearances related to the DI Products." CIB at 158. ALC first tallies its own company-wide investments in software, hardware, regulatory, and customer support teams from 2016 to 2021, as in the subsection (A) analysis, above. *Id.* (citing Hr'g Tr. (Akemann) at 657:15-660:2). To this amount, it adds costs related to "domestic contractors who performed development work, . . . prepared FDA applications, . . .and performed customer support work . . . related to the DI Products." *Id.* at 158-159. Then ALC applies the same per-employee time allocation used in conjunction with subsection (A) against these company-wide expenditures to arrive at the following labor amounts in support of the DI Products:

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|
| DI Internal Software R&D Labor | | | | | | | |
| DI Internal Hardware R&D Labor | | | | | | | |
| DI Contractor R&D Labor | | | | | | | |
| DI Regulatory Labor | | | | | | | |
| DI Customer Support Labor | | | | | | | |
| Total DI Labor Investments | | | | | | | |

*Id.* (citing Hr'g Tr. (Akemann) at 658:13-660:2; CDX-0001C.13; CPX-047C; CPX-048C; CPX-052C; CPX-053C; CX-0924C - CX-0928C).

The first two rows, internal hardware and software personnel, are not sufficiently reliable for a domestic industry that "exists" for the same reasons discussed above for subsection (A). They include labor directed, at least, to the ███, which did not exist by the time of the complaint; and they are rooted in the same dubious, from-memory, five-year, ███████ time allocations provided by Dr. Albert. CX-0924C.

The third row, R&D contractors, appears to be largely undisputed by Apple, however. It is not based on Dr. Albert's recollection but on business records of ALC payments to contractors. CX-0925C (citing CPX-0048C (ALiveITC_00024846) (█████████████████████████ ████████)). And Dr. Vander Veen does not challenge the records, but would remove certain projects that he views as ███████ rather than KBS—within years 2018-2021. This leaves an amount of ███████████████████

| AliveCor's Labor and Capital Investments in KardiaBand | | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Software R&D | | | | | | |
| Hardware R&D | | | | | | |
| Contractor R&D | | | | | | |
| Regulatory | | | | | | |
| Customer Support | | | | | | |
| Total DI | | | | | | |
| Total DI Labor vs. Total Labor (%) | | | | | | |

RDX-0004C.44 (annotation in original); *see* RX-0314C (citing "[O] and [W] Expert Report of Dr. Michael P. Akemann, December 22, 2021, at Exhibit 6. Tab 7. Adjusted Dr. Akemann's 2018 DI Contractor R&D Labor figure to exclude expenses related to the '███' project."). Since removing ███ investment is proper, and without any further objection, these contractor R&D amounts are accepted for purposes of subsection (B).

There is much dispute over the fourth row, regulatory investment. Apple argues it is overstated because two ALC witnesses stated regulatory work for KBS ended after it obtained FDA clearance in November 2017. RIB at 135 (citing JX-0225C (Raghavan) at 88:22-89:3 ("A. ███████████████████████████████████████████████████), 170:19-22); Hr'g Tr. (Albert) at 141:9-24 ("███████████████████████ ███████████)). Apple also argues a time-estimate allocation developed by Mr. Raghavan, similar to Dr. Albert's, is unreliable and cannot support any of the amounts including 2016-2017. *See id.* at 136-137.

As with the other categories, Apple is persuasive to the extent the investment should be limited to activity in support of KBS as opposed to other, non-practicing products. This indisputably includes the FDA submissions of 2016-2017, as none were made for ███ during this time. It would also likely include a portion of 2018, as this was the year the KardiaAI FDA

submission was filed, and KardiaAI is used in the KBS. CIB at 147; RRB at 74; Hr'g Tr. (Raghavan) at 575:19-23. Yet it is unclear what that portion should be. Mr. Raghavan estimated ██████████████████████████████████████████████████ which must be excluded. So to be conservative, 2018 is excluded entirely. And while Apple suggests that 2016-2017 is not reliable because "AliveCor was also working on regulatory submissions for ██████████████ ████████████████████████████████████" (RIB at 136), the cited testimony only refers generally to "regulatory activities" (JX-0225C (Raghavan) at 92:12-23). Mr. Raghavan's testimony likely referred to the group's quality function (████████████████████████████) and not FDA submission function. Hr'g Tr. (Raghavan) at 573:16-22 (two functions, regulatory and quality), 575:1-3 (██████████████████████████████████████████); *see* CRB at 86. ALC's figures, and allocation percentages, of 2016-2017 are otherwise reliable.

In reply, ALC contends the full set of 2016-2021 is appropriate because "[Apple] never disputes—or even mentions—████████████████████████████████████████████ ██ ██████████████████████████████████ CRB at 86 (citing Hr'g Tr. (Raghavan) at 568:19-569:12). Yet it is undisputed the KBS production was cancelled in 2019, such that this FDA submission cannot possibly be in support of it as a product.

As for the final row, customer support, there is no dispute that the cancellation of the KBS in 2019 does not affect these amounts, because previous purchasers continued to have service issues. And, since ████████████ have not been released, no amounts tied to these two products need be removed. Apple continues to contend the investment figures are overstated and unreliable, however. RIB at 137. Specifically, Apple argues the ████████████████████████████ ██████████████████████████████████████████████ and should not be credited to KBS. *Id.* (citing JX-0227C (White) at 148:24-149:11, 150:3-6, 151:9-12, 148:24-

**CONFIDENTIAL MATERIAL OMITTED**

149:11; Hr'g Tr. (Vander Veen) at 1001:8-22).  Apple also complains that very few of the tickets appear to concern SmartRhythm, which is a necessary feature to practice the claims, and suggests ALC's customer service contractor, ███, must be considered differently than ALC's internal team. *See id.* at 137-138.

Apple is partially persuasive.  Its expert, Dr. Vander Veen, does more to explain why the hardware unknown tickets should not be counted than ALC's expert, Dr. Akemann, explains why they should.  Hr'g Tr. (Vander Veen) at 1000:18-1001:22 ("the hardware unknown tickets do not appear to tie to the KardiaBand specifically"); Hr'g Tr. (Akemann) at 652:21-25 ("in some cases they don't know the product type and they record that too").  So they are removed from consideration, but as ALC notes, this makes little difference.  CRB at 87 (removal changes allocation from ███████████).  Apple's other points are not accepted.  It is not clear why ███ contractor costs require an allocation distinct from the one used for ALC's internal personnel; once KBS is shown to practice a claim of an asserted patent (above), customer support activities related to any part of that article can be counted—not just those associated with SmartRhythm.  The following customer support costs are therefore included in ALC's subsection (B) calculus: ███

████████████████████████████████████████████████████████████
███

Accordingly, the total amounts to be considered for significance, for an industry that "exists" under subsection (B), are as follows, with 2021 removed because data for just Q1 (up to the filing of the complaint) does not appear to be available, and with allocation percentages involving "Unknown Hardware" removed:

168

**CONFIDENTIAL MATERIAL OMITTED**

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|
| DI Contractor R&D Labor | | | | | | | |
| DI Regulatory Labor | | | | | | | |
| DI Customer Support Labor | | | | | | | |
| Total DI Labor Investments | | | | | | | |

*See generally* CX-0930C (customer support).

### c.    Subsection (C) – Licensing and Research and Development

Considering subsection (C), "substantial investment in its exploitation, including engineering, research and development, or licensing," ALC contends its R&D has always been in "critical components of a DI Product" such as KardiaAI, the KardiaApp, and SmartRhythm. *See* CIB at 162-163; *see* CRB at 74-75. ALC argues that investments in such critical components qualify. CIB at 163 (citing *Certain Beverage Brewing Capsules, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-929, Comm'n Op. at 82 (April 5, 2016); *Certain Electronic Digital Media Devices and Components Thereof*, Inv. No. 337-TA-796, Comm'n Op. at 99-100 (Sept. 6, 2013)); CRB at 83-84. ALC presents the following amounts for subsection (C) consideration:

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|
| Allocated R&D Expenses | | | | | | | |

**CONFIDENTIAL MATERIAL OMITTED**

CIB at 163 (citing, *inter alia*, Hr'g Tr. (Akemann) at 659:25-660:18; CX-0918C; CX-0920C; CX-0924C; CX-0925C). Dr. Akemann explains how these figures are simply the sums of previously calculated subsection (A) and (B) values:

> This shows the allocated R&D expenses in each year. It shows the derivation of the ███████ figure in the far right corner, which maps to the first slide of numbers that I put on the screen. So this shows the plant and equipment and labor expenses that just relate to the R&D group post-allocation, focusing in on a fraction of those expenses that I think are reasonably related to the three DI products at issue in this investigation.

Hr'g Tr. (Akemann) at 660:10-18.

In opposition, and on subsection (C) specifically, Apple argues all 2019-2021 figures must be eliminated because of testimony from Dr. Albert that "there was no investment in KBS after 2018." RIB at 141 (citing JX-0223 (Albert) at 249:16-20, 254:15-18, 255:21-24), 142-143. Apple also argues that ALC has failed to show sufficient nexus between the alleged investments and the asserted patents. *Id.* at 142 (citing *Certain Integrated Circuit Chips and Products Containing Same*, Inv. No. 337-TA-859, Comm'n Op., 2014 WL 12796437, at *22 (Aug. 22, 2014)). Apple highlights Dr. Akemann's admission that he has no opinion on the matter, and simply assumed nexus existed. *Id.* (citing Hr'g Tr. (Akemann) at 720:15-21).

ALC has not shown that a majority of its alleged investments for subsection (C) are sufficiently reliable. Unlike subsections (A) and (B), where a connection is made between an alleged investment and a patent-practicing product, a subsection (C) analysis requires a connection between the R&D investment and the asserted patents (*i.e.*, nexus). *See Electronic Candles*, Inv. No. 337-TA-1195, Comm'n Op. at 15-17 ("On remand, Complainants must show a nexus between the investments and the patented features of its candles specifically if they seek to show a domestic industry under subsection 337(a)(3)(C).")). The record certainly evidences a qualitative effort on the part of ALC to refine and improve features like SmartRhythm and KardiaAI—which have a

**CONFIDENTIAL MATERIAL OMITTED**

clear nexus to the heart rate and ECG analysis limitations recited in the Asserted Claims of the 941, 731, and 499 patents. *See, e.g.*, CIB at 162-163 (referring to work on "KardiaAI, the Kardia App, and SmartRhythm" as components of products).

But the *quantitative* amounts presented for ALC's subsection (C) theory are not derived from records or testimony concerning the amount of work ALC puts into these features. Rather, they are generated from the same per-employee, per-DI Product time estimates provided by Dr. Albert and found deficient above. *See* CIB at 163 ("Dr. Akemann calculated AliveCor's research and development investments using the same allocation methods discussed above."); *see also* CX-0918C (detailing facility investments for R&D using Dr. Albert's headcount estimates); CX-0920C (same for equipment); CX-0923 (same for hardware labor and software labor).

And a close review of ALC's evidence demonstrates why Dr. Albert's estimates are particularly not reliable for R&D. CX-0932C, a worksheet taken from the expert report of Dr. Akemann, displays Dr. Albert's employee time estimations (2016 – Q1 2021) alongside the estimations of Mr. Somajjula (Q2/Q3 2021). For those individuals working on the DI Products for both time periods, there is a marked decrease in the portion of their time spent as between the two estimations.



**CONFIDENTIAL MATERIAL OMITTED**

█████████████████. *Id.* ALC may argue these drops are due to the conservative calculus Mr. Somayajula applied (*see* Hr'g Tr. (Somayajula) at 223:17-225:21 (describing email/meeting records review with strict limits)), which is probably a contributing factor. But that Mr. Somayajula's methodology may actually be appropriate only casts more doubt over Dr. Albert's knowledge on the matter.

Adding to the dubiousness of ALC's numbers is the general lack of familiarity Dr. Albert displayed at the hearing concerning the development and status of the ███████ products, despite being someone allegedly "very involved in new product development":

> Well, as the common denominator in the company since the beginning, and as I'm very involved in new product development, I was asked last year to estimate the contribution of this list of people to KardiaBand, ████████████████████████████.

Hr'g Tr. (Albert) at 96:14-19. When asked about the basic existence of any manufacturing agreements ████████████████████████, he had no knowledge and indicated he would not even be the correct person to ask:

> Q. Okay. So AliveCor has not signed any manufacturing agreements ████████████████████████████, correct?
>
> A. I don't – you're talking to the wrong person on that one. I'm sorry.
>
> Q. You just don't know?
>
> A. yes, sir.
>
> Q. Okay. And you also don't know if █████ is going to be the manufacturer of the ███████ product, correct?
>
> A. You're right, I do not know about that either.

*Id.* at 143:25-144:10. Dr. Albert also did not have firsthand knowledge of how the ██████████ started or its current status:

> Q. AliveCor has not found any suitable customers for the ████████████ ██████ correct?

A. ███████████████████████████████████████████
██████████████████████, to be honest with you.

Q. Okay.

A. ███████████████████████████████████████████
████████████████████████ So that's my understanding.

Q. Thank you, Dr. Albert. If you could just answer my question, sir, I'll move on.
It is a fact that AliveCor has not found any ███████████████████████████
████████████████████████████████████

A. I have no idea actually.

Q. Okay. You know that ████████████████████████████████████
██████████████████ correct?

A. I have no knowledge of that whatsoever.

*Id.* at 149:18-150:5; *see id.* at 185:7-17. Even though the ███████████████

██—*i.e.*, the time period Dr. Albert was not asked to estimate—how the project started and its

current status should be basic knowledge for one who is "the common denominator in the company

since the beginning, and . . . very involved in new product development."

Dr. Albert even suggested he has never communicated with ██████████████ or other

matters: "Q. Well, you recognize that the product that you put on your slide is called ████████

███ right? A. No, I did not know that. I wasn't directly involved with the names of the

contracts, so I don't interface ████████████████████████████████████████

█████████████████████ " Hr'g Tr. (Albert) at 151:14-19. ████████████████

████████████████████████. Hr'g Tr. (Somayajula) at 206:4-7, 257:8-

18. But despite all this lack of knowledge, Dr. Albert later claimed to somehow know that

AliveCor helped ████████████████████████████████. *Id.* at 154:11-21.

**CONFIDENTIAL MATERIAL OMITTED**

Perhaps most tellingly, when shown a CAD image for a █████████ ████████████████—presented by ALC as evidence of the completeness of the design—Dr. Albert had no idea what it was:



Q. Let me try a different one. Can I have slide 44? You recall this one, right, Dr. Albert?

A. Yes.

Q. This is a 3D printed device, correct?

A. I don't know that that's what it is, but you've told me that's what it is, so I'll say yes.

Q. Well, sir, unfortunately I don't get to testify.

A. Well, the truth is, I've seen – I saw this device for the first time the day before yesterday, at least it brought down from our facility in Mountain View. So what I will tell you is I don't know how it was manufactured.

Hr'g Tr. (Albert) at 154:22-155:7. In confirmation of his lack of first-hand knowledge on this project, Dr. Albert testified, again, that he was the wrong person to ask questions about the status of the prototype:

174

Q. In fact, as of the date of the complaint, AliveCor did not have any ██████████ ██████████████████████, correct?

A. You're talking to the wrong person for that. You'd have to get somebody who knows that hardware part more than I do, that would have greater detail than I do, sir.

Q. So you just don't know one way or the other ████████████████ ████████████████████████

A. You're correct, I do not.

*Id.* at 170:16-25. And, following all of this testimony, Dr. Albert re-confirmed the estimations at the heart of ALC's subsection (A), (B), and (C) calculations were "simply my knowledge of the projects we had going at the time and what I thought those – how much of their time they were spending on the KardiaBand project or the ██████████████████████████. That's what I was asked to comment on." *Id.* at 186:22-187:1.

In sum, the most logical inference to draw is that Dr. Albert's estimations, on their own, are not sufficiently reliable for determining the quantitative value of ALC's R&D activities as they concern the Asserted Patents. Thus, the hardware labor, software labor, facilities, and equipment amounts in ALC's subsection (C) totals are disregarded.

This leaves payments made to R&D contractors, with those payments having been recorded in CPX-0048C and summed by Dr. Akemann. *See* CX-09236C (presenting totals for "DI Contractor R&D Labor" and citing "Exhibit 7b"); CX-0925C ("Exhibit 7b" and citing, via Bates Number, CPX-0048C). These are not tied to Dr. Albert's percentages, and unlike hardware labor, software labor, facilities, and equipment, CPX-0048C provides at least some description of the activity behind each cost that *suggests* a nexus to sensors, circuitry, and housing structure:



*See* CPX-0048C (Tabs "2017 QB," "NS 2018-2020").  And while no ALC witness explained any of these projects or relationships, and Dr. Akemann made clear he conducted no analysis on nexus (Hr'g Tr. (Akemann) at 720:8-21), Apple's expert, Dr. Vander Veen, also did not opine that any of these expenses have no nexus to the Asserted Claims (*see* Hr'g Tr. (Vander Veen) at 1012:9-16 (opinion limited to Dr. Akemann's lack of opinion)).  Thus, the contractor R&D expenses are accepted.

Accordingly, the total amounts to be considered for substantiality, for an industry that "exists" under subsection (C), are as follows:

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|
| Total DI R&D | | | | | | | |

*See* CX-0923C (DI Contractor R&D Labor).

### 2. "Significant" or "Substantial"

The next step in the evaluation of domestic industry is to determine if the investment amounts identified above are "significant," as in subsections (A) and (B), or "substantial," as in subsection (C). The most recent precedential decision by the Court of Appeals for the Federal Circuit addressing this determination is *Lelo*, which restated law applicable to a number of issues surrounding the economic prong of domestic industry. *See* 786 F.3d at 883-85. In particular, the Federal Circuit held that the statutory terms "'significant' and 'substantial' refer to an increase in quantity, or to a benchmark in numbers," and "[a]n 'investment in plant and equipment' therefore is characterized quantitatively, *i.e.*, by the amount of money invested in the plant and equipment." *Lelo*, 786 F.3d at 883. Continuing, the Federal Circuit held "[a]ll of the foregoing requires a quantitative analysis in order to determine whether there is a 'significant' increase or attribution by virtue of the claimant's asserted commercial activity in the United States." *Id.* In short, "[q]ualitative factors cannot compensate for quantitative data that indicate insignificant investment and employment." *Id.* at 885. The Commission has since made clear that some sort of comparative analysis must be made before significant or substantial can be found. *See, e.g., Gas Spring Nailers*, Inv. No. 337-TA-1082, Notice of Comm'n Determination at 3 (Dec. 12, 2019); *Certain Carburetors and Products Containing Such Carburetors*, Inv. No. 337-TA-1123, Comm'n Op. at 17-19 (Oct. 28, 2019) ("*Carburetors*").

As determined above, ALC has not presented sufficiently reliable figures for subsection (A) such that no determination need be made on significance. *Stud Finders*, Inv. No. 337-TA-1221, Comm'n Op. at 48, 50-51. The amounts established for subsections (B) and (C) above, however, are considered.

### a.    Subsection (B) – Labor and Capital

ALC argues its labor and capital expenditures in "a hardware development team, software development team, AI team, regulatory team, and customer support team" are qualitatively and quantitatively significant. CIB at 159-160. ALC presents its ████ figure from 2016 to 2021 as "approximately ███ of the total AliveCor labor and capital investments from 2016 to 2020" and refers to the testimony of Dr. Akemann to explain why this is "a significant percentage." *Id.* at 160 (citing, *inter alia*, Hr'g Tr. (Akemann) at 663:7-664:5). Alternatively, ALC argues for significance based on sales of KBS which "[f]rom 2018 to 2019 . . . accounted for ███ of AliveCor's hardware revenues and ███ of AliveCor's total revenues" and as compared to ██████ in payments to ████ for development of the ███. *See id.* at 160-161. With that said, ALC disputes that foreign development/manufacturing costs even need to be considered since "AliveCor's operations do not include manufacturing." CIB at 148 (citing *Certain Movable Barrier Operator Systems and Components Thereof*, Inv. No. 337-TA-1118, Comm'n Op. at 26 (Jan. 12, 2021) ("*Movable Barriers*"), 161 n.18 (same); *see* CRB at 90. And in reply, ALC points to the year 2018 "which, according to charts in Apple's brief, amounted to over ███ of AliveCor's overall labor and capital spend that year and over ███ of overall plant and equipment spend that year." CRB at 77.

Using the same quantitative contexts provided by ALC, significance has not been shown under subsection (B). ALC's labor of ██████ of 2016-2021 is closer to ████ of its total labor and capital investments from 2016 to 2020, instead of ALC's calculated ███. *See* CIB at 160. This is not a significant percentage on its own. And even though there is bound to be some additional domestic labor from currently uncounted ALC personnel due to Dr. Albert's otherwise-discounted estimation, it would not have made a material difference. ALC would have an internal labor investment (hardware and software) of ██████ from 2016-2017. CIB at 159. Adding this

to ALC's accepted labor of ███ creates ████ n, which is still only ██ of ALC's total labor and capital investment for 2016-2020.

More importantly, ALC's comparative approach is barely even relevant, because the fact that "a complainant may have substantial sales of other products is not pertinent to this analysis." *Carburetors*, Inv. No. 337-TA-1123, Comm'n Op at 28. A large company with many products may have a domestic industry based on one such product, even though it only accounts for a tiny percentage of the company's expenses; conversely, a small company with a single qualifying product may not have a domestic industry if the bulk of its investments are overseas. And in both cases, the most commonly accepted approach to proving a domestic industry is by substantiating either "the value added to the article in the United States by the domestic activities," or "the relative domestic contribution to the protected article by comparing complainant's product-related domestic activities to its product-related foreign activities." *Id.* at 19. Comparing DI labor and capital expenses to total ALC labor and capital expenses addresses neither of these metrics.

That the thousands of KBS products sold were likely manufactured overseas (*see* Hr'g Tr. (Akemann) at 646:6-12) makes ALC's comparison especially inapt, because it raises the possibility that ALC was a "mere importer[]." *Electronic Candles*, Inv. No. 337-TA-1195, Comm'n Op. at 8, 19; *Movable Barriers*, Inv. No. 337-TA-1118, Comm'n Op., Separate Views of Chair Kearns Regarding Economic Prong Issues at 2 (Jan. 12, 2021). This is so despite ALC's argument that manufacturing costs need not be considered. CIB at 161 n.18. Its cited case, *Movable Barriers*, merely held that a complainant's economic prong case does not automatically fail if the complainant fails to include foreign manufacturing costs:

> [W]hile foreign manufacturing costs may be relevant to proving that a complainant's investments are significant or substantial, Nortek has provided no authority that compels a finding that domestic investments cannot satisfy the

domestic industry requirement in the absence of presenting a comparison of foreign manufacturing costs to a complainant's U.S. investments.

Inv. No. 337-TA-1118, Comm'n Op. at 24. Yet the Commission also made clear that when manufacturing is entirely overseas (as with KBS) foreign investment is certainly relevant. *Id.* at 24, 26 n.10 ("This is not to say that foreign manufacturing data is irrelevant. Such evidence may be useful in evaluating the significance of a complainant's domestic activities where, [[ ]], the DI products are manufactured primarily (or exclusively) overseas."). In view of the payments ██ ███████████████████████████████, the foreign manufacturing expenses for KBS may have been in ████████████. *See* CIB at 161; JPX-0012C. Equally relevant are any foreign labor expenditures for development of the product, which in this case have not been called out clearly. *See, e.g.*, CPX-0048C (████████████████████████████ ████████████)); CX-0925 (████████████████████████████████).

On the whole, then, it is fair to infer that foreign labor investment, if proven, would weigh against a finding of significance. ALC's remaining quantitative context, the percentage of ALC total revenue provided by KBS, is not material because it does not involve investment at all, and is for a limited range of years. *See* CIB at 160 (highlighting that in 2018-2019, KBS supplied "██ of AliveCor's hardware revenues and ██ of AliveCor's total revenues.").

Accordingly, it has not been shown that ALC's investment in domestic labor in support of the KBS (and, therefore, the Asserted Patents) is "significant."

### b. Subsection (C) – Licensing and Research and Development

For the related question of a "substantial" domestic industry through its R&D activities, ALC contends its 2016 – Q1 2021 total is closer to ████████, and that this is substantial "for many of the same reasons the investments are significant under subprongs (A) and (B)." CIB at 164. ALC also offers that the amount is "approximately ██ of total AliveCor R&D expenses

over the period at issue." *Id.* (citing, *inter alia*, CX-0941C).  As with labor and capital under subsection (B), this comparison is not helpful.

Nonetheless, there is circumstantial quantitative evidence suggesting that ALC's R&D labor expenses overall, including for the DI Products, are mostly domestic.  Dr. Akemann opines that over the entire DI period ▮ of ALC's total headcount was domestic, of which ▮ worked in software and hardware R&D.  *See* CDX-0001C.16.  His underlying computation supports his opinion:



Exhibit 15
AliveCor Headcount by Team vs International Headcount by Team

CX-0937C.  After comparing domestic and foreign R&D headcount, especially for the period 2016-19, it is likely that ALC's internal R&D labor expenses for KBS were overwhelmingly domestic, even without allocation.

This conclusion is weakened only slightly by considering the R&D contractor expenses allocated to the DI Products of ▮, which were incurred almost entirely over the same period, as well as the 2020 - Q1 2021 headcount.  *See* CX-0925C.  Converting ▮ to headcount by conservatively assuming it is all for labor, and then dividing it by ALC's "Average Salary" in 2020, approximately ▮ were dedicated to DI-related contractor R&D between 2016 and 2020.  *See* CX-0050C (Tab "Salaries – All YE 20" (row 145)).

Even treating these contractor costs as foreign, it is still likely the DI-related R&D labor costs were substantially domestic, because the total domestic headcount of the software and

**CONFIDENTIAL MATERIAL OMITTED**

hardware teams for 2016-19 totaled ███████████. *See* CX-0937C. As for 2020 - Q1 2021, although "international" headcount jumped dramatically, domestic R&D headcount also increased, and in 2020 remained larger even than total international headcount (████████████ ██████████████████████). *See id.* And contractor costs for 2020 – Q1 2021 were negligible. *See* CX-0925C. Moreover, while ALC's record of R&D contractor payments do suggest a material amount of foreign payments towards the DI Products in 2016-2020 that have otherwise gone unaddressed in ALC's briefing (see CPX-0048C (Tabs "2016 PCH," "2017 QB, "NS 2018-2020 (see payments to PCH International)); CX-0935C (note: "Excludes expenses with Vendor Name of PCH International"), they only add up to ████████████████████████████). If this is the true extent of foreign R&D payments over this time and dedicated to the DI Products, then it only further supports the substantiality of the ████████ domestic spend.

On balance, therefore, ALC has demonstrated economic prong under subsection (C) by a preponderance of the evidence. Apple's argument in opposition largely rests on accepting the near-zero research and development costs in the KBS after 2018 as dispositive, as opposed to addressing whether or not the ALC's quantitative evidence is "substantial." *See* RIB at 141-143; Hr'g Tr. (Vander Veen) at 1012:2-22. Because ALC likely had a substantial domestic headcount relative to its foreign R&D labor expenses, Apple's argument is not persuasive.

The overall analysis here is troubling, to be sure. It is no secret that a domestic-to-foreign comparison is at least the preferred method of proving economic prong. *See Carburetors*, Inv. No. 337-TA-1123, Comm'n Op at 17-19. The parties were even warned at the end of the evidentiary hearing that "you need to compare foreign and domestic investments." Hr'g Tr. at 1312:17-18. For whatever reason, however, ALC has seemingly taken the position that no such comparison is needed. Fortunately for ALC, Dr. Akemann assembled a sufficiently detailed and pertinent

headcount comparison showing it more likely than not that DI-related R&D labor expenses were substantially domestic.

Accordingly, ALC has met the economic prong under subsection (C) for a domestic industry that "exists."

### B.    Domestic Industry in the Process of Being Established

ALC contends, "if AliveCor does not have an ongoing domestic industry, its investments related to ███████████ demonstrate an industry in the process of being established." CIB at 164. ALC continues:

> A domestic industry is in the process of being established when the complainant "demonstrate[s] that [it] is taking the necessary tangible steps to establish an industry" and that there is a "significant likelihood that the industry requirement will be satisfied in the future." *Certain Stringed Musical Instruments*, Inv. No. 337-TA-586, Comm'n Op., at 13 (May 16, 2008) (quotation marks omitted). The complainant need not establish that its practicing article is a product that has been or will be commercialized. *See Certain Non-Volatile Memory Devices*, Inv. No. 337-TA-1046, Comm'n Op., at 40-44 (Oct. 26, 2018). Past research and development investments combined with evidence of "further planned work to be undertaken in order to bring [an] industry to fruition within the foreseeable future" is sufficient. *Id.* at 44.

*Id.* at 164-165. ALC concentrates on investments from 2018-2021 to demonstrate the work that has already been done for the domestic industry in the process of being established. *Id.* at 165, 167-169 (broken out per subsection (A), (B), (C)). ALC adds that the 2018-2021 amounts are "significant" or "substantial" for generally the same reasons as the previous 2016-2021 amounts. *See id.* CIB at 167-169.

Referring back to the standard, ALC points to the "tangible steps" it presently takes to achieve prototype ███████████ that run the KardiaApp (with KardiaAI), and those arrangements it has made for future FDA submissions. *See* CIB at 165-166; CRB at 91 ("all of the components on the ███████████████████████████."), 93. As for a likelihood of success, ALC points to its timelines for moving from ███████████████

**CONFIDENTIAL MATERIAL OMITTED**

████████████████████████████████████████████, among other documentary evidence. *See* CIB at 166.

In response to Apple, ALC disputes that it has provided no "'financial forecast, sales projection, budget, planned investment, marketing plan, or manufacturing agreement for the ████ ████'" and points to the press release frequently asked questions (PRFAQ) document it created, a development plan, "a plan specific to ████████████████████████" and a purchase order for EVT and PVT work ██████████ CRB at 92 (citing, *inter alia*, JX-0095C; JX-0090C; JX-0096C; CX-0485C). ALC rejects any contention that its materials amount to one or two CAD drawings, as the Commission has found insufficient in the past. *Id.* at 93 (citing *Thermoplastic Motors*, 2019 WL 9596564, at *8). ALC concludes that even if the ██████████ projects take years to commercialize, those years will be filled with relevant, recognizable investment. *See id.* at 94.

ALC has not shown a domestic industry is "in the process of being established." Much like its approach to a domestic industry that "exists," ALC pins its case on investments in support of certain patent-practicing products—in this case, the ██████████—as opposed to investments in research and development work with direct nexus to the Asserted Patents—*e.g.*, KardiaAI or SmartRhythm. This is problematic, because the evidence as of the complaint filing (April 20, 2021) does not convincingly demonstrate "a significant likelihood that the industry requirement will be satisfied in the future" for either product. *Thermoplastic Motors*, Inv. No. 337-TA-1073, Comm'n Op. at 11 (citing *Stringed Instruments*, Inv. No. 337-TA-1073, Comm'n Op. at 13).

This can be seen by examining ALC's contentions. For subsection (A) it refers to an amount of ██████ spent from 2018 up to the complaint and argues, "it is reasonable to expect plant and equipment investments in the ██████████ to continue in the future given the

CONFIDENTIAL MATERIAL OMITTED

concrete plans to continue product development and regulatory submission work." CIB at 167. Even if this number were reliable, which it is not per Dr. Albert's estimations, it is not clear that the amount would constitute a significant value-add to the ███████ products. Both of these products, if commercialized, are expected to be manufactured overseas. Hr'g Tr. (Akemann) at 686:22-4 (██), 700:2-12 (██); JX-0095C.1. If, for example, $4.5 million is spent in facilities and equipment to produce these products over three years, then ALC's domestic contribution comes to approximately ██ This value-add is of questionable significance.

Even then, it is not clear the efforts of ALC personnel (leading to time estimations, which provide facility and equipment values) will continue as alleged. ALC's plan for ██, in particular, ████████████████████████████████████████████ ████████████████████—the equivalent of a license. *See* JX-0095C (PRFAQ document). Such activities shortly before filing the complaint (JX-0008) certainly constitute a "necessary tangible" step, but it cannot be said there is a "significant likelihood" that economic prong will be satisfied given ALC's current plans.

ALC witness testimony, contractor invoices, and project summary reports overwhelmingly show that "necessary tangible" steps to developing the ██ were taken across 2018 - Q1 2021. *See, e.g.*, Hr'g Tr. (Somayajula) at 2015:9-206:7; Hr'g Tr. (Raghavan) at 568:16-570:15; CPX-0048C (Tabs "2017 QB," "NS 2018-2020"); JX-0152C; JX-096C. Yet, at the time of the complaint, the product did not even ████████████. Thus, a substantial, further, amount of research and development is needed before ██ can be entered into a study, qualified by the FDA, or marketed, among other things. *See* RIB at 147 (citing Hr'g Tr. (Albert) at 185:7-23, 158:8-15; Hr'g Tr. (Somayajula) at 252:18-22), 149.

Whether or not ALC will undertake this effort, and whether or not it takes place domestically—as evaluated at the time of the complaint—is unclear.  ALC's expenses show it has R&D contacts overseas (CPX-0048C) and its internal time estimations indisputably show fewer and fewer of its own employees working on the project (CDX-0005C.48).  Indeed, not one person dedicates ████████████ to getting this new product off the ground (*see* CDX-0005C.48) , and it appears in 2020 that ALC has begun a concerted push to hire substantially more foreign personnel (*see* CX-0937C; CPX-0048C (Tab "Salaries-all YE 20")).  And as Dr. Vander Veen persuasively testified, without dispute from Dr. Akemann, there are no records of planned investment or forecasting revenue for the project:

> Here what I think is really important is what you would expect to see in terms of business plans or financial plans for -- if there were to be significant investments, you know, in the future.
>
> If there were plans for -- if there were going to be significant investments for this domestic industry, I would expect to see that there would be plans for those investments, and, even more than that, that there would be management review, approval, and even potential board approval of such investments.
>
> We don't see any planned investments or documents to support investments here related to ████████████████████████████
> ████████████████████████ We don't see approved budgets for this ongoing or future work. There's no financial forecast or sales forecasts. ████████████████████ -- there's been no public announcement of either of these products or launch of these products.
>
> ██████████████████████████████████████████
> ██████████████████████████████████████████
>
> So I think, as we look at this, these factors, it doesn't -- it doesn't support that there's a significant likelihood of domestic industry for these two products that are in the process of being established. I think this is true both at the time of the filing of the complaint and all of these elements appear to be true even today.

Hr'g Tr. (Vander Veen) at 1013:7-25; *see* Hr'g Tr. (Akemann) at 686:5-10 ("I don't recall seeing any financial planning documents that project out investments, for example, that's correct.").

**CONFIDENTIAL MATERIAL OMITTED**

These documents would have been the exact "concrete plans" ALC alleges exist.  CIB at 167.  The more reasonable inference, then, is that ███ is in more of an exploration phase as opposed to a planned commitment.  *See* JX-0152C ████████████████████████████████████ defining "product definition, feature expectations, and product risks").  Thus, ALC has not shown—at the time of the complaint—a "significant likelihood" economic prong will be met through ███.

Accordingly, it has not been shown that a domestic industry under subsection (A) is "in the process of being established" through the ████████████

The same determination is warranted for subsection (B).  Here, ALC refers to ████████ in labor that it spent from 2018 – Q1 2021, and reasons, again, that it "expect[s] these investments to continue in the future given the concrete plans to continue product development and regulatory submission work."  CIB at 168.  Not only is this amount not reliable as built upon Dr. Albert's time estimations, but it does not overcome the overall plan for ████████████████ ████████████████████████

Similarly, for subsection (C), ALC points to ████████ it spent on R&D from 2018 – Q1 2021.  CIB at 169.  Although not stated, it is assumed ALC contends a similar amount can be expected to be further invested as in subsections (A) and (B).  Again, this number is not particularly reliable, and in any event it is not clear that the amount previously spent will be spent again going forward, within the United States by ALC, or overseas by ALC or by a contractor.

Accordingly, it has not been shown that a domestic industry under subsections (A), (B), or (C) is "in the process of being established" through the ████████████.

## VIII.  CONCLUSIONS OF LAW

1.      ALC has proven infringement of claims 12, 13, 19, 20, 21, 22, and 23 of U.S. Patent No. 10,683,941 by the Accused Products.

2.    ALC has proven infringement of claims 1, 3, 5, 8, 9, 10, 12, 15, and 16 of U.S. Patent No. 10,595,731 by the Accused Products.

3.    ALC has not proven infringement of claims 16 or 17 of U.S. Patent No. 9,572,499 by the Accused Products.

4.    Apple has not proven any claim of U.S. Patent No. 10,683,941 invalid.

5.    Apple has proven claims 1, 8, 12, and 16 of U.S. Patent No. 10,595,731 are invalid as obvious under 35 U.S.C. § 103, and otherwise has not proven any claim invalid.

6.    Apple has proven claim 17 of U.S. Patent No. 9,572,499 is invalid for lack of patentable subject matter under 35 U.S.C. § 101, and otherwise has not proven any claim invalid.

7.    ALC has proven the existence of a domestic industry as required by 19 U.S.C. § 1337(a)(2) for U.S. Patent Nos. 10,683,941, 10,595,731, and 9,572,499, in that it has proven that a domestic industry exists that practices at least one valid claim of each patent.

8.    There is a violation of section 337 with respect to U.S. Patent No. 10,683,941.

9.    There is a violation of section 337 with respect to U.S. Patent No. 10,595,731.

10.    There is no violation of section 337 with respect to U.S. Patent No. 9,572,499.

## IX.    RECOMMENDED DETERMINATION ON REMEDY AND BOND

The Commission's Rules provide that subsequent to an initial determination on the question of violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, the administrative law judge shall issue a recommended determination concerning the appropriate remedy in the event that the Commission finds a violation of section 337, and the amount of bond to be posted by respondent during Presidential review of the Commission action under section 337(j). *See* 19 C.F.R. § 210.42(a)(1)(ii).

The Commission has broad discretion in selecting the form, scope, and extent of the remedy in a section 337 proceeding. *Viscofan, S.A. v. Int'l Trade Comm'n*, 787 F.2d 544, 548 (Fed. Cir. 1986). Under Section 337(d)(1), if the Commission determines as a result of an investigation that there is a violation of section 337, the Commission is authorized to enter either a limited or a general exclusion order. 19 U.S.C. § 1337(d)(1). A limited exclusion order instructs the U.S. Customs and Border Protection ("CBP") to exclude from entry all articles that are covered by the patent at issue and that originate from a named respondent in the investigation. A general exclusion order instructs the CBP to exclude from entry all articles that are covered by the patent at issue, without regard to source. *Certain Purple Protective Gloves*, Inv. No. 337-TA-500, Comm'n Op. at 5 (Dec. 22, 2004). Under section 337(f)(1), the Commission may issue a cease and desist order in addition to, or instead of, an exclusion order. 19 U.S.C. § 1337(f)(1). The Commission generally issues a cease and desist order directed to a domestic respondent when there is a "commercially significant" amount of infringing, imported product in the United States that could be sold, thereby undercutting the remedy provided by an exclusion order. *See Certain Crystalline Cefadroxil Monohydrate*, Inv. No. 337-TA-293, USITC Pub. 2391, Comm'n Op. on Remedy, the Public Interest and Bonding at 37-42 (June 1991); *Certain Condensers, Parts Thereof*

*and Prods. Containing Same, Including Air Conditioners for Automobiles*, Inv. No. 337-TA-334 (Remand), Comm'n Op. at 26-28 (Sept. 10, 1997).

Additionally, during the 60-day period of Presidential review under 19 U.S.C. § 1337(j), "articles directed to be excluded from entry under subsection (d) . . . shall . . . be entitled to entry under bond prescribed by the Secretary in an amount determined by the Commission to be sufficient to protect the complainant from any injury." *See* 19 U.S.C. § 1337(j)(3). "The Commission typically sets the bond based on the price differential between the imported infringing product and the domestic industry article or based on a reasonable royalty. However, where the available pricing or royalty information is inadequate, the bond may be set at one hundred (100) percent of the entered value of the infringing product." *Certain Industrial Automation Systems and Components Thereof Including Control Systems, Controllers, Visualization Hardware, Motion and Motor Control Systems, Networking Equipment, Safety Devices, and Power Supplies*, Inv. No. 337-TA-1074, Comm'n Op. at 13 (Apr. 23, 2019) ("*Automation Systems*") (public version) (citation omitted).

## A.   Limited Exclusion Order

Should a violation be found, there is no dispute that a limited exclusion order ("LEO") should issue against Apple. *See* CIB at 171 ("cover[ing] all infringing products imported by or on behalf of Apple or its agents"); *see generally* RIB at 167-169, 173-175; RRB at 95-98, 99-100; SIB at 88. Apple argues the order should, however, include a standard certification provision (RIB at 169) and a number of other modifications.

First, Apple seeks a stay of any remedial order until two conditions are met:

(1) the PTAB has issued its final written decision in the now-instituted IPRs Apple filed on the Asserted Patents, and (2) AliveCor submits evidence that it has a protectable domestic industry product that has been FDA cleared and has commercially launched in the U.S. so as to avoid harming consumers.

190

RIB at 167-168, 173-175; RRB at 99-100. This request is denied. Apple's cited case, *Certain Laparoscopic Surgical Staplers, Reload Cartridges, and Components Thereof*, concerned an issued final written decision, not the mere institution of an IPR as is the present situation. Inv. No. 337-TA-1167, Comm'n Op. at 64 (Dec. 20, 2021). And the proposed domestic industry/FDA restriction goes well beyond a more typical reporting requirement and is otherwise vague. To the extent it is justified by public interest considerations (RIB at 174-175 ("it is U.S. consumers who will suffer . . .")), those have not been delegated to this proceeding and are reserved for Commission review. *See* 86 Fed. Reg. 28382 (May 26, 2021).

Second, Apple seeks an exception for repair, replacement, and warranty, with mention of additional public interest considerations. RIB at 168; RRB at 95-97; *see* RIB at 169-170. This too is reserved for Commission review. *See* 86 Fed. Reg. 28382 (May 26, 2021).

Third, Apple seeks an exemption "where the ECG app is either not used in or removed from the accused products because such products would be noninfringing products." RIB at 168. Apple also proposes any use or purchase by persons under 22 be exempt because the ECG feature is not meant for that group. *Id.* at 168-169. All of these requests are denied. Apple has not even attempted to show why a product which has not been used—or used, but by persons under the age of 22, or purchasers under 22—would not continue to infringe the asserted claims. Very likely, they would. Even then, once-infringing products modified to avoid infringement are intended for full fact gathering under section 337 modification proceedings. 19 C.F.R. § 210.76; *Certain Laparoscopic Surgical Staplers, Reload Cartridges, and Components Thereof*, Inv. No. 337-TA-1167, Comm'n Op. at 60 (Dec. 20, 2021).

Fourth, Apple seeks a standard certification provision without opposition. RIB at 169; *see* SIB at 92; *see generally* CIB; CRB. Certification provisions are known to "aid U.S. Customs and

**CONFIDENTIAL MATERIAL OMITTED**

Border Protection ('CBP') in enforcing Commission orders but 'do not mandate that CBP accept certification as proof that the articles in question are not covered' by the limited exclusion order." *Certain Robotic Vacuum Cleaning Devices and Components Thereof Such as Spare Parts*, Inv. No. 337-TA-1057, Comm'n Op. at 55 (Feb. 1, 2019). As "it has been Commission practice for the past several years to include certification provisions in its exclusion orders to aid CBP" (*see Certain Road Milling Machines and Components Thereof*, Inv. No. 337-TA-1067, Comm'n Op. at 15, 15 n. 5 (July 18, 2019) (citations omitted)), it is therefore recommended that in the event a limited exclusion order issues, it should include the Commission's standard certification provision.

### B.    Cease and Desist Order

Should a violation be found, ALC argues a cease and desist order ("CDO") should issue. CIB at 172. ALC references a stipulation from Apple that it "'will not dispute that it currently maintains a commercially significant inventory of the Accused Apple Products in the United States at the time hearing evidence is submitted in this Investigation.'" *Id.* at 173 (citing CX-0904C.3). Per that stipulation, ALC reports "a domestic inventory of ▆▆▆ units that cumulatively value at over ▆▆▆▆▆▆" and argues it is "commercially significant" as well as an underestimation. *See id.* at 173. As with the LEO, ALC contends Apple's requested modifications to the CDO are inappropriate. *See* CRB at 94-95. The Staff agrees with ALC. SIB at 88; SRB at 89. Apple does not contest the issuance of a CDO but urges its list of LEO modifications should apply. *See* RIB at 167-170, 173-175; RRB at 95-98, 99-100.

Complainants bear the burden on the issue of cease and desist orders. *Certain Microfluidic Devices*, Inv. No. 337-TA-1068, Comm'n Op. at 23 (Jan. 10, 2020). Such orders "are generally issued when, with respect to the imported infringing products, respondents maintain commercially significant inventories in the United States or have significant domestic operations that could

CONFIDENTIAL MATERIAL OMITTED

undercut the remedy provided by an exclusion order." *Id.* at 22-23 (citations omitted).    Given the stipulation referenced above, this inventory requirement is certainly met for Apple, and it is my recommendation that a cease and desist order issue against this respondent. *See* CX-0904C.3.

**C.    Bond**

The Commission has held that "[t]he complainant bears the burden of establishing the need for a bond" during the Presidential Review period. *See Robotic Vacuums*, Inv. No. 337-TA-1057, Comm'n Op. at 68.    The amount of the bond is, generally, set "to be sufficient to protect the complainant from any injury." 19 U.S.C. § 1337(e)(1), (j3).

ALC argues a bond is necessary.    CIB at 173.    ALC refers to Apple internal documents showing Apple believes ALC's products are competitive with Apple Watches and reasons, "[t]he injury to AliveCor is plain." *Id.* at 173-174; *see* CRB at 96.    ALC explains, however, that a direct price comparison is impractical due to the nature of the KBS product being an accessory to unaccused Apple Watch models, with the accused products being whole Apple Watch products themselves.    *See* CIB at 174 (citing Hr'g Tr. (Akemann) at 638:18-639:15).    Thus, ALC looks to licensing evidence—in particular, the ██████████—which it alleges supports an ████ $13 per-unit bond. *Id.*; CRB at 96.

Apple rejects any bond.    RIB at 170.    Apple argues that a bond is not meant as punishment or a deterrent to importation, but solely to offset any competitive advantage the respondent may have by virtue of the offending imports. *See id.* at 170-171 (collecting cases); RRB at 98.    Apple continues:

> Should the Commission issue a bond, it should be set at zero because AliveCor does not compete with the accused Apple Watches, and has failed to prove that it would be injured by the importation of the accused Apple Watches, or that Apple enjoys a competitive advantage resulting from its alleged infringement.

**CONFIDENTIAL MATERIAL OMITTED**

RIB at 171 (citing Hr'g Tr. (Vander Veen) at 1021:6-14, 1050:21-1051:4).  Like ALC, Apple cites to ALC internal documents suggesting ALC and Apple are not competitors in this space (*id.* at 172; RRB at 98), and otherwise argues ALC's $13 royalty is inappropriate based on the terms of the ███████████████████████████████████████████████████████████████ ████████████████.

The Staff agrees with Apple, finding the evidence fails to support a $13 bond rate due, in part, to ██████████████████████████████████████████████████████████████ ████████████████████████████████ SIB at 94 (citing JX-0008C.4; Hr'g Tr. (Vander Veen) at 1049:11-25); SRB at 52 ("AliveCor has not offered any evidence or set forth any arguments as to what portion of the ██████████ is attributable ████████████████ as opposed to the asserted patents.").  Thus, according to the Staff, the bond rate should be zero.  SIB at 94; SRB at 52.

ALC has not met its burden for a bond requirement.  The presidential review period is short (60 days), compared to the possible lifetime of an LEO or CDO (years).  It is entirely unclear what competitive harm ALC will face during this time as the KBS product has not been sold for some time (Hr'g Tr. (Albert) at 135:14-136:22) and ██████████ are, at best, in development.  And as for a reasonable royalty, Staff persuasively argues that the ███████████████████████████████ ██████████████████████████████████ (JX-0008C.1-3 ("2.1 ████████████████ ████████████████████████)) in addition to a right to use the asserted patents.  In fact, if ALC's contentions surrounding its contributions to the art are to be believed, then ██████████ must be of significant value.  *See, e.g.*, CIB at 67 (referring to ALC's ground breaking and unconventional "configuration of sensors and algorithmic instructions"); CRB at 47 (alleging copying through ████████████████████████████████████████████████████).  With Apple using its own software, the $13 rate is demonstrably too high.  As ALC has not offered alternative proposals reflecting this

reality, it has not met its burden.  It is therefore recommended no bond should issue in the event of a violation.

## X.    INITIAL DETERMINATION AND ORDER

Based on the foregoing,[1] it is my Initial Determination that there is a violation of Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain wearable electronic devices with ECG functionality and components thereof in connection with the asserted claims of U.S. Patent Nos. 10,638,941 and 10,595,731.  There has been no violation of U.S. Patent No. 9,572,499.

The undersigned hereby certifies to the Commission this Initial Determination, together with the Record of the hearing in this investigation consisting of the following: the transcript of the evidentiary hearing, with appropriate corrections as may hereafter be ordered; and the exhibits accepted into evidence in this investigation.[2]

Pursuant to 19 C.F.R. § 210.42(h), this Initial Determination shall become the determination of the Commission sixty (60) days after the date of service of the Initial Determination, unless a party files a petition for review of the Initial Determination within twelve (12) days after service of the Initial Determination pursuant to 19 C.F.R. § 210.43(a) or the Commission, pursuant to 19 C.F.R. § 210.44, orders on its own motion, a review of the Initial Determination or certain issues therein.  Any issue or argument not raised in a petition for review,

---

[1]    The failure to discuss any matter raised by the parties or any portion of the Record herein does not indicate that said matter was not considered.  Rather, any such matter(s) or portion(s) of the Record has/have been determined to be irrelevant, immaterial or meritless.  Arguments made on brief which were otherwise unsupported by Record evidence or legal precedent have been accorded no weight.

[2]    The pleadings of the parties filed with the Secretary need not be certified as they are already in the Commission's possession in accordance with Commission rules.

or response thereto, will be deemed to have been abandoned and may be disregarded by the Commission in reviewing the Initial Determination pursuant to 19 C.F.R. § 210.43(b) and (c).

196

**Confidentiality Notice:**

This Initial Determination is being issued as confidential, and a public version will be issued pursuant to Commission Rule 210.5(f). Within seven (7) days of the date of this Initial Determination, the parties shall jointly submit: (1) a proposed public version of this opinion with any proposed redactions bracketed in red; and (2) a written justification for any proposed redactions specifically explaining why the piece of information sought to be redacted is confidential and why disclosure of the information would be likely to cause substantial harm or likely to have the effect of impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions.[3]

**SO ORDERED.**

Cameron Elliot
Administrative Law Judge

---

[3] Under Commission Rules 210.5 and 201.6(a), confidential business information includes: information which concerns or relates to the trade secrets, processes, operations, style of works, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, or amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, or other information of commercial value, the disclosure of which is likely to have the effect of either impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions, or causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained, unless the Commission is required by law to disclose such information. *See* 19 C.F.R. § 201.6(a). Thus, to constitute confidential business information the disclosure of the information sought to be designated confidential must likely have the effect of either: (1) impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions; or (2) causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained.

197

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

**In the Matter of**

**CERTAIN WEARABLE ELECTRONIC**
**DEVICES WITH ECG FUNCTIONALITY**
**AND COMPONENTS THEREOF**

**Inv. No.  337-TA-1266**

**ORDER NO. 12:     CONSTRUING THE TERMS OF THE ASSERTED CLAIMS OF**
**THE PATENTS AT ISSUE**

(November 4, 2021)

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................1

II.     IN GENERAL .....................................................................................1

III.    RELEVANT LAW ..............................................................................2

IV.     OVERVIEW OF THE ART AND THE LEVEL OF ORDINARY SKILL........................6

V.      THE ASSERTED PATENTS ..............................................................8

        A.      The 499 Patent .........................................................................8

        B.      The 731 Patent .......................................................................10

        C.      The 941 Patent .......................................................................11

VI.     CLAIM CONSTRUCTION ..............................................................12

        A.      Construction of the Agreed-Upon Claim Term .....................12

        B.      Construction of the Disputed Claim Terms ..........................13

                1.      499 Patent – Preambles ...............................................13

                2.      499 Patent – "alerting said first user to sense an electrocardiogram"/ "alert" ...................................................15

                3.      499 Patent – "heart rate sensor" ................................17

                4.      499 Patent – Order of Method Steps ...........................19

                5.      731 Patent – "confirm the presence of the arrhythmia based on the ECG data" / "confirming the presence of the arrhythmia based on the ECG data" ...................................................20

                6.      731 Patent – Order of Method Steps ..........................22

                7.      941 Patent – "to confirm a presence of the arrhythmia" / "to confirm the presence of the arrhythmia" ...................................................24

                8.      941 Patent – "when the activity level is resting" / "when the activity level value is resting" ...................................................27

                9.      941 Patent – "discordance" ........................................30

                10.     941 Patent – Order of Method Steps ...........................30

# I.     INTRODUCTION

This investigation was instituted by the Commission on May 20, 2021 to determine whether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain wearable electronic devices with ECG functionality and components thereof by reason of infringement of one or more of claims 1-23 of U.S. Patent No. 10,638,941 ("the 941 patent"), claims 1-30 of U.S. Patent No. 10,595,731 ("the 731 patent"), and claims 1-4, 6-14, and 16-20 of U.S. Patent No. 9,572,499 ("the 499 patent"). *See* 86 Fed. Reg. 28382 (May 26, 2021). The Complainant is AliveCor, Inc. ("AliveCor"), the Respondent is Apple Inc. ("Apple"), and the Office of Unfair Import Investigations ("Staff") is a party. *See id*.

No *Markman* hearing was held. However, the parties filed joint proposed claim construction charts setting forth a limited set of terms to be construed, and also filed claim construction briefs.[1]

# II.     IN GENERAL

The claim terms addressed below are construed for the purposes of this investigation, and those terms not in dispute need not be construed. *See Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1323 (Fed. Cir. 2004) (noting that the administrative law judge need only construe disputed claim terms). The meaning of any claim terms not presently disputed will be addressed in connection with the evidentiary hearing.

---

[1] For convenience, the briefs and chart submitted by the parties are referred to as:

| | |
|---|---|
| CIMB | Complainant's Initial Markman Brief |
| CRMB | Complainant's Reply Markman Brief |
| RIMB | Respondent's Initial Markman Brief |
| RRMB | Respondent's Reply Markman Brief |
| SIMB | Staff's Initial Markman Brief |
| JC | Joint Disclosure of Proposed Claim Constructions |

### III.    RELEVANT LAW

"An infringement analysis entails two steps.  The first step is determining the meaning and scope of the patent claims asserted to be infringed.  The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*) (internal citations omitted), *aff'd*, 517 U.S. 370 (1996). Claim construction is a "matter of law exclusively for the court." *Id.* at 970-71.  "The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000).

Claim construction focuses on the intrinsic evidence, which consists of the claims themselves, the specification, and the prosecution history.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*); *see also Markman*, 52 F.3d at 979.  As the Federal Circuit in *Phillips* explained, courts must analyze each of these components to determine the "ordinary and customary meaning of a claim term" as understood by a person of ordinary skill in art at the time of the invention.  415 F.3d at 1313.  "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)); *see Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point [ ] out and

2

distinctly claim [ ] the subject matter which the patentee regards as his invention."). The context in which a term is used in an asserted claim can be "highly instructive." *Phillips*, 415 F.3d at 1314. Additionally, other claims in the same patent, asserted or unasserted, may also provide guidance as to the meaning of a claim term. *Id*. "Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999).

The specification "is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *K-2 Corp.,* 191 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." 191 F.3d at 1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id*. As a general rule, however, the particular examples or embodiments discussed in the specification are not to be read into the claims as limitations. *Id.* at 1323. In the end, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be . . . the correct construction." *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

In addition to the claims and the specification, the prosecution history should be examined, if in evidence. *Id.* at 1317; *see Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). The prosecution history can "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317; *see Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1384 (Fed. Cir.

3

2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.").

When the intrinsic evidence does not establish the meaning of a claim, then extrinsic evidence (*i.e.*, all evidence external to the patent and the prosecution history, including dictionaries, inventor testimony, expert testimony, and learned treatises) may be considered. *Phillips*, 415 F.3d at 1317. Extrinsic evidence is generally viewed as less reliable than the patent itself and its prosecution history in determining how to define claim terms. *Id.* "The court may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999).

The construction of a claim term is generally guided by its ordinary meaning. However, courts may deviate from the ordinary meaning when: (1) "the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention;" or (2) "the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history." *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("the specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."); *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender."); *Rheox,*

4

*Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."). Nevertheless, there is a "heavy presumption that a claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citations omitted). The standard for deviating from the plain and ordinary meaning is "exacting" and requires "a clear and unmistakable disclaimer." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012); *see Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009) (requiring "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope" to deviate from the ordinary meaning) (citation omitted). As the Federal Circuit has explained, "[w]e do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that." *Thorner*, 669 F.3d at 1366.

Courts are not required to construe every claim limitation of an asserted patent. *See O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (citations omitted). Rather, "claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *Id.* at 1362 (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)); *see also Embrex*, 216 F.3d at 1347 ("The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims.") (citation omitted). In addition, "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro*, 521 F.3d at 1361. Claim construction, however, is not an "obligatory exercise in redundancy." *U.S. Surgical Corp.*, 103 F.3d

5

at 1568. "[M]erely rephrasing or paraphrasing the plain language of a claim by substituting synonyms does not represent genuine claim construction." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004).

A claim must also be definite. Pursuant to pre-AIA 35 U.S.C. § 112, second paragraph: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. In *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014), the Supreme Court held that § 112, ¶ 2 requires "that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Id.* at 2129. A claim is required to "provide objective boundaries for those of skill in the art," and a claim term is indefinite if it "might mean several different things and no informed and confident choice is among the contending definitions." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). A patent claim that is indefinite is invalid. 35 U.S.C. § 282(b)(3)(A).

If, after a review of the intrinsic and extrinsic evidence, a claim term remains ambiguous, the claim should be construed so as to maintain its validity. *Phillips*, 415 F.3d at 1327. Claims, however, cannot be judicially rewritten in order to fulfill the axiom of preserving their validity. *See Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999). Thus, "if the only claim construction that is consistent with the claim's language and the written description renders the claim invalid, then the axiom does not apply and the claim is simply invalid." *Id.*

## IV.   OVERVIEW OF THE ART AND THE LEVEL OF ORDINARY SKILL

The three patents in suit relate to systems, devices, and methods for monitoring cardiac health and managing cardiac disease. *See* 941 patent at 1:26-33; 731 patent at 1:29-33. The specific cardiac condition addressed by all the asserted claims is arrhythmia, or abnormal heart rhythm. *See*

6

941 patent at 4:9-10; 499 patent at cl. 1 (preamble). The devices recited in the claims, including in the method claims, are either a smartwatch (for the 941 and 731 patents) or a mobile computing device (for the 499 patent). The smartwatch claims require an electrocardiogram (ECG) sensor and at least one other sensor. *E.g.*, 941 patent at cl. 1; 731 patent at cl. 25. For most asserted smartwatch claims one of the other sensors is a photoplethysmogram (PPG) sensor, which detects heart rate optically. *See* 731 patent at 8:51-55. The mobile computing device claims require an ECG sensor, a heart rate sensor, and a motion sensor. *E.g.*, 499 patent at cls. 1, 11. Whether reciting a method or apparatus, the asserted independent claims generally involve monitoring heart rate (*e.g.*, "sensing a heart rate" (499 patent at cl. 1)), detecting or determining possible arrhythmia or irregularity in heart rate variability (*e.g.*, "detect, based on the PPG data, the presence of an arrythmia" (731 patent at cl. 1)), and either performing an ECG or alerting the user that an ECG is called for (*e.g.*, "receive electric signals of the user from the ECG sensor to confirm the presence of the arrythmia" (941 patent at cl. 12)).

A person of ordinary skill in such art would likely have an engineering education and experience with cardiac-related equipment, diagnostics, and signal processing. And the parties agree that a skilled artisan at the time of the invention would have had a "bachelor of science degree in electrical engineering, mechanical engineering, biomedical engineering, computer science, or a related discipline, with at least two years of relevant work experience designing wearable devices and/or sensors for measuring physiological signals or parameters of mammals." SIMB at 6; *see* CIMB at 5; RIMB at 3. This is reasonable and is adopted.

Respondent additionally proposes that a skilled artisan at the time of the invention could have had a medical degree (M.D. or D.O.) and at least two years of work experience using biomedical sensors and/or analyzing their data, including in clinical practice treating patients. *See*

7

RIMB at 3. But it is not enough for a skilled artisan to be able to use the claimed invention; the skilled artisan must also be able to make it. *See Amgen Inc. v. Sanofi, Aventisub LLC*, 987 F.3d 1080, 1084 (Fed. Cir. 2021). A physician might know how to use the claimed inventions, but there is no reason to expect that a physician in clinical practice would be able to make them without substantially more experience and training than two years using biomedical sensors or analyzing their data.

Therefore, a person of ordinary skill in the art at the time of the invention would have had either (1) a bachelor of science degree in electrical engineering, mechanical engineering, biomedical engineering, computer science, or a related discipline, with at least two years of relevant work experience designing wearable devices and/or sensors for measuring physiological signals or parameters of mammals, or (2) a medical degree and at least five years of relevant work experience designing wearable devices and/or sensors for measuring physiological signals or parameters of mammals. Also, relevant experience could substitute for education and vice versa for both categories of skilled artisan.

## V. THE ASSERTED PATENTS

Although various dependent claims have been asserted, the parties' claim construction disputes all pertain to terms found in the independent claims, as well as to some preambles and the order of method steps. *See* JC at 2-4. Therefore, only the independent claims are reproduced below.

### A. The 499 Patent

The 499 patent, entitled "Methods and Systems for Arrhythmia Tracking and Scoring," issued February 21, 2017, to Gopalakrishnan, et al., and is assigned on its face to Complainant. It claims priority to provisional application No. 61/915,113, filed on December 12, 2013. *See generally* 499 patent.

8

The 499 patent has 20 claims, of which claims 1-4, 6-14, and 16-20 are asserted. Claims 1 and 11 are independent, and the disputed terms are highlighted in **bold.**

1.  A method of determining a presence of an arrhythmia of a first user, said method comprising

sensing a heart rate of said first user with a **heart rate sensor** coupled to said first user;

transmitting said heart rate of said first user to a mobile computing device, wherein said mobile computing device is configured to sense an electrocardiogram;

determining, using said mobile computing device, a heart rate variability of said first user based on said heart rate of said first user;

sensing an activity level of said first user with a motion sensor;

comparing, using said mobile computing device, said heart rate variability of said first user to said activity level of said first user; and

**alerting said first user to sense an electrocardiogram** of said first user, using said mobile computing device, in response to an irregularity in said heart rate variability of said first user.

11.  A system for determining the presence of an arrhythmia of a first user, comprising

a **heart rate sensor** coupled to said first user;

a mobile computing device comprising a processor, wherein said mobile computing device is coupled to said **heart rate sensor**, and wherein said mobile computing device is configured to sense an electrocardiogram of said first user; and

a motion sensor

a non-transitory computer readable medium encoded with a computer program including instructions executable by said processor to cause said processor to receive a heart rate of said first user from said **heart rate sensor**, sense an activity level of said first user from said motion sensor, determine a heart rate variability of said first user based on said heart rate of said first user, compare and activity level of said first user to said heart rate variability of said first user, and **alert** said first user to record an electrocardiogram using said mobile computing device.

9

B.      **The 731 Patent**

The 731 patent, entitled "Methods and Systems for Arrhythmia Tracking and Scoring," issued March 24, 2020, to Gopalakrishnan, et al., and is assigned on its face to Complainant.  It derives from a series of continuation applications, one of which issued as the 499 patent, and claims priority to the same provisional application as the 499 patent.  As a result, it appears to have substantially the same specification as the 499 patent.  *See generally* 731 patent.

The 731 patent has 30 claims, all of which are asserted.  Claims 1, 17 and 25 are independent, and the disputed term are highlighted in **bold**:

**1.**     A smart watch to detect the presence of an arrhythmia of a user, comprising:

a processing device;

a photoplethysmography ("PPG") sensor operatively coupled to the processing device;

an ECG sensor, comprising two or more ECG electrodes, the ECG sensor operatively coupled to the processing device;

a display operatively coupled to the processing device; and

a memory, operatively coupled to the processing device, the memory having instructions stored thereon that, when executed by the processing device, cause the processing device to:

> receive PPG data from the PPG sensor;
>
> detect, based on the PPG data, the presence of an arrhythmia;
>
> receive ECG data from the ECG sensor; and
>
> **confirm the presence of the arrhythmia based on the ECG data**.

**17.**     A method to detect the presence of an arrhythmia of a user on a smart watch, comprising:

receiving PPG data from a PPG sensor of the smartwatch;

10

detecting by a processing device, based on the PPG data, the presence of an arrhythmia;

receiving ECG data from an ECG sensor of the smartwatch; and

**confirming the presence of the arrhythmia based on the ECG data**.

25.     A non-transitory computer-readable storage medium including instructions that, when executed by a processing device, cause the processing device to:

receive PPG data from a PPG sensor of the smartwatch;

detect by the processing device, based on the PPG data, the presence of an arrhythmia;

receive ECG data from an ECG sensor of the smartwatch; and

**confirm the presence of the arrhythmia based on the ECG data**.

### C.     The 941 Patent

The 941 patent, entitled "Discordance Monitoring," issued May 5, 2020, to Albert, et al., and is assigned on its face to Complainant.  It claims priority to provisional application No. 62/161,092, filed on May 13, 2015.  *See generally* 941 patent.

The 941 patent has 23 claims, all of which are asserted.  Claims 1 and 12 are independent, and the disputed terms are highlighted in **bold.**

1.     A method of cardiac monitoring, comprising:

sensing an activity level of a user with a first sensor on a smartwatch worn by the user;

**when the activity level is resting**, sensing a heart rate parameter of the user with a second sensor on the smartwatch;

determining, by a processing device, that a **discordance** is present between the activity level value and the heart rate parameter;

based on the presence of the **discordance**, indicating to the user, using the smartwatch, a possibility of an arrhythmia being present; and

11

receiving electric signals of the user from an electrocardiogram sensor ("ECG") on the smartwatch **to confirm a presence of the arrhythmia**, wherein the ECG sensor comprises a first electrode and a second electrode.

**12.**    A smartwatch, comprising:

a processor;

a first sensor configured to sense an activity level value of a user, wherein the first sensor is coupled to the processor;

a photoplethysmogram ("PPG") sensor configured to sense a heart rate parameter of the user **when the activity level value is resting**, wherein the PPG sensor is coupled to the processor;

an electrocardiogram ("ECG") sensor configured to sense electrical signals of a heart, wherein the ECG sensor comprises a first electrode and a second electrode, and wherein the ECG sensor is coupled to the processor; and

a non-transitory computer readable storage medium encoded with a computer program including instructions executable by the processor to cause the processor to:

> determine if a **discordance** is present between the activity level value of the user and the heart rate parameter of the user;

> based on the presence of the **discordance**, indicate to the user a possibility of an arrhythmia being present; and

> receive electric signals of the user from the ECG sensor to **confirm the presence of the arrhythmia**.

## VI.    CLAIM CONSTRUCTION

### A.    Construction of the Agreed-Upon Claim Term

The parties agree that the term "arrhythmia," which appears in all independent claims, means "a cardiac condition in which the electrical activity of the heart is irregular or is faster or slower than normal." JC at 4.  This construction is consistent with the plain and ordinary meaning of the term and with the intrinsic evidence.  *See* 731 patent at 1:40-42 ("Arrhythmia is a cardiac condition in which the electrical activity of the heart is irregular or is faster (tachycardia) or slower (bradycardia)

12

than normal."); 941 patent at 4:9-10 (arrhythmia is "an abnormality of rhythm"). It is therefore adopted.

## B.    Construction of the Disputed Claim Terms

The disputed claim terms are summarized in the parties' Joint Disclosure of Proposed Claim Constructions. *See generally* JC.

### 1.    499 Patent – Preambles

| Claims | AliveCor's Proposed Construction | Staff's Proposed Construction | Apple's Proposed Construction |
|---|---|---|---|
| 499 patent: preambles | The preambles are not limiting. | The preambles of the asserted claims are limiting. | The preambles of claims 1 and 11 are limiting. |

JC at 2.

The only place in the independent claims of the 499 patent that the term "arrhythmia" appears is in the preambles. *See* 499 patent at cls. 1 ("an arrhythmia of a first user"), 11 (same). Claim 7, which depends from claim 1, and claim 17, which depends from claim 11, further recites the step of "determining a presence of said arrhythmia" and the operation of "determine a presence of said arrhythmia," respectively. *See id.* at cls. 7, 17. Respondent argues, among other points, that the preambles are limiting because they provide an antecedent basis for "said arrhythmia." RIMB at 10-13. Staff agrees. *See* SIMB at 8. Complainant, relying principally on examples from District Court cases, argues that "the fact that the antecedent basis for a term in the body of some dependent claims is found in the preamble of the independent claims does not require a preamble to be limiting." CIMB at 7.

In one respect, at least, the preambles are undoubtedly limiting. The body of claim 1 does not describe a structurally complete method for "alerting said first user to sense an electrocardiogram . . . in response to an irregularity of said heart rate variability of said first user."

13

*See* 499 patent at 26:36-39. This is because the antecedent basis for "said first user" appears in the preamble. *See id*. at 26:27-28. Claim 11 similarly fails to describe a structurally complete invention, albeit a system rather than a method. *See id*. at 27:19-24 ("determine a heart rate variability of said first user . . . and alert said first user to record an electrocardiogram"). So the preambles are limiting to the extent they provide antecedent bases for "said first user."

Whether they are limiting with respect to "arrhythmia," however, is a different question. *See TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015) (finding one part of a preamble limiting but not another part). Nothing in the body of claims 1 or 11 requires "determining [a/the] presence of an arrhythmia," because the recited methods stop at alerting the user to "sense" or "record" an ECG. 499 patent at cls. 1, 11. So on the surface, determining the presence of arrhythmia is just the "purpose or intended use for the invention." *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc*., 289 F.3d 801, 808 (Fed. Cir. 2002).

Claims 7 and 17, however, use the term "said arrhythmia," which would be expected to require an antecedent basis. *See Catalina Marketing*, 289 F.3d at 808. Moreover, claims 7 and 17 reiterate an entire clause of the relevant preamble, almost verbatim, before adding one limitation. Specifically, claim 1 recites "using a machine learning algorithm" for "determining a presence of an arrhythmia," while claim 7 recites the same for "determining a presence of said arrhythmia," and claim 11 recites "using a machine learning algorithm" for "determining the presence of an arrhythmia," while claim 17 recites the same to "determine a presence of said arrhythmia." 499 patent at cls. 1, 7, 11, 17.

Such repetition of the preamble, combined with the use of the term "said," indicates that the "arrhythmia" portion of each preamble is limiting, and is not just the purpose or intended use of each claimed invention. Admittedly, there are instances in the case law where a preamble has been

14

found limiting for a dependent claim and not limiting for the associated independent claim. *See* CIMB at 7-9 (collecting cases); CRMB at 1-2 (same); *see also Energizer Holdings, Inc. v. ITC*, 435 F.3d 1366, 1370 (Fed. Cir. 2006) (an antecedent basis need be express if it is "present by implication"). But the weight of authority is that if a preamble is limiting for a dependent claim, it is also limiting for the associated independent claim, because a dependent claim possesses all the elements of the claim from which it depends. *See Catalina Marketing*, 289 F.3d at 808; *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) ("claims in dependent form include all the limitations of the claim" from which they depend). And it may be true that if claims 7 and 17 had been drafted without using "said" and without repeating the language of the preambles of claims 1 and 11 (and the bodies of claims 1 and 11 had not used the term "said first user"), then the preambles would not be limiting. *See* CRMB at 3. But the claims were not so drafted, and the claim language must instead be considered as it is actually written.

On balance, therefore, the preambles of claims 1 and 11 of the 499 patent are limiting.

### 2. 499 Patent – "alerting said first user to sense an electrocardiogram"/ "alert"

| Claims | AliveCor's Proposed Construction | Staff's Proposed Construction | Apple's Proposed Construction |
|---|---|---|---|
| 499 patent: "alerting said first user to sense an electrocardiogram" [cl. 1]; "alert" [cl. 11] | No construction required.<br><br>Alternatively, "notifying said first user to sense an electrocardiogram"/ "notify" | No construction necessary.<br><br>If construed, "informing the first user to take an electrocardiogram"/ "inform" | "informing the first user to take an electrocardiogram"/ "inform" |

JC at 2.

15

Respondent most clearly explains the nature of the dispute in its reply brief. *See* RRMB at 5-8. Respondent argues that: (1) its proposed construction will "aid . . . in understanding the term as it is used in the claimed invention"; (2) references to performing an ECG in the specification use the term "take" or some variation of it; (3) the claim language suggests an affirmative act by the user (as in "taking" an ECG) rather than mere passive sensing of a parameter (as in "sensing a heart rate"); and (4) the specification contemplates a "trigger message to inform the user" to get an ECG, rather than some less informative "alert." *Id.*

These points offer insufficient reason to deviate from the plain and ordinary meaning of the claim language. First, the prosecution history does not appear to be relevant. *See* RIMB at 16-17. As for the specification, the term "sense" in reference to obtaining an ECG clearly has a broad meaning, including "take" (*e.g.*, 499 patent at 6:64), "record" (*id.* at cl. 11), and "measure" (*id.* at Table 1). Construing "sense" to mean just one of these actions is not warranted, and does not clarify anything about the claim language. And to the extent the term "sense" is ambiguous, the specification explains what it means: "the ECG device includes an electrode assembly configured to sense heart-related signals upon contact with a user's skin, and to convert the sensed heart-related signals to an ECG electric signal." *Id.* at 25:29-33. Moreover, the claims are directed to determining whether or not an ECG is appropriate, and then "alerting" the user to that fact; substituting "to take" for "to sense" does not clarify anything about whether "to sense" the ECG requires an affirmative act by the user.

As for "alert" and "alerting," the plain and ordinary meaning is similarly broad, and includes "notify" (499 patent at 5:12), "instruct" (*id.* at 20:59), "indicate" (*id.* at 23:21), and "generate and send notification signals" (*id.* at 25:2-3). In fact, one purpose of the disclosed invention is to "minimize[] false alarms," suggesting that an "alarm" (i.e., an audible tone) may qualify as an

16

"alert." *Id*. at 25:24. The proposed term "inform," by contrast, appears nowhere in the specification, and the term "informing" appears only once, in disclosing the optional feature of "informing the patient" of "behaviors, habits . . . and the like" associated with abnormal ECG readings, instead of "informing the patient" of the need for an ECG. *Compare id*. at 16:42-46 *with id*. at cl. 11. So inasmuch as "inform" implies a message of some sort, and excludes a non-linguistic method of alerting, it is clearly too narrow.

Therefore, the terms "alerting said first user to sense an electrocardiogram" and "alert" are accorded their plain and ordinary meaning, the "alert" is not limited to a message, and the terms need not otherwise be construed.

### 3.    499 Patent – "heart rate sensor"

| Claims | AliveCor's Proposed Construction | Staff's Proposed Construction | Apple's Proposed Construction |
|---|---|---|---|
| 499 patent: "heart rate sensor" [cls. 1, 11] | No construction necessary.<br><br>Alternatively: "a sensor for measuring heart rate" | No construction necessary.<br><br>If construed: "a sensor for measuring heart rate" | "A sensor that directly measures heart rate" |

JC at 2.

Claims 1 and 11 of the 499 patent require a "heart rate sensor coupled to [a] first user." 499 patent at cls. 1, 11. In method claim 1, the heart rate is "sens[ed]," and the heart rate variability is then "determine[ed] . . . based on said heart rate." *Id*. at cl. 1. In system claim 11, a processor "receive[s] a heart rate . . . from said heart rate sensor," and the processor then determines the heart rate variability "based on said heart rate." *Id*. at cl. 11.

The specification does not limit the nature of the heart rate sensor. It may be a "portable computing device" executing an "application," an "accessory usable with the portable computing device," an "accessory device" including "Garmin's Vivofit Fitness Band, Fitbit, Polar Heart Rate

17

Monitors . . . and the like," an "[ECG] in communication with the portable computing device or accessory," an "on-board heart rate sensor of the portable computing device," or "[PPG] implemented by an imaging source and a light source of the portable computing device." 499 patent at 8:28-53; *see also id.* at 25:13-16 ("an optical sensor to detect the fluctuation of blood flow"), 25:38-39 ("[t]he ECG can be further processed using algorithms to calculate heart rate"). In fact, although the specification incorporates by reference the application resulting in U.S. Patent No. 9,649,042, which discloses a stethoscope, a device which Respondent argues "measure[s] heart rate directly," the 499 patent's specification does not expressly teach this well-known "heart rate sensor." RIMB at 18 & Ex. 3.

Therefore, Respondent's argument that the specification distinguishes between different kinds of heart rate sensors, and in particular between "heart rate sensors" on the one hand and PPG and ECG sensors on the other, is not supported by the specification. *See* RIMB at 17-18. Nor is the prosecution history Apple cites especially relevant. *See id.* at 1819. If there was disavowal, at most it was of using "ECG data only" and "determining [heart rate variability] from peak to peak interval data taken from a sensed ECG," as opposed to "use of a heart rate sensor" and then computing heart rate variability. *See id.*, Ex. 4 at 6-7 (emphasis omitted). Lastly, Respondent's expert opined that a skilled artisan would understand "heart rate sensor" narrowly, but his opinion was based on arguments that duplicate Respondent's legal arguments; it is accordingly inconsistent with the intrinsic evidence and is accorded no weight. *See* RIMB, Ex. 1 (Stultz Decl.) at ¶¶ 67-69.

Therefore, the term "heart rate sensor" is accorded its plain and ordinary meaning, and in particular is construed to mean heart rate sensors that sense heart rate both directly and indirectly, and is not otherwise construed.

18

### 4.    499 Patent – Order of Method Steps

| Claims | AliveCor's Proposed Construction | Staff's Proposed Construction | Apple's Proposed Construction |
|---|---|---|---|
| 499 patent: order of steps [cl. 1] | While some ordering is dictated by logic, the limitations of the claim may be performed in different order than recited. | While some ordering is dictated by logic, the limitations of the claim may be performed in different order than recited. | Should be performed in the order listed. |

JC at 2.

Claim 1 covers a method with six basic steps:  (1) sensing the user's heart rate; (2) transmitting the heart rate to a mobile computing device; (3) determining heart rate variability; (4) sensing the user's activity level; (5) comparing the heart rate variability to the activity level; and (6) alerting the user to sense an ECG in response to an irregularity in heart rate variability.  *See* 499 patent at cl. 1.  The parties' disagreement is over whether step (4), sensing an activity level, may be performed before or simultaneously with steps (1), (2), or (3), or whether it must be performed only after step (3).  *See* RIMB at 21-22; SIMB at 19; CIMB at 18-19.

Generally, "[u]nless the steps of a method actually recite an order, the steps are not ordinarily construed to require one."  *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001).  Claim 1 does not expressly recite any particular order of steps, so presumptively there is none.  *See* 499 patent at cl. 1.  Contrary to Respondent's suggestion, the fact that in step (5) the heart rate variability is compared to the activity level, rather than the other way around, does not grammatically or logically require that one parameter be measured before the other, because what the step requires is simply a comparison.  *See* RRMB at 10.

Nor does anything in the specification require a particular order.  Respondent's assertion that "in all the disclosed examples, heart rate and [heart rate variability] are always analyzed first" is incorrect, because the cited examples do not even disclose measuring activity level.  RIMB at 22

19

(citing 499 patent at 22:56-65, 23:12-26); *see* RRMB at 10-11 (citing 499 patent at 19:42-46 & Fig. 6). In short, "[t]he only order mandated by the claim language" – and in this case the specification, as well – "is the conditional language in several of the steps," and that conditional language does not logically mandate that step (4) be performed only after steps (1), (2), and (3). *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1370 (Fed. Cir. 2003).

Therefore, claim 1 of the 499 patent is construed such that the step of "sensing an activity level of said first user with a motion sensor" need not be performed after the step of "determining, using said mobile device, a heart rate variability of said first user based on said heart rate of said first user."

**5.    731 Patent – "confirm the presence of the arrhythmia based on the ECG data" / "confirming the presence of the arrhythmia based on the ECG data"**

| Claims | AliveCor's Proposed Construction | Staff's Proposed Construction | Apple's Proposed Construction |
|---|---|---|---|
| 731 patent: "confirm[ing] the presence of the arrhythmia based on the ECG data" [cls. 1, 17, 25] | No construction required.<br><br>Alternatively: "identify[ing] the occurrence of the arrhythmia based on the ECG data" | No construction necessary.<br><br>These claims do not require verifying the arrhythmia by comparing the ECG sensor data to the PPG sensor data.<br><br>If construed: "verify[ing] the occurrence of the arrhythmia based on the ECG data" | "verify[ing] the arrhythmia by comparing the ECG sensor data to the PPG sensor data" |

JC at 3.

Claims 1, 17, and 25 of the 731 patent cover, respectively, a "smart watch" comprising a processing device that executes instructions to perform certain operations, a method of using a

20

smartwatch, and a "non-transitory computer-readable storage medium including instructions that . . . cause [a] processing device to" perform certain operations based on smartwatch data. *See* 731 patent at cls. 1, 17, 25. The method of claim 17 and the operations of claims 1 and 25 are in substance the same: (1) receive PPG data from the smartwatch's PPG sensor; (2) detect the presence of an arrhythmia based on the PPG data; (3) receive ECG data from the smartwatch's ECG sensor; and (4) confirm the presence of the arrhythmia based on the ECG data. *See id*.

There are two disputes over the last element of the claim. First, Respondent argues that "confirm" (cls. 1 and 25) and "confirming" (cl. 17) should be construed as "verify" and "verifying." *See* RIMB at 23-25. It is true that the specification sometimes uses the synonymous term "verify," but it also uses the term "identify." 731 patent at 15:19, 21:7, 25:47. Respondent offers no reason to prefer one of these terms over any other, and in any event "confirm" and "confirming" have plain and ordinary meanings even to a layperson. *See* RIMB at 23-25.

Second, Respondent argues that "there must necessarily be a comparison of the ECG data to the PPG data to verify that [the arrhythmia] is indeed the same condition." RIMB at 26. But the claims do not say "detect a type of arrhythmia," or otherwise require detecting or confirming a particular species of arrhythmia; they instead merely require "detecting . . . the presence of an arrhythmia" and "confirming the presence of the arrhythmia." 731 patent at cl. 17. It is not clear that detecting, say, atrial fibrillation, followed by confirming, say, tachycardia, would fall outside the scope of the claims, because both conditions are arrhythmias. *See id*. at 1:40-45. Even assuming as a matter of construction that the two arrhythmias must be the same condition – an interpretation the parties have not squarely briefed or addressed – Respondent offers no intrinsic evidence that the only way to confirm that fact is by comparing ECG sensor data to PPG sensor data. *See* RIMB at 26. The specification says nothing about such a comparison. Indeed, a skilled artisan could

21

seemingly practice the claims by programming a smartwatch to apply a machine learning algorithm to the heart rate data from the PPG, output a "recognize[d]" species of "detected" arrhythmia, and then send only that species identification, without the underlying data, to the smartwatch processor as an input to the ECG "confirmation" analysis. *See* 731 patent at 4:6-9 ("the machine learning algorithm may recognize atrial fibrillation from the continuously measured heart rate data of a new user who has not yet been identified as having atrial fibrillation"). Finally, Respondent's expert's opinion on this point is either conclusory or relies on statements in the specification that do not even reference PPG. *See id.*, Ex. 1 at ¶¶ 75-79.

Therefore, the terms "confirm the presence of the arrhythmia based on the ECG data" and "confirming the presence of the arrhythmia based on the ECG data" are accorded their plain and ordinary meaning, with no requirement of a comparison of the ECG data to the PPG data.

**6.    731 Patent – Order of Method Steps**

| Claims | AliveCor's Proposed Construction | Staff's Proposed Construction | Apple's Proposed Construction |
|---|---|---|---|
| 731 patent: order of steps [cl. 17] | While some ordering is dictated by logic, the limitations of the claim may be performed in different order than recited. | While some ordering is dictated by logic, the limitations of the claim may be performed in different order than recited. | Should be performed in the order listed. |

JC at 3.

Again, claim 17 covers a method with four basic steps: (1) receiving PPG data from the smartwatch's PPG sensor; (2) detecting the presence of an arrhythmia based on the PPG data; (3) receiving ECG data from the smartwatch's ECG sensor; and (4) confirming the presence of the arrhythmia based on the ECG data. *See* 731 patent at cl. 17. The parties' disagreement is over whether steps (3) and (4) (which the parties agree must be consecutive) may be performed before

22

or simultaneously with steps (1) and (2) (which the parties agree must be consecutive).  *See* RIMB at 26-27; SIMB at 24-25; CIMB at 24-25.

Claim 17 does not expressly recite any particular order of steps, so presumptively there is none.  *Interactive Gift Express*, 256 F.3d at 1342.  The specification discloses continuous ECG monitoring.  *See* 731 at 14:14 ("[t]he ECG signal data can be continuously recorded"), 16:16-19 ("[a]nalysis of the time before the abnormality . . . may allow the system to identify patterns or correlations of various ECG features that precede the occurrence of the abnormality").  Similarly, the specification discloses continuous PPG monitoring.  *See id*. at 2:42-57 ("heart rate may be measured by . . . imaging and lighting sources"), 8:54-55 (PPG is "implemented by an imaging source and a light source").  Nothing in the specification rules out commencing PPG monitoring after commencing ECG monitoring, so Respondent's assertion that "there is no disclosure that ECG data can be taken prior to a PPG measurement" is unpersuasive.  RRMB at 15.  At minimum, therefore, step (3) (receiving the ECG data) may occur before or simultaneously with steps (1) and (2).

Respondent advances two additional points.  First, it argues that "the arrhythmia" confirmed by the ECG must be the same arrhythmia detected by the PPG.  *See* RIMB at 27.  Again, this issue is not squarely addressed by the parties, but even assuming that the two arrhythmias must be the same condition, "an arrhythmia" in the PPG "detecting" step merely provides antecedent basis for "the arrythmia" in the ECG "confirming" step, it does not necessarily imply a temporal order.

Second, Respondent argues that "one must first detect . . . before one can confirm" the arrhythmia's presence.  RRMB at 15.  To be sure, the specification discloses an embodiment where "continuous monitoring may allow a subject to be alerted immediately upon an indication of the potential problem," which suggests that the "indication," or detection, triggers the measurement of

23

an ECG.  731 patent at 23:13-15.  But that same embodiment then discloses simultaneous monitoring: "This may allow the coupling of continuous HR monitoring with ECG recording and analysis." *Id.* at 23:16-18.  Moreover, it is undisputed that an ECG (as opposed to a PPG) is "the required standard of care for use in diagnosing cardiac arrhythmias," because it can "confirm or refute the suspected irregularity."  RIMB, Ex. 1 (Stultz Decl.) at ¶¶ 59-60.  So "confirming," as relevant here, means "obtaining sufficient data for a diagnosis," rather than simply "confirming what was previously detected" or "double-checking."  And although such a confirmation would seemingly render subsequent detection by PPG monitoring superfluous, continuous ECG monitoring is plainly taught by the specification.  In short, Respondent points to nothing in the intrinsic evidence that requires detection before confirmation, or otherwise bars practicing the "confirming" step before the "detecting" step.

Therefore, claim 17 of the 731 patent is construed such that the step of "receiving PPG data from a PPG sensor of the smartwatch" must be performed before the step of "detecting by a processing device, based on the PPG data, the presence of an arrhythmia," and the step of "receiving ECG data from an ECG sensor of the smartwatch" must be performed before the step of "confirming the presence of the arrhythmia based on the ECG data," but there is otherwise no restriction on the order of the steps.

### 7.    941 Patent – "to confirm a presence of the arrhythmia" / "to confirm the presence of the arrhythmia"

| Claims | AliveCor's Proposed Construction | Staff's Proposed Construction | Apple's Proposed Construction |
|---|---|---|---|
| 941 patent: "to confirm a presence of the arrhythmia" / "to confirm | No construction required.  Alternatively: | No construction necessary.  These claims do not require verifying the arrhythmia by | "to verify the arrhythmia by comparing the ECG sensor results to the discordance determination" |

24

| the presence of the arrhythmia" [cls. 1, 12] | "to identify an occurrence of the arrhythmia" | comparing the ECG sensor data to the PPG sensor data.<br><br>If construed: "to verify a presence of the arrhythmia" (claim 1) / "to verify the presence of the arrhythmia" (claim 12) | |
|---|---|---|---|

JC at 4; CIMB at 25; RIMB at 28.

Independent claim 1 of the 941 patent covers a method where the final step, in pertinent part, is "receiving electric signals of the user from [a smartwatch ECG sensor] to confirm a presence of the arrhythmia." 941 patent at cl. 1. Independent claim 12 covers a smartwatch comprising a processor programmed to "receive electric signals of the user from the ECG sensor to confirm the presence of the arrhythmia." *Id*. at cl. 12. As with the corresponding limitation of the independent claims of the 731 patent, Respondent argues that "confirm" should be construed as "verify." *See* RIMB at 29. In contrast to the 731 patent, however, the term "verify" appears nowhere in the 941 patent. *See* SIMB at 27 (collecting specification citations where only "confirm" is used). And again, "confirm" has a plain and ordinary meaning even to a layperson.

Respondent's other argument varies somewhat from the corresponding one advanced regarding the 731 patent. Unlike the 731 patent, the independent claims of the 941 patent require "sensing an activity level," "sensing a heart rate parameter" when the activity level is resting, and then "determining . . . that a discordance is present between the activity level value and the heart rate parameter." 941 patent at cl. 1; *see id*. at cl. 12. The claims then require "based on the presence of the discordance, indicate to the user a possibility of an arrhythmia being present," followed by the ECG confirmation step. *Id*. at cl. 12; *see id*. at cl. 1.

25

Respondent argues that the claimed invention "must necessarily compare the results of the ECG sensor to the results of the previous discordance determination." RIMB at 29. Certainly one embodiment disclosed in the specification works that way. *See* 941 patent at 13:60-14:18. But the disclosed embodiments associated with Figure 7 (a decision tree describing various combinations of measurements and their associated diagnoses) say nothing about such a comparison. *See id*. at 14:59-15:59 & Fig. 7. In fact, the most natural reading of the claim language is that the only use for "determin[ing] . . . a discordance" is to "indicate . . . a possibility of an arrhythmia being present." *Id*. at cl. 12. Respondent's prosecution history evidence has no clear relevance to this issue, and its expert evidence merely repeats the arguments made in its brief without substantial elaboration. *See* RIMB at 30 (citing RIMB, Ex. 1 (Stultz Decl.) at ¶¶ 84-86; Ex. 5 at 5). Lastly, to the extent "the arrhythmia" must be the same "an arrhythmia" previously found to be "a possibility," the discordance determination itself does not necessarily result in any diagnostic conclusions, because such conclusions may instead result from a machine learning algorithm. *See* 941 patent at 13:60-14:18; RIMB at 29. Similarly to the 731 patent, then, it stands to reason that a skilled artisan could practice the claimed inventions without using any discordance data as a direct input to the ECG analysis.

Therefore, the terms "to confirm a presence of the arrhythmia" and "to confirm the presence of the arrhythmia" are accorded their plain and ordinary meaning, with no requirement of a comparison of the ECG sensor results to the discordance determination.

26

**8.     941 Patent – "when the activity level is resting" / "when the activity level value is resting"**

| Claims | AliveCor's Proposed Construction | Staff's Proposed Construction | Apple's Proposed Construction |
|---|---|---|---|
| 941 patent: "when the activity level is resting" / "when the activity level value is resting" [cls. 1, 12] | Not indefinite. | Not indefinite. | Indefinite. |

JC at 4.

Independent claim 1 of the 941 patent covers a method comprising "sensing an activity level of a user," and then, "when the activity level is resting, sensing a heart rate parameter of the user." 941 patent at cl. 1. If there is a discordance between the sensed data, "a possibility of an arrhythmia being present" is "indicat[ed] to the user." *Id*. Independent claim 12 covers a smartwatch comprising a processor programmed to perform substantially the same method, including sensing a heart rate parameter "when the activity level value is resting." *Id*. at cl. 12.

Respondent argues that a skilled artisan cannot adequately discern the scope of the terms "activity level is resting" and "activity level value is resting," and the claims are therefore indefinite. *See* RIMB at 31-34. It is true that the specification seemingly equates "resting" with "normal." *E.g.*, 941 patent at 16:6. It is also true that "what is considered resting for one person, is not necessarily resting for another person." RIMB, Ex. 1 (Stultz Decl.) at ¶ 93. The specification acknowledges this: "an activity level [that] is determined to be increased in a 70 year old user [] would not be increased in a 7 year old user." 941 patent at 16:10-12. Respondent's expert accordingly opines that the 941 patent "provides no guidance on what would be considered a resting activity level other than to say that it would be determined for each individual separately." RIMB, Ex. 1 (Stultz Decl.) at ¶ 93.

27

Respondent has not met its burden of proving indefiniteness. Three teachings of the patent are especially pertinent. First, "resting" and "normal" have different plain and ordinary meanings, and the claims use the term "resting." In the absence of lexicography (and the cited passages fall short of it) the meaning of "resting" controls. Moreover, nothing in the claims requires measuring the degree of activity level; instead, the user's activity level must be "sense[d]," and "when the activity level value is resting" a heart rate parameter is sensed. 941 patent at cl. 12. So the trigger for heart rate parameter sensing is binary – resting or not resting – and the example of "increased" activity varying between persons of different ages is therefore not especially relevant. *Id.* at 16:10-12.

Second, the only "activity level" sensors disclosed are an accelerometer and a gyroscope, that is, motion sensors. *See* 941 patent at 2:57-58. The specification makes clear that a "resting" activity level measured by such devices corresponds to a lack of motion. *See id.* at 15:64-65 ("resting activity level as sensed by an accelerometer which measures that the individual is traveling at 0 miles/hr"). And again, the activity level does not have to be measured or quantified, it just has to be "sense[d]" as resting, and presumably both an accelerometer and a gyroscope sense a resting state by sensing a lack of motion. *Id.* at cl. 12. In other words, the user does not actually have to be resting, the sensor just has to detect the user as resting, or "simply not moving." RIMB, Ex. 1 (Stultz Decl.) at ¶ 95.

Third, if the sensor detects motion, the sensed activity level is "not resting," and the claims are not practiced. As the specification explains, if "an increased heart rate is sensed together with an increased activity level . . . no discordance is present, and an ECG is not recorded as the individual is probably exercising." 941 patent at 15:44-48. By extension, the claims are also not practiced in the situation Respondent hypothesizes, because it involves a false positive discordance: "a user can

28

be 'motionless' – e.g., traveling at 0 miles/hour – and yet not resting, if they are exercising (on a stationary bike) or agitated." RIMB at 34. In such a case, there may be a discordance but there is no arrhythmia, so the claimed invention may "indicate . . . a possibility of an arrhythmia being present," but any ECG will not confirm the arrhythmia (and the user may even not initiate the ECG).

In view of these disclosures, "when the activity level is resting" is not fatally ambiguous to a skilled artisan. If the activity level sensor detects "not resting," that is, the sensor detects motion, the processor does not determine that a discordance is present and the claims are not practiced. If the activity level sensor detects "resting," that is, no motion, but the user is not actually resting and one or more heart rate parameters are discordant with "resting," a possible arrhythmia is (erroneously) indicated but the ECG measurement either does not occur or cannot confirm the arrhythmia, and the claims are not practiced. If the activity level sensor detects "resting," the user is actually resting, and the sensed heart rate parameter is not discordant with resting, the discordance is not determined and a possible arrhythmia is not indicated, so the claims are not practiced. Lastly, if the activity level sensor detects "resting," the user is actually resting, and the sensed heart rate parameter is discordant with resting, a possible arrhythmia is indicated and the ECG is taken to confirm the arrhythmia; only in this last case are the claims practiced.

So a skilled artisan should be able to discern when the claim limitations are satisfied and when they are not. The specification and claims do, therefore, sufficiently define the metes and bounds of the claimed inventions, and claims 1 and 12 are not indefinite because of the "activity level [value] is resting" language.

29

### 9.     941 Patent – "discordance"

| Claims | AliveCor's Proposed Construction | Staff's Proposed Construction | Apple's Proposed Construction |
|---|---|---|---|
| 941 patent: "discordance" [cls. 1, 12] | No construction required. | "inconsistency" | "inconsistency" |

JC at 4.

The parties' dispute regarding the term "discordance" is mystifying.  The term is admittedly uncommon, but it has a customary meaning, and neither Staff nor Apple offer any reason why substituting "inconsistency" clarifies anything.  *See* SIMB at 32-33; RIMB at 35-38.  To the extent any doubt exists about its meaning, it is used in numerous passages of the specification without any apparent lexicography, so it should not be difficult to ascertain the scope of the claims in practice. *E.g.*, 941 patent at 1:61-2:1, 12:47-65.  Therefore, the term "discordance" is accorded its plain and ordinary meaning.

### 10.     941 Patent – Order of Method Steps

| Claims | AliveCor's Proposed Construction | Staff's Proposed Construction | Apple's Proposed Construction |
|---|---|---|---|
| 941 patent: order of steps [cl. 1] | While some ordering is dictated by logic, the limitations of the claim may be performed in different order than recited. | While some ordering is dictated by logic, the limitations of the claim may be performed in different order than recited. | Should be performed in the order listed. |

JC at 4.

Independent claim 1 covers a method with five basic steps:  (1) sensing an activity level; (2) sensing a heart rate parameter when the activity level is resting; (3) determining the presence of a discordance between the activity level and the heart rate parameter; (4) indicating the possibility of an arrhythmia based on the presence of the discordance; and (5) confirming the presence of the arrhythmia using an ECG.  *See* 941 patent at cl. 1.  As with the other asserted method claims, claim

30

1 of the 941 patent does not expressly recite any particular order of steps, so presumptively there is none. *Interactive Gift Express*, 256 F.3d at 1342. The parties nonetheless have two disagreements over order.

First, Respondent argues that step (2) must be performed only after step (1), while Complainant and Staff argue that the two steps may be performed simultaneously. *See* RRMB at 22-23; CIMB at 36-37; SIMB at 34-35. As Respondent acknowledges, the specification discloses an embodiment in which both activity level and heart rate are "continuously and simultaneously sensed." *See* RRMB at 22 n.11 (citing 941 patent at 5:27-31). In such an embodiment, whenever the activity level is sensed as resting, the heart rate (which qualifies as a heart rate parameter) is necessarily sensed simultaneously. So step (2) may be performed simultaneously with step (1).

Second, Respondent contends that step (5), the ECG measurement, must occur last. *See* RIMB at 38-39. Here, too, the specification refutes Respondent's contention: "In some embodiments, an intermittently sensed [ECG] is caused to be sensed in response to both a continuously measured heart rate and a continuously measured activity level." 941 patent at 11:35-38; *see generally id.* at 11:22-42. In such an embodiment the ECG "electric signals" could easily be "receiv[ed]" before both the discordance is determined and the possible arrhythmia is indicated; certainly nothing in the specification rules out the possibility. *See id.* at cl. 1. So step (5) need not be performed last.

Therefore, method claim 1 of the 941 patent is construed such that the step of "when the activity level is resting, sensing a heat rate parameter of the user with a second sensor on the smartwatch" may be performed after or simultaneously with the step of "sensing an activity level of a user with a first sensor on a smartwatch worn by the user," and the step of "receiving electric

31

signals of the user from an [ECG] on the smartwatch to confirm a presence of the arrhythmia" need not be performed last.

**SO ORDERED.**

Cameron Elliot
Administrative Law Judge

32

# INVESTIGATION REPORT
## Investigation No. 337-TA-1266

| Official Received Date | Doc ID - Sec Level | Investigation Information (Document Type, Document Title, Filed by, Firm, on Behalf of) |
|---|---|---|
| 04/20/2021 | (740374 - Confidential) | Complaint, Confidential Exhibits to the Public Complaint, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 04/20/2021 | (740394 - Public) | Complaint, Appendices A-F, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 04/20/2021 | (740438 - Public) | Complaint, Public Complaint and Exhibits, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 04/21/2021 | (740503 - Public) | Notice, Receipt of Complaint; Solicitation of Comments Relating to the Public Interest, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 04/26/2021 | (740951 - Public) | Complaint, First Public Supplement to the Complaint, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 04/26/2021 | (740967 - Public) | Notice, 86 FR 22069 F.R. Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 05/04/2021 | (741558 - Public) | Comments/Response to Comments, Public Interest Statement of Proposed Respondent Apple Inc., filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 05/04/2021 | (741559 - Public) | Action Request, AR 21-29 Proposed Respondent Apple Inc.'s Request for Early Disposition Program, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 05/07/2021 | (741951 - Public) | Action Request, AR 21-29 Complainant's Response to Request for Early Disposition Program, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 05/07/2021 | (741952 - Public) | Comments/Response to Comments, Alivecor's Reply to the Public Interest Statement of Proposed Respondent Apple Inc., filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 05/20/2021 | (743034 - Public) | Notice, Institution of Investigation, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 05/20/2021 | (743035 - Public) | Order, Commission, Order Denying Request for Entry into Early Disposition Program, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 05/20/2021 | (743036 - Public) | Notice, Assignment of ALJ Elliot, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 05/24/2021 | (743237 - Public) | Correspondence, Proof of Service of Complaint and Related Documents, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of Alivecor, Inc. |
| 05/26/2021 | (743355 - Public) | Order, 1 Protective Order, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 05/26/2021 | (743356 - Public) | Order, 2 Notice of Ground Rules; Order Setting Date for Submission of Joint Discovery Statement, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 05/27/2021 | (743417 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Benjamin C. Elacqua, Ruffin B. Cordell, Betty Chen, Michael A. Amon, Joseph V. Colaianni, Jr., Thomas S. Fusco, Katherine H. Reardon, Qiuyi Wu, Taylor C. Burgener, and Raisa N. Ahmad, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |

**INVESTIGATION REPORT**                    Date/Time:  04/12/2023, 12:00 PM
Investigation No. 337-TA-1266                                    Page 2 of 23
                                                         Total Records = 350

| | | |
|---|---|---|
| 05/27/2021 | (743418 - Public) | Notice of Appearance, Notice of Appearance of Fish & Richardson P.C. on Behalf of Apple Inc.; Designation of Benjamin C. Elacqua as Lead Counsel, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 05/27/2021 | (743419 - Public) | Request for Confidential Materials, Request for Confidential Materials on Behalf of Apple Inc., filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 05/27/2021 | (743464 - Public) | Notice of Appearance, Notice of Appearance of Quinn Emanuel Urquhart & Sullivan, LLP on Behalf of AliveCor, Inc.; Designation of S. Alex Lasher as Lead Counsel, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of Alivecor, Inc. |
| 05/27/2021 | (743465 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of S. Alex Lasher, Sean S. Pak, Andrew M. Holmes, Michelle A. Clark, Adam B. Wolfson, Philip Ducker, Brian L. Saunders, Peter Benson, John W. McCauley, Kevin Gu, and Catherine R. Lacey, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 05/28/2021 | (743552 - Public) | Notice, 86 FR 28382 F.R. Notice of Institution of Investigation, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 06/04/2021 | (744025 - Public) | Motion, 1266-001 Respondent Apple Inc.'s Unopposed Motion for Extension of Time to Respond to Complaint and Notice of Investigation, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 06/07/2021 | (744089 - Public) | Order, 1266-001 3 Granting Respondent's Unopposed Motion for Extension of Time to Respond to the Complaint and Notice of Investigation, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 06/09/2021 | (744419 - Public) | Discovery Statement, Joint Discovery Statement, filed by Brian Saunders of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc., Apple Inc., and the Office of Unfair Import Investigations |
| 06/10/2021 | (744439 - Public) | ID/RD - Other Than Final on Violation, 4 Initial Determination Setting the Target Date at Seventeen Months, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 06/10/2021 | (744440 - Public) | Order, 5 Regarding Procedural Schedule, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 06/10/2021 | (744459 - Public) | Voting Sheet, OUII-21-032, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 06/21/2021 | (745053 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of James M. Glass, filed by Michael Kim of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 06/21/2021 | (745156 - Public) | Other, Notice of Filing of Petitions for Inter Partes Review of U.S. Patent Nos. 9,572,499, 10,638,941, and 10,595,731, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 06/24/2021 | (745486 - Public) | Response/Submission to ALJ Order, 5 Joint Proposed Procedural Schedule, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. and Apple Inc. |
| 06/25/2021 | (745515 - Public) | Order, 6 Setting Procedural Schedule, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 06/28/2021 | (745641 - Public) | Answer to Complaint, Respondent Apple Inc.'s Response to the Amended Complaint of Alivecor, Inc. under Section 337 of the Tariff Act of 1930, as Amended, and Notice of Investigation, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |

**INVESTIGATION REPORT**                    Date/Time:  04/12/2023, 12:00 PM
Investigation No. 337-TA-1266                                    Page 3 of 23
                                                      Total Records = 350

| | | |
|---|---|---|
| 06/28/2021 | (745646 - Confidential) | Answer to Complaint, Confidential Exhibit A to Respondent Apple Inc.'s Response to the Amended Complaint of Alivecor, Inc. under Section 337 of the Tariff Act of 1930, as Amended, and Notice of Investigation, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 06/29/2021 | (745705 - Public) | Complaint, Letter to Secretary Barton regarding Certified Copies of Appendices A and E, filed by Peter Benson of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 06/29/2021 | (745708 - Public) | Notice, 4 Commission Determination Not to Review an Initial Determination Setting the Target Date for Completion of the Investigation at Seventeen Months, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 07/07/2021 | (746153 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Veena Tripathi, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 07/08/2021 | (746292 - Public) | Answer to Complaint, Exhibit A to Apple Inc.'s Response to Amended Complaint and Notice of Institution, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 07/20/2021 | (747347 - Public) | Voting Sheet, GC-21-166, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 07/23/2021 | (747750 - Public) | Witness List, Respondent's Expert Witness Identification, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 07/23/2021 | (747765 - Public) | Witness List, Complainant's Initial Identification of Expert Witnesses, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 08/04/2021 | (748675 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Jason Lo and Jennifer Rho, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 08/06/2021 | (748893 - Public) | Witness List, Respondent's Rebuttal Expert Witness Identification, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 08/06/2021 | (748948 - Public) | Witness List, Complainant's Rebuttal Identification of Expert Witnesses, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 08/17/2021 | (749757 - Public) | Motion, 1266-002 Joint Motion to Amend the Protective Order to Add Provisions regarding Production and Review of Source Code, filed by Michael Amon of Fish & Richardson P.C., on behalf of Alivecor, Inc. and Apple Inc. |
| 08/18/2021 | (749871 - Public) | Order, 1266-002 7 Amending the Protective Order, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 08/18/2021 | (749886 - Public) | Other, Joint Stipulation regarding Scope of Email Discovery and Production, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. and Apple Inc. |
| 08/23/2021 | (750117 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Erika Lietzan, Collin Stultz, Rosalind Picard, Majid Sarrafzahdeh, Thomas Vander Veen, and Philip Phillips, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 08/25/2021 | (750306 - Confidential) | Motion, 1266-003 Apple's Motion for a Protective Order to Preclude the Disclosure of Confidential Business Information to Dr. Gregory Marcus, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |

| | | |
|---|---|---|
| 09/02/2021 | (750782 - Public) | Motion, 1266-003 Apple's Motion for a Protective Order to Preclude the Disclosure of Confidential Business Information to Dr. Gregory Marcus, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 09/07/2021 | (751029 - Confidential) | Motion Response/Reply, 1266-003 Response of the Commission Investigative Staff to Apple's Motion for a Protective Order to Preclude the Disclosure of Confidential Business Information to Dr. Gregory Marcus, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 09/07/2021 | (751133 - Confidential) | Motion Response/Reply, 1266-003 AliveCor's Opposition to Apple's Motion for a Protective Order to Preclude the Disclosure of Confidential Business Information to Dr. Gregory Marcus, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 09/10/2021 | (751422 - Confidential) | Order, 1266-003 8 Denying Respondent's Motion for a Protective Order to Preclude the Disclosure of Confidential Business Information to Dr. Gregory Marcus, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 09/13/2021 | (751575 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Michael Akemann, Daniel Enzminger, Owen Warner, and Lira Rathee, filed by Peter Benson of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 09/13/2021 | (751576 - Public) | Other, Joint Disclosure of Proposed Claim Constructions, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc., Apple Inc., and the Office of Unfair Import Investigations |
| 09/14/2021 | (751591 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Caleb Harris, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 09/21/2021 | (752242 - Public) | Order, 1266-003 8 Denying Respondent's Motion for a Protective Order to Preclude the Disclosure of Confidential Business Information to Dr. Gregory Marcus, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 09/21/2021 | (752328 - Public) | Motion Response/Reply, 1266-003 AliveCor's Opposition to Apple's Motion for a Protective Order to Preclude the Disclosure of Confidential Business Information to Dr. Gregory Marcus, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 09/22/2021 | (752480 - Public) | Brief Filed With ALJ, Respondent Apple Inc.'s Opening Markman Brief, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 09/22/2021 | (752482 - Public) | Brief Filed With ALJ, Complainant's Opening Claim Construction Brief, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 09/23/2021 | (752554 - Public) | Motion, 1266-004 Complainant's Unopposed Motion to File a Corrected Exhibit 4 to Its Opening Claim Construction Brief, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 09/24/2021 | (752574 - Public) | Order, 1266-004 9 Granting Complainant's Unopposed Motion to File a Corrected Exhibit 4 to Its Opening Claim Construction Brief, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 09/24/2021 | (752651 - Public) | Notice of Prior Art, Commission Investigative Staff's Notice of Prior Art, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |

**INVESTIGATION REPORT**
Investigation No. 337-TA-1266

| | | |
|---|---|---|
| 09/24/2021 | (752658 - Public) | Notice of Prior Art, Respondent Apple Inc.'s Notice of Prior Art, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 10/01/2021 | (753175 - Public) | Brief Filed With ALJ, Claim Construction Brief of the Commission Investigative Staff, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 10/12/2021 | (754001 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Richard Doss, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 10/13/2021 | (754118 - Public) | Brief Filed With ALJ, Apple's Rebuttal Markman Brief, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 10/14/2021 | (754130 - Public) | Brief Filed With ALJ, Complainant's Rebuttal Claim Construction Brief, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 10/14/2021 | (754131 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Matt Hosen and Bruce Lee, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 10/15/2021 | (754234 - Public) | Motion, 1266-005 Complainant's Unopposed Motion for Leave to File Its Rebuttal Claim Construction Brief out of Time, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 10/15/2021 | (754256 - Public) | Order, 1266-005 10 Granting Complainant's Unopposed Motion to File Its Rebuttal Claim Construction Brief out of Time, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 10/15/2021 | (754294 - Public) | Order, 11 Cancelling the Markman Hearing, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 10/25/2021 | (755042 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Isabel Redleaf, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 11/04/2021 | (755887 - Public) | Order, 12 Construing the Terms of the Asserted Claims of the Patents at Issue, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 11/08/2021 | (756123 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Evan Larson, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 11/12/2021 | (756463 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of James Huguenin-Love, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 11/12/2021 | (756494 - Public) | Witness List, Tentative Witness List of the Commission Investigative Staff, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 11/12/2021 | (756519 - Public) | Witness List, Apple's Tentative Witness List of Evidentiary Hearing Witnesses, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 11/12/2021 | (756527 - Public) | Witness List, Complainant AliveCor's Tentative Witness List, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 11/30/2021 | (757489 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Fabio Orellana, Gus Phillips, and John Wissenbach, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 12/02/2021 | (757761 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Sandra Rocca and David Manzo, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |

**INVESTIGATION REPORT**                    Date/Time:  04/12/2023, 12:00 PM
Investigation No. 337-TA-1266                              Page 6 of 23
                                                          Total Records = 350

| | | |
|---|---|---|
| 12/07/2021 | (758095 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Jefree Anderson, Ramon Peraza, and Rebecca Romano, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 12/07/2021 | (758097 - Confidential) | Other, Joint Stipulation regarding Representative Accused Products, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. and Apple Inc. |
| 12/08/2021 | (758231 - Confidential) | Other, Importation and Inventory Stipulation between Complainant Alivecor, Inc. and Respondent Apple Inc., filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Alivecor, Inc. and Apple Inc. |
| 12/10/2021 | (758303 - Public) | Motion, 1266-006 Joint Motion of the Private Parties for Leave to Take Depositions out of Time, filed by Michael Amon of Fish & Richardson P.C., on behalf of Alivecor, Inc. and Apple Inc. |
| 12/10/2021 | (758322 - Public) | Order, 1266-006 13 Granting Joint Motion for Leave to Take Depositions out of Time, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 12/15/2021 | (758617 - Public) | Action Request, AR 22-09 Letter Requesting Consent to Appear as Counsel for Apple Inc., filed by John Thuermer of Fish & Richardson P.C., on behalf of Apple Inc. |
| 12/17/2021 | (758789 - Public) | Motion, 1266-007 Joint Motion for Extension of Expert Deadlines, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. and Apple Inc. |
| 12/17/2021 | (758817 - Public) | Order, 1266-007 14 Granting Joint Motion for Extension of Expert Discovery Deadlines, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 01/10/2022 | (759993 - Public) | Other, Notice of Institution of Petitions for Inter Partes Review of U.S. Patent Nos. 9,572,499, 10,638,941, and 10,595,731, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 01/12/2022 | (760338 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of John McKee, filed by Peter Benson of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 01/18/2022 | (760613 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Haihang Wang, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 01/18/2022 | (760730 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Joshua Scheufler, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 02/02/2022 | (762311 - Confidential) | Motion, 1266-008 Alivecor's Motion for Leave to Supplement Interrogatory Responses after the Close of Fact Discovery, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 02/04/2022 | (762499 - Public) | Motion, 1266-009 Joint Motion for the Private Parties for Extension of Time to Exchange Exhibit Lists and Serve Exhibits, filed by Michael Amon of Fish & Richardson P.C., on behalf of Alivecor, Inc. and Apple Inc. |
| 02/04/2022 | (762509 - Public) | Order, 1266-009 15 Granting Joint Motion for Extension of Time to Exchange Exhibit Lists and Serve Exhibits, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 02/09/2022 | (762881 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Justin Chauncey, Thomas Lee, Ouliana Nikolaeva-Hir, Jennifer Gustavson, and Shaun Kelly, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |

**INVESTIGATION REPORT**                    Date/Time: 04/12/2023, 12:00 PM
Investigation No. 337-TA-1266               Page 7 of 23
                                           Total Records = 350

| 02/10/2022 | (762920 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of James M. Darling, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 02/14/2022 | (763139 - Public) | Motion, 1266-008 AliveCor's Motion for Leave to Supplement Interrogatory Responses after the Close of Fact Discovery, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 02/14/2022 | (763181 - Confidential) | Motion Response/Reply, 1266-008 Apple's Opposition to AliveCor's Motion for Leave to Supplement Interrogatory Responses after the Close of Fact Discovery, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 02/14/2022 | (763185 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Jon Eilers, Luis Figuera, Ryan Fisher, Rich Hill, and Gabi Young, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 02/14/2022 | (763196 - Confidential) | Motion Response/Reply, 1266-008 Response of the Commission Investigative Staff to Alivecor's Motion for Leave to Supplement Interrogatory Responses after the Close of Fact Discovery, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 02/18/2022 | (763583 - Public) | Motion, 1266-010 Complainant's Unopposed Motion for Partial Termination by Withdrawal of Certain Claims of the Asserted Patents, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 02/21/2022 | (763593 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Richard A. Sterba, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 02/22/2022 | (763702 - Public) | Motion, 1266-010 Complainant's Corrected Motion for Partial Termination by Withdrawal of Certain Claims of the Asserted Patents, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 02/22/2022 | (763707 - Public) | Motion Response/Reply, 1266-008 Response of the Commission Investigative Staff to AliveCor's Motion for Partial Termination by Withdrawal of Certain Claims of the Asserted Patents, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 02/22/2022 | (763714 - Confidential) | Pre-Hearing Statement, Apple Inc.'s Pre-Hearing Statement, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 02/22/2022 | (763727 - Confidential) | Pre-Hearing Statement, Complainant's Pre-Trial Statement, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 02/22/2022 | (763735 - Confidential) | Brief Filed With ALJ, Apple Inc.'s Pre-Hearing Brief, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 02/22/2022 | (763742 - Confidential) | Brief Filed With ALJ, Complainant AliveCor, Inc.'s Pre-Hearing Brief, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 02/23/2022 | (763757 - Public) | Motion Response/Reply, 1266-008 Apple's Opposition to AliveCor's Motion for Leave to Supplement Interrogatory Responses after the Close of Fact Discovery, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 02/23/2022 | (763774 - Public) | ID/RD - Other Than Final on Violation, 1266-010 16 Initial Determination Granting Complainant's Unopposed Motion for Partial Termination by Withdrawal of Certain Claims of the Asserted Patents, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |

**INVESTIGATION REPORT**                Date/Time:  04/12/2023, 12:00 PM
Investigation No. 337-TA-1266                                Page 8 of 23
                                                    Total Records = 350

| | | |
|---|---|---|
| 02/24/2022 | (763892 - Public) | Correspondence - USITC, Letter to John Thuermer Granting Request to Appear, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 02/24/2022 | (763917 - Confidential) | Order, 1266-008 17 Granting Complainant's Motion for Leave to Supplement Interrogatory Responses after the Close of Fact Discovery, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 02/25/2022 | (764031 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of John Thuermer, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/03/2022 | (764538 - Confidential) | Brief Filed With ALJ, Pre-Hearing Brief of the Commission Investigative Staff, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 03/03/2022 | (764539 - Public) | Pre-Hearing Statement, Pre-Hearing Statement of the Commission Investigative Staff, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 03/04/2022 | (764558 - Public) | Notice of Withdrawal of Appearance, Notice of Withdrawal of Appearance of Thomas Fusco from Fish & Richardson P.C. on Behalf of Apple Inc., filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/07/2022 | (764735 - Confidential) | Motion, 1266-011 Apple's Motion in Limine No. 1 to Exclude Reference to Any Alleged "Anticompetitive" Conduct by Apple in This Investigation, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/07/2022 | (764737 - Confidential) | Motion, 1266-012 Apple's Motion in Limine No. 5 to Exclude the License and to Preclude AliveCor's Reliance on the License, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/07/2022 | (764748 - Confidential) | Motion, 1266-013 Apple's Motion in Limine No. 3 to Preclude AliveCor and Its Experts from Advancing a New Claim Construction of "Discordance" Not Ever Disclosed in Contention Responses or Expert Reports, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/07/2022 | (764749 - Confidential) | Motion, 1266-014 AliveCor's Motion in Limine No. 4: Motion to Exclude the Declaration of Jessica Ho, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/07/2022 | (764751 - Confidential) | Motion, 1266-015 Apple's Motion in Limine No. 4 to Preclude Dr. Akemann from Relying on Evidence Not Identified in His Report, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/07/2022 | (764759 - Confidential) | Motion, 1266-016 AliveCor's Motion in Limine No. 5: To Exclude Testimony of FDA Expert Erika Lietzan, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/07/2022 | (764763 - Confidential) | Motion, 1266-017 AliveCor's Motion in Limine No. 1: Motion to Exclude Untimely and Improper Claim Constructions, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/07/2022 | (764765 - Confidential) | Motion, 1266-018 Apple's Motion in Limine No. 2 to Preclude Evidence and Argument regarding AliveCor's Meetings with Apple, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/07/2022 | (764769 - Confidential) | Motion, 1266-019 Complainant's Motion in Limine No. 3: To Preclude Evidence and Testimony Not Disclosed during Fact Discovery, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |

**INVESTIGATION REPORT**                    Date/Time: 04/12/2023, 12:00 PM

| | | |
|---|---|---|
| 03/07/2022 | (764770 - Confidential) | Motion, 1266-020 Complainant's Motion in Limine No. 2 to Preclude Evidence and Testimony Not Disclosed during Fact Discovery, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/09/2022 | (764922 - Public) | Notice, Notice to the Parties regarding Substitute Attorney Advisor, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 03/09/2022 | (764972 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Scott Watson, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/10/2022 | (765018 - Confidential) | Motion, 1266-021 Respondent Apple Inc.'s Motion for Leave to File Motions in Limine out of Time, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/10/2022 | (765062 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Michael J. McKeon, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/11/2022 | (765193 - Public) | Order, 1266-021 18 Granting Respondent Apple Inc.'s Motion for Leave to File Motions in Limine out of Time, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 03/11/2022 | (765199 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Robin McGrath, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/14/2022 | (765282 - Confidential) | Motion, 1266-022 Apple's Motion in Limine No. 1 to Exclude Reference to Any Alleged "Anticompetitive" Conduct by Apple in This Investigation, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/14/2022 | (765283 - Confidential) | Motion, 1266-023 Apple's Motion in Limine No. 2 to Preclude Evidence and Argument regarding AliveCor's Meetings with Apple, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/14/2022 | (765285 - Confidential) | Motion, 1266-024 Apple's Motion in Limine No. 3 to Preclude AliveCor and Its Experts from Advancing a New Claim Construction of "Discordance" Not Ever Disclosed in Contention Responses or Expert Reports, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/14/2022 | (765286 - Confidential) | Motion, 1266-025 Apple's Motion in Limine No. 4 to Preclude Dr. Akemann from Relying on Evidence Not Identified in His Report, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/14/2022 | (765288 - Confidential) | Motion, 1266-026 Apple's Motion in Limine No. 5 to Exclude the License and to Preclude AliveCor's Reliance on the License, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/15/2022 | (765474 - Public) | Motion, 1266-017 AliveCor's Motion in Limine No. 1: Motion to Exclude Untimely and Improper Claim Constructions, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/15/2022 | (765481 - Public) | Motion, 1266-020 Complainant's Motion in Limine No. 2 to Preclude Evidence and Testimony Not Disclosed during Fact Discovery, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/15/2022 | (765482 - Public) | Motion, 1266-019 Complainant's Motion in Limine No. 3 to Preclude Evidence and Testimony Not Disclosed during Fact Discovery, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |

**INVESTIGATION REPORT**                    Date/Time:  04/12/2023, 12:00 PM
Investigation No. 337-TA-1266                              Page 10 of 23
                                                    Total Records = 350

| | | |
|---|---|---|
| 03/15/2022 | (765486 - Public) | Motion, 1266-016 AliveCor's Motion in Limine No. 5: To Exclude Testimony of FDA Expert Erika Lietzan, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/16/2022 | (765551 - Public) | Voting Sheet, GC-22-027, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 03/16/2022 | (765570 - Public) | Motion, 1266-022 Apple's Motion in Limine No. 1 to Exclude Reference to Any Alleged "Anticompetitive" Conduct by Apple in This Investigation, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/16/2022 | (765571 - Public) | Motion, 1266-026 Apple's Motion in Limine No. 5 to Exclude the and to Preclude AliveCor's Reliance on the, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/16/2022 | (765572 - Public) | Motion, 1266-023 Apple's Motion in Limine No. 2 to Preclude Evidence and Argument regarding AliveCor's Meetings with Apple, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/16/2022 | (765573 - Public) | Motion, 1266-024 Apple's Motion in Limine No. 3 to Preclude AliveCor and Its Experts from Advancing a New Claim Construction of "Discordance" Not Ever Disclosed in Contention Responses or Expert Reports, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/16/2022 | (765574 - Public) | Motion, 1266-025 Apple's Motion in Limine No. 4 to Preclude Dr. Akemann from Relying on Evidence Not Identified in His Report, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/17/2022 | (765653 - Public) | Order, 19 Regarding Evidentiary Hearing and Videoconference Protocol, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 03/17/2022 | (765681 - Confidential) | Motion Response/Reply, 1266-011 Combined Response of the Commission Investigative Staff to the Motions in Limine of the Private Parties, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 03/17/2022 | (765709 - Confidential) | Motion Response/Reply, 1266-023 AliveCor's Opposition to Apple's Motion in Limine No. 2 to Preclude Evidence and Argument regarding Apple's Meetings with AliveCor, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/17/2022 | (765711 - Confidential) | Motion Response/Reply, 1266-025 AliveCor's Opposition to Apple's Motion in Limine No. 4 to Preclude Dr. Akemann from Relying on Evidence Not Identified in His Report, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/17/2022 | (765712 - Confidential) | Motion Response/Reply, 1266-024 AliveCor's Opposition to Apple's Motion in Limine No. 3 to Preclude AliveCor and Its Experts from Advancing a New Claim Construction of "Discordance" Not Ever Disclosed in Contention Responses or Expert Reports, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/17/2022 | (765714 - Confidential) | Motion Response/Reply, 1266-022 AliveCor's Opposition to Apple's Motion in Limine No. 1 to Exclude Reference to Any Alleged "Anticompetitive" Conduct by Apple in This Investigation, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/17/2022 | (765733 - Public) | Motion, 1266-014 AliveCor's Motion in Limine No. 4: Motion to Exclude the Declaration of Jessica Ho (RX-0295C), filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |

**INVESTIGATION REPORT**                    Date/Time: 04/12/2023, 12:00 PM
Investigation No. 337-TA-1266                              Page 11 of 23
                                                    Total Records = 350

| | | |
|---|---|---|
| 03/17/2022 | (765738 - Confidential) | Motion Response/Reply, 1266-026 AliveCor's Opposition to Apple's Motion in Limine No. 5 to Exclude the Fossil License and to Preclude AliveCor's Reliance on the Fossil License, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/17/2022 | (765739 - Confidential) | Motion Response/Reply, 1266-016 Apple's Opposition to AliveCor's Motion in Limine No. 5: To Exclude the Testimony of FDA Expert Erika Lietzan, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/17/2022 | (765740 - Confidential) | Motion Response/Reply, 1266-017 Apple's Opposition to AliveCor's Motion in Limine No. 1: Motion to Exclude Untimely and Improper Claims Constructions, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/17/2022 | (765741 - Confidential) | Motion Response/Reply, 1266-020 Apple's Opposition to AliveCor's Motion in Limine No. 2: To Preclude Evidence and Testimony Not Disclosed during Fact Discovery, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/17/2022 | (765742 - Public) | Motion Response/Reply, 1266-019 Apple's Opposition to AliveCor's Motion in Limine No. 3: to Preclude Evidence and Testimony Not Disclosed during Fact Discovery, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/17/2022 | (765745 - Confidential) | Motion Response/Reply, 1266-014 Apple's Opposition to AliveCor's Motion in Limine No. 4: Motion to Exclude Third-Party Declaration (RX-0295C), filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/18/2022 | (765832 - Public) | Notice, 16 Commission Determination Not to Review an Initial Determination Granting an Unopposed Motion to Terminate the Investigation as to Certain Asserted Patent Claims, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 03/21/2022 | (765896 - Confidential) | Motion, 1266-027 Alivecor's Unopposed Motion for Leave to File Reply in Support of Its Motion in Limine No. 4: Motion to Exclude the Declaration of Jessica Ho (RX-0295C), filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/21/2022 | (765898 - Confidential) | Motion, 1266-028 Motion for Leave to Amend Pre-Hearing Statement and Request for Shortened Time to Respond, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/21/2022 | (765942 - Public) | Order, 1266-028 20 Granting Respondent's Request for Shortened Time to Respond, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 03/21/2022 | (765943 - Confidential) | Order, 1266-014 21 Regarding Complainant AliveCor's Motions in Limine Nos. 3, 4, and 5, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 03/22/2022 | (765992 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Stephen Klapper, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/22/2022 | (766057 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Scott M. Flanz, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/22/2022 | (766101 - Confidential) | Order, 1266-017 22 Denying Complainant AliveCor's Motions in Limine Nos. 1 and 2, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 03/23/2022 | (766175 - Confidential) | Order, 1266-022 23 Denying Respondent Apple's Motions in Limine Nos. 1 and 2, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |

Case: 23-1509    Document: 94-1    Page: 392    Filed: 03/25/2024

**INVESTIGATION REPORT**                    Date/Time: 04/12/2023, 12:00 PM
Investigation No. 337-TA-1266                                     Page 12 of 23
                                                        Total Records = 350

| | | |
|---|---|---|
| 03/23/2022 | (766269 - Confidential) | Order, 1266-024 24 Denying Respondent Apple's Motion in Limine No. 3, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 03/23/2022 | (766271 - Confidential) | Order, 1266-025 25 Denying Respondent Apple's Motion in Limine No. 4, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 03/23/2022 | (766289 - Confidential) | Motion Response/Reply, 1266-028 AliveCor's Opposition to Apple's Motion for Leave to Amend Its Pre-Hearing Statement, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/24/2022 | (766420 - Confidential) | Motion Response/Reply, 1266-028 Response of the Commission Investigative Staff to Apple's Motion for Leave to Amend Its Pre-Hearing Statement, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 03/24/2022 | (766423 - Public) | Motion, 1266-029 Joint Unopposed Motion for Leave to Amend Exhibit Lists, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. and Apple Inc. |
| 03/24/2022 | (766425 - Confidential) | Order, 1266-026 26 Denying Respondent Apple's Motion in Limine No. 5, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 03/24/2022 | (766481 - Public) | Order, 1266-029 27 Granting Joint Unopposed Motion for Leave to Amend Exhibit List, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 03/25/2022 | (766510 - Confidential) | Motion, 1266-030 Apple's Unopposed Motion for Leave to File a Reply in Support of Its Motion for Leave to Amend Pre-Hearing Statement, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 03/28/2022 | (766667 - Public) | Notice of Withdrawal of Appearance, Notice of Withdrawal of Appearance of Michelle Clark, Philip Ducker, John McCauley, Kevin Gu, and Catherine Lacey from Quinn Emanuel Urquhart & Sullivan, LLP on Behalf of AliveCor, Inc., filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/30/2022 | (766917 - Confidential) | Transcript, Hearing (Pages 1-273) (with excerpts), filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 03/30/2022 | (766918 - Public) | Transcript, Hearing (Pages 1-273) (with excerpts), filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 03/30/2022 | (766920 - Confidential) | Transcript, Hearing (Pages 274-547) (with excerpts), filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 03/30/2022 | (766921 - Public) | Transcript, Hearing (Pages 274-547) (with excerpts), filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 03/31/2022 | (767032 - Confidential) | Transcript, Hearing (Pages 548-827) (with excerpts), filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 03/31/2022 | (767033 - Public) | Transcript, Hearing (Pages 548-827) (with excerpts), filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 04/01/2022 | (767144 - Confidential) | Transcript, Hearing (Pages 828-1101) (with excerpts), filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 04/01/2022 | (767145 - Public) | Transcript, Hearing (Pages 828-1101) (with excerpts), filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 04/05/2022 | (767374 - Public) | Order, 28 Amending Ground Rules, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 04/15/2022 | (768408 - Confidential) | Brief Filed With ALJ, Initial Post-Hearing Brief of the Commission Investigative Staff, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |

**INVESTIGATION REPORT**    Date/Time: 04/12/2023, 12:00 PM
**Investigation No. 337-TA-1266**    Page 13 of 23
    Total Records = 350

| 04/15/2022 | (768425 - Confidential) | Brief Filed With ALJ, Apple Inc.'s Post-Hearing Brief, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 04/15/2022 | (768430 - Public) | Exhibit List, Respondent Apple Inc.'s Final Admitted Exhibit Lists, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 04/15/2022 | (768431 - Confidential) | Brief Filed With ALJ, Complainant AliveCor, Inc's Initial Post-Hearing Brief, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 04/18/2022 | (768434 - Public) | Exhibit List, Final Admitted Joint and Complainant's Exhibit Lists, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 04/19/2022 | (768585 - Public) | Motion, 1266-031 Joint Motion of the Private Parties for Extension of the Deadline to File Reply Post-Trial Briefs, filed by Michael Amon of Fish & Richardson P.C., on behalf of Alivecor, Inc. and Apple Inc. |
| 04/19/2022 | (768673 - Public) | Order, 1266-031 29 Granting Joint Motion of the Private Parties for Extension of the Deadline to File Reply Post-Trial Briefs, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 04/21/2022 | (768866 - Confidential) | Transcript, Hearing (Pages 1102-1375) (with excerpts), filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 04/21/2022 | (768867 - Public) | Transcript, Hearing (Pages 1102-1375) (with excerpts), filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 04/27/2022 | (769298 - Confidential) | Motion, 1266-032 Complainant's Unopposed Motion to File a Corrected Version of Complainant's Initial Post-Hearing Brief, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 04/28/2022 | (769406 - Public) | Order, 1266-032 30 Granting Complainant's Unopposed Motion to File a Corrected Version of Complainant's Initial Post-Hearing Brief, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 04/29/2022 | (769515 - Confidential) | Brief Filed With ALJ, Reply Post-Hearing Brief of the Commission Investigative Staff, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 04/29/2022 | (769518 - Confidential) | Brief Filed With ALJ, Complainant AliveCor's Corrected Initial Post-Hearing Brief, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 04/29/2022 | (769543 - Confidential) | Brief Filed With ALJ, Complainant AliveCor, Inc.'s Reply Post-Hearing Brief, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 04/29/2022 | (769550 - Confidential) | Brief Filed With ALJ, Apple Inc.'s Post-Hearing Reply Brief, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 05/27/2022 | (771754 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Nicolas Siebert, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 06/10/2022 | (772807 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Joy Kete, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 06/10/2022 | (772910 - Public) | Notice of Withdrawal of Appearance, Notice of Withdrawal of Appearance of Raisa Ahmad from Fish & Richardson P.C. on Behalf of Apple Inc., filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 06/21/2022 | (773480 - Public) | Order, 1266-014 21 Regarding Complainant AliveCor's Motions in Limine Nos. 3, 4, and 5, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |

**INVESTIGATION REPORT**
Investigation No. 337-TA-1266

| | | |
|---|---|---|
| 06/21/2022 | (773481 - Public) | Order, 1266-017 22 Denying Complainant Alivecor's Motions in Limine Nos. 1 and 2, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 06/21/2022 | (773482 - Public) | Order, 1266-022 23 Denying Respondent Apple's Motions in Limine Nos. 1 and 2, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 06/21/2022 | (773483 - Public) | Order, 1266-024 24 Denying Respondent Apple's Motion in Limine No. 3, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 06/21/2022 | (773484 - Public) | Order, 1266-025 25 Denying Respondent Apple's Motion in Limine No. 4, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 06/21/2022 | (773485 - Public) | Order, 1266-026 26 Denying Respondent Apple's Motion in Limine No. 5, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 06/27/2022 | (773988 - Confidential) | ID/RD - Final on Violation, Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 06/27/2022 | (773989 - Public) | Notice, Initial Determination on Violation of Section 337, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 06/28/2022 | (774120 - Confidential) | Exhibit, Post-Trial, CPX-004C - CPX-0148C, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of Alivecor, Inc. |
| 06/28/2022 | (774122 - Confidential) | Exhibit, Post-Trial, CX-0012C - CX-0942C, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of Alivecor, Inc. |
| 06/29/2022 | (774174 - Confidential) | Exhibit, Post-Trial, JPX-001C - JPX-018C, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of Alivecor, Inc. and Apple Inc. |
| 06/29/2022 | (774171 - Confidential) | Exhibit, Post-Trial, JX-007C - JX-241C, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of Alivecor, Inc. and Apple Inc. |
| 06/29/2022 | (774173 - Public) | Exhibit, Post-Trial, JX-001 - JX-215, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of Alivecor, Inc. and Apple Inc. |
| 06/29/2022 | (774184 - Confidential) | Exhibit, Post-Trial, RX-0002C - RX-0210C, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 06/29/2022 | (774187 - Confidential) | Exhibit, Post-Trial, RX-0213C - RX-0837C, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 06/29/2022 | (774190 - Confidential) | Exhibit, Post-Trial, RPX-001 - RPX-087, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 06/29/2022 | (774213 - Confidential) | Exhibit, Post-Trial, RDX-002C - RDX-006C, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 06/29/2022 | (774216 - Public) | Exhibit, Post-Trial, RX-0001 - RX-0824, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 06/30/2022 | (774315 - Confidential) | Exhibit, Post-Trial, RX-0295C (Rejected), filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 07/01/2022 | (774296 - Public) | Exhibit, Post-Trial, RPX-001 - RPX-086, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 07/01/2022 | (774297 - Public) | Exhibit, Post-Trial, RDX-0003, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 07/01/2022 | (774477 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Elizabeth Moulton, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |

| 07/06/2022 | (774613 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Sheila Baynes, Abigail Colella, Mark Davies, and Zachary Hennessee, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 07/07/2022 | (774824 - Confidential) | Exhibit, Post-Trial, CPX-059C (Rejected), filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of Alivecor, Inc. |
| 07/07/2022 | (774844 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Sunyoung Park, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 07/11/2022 | (775026 - Public) | Notice, Request for Submissions on the Public Interest, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 07/11/2022 | (775064 - Confidential) | Petition for Review; and Response to, Respondent Apple Inc.'s Summary of Its Petition for Review of the Initial Determination on Violation of Section 337, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 07/11/2022 | (775069 - Confidential) | Petition for Review; and Response to, Respondent Apple Inc.'s Petition for Review of the Initial Determination on Violation of Section 337, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 07/11/2022 | (775072 - Confidential) | Petition for Review; and Response to, Complainant Alivecor, Inc.'s Combined Petition for Review and Contingent Petition for Review of the Initial Determination, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 07/11/2022 | (775074 - Confidential) | Petition for Review; and Response to, Summary of Complainant AliveCor, Inc.'s Combined Petition for Review and Contingent Petition for Review of the Initial Determination, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 07/12/2022 | (775078 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of William Adams, filed by Peter Benson of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 07/12/2022 | (775107 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Jordan Coyle, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 07/18/2022 | (775611 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Shara Aranoff, Brian Nester, Alexander Chinoy, and Amy Bond, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 07/19/2022 | (775816 - Confidential) | Petition for Review; and Response to, Combined Response of the Office of Unfair Import Investigations to the Private Parties' Petitions for Review of the Final Initial Determination on Violation, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 07/19/2022 | (775828 - Confidential) | Petition for Review; and Response to, Respondent Apple Inc.'s Response to Complainant's Petition for Review of the Initial Determination on Violation of Section 337, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 07/19/2022 | (775838 - Confidential) | Petition for Review; and Response to, Summary of Complainant AliveCor, Inc.'s Response to Respondent Apple Inc.'s Petition for Review of the Initial Determination on Violation of Section 337, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 07/19/2022 | (775839 - Confidential) | Petition for Review; and Response to, Complainant AliveCor, Inc.'s Response to Respondent Apple Inc.'s Petition for Review of the Initial Determination on Violation of Section 337, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |

**INVESTIGATION REPORT**                    Date/Time:  04/12/2023, 12:00 PM
Investigation No. 337-TA-1266                              Page 16 of 23
                                                    Total Records = 350

| | | |
|---|---|---|
| 07/26/2022 | (776233 - Confidential) | ID/RD - Final on Violation, Corrected Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 07/26/2022 | (776234 - Public) | ID/RD - Final on Violation, Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond, filed by Cameron R. Elliot of USITC, on behalf of Administrative Law Judge |
| 07/26/2022 | (776278 - Public) | Brief on Review/Remedy, Statement of Non-Party American Heart Association on the Public Interest of the Recommended Remedial Orders but Not in Support of Any Party, filed by Darren Donnelly of Polsinelli LLP, on behalf of American Heart Association |
| 07/27/2022 | (776312 - Public) | Brief on Review/Remedy, Public Interest Comments on Behalf of StopAfib, filed by Mellanie Hills of StopAfib.org, on behalf of StopAfib.org |
| 07/27/2022 | (776317 - Public) | Brief on Review/Remedy, Public Interest Comments on Behalf of Dr. Richard Milani, filed by Richard Milani of Ochsner Health System, on behalf of Ochsner Health System |
| 07/27/2022 | (776318 - Public) | Brief on Review/Remedy, Public Interest Comments on Behalf of Dr. Hugh Calkins, filed by Hugh Calkins of The Johns Hopkins Hospital, on behalf of The Johns Hopkins Hospital |
| 07/27/2022 | (776319 - Public) | Brief on Review/Remedy, Public Interest Comments on Behalf of Dr. Marco Perez, filed by Marco Perez of Stanford University School of Medicine, on behalf of Stanford University School of Medicine |
| 07/27/2022 | (776320 - Public) | Brief on Review/Remedy, Public Interest Comments on Behalf of Medical Device Manufacturers Association, filed by Mark Leahey of Medical Device Manufacturers Association, on behalf of Medical Device Manufacturers Association |
| 07/27/2022 | (776345 - Public) | Notice of Appearance, Supplemental Notice of Appearance; Additional Attorneys from Covington & Burling LLP on Behalf of Apple Inc., filed by Alexander D. Chinoy of Covington & Burling LLP, on behalf of Apple Inc. |
| 07/27/2022 | (776373 - Public) | Brief on Review/Remedy, Public Interest Comments on Behalf of Dr. Dwight Reynolds, filed by Dwight Reynolds of University of Oklahoma Health Sciences Center, on behalf of University of Oklahoma Health Sciences Center |
| 07/27/2022 | (776375 - Public) | Brief on Review/Remedy, Public Interest Comments on Behalf of Dr. Ronald Karlsberg, filed by Ronald Karlsberg of Cardiovascular Research Foundation of Southern California, on behalf of Cardiovascular Research Foundation of Southern California |
| 07/27/2022 | (776377 - Public) | Brief on Review/Remedy, Public Interest Comments on Behalf of Dr. Eric Topol, filed by Eric Topol of Scripps Research Translational Institute, on behalf of Scripps Research Translational Institute |
| 07/27/2022 | (776380 - Public) | Brief on Review/Remedy, Public Interest Comments of Dr. Charles Swerdlow, filed by Charles Swerdlow of Cedars-Sinai Heart Institute, on behalf of Charles Swerdlow |
| 07/27/2022 | (776391 - Public) | Brief on Review/Remedy, Statement of Third Parties Computer & Communications Industry Association and NetChoice in Response to the Commission's July 15, 2022, Notice of Request for Statements on the Public Interest, filed by Joshua Landau of Computer & Communications Industry Association, on behalf of Computer & Communications Industry Association and NetChoice LLC |

| | | |
|---|---|---|
| 07/27/2022 | (776393 - Public) | Notice of Appearance, Supplemental Notice of Appearance; Additional Attorneys from Orrick Herrington & Sutcliffe LLP on Behalf of Apple Inc., filed by Jordan L. Coyle of Orrick Herrington & Sutcliffe LLP, on behalf of Apple Inc. |
| 07/27/2022 | (776396 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Cesar Lopez-Morales, filed by Jordan L. Coyle of Orrick Herrington & Sutcliffe LLP, on behalf of Apple Inc. |
| 07/27/2022 | (776401 - Confidential) | Brief on Review/Remedy, Complainant AliveCor, Inc.'s Statement on the Public Interest, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 07/27/2022 | (776403 - Confidential) | Brief on Review/Remedy, Respondent Apple Inc.'s Public Interest Statement, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 07/28/2022 | (776492 - Public) | Brief on Review/Remedy, Respondent Apple Inc.'s Public Interest Statement, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 07/29/2022 | (776493 - Public) | Brief on Review/Remedy, Complainant AliveCor, Inc.'s Statement on the Public Interest, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 07/29/2022 | (776561 - Public) | Petition for Review; and Response to, Combined Response of the Office of Unfair Import Investigations to the Private Parties' Petitions for Review of the Final Initial Determination on Violation, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 08/01/2022 | (776663 - Public) | Notice, 87 FR 42500 F.R. Notice of Request for Submissions on the Public Interest, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 08/02/2022 | (776820 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Roger Denning and Oliver Richards, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 08/02/2022 | (776875 - Public) | Petition for Review; and Response to, Respondent Apple Inc.'s Summary of Its Petition for Review of the Initial Determination on Violation of Section 337, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 08/02/2022 | (776876 - Public) | Petition for Review; and Response to, Complainant AliveCor's Combined Petition for Review and Contingent Petition for Review of the Initial Determination, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 08/02/2022 | (776877 - Public) | Petition for Review; and Response to, Respondent Apple Inc.'s Petition for Review of the Initial Determination on Violation of Section 337, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 08/02/2022 | (776878 - Public) | Petition for Review; and Response to, Respondent Apple Inc.'s Response to Complainant's Petition for Review of the Initial Determination on Violation of Section 337, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 08/02/2022 | (776879 - Public) | Petition for Review; and Response to, Summary of Complainant AliveCor, Inc.'s Combined Petition for Review and Contingent Petition for Review of the Initial Determination, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |

| | | |
|---|---|---|
| 08/02/2022 | (776881 - Public) | Petition for Review; and Response to, Summary of Complainant AliveCor, Inc.'s Response to Respondent Apple Inc.'s Petition for Review of the Initial Determination on Violation of Section 337, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 08/03/2022 | (777009 - Public) | Petition for Review; and Response to, Complainant AliveCor, Inc.'s Response to Respondent Apple Inc.'s Petition for Review of the Initial Determination on Violation of Section 337, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 08/23/2022 | (778529 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Jeffrey T. Quilici, filed by Jordan L. Coyle of Orrick Herrington & Sutcliffe LLP, on behalf of Apple Inc. |
| 08/25/2022 | (778749 - Public) | Notice, Commission Determination to Extend the Date for Deciding Whether to Review the Final Initial Determination, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 08/29/2022 | (778894 - Public) | Voting Sheet, GC-22-282, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 08/31/2022 | (779105 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Isaac Park, filed by Jordan L. Coyle of Orrick Herrington & Sutcliffe LLP, on behalf of Apple Inc. |
| 09/22/2022 | (780874 - Public) | Notice, Commission Determination to Review in Part a Final Initial Determination Finding a Violation of Section 337; Request for Written Submissions on the Issues under Review and on Remedy, the Public Interest, and Bonding; Extension of the Target Date, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 09/23/2022 | (780921 - Public) | Voting Sheet, GC-22-293, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 09/28/2022 | (781222 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Christian Dippon and Michael Davies, filed by Michael Amon of Fish & Richardson P.C., on behalf of Apple Inc. |
| 09/29/2022 | (781289 - Public) | Notice, 87 FR 58819 F.R. Notice of a Commission Determination to Review in Part a Final Initial Determination Finding a Violation of Section 337; Request for Written Submissions on the Issues under Review and on Remedy, the Public Interest, and Bonding; Extension of the Target Date, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 09/30/2022 | (781398 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Mike Cragg and Douglas Frank, filed by Peter Benson of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 10/03/2022 | (781488 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Lucas Moench, filed by Alexander D. Chinoy of Covington & Burling LLP, on behalf of Apple Inc. |
| 10/06/2022 | (781761 - Public) | Brief on Review/Remedy, Public Interest Comments of Vinod Khosla, filed by Vinod Khosla of Khosla Ventures, on behalf of Khosla Ventures |
| 10/06/2022 | (781817 - Public) | Brief on Review/Remedy, Public Interest Comments of Dr. Toby Cosgrove, filed by Toby Cosgrove of Toby Cosgrove, on behalf of Toby Cosgrove |
| 10/06/2022 | (781822 - Public) | Brief on Review/Remedy, Proposed Limited Exclusion Order and Cease and Desist Order, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |

**INVESTIGATION REPORT**
Investigation No. 337-TA-1266

| | | |
|---|---|---|
| 10/06/2022 | (781824 - Confidential) | Brief on Review/Remedy, Brief of the Office of Unfair Import Investigations on the Issues under Review and on Remedy, the Public Interest, and Bonding, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 10/06/2022 | (781827 - Confidential) | Brief on Review/Remedy, Complainant AliveCor, Inc.'s Submission in Response to the Commission's September 22, 2022 Notice of a Commission Determination to Review in Part, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 10/06/2022 | (781829 - Confidential) | Brief on Review/Remedy, Respondent Apple Inc.'s Opening Brief in Response to the Commission's Request for Written Submissions on the Issues under Review and on Remedy, the Public Interest, and Bonding, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 10/07/2022 | (781835 - Confidential) | Correspondence, Motion for Leave to File out of Time Respondent Apple Inc.'s Exhibits 5 and 6 in Support of Brief in Response to the Commission's Request for Written Submissions, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 10/07/2022 | (781878 - Public) | Correspondence - USITC, Letter Granting Leave to File out of Time Brief in Response to the Commission's Request for Written Submissions, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 10/11/2022 | (781912 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Daniel E. Gaynor, Clare Stevens, and Benjamin Wolters, filed by Peter Benson of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 10/11/2022 | (782049 - Public) | Brief on Review/Remedy, Complainant AliveCor, Inc.'s Submission in Response to the Commission's September 22, 2022 Notice of a Commission Determination to Review in Part, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 10/11/2022 | (782050 - Public) | Brief on Review/Remedy, Brief of the Office of Unfair Import Investigations on the Issues under Review and on Remedy, the Public Interest, and Bonding, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 10/11/2022 | (782052 - Public) | Brief on Review/Remedy, Respondent Apple Inc.'s Opening Brief in Response to the Commission's Request for Written Submissions on the Issues under Review and on Remedy, the Public Interest, and Bonding, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 10/12/2022 | (782056 - Confidential) | Correspondence, Respondent Apple Inc.'s Motion for Leave to File Corrected Exhibits 5 and 6 in Support of Respondent's Brief in Response to the Commission's Request for Written Submissions, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 10/12/2022 | (782120 - Public) | Correspondence, Joint Motion of the Private Parties for Extension of the Deadline to File Replies to Written Submissions on the Issues under Review and on Remedy, the Public Interest, and Bonding, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Alivecor, Inc. and Apple Inc. |
| 10/12/2022 | (782164 - Public) | Brief on Review/Remedy, Written Comments, filed by Henry C. "Hank" Johnson, Jr. of Congress of the United States, on behalf of Congress of the United States |

| 10/12/2022 | (782166 - Public) | Correspondence, Respondent Apple Inc.'s Motion for Leave to File Corrected Exhibits 5 and 6 in Support of Respondent's Brief in Response to the Commission's Request for Written Submissions, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| --- | --- | --- |
| 10/12/2022 | (782169 - Public) | Correspondence - USITC, Letter Granting Request for Extension of Time to File Replies to the Commission's Request for Written Submissions, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 10/13/2022 | (782170 - Public) | Correspondence - USITC, Letter Granting Request for Leave to File out of Time Exhibits to Brief in Response to the Commission's Request for Written Submissions, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 10/14/2022 | (782339 - Confidential) | Brief on Review/Remedy, Reply Brief of the Office of Unfair Import Investigations on the Issues under Review and on Remedy, the Public Interest, and Bonding, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 10/14/2022 | (782347 - Confidential) | Brief on Review/Remedy, Respondent Apple Inc.'s Reply Brief to AliveCor and OUII's Response to the Commission's Request for Written Submissions on the Issues under Review and on Remedy, the Public Interest, and Bonding, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 10/14/2022 | (782363 - Confidential) | Brief on Review/Remedy, Complainant AliveCor, Inc.'s Reply Submission in Response to the Commission's September 22, 2022 Notice of a Commission Determination to Review in Part, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 10/17/2022 | (782435 - Public) | Brief on Review/Remedy, Written Comments, filed by Eric Swalwell of Congress of the United States, on behalf of Congress of the United States |
| 10/18/2022 | (782526 - Public) | Brief on Review/Remedy, Written Comments, filed by Lucy McBath of Congress of the United States, on behalf of Congress of the United States |
| 10/18/2022 | (782552 - Public) | Brief on Review/Remedy, Respondent Apple Inc.'s Reply Brief to AliveCor and OUII's Response to the Commission's Request for Written Submissions on the Issues under Review and on Remedy, the Public Interest, and Bonding, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 10/18/2022 | (782587 - Public) | Brief on Review/Remedy, Reply Brief of the Office of Unfair Import Investigations on the Issues under Review and on Remedy, the Public Interest, and Bonding, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 10/18/2022 | (782588 - Public) | Brief on Review/Remedy, Written Comments, filed by Donald S. Beyer Jr. of Congress of the United States, on behalf of Congress of the United States |
| 10/18/2022 | (782590 - Public) | Brief on Review/Remedy, Written Comments, filed by Zoe Lofgren of Congress of the United States, on behalf of Congress of the United States |
| 10/18/2022 | (782591 - Public) | Brief on Review/Remedy, Written Comments, filed by Anna G. Eshoo of Congress of the United States, on behalf of Congress of the United States |
| 10/18/2022 | (782594 - Public) | Brief on Review/Remedy, Written Comments, filed by Jimmy Panetta of Congress of the United States, on behalf of Congress of the United States |

| | | |
|---|---|---|
| 10/18/2022 | (782595 - Public) | Brief on Review/Remedy, Written Comments, filed by Linda T. Sanchez of Congress of the United States, on behalf of Congress of the United States |
| 10/19/2022 | (782626 - Public) | Brief on Review/Remedy, Complainant AliveCor, Inc.'s Reply Submission in Response to the Commission's September 22, 2022 Notice of a Commission Determination to Review in Part, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 10/21/2022 | (782845 - Public) | Motion, 1266-033C Respondent Apple Inc.'s Motion for Leave to File Sur-Reply Brief to AliveCor's Reply to the Commission's Request for Written Submissions on the Issues under Review and on Remedy, the Public Interest, and Bonding, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 10/24/2022 | (782936 - Confidential) | Motion Response/Reply, 1266-033C AliveCor's Opposition to Apple's Motion for Leave to File a Sur-Reply to AliveCor's Reply to the Commission's Request for Written Submissions on the Issues under Review and on Remedy, the Public Interest, and Bonding, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 10/28/2022 | (783276 - Public) | Motion Response/Reply, 1266-033C AliveCor's Opposition to Apple's Motion for Leave to File a Sur-Reply to AliveCor's Reply to the Commission's Request for Written Submissions on the Issues under Review and on Remedy, the Public Interest, and Bonding, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 11/02/2022 | (783627 - Public) | Motion Response/Reply, 1266-033C Response of the Office of Unfair Import Investigations to Respondent Apple Inc.'s Motion for Leave to File Sur-Reply Brief to Alivecor's Reply to the Commission's Request for Written Submissions on the Issues under Review and on Remedy, the Public Interest, and Bonding, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 11/28/2022 | (785236 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Melanie L. Bostwick and Katherine M. Kopp, filed by Jordan L. Coyle of Orrick Herrington & Sutcliffe LLP, on behalf of Apple Inc. |
| 11/29/2022 | (785278 - Public) | Brief on Review/Remedy, Written Comments, filed by J. Luis Correa of Congress of the United States, on behalf of Congress of the United States |
| 11/29/2022 | (785297 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Joseph R. Kolker, filed by Jordan L. Coyle of Orrick Herrington & Sutcliffe LLP, on behalf of Apple Inc. |
| 12/07/2022 | (785898 - Public) | Motion, 1266-034C Respondent Apple Inc.'s Emergency Motion to Suspend Any Remedy or Extend the Target Date and Stay Proceedings Pending Resolution of Any Appeal of the Patent Office's Decision That United States Patent Nos. 10,638,941, 10,595,731, and 9,572,499 Are Unpatentable, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 12/09/2022 | (786023 - Public) | Motion Response/Reply, 1266-034C AliveCor's Opposition to Apple's Emergency Motion to Suspend Any Remedy or Extend the Target Date and Stay Proceedings, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 12/09/2022 | (786057 - Public) | Notice, Commission Determination to Extend the Target Date for the Completion of This Investigation, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |

**INVESTIGATION REPORT**
**Investigation No. 337-TA-1266**

| | | |
|---|---|---|
| 12/16/2022 | (786480 - Public) | Motion Response/Reply, 1266-034C Response of the Office of Unfair Import Investigations to Respondent Apple Inc.'s Emergency Motion to Suspend Any Remedy or Extend the Target Date and Stay Proceedings Pending Resolution of Any Appeal of the Patent Office's Decision That United States Patent Nos. 10,638,941, and 9,572,499 Are Unpatentable, filed by R. Whitney Winston of USITC, on behalf of Office of Unfair Import Investigations |
| 12/20/2022 | (786648 - Public) | Notice, Commission Determination to Extend the Target Date for the Completion of This Investigation, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 12/22/2022 | (786801 - Public) | Notice, Commission's Final Determination Finding a Violation of Section 337; Issuance and Suspension of a Limited Exclusion Order and a Cease and Desist Order; Termination of the Investigation, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 12/22/2022 | (786802 - Public) | Order, Commission, Limited Exclusion Order for Apple Inc., filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 12/22/2022 | (786803 - Confidential) | Opinion, Commission, Commission Opinion, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 12/22/2022 | (786804 - Public) | Order, Commission, Cease and Desist Order for Apple Inc., filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 12/22/2022 | (786805 - Public) | Correspondence - USITC, Letter to Chief Dax Terrill about the Issuance and Suspension of a Limited Exclusion Order and a Cease and Desist Order; Termination of the Investigation, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 12/23/2022 | (786861 - Confidential) | Correspondence - USITC, Letters from Chairman David S. Johanson to the President of the United States, Janet L. Yellen, Secretary of the Treasury and Katherine Tai, United States Trade Representative Transmitting a General Exclusion Order and Cease and Desist Order, filed by David S. Johanson of USITC, on behalf of Office of the Chairman |
| 12/23/2022 | (786862 - Public) | Correspondence - USITC, Letters from Chairman David S. Johanson to the President of the United States, Janet L. Yellen, Secretary of the Treasury and Katherine Tai, United States Trade Representative Transmitting a General Exclusion Order and Cease and Desist Order, filed by David S. Johanson of USITC, on behalf of Office of the Chairman |
| 12/30/2022 | (787080 - Public) | Notice, 87 FR 80569 F.R. Notice of Commission's Final Determination Finding a Violation of Section 337; Issuance and Suspension of a Limited Exclusion Order and a Cease and Desist Order; Termination of the Investigation, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 01/10/2023 | (787600 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Joseph R. Dorris, filed by Benjamin Elacqua of Fish & Richardson P.C., on behalf of Apple Inc. |
| 01/10/2023 | (787646 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Krishna Shah, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 01/11/2023 | (787759 - Public) | Voting Sheet, GC-22-391, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 01/12/2023 | (787815 - Public) | Voting Sheet, GC-22-403, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 01/12/2023 | (787839 - Public) | Voting Sheet, GC-22-369, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |

**INVESTIGATION REPORT**                    Date/Time:  04/12/2023, 12:00 PM
Investigation No. 337-TA-1266                                Page 23 of 23
                                                          Total Records = 350

| 01/20/2023 | (788332 - Public) | Opinion, Commission, Commission Opinion, filed by Katherine M. Hiner of USITC, on behalf of Office of the Secretary |
| 02/09/2023 | (790017 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Kristina D. McKenna, filed by Jordan L. Coyle of Orrick Herrington & Sutcliffe LLP, on behalf of Apple Inc. |
| 03/03/2023 | (791707 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Bas de Blank, filed by Jordan L. Coyle of Orrick Herrington & Sutcliffe LLP, on behalf of Apple Inc. |
| 03/06/2023 | (791751 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Nicholas Caluda and Lora Green, filed by Peter Benson of Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of AliveCor, Inc. |
| 03/09/2023 | (792143 - Public) | Notice of Appearance, Supplemental Notice of Appearance; Additional Attorney from DLA Piper LLP (US) on Behalf of Apple Inc., filed by Jessica Hannah of DLA Piper LLP (US), on behalf of Apple Inc. |
| 03/09/2023 | (792144 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Jessica Hannah, filed by Jessica Hannah of DLA Piper LLP (US), on behalf of Apple Inc. |
| 03/23/2023 | (792999 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Stanley J. Panikowski, filed by Jessica Hannah of DLA Piper LLP (US), on behalf of Apple Inc. |
| 03/27/2023 | (791113 - Public) | Other, Certified List, 23-1509, AliveCor, Inc. v. International Trade Commission, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 03/27/2023 | (793249 - Public) | Notice of Withdrawal of Appearance, Notice of Withdrawal of Appearance of Jeffrey Quilici from Orrick Herrington & Sutcliffe LLP on Behalf of Apple Inc., filed by Jordan L. Coyle of Orrick Herrington & Sutcliffe LLP, on behalf of Apple Inc. |
| 04/12/2023 | (793278 - Public) | Other, Certified List, 23-1553, Apple Inc. v. International Trade Commission, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |

Dated:          4/12/2023

Lisa R. Barton, Secretary
U.S. International Trade Commission

Certified to be a
true copy of the
Original
Secretary





# UNITED STATES INTERNATIONAL TRADE COMMISSION

WASHINGTON, DC 20436

### CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that on this 12th day of April, 2023 a true and

correct copy of the attached **CERTIFIED LIST** was served via electronic service,

upon the following:

**On Behalf of Apple Inc.:**

Melanie L. Bostwick, Esq.
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
1152 15th Street, NW
Columbia Center
Washington, DC 20005
Email: mbostwick@orrick.com

**On Behalf of AliveCor, Inc.:**

Sean S. Pak, Esq.
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
50 California Street, 22nd Floor
San Francisco, CA 94111
Email: seanpak@quinnemanuel.com

Lisa R. Barton, Secretary
U.S. International Trade Commission

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

**In the Matter of**

**CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF**

Investigation No. 337-TA- _____

## AMENDED COMPLAINT UNDER SECTION 337 OF THE TARIFF ACT OF 1930, AS AMENDED

**Complainant**

AliveCor, Inc.
444 Castro St, Suite 600,
Mountain View, CA 94041
Tel. (650) 396-8650

**Proposed Respondent**

Apple Inc.
One Apple Park Way,
Cupertino, California 95014
Tel. (408) 996–1010

**Counsel for Complainant AliveCor, Inc.**

S. Alex Lasher
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington D.C. 20005
Tel.: (202) 538-8000

Sean S. Pak
Andrew M. Holmes
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel.: (415) 875-6600

Adam B. Wolfson
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
TEL: (213) 443-3000

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II. PARTIES ............................................................................................................. 3

    A.  AliveCor ...................................................................................................... 3

    B.  Apple .......................................................................................................... 4

III. BACKGROUND ................................................................................................. 4

    A.  Heart Disease in the United States ............................................................. 4

    B.  AliveCor's Wearable ECG Technology ..................................................... 5

    C.  AliveCor's First Heart Monitor .................................................................. 6

    D.  AliveCor's KardiaBand and SmartRhythm Application ............................ 7

    E.  Apple Copies AliveCor's Technology and Eliminates Competition .......... 9

    F.  AliveCor's Continuing Investment in KardiaBand and SmartRhythm
       Technology ................................................................................................ 10

IV. THE TECHNOLOGY AND PRODUCTS AT ISSUE ..................................... 11

V.  THE ASSERTED PATENTS AND NONTECHNICAL DESCRIPTIONS OF THE
    INVENTIONS ................................................................................................... 12

    A.  The '731 Patent ......................................................................................... 13

         1.  Identification and Ownership of the '731 Patent ........................... 13

         2.  Foreign Counterparts to the '731 Patent ...................................... 14

         3.  Non-Technical Description of the '731 Patent ............................... 14

    B.  The '941 Patent ......................................................................................... 15

         1.  Identification and Ownership of the '941 Patent ........................... 15

         2.  Foreign Counterparts to the '941 Patent ...................................... 15

         3.  Non-Technical Description of the '941 Patent ............................... 15

    C.  The '499 Patent ......................................................................................... 16

1

        1.    Identification and Ownership of the '499 Patent.....................................16

        2.    Foreign Counterparts to the '499 Patent...................................................16

        3.    Non-Technical Description of the '499 Patent..........................................17

    D.    Apple's Infringement Of The Asserted Patents ....................................17

        1.    Infringement of the '731 Patent.................................................................17

        2.    Infringement of the '941 Patent.................................................................18

        3.    Infringement of the '499 Patent.................................................................20

VI.    SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE...........................21

    A.    Harmonized Tariff Schedule Numbers...................................................22

VII.    RELATED LITIGATION...............................................................................................22

VIII.    LICENSEES TO THE ASSERTED PATENTS...........................................................22

IX.    THE DOMESTIC INDUSTRY RELATING TO THE ASSERTED PATENTS............23

    A.    Technical Prong........................................................................................23

    B.    Economic Prong .......................................................................................23

X.    RELIEF REQUESTED .................................................................................................25

2

**EXHIBIT LIST**

| Exhibits | Description |
|---|---|
| 1 | U.S. Patent No. 10,595,731 |
| 2 | U.S. Patent No. 10,638,941 |
| 3 | U.S. Patent No. 9,572,499 |
| 4 | Assignment Records for U.S. Patent No. 10,595,731 |
| 5 | Assignment Records for U.S. Patent No. 10,638,941 |
| 6 | Assignment Records for U.S. Patent No. 9,572,499 |
| 7 | List of Foreign Counterparts |
| 8 | Confidential List of Licensees |
| 9 | '731 Infringement Claim Charts |
| 10 | '941 Infringement Claim Charts |
| 11 | '499 Infringement Claim Charts |
| 12 | Photographs and proof of purchase of the Apple Watch |
| 13 | '731 Domestic Industry Claim Chart KardiaBand |
| 14 | '941 Domestic Industry Claim Chart KardiaBand |
| 15 | '499 Domestic Industry Claim Chart KardiaBand |
| 16 | Confidential '731 Domestic Industry Claim Chart Reference |
| 17 | Confidential '941 Domestic Industry Claim Chart Reference |
| 18 | Confidential '499 Domestic Industry Claim Chart Reference |
| 19 | Confidential Declaration of Siva Somayajula |
| 20 | Confidential Declaration of Clyde Hosein |
| 21 | Confidential Domestic Industry Product Reference |
| 22 | Confidential License to the Asserted Patents |
| 23 | Certificate of Correction for U.S. Patent No. 10,638,941 |

3

**APPENDIX LIST**

| Appendices | Description |
|---|---|
| A | Prosecution History of U.S. Patent No. 10,595,731 |
| B | Patents and Applicable Pages of Technical References Mentioned in the Prosecution History of U.S. Patent No. 10,595,731 |
| C | Prosecution History of U.S. Patent No. 10,638,941 |
| D | Patents and Applicable Pages of Technical References Mentioned in the Prosecution History of U.S. Patent No. 10,638,941 |
| E | Prosecution History of U.S. Patent No. 9,572,499 |
| F | Patents and Applicable Pages of Technical References Mentioned in the Prosecution History of U.S. Patent No. 9,572,499 |

4

## I.    INTRODUCTION

1.    AliveCor, Inc. (hereinafter "AliveCor" or "Complainant") files this complaint under Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, based on the Proposed Respondent Apple Inc.'s ("Apple" or "Respondent") unlawful importation into the United States, sale for importation into the United States, and/or sale within the United States after importation of certain wearable electronic devices with electrocardiogram ("ECG") capability and components thereof ("the Accused Devices").

2.    These products infringe one or more claims of United States Patent Nos. 10,595,731 ("the '731 patent"), 10,638,941 ("the '941 patent"), and 9,572,499 ("the '499 patent") (collectively, the "Asserted Patents"), either literally or under the doctrine of equivalents. AliveCor owns full rights, title, and interest in and to the Asserted Patents.

3.    Exemplary models of Apple's wearable electronic devices at issue in this complaint include the Apple Watch Series 4, Apple Watch Series 5, and Apple Watch Series 6.

4.    The following table provides a summary of the asserted claims of the Asserted Patents (independent claims in bold):

| Patent No. | Asserted Claims |
|---|---|
| 10,595,731 | **1**, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, **17,** 18, 19, 20, 21, 22, 23, 24, **25**, 26, 27, 28, 29, 30 |
| 10,638,941 | **1**, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, **12**, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23 |
| 9,572,499 | **1**, 2, 3, 4, 6, 7, 8, 9, 10, **11**, 12, 13, 14, 16, 17, 18, 19, 20 |

5.    A domestic industry as required by 19 U.S.C. § 1337(a)(2) and (3) exists and/or is in the process of being established in the United States relating to articles protected by AliveCor's Asserted Patents. AliveCor's domestic industry includes significant investment in plant and equipment, significant employment of labor and capital, and substantial investment in the

1

exploitation of the inventions claimed in AliveCor's Asserted Patents, including through engineering, research, and development.

6.    Apple's unlicensed and unauthorized use of AliveCor's technology—including the technology disclosed in the Asserted Patents—to import and sell wearable electronic devices with ECG functionality in the United States constitutes an unfair act within the meaning of Section 337.

7.    On information and belief, the Accused Devices are manufactured and/or sold for importation into the United States, imported into the United States, and/or sold after importation into the United States by or on behalf of Apple.

8.    AliveCor seeks as relief a permanent limited exclusion order under 19 U.S.C. § 1337(d) barring from entry into the United States infringing wearable electronic devices with ECG capability and components thereof that are manufactured, sold for importation, and/or imported by or on behalf of Apple.

9.    AliveCor further seeks as relief permanent cease and desist orders under 19 U.S.C. § 1337(f) prohibiting Apple from marketing, distributing, selling, offering for sale, warehousing inventory for distribution, and otherwise transferring or bringing into the United States wearable electronic devices with ECG functionality and components thereof that violate Section 337.

10.    AliveCor further seeks as relief a bond, for the 60-day Presidential review period pursuant to 19 U.S.C. § 1337(j), for the importation of Respondent's wearable electronic devices with ECG functionality and components thereof that infringe one or more claims of the Asserted Patents.

2

## II.    PARTIES

### A.    AliveCor

11.    AliveCor is a corporation organized and existing pursuant to the laws of the State of Delaware, and has its principal place of business at 444 Castro St, Suite 600, Mountain View, CA 94041.    AliveCor is a leader in the design and development of products that provide intelligent, highly-personalized heart data to help diagnose heart conditions.

12.    In 2017, AliveCor was first to bring to market an FDA cleared wearable consumer device, the KardiaBand, capable of monitoring the owner's heart, detecting heart rate irregularities, and then allowing the owner to perform an ECG to diagnose potential atrial fibrillation ("AFib").    In doing so, it became the first to ever receive FDA clearance for a non-prescription wearable medical device that allowed the consumer to record an ECG reading.

13.    Since introducing KardiaBand, AliveCor has devoted significant resources to bringing additional wearable electronic ECG devices to market.

14.    AliveCor currently employs approximately 95 individuals in the United States and has made a substantial investment in domestic activities in the United States including, engineering, design, data collection and analysis, customer service, research, and development to bring products to market that make diagnosing AFib, and other irregular heart beat illnesses, more accessible, more accurate, and more convenient.

15.    AliveCor's patent-protected breakthroughs were acknowledged, and subsequently duplicated, without license or permission, by Apple.    This Complaint is one step, among others, AliveCor is taking to obtain relief for Apple's intentional copying of AliveCor's patented technology—including the ability to take an ECG reading on the Apple Watch, and to  perform

3

heartrate analysis—as well as Apple's efforts to eliminate AliveCor as competition in the heartrate analysis market for the Apple Watch.

**B.      Apple**

16.      Apple is a California corporation with a principal place of business at One Apple Park Way, Cupertino, California 95014.

17.      On information and belief, Apple designs, develops, tests, imports into the United States, offers for sale, and sells in the United States after importation infringing wearable electronic devices, including those sold under the tradenames Apple Watch Series 4, Apple Watch Series 5, and Apple Watch Series 6.

**III.      BACKGROUND**

**A.      Heart Disease in the United States**

18.      According to the Centers for Disease Control and Prevention (the "CDC"), heart disease is the leading cause of death for men, women, and people of most racial and ethnic groups in the United States. One person dies every 36 seconds in the United States from cardiovascular disease.

19.      AFib is one type of heart disease. AFib is a quivering or irregular heartbeat (arrhythmia) that can lead to blood clots, stroke, heart failure and other heart-related complications. Normally, the heart contracts and relaxes to a regular beat. When a person has AFib, however, the normal beating in the upper chambers of the heart (the two atria) is irregular, and blood does not flow as well as it should from the atria to the lower chambers of the heart (the two ventricles). AFib may happen in brief episodes, or it may be a permanent condition.

4

20.        Millions of Americans live with AFib. Untreated atrial fibrillation doubles the risk of heart-related deaths and is associated with a 5-fold increased risk for stroke. Despite this, many patients are unaware that they have AFib—or that it is a serious condition at all.

21.        There are different types of atrial fibrillation, but the most difficult type of AFib to diagnose is paroxysmal atrial fibrillation. This type of atrial fibrillation is episodic—it comes and goes in paroxysms, or sudden attacks. A principal feature of this type of atrial fibrillation is its unpredictability.[1] For a patient, that unpredictability makes diagnosis difficult--the episodes may occur when no doctor is monitoring the heart. When a patient does go to a doctor, the doctor may find that the heart is operating in perfect order.

## B.        AliveCor's Wearable ECG Technology

22.        In 2010, David Albert, Bruce Satchwell, and Kim Barnett began working together to address the leading cause of death in the United States: heart disease. Their idea was to give patients the ability to monitor their heart health with an accurate and easy to use device that allowed individuals to take their own ECG.

23.        In late December 2010, Dr. Albert uploaded a video demo of an ECG device that could work with an iPhone to YouTube. The video went viral with more than 100,000 views in the first few days, and it made AliveCor's ECG device one of the most talked about technologies at the 2011 Consumer Electronics Show.

24.        Shortly after the 2011 Consumer Electronics Show, Dr. Albert, Mr. Satchwell, and Mr. Barnett officially formed AliveCor in order to bring their novel ECG device to market.

---

[1] "Sometimes the symptoms last for minutes, sometimes they can last for days; a principle feature of this type of AFib is that it's unpredictable." *See, e.g.*, https://www.alivecor.com/ blog/articles/the_3_forms_of_AFib/

5

### C.    AliveCor's First Heart Monitor

25.    Just two years later, in 2013, AliveCor introduced the first FDA approved portable ECG product. That product—the AliveCor Heart Monitor—incorporated two electrodes into an iPhone case. Those electrodes allowed the user to take real-time ECG readings by either holding the monitor in their hands or by pressing it against their chest. Before reaching the market, AliveCor demonstrated the effectiveness and accuracy of its revolutionary heart monitor through clinical trials.

26.    AliveCor participated in two clinical trials to field test both the hardware and the accompanying iPhone application for the AliveCor Heart Monitor. One study investigated how AliveCor's single-lead ECG compared to a traditional 12-lead device. Another examined if 54 participants could figure out how to use the case properly, with no previous medical training. The latter study not only showed the device could be used without specialized training, but also led to the diagnosis of two serious heart problems.

27.    The AliveCor Heart Monitor system consisted of the heart monitor itself, which could be mounted onto the back of most smartphones, or embedded into a special case for the iPhone, and the AliveECG app, which showed the user's ECG reading. To check heart activity, the user placed the detector against their fingers or chest. The detector then recorded an ECG and sent that data to the app on a smartphone, using an ultrasonic signal that is sent to the phone's microphone.

6

28.      The data was also sent to AliveCor's servers so that the AFib Detector algorithms could analyze the data and interpret it. Once the ECG reading was obtained, it could be sent to a doctor or a heart specialist for more information.



**Figure 1: AliveCor Heart Monitor**

### D.    AliveCor's KardiaBand and SmartRhythm Application

29.      In late 2014 or early 2015, AliveCor began working on what ultimately became the AliveCor KardiaBand. The KardiaBand was a replacement watch band for a user's Apple Watch. The KardiaBand was the first FDA cleared medical accessory for the Apple Watch. KardiaBand, in conjunction with the Kardia watch app, enabled a user to record an ECG  on their wrist anywhere in the world. KardiaBand entered the U.S. market at the end of 2017.

30.      Like the AliveCor Heart Monitor,[2] the KardiaBand was also easy to use and activate. Recording an ECG took just three steps: (i) open the Kardia watch app; (ii) open the in-app instructions; and (iii) put your right thumb on the KardiaBand outer electrode while ensuring the inner electrode was in contact with the skin of the left wrist.

---

[2] The current AliveCor Heart Monitor is marketed under the KardiaMobile brand name.

7



**Figure 2: AliveCor KardiaBand**

31.     Along with the KardiaBand for Apple Watch, AliveCor also introduced a new software feature in its Kardia App called SmartRhythm. SmartRhythm used artificial intelligence to continuously evaluate the correlation between heart activity and physical activity using heart rate data and activity data sensors in the Apple watch. SmartRhythm was developed to work in coordination with the KardiaBand and the Kardia App to detect and notify users of heart rate irregularities. Users were then asked to record an ECG which could confirm the occurrence of AFib.

32.     Dr. Ronald Karlsberg of Cedars Sinai Heart Institute and UCLA's School of Medicine described the combination of KardiaBand and SmartRhythm as "a paradigm shift for cardiac care as well as an important advance in healthcare." See https://www.alivecor.com/press/press_release/fda-clears-first-medical-device-for-apple-watch/. Dr. Karlsberg further explained the significance of AliveCor's innovation: "Today, [ECGs] are available only in offices and hospitals, using complex equipment, and usually only after a life threatening event, for example a stroke. With an EKG device on the wrist, AFib can be detected wherever the patient is, 24 hours a day. In randomized research trials, KardiaMobile, the first AliveCor [ECG] device, proved to be superior to routine care provided by physicians. Today, KardiaBand is a giant leap in personalized health care." *Id.*

8

33.    The SmartRhythm algorithm was trained, via user data, to monitor a user in real time and provide alerts to users when they were experiencing unexpected heart rates. These unexpected heart rates were potential occurrences of AFib. Users could then record an ECG which would confirm possible AFib. Initially, SmartRhythm was trained to recognize discordant heart rates by looking at a user's heart rate as provided by the Apple Watch. Over time, AliveCor developed a neural network architecture that could project what a patient's future heart rate should be such that when the projected heart rate did not match the actual heart rate, the user would receive a notification and be instructed to record an ECG.

34.    SmartRhythm used heart rate data generated by the Apple Watch to identify heart rate irregularities and suggest recording an ECG. An algorithm in the Apple Watch uses a photoplethysmogram ("PPG") sensor to report a heart rate. PPG data was converted to heart rate data at certain times based on proprietary Apple code.

**E.    Apple Copies AliveCor's Technology and Eliminates Competition**

35.    After AliveCor presented KardiaBand publicly, its founder Dr. Albert was invited to Apple's campus by Dr. Michael O'Reilly, Apple's Vice President of Medical Technology, to present to Apple on KardiaBand. Dr. Albert demonstrated KardiaBand's operation to Apple engineers and Apple's COO, Jeff Williams. Mr. Williams told Dr. Albert that Apple wanted to figure out how to work with AliveCor.

36.    A few months later, Dr. Albert and AliveCor's then-CEO met with Phil Schiller, Apple's SVP of Worldwide Marketing, in order to further demonstrate the KardiaBand product. Unbeknownst to AliveCor, however, Apple was using these meetings to gather information on the operation of KardiaBand. Apple recognized the value in the combination of AliveCor's

9

KardiaBand and SmartRhythm products and wanted to take those ideas as their own and eliminate AliveCor and everyone else as competition.

37.     In fact, after seeing the utility of KardiaBand and SmartRhythm, Apple decided to copy these features and introduce a version of an Apple Watch with its own ECG and AFib analysis and reporting functionality. In late 2018, Apple announced that it was introducing its own ECG app and irregular heart rhythm notification feature as part of an update to the Operating System for the Apple Watch Series 4.

38.     After Apple introduced its KardiaBand and SmartRhythm competitor products, it decided to eliminate AliveCor as a competitor. Specifically, with the Apple Watch series 4, Apple updated the watch operating systems from OS4 to OS5. This operating system update included changes to the algorithm the Watch OS used to report heart rates in specific ways that made it impossible for KardiaBand and SmartRhythm (as well as all other third party heartrate analysis app providers) to identify and predict unexpected heartrates and arrhythmias and suggest users record an ECG for confirming potentially occurrences of AFib.

39.     Ultimately, the changes Apple made to its operating system in OS5 and the introduction of Apple's copycat ECG watches compelled AliveCor to pull the KardiaBand product and SmartRhythm from the market in 2018. Despite the fact that KardiaBand is no longer sold, AliveCor continues to collect and analyze information from KardiaBand customers as well as support customers who had previously purchased the products and continue to use it.

**F.     AliveCor's Continuing Investment in KardiaBand and SmartRhythm Technology**

40.     AliveCor spent millions of dollars and thousands of man hours developing KardiaBand and SmartRhythm, including time and money to engineer the product and clinical studies to verify it worked.

10

Appx378

41.     After Apple changed its heart rate reporting algorithm, but before KardiaBand and SmartRhythm were pulled from the market in 2018, AliveCor began development of its own hardware platform for detecting AFib that builds on the technology introduced in the KardiaBand product and SmartRhythm app. As described in more detail in Confidential Exhibits 19 and 20, since Apple's actions caused AliveCor to remove KardiaBand and SmartRhythm from the market, AliveCor has continued to invest significant resources into developing alternative wearable electronic ECG devices that incorporate the inventions of the Asserted Patents.

## IV.     THE TECHNOLOGY AND PRODUCTS AT ISSUE

42.     Pursuant to Commission Rules 210.10(b)(1) and 210.12(a)(12), the accused products are Apple Watches with ECG functionality, and hardware and software components thereof.[3]

43.     The technology at issue relates to wearable electronic devices with ECG functionality.

44.     Given the unpredictable nature of AFib, it is difficult to diagnose. Before AliveCor, the state-of-the-art for monitoring the heart for episodes of AFib was expensive and either (1) short-term and unwieldy or (2) or long-term. The first kind of device required wearing sensors with wires strapped across the body, like those for a sleep study. The second kind of device required a sensor to be implanted underneath the skin and cost tens of thousands of dollars.

45.     AliveCor solved the difficulty in diagnosis and the problems with prior AFib monitors by integrating sensors into a wearable device, such as a smartwatch that allowed for comfortable, long-term monitoring of the heartbeat for a few hundred dollars, instead of thousands or tens of thousands of dollars.

---

[3]     Representative samples of the products at issue are available upon request.

11

46.     In bringing this new technology to market, AliveCor had to win consumer trust. The margin of error for the technology was small. If the heart rate discordance technology was too sensitive, it risked sending too many false positives, leading consumers to ignore the request to record an ECG when a potential real episode of AFib was occurring. On the other hand, if the heart rate discordance technology was not sensitive enough it would fail to notify the owner when the heartbeat really was erratic thereby failing to perform its designed function.

47.     To reduce the risk of these kinds of errors, AliveCor developed a method for marshaling data from other sensors in the smartwatch in order to compare the activity level, the heart rate, and the heart rate variability of the wearer. The method looks for discordance between those values to determine when to notify the wearer of a possible heart issue and to suggest an ECG.

48.     Apple intentionally replicated AliveCor's patented technology into its Apple Watch, and took other steps to eliminate AliveCor as a competitor. This Investigation is one avenue, among others, AliveCor is taking to seek redress for Apple's duplicitous conduct.

## V.    THE ASSERTED PATENTS AND NONTECHNICAL DESCRIPTIONS OF THE INVENTIONS[4]

49.     The claims of the '731, the '941, and the '499 Patents are novel, unconventional and focus on specific means and methods of using specialized sensors in a wearable device to improve upon existing cardiac monitoring technology. The Asserted Patents explain the state of the art in arrhythmia diagnosis, the limitations in known diagnostic techniques and diagnostic

---

[4] All non-technical descriptions of the patents herein are presented to give a general background of those patents. These descriptions are not intended to be used nor should they be used for purposes of patent claim construction. Complainant presents these statements subject to and without waiver of its right to argue that claim terms should be construed in a particular way under claim interpretation jurisprudence and the relevant evidence.

12

equipment, and the need for the inventors' improvement in diagnostic techniques and equipment. '941 Patent at 1:26-3:26; '499 Patent at 1:20-2:4. The claims then recite specific and novel implementations of apparatus and methods used for diagnosing intermittent arrhythmias that address the limitations in the prior art including the requirement that the users be made aware of the potential arrhythmia and have ready access to specialized diagnostic equipment in a clinical setting.

50.      In the Asserted Patents, a unique and novel combination of sensors are used to sense certain parameter values such as, for example, heart rate and activity level, which are then analyzed to predict or determine the presence of an arrhythmia. *See, e.g.*, '731 Patent at 26:27-52. These novel wearable devices differ from the disclosed and known prior art for several reasons including the incorporation and coordinated use of photoplethysmography ("PPG"), electrocardiography ("ECG"), and movement sensors in order to collect accurate, real-time cardiac data of the user and compare such data to the expected cardiac data based on the activity level of the user. *Id.* at 4:46-5:29. The collected data also allows device makers to train machine learning algorithms that can more quickly predict and notify users of potential arrhythmias using heart rate data along with information and signals from the other sensors in the watch. *Id.* at 4:2-10, 5:15-19. The claimed inventions thus offer a uniquely convenient heart monitoring apparatus and methods that leverages wearability, specialized sensors, and machine learning to generate more accessible and effective diagnosis of potentially dangerous arrhythmia conditions.

### A.      The '731 Patent

#### 1.      Identification and Ownership of the '731 Patent

51.      AliveCor owns by assignment the right, title and interest in United States Patent No. 10,595,731, titled "Methods and systems for arrhythmia tracking and scoring," which issued

on May 5, 2020, naming David E. Albert, Omar Dawood, Lev Korzinov, Iman Abuzeid, Nupur Srivastava, Fei Wang, Euan Thomson, and Ravi Gopalakrishnan as co-inventors. The '731 patent issued from U.S. Patent Application Serial No. 16/158,112, filed on October 28, 2018, and expires on December 12, 2034. A copy of the '731 patent is attached as Exhibit 1. A copy of the assignment from the named inventors to AliveCor is attached as Exhibit 4. A copy of the prosecution history of the '731 patent is attached as Appendix A.[5] Copies of each patent and applicable pages of each technical reference mentioned in the prosecution history of the '731 patent are attached as Appendix B.

### 2.    Foreign Counterparts to the '731 Patent

52.    Exhibit 7 lists each foreign patent and each pending foreign patent application (not already issued as a patent), and each foreign patent application that has been denied, abandoned or withdrawn, corresponding to the '731 patent, with an indication of the prosecution status of each such patent application. No other foreign patents or patent applications corresponding to the '731 patent have been filed, abandoned, withdrawn, or rejected.

### 3.    Non-Technical Description of the '731 Patent

53.    The '731 patent generally relates to the method and device AliveCor invented that enabled a user to wear a smartwatch that would continuously monitor the heart and allow the user to record an ECG. It describes how to take data from an ECG sensor, a PPG sensor, and a motion sensor and run it through machine learning algorithms to determine whether the user may be experiencing an episode of atrial fibrillation and recommending an ECG. Compared to the prior art, the '731 patent dramatically increased the convenience of such heart monitoring.

---

[5] A certified copy of the patent prosecution history has been ordered and will be provided once they are received from the U.S.P.T.O.

**B.    The '941 Patent**

**1.    Identification and Ownership of the '941 Patent**

54.    AliveCor owns by assignment the right, title and interest in United States Patent No. 10,638,941, titled "Discordance monitoring," which issued on May 5, 2020,  naming David E. Albert, Omar Dawood, Ravi Gopalakrishan, Fei Wang, Euan Thomson, and Iman Abuzeid as co-inventors.[6]  The '941 patent issued from U.S. Patent Application Serial No. 16/158,112, filed on October 11, 2018, and expires on May 13, 2036.  A copy of the '941 patent is attached as Exhibit 2.  A copy of the assignment from the named inventors to AliveCor is attached as Exhibit 5.  A copy of the prosecution history of the '941 patent is attached as Appendix C.  Copies of each patent and applicable pages of each technical reference mentioned in the prosecution history of the '941 patent are attached as Appendix D.

**2.    Foreign Counterparts to the '941 Patent**

55.    Exhibit 7 lists each foreign patent and each pending foreign patent application (not already issued as a patent), and each foreign patent application that has been denied, abandoned or withdrawn, corresponding to the '941 patent, with an indication of the prosecution status of each such patent application.  No other foreign patents or patent applications corresponding to the '941 patent have been filed, abandoned, withdrawn, or rejected.

**3.    Non-Technical Description of the '941 Patent**

56.    The '941 patent generally relates to the method of refining the accuracy of an potential arrhythmia diagnosis by comparing the data coming in from different sensors with each other. By determining whether each value falls within an expected range as the other values

---

[6]  The PTO approved and granted a certificate of correction, attached as Exhibit 23, adding inventors Fei Wang, Euan Thomas, and Iman Abuzeid as inventors on March 31, 2021.

15

change, the '941 patent explains how discordance can be used to reduce the rate of false positive and false negative errors in a cardiac monitor.

## C.     The '499 Patent

### 1.     Identification and Ownership of the '499 Patent

57.     AliveCor owns by assignment the right, title and interest in United States Patent No. 9,572,499, titled "Methods and systems for arrhythmia tracking and scoring," which issued on February 21 2017,  naming David E. Albert, Omar Dawood, Lev Korzinov, Iman Abuzeid, Nupur Srivastava, Fei Wang, Euan Thomson, and Ravi Gopalakrishnan as co-inventors.  The '941 patent issued from U.S. Patent Application Serial No. 14/730,122, filed on June 3, 2015, and expires on December 12, 2034.  A copy of the '499 patent is attached as Exhibit 3.  A copy of the assignment from the named inventors to AliveCor is attached as Exhibit 6.  A copy of the prosecution history of the '941 patent is attached as Appendix E.[7]  Copies of each patent and applicable pages of each technical reference mentioned in the prosecution history of the '499 patent are attached as Appendix F.

### 2.     Foreign Counterparts to the '499 Patent

58.     Exhibit 7 lists each foreign patent and each pending foreign patent application (not already issued as a patent), and each foreign patent application that has been denied, abandoned or withdrawn, corresponding to the '499 patent, with an indication of the prosecution status of each such patent application.  No other foreign patents or patent applications corresponding to the '499 patent have been filed, abandoned, withdrawn, or rejected.

---

[7]  A certified copy of the patent prosecution history has been ordered and will be provided once they are received from the U.S.P.T.O.

16

### 3. Non-Technical Description of the '499 Patent

59.     Like the '941 patent, the '499 patent generally relates to the method and devices AliveCor invented that enabled a user to wear sensors that would continuously monitor the heart and allow the user to record an ECG. The '499 patent envisioned sending the sensor data to a smartphone or a smartwatch in order to determine whether a heart arrhythmia was occurring. Like the '941 patent, the '499 patent increased the convenience of heart monitoring for conditions like atrial fibrillation.

### D. Apple's Infringement Of The Asserted Patents[8]

### 1. Infringement of the '731 Patent

60.     71. Apple infringes, literally and/or under the doctrine of equivalents, at least claims 1-15 of the '731 patent. Apple infringes at least these claims by importing, selling for importation, and/or selling after importation into the United States certain of the Accused Devices, including at least the Apple Watch Series 4, Apple Watch Series 5, and Apple Watch Series 6 (the "Accused '731 Devices"). The Accused '731 Devices satisfy all claim limitations of claims 1-15 of the '731 Patent at the time of importation into the United States.

61.     On information and belief, Apple also knowingly induces and/or contributes to the infringement of at least claims 1-15 of the '731 patent by others. On information and belief, Apple has had knowledge of the '731 patent, and its infringement of the '731 patent, since at least December 7, 2020, when AliveCor filed a parallel action in the Western District of Texas.

62.     Apple also contributes to infringement of the '731 patent by selling for importation into the United States, importing into the United States, and/or selling within the

---

[8]     Complainant's investigation of Respondent's infringement is ongoing.  Complainant may provide additional theories concerning Respondent's infringement of the Asserted Patents as Complainant receives discovery.

17

United States after importation the Accused '731 Devices and the non-staple constituent parts of those devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '731 patent. These wearable electronic devices with ECG functionality are known by Apple to be especially made or especially adapted for use in the infringement of the '731 patent. Apple also contributes to the infringement of the '731 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation components, such as the chipsets or software containing the infringing functionality, of the Accused '731 Devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '731 patent. These mobile devices are known by Apple to be especially made or especially adapted for use in the infringement of the '731 patent. Specifically, on information and belief, Apple sells the Accused '731 Devices to resellers, retailers, and end users with knowledge that the devices are used for infringement.

63.     Attached as Exhibit 9 are representative claim charts for the Accused '731 Devices showing infringement of the '731 patent by exemplary Accused '731 Devices.

### 2.    Infringement of the '941 Patent

64.     Apple infringes, literally and/or under the doctrine of equivalents, at least claims 1-23 of the '941 patent. Apple infringes at least these claims by importing, selling for importation, and/or selling after importation into the United States certain of the Accused Devices, including at least the Apple Watch Series 4, Apple Watch Series 5, and Apple Watch Series 6 (the "Accused '941 Devices"). The Accused '941 Devices satisfy all claim limitations of claims 1-23 at the time of importation into the United States.

18

65.     On information and belief, Apple also knowingly induces and/or contributes to the infringement of at least claims 12-23 of the '941 patent by others. On information and belief, Apple has had knowledge of the '941 patent, and its infringement of the '941 patent, since at least December 7, 2020, when AliveCor filed a parallel action in the Western District of Texas.

66.     Apple also contributes to infringement of the '941 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation the Accused '941 Devices and the non-staple constituent parts of those devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '941 patent. These mobile electronic devices are known by Apple to be especially made or especially adapted for use in the infringement of the '941 patent. Apple also contributes to the infringement of the '941 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation components, such as the chipsets or software containing the infringing functionality, of the Accused '941 Devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '941 patent. These mobile devices are known by Apple to be especially made or especially adapted for use in the infringement of the '941 patent. Specifically, on information and belief, Apple sells the Accused '941 Devices to resellers, retailers, and end users with knowledge that the devices are used for infringement.

67.     Attached as Exhibit 10 are representative claim charts for the Accused '941 Devices showing infringement of the '941 patent by exemplary Accused '9419 Devices.

19

### 3. Infringement of the '499 Patent

68.     Apple infringes, literally and/or under the doctrine of equivalents, at least claims 1-4, 6-14, and 16-20 of the '499 patent. Apple infringes at least these claims by importing, selling for importation, and/or selling after importation into the United States certain of the Accused Devices, including at least the Apple Watch Series 4, Apple Watch Series 5, and Apple Watch Series 6 (the "Accused '499 Devices"). The Accused '499 Devices satisfy all claim limitations of claims 1-4, 6-14, and 16-20 at the time of importation into the United States.

69.     On information and belief, Apple also knowingly induces and/or contributes to the infringement of at least claims 1-4, 6-14, and 16-20 of the '499 patent by others. On information and belief, Apple has had knowledge of the '499 patent, and its infringement of the '499 patent, since at least December 7, 2020, when AliveCor filed a parallel action in the Western District of Texas.

70.     Apple also contributes to infringement of the '499 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation the Accused '499 Devices and the non-staple constituent parts of those devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '499 patent. These mobile electronic devices are known by Apple to be especially made or especially adapted for use in the infringement of the '499 patent. Apple also contributes to the infringement of the '499 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation components, such as the chipsets or software containing the infringing functionality, of the Accused '499 Devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '499 patent.

20

These mobile devices are known by Apple to be especially made or especially adapted for use in the infringement of the '499 patent. Specifically, on information and belief, Apple sells the Accused '499 Devices to resellers, retailers, and end users with knowledge that the devices are used for infringement.

71.     Attached as Exhibit 11 are representative claim charts for the Accused '499 Devices showing infringement of the '499 patent by exemplary Accused '499 Devices.

## VI.     SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE

72.     Apple sells for importation into the United States, imports into the United States, and/or sells after importation into the United States the Accused Products.  These Accused Products include, but are not limited to the Apple Watch Series 4, Apple Watch Series 5, and Apple Watch Series 6.

73.     A sample of the Apple Watch Series 6 was purchased from bestbuy.com on March 19, 2021.  *See* Ex. 12.  The packaging states that the Apple Watch Series 6 was "assembled in Vietnam." *See id.*

74.     A sample of the Apple Watch Series 5 was purchased from bestbuy.com on March 19, 2021.  *See* Ex. 12.  The packaging states that the Apple Watch Series 5 was "assembled in China." *See id.*

75.     A sample of the Apple Watch Series 4 was purchased on March 24, 2021.  *See* Ex. 12.  The packaging states that the Apple Watch Series 4 was "assembled in China."  *See id.*

76.     Upon information and belief, substantially all of the Accused Products in the United States are manufactured by Apple's suppliers, which are located primarily in Asia, and sold for importation into the United States by or on behalf of Apple.  *See* Ex. 12.

21

A. **Harmonized Tariff Schedule Numbers**

77.    The Accused Products are classified under at least the following subheading of the Harmonized Tariff Schedule of the United States: 8517.62.00 (Telephone sets, including telephones for cellular networks or for other wireless networks; other apparatus for the transmission or reception of voice, images or other data, including apparatus for communication in a wired or wireless network (such as a local or wide area network), other than transmission or reception apparatus of heading 8443, 8525, 8527 or 8528; parts thereof: Other apparatus for transmission or reception of voice, images or other data, including apparatus for communication in a wired or wireless network (such as a local or wide area network): Machines for the reception, conversion and transmission or regeneration of voice, images or other data, including switching and routing apparatus). This classification is exemplary in nature and not intended to restrict the scope of any exclusion order or other remedy ordered by the Commission.

VII.    **RELATED LITIGATION**

78.    AliveCor filed a complaint in the Western District of Texas on December 07, 2020, asserting the same patents asserted here. *See AliveCor, Inc. v. Apple, Inc.*, 6:20-cv-1112 (WDTX).

79.    Aside from the above-mentioned parallel district court matter, AliveCor has not previously litigated the asserted patents before any other court or agency.

VIII.    **LICENSEES TO THE ASSERTED PATENTS**

80.    Confidential Exhibit 8 is a list of licensees that includes within that list all licenses to one or more of the Asserted Patents. Confidential Exhibit 22 is a copy of a license to the Asserted Patents.

22

## IX.    THE DOMESTIC INDUSTRY RELATING TO THE ASSERTED PATENTS

81.    An industry as required by Section 337(a)(2) and defined by Section 337(a)(3)(A)-(C) exists and/or is in the process of being established in the United States relating to the Asserted Patents and AliveCor's products and components thereof protected by the Asserted Patents.

82.    As described below and in the accompanying declaration at Confidential Exhibits 19 and 20, AliveCor researches, designs, and develops wearable electronic devices and components in the United States that practice the claims of each of the Asserted Patents ("Domestic Industry Products").

83.    As further described in Confidential Exhibits 19 and 20, AliveCor is currently developing new wearable devices, that practice the claims of each of the Asserted Patents.

### A.    Technical Prong

84.    The Domestic Industry Products include AliveCor's KardiaBand and new wearable devices under development.  Claim charts demonstrating that representative Domestic Industry Products practice at least one claim of each Asserted Patent are attached as Exhibits 13-15 and Confidential Exhibits 16-18.[9]

### B.    Economic Prong

85.     There is a domestic industry as defined under 19 U.S.C. § 1337(a)(3)(A), (B), and/or (C), comprising continuing significant investments made in the United States by AliveCor in plant and equipment and employment of labor and capital, and continuing substantial investment in exploitation of the Asserted Patents.

---

[9]   The Domestic Industry Products practice additional claims of the Asserted Patents, and AliveCor may establish the technical prong of the domestic industry requirement through claims other than those used in these exhibits.

86.    AliveCor has made and continues to make significant investments in plant and equipment directed to the Domestic Industry Products in the United States. Those investments in plant and equipment are dedicated to research, design, development, engineering, product support, manufacturing support, testing, and various customer support activities focused on the Domestic Industry Products.

87.    AliveCor also has made and continues to make significant investments in labor and capital directed to the Domestic Industry Products in the United States. Those investments in labor and capital are dedicated to research, design, development, engineering, product support, manufacturing support, testing, and various customer support activities focused on the Domestic Industry Products.

88.    AliveCor further engages in exploitation of the Asserted Patents through its substantial domestic investments in research and development and engineering activities in the United States. These activities include, among other things, research and development and engineering and design tied to the claimed technology implemented in the Asserted Patents. These activities have occurred in the past and are ongoing with respect to prior and current versions of the Domestic Industry Products as well as future products under development.

89.    In addition to the existing domestic industry, a domestic industry in new products that practice the Asserted Patents in the United States is in the process of being established under 19 U.S.C. § 1337(a)(3)(A), (B), and/or (C).  AliveCor has taken necessary tangible steps to establish of this new domestic industry in the United States.  As a result of these steps, there is a significant likelihood that this new domestic industry will be established in the future.

90.    Specific, non-limiting examples of the foregoing investments are set forth in Confidential Exhibits 19 and 20.

24

## X.    RELIEF REQUESTED

91.    Complainant respectfully requests that the Commission:

(a)    Institute an investigation pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, with respect to Apple's violations of that section arising from the importation into the United States, sale for importation, and/or the sale within the United States after importation of certain wearable electronic devices with ECG functionality and components thereof that infringe one or more claims of the Asserted Patents;

(b)    Schedule and conduct a hearing pursuant to Section 337(c) for the purposes of (i) receiving evidence and hearing argument concerning whether there has been a violation of Section 337, and (ii) following the hearing, determining that there has been a violation of Section 337;

(c)    Issue a permanent limited exclusion order pursuant to 19 U.S.C. § 1337(d) excluding entry into the United States of Respondent's wearable electronic devices with ECG functionality and components thereof that infringe one or more claims of the Asserted Patents;

(d)    Issue a permanent cease and desist order pursuant to 19 U.S.C. § 1337(f) prohibiting Apple, its subsidiaries, related companies and agents from engaging in the importation, sale for importation, marketing and/or advertising, distribution, offering for sale, sale, use after importation, sale after importation, and other transfer within the United States of wearable electronic devices with ECG functionality and components thereof that infringe one or more claims of the Asserted Patents;

(e)    Impose a bond upon importation of Respondent's wearable electronic devices with ECG functionality and components thereof that infringe one or more claims of the

25

Appx393

Asserted Patents during the 60-day Presidential review period pursuant to 19 U.S.C. § 1337(j); and

(f)      Issue such other and further relief as the Commission deems just and proper under the law, based on the facts determined by the investigation and the authority of the Commission.

Dated:  April 26, 2021                    Respectfully submitted,

 /s/ S. Alex Lasher_____
S. Alex Lasher
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington D.C. 20005
Tel.: (202) 538-8000

Sean S. Pak
Andrew M. Holmes
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel.: (415) 875-6600

Adam B. Wolfson
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
TEL: (213) 443-3000
*Counsel for AliveCor, Inc.*

26

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

| | |
|---|---|
| **In the Matter of** | |
| **CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** | **Investigation No. 337-TA- _____** |

**VERIFICATION OF COMPLAINT**

I, Brian Clarke, am General Counsel at AliveCor, Inc., and I am authorized to execute this verification on behalf of Complainant.  I have read the Complaint and am aware of its contents.  To the best of my knowledge, information, and belief, and based upon a reasonable inquiry under the circumstances, I hereby certify that:

1.      The allegations contained in the Complaint are well grounded in fact and have evidentiary support, or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery;

2.      The claims and other legal contentions set forth in the Complaint are warranted by existing laws or by a good faith, non-frivolous argument for extension, modification, or reversal of existing law, or by the establishment of new law; and

3.      The Complaint is not being filed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Dated:  4/26/2021 | 10:20 AM PDT

_____
Brian Clarke

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

In the Matter of

**CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF**

**Inv. No. 337-TA-1266**

**NOTICE OF INSTITUTION OF INVESTIGATION**

Institution of investigation pursuant to 19 U.S.C. 1337

AGENCY:  U.S. International Trade Commission

ACTION:  Notice

SUMMARY:  Notice is hereby given that a complaint was filed with the U.S. International Trade Commission on April 20, 2021, under section 337 of the Tariff Act of 1930, as amended, on behalf of AliveCor, Inc. of Mountain View, California.  The complaint alleges violations of section 337 based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain wearable electronic devices with ECG functionality and components thereof by reason of infringement of one or more claims of U.S. Patent No. 10,595,731 ("the '731 patent"); U.S. Patent No. 10,638,941 ("the '941 patent"); and U.S. Patent No. 9,572,499 ("the '499 patent").  The complaint further alleges that an industry in the United States exists or is in the process of being established as required by the applicable Federal Statute.

The complainant requests that the Commission institute an investigation and, after the investigation, issue a limited exclusion order and a cease and desist order.

ADDRESSES:  The complaint, except for any confidential information contained therein, may be viewed on the Commission's electronic docket (EDIS) at https://edis.usitc.gov.  For help accessing EDIS, please email EDIS3Help@usitc.gov.  Hearing impaired individuals are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205-1810.  Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at (202) 205-2000.  General information concerning the Commission may also be obtained by accessing its internet server at https://www.usitc.gov.

FOR FURTHER INFORMATION CONTACT:  Pathenia M. Proctor, The Office of Unfair Import Investigations, U.S. International Trade Commission, telephone (202) 205-2560.

SUPPLEMENTARY INFORMATION:

AUTHORITY:  The authority for institution of this investigation is contained in section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, and in section 210.10 of the Commission's Rules of Practice and Procedure, 19 C.F.R. 210.10 (2021).

SCOPE OF INVESTIGATION:  Having considered the complaint, the U.S. International Trade Commission, on May 20, 2021, ORDERED THAT –

(1)  Pursuant to subsection (b) of section 337 of the Tariff Act of 1930, as amended, an investigation be instituted to determine whether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain products identified in paragraph (2) by reason of infringement of one or more of claims 1-30 of the '731 patent; claims 1-23 of the '941 patent; claims 1-4, 6-14, 16-20 of the '499 patent, and whether an industry in the United States exists or is in the process of being established as required by subsection (a)(2) of section 337;

(2)  Pursuant to section 210.10(b)(1) of the Commission's Rules of Practice and Procedure, 19 C.F.R. 210.10(b)(1), the plain language description of the accused products or category of accused products, which defines the scope of the investigation, is "Apple Watches with ECG functionality, and hardware and software components thereof";

(3)  For the purpose of the investigation so instituted, the following are hereby named as parties upon which this notice of investigation shall be served:

(a)  The complainant is:

AliveCor, Inc.
444 Castro St, Suite 600
Mountain View, CA 94041

(b)  The respondent is the following entity alleged to be in violation of section 337, and is the party upon which the complaint is to be served:

Apple, Inc.
One Apple Park Way
Cupertino, CA 95014

(c)  The Office of Unfair Import Investigations, U.S. International Trade Commission, 500 E Street, S.W., Suite 401, Washington, D.C. 20436; and

(4)  For the investigation so instituted, the Chief Administrative Law Judge, U.S. International Trade Commission, shall designate the presiding Administrative Law Judge.

Responses to the complaint and the notice of investigation must be submitted by the named respondent in accordance with section 210.13 of the Commission's Rules of Practice and

Procedure, 19 C.F.R. 210.13.  Pursuant to 19 C.F.R. 201.16(e) and 210.13(a), as amended in 85 Fed. Reg. 15798 (March 19, 2020), such responses will be considered by the Commission if received not later than 20 days after the date of service by the complainant of the complaint and the notice of investigation.  Extensions of time for submitting responses to the complaint and the notice of investigation will not be granted unless good cause therefor is shown.

Failure of the respondent to file a timely response to each allegation in the complaint and in this notice may be deemed to constitute a waiver of the right to appear and contest the allegations of the complaint and this notice, and to authorize the administrative law judge and the Commission, without further notice to the respondent, to find the facts to be as alleged in the complaint and this notice and to enter an initial determination and a final determination containing such findings, and may result in the issuance of an exclusion order or a cease and desist order or both directed against the respondent.

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: May 20, 2021

3

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

**Before the Honorable Cameron R. Elliot**
**Administrative Law Judge**

| |
|---|
| In the Matter of |
| **CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** |

Inv. No. 337-TA-1266

## RESPONDENT APPLE INC.'S OPENING *MARKMAN* BRIEF

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     LEVEL OF ORDINARY SKILL IN THE ART ...............................................3

III.    OVERVIEW OF THE TECHNOLOGY CLAIMED IN THE ASSERTED
        PATENTS ...........................................................................................................3

        A.      Methods and Tools to Monitor a Patient's Heart Health ...........................3

                1.      PPG Technology ...........................................................................5

                2.      ECG Technology ...........................................................................5

                3.      The Asserted Patents ....................................................................7

IV.     APPLICABLE LEGAL PRINCIPLES ..............................................................9

V.      DISPUTED CLAIM TERMS ..........................................................................10

        A.      Preamble is Limiting ...............................................................................10

        B.      "alerting said first user to sense an electrocardiogram" (Claim 1)/ "alert"
                (Claim 11)................................................................................................13

        C.      "Heart rate sensor"..................................................................................17

        D.      Order of steps ('499 patent) ...................................................................20

        E.      "Confirm the presence of the arrhythmia based on the ECG data" and
                "confirming the presence of the arrhythmia based on the ECG data".......23

        F.      Order of steps ('731 patent) ...................................................................26

        G.      "To confirm a presence of the arrhythmia"/ "to confirm the presence of the
                arrhythmia"...............................................................................................27

        H.      "When the activity level is resting" / "when the activity level value is resting".........31

        I.      "Discordance"..........................................................................................35

        J.      Order of steps ..........................................................................................38

VI.     CONCLUSION ................................................................................................39

E.    **"Confirm the presence of the arrhythmia based on the ECG data"** and **"confirming the presence of the arrhythmia based on the ECG data"**

| Complainant's Construction | Respondents' Construction | Staff's Construction |
|---|---|---|
| No construction required. Alternatively: "identify[ing] the occurrence of the arrhythmia based on the ECG data." | "verify the arrhythmia by comparing the ECG sensor data to the PPG sensor data" (claims 1 and 25) "verifying the arrhythmia by comparing the ECG sensor data to the PPG sensor data" (claim 17) | No construction necessary. These claims do not require verifying an arrhythmia by comparing ECG sensor data to PPG sensor data. If, however, these claims are construed, they mean: "verify the presence of the arrhythmia based on the ECG data" (claims 1 and 15) "verifying the presence of the arrhythmia based on the ECG data" (claim 17) |
| **'731 Patent:** claims 1, 17, 25 | | |

Each of the independent claims of the '731 patent includes essentially the same limitation requiring the claimed system and method to "confirm the presence of *the* arrhythmia based on the ECG data." In all three independent claims, a PHOSITA in December 2013 would have understood this limitation to mean and require that the claimed system and method "verify the arrhythmia by comparing the ECG sensor data to the PPG sensor data" that was used to first identify "an arrhythmia."[11] This is clearly seen when the limitation at issue is read in the context of the entire claim. Claim 17 of the '731 patent exemplifies the point:

17.  A method to detect the presence of an arrhythmia of the user on a smart a watch, comprising:

receiving PPG data from a PPG sensor of the smartwatch;

---

[11] Apple maintains that the "confirming" limitations of the independent claims of '731 patent and the "confirming" limitations of the '941 patent (addressed below) should be construed consistently. In both the '731 and '941 patents, the ECG is being used to verify the "an arrhythmia."

23

> detecting by a processing device, based on the PPG data, the presence of ___**an arrhythmia**___;
>
> receiving ECG data from an ECG sensor of the smartwatch; and
>
> confirming the presence of ___**the arrhythmia**___ based on the ECG data.

'731 patent, claim 17 (emphasis added).

As the plain language of the claims requires, the claimed method and system first detect the presence of "an arrhythmia" using PPG sensor data. *See* '731 patent, claim 17; *see also id.*, claim 1 ("detect, based on the PPG data, the presence of an arrhythmia"), claim 25 ("detect by the processing device, based on the PPG data, the presence of an arrhythmia"). The claimed method and system subsequently verify the presence of "the arrhythmia" based on the ECG data. In other words, the claimed system and method require that the ECG data be used to verify the same "cardiac condition in which the electrical activity of the heart is irregular or is faster or slower than normal" that was previously detected using the PPG data. '731 patent, 1:40-42. The plain language of the claim requires this because "an arrhythmia" is the antecedent basis for "the arrhythmia" verified by the ECG data. *See Wi-Lan*, 811 F.3d at 462 ("Subsequent use of the definite articles 'the' or 'said' in a claim refers back to the same term recited earlier in the claim."); *see also Hytera*, 841 Fed. Appx. at 218 ("Hytera argues that the antecedent basis is not meaningful because the 'determining' step says 'the' when it could have said 'a' timeslot; on the contrary, the fact that the 'determining' step says 'the' when it could have said 'a' reinforces our conclusion that it is meant to come after the 'preparing' step.").

The specification of the '731 patent confirms this understanding. One key aspect of the alleged invention of the '731 patent, according to the applicants, is that the claimed system and method provide "a dashboard centered around arrhythmia or atrial fibrillation tracking. The dashboard includes a heart score that can be calculated in response to data from the user such as their ECG and other personal information such as age, gender, height, weight, body fat, disease

24

risks, etc. The main driver of this health score will often be the incidence of the user's atrial fibrillation." ('731 patent, 3:17-28.) The '731 patent's specification provides additional detail about how to calculate the heart score (also referred to in the specification as the "heart health score" and the "cardiac health score")[12]:

> A cardiac health score may be generated in response to the received biometric data. One or more recommendations or goals for improving the generated cardiac health score may be displayed to the user. The biometric data may comprise one or more of an electrocardiogram (ECG), dietary information, stress level, activity level, gender, height, weight, age, body fat percentage, blood pressure, results from imaging scans, blood chemistry values, or genotype data. The recommendations or goals may be updated in response to the user meeting the displayed recommendations or goals.

('731 patent, 3:45-55.)

In further describing the application to calculate the heart score, the specification explains that:

> The heart health score may be provided on a software application such as a mobile app downloaded from an application distribution platform and executed on a local computing device of the user as described above. This executed application may instruct the user to take active steps in response to a poor or moderate heart health score. … Alternatively, or in combination, *the instructions to the user may be to take a further step such as to take an electrocardiogram (e.g. to verify the presence of an arrhythmia*), enroll in an electrocardiogram over-read service, or schedule an appointment with a physician or other medical specialist.

('731 patent, 20:63-21:19.) By its own description, the claimed method and system require the user of the smartwatch to take an ECG to "verify the presence of an arrhythmia."

---

[12] A PHOSITA reading the specification of the '731 patent in December 2013 would have understood the phrases "heart score," "heart health score," and "cardiac health score" to be interchangeable and to be referring to the same concept in the context of the '731 patent. (Exh. 1 (Stultz Decl.) at ¶ 79.)

25

Because "an arrhythmia" **detected** by the PPG data and "the arrhythmia" **verified** by the

ECG data refer to the same "cardiac condition," there must necessarily be a comparison of the ECG

data to the PPG data to verify that it is indeed the same condition. Without this comparison, the

ECG is not "verifying" the arrhythmia detected by the PPG data, but rather may be detecting a

different arrhythmia, i.e., detecting (rather than verifying) a different "cardiac condition." That

would be contrary to the plain language of the claims and contrary to how a PHOSITA would

understand the scope and requirements of the claims. (Exh. 1 (Stultz Decl.) at ¶¶ 70-79.)

Accordingly, the Court should construe the "confirming" limitations of the '731 patent to

mean "verify/[ing] the arrhythmia by comparing the ECG sensor data to the PPG sensor data."

**F.    Order of steps ('731 patent)[13]**

| Complainant's Construction | Respondents' Construction | Staff's Construction |
|---|---|---|
| While some ordering is dictated by logic, the limitations of the claim may be performed in different order than recited. | Should be performed in the order listed. | While some ordering is dictated by logic, the limitations of the claim may be performed in different order than recited. |
| **'731 Patent:** claim 17 | | |

Claim 17 of the '731 patent requires that the claims be performed in the order listed, for

many of the same reasons listed in Section V(D), above. Claim 17 is even simpler, requiring only

four steps, one logically and necessarily following after the other:

> 17. A method to detect the presence of an arrhythmia of the user on
> a smart a watch, comprising:
>
> **[A]** receiving PPG data from a PPG sensor of the smartwatch;
>
> **[B]** detecting by a processing device, based on the PPG data, the
> presence of an arrhythmia;
>
> **[C]** receiving ECG data from an ECG sensor of the smartwatch; and

---

[13] This claim construction argument applies to claim 17 of the '731 patent.

26

     **[D]** confirming the presence of the arrhythmia based on the ECG data.

'731 patent, claim 17 (annotations added).  As a matter of both logic and grammar, the "detecting by a processing device, based on the PPG data the presence of an arrhythmia" limitation of step [B] requires that the "PPG data" first be "received," as required by step [A].  The "receiving ECG data" limitation of step [C] must come before step [D], which confirms the presence of "the arrhythmia" based on the "ECG data."  Critically, steps [A] and [B], which are directed at using PPG to detecting "the presence of *an* arrhythmia," must come before steps [C] and [D], which are directed to "confirming the presence of *the* arrhythmia" from steps [A] and [B].  As discussed above with respect to the "confirming" limitations, "an arrhythmia" provides the antecedent basis for "the arrhythmia" that is confirmed by the ECG data.  As such the steps of claim 17 must be performed in the order listed.

    **G.**    **"To confirm a presence of the arrhythmia"/ "to confirm the presence of the arrhythmia"[14]**

| Complainant's Construction | Respondents' Construction | Staff's Construction |
|---|---|---|
| No construction required. Alternatively, "to identify an occurrence of an arrhythmia." | "to verify the arrhythmia by comparing the ECG sensor results to the discordance determination" (claims 1 and 12) | No construction necessary. These claims do not require verifying an arrhythmia by comparing ECG sensor data to PPG sensor data. If, however, these claims are construed, they mean: "to verify a presence of the arrhythmia" (claims 1) / "to verify the presence of the arrhythmia" (claim 12) |
| **'941 Patent:** claims 1 and 12 | | |

---

[14] This claim term appears in claims 1 and 12 of the '941 patent.

Like the "confirming" limitations of the '731 patent discussed above, the phrase "to confirm a/the presence of the arrhythmia" in the independent claims of the '941 patent would have been understood by a PHOSITA, in May 2015, to mean "to verify the arrhythmia by comparing the ECG sensor results to the discordance determination."[15] Like with the '731 patent, this interpretation is confirmed by the plain language of the claims and also by the specification and other intrinsic evidence describing the alleged invention. Starting with the claim language itself (using claim 12 as representative), the alleged method and system claim:

12. A smartwatch, comprising:

a processor;

a first sensor configured to sense an activity level value of a user, wherein the first sensor is coupled to the processor;

a photoplethysmogram ("PPG") sensor configured to sense a heart rate parameter of the user when the activity level value is resting, wherein the PPG sensor is coupled to the processor;

an electrocardiogram ("ECG") sensor configured to sense electrical signals of a heart, wherein the ECG sensor comprises a first electrode and a second electrode, and wherein the ECG sensor is coupled to the processor; and

a non-transitory computer readable storage medium encoded with a computer program including instructions executable by the processor to cause the processor to:

*determine if a discordance* is present between the activity level value of the user and the heart rate parameter of the user;

*based on the presence of the discordance, indicate* to the user *a possibility of an arrhythmia* being present; and

receive electric signals of the user from the EGG sensor *to confirm the presence of the arrhythmia*.

---

[15] Apple modified its proposed construction of this phrase from "to verify the arrhythmia by comparing the ECG sensor results to the PPG sensor result" which was included in the Joint Claim Construction Chart filed on September 13, 2021. Apple informed both AliveCor and Staff of this changed proposal on September 17, 2021, and proposed the parties file an Amended Joint Claim Construction chart.

28

'941 patent, claim 12. Although the claims of the '941 require a few additional steps to (1) detect an activity level and (2) determine if a discordance exists between the activity level and the heart rate parameter measured by the PPG sensor, the basic framework of what the claims require is the same as those claims of the '731 patent. First, the claimed system and method use a PPG sensor on a smartwatch to measure heart rate data. The claimed system and method then use that data to determine if a discordance exists between the heart rate measurement and the activity measurement, which is also measured by the smartwatch. If a discordance is determined, the claimed system and method indicate to the user of the smartwatch the possibility of "an arrhythmia." That determination of "an arrhythmia" causes the user of the claimed method and system to take an ECG. Thus, "an arrhythmia" determined by the discordance provides the antecedent basis for the "the arrhythmia" "confirm[ed]," i.e., verified by the ECG results.

Similar to the '731, for the claimed system and method to verify "the arrhythmia" identified by the discordance, it must necessarily compare the results of the ECG sensor to the results of the previous discordance determination, which includes the PPG sensor results. (*See* Stultz Decl. at ¶ 84.) Indeed, the '941 patent's specification expressly discloses this comparison:

> In some embodiments, a machine learning algorithm causes the devices, systems, and methods described herein to more accurately identify or predict the presence of an arrhythmia in a given individual. For example, in some embodiments, ***sensed electrocardiogram data may be compared back to parameter values such as, for example, sensed heart rates and activity levels that triggered the sensing of said electrocardiograms.*** When, for example, sensed electrocardiograms confirm the presence of an arrhythmia, the presence of which was indicated by, for example, a discordance between other parameter values, the machine algorithm causes the device or system described herein to learn from that data. Similarly, when, for example, sensed electrocardiograms do not confirm the presence of an arrhythmia, the presence of which was indicated by, for example, a discordance between other parameter values, the machine algorithm causes the device or system described herein to learn from that data as well. … The presence or absence of an arrhythmia on the electrocardiogram either respectively reinforces the correlation of an arrhythmia with the discordance that caused the electrocardiogram to

29

be sensed or contradicts the presence of a correlation of an arrhythmia
with the discordance.

'941 patent, 13:60-14:18; *see also* (*See* Stultz Decl. at ¶ 85.). The '941 patent applicants' statements during prosecution further confirm this interpretation.

During prosecution, the claims of the '941 patent were rejected in light of the Katra prior art, among others. According to the Patent Office, the Katra prior art "describes a method of cardiac monitoring ([0025]), including wherein the device monitors physiological parameters and records ECG signals based on predetermined characteristics of the physiological parameters ([0077]). Katra further describes wherein the predetermined characteristics may be thresholds indicative of cardiac arrhythmias ([0035] and [0061])." (Exh. 5 (10/2/2019 Office Action) at 5.) In distinguishing Katra to overcome the Patent Office rejection, the applicants stated that "Katra does not describe indicating to a user *the possibili'y* of an arrhythmia being present and certainly does not teach or suggest doing so *in re.ponse to* determining the presence of an arrhythmia. … Katra further does not describe **taking an ECG to confoɪm [sic] the possibɪli'y of an aɪɪhythmia** detected based on a discordance." (Exh. 5 (2/3/2019 Response to Office Action) at 11 (emphasis added).) Thus, there can be no doubt that the scope of the claims of the '941 patent require a discordance monitoring analysis, in which physiological parameters are sensed, and a discordance is detected which indicates an arrhythmia; it is that discordance that triggers the taking of an ECG to confirm the presence of the suspected arrhythmia.

Accordingly, the Court should construe "to confirm a/the presence of the arrhythmia" in the '941 patent to mean "to verify the arrhythmia by comparing the ECG sensor results to the discordance  determination."

CONTAINS CONFIDENTIAL BUSINESS INFORMATION -- SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

**Before the Honorable Cameron R. Elliot**
**Administrative Law Judge**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** | **Inv. No. 337-TA-1266** |

## APPLE INC.'S PRE-HEARING BRIEF

CONTAINS CONFIDENTIAL BUSINESS INFORMATION -- SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

(citing Stultz Decl. ¶ 36). The variation between successive beats over a measured period of time is broadly, and colloquially, referred to as heart rate variability (HRV). *Id.* As stated in the specification of the '499 patent, there are a variety of known ways to use heart rate information to calculate or derive HRV. *See* JX-1, 8:54-64.

Medical professionals use a variety of tools to assess these cardiac conditions in a patient. These may include (1) measuring a patient's pulse through manual palpation, e.g., a doctor feeling a patient's pulse at the wrist, (2) using a stethoscope/electronic stethoscope to listen to a patient's heart beats through the chest wall, (3) using a stethoscope/electronic stethoscope to listen to a patient's pulse at an appendage, (4) using photoplethysmography (PPG) sensors to measure and calculate, among other things, a patient's heart rate, heart rate variability, and blood oxygen saturation, (5) using an electrocardiogram (ECG) to measure the electrical activity of the patient's heart, and (6) measuring a patient's blood pressure.

## 2.     PPG Technology

Medical professionals have long used PPG sensors to measure heart rate and heart rate variability, among other things. PPG sensors use light to measure the absorption rate as blood flows through a patient's blood vessels. Apple Op. Claim Const. Br. (EDIS No. 752480), Exh. 1 ¶¶ 53-65. Specifically, a source shines light at particular wavelengths into the body. The amount of light that is detected by photodiodes after it passes through a body part, e.g., a fingertip, is "transmittal PPG." *Id.* The amount of light that is reflected back out of the body as detected by photodiodes is "reflective PPG." *Id.* Both are used to determine, among other things, the pulse of the patient. The pulse data from the PPG can then be used to derive estimates of heart rate and HRV. *Id.*

Notably, the PPG sensor may be used passively. As long as a user is wearing a PPG sensor, for example, on a smartwatch, the PPG sensor can continuously monitor the user/measure blood

CONTAINS CONFIDENTIAL BUSINESS INFORMATION -- SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

volume pulse of the user without any active input from the user other than wearing the device. The monitoring will take place in the background without the user having to activate a measurement.

### 3.     ECG Technology

As Dr. Stultz will explain, an ECG measures the small electrical changes in the skin generated from the depolarization of the four chambers of the heart muscle as it contracts. Apple Op. Claim Const. Br. (EDIS No. 752480) Exh. 1 ¶ 51. That depolarization creates an electrical impulse that can be measured by electrodes placed on a person's skin. Specifically, during the cardiac cycle, initially, both the atria and ventricles are relaxed (diastole). The "P wave" represents depolarization of the atria and is followed by atrial contraction (systole). Ventricular systole follows the depolarization of the ventricles and is represented by the "QRS complex" in the ECG. Ventricular relaxation, or diastole, follows repolarization of the ventricles and is represented by the "T wave" of the ECG. *Id.* ¶¶ 39-52.

There are different types of ECG devices. A 12-lead ECG is the standard for measuring the heart's electrical function. *See* RX-325C.5. The 12-lead ECG records the heart's electrical activity from 12 electrodes on the patient's chest, arms, and legs at the same time. A 12-lead ECG is typically administered in a clinic or hospital setting, and the results analyzed and interpreted by a doctor or other medical professional. *See* RX-325C.5-7. In contrast, a single-lead ECG may be incorporated in portable wearable devices that provide a user heart rhythm information outside of a clinical setting.

ECG signals are obtained by placing electrodes either on the torso itself or on opposite sides of the body, e.g., one electrode on the left side of the torso and one electrode on the right side of the torso. *See* Apple Op. Claim Const. Br. (EDIS No. 752480), Exh. 1 at ¶ 51. This is because it is necessary to measure the electrical activity across the heart, given that the heart is an electric dipole that sits in the torso.

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION -- SUBJECT TO PROTECTIVE ORDER**
**CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Cameron R. Elliot**
**Administrative Law Judge**

| | |
|---|---|
| **In the Matter of** | |
| **CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** | Inv. No. 337-TA-1266 |

**APPLE INC.'S POST-HEARING BRIEF**

CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

a patient's blood pressure. Tr. (Stultz) at 1076:12-1077:12. Additionally, wearable digital health devices may apply machine learning techniques and algorithms to classify heart data gathered from device sensors, including PPG and ECG sensors, *see, e.g.*, JX-3 ('941 patent), 13:60-14:18; JX-1 ('499 patent), 12:48-54, to help detect arrhythmias, among other things. These machine learning techniques were known well before the alleged inventions in the Asserted Patents. *See e.g.*, RX-562.7(AI 2008 Article) (discussing "machine learning techniques" for analysis of HRV for arrhythmia detection.).

### 5.     PPG Technology

PPG sensors use light to determine heart rate by measuring the absorption rate of the light as blood flows through a patient's blood vessels. EDIS No. 752480 (Apple Op. Claim Constr. Br.), Ex. 1 ¶¶ 53-65. PPG sensors have been in existence for decades and were not invented by the inventors of the Asserted Patents. Tr. (Albert) at 114:14-16.[16]

### 6.     ECG Technology

An ECG uses electrodes placed on a patient's skin to measure the small electrical changes generated from the depolarization of the four chambers of the heart muscle as it contracts. Apple Op. Claim Constr. Br. (EDIS No. 725480), Ex. 1 ¶51. As described by Dr. Stultz, the transmission of electrical energy through the heart causes it to contract. Tr. (Stultz) at 1066:10-1068:7. An ECG measures that electrical flow. *Id.* at 1066:18-22. During each contraction, depolarization through the different chambers has a characteristic shape shown on the ECG. *Id.* at 1067:11-14. For example, the "P wave" represents the atrial depolarization and subsequent contraction, and the "QRS complex" represents the ventricular depolarization and subsequent contraction. *Id.* at 1066:23-1068:7. Notably, to measure an ECG, electrodes are placed on opposite sides of the body because it is necessary to

---

[16] A further description of PPG sensors is provided in Apple's Prehearing Brief. RPHB at 11-12.

CONFIDENTIAL MATERIAL REDACTED
CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

### 2.    Apple's Irregular Rhythm Notification (IRN)

IRN is a standalone, software as a medical device (SaMD) cleared by FDA under a *de novo* authorization on September 11, 2018.  *See* RX-4C.1 (IRN FDA Authorization).  It is available on Apple Watch Series 1-7.  IRN identifies and notifies the user of episodes of irregular heart rhythms suggestive of AFib using pulse rate data.  RX-49C.1 (IRN De Novo Request).  The feature will not, however, detect all instances of rhythms consistent with AFib.  Indeed, IRN is meant as an early detection feature for those not already diagnosed with AFib, and serves to notify the user that further

11

**CONFIDENTIAL MATERIAL REDACTED**
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER**
**CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

evaluation by a cardiac medical professional may be warranted.  IRN is not automatically enabled and must be on-boarded before it is active on the Watch.  Tr. (Waydo) at 763:23-764:16.

IRN is a passive feature ████████████████████████████████████████

████████████████████████████████████████████ ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ ████████████████████████████████

Once ████████████████ determines the user is still, ████████████████ the IRN algorithm begins tachogram collection.  *Id.* ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ IRN retrieves the collected tachogram and assesses ████████████████████████ to classify it as either irregular or not AFib.  *See* RX-177C.1 (IRN Software Specification); Tr. (Waydo) at 756:7-759:7; RX-835C.3 (████████ 2017 Presentation).  If the tachogram is classified as irregular, IRN begins its

---

[23] "████████ is the code name for IRN.  Tr. (Jafari) at 312:18-313:3.

CONFIDENTIAL MATERIAL REDACTED
CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

confirmation cycle by requesting additional tachograms more frequently. Tr. (Waydo) at 756:7-759:7; RX-177C.17 (IRN Software Specification); RX-835C.3 (Antimony 2017 Presentation).

If a sufficient number of such tachograms are classified to meet the notification threshold, IRN will surface a notice to the user that that his or her "heart has shown signs of irregular rhythm suggestive of atrial fibrillation" and to "talk to a doctor" if the user "has not been diagnosed with AFib by a physician." RX-177C.4, 23 (IRN Software Specification); Tr. (Waydo) at 756:7-759:7; RX-835C.3 (█████ 2017 Presentation). The notification never recommends, prompts, or alerts the user to take an ECG, nor does the ECG App automatically launch with an IRN notice. *See* RX-51C.1 (IRN Instructions for Use); RX-101C (IRN FDA Authorization); CX-50 (ECG App Spec.); CX-51 (ECG 2.0 Spec.); RX-179C.72 (IRN Design Specification); Tr. (Waydo) at 763:5-22, 772:13-15, 859:18-860:18; Tr. (Picard) at 891:18-892:14, 904:18-906:10.

### 3. Apple's ECG App

The ECG App is an on-demand ECG analysis application available on Apple Watch Series 4-7. *See* Tr. (Waydo) at 766:4-768:12, 772:5-8; RX-836C.2 (█████Presentation); JX-235C (Brittain Dep. Tr.) at 245:1-248:1. It was cleared by FDA under its own *de novo* authorization on September 11, 2018 as a standalone SaMD. *See* RX-2C.1 (ECG App FDA Authorization). The ECG App measures an electrocardiogram using electrodes built into the digital crown and the back crystal on the Apple Watch Series 4-7 as a Lead I ECG. CX-53C.16 (ECG 2.0 Design Specification). While the ECG App is preloaded on the watch, a user must on-board the App before it will function. *See id.* at 8; Tr. (Waydo) at 772:9-18.

Unlike HHRN and IRN, the ECG App is not a passive feature (i.e. does not run constantly in the background); rather, it requires the user to affirmatively open the ECG App. RX-178C.4 (ECG Software Requirements); Tr. (Waydo) at 766:4-768:12. █████████████████████

████████████████████████████████████████████

CONFIDENTIAL MATERIAL REDACTED
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER**
**CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████ After the user affirmatively opens the ECG App, the App instructs the user to take an ECG by holding their finger on the digital crown of the Watch. CX-53C.16 (ECG 2.0 Design Specification); Tr. (Waydo) at 766:4-768:12. The electrical sensors then acquire Lead I ECG signals, and the ECG App will display a visual representation of the ECG waveform to provide real-time feedback of signal quality during the session. CX-53C.19-24 (ECG 2.0 Design Specifications); Tr. (Waydo) at 766:4-768:12. During the session, the user is instructed to keep his or her arms still. *Id.* After the 30-second recording, the ECG App analyzes the acquired ECG data and produces a clinically equivalent ECG waveform, calculates average heart rate, and classifies the rhythm of the waveform (collectively called "████████"). *See id.*; CX-53C.19-24 (ECG 2.0 Design Specification); RX-178C.1 (ECG Software Specification); RX-136C.1 (ISCE Proposal). Once the user's rhythm is classified, the ECG App generates a notification to the user on the Watch indicating one of the following: sinus rhythm, AFib, AFib with high heart rate, or poor recording (inconclusive).[24] Tr. (Waydo) at 766:23-767:2; CX-50C.65-66 (ECG Design Specification); RX-792C.6-7 (Apple FDA Presentation). The notification also prompts the user to enter any symptoms they are feeling. CX-50C.65-66 (ECG Design Specification)

█ ████████████

████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████  █████████████████████

███████████████████████████████████████████████████████

---

[24] The ECG 2.0 App modified the notification to include the following: low heart rate, sinus rhythm, high heart rate, AFib, AFib high heart rate, inconclusive, and poor recording. RX-138C.9-10 (Apple FDA Presentation); RX-140C.1 (ECG 2.0 510(k) Summary).

14

CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

HHRN merely provides a general wellness notification to the user, and as Dr. Jafari admits, an elevated heart rate while the user is stationary, may not be indicative of any arrhythmia, much less AFib.[26] On this point, Dr. Stultz agrees. Tr. (Stultz) at 1070:7-23. Indeed, as discussed above, even AliveCor's documents for its SmartRhythm product provides that there are many causes of high heart rate not attributable to arrhythmia. *See* RX-128C.12. For these reasons, HHRN does not perform substantially the same function of indicating to the user that an arrhythmia may be present, in substantially the same way, to achieve substantially the same result.

### 3. Apple Watch Does Not Infringe Claim 12(f)(iii) Because It Does Not "Confirm the Presence of *the* Arrhythmia"

Claim 12(f)(iii) of the '941 patent requires "a nontransitory computer readable storage medium encoded with a computer program ***including instructions executable by the processor to*** cause the processor to … receive electric signals of the user from the ECG sensor ***to confirm*** the presence of ***the*** arrhythmia." JX-3, cl. 12 (emphasis added). As discussed below, Apple Watch's ECG App is an independent feature, and ECG App does not have instructions to "confirm the presence of the arrhythmia" as required by the claims of the Asserted '941 and '731 patents.[27]

The Court's construction of "confirm" was the plain and ordinary meaning, and as explained by Dr. Picard, "in the field of wearables and machine learning and pattern recognition to detect and verify events[,] there is a very widely used plain and ordinary meaning ...." Tr. (Picard) at 886:8-887:15. In applying the plain meaning of "to confirm," Dr. Picard explained that the ECG confirmation must be as to the particular arrhythmic event detected by the PPG sensor. *Id.* Thus, the plain meaning of "to confirm" requires the ECG sensor to record and analyze data significantly overlapping in time with

---

[26] AliveCor admits the presence of tachycardia is not always symptomatic of arrhythmia in its claim chart for the '941 patent: "the presence of tachycardia, in turn, may indicate that the user has atrial fibrillation because the two conditions sometimes accompany one another." *See* RX-366C.97-98 (Jafari Op. Rpt. Exhibit 6).

[27] This analysis applies to the '941 patent's "confirming the presence of the arrhythmia" limitation, and applies equally to the '731 patent's requirement of essentially the same limitation.

CONFIDENTIAL MATERIAL REDACTED
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

AliveCor alleges that it has an established domestic industry and a domestic industry in the process of being established vis-à-vis the '941 patent with three different products. Those three products are either (1) discontinued (the KBS), (2) designed entirely by a third party outside the United States with no plans to commercialize them (███████ or (3) at such a rudimentary stage of development that they do not practice any of the claims of the '941 patent and are years from being able to do so (████████). To meet its burden of showing the domestic industry products practice, AliveCor must compare the properly construed terms of the '941 patent to the products and show that the products practice every limitation of at least one identified claim, literally or under the doctrine of equivalents. *Certain Doxorubicin and Preparations Containing Same,* Inv. No. 337-TA-300, ID, at 109, 1990 WL 710463 (May 21, 1990), *aff'd,* Views of the Commission at 22 (Oct. 31, 1990). It is the same test that is applied for determining infringement by an accused product. *Id.* The alleged domestic industry products do not practice the claims of the '941 patent.

### 1. KardiaBand (KBS)

The KBS (which is entirely different from ███████ discussed below) consists of an Apple Watch Series 1-3, running watchOS 4.0 or earlier—both of which were previously sold by Apple—that has been equipped with an ECG accessory watchband (KBS) along with an application (the KardiaApp), both sold by AliveCor. *See* RX-462C.131-32 (AliveCor Interrogatory Responses); JX-96C (Considerations for Implementation of SmartRhythm); RX-130C (AliveCor testing using watchOS 4 vs watchOS5). The KardiaApp that was designed for the Apple Watch Series 1-3 had a feature called SmartRhythm. *See* RX-128C (Kardia User Manual). SmartRhythm would activate the high fidelity green LEDs on the PPG sensor of the Apple Watch Series 1-3[29], receive the PPG data from the Apple Watch Series 1-3, and analyze that PPG data using the processor provided by the

---

[29] A consequence of the KardiaApp activating the green LEDs on the Apple Watch Series 1-3 was that battery of the Apple Watch would run down faster than normal, adversely affecting the utility of the Apple Watch for the user. RX-128C (Kardia™ User Manual) at RX-128C.0012.

CONFIDENTIAL MATERIAL REDACTED
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER**
**CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

Apple Watch.  If the analysis of the PPG data provided by the Apple Watch met certain criteria, SmartRhythm would surface a message to the user of the Apple Watch through the KardiaApp which read: "Unexpected Heart Rate[.]  Would you like to take an EKG?" RPX-16C (How to record a clean EKG with KardiaBand.mp4).  It would also include a "button" as part of the message that allowed the user to launch the recording of the ECG using the KBS.  *Id.*



The KBS ECG accessory for the Apple Watch Series 1-3 received FDA approval in November 2017, and was launched shortly after.  RX-26C (FDA Approval of Kardia Band).  Ten months later, Apple announced that it was releasing Apple Watch Series 4, which included an ECG sensor built into the watch case—a feature Apple had been independently developing ███████  Tr. (Waydo) at 738:6-16; RX785C; JX-238C (Klaassen) at 45:14-46:11.  In 2019, AliveCor discontinued both the KBS accessory and SmartRhythm.  Tr. (Albert) at 85:7-17.  Neither the KBS accessory nor SmartRhythm has been available commercially since 2019.  Tr. (Albert) at 135:14-136:22 (Dr. Albert confirming that AliveCor discontinued KBS and SmartRhythm).

### a.     **KBS does not practice claim 12 of the '941 patent (or its dependents)**

AliveCor maintains that the KBS with SmartRhythm running on an Apple Watch Series 1-3 with watchOS 4.0 or earlier practice claims 12, 16, and 20-23 of the '941 patent, and only claim 12 is independent.  As detailed below, the KBS with SmartRhythm does not practice the limitations of

41

CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

claim 12 that require "instructions … [that] cause the processor to: (ii) based on the presence of the discordance, indicate to the user a possibility of an arrhythmia being present; [or] (iii) receive electric signals of the user from the ECG sensor to confirm the presence of the arrhythmia," either literally or under the doctrine of equivalents.

### b.    KBS does not "based on the presence of the discordance, indicate to the user the possibility of an arrhythmia"

The KBS was an accessory replacement watchband with an ECG sensor sold for use exclusively with an Apple Watch Series 1-3. To use, a user would download the KardiaApp with SmartRhythm onto the Apple Watch and SmartRhythm would put the Apple Watch into workout mode to activate the higher fidelity green LEDs from the Apple Watch PPG sensor. JX-96C.2-3 (Smart Rhythm Development Plan); CX-266C.11-12 (KBS User Manual). The KardiaApp would then analyze that PPG data and if it detected an irregularity, it would surface an alert to the user to record an ECG. *Id.*

This alert did not indicate to the user the possibility of an arrhythmia. Rather, it merely alerted the user that the system had identified an "unexpected heart rate" that may be caused by many different factors, including normal factors that are not "cardiac conditions." Tr. (Stultz) at 1071:7-20. As explained above with respect to the HHRN non-infringement analysis, there are a variety of different physiological states that can cause an "unexpected heart rate." *Id.* An unexpected heart rate does not "indicate to the user the possibility of an arrhythmia." *Id.* Indeed, even AliveCor's own documents related to KBS indicate that the message it surfaces does not "necessarily mean you have an abnormality." RX-128C.12 (KBS User Manual). As such, KBS does not "indicate to the user the possibility of an arrhythmia being present" as required by claim 12 of the '941 patent.

### c.    KBS does not "receive electric signals of the user to confirm the presence of the arrhythmia"

42

**CONFIDENTIAL MATERIAL REDACTED**
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER**
**CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

the investment made by ▇▇▇ and others outside of the U.S. in doing this work. Although

▇▇▇ completed a prototype of ▇▇▇ in October 2021, ▇▇▇ did not develop further the

▇▇ after that. Tr. (Picard) at 910:2-13; Tr. (VanderVeen) at 990:17-991:4. At the time of the

complaint, AliveCor had no plans to build, market, or sell ▇▇▇. Tr. (Albert) at 168:8-12

(confirming the only domestic industry product that AliveCor was working on in first quarter of 2021

was ▇▇▇); *see also* Tr. (Akemann) at 686:1-4 ("Q. But you have not seen any financial forecasts for

▇▇▇ correct? A. That's certainly correct, at least with respect to product sales and profits and the

like."); *id.* at 686:5-10 ("Q. You have not seen any documents that reflect AliveCor's planned

investments ▇▇▇], correct? A. I don't recall seeing any financial planning documents that project

out investments, for example, that's correct."); *id.* at 686:11-14 ("Q. You have not seen any projections

of consumer demand ▇▇▇], correct? A. That's correct. Again, no financial forecasts of that

sort."); *id.* at 686:15-21 ("Q. You have not seen any manufacturing agreements ▇▇▇ correct? A.

I think that's correct."). And AliveCor has been unable to find any suitable customers to

commercialize ▇▇▇ Tr. (Vander Veen) at 1013:20-25; Tr. (Albert) at 156:1-12; JX-224C (Hosein Tr.)

at 64:12-20; 75:11-14. Additionally, neither AliveCor nor ▇▇▇ have started discussions with FDA

related ▇▇▇. Tr. (Albert) at 158:17-24 (confirming that AliveCor has not begun the process of

collecting data to qualify ▇▇▇ with the FDA, has not collected any PPG data, and just recently

received prototypes); Tr. (Somayajula) at 250:11-18. Thus, these products—created, designed, and

developed ▇▇▇, with no further development plans, no customers, that are not FDA-cleared—

cannot constitute DI products that practice any claim of the '941 patent.

Nonetheless, AliveCor and Dr. Jafari maintain ▇▇▇ "practices" claims 12, 16 and 20-23

of the '941 patent, with claim 12 being the only independent claim identified. ▇▇▇ does not, however,

practice all limitations of claim 12 and cannot practice its dependent claims.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

effective filing date of the '941 patent (May 13, 2015). RX-419.1 (AMON). It is undisputed that AMON discloses a wearable medical monitoring and alert system targeting high-risk cardiac patients, which encompasses multiple sensors, including SpO2 (which is based on PPG technology; the two are treated interchangeably), blood pressure, motion, and ECG. Tr. (Stultz) at 1115:5-21; RDX-3.42.

Almen is also prior art under § 102(a) because it is a published patent with an effective filing date of February 25, 2005, and an issuance date of December 2, 2008. RX-400.1 (Almen). Almen also discloses a wrist worn device that focuses on optical sensing to measure HRV for a variety of different "cardiac maladies" including arrhythmias and atrial fibrillation. Tr. (Stultz) at 1116:15-21; RDX-3.44.

Kotzin is also prior art under § 102(a) because it is a published patent application with an effective filing date of July 8, 2003, and a publication date February 5, 2004. RX-401.1 (Kotzin). Kotzin discloses a portable communication device with one or more sensors, including heart rate sensors, used to relay information from the sensors to the user. Tr. (Stultz) at 1116:22-1117:3; RDX-3.45; RX-401.6 (Kotzin). AliveCor does not dispute that each of these three references is prior art to the Asserted Patents, including the '941 patent.

AliveCor also does not dispute that the majority of the limitations of the '941 patent claims are found in AMON. AliveCor only disputes whether four discrete limitations of claim 12 are met, along with a handful a dependent claim limitations. As Dr. Stultz testified, however, after reviewing the scope of AMON alone, and in combination with Almen and Kotzin, and taking into account the state of the art and knowledge and level of skill that a POSITA would have had in May 2015, all of the asserted claims of the '941 are rendered obvious. Tr. (Stultz) at 1113:12-114:11. In this regard, Dr. Stultz testified that his analysis of the state of the art revealed that a POSITA would have been well-aware of various concepts fundamental to the claimed limitations of all of the Asserted Patents, including the '941 patent. Tr. (Stultz) at 1113:12-1114:2; RDX-3.39. In his view, a POSITA's knowledge as of December 2013, and certainly before May 2015, was well encapsulated by four

CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

articles: Leijdekkers (RX-560), that disclosed a smart phone app used to detect life threatening arrhythmias as of 2006, Mohammadzadeh Asl (RX-562) that disclosed machine learning algorithms using HRV data (derived from R-R intervals from PPG signals) derived from noisy signals as identifying atrial fibrillation with high levels of accuracy in as of 2007; Suzuki (RX-554) which disclosed a wearable PPG sensor for irregular pulse detection as of 2009; and Thalagne & Mergu (RX-563) which disclosed using HRV analysis of arrhythmias using linear and non-linear methods (including Poincare plots) as of 2010. *Id.* Given this state of the art, and the express disclosures in AMON, Almen, and Kotzin, the asserted claims of the '941 patent are obvious and therefore invalid.

> ### a.     For Obviousness, AMON, Almen, and Kotzin Need Only Be Enabled When Taken as a Whole, to a Person of Ordinary Skill, at the Time of the Challenged Invention

At the hearing, the Court asked the parties to address whether prior art for purposes of an obviousness analysis under 35 U.S.C. § 103 has the same enablement requirement for prior art under a Section 102 anticipation analysis. Although there is an enablement requirement for Section 103, it is less stringent than the enablement requirement applied in a Section 102 anticipation analysis, and also less stringent than the enablement requirement under Section 112 for purposes of patentability.

The Federal Circuit has repeatedly held that in general, a prior art reference under Section 103 does not necessarily have to enable its own disclosure, i.e., it does not have to be "self-enabling" to be relevant to an obviousness analysis. *See Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991) ("While a reference must enable someone to practice the invention in order to anticipate under § 102(b), a non-enabling reference may qualify as prior art for the purpose of determining obviousness under § 103."); *Beckman Instruments Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989) ("Even if a reference discloses an inoperative device, it is prior art for all that it teaches."). Indeed, a non-enabled prior art reference is prior art for all that it teaches, and further, may provide the motivation to modify (for single reference obviousness) or combine with other prior art references

CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

ineligible claims directed at mathematical steps performed and data received that were conventional and well understood in the prior art); *see also Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014) ("Without additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible.'). *Health Discovery Corp. v. Intel Corp.*, No. 6:20-CV-666-ADA, 2021 WL 6116891, at *12 (W.D. Tex. Dec. 27, 2021) ("[A] specific or different combination of mathematical steps . . . is not enough to transform the abstract idea in claim 1 into a patent eligible application.").

Asserted claim 12 adds only to abstract claim 1 that a notification of the detected arrhythmia is generated. Dr. Stultz testified, however, that this adds nothing inventive—clinicians have long notified patients of an arrhythmia detected during an exam. Tr. (Stultz) at 1088:2-11.

Finally, claim 15 and 16 add nothing novel, and are the same limitations analyzed in the '941 patent. *See supra* Section IV.C.1.c. In Dr. Stultz's view, the fact that the '731 patent has an earlier priority date has no bearing on his ultimate opinion that both of these dependent claims recite patent ineligible subject matter. Tr. (Stultz) at 1088:12-1089:12. As such, all asserted claims of the '731 patent are directed to patent ineligible subject matter, with no inventive concept provided, and thus are invalid under Section 101.

## 2.     Obviousness Under 35 U.S.C. § 103: AMON, Almen, and/or Kotzin

Just like with the '941 patent, AMON—alone or in combination with Almen and/or Kotzin for minor limitations—renders obvious all of the '731 patent's Asserted Claims, including claims 1, 3, 5 , 8-10, 12, 15-16. *See supra* Section IV.C.2. AMON is prior art to the '731 patent under § 102(a) because it was published by others in December 2004, well before the earliest effective filing date of the '731 patent (December 12, 2013). RX-419.1 (AMON). Almen is also prior art under § 102(a) because it is a published patent with an effective filing date of February 25, 2005, and an issuance date of December 2, 2008. RX-400.1 (Almen). Kotzin is also prior art under § 102(a) because it is a

95

CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

> **to: determine heartrate variability ("HRV") data from the PPG data; and detect, based on the HRV data, the presence of the arrhythmia**[35]

Claim 4 is not asserted, but is analyzed because certain asserted claims depend from it. As Dr. Stultz testified, AMON discloses claim 4, as he analyzed the nearly identical limitation as part of his analysis of the '941 patent, claim 13. Tr. (Stultz) at 1137:23-1138:13. *See supra* Section IV.C.2.d.

> **f.    Claim 5: The smart watch of claim 4, wherein to detect the presence of the arrhythmia, the processing device is configured to input the HRV data into a machine learning algorithm trained to detect arrhythmias.**

As Dr. Stultz testified, AMON discloses claim 5. Dr. Stultz analyzed the nearly identical limitation as part of his analysis of claim 3. Tr. (Stultz) at 1138:20-1139:2. *See supra* Section V.C.2.d. As already discussed, AMON discloses a machine learning algorithm to determine whether the detected vital signs (e.g., the PPG data from the SpO$_2$ sensor) are irregular by using data about activity level, age, gender, fitness, and medical history to set high risk and normal thresholds. RX-419.3, 6 (AMON) Table I. The vital sign data input into the algorithm for the initial analysis can be from HRV derived from the PPG pulse data. *Id.* at 3. AMON also discloses a machine learning algorithm for detecting the R-R distances, using an initial learning stage followed by a detection of the different ECG waveforms, for use in determining if vital signs are irregular. *Id.* at 4. As such, AMON discloses or renders obvious all the additional limitations of claim 5 of the '731 patent.

> **g.    Claim 7: The smart watch of claim 1, wherein the processing device is further configured to: extract one or more features from the PPG data; and detect, based on the one or more features, the presence of the arrhythmia.**

---

[35] Although AliveCor contests that determining HRV based on a user's heart rate is disclosed in AMON, it did not contest limitation 11[f] of the '499 patent ("determine a heart rate variability of said first user based on said heart rate of said first user") in its Pre-Hearing Brief. Therefore, AliveCor has waived its argument that AMON does not disclose HRV across all three Asserted Patents.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

the claimed smartwatch that makes it anything more than an off-the shelf computer. Tr. (Stultz) at 1083-12-17, 1091:15-1092:5; *id.* (Efimov) at 1298:20-22. Even Dr. Efimov and Staff equated a smartwatch to be nothing more than a wearable computer, and Dr. Efimov admitted that wearable electronics for arrhythmia diagnosis have been around for decades. *See* Tr. (Efimov) at 1306:17-1307:4; 1294:22-1295:3. The '499 patent itself references that the generic "computing device" may comprise, for example, a computing device worn on the body . . . [including] a wrist-worn computing device such as a Samsung Galaxy Gear Smart Watch[.]" JX-1 at 2:21-29.

Claim 17 adds that the presence of the arrhythmia is determined using a machine learning algorithm. But as summarized with respect to claim 5 of the '731 patent, and as Dr. Stultz testified, a machine learning algorithm without specifics is nothing more than generic, functional language that does not purport to add anything to the particular alleged inventive implementation. *See supra* Section V.C.1.c. Claim 17 recites nothing about how the algorithm is trained, and the '499 patent itself only notes that "machine learning algorithms may be trained to identify atrial fibrillation," without any additional detail. JX-1 at 5:6-10. Dr. Efimov admitted only that "general principles of machine learning were known as of December 2013," (Tr. (Efimov) at 1299:1-5) which is all that the '499 patent discloses—the general concept of machine learning for arrhythmia detection. But Dr. Stultz demonstrated that as of April 2008, machine learning was being used in the art for the specific goal of detecting arrhythmias. RX-562 (Mohammadzadeh Asl) (noting the objective to be an effective arrhythmia classification algorithm using HRV). Dr. Efimov's response was only that this paper had a small number of recordings—not that machine learning was not known for arrhythmia detection prior to 2013. Tr. (Efimov) at 1299:6-1300:8.

### 2.     Obviousness Under 35 U.S.C. § 103: AMON, Kotzin and Almen

Just like the '941 and '731 patents, AMON—alone or in combination with Almen and Kotzin for minor limitations—renders obvious all of the '499 patent's Asserted Claims in this Investigation,

115

CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

including claims 11, 16 and 17.  *See supra* Section IV.C.2.; V.C.2.  Given that the '499 patent has the same December 12, 2013 priority date as the '731 patent, AMON, Almen and Kotzin are all prior art under Section 102(a).  *Id.*

### a.    Motivation to Combine AMON, Almen, and Kotzin

A POSITA would have been motivated to combine AMON with Almen and/or Kotzin in December 2013 for the same reasons already discussed above with respect to the '731 patent and the 941 patent.  Tr. (Stultz) at 1144:2-21; RDX-3.103; *supra* Sections IV.C.2.a; V.C.2.a.

### b.    Claim 11:

Claim 11 is not asserted by AliveCor; however, asserted claims 16 and 17 depend from claim 11, and all are rendered obvious by AMON, alone or in combination with Almen and Kotzin.

#### i.    11[pre]: 11. A system for determining the presence of an arrhythmia of a first user, comprising:

The evidence shows (and AliveCor does not contest) that AMON discloses a system for determining the presence of an arrhythmia of a first user.  Tr. (Stultz) at 1142:20-1143:6.  AMON discloses a system in a wearable smartwatch that uses a clinical algorithm to determine whether certain vital signs, including heart rate, is outside a normal range, i.e. faster or slower than normal. RX-419 (AMON) Abstract, 2-6, Table 1, Figs. 3-4.  Thus, AMON discloses or renders obvious the preamble of claim 11 of the '499 patent.

#### ii.    11[a]: a heart rate sensor coupled to said first user;

The evidence shows (and AliveCor does not contest) that AMON discloses limitation 11[a]. Tr. (Stultz) at 1142:20-1143:6.  AMON discloses multiple sensors that sense the pulse (heart rate) of the user, including the $SPO_2$ sensor, which is based on PPG technology. RX-419.6, Fig. 3 (AMON). Table IV also shows the pulse and heart rates measured by the three different sensors, blood pressure sensor, pulse oximeter ($SpO_2$) sensor, and ECG sensor. *Id.* 416-419, Table IV, Figs. 4-5. Thus, AMON discloses or renders obvious this limitation of claim 11 of the '499 patent.

116

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

### Before the Honorable Cameron R. Elliot

### Administrative Law Judge

|  |  |
|---|---|
| In the Matter of<br><br>**CERTAIN WEARABLE ELECTRONIC DEVICES WITH EGG FUNCTIONALITY AND COMPONENTS THEREOF** | Inv. No. 337-TA-1266 |

## COMPLAINANT ALIVECOR, INC.'S INITIAL POST-HEARING BRIEF

CONFIDENTIAL MATERIAL REDACTED
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

20, 325:1-12. Many of the classification steps are similar or identical to those used by the IRN classification algorithm, ████████████████████████████████████ *Id.*; *see supra* § I.1.b. Further, and unique to the ECG analysis, ████████████████████████ ████████████████████████████████████████████████████ *Id.*; CX-0051C.75-76. After the classification is completed, the ECG Feature will determine if the 30-second ECG is labeled as (*inter alia*) AFib, AFib with high heart rate, normal sinus rhythm, or normal sinus rhythm with high heart rate and notify the user by displaying an indication of the classification outcome on the watch face. *Id.*; Tr. (Jafari) 322:19-323:4; CDX-0003C.31 (Jafari demonstrative); JX-219C (Klaassen) at 76:15-77:3.

## 2. AliveCor Products

The domestic industry products are wearable electronic devices, developed, being developed, manufactured, and/or sold by AliveCor under the tradenames KardiaBand System, ████████, and ████████████████, each comprising, among other things, a smartwatch, activity sensor, PPG sensor, and ECG sensor that together practice at least claims 12, 16, 20, and 21-23 of the '941 patent, claims 1, 3, 12, 15, and 16 of the '731 patent, and claims 16 and 17 of the '499 patent, as detailed below. Tr. (Jafari) at 384:3-386:15, 388:10-391:11, 392:3-393:10; CDX-0003C.91-98, 103-109, 112-120; JX-096C; CX-0541C; CX-0542C; JX-011C; CPX-021C; CX-0271C; CX-0266C; CX-0547C; JX-228C at 68:5-19, 98:20-99:1, 110:1-111:4, 120:12-121:10.

(a) AliveCor's KardiaBand System ("KBS") comprises a KardiaBand and the KardiaApp running on an Apple Watch Series, 1, 2, or 3 with Watch OS 5.0 or earlier. Tr. (Jafari) at 385:16-386:15; CDX-0003C.91; JX-096C; CX-0547C.2; CDX-0005.21; Tr. (Albert) at 64:1-66:1; JX-009C.14; CPX-0060. KBS was the first FDA cleared medical device accessory for Apple Watch and has two stainless-steel electrodes, one on the front and one on the back of the KardiaBand, that is capable of recording and analyzing an ECG when the user touches her watch wearing hand with one digit from the other

CONFIDENTIAL MATERIAL REDACTED
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

and places her thumb on the front electrode. Tr. (Albert) at 65:13-17; CX-0541.3; JX-011C.1; JX-094C.1-2. "After an ECG recording is complete, the ECG is analyzed to determine if it is at least 30 seconds long, if it is Normal, Unclassified, if Atrial Fibrillation is present, or if it is too noisy to interpret." JX-011C.1; Tr. (Albert) at 70:13-71:6; CDX-0005C.25. KBS uses proprietary algorithms, including KardiaAI, to classify ECG recordings. Tr. (Somayajula) at 196:17-197:14; CX-0271C.1, 3, 5; CPX-021C.

In addition to using the KardiaApp to record an ECG, in some cases a user will be prompted to record an ECG by SmartRhythm, a feature developed by AliveCor for use with the KardiaApp that uses deep machine learning to evaluate a user's heart rate received from the Apple Watch's PPG sensor and accelerometer data. Tr. (Albert) at 64:2-66:1, 70:16-73:12; JX-031C; CX-0266C.11-12; CX-0547C; JX-096C.1-7; CDX-0005C.24-28; RX-0488C.3.

AliveCor also developed SmartRhythm V2 (internally ███████████), which operates similarly to SmartRhythm V1, and receives heart rate samples, sample times, and step counts as inputs. Tr. (Albert) at 76:17-77:23; JX-096C.1-7; CDX-0005C.28. From this information, SmartRhythm V2 identifies an AF probability based, in part, on ████████████████████████████████ ██████. Tr. (Albert) at 76:17-77:23; JX-96C.1-7; CDX-0005C.28; JX-228C (Treiman) at 69:2-24. When SmartRhythm V2 identifies a likely occurrence of AFib, it checks the user's activity level. JX-228C (Treiman) at 64:16-66:7; JX-96C.1-7. If the user is at rest, *i.e.*, has taken fewer than 100 steps over the previous 10 minutes, SmartRhythm V2 identifies a discordance and alerts a user to record an ECG. *Id.* SmartRhythm V2, which was developed by AliveCor using data collected from SmartRhythm V1, is an ████████████████ that was trained using heart rate data, step count data, as well as the ECGs recorded by users using SmartRhythm V1. *Id.* "Once AliveCor had sufficient data ████████████, a NN [neural network] was trained using the same input as the SmartRhythm NN, but this time it was trained as ████████████ to predict AF." JX-096C.1. ████████████████

CONFIDENTIAL MATERIAL REDACTED
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**
**CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

the previous 10 minutes, and if the step count is fewer than 100, it alerts a user to record an ECG. JX-096C.1-7; JX-0228C (Treiman) at 125:7-10, 125:18-126:1; CX-0266C.11, 33.



(b) AliveCor's ██████████████████ is a smartwatch being developed by AlivCor in conjunction with ██████ and is an "████████████████████████ ██████████████████████." Tr. (Albert) at 91:12-24; CDX-0005C.42-43; JX-8C; JX-23C; JX-25C; JX-95C.1-3; CPX-4C; CPX-5C; CPX-17C; CPX-55C; CPX-56C; RPX-14C; CX-271C; Tr. (Somayajula) at 195:7-14, 213:1-214:9; 216:14-219:5; RX-488C.4-5; Tr. (Jafari) at 384:21-385:15, 399:6-9; Tr. (Jafari) at 384:21-385:15; CDX-0003C.92. ██ includes ██████████████ ████████████████████████████████████████████████ It also will have "an array of sensors including ECG, PPG for heart rate monitoring, accelerometer, gyroscope, and altimeter for activity and exercise tracking, and GPS." JX.095C.2.

AliveCor has been and is working with ██████ to incorporate AliveCor's proprietary SmartRhythm and ECG algorithms into ████ Tr. (Albert) at 91:12-24, 181:10-182:15; CDX-0005C.42-43; JX-008C; JX-025C; JX-095C.1-3; CPX-004C; CPX-005C; CPX-017C; Tr. (Somayajula) at 195:7-14, 213:1-214:9; 216:14-219:5; RX-0488C.4-5; Tr. (Jafari) at 388:12-389:25; CDX-0003C.92. ████ will be able to monitor a user's heart activity with a PPG sensor and activity level with an accelerometer to identify potential instances of an arrhythmia, including AFib, using AliveCor's proprietary algorithms, including SmartRhythm, that were developed for AliveCor's KBS. *Id.* AliveCor has built and tested a version of ████ with a beta version of the KardiaApp with SmartRhythm installed, which was able to detect a possible arrhythmia using PPG data and to record and classify an ECG. Tr. (Albert) at 92:5-24; CDX-0005C.43; CPX-017C; Tr. (Jafari) at 392:13-393:10; CPX-004C; CPX-005C.

(c) AliveCor's ██████████████ is a smartwatch and prescription medical device that uses a combination of PPG, motion, and ECG sensors to collect data that is analyzed by

CONFIDENTIAL MATERIAL REDACTED
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

AliveCor's SmartRhythm and KardiaApp to determine the presence of an arrhythmia. Tr. (Albert) at 85:20-86:20, 93:5-95:21, 174:9-23, 175:20-177:9, 177:17-178:24, 180:13-181:9, 186:3-9; CDX-0005C.37, 44; JX-150C.13; CX-0250C.1-2, 6; Tr. (Jafari) at 390:1-391:8, 392:3-393:1; CDX-0003C.93; CX-0344.13-15; Tr. (Somayajula) at 195:7-197:23, 198:13-199:2, 202:11-205:17; JX-096C.1-7; JX-090C. Development on ███████ began in ███ as an over-the-counter product originally called ███████ But in ███ AliveCor determined that ███████ would be a "prescription medical device intended to (1) monitor user's heart activity via PPG, (2) monitor their activity level, (3) allow them to take their ECG at home or on-the-go, (4) leverage AliveCor algorithms to recommend times to record an ECG." CX-0250C.6; CX-0252C.5; RX-0488C.3-4. ███████ was renamed ███████ and operates like the KardiaBand—it monitors heart rate, has electrodes for users to take ECG measurements, and uses software algorithms to analyze those measurements for normal or abnormal heart rhythm. CX-0250C.6, 10-12; CX-0252C.2, 5; Tr. (Albert) at 174:16-19, 175:20-177:9, 186:3-9. Unlike KBS, ███████ will collect its own PPG data rather than taking heart rate data from the Apple Watch. CX-0250C.6, 10-12; CX-0252C.4-8; Tr. (Albert) at 174:9-19.

████████████████████████████████ running a version of the KardiaApp with SmartRhythm, which will be able to "run ECG algorithms on user recordings," "run ongoing neural network on PPG samples," and perform "ECG/PPG/Accel recording and HR storage." CX-0252C.9; CX-0251C.1.

███████ uses AliveCor's SmartRhythm algorithms along with the KardiaApp to determine the presence of an arrhythmia. JX-033C.1; JX-096C.1-7; Tr. (Somayajula) at 195:7-198:19; JX-228C (Treiman) at 114:6-24; RX-0488C.4. SmartRhythm will be trained on ███████ hardware to use data derived from a PPG sensor, including heart rate and R-R intervals, along with activity level from an accelerometer to detect arrhythmias and to alert a user they should take an ECG recording. JX-033C.1; JX-096C.1-7; Tr. (Somayajula) at 195:7-198:19; JX-228C (Treiman) at 114:6-24; RX-0488C.4.

"SmartRhythm is a product that combines data from an ECG sensor, PPG sensor, and accelerometer to enhance arrhythmia diagnostic capability over the use of an ECG sensor alone." JX-096C.1. AliveCor's SmartRhythm uses an "█████████████████ to detect discordance between PPG and activity. Provide alerts to users based on discordance prompting them to take an ECG." JX-096C.2.

Once the user records an ECG, that ECG recording will be analyzed by KardiaApp running on ████. JX-150C.13-15, 20. The ECG will be analyzed using AliveCor's FDA approved proprietary ECG analysis algorithms. *Id.*; CX-0266C.3, 8-12; CX-0271C.1-5. ████ will classify ECG recordings as Normal, Unclassified, or if AFib is present, or if it is too noisy to interpret. JX-150C.13-15, 20; CX0-266C.3, 8-12; CX-0271C.1-5; Tr. (Albert) at 63:6-25.

## II.    <u>JURISDICTION</u>

The Commission has subject matter jurisdiction over this investigation because AliveCor alleges violations of Section 337 due to Apple's sale for importation, importation, and sale after importation of products that infringe the Asserted Patents. Am. Compl. ¶¶ 60-77; *see Certain Light-Emitting Diode Products, Systems, and Components Thereof (III)*, Inv. No. 337-TA-1168, ID at 13 (June 26, 2020). Apple has appeared and participated in this investigation, and has not contested the Commission's jurisdiction over it. Accordingly, it has consented to personal jurisdiction at the Commission. *See Certain Optical Disk Controller Chips & Chipsets & Prods. Containing Same, Including DVD Players & PC Optical Storage Devices*, Inv. No. 337-TA-506, Initial Determination at 4-5 (May 16, 2005) (unreviewed in relevant part).

Section 337(a)(1)(B) proscribes the "importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles" that infringe a United States patent. 19 U.S.C. § 1337(a)(1)(B). Importation of just one accused product can satisfy this requirement. *Certain Road Milling Machines and Components*

- 20 -

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

AFib manifesting as a discordant high heart rate (*e.g.*, CX-0624.2. (Mayo Clinic: AFib Symptoms)). Tr. (Jafari) at 339:5-340:9, 240:10-22, 241:18-242:10.

Apple does not contest this limitation is satisfied for the HHRN feature,[10] and Apple does not independently contest that the limitation is satisfied for the IRN feature (but for the fact that this limitation incorporates "the discordance" found in limitation 12(f)(i), which Apple does contest as set out in Section IV.C.1.g, *supra*).

**(i) Limitation 12(f)(iii) – *Contested* –** The evidence shows that the Accused Products are programmed with executable instructions that enable them to confirm the presence of the arrhythmia using the ECG feature. As set forth above, the plain and ordinary meaning of term "confirm" as used in limitation 12(f)(iii) does not require (yet does not exclude) simultaneous ECG and PPG measurements. *See supra* § IV.A.2. Rather, the plain and ordinary meaning of this term—as supported by the intrinsic record—encompasses the capability of the Accused Products to confirm using an ECG measurement an underlying arrhythmia condition, the likelihood of which was detected by a PPG measurement using the same device. *Id.*

It is undisputed that each Accused Product is pre-programmed by Apple to contain Apple's fully-functional ECG App, the latest version of which is the ECG 2.0 App. CX-0081 (FDA De Novo Clearance for ECG 1.0 – DEN180044); CX-0051C.5 (ECG App 2.0 Software Design Specification); Tr. (Waydo) at 735:22-736:5; JX-221C (Waydo) at 47:6-22. Thus, the only remaining dispute is whether the accused ECG App is capable of confirming the presence of arrhythmia, the likelihood of which was detected by the PPG sensor. The evidence presented at the hearing—including Apple's own documents and literature—demonstrates that the accused ECG feature provides a confirmation of an

---

at 205:2-25; CPX-148C.130-132, 207; CX-0382C.18; Tr. (Jafari) at 339:9-24.

[10]   It is noted that although Apple presented argument in its pre-hearing brief that claim limitation 12(f)(ii) was not satisfied by the HHRN feature, Apple presented no evidence or expert testimony at the hearing regarding this issue. Accordingly, Apple has waived the issue.

CONFIDENTIAL MATERIAL REDACTED
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

underlying arrhythmia, such as AFib or AFib with tachycardia (*i.e.*, high heart rate).

The evidence shows that ECG was and remains a superior measurement technique for arrhythmias such as AFib. Tr. (Albert) at 48:2-8; Tr. (Jafari) at 286:12-288:5. As explained above, ECG is an electrical measurement across the heart, which uniquely provides measurement characteristics such as P Wave detection (representing contraction of the atria) that are unavailable from other measurement modalities, such as PPG, and that can uniquely identify the presence of AFib. Tr. (Jafari) at 291:4-13. Because episodes of the AFib condition are characterized by the absence of P Waves, ECG provides a crucial advantage over PPG and other heart measurement techniques. Tr. (Jafari) at 351:22-352:1 (testifying that the "added benefit" of P wave detection makes ECG "a better modality or better mechanism to identify AFib compared to PPG").

Despite its diagnostic advantages, traditional ECG measurement techniques—such as 12-lead clinical ECG, Holter monitors, and ECG patches—have multiple disadvantages that are not disputed. Tr. (Jafari) 286:8-20, 286:25-288:5 JX-003 ('941 patent) at 4:14-32. Although PPG detection is more wearable and can serve an important role of background monitoring, it lacks the definitive and confirmatory capability for arrhythmias that is associated with and trusted from ECG. JX-003 at 4:14-32. Dr. Jafari testified particularly about these wearability considerations and how they informed the nature of AliveCor's invention in the '941 patent. Tr. (Jafari) at 292:7-293:2. Considering that episodes of arrhythmias can be episodic (*e.g.*, paroxysmal) and are oftentimes asymptomatic, the '941 patent invention provides users of the claimed invention with the ability to take an ECG measurement that is more likely to confirm an arrhythmia when the user is experiencing a detectable episode. JX-003 at 4:14-32; Tr. (Jafari) at 343:4-344:18.

The fact that ECG provides a superior measurement tool is a fact known by Apple, and which is exemplified by how the ECG classification algorithm operates. Namely, Apple's ECG classification algorithm prominently relies upon ███████████████████████████████

CONFIDENTIAL MATERIAL REDACTED
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

███████████████████████████████████████████████████████ to render a final

determination regarding the presence of AFib. CX-0051C.75-76; Tr. (Jafari) at 351:22-352:1. As

described in Section I.E.1 *supra*, the ECG classification algorithm ████████████████

███████████████████████████████████████████ from the measured ECG

waveform using the ECG feature of the Accused Products. CX-0051C.73-75; Tr. (Jafari) at 324:3-20,

343:12-344:18; JX-221C (Waydo) at 113:24-25; JX-219C (Klaassen) at 97:8-15. ██████████

████████ is essential to the classification performed by the ECG software on the user's ECG

waveform, such that the ultimate determination of whether to label the ECG waveform as AFib

Positive requires consideration of ██████████████. CX-0051C.73-76; CPX-148C.107-109, 155-

156 (Apple Source Code); Tr. (Jafari) at 324:3-20, 325:5-12.

Apple's internal clinical testing summary of the ECG feature demonstrates—to a level of

statistical significance—that the ECG App is highly accurate in the detection of AFib. CX-0044C.26.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ That ECG

classification algorithm as measured from a Lead-I ECG and relying exclusively on classification

algorithms trained by machine-learning performed *just as well* for the detection of AFib as the

cardiologist-interpreted 12-Lead ECG further demonstrates the confirmatory capability of the ECG

App. Tr. (Jafari) at 350:12-351:12.

Other evidence shows that Apple itself considered its ECG App to be capable of confirming

AFib, the likelihood of which was previously detected by, for instance, the IRN feature. In an email

chain including Apple engineer Chris Brouse—a member of Dr. Waydo's algorithm development

team for the accused software features—Mr. Brouse states to the team of engineers that he is

CONFIDENTIAL MATERIAL REDACTED
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

activity level to HRV; (ii) Apple's understanding of the role of activity level in the context of the overall IRN algorithm, and (iii) how Apple's invalidity expert Dr. Stultz has applied activity level in rendering opinions on invalidity.

As to the first inconsistency, Dr. Picard improperly reads additional requirements into the claim limitation. Limitation 11(e)(iv) merely recites that the user's activity level (which, as claimed, is sensed from the motion sensor) is compared to HRV. JX-001, claim 11. There is no requirement in the claim that motion sensor data be sensed at the same time as HRV is determined from the PPG data, nor is there any requirement in the claim that motion sensor data inform the basis for a determination regarding the detection of an arrhythmia (such as by way of input into the IRN classification algorithm)—indeed, Dr. Picard has identified no evidence to support either proposition. By contrast, the '499 patent's specification provides that the aim of "comparing measured heart ranged with measured activity changes" is to "minimize[] false alarms". JX-001 at 25:22-25. Nothing more is required, and Dr. Picard's insistence to the contrary is unsupported by the '499 patent.

As to the second and third inconsistencies, Dr. Picard once again directly contradicts Apple's witness testimony, documents, and source code, as well as the manner in which activity level was applied by Dr. Stultz in rendering his invalidity positions. To these points, AliveCor incorporates its arguments offered in rebuttal in Section IV.C.1.g, *supra*, which apply with equal weight to Dr. Picard's reiterated opinion with respect to limitation 11(e)(iv).

Accordingly, the evidence shows that the accused IRN feature satisfies limitation 11(e)(iv) because a processor literally compares the activity level ████████████████████ ████████████████████████████████████████████████with HRV ██████████████ ████████████████████████████. Tr. (Jafari) at 374:21-24.

        (i)        <u>Limitation 11(e)(v) – *Contested by Apple*</u>

Apple contests that the Accused Products satisfy limitation 11(e)(v), "alert[ing] said first user

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

to record an electrocardiogram using said mobile computing device." However, the evidence shows that limitation 11(e)(v) is satisfied either literally, or in the alternative under the DOE, because Apple's IRN feature serves the aim of alerting the user to take a subsequent ECG after being notified regarding the detection of the known serious arrhythmia AFib. Apple's non-infringement arguments are contrary to the evidence, contrary to the ALJ's claim construction, and overall lack merit.

In construing the term alert as "not limited to a message," ALJ Elliot's claim construction order specified "the claims are directed to determining whether or not an ECG is appropriate, and then 'alerting' the user to that fact." CX-0692.16-17; *see also* JX-001 ('499 patent) at 25:17-25 (disclosing the intent to provide an "advisory condition for recording an ECG").

The accused IRN feature readily satisfies limitation 11(e)(v) because the IRN's indication provided to a user concerning the background detection of AFib constitutes an advisory condition that triggers an appropriate/opportune moment to capture an ECG to confirm the AFib. Tr. (Jafari) at 375:6-13; *see supra* § I.E.1 (describing accused IRN feature).

Apple does not dispute—nor can they dispute—that the IRN feature and the ECG feature are both directed to detecting the same type of arrhythmia (AFib), or that the IRN feature surfaces an "alert" to the user upon the detection of AFib. Rather, Apple's dispute resides solely with whether the IRN's "alert" is an "alert [to] said first user to record an electrocardiogram." Tr. (Picard) at 905:2-16. Specifically, Dr. Picard testified that "[i]t's important here [that] it's a specific kind of alert to record an ECG, not just the word alert without any context." Tr. (Picard) at 903:23-25. But the evidence overwhelmingly shows that Apple has amply provided the "context" from which the IRN alert constitutes an alert to take an ECG, whether literally or under the DOE. Tr. (Jafari) at 378:3-379:10. The evidence generally falls into two categories: (1) externally-facing evidence that Apple provides or endorses concerning the nature of the IRN alert and that users take an ECG upon receiving such alert, and (2) internally-facing evidence that Apple has designed the IRN feature as a "trigger" to take an

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

ECG, and that Apple tracks and derives benefit from users who follow the IRN alert and do subsequently take an ECG.

(i)     *Externally Facing Evidence*

As noted above, users must proceed through an on-boarding, educational process before they can use the IRN and ECG features, wherein they learn about AFib, its symptoms, and how "if left untreated [it] can cause blood to clot in the heart…[which] can lead to stroke, heart failure or other medical complications." CX-0048C.31 (IRN on-boarding); CX- 0051C.31 (ECG on-boarding). Each on-boarding identifies the lack of proper diagnosis of the condition given its transient and often-asymptomatic manifestations. *Id.* In a crucial respect, the on-boarding educates the user that while they are unable to control the passive monitoring nature of the IRN feature in its search for AFib, the ECG feature, by contrast, provides an on-demand measurement technique that the user can voluntarily take by simply launching the App, and where they can receive a result in merely 30-seconds. CX-0048C.26-42; CX-0051C.27-40. The fact that both IRN and ECG look for the same deadly arrhythmia—AFib—and that only ECG can be used on-demand demonstrates that the IRN alert is not only connected to the ECG feature, but that the IRN alert is in fact an alert for the user to take an on-demand ECG using the watch. Tr. (Jafari) at 380:21-381:6.

In yet another critical piece of external evidence, Apple's public support website provides a direct instruction to its user base that they take an ECG after receiving an IRN alert. CX-0073; *see also* CDX-0003C.57 (Jafari demonstrative). Moreover, Apple's instruction is not new—Apple has been consistently providing users with the instruction to take an ECG following the IRN alert since the pair of features were first introduced in December 2018, and Apple continues to provide this instruction on its website even today. *Supra* § IV.C.1.i; Tr. (Jafari) at 379:11-380:13; 475:200-476:17. In fact, in the press release published by Apple from December 2018 announcing the then-brand-new IRN and ECG features—a document that Apple undoubtedly vetted heavily before publication—

## CONFIDENTIAL MATERIAL REDACTED
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**
**CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

Apple indicated that users could "take an ECG recording at any time *or following an irregular rhythm notification.*" CX-0622.3; Tr. (Jafari) at 381:9-382:2.

In addition to Apple's own public and user-facing documentation, numerous third-party websites regularly publishing reviews, guides, and materials concerning Apple products, have touted the hand-in-hand-use of the IRN and ECG, and how the IRN alert provides a trigger for users to follow it up with an ECG. CX-0623; CX-0626. In the *MacRumors* Article, the publisher notes that upon receiving an IRN notification, users "can immediately launch the ECG app and perform a more comprehensive test in just 30 seconds…the [IRN] and ECG feature therefore work hand in hand." CX-0623.2. In the *MyHealthlyApple* article, the publisher repeats the language from Apple's support website—that "you can take an ECG recording at any time or following an irregular rhythm notification"—but goes a step further by saying "If you receive an irregular heart rhythm notification, it's a good idea to take an ECG with your Apple Watch to get a closer look." CX-0626.2, 12. The article also notes that "[y]ou might want to take an ECG if you're feeling symptoms such as a rapid or skipped heartbeat or when you receive an irregular rhythm notification." CX-0626.15. Despite the fact that Apple is a large and sophisticated technology company and undoubtedly was aware of these third party materials at or shortly after their times of publication—or at least since AliveCor produced these documents to Apple during discovery— Apple has evidently taken no steps to seek to have these third party materials removed or corrected.

(ii) *Internally Facing Evidence*

As set forth in greater detail in Section IV.C.1.i, *supra*, Apple has taken a keen interest in tracking the way users specifically interact with the IRN and ECG features of the Accused Products.

CONFIDENTIAL MATERIAL REDACTED

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**
**CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**



CONFIDENTIAL MATERIAL REDACTED
CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

This evidence further supports Apple's design and expectation that users will in fact use the IRN alert as a trigger to take an ECG— ████████████ —and that Apple would also benefit on the backend from ████████████ to understand how well the features performed so that they could be honed and improved. *Id*; Tr. (Jafari) at 382:3-382:19.[15]

---

[15] Apple's interest and intent for the IRN alert to serve as an alert to take an ECG continues through today, as Apple's corporate witness on source code and data metrics topics, Ms. Dash Brittain, testified. JX-216C (Brittain) at 248:15-256:14; CPX-148C.130-132, 200, 205, 207 (Apple Source Code testified to by Ms. Brittain).

CONFIDENTIAL MATERIAL REDACTED
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**
**CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**



To the extent the ALJ believes that, considering the full context surrounding the IRN alert, that it does not literally satisfy claim limitation 11(e)(v), then it nevertheless satisfies the limitation under the DOE because it satisfies the triple identity test. Tr. (Jafari) at 375:19-377:15 (providing DOE infringement opinions). That is, the IRN alert provides substantially the same function (*e.g.*, to provide a triggering message that something is wrong" and "better observations" are needed via the ECG, Tr. (Jafari) at 376:8-12)) in substantially the same way (*e.g.*, the generation of a "trigger" message to prompt the user to take immediate action, Tr. (Jafari) at 376:17-21)), to achieve substantially the same result (*e.g.*, the user takes the ECG in response to the trigger to "confirm" "verify" or "augment our knowledge of the condition," Tr. (Jafari) at 376:22-377:1)).

### 2.    Claim 17 – *Uncontested by Apple*

Claim 17 depends directly from independent claim 11, and therefore requires all of its limitations. As detailed above with respect to claims 3 and 5 of the '731 patent, *see supra* §§ V.C.2 and V.C.3 (each collective evidence), the evidence shows that the Accused Products meet the requirements

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION -- SUBJECT TO PROTECTIVE ORDER**
**CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Cameron R. Elliot**
**Administrative Law Judge**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** | Inv. No. 337-TA-1266 |

**APPLE INC.'S POST-HEARING REPLY BRIEF**

1

CONFIDENTIAL MATERIAL REDACTED
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

connection, the court noting that the claim recited "the correspondence" and not merely "a correspondence.").

Moreover, AliveCor's treatment of "to confirm" downplays the temporal aspect involved with detecting and confirming intermittent arrhythmias described in the '941 patent. *See, e.g.*, JX-3 at 1:33-57. Notably, during the course of this case, AliveCor's interpretation of the plain meaning of "to confirm," has been a moving target. At the hearing, although Dr. Jafari testified that "to confirm" can mean taking an ECG "in relative [temporal] proximity to" the PPG indication (Tr. (Jafari) at 455:16-23), his opinion changed substantially to include taking an ECG *a month or even one year later*. *Id.* (Jafari) at 457:14-17. He went further and testified that "when the user is going to take [an ECG after an IRN] is irrelevant." *Id.* at 461:1-10. This example not only highlights the inconsistencies in Dr. Jafari's opinion, but also demonstrates why the temporal aspect of the ECG confirmation *is* relevant to confirming when an arrhythmia, particularly an intermittent arrhythmia, is present. *See, e.g.*, JX-3 ('941 patent) at 4:14-32 ("Many arrhythmias occur intermittently, and relatively infrequently. Thus, in order to monitor and capture an intermittent arrhythmia, continuous monitoring is typically required."). It defies logic that a user who chooses to take an ECG one year later would be "confirm[ing] the presence of the arrhythmia" indicated by IRN one year earlier. Moreover, it leaves a person of ordinary skill in the art with no certainty as to when such confirmation must occur under the scope of the claims. This is simply unreasonable and is avoided by Dr. Picard's explanation of the plain meaning of "confirming." RPoHB at 33-35.

### c.    The Cited Evidence Fails to Satisfy AliveCor's Burden to Prove Apple Watch's ECG App Confirms "the Arrhythmia"

The evidence presented at the hearing makes clear that ECG App does not "confirm the presence of *the* arrhythmia" initially detected by the PPG sensor. Tr. (Picard) at 891:16-896:17. ECG App and Apple Watch's PPG sensors cannot analyze the same series of heartbeats ███████

16

**CONFIDENTIAL MATERIAL REDACTED**
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER**
**CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

██████████████████████████████████████ Tr. (Picard) at 894:19-896:2.  There are no instructions executable on Apple Watch that allow it to simultaneously record, much less analyze both PPG and ECG data for the same series of heartbeats.  Tr. (Waydo) at 768:13-769:15; Tr. (Picard) at 894:15-896:17; *Id.* (Jafari) at 464:16-465:19; RPX-4C (Apple source code) at ALIVE_SC-0000212

████████████████████████████████████████████████████████████████

████████ Moreover, there are no inputs from PPG to ECG App's algorithm.  Tr. (Waydo) at 763:17-19; *id.* (Waydo) at 768:25-769:18, 769:11-15*; id.* (Picard) at 891:16-24, 892:15-24, 895:22-896:2; *id.* (Jafari) at 462: 17-21, 463:11-25, 464:13-15.  ECG App's design specifications and FDA submissions make no reference to IRN or HHRN because—as Apple told FDA—ECG App is a standalone SaMD not intended to be used with any other medical device.  CX-50C (ECG App Spec.); CX-51C (ECG 2.0 Design Spec.); Tr. (Picard) at 891:18-892:14; *id.* (Waydo) at 859:18-860:18; RX-50C.24, 32 (ECG FDA Submission).  ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ AliveCor presents no evidence to the contrary, and thus cannot meet its burden to prove Apple Watch infringes claim 12(f)(iii) under either party's interpretation of the plain meaning of "to confirm."

AliveCor makes certain straw-man arguments in support of its claims that are irrelevant to the infringement analysis.  For example, AliveCor's argument that ECG is the best technique for measuring arrhythmias is true, but only with respect to a 12-lead ECG interpreted by a medical professional.  Tr. (Albert) at 48:2-8, 48:25-49:5; *id.* (Jafari) at 286:12-288:5.  Moreover, while it may be that ECG App's ability to detect the presence or absence of ████████ is an important tool in *detecting* arrhythmia, specifically AFib, it says nothing about ECG App's ability to *confirm* an arrhythmia detected

17

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION**

by IRN or HHRN[17] on Apple Watch. None of AliveCor's cited evidence shows that ECG App confirms the arrhythmia indicated by IRN or HHRN, because such evidence simply does not exist. *See* CX-51C.73-75 (ECG App 2.0 Design Spec.) (describing ECG's independent classification process); Tr. (Jafari) at 324:3-20 (describing ECG waveform on Apple Watch with no reference to IRN/HHRN), 343:12-344:18 (describing ECG App's ability to detect an arrhythmia, not confirm the prior PPG-detected arrhythmia); JX-240C (Waydo) at 113:24-25 (in AFib, no p-wave is present); JX-238C (Klaassen) at 97:8-15 (describing only that ECG sensor measures the waveform). Indeed, Apple's source code, design specifications, FDA submissions, and its engineers' testimony demonstrate that ECG App is incapable of, and does not confirm IRN or HHRN. Thus, ECG App simply does not confirm the presence of "the arrhythmia" as required by the asserted claims.

In its opening brief, Apple explains, in detail, why its clinical validation studies, usage statistics, internal emails, and user support website do not support AliveCor's infringement allegations that ECG App confirms "the arrhythmia" from IRN or HHRN. *See* RPoHB at 35-39 (discussing CX-54C.7-8 (Brouse email discussing Apple's data metrics and usage statistics), CX-370C.21 (████████ ████████████████████████████████████████████████); CX-44C (Apple's Clinical Evaluation Report for ECG 1.0, ECG 2.0, and IRN), CX-73 (Apple's support webpage). In short, these references tell nothing of the executable instructions that operate when ECG App is initiated, and do not show that the system is in any way linked to IRN or HHRN such that it could confirm the prior-detected arrhythmia. *Id.* Thus, AliveCor is forced to rely on the user—and not the system—to mentally confirm the arrhythmia. *See, e.g.,* Tr. (Jafari) at 377: 2-8 ("Q. And what is the point of using an electrocardiogram measurement in the accused devices with respect to the earlier PPG measurements that were taken? A. It would confirm, *it would verify our understanding,* and it would

---

[17] As addressed above, HHRN does not indicate the possibility of arrhythmia. Its reference here is not an admission otherwise, but a statement for purposes of completeness.

augment our knowledge of the condition, and it helps us to establish better confidence in assessing the end outcome." (emphasis added)); *see also id.* at 448:11-17 ("But, yes, there might be instances where *the user actually captures it* even a month down the road and it happens to actually catch one of those AFib episodes. That's okay. It is the confirmation." (emphasis added)).

Indeed, many of the documents AliveCor cites support Apple's position and undermine its own. For example, Apple's clinical validation studies used simultaneous measurement of Apple Watch's single-lead ECG and a separate 12-lead ECG to verify the accuracy of Apple Watch's ECG recordings. *See* RX-183C (Apple Clinical Validation Study); CX-44C (same). The studies support the plain meaning of "confirm"—i.e., that near-simultaneous measurement are required to confirm the detected arrhythmia. *Id.*

AliveCor makes unfounded assumptions that "Apple itself considered its ECG App to be capable of confirming AFib" in analyzing CX-54C.7-8, an email ██████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████ and do not describe the operation of ECG App (which runs independently from IRN and HHRN), the source code operating ECG App, IRN, or HHRN, or the instructions on Apple Watch, as Dr. Jafari admits. Tr. (Jafari) at 467:20-468:9. There are simply no computer instructions on Apple Watch that trigger a user to record an ECG following an IRN, or that confirm the presence of the arrhythmia indicated by the PPG-based analysis.

Moreover, AliveCor's reliance on Apple's development documents is misplaced because they describe design ideas that were never implemented. *See, e.g.,* CX-370C.21 (2017 ██████ Presentation). Specifically, Apple's ████████████████████████████████████████ is not now and has never been on a commercial product. Tr. (Waydo) at 768:25-769:10 (confirming that Apple Watch does not confirm results from IRN against results from ECG because it simply was not useful to Apple.). These development documents underscore the importance of Apple's deliberate design

19

CONFIDENTIAL MATERIAL REDACTED
CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

choice of keeping ECG App, IRN, and HHRN independent. *Id.* (Waydo) at 859:18-860:18 (█████████

███████████████████████████████████████████████████).

Apple's support website—a static website that is in not displayed on the accused Apple Watch ECG App—does not show Apple Watch's ECG App confirming AFib detected by the PPG sensor/IRN. *See* (Tr. (Jafari) at 475:11-16; *id.* (Jafari) at 476:18-477:3. The ECG App message surfaced to the user on Apple Watch tells the user to talk to their doctor, not that it confirmed anything, much less that it confirmed a reading from, or is in anyway linked to IRN. *See, e.g.*, RPX-4C (Apple source code) at APL-ALIVE_SC_0000164 (Apple ECG App's notification to user stating "this ECG shows signs of AFib.\n If this is an unexpected result, you should talk to your doctor soon").

Finally, even under AliveCor's interpretation of the plain meaning of "to confirm … the arrhythmia"—which involves confirming the general condition of arrhythmia, AliveCor's cited evidence fails to demonstrate how *the system* confirms even the general condition of arrhythmia. Even though ECG App is capable of detecting an arrhythmia, as explained above, AliveCor relies on the user to assume that two consistent results between PPG data and ECG data confirm the general condition of arrhythmia. None of AliveCor's cited evidence can support its burden in proving that there are computer instructions on Apple Watch that are used to confirm the presence of *the* arrhythmia indicated by the PPG-based analysis. Indeed, the evidence shows that Apple does not do what the claims require, and thus, its accused products do not infringe.

### 4.     Apple Watch Does Not Infringe Dependent Claims 13, 19, 20-23

For the reasons described in Apple's post-hearing brief, and the additional bases discussed above, Apple Watch Series 4-7 do not infringe claim 12 of the '941 patent, either literally or under the doctrine of equivalents, and therefore do not infringe dependent claims 13, 19, and 20-23.

### C.     AliveCor's DI Products Do Not Practice the Claims of the '941 Patent

### 1.     KBS Did Not Practice Claims 12, 16, 20, 21, 22, and 23 of the '941 Patent

CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

fact. For example, the '731 patent's specification discloses different types of well-known machine learning, including "similarity and metric learning, sparse dictionary learning, or the like." JX-2 at 9:67-10:10. Similarity and metric learning are machine learning methods that are often used for classification tasks, like those disclosed by the algorithm of AMON. Thus, a POSITA in December 2013 would have known based on their training and education that AMON discloses the same type of well-known machine learning exemplified in the '731's disclosure. Notably, there is nothing in the '731 patent that in advances those well-known machine learning techniques. Tr. (Stultz) at 1084:18-1086:6 (opining that claims 3 and 5 of the '731 provide no inventive advancement to machine learning in the context of patent ineligibility). The fact that machine learning today and machine learning on the Apple Watch are more sophisticated, relying on deep neural networks and complicated algorithms, has no bearing on whether AMON discloses machine learning according to the claims. As Dr. Stultz opined, it clearly does. Tr. (Stultz) at 1136:3-1137:22; *id.* at 1138:14-24.

Dr. Stultz testified that claims 8, 9, 10, which depend from unasserted claim 7, are all simply different ways of calculating HRV. And while AliveCor is correct, neither AMON nor Almen detail these specific ways of analyzing heart rate data (CPoHB at 120-121), Dr. Stultz testified that all of these "off the shelf" methods of analyzing HRV were known in the art to a POSITA in 2013. Tr. (Stultz) at 1139:3-1141:7. Indeed, the '731 patent itself says they were well known. JX-2 at 8:64-9:2.

AliveCor contends that claim 12 is not rendered obvious because AMON does not expressly disclose "arrhythmias." CPoHB at 121. But as repeatedly discussed with respect to AliveCor's asserted claims and as AliveCor admits, AMON "informs the user that one of the pre-set parameters may be outside of a normal range." CPoHB at 75. As Dr. Stultz testified, a heart rate outside of the normal range based on activity is inherently indicative of possible arrhythmia under AliveCor's and Dr. Jafari's application of the claims for infringement. Tr. (Stultz) at 1120:1-12. Moreover, AMON was designed for targeting "high-risk" cardiac patients. A POSITA would have recognized that one

63

CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER
CONTAINS SOURCE CODE – ATTORNEYS' EYES ONLY INFORMATION

at 1120:1-12.    Moreover, AMON's disclosed algorithm contemplates taking an additional measurement, including an ECG, when one of the prior measurements indicates a "risk or high risk zone." RX-419.6 (AMON).  And AMON expressly states that at "each step [of the algorithm], the result is displayed …" to the user.  Thus, AMON expressly or inherently discloses limitation 11[h] of the '499, or a POSITA would have found it obvious to modify AMON to arrive at this limitation.

### b.     Dependent Claims 16 and 17 are Obvious in View of AMON Alone or in Combination with Almen and/or Kotzin

AliveCor admits that its only basis for contending that dependent claim 16, would not have been rendered obvious by the prior art is its belief that limitations 11(h) and (g) (above) are not satisfied.  Thus, AliveCor only substantively contests the additional limitation of claim 17, "determine a presence of said arrhythmia using a machine learning algorithm," which AliveCor argues is the same as claims 3 and 5 of the '731 patent.  CPoHB at 146.  Apple's response is therefore incorporated here by reference.  *See* Section III.D.2.b, *above*.

The evidence thus is clear and convincing that the disclosures of AMON, alone and/or in combination with Almen and/or Kotzin would have rendered the asserted claims of the '499 patent obvious and invalid under Section 103.   AliveCor's cited secondary considerations do not overcome the clear and convincing obviousness finding, as discussed above regarding the '941 patent.  *See* Section II.E, *above*.

## V.     EXPERIMENTAL USE DEFENSE

Any experimental use of Apple's products, including IRN and/or the ECG App cannot be the basis for infringement liability.  *See* 35 U.S.C. § 271(e)(1) (making, using, offering to sell, or selling a "patented invention" within the United States "solely for uses reasonably related to the development and submission of information under a Federal law is not infringement); *see also Eli Lilly and Co. v. Medtronic, Inc.*, 496 U.S. 661, 665 (1990) (construing "patented invention" in § 271(e)(1) "to include all

71

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

**Before the Honorable Cameron R. Elliot**
**Administrative Law Judge**

| |
|---|
| In the Matter of<br><br>**CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** |

Inv. No. 337-TA-1266

**RESPONDENT APPLE INC.'S PETITION FOR REVIEW OF**
**THE INITIAL DETERMINATION ON VIOLATION OF SECTION 337**

Watch. CX-53C.16 (ECG 2.0 Design Specification); Tr. (Waydo) at 766:4-768:12. The user is instructed to keep his or her arms still. *Id.* After the 30-second recording, the ECG App analyzes the acquired ECG data and produces a clinically equivalent ECG waveform, calculates average heart rate, and classifies the rhythm of the waveform (collectively called ███████████ *See id.*; CX-53C.19-24 (ECG 2.0 Design Specification); RX-178C.1 (ECG Software Specification); RX-136C.1 (ISCE Proposal). Once the user's rhythm is classified, the ECG App generates a notification to the user on the Watch indicating one of the following: sinus rhythm (i.e., normal), AFib, AFib with high heart rate, or poor recording (inconclusive).[5] Tr. (Waydo) at 766:23-767:2; CX-50C.65-66 (ECG Design Specification); RX-792C.6-7 (Apple FDA Presentation).

### D. Procedural History

On December 7, 2020, AliveCor filed a complaint against Apple in the Western District of Texas asserting infringement of AliveCor's '941, '731, and '499 patents. *See AliveCor, Inc. v. Apple Inc.*, 6:20-cv-01112, Complaint, Dkt. No. 1 (W.D. Tex. Dec. 7, 2020) ("the Texas Action"). Months later, AliveCor filed its Complaint with the ITC on April 26, 2021, alleging infringement of the same three patents. The Texas Action was stayed on May 6, 2021. *See* Case No. 6:20-cv-01112, Dkt. No. 26. The Commission instituted this Investigation on May 26, 2021. 86 Fed. Reg. 100-28382 (May 26, 2021). On June 27, 2022, the ALJ issued an ID finding a violation with respect to the '941 and '731 patent and no violation with respect to the '499 patent. EDIS ID No. 773988.

In response to AliveCor's Texas Action and the ITC investigation, Apple filed petitions for

---

[5] The ECG 2.0 App modified the notification to include the following: low heart rate, sinus rhythm, high heart rate, AFib, AFib high heart rate, inconclusive, and poor recording. RX-138C.9-10 (Apple FDA Presentation); RX-140C.1 (ECG 2.0 510(k) Summary).

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER*

numbers is the general lack of familiarity Dr. Albert displayed at the hearing concerning the development and status of the ██████████ Products, despite being someone allegedly 'very involved in new product development. . . .'"); *id.* at 162 ("It is also not clear how seriously Dr. Albert took the estimation process, because he was seemingly surprised that his estimations would be used for purposes of this investigation's record.").

After correctly excluding AliveCor's alleged R&D investments in P&E and labor as arbitrary and unreliable, the only investments left for consideration under subsection (C) are AliveCor's alleged R&D contractor expenses.  ID at 175; CX-925C.  The ID, however, erred in finding that AliveCor's purported R&D contractor expenses satisfy the economic domestic industry requirement under subsection (C) because AliveCor failed to 1) show sufficient ongoing activity that justifies looking back to historical expenditures in KBS, a product that was discontinued 2019; 2) establish a nexus between the alleged R&D contractor expenditures and the Asserted Patents; and 3) prove substantial qualifying R&D activity at the time of the Complaint.

In particular, the ID erred in crediting AliveCor's post-2017 R&D expenditures relating to ████, a product that did not exist, let alone practice any Asserted Patent, at the time of the Complaint. ID at 47, 158.  *Certain Thermoplastic-Encapsulated Elec. Motors, Components Thereof, & Prod. & Vehicles Containing Same II*, Inv. No. 337-TA-1073, Comm'n Op., 2019 WL 9596564, at *6 (Aug. 12, 2019) (hereinafter, "*Thermoplastic Motors*") ("The Commission has held that a complainant alleging the existence of a domestic industry under 19 U.S.C. § 1337(a)(3)(C) must show the *existence* of articles.") (emphasis added); *see also* ID at 46-47 ("[T]he law is clear that an actual article protected by the patent must exist to show that a domestic industry 'exists' . . . .").  After removing expenses associated with ████, AliveCor incurred only ███████████████████████████████

████████ ID at 166; RX-0314C (adjusted Dr. Akemann's 2018 DI Contractor R&D Labor figure to

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER*

exclude expenses related to ▉▉. As further detailed below, the ID relied on this fundamental factual error, counting investments in non-DI Products and investments without a nexus to the Asserted Patents, and otherwise accepting miniscule investments that were curtailed by the time of the Complaint in order to reach a finding that AliveCor proved the existence of domestic industry.

1. **The ID Erred in Finding Sufficient Activity in April 2021 to Justify Looking Back to 2016 in Determining Whether AliveCor Satisfied the Economic Prong of the Domestic Industry Requirement**

Past expenditures may be considered to support a domestic industry claim, but only if those expenditures "pertain to the complainant's industry with respect to the articles protected by the asserted IP rights and the complainant is continuing to make qualifying investments at the time the complaint is filed." *Certain Television Sets, Television Receivers, Television Tuners, and Components Thereof*, Inv. No. 337-TA-910, Comm'n Op., 2015 WL 6755093, at *36 (Oct. 30, 2015) (hereinafter "*Television Sets*").

There is no dispute that the only AliveCor product the ID found to qualify for domestic industry, the KBS, was discontinued in 2019. Am. Compl. ¶¶ 38-39, 41. AliveCor admitted that there has been ▉▉ R&D and regulatory investments for KBS since that time. *See, e.g.*, JX-223C (Albert Dep. Tr.) at 194:7-25; 249:16-20; 254:15-18; 255:21-24; JX-225C (Raghavan Dep. Tr.) at 88:22-89:3. AliveCor also admitted that there has been ▉▉▉▉▉ sales for the past three years. JX-224C (Hosein Dep. Tr.) at 39:24-40:6; 41:21-25; 48:25-49:3; RX-322C. When AliveCor filed its Complaint in April 2021, the only allegedly ongoing activity related to KBS was ▉▉▉▉▉▉▉. Tr. (Vander Veen) at 1000:5-15. Under AliveCor's own unilateral assertions, AliveCor only spent ▉▉ on the customer care of the KBS in 2021, ▉▉▉▉▉▉ on the KBS in 2021. *See* CX-928C (Akemann Rpt., Ex. 9a); RX-314C (Vander Veen Rpt., Tab 3).

Moreover, the ID correctly found that costs associated with customer service tickets under the ▉▉▉▉▉ category are not relevant, since those tickets do not appear to tie to KBS.

20

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

ID at 168. The ID also correctly excluded all customer service tickets from January to April 2021 because AliveCor failed to reliably present that information. *Id.* Thus, there was ██ qualifying customer support activity in the first four months of 2021, *i.e.*, the time of the Complaint. *Id.* at 163. However, without any support, the ID discounted the ██ ongoing customer activity as "not all that surprising or dispositive." *Id.* But, the amount of qualifying ongoing activity at the time of the Complaint is essential here. Without sufficient ongoing qualifying activity, the ID could not have allowed AliveCor to look back to its historical investments. *Television Sets*, 2015 WL 6755093, at *36.

The ID also erred in finding "substantial evidence that *some* amount of R&D was []occurring" when AliveCor filed the Complaint. ID at 163-64 (emphasis in original). As discussed above, AliveCor failed to present any reliable evidence to show the amount of R&D activity at the time of the Complaint. The ID correctly found that AliveCor's allocations are "dubious" and "unreliable," and thus disregarded AliveCor's entire "hardware labor, software labor, facilities, and equipment amounts in [AliveCor's] subsection (C) totals." ID at 160, 170-75. And with respect to AliveCor's purported contractor R&D expenses (the only expenses left for consideration under subsection (C)), there is no dispute that AliveCor incurred ██ R&D contractor expense in 2021, the time of the Complaint. ID at 176; CX-923C. Thus, AliveCor failed to present any reliable evidence to show the amount of qualifying ongoing R&D activity that would justify looking back to investments in 2016 to support an industry that "exists." *See* ID at 164 (acknowledging that the "exact figures are not particularly reliable"). Indeed, even AliveCor's expert did not include any post-2018 R&D investments in KBS in his analysis, effectively conceding that all R&D and regulatory work for the KBS ceased *years* before the Complaint was filed. *Compare* Tr. (Akemann) at 712:1-8 ("The overall level of R&D investments in software and components integral to ████████████████████ from 2018 to 2021.") *with* CX-917C (listing ██████ as AliveCor's total R&D investments from

21

**CONFIDENTIAL MATERIAL REDACTED**
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

estimates provided by Dr. Albert and found deficient above." ID at 171; *id.* ("And a close review of [AliveCor's] evidence demonstrates why Dr. Albert's estimates are *particularly not reliable* for R&D.") (emphasis added). The ID correctly disregarded "the hardware labor, software labor, facilities, and equipment amounts in [AliveCor's] subsection (C) totals[.]" *Id.* at 175. Under the same rationale, AliveCor's R&D headcount should be disregarded as well, since AliveCor failed to provide a reliable allocation method to identify the headcount relating only to the exploitation of the Asserted Patents. Otherwise, crediting AliveCor's entire R&D teams in the subsection (C) analysis would grossly inflate AliveCor's qualifying R&D activity.

Even assuming that AliveCor's self-serving allocations are adopted, the domestic-to-foreign R&D headcount comparison unequivocally shows insubstantial domestic R&D activity after 2020:

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2016-2021 |
|---|---|---|---|---|---|---|---|
| DI Software Team | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| DI Hardware Team | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| DI R&D Total | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Foreign | ▮ | ▮ | | ▮ | ■ | ■ | |
| DI R&D Total vs. Foreign | ▎ | ▎ | ▎ | ▎ | ■ | ■ | ■ |

CX-931C (Akemann Rpt., Ex. 10a); CX-937C (Akemann Rpt., Ex. 15). As shown above, based on AliveCor's own allocations, AliveCor had a total of ■ U.S. headcount in 2020 working on relevant R&D activities, which represents ■ of AliveCor's total foreign headcount ■ a total of ■ U.S. headcount in 2021 on relevant R&D activities, which represents ■ of AliveCor's total foreign headcount ■; and a total of ■ U.S. headcount from 2016 to 2021 on relevant R&D activities, which represents ■ of AliveCor's total foreign headcount ■ These ratios demonstrate the insubstantiality of AliveCor's domestic R&D activity under AliveCor's own allocations.

Moreover, the ID improperly shifted burden of proof onto Respondent Apple. AliveCor has the burden to show substantial R&D activity with reliable evidence under subsection (C), but failed to do so even after the ALJ's warning during the hearing—"[t]he parties were even warned at the end

35

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

of the evidentiary hearing that 'you need to compare foreign and domestic investments.' Hr'g Tr. at 1312:17-18. For whatever reason, however, ALC has seemingly taken the position that no such comparison is needed." ID at 182. Given AliveCor's "troubling" substantiality analysis and failure to conduct a meaningful domestic versus foreign comparison under subsection (C), instead of finding that AliveCor failed to meet the domestic industry requirement, the ID faulted Apple for not sufficiently "addressing whether or not the [AliveCor's] quantitative evidence is 'substantial.'" ID at 182. As the ID correctly found, AliveCor's comparison of its allegedly qualifying R&D expenses with its total R&D expenses "is not helpful." ID at 181. In addition, as discussed above, AliveCor presented neither the headcount comparison nor any domestic-to-foreign contractor expense comparison to show substantiality under subsection (C). *See* CIB at 163-64; CPB at 191-93. Those theories and arguments were raised for the first time in the ID. Thus, there was no "quantitative" analysis for Apple to meaningfully rebut. The ID's reasoning is clearly erroneous.

Accordingly, the ID erred in finding that AliveCor has shown substantial domestic R&D investments under subsection (C).

**B. Issue 2: The ID Erred in Finding That AliveCor Has Taken the Necessary Tangible Steps to Develop ████████ at the Time of the Complaint**

To the extent the Commission reviews any aspect of the ID's determination of no domestic industry in the process of being established, Apple petitions for review of the ID's findings that AliveCor has taken the necessary tangible steps to develop the ████████ at the time of the Complaint.

With respect to the ███, AliveCor purportedly started developing the KBP in 2018, but was not able to provide even a circuit board of ███ in April 2021. ID at 47 ("It is essentially undisputed that the ███ did not exist in a 'hardware' sense at the time of the complaint."). The lack of any prototype, despite three-years of alleged development, contradicts AliveCor's contentions it has taken

36

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

tangible steps to develop the ████ Moreover, testimony from AliveCor's own witnesses further demonstrates the lack of tangible steps that have been taken to develop the ████ or that there is a significant likelihood that the DI requirement will be satisfied in the future. *See, e.g.*, Tr. (Albert) at 185:7-23 ("████████████████████████████████████████████████

████████████████████████████████████████████

(emphasis added); Tr. (Albert) at 158:8-15 ("██████████████████████████████████

████████████████████████     ████████████████████████ Tr.

(Somayajula) at 252:18-22; *Thermoplastic Motors*, Comm'n Op. at 5.

With respect to the ████ all AliveCor pointed to was a licensing scheme premised on an agreement reached days before the Complaint was filed. As the ID acknowledged, AliveCor's plan "is to contribute technologies and FDA clearances already developed and obtained, and otherwise have as little involvement as possible[.]" ID at 185. The only activity AliveCor pointed to is the license agreement between AliveCor and ██████████████████████, to develop the ████ JX-8C.14 (████ License). Critically, that license was not fully executed until ████ ████ just before the filing of the Complaint in April 2021. *Id.* In addition, AliveCor did not even start working on the ████ until ████ 1, around the same time when it filed this Complaint. *See, e.g.*, JX-8C.14; Tr. (Somayajula) at 247:5-21 (Mr. Somayajula admitting that ████ signed license two days before he signed his declaration in support of AliveCor's Complaint); Tr. (Vander Veen) at 991:5-25; RX-462C.146-47; RDX-4C.16.

Thus, the ID erred in concluding that AliveCor has shown the necessary tangible steps to establish that it is in the process of establishing a domestic industry based on ██████████

## VI.  THE ID ERRED IN ITS CLAIM CONSTRUCTION AND SUBSEQUENT INFRINGEMENT ANALYSIS

### A.  Issue 3: The ID Erred in Construing "confirm the presence of the arrhythmia"

37

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

the [ECG] technology . . . all the way through when it was slated for incorporation into . . . what[ is] now the Series 4 Apple Watch" after Apple decided to do a physical (hardware) update to the Watch to account for the ECG sensor.  JX-219C (Klaassen Dep. Tr.) 45:14-47:24; *see also* Tr. (Waydo) at 744:22-745:15.  This was in response to customers' feedback to turn Apple Watch into a medical device, which Dr. Albert himself acknowledged in 2015, shortly after Apple Watch was first released.  *See* CDX-5C.26 ("People have been asking when is Apple going to turn their wonderful Apple Watch into a useful medical device . . . ." (citing https://www.youtube.com/watch?v=szNpaJjeWM0).  Thus, Apple's efforts toward that goal with the release of HHRN in September 2017—before the KBS— and IRN and ECG App just a year later, show the obviousness of the alleged invention.

Although the ALJ correctly noted that any "access" Apple had to AliveCor's technology and its obtaining ALC documents via FOIA requests were "not especially probative," he erred in determining that these facts indicated that Apple "copied" AliveCor's technology.  ID at 96.  The fact that Apple submitted FOIA requests regarding AliveCor's FDA submissions is not evidence of copying.  First, the documents Apple requested related to the AliveCor Heart Monitor for iPhone, not KardiaBand or SmartRhythm.  Thus, there is, again, no showing of nexus between the cited "copying" evidence and the substance of the asserted claims, as discussed above.  Second, it is common practice—and even prudent—for companies to look to others' FDA filings to determine what hurdles others have faced when requesting authorization, and, if necessary, how to overcome them, and consider potential predicate devices.  JX-241C (Wu Dep. Tr.) at 217:20-218:13; Tr. (Albert) at 131:25-132:3 (Dr. Albert admitting that ██████████████████████████████████████████ ████████████████████; Tr. (Raghavan) at 588:8-25 (AliveCor admitting that they are planning to ███████████████████████████████████████████████████████████████████, if ever that is ever filed); Tr. (Efimov) at 1203:6-11, 20-25.  Third, FOIA requests provide public access

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

to federal agency records, subject to certain exemptions including trade secrets or confidential business information. Thus, documents obtained under FOIA requests are redacted to exclude companies' confidential business information, including technical, design, and testing specification and results that would have been required for Apple to have "copied" the claimed invention. *See, e.g.*, CX.432C.128-29 (AliveCor's Heart Monitor 510(k)) (redacting hardware and software design sections), 128-29 (redacting "ECG for iPhone Design Description, Software" document in its entirety), 138-142 (redacting "Risk Assessment," "Hazard Analysis," and "Biocompatability Testing" in their entirety). Consequently, Apple's request for such documents does not indicate there was or has been any copying of the alleged invention. There has been none.

### iv. The ID erred in determining any evidence of secondary considerations was sufficient to overcome Apple's prima facie showing of obviousness.

If the Commission determines that the ALJ did not err in finding evidence of secondary considerations exists, the ALJ still erred in determining that such evidence was sufficient to overcome Apple's strong *prima facie* showing of obviousness. As the Federal Circuit and this Commission have both recognized, a "weak showing of secondary considerations" cannot "overcome [a] showing of obviousness based on the prior art." *Becton, Dickinson & Co. v. Baxter Corp. Englewood*, 998 F.3d 1337, 1345 (Fed. Cir. 2021), *cert. denied sub nom. Englewood v. Becton, Dickinson & Co.*, No. 21-819 (U.S. Apr. 25, 2022); *see Certain Marine Sonar Imaging Devices, Including Downscan and Sidescan Devices, Products Containing the Same, and Components Thereof*, 337-TA-921, Comm'n Op., 2016 WL 10987364, at *35 (Jan. 6, 2016) (finding that even though Complainant "presented evidence of secondary considerations, the record also contain[ed] evidence that weigh[ed] against some of those considerations" and therefore "these secondary considerations do not overcome the strong prima facie showing of obviousness" of the asserted claims). Here, the ALJ correctly recognized that there was no evidence of failure by others or long-felt need that would support a finding of nonobviousness. ID at 95. And the ID itself negated

93

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

testimony that, for each of these limitations, even to the extent AMON did not expressly disclose the limitations, that it would have been obvious to a POSITA at the time of the '731 patent to do so.

Claims 3 and 5 both require inputting data into a "machine learning algorithm trained to detect arrhythmias." JX-2 at cl. 3, 5. As an initial matter, the ID finds that a "machine learning algorithm" is disclosed in AMON: "To be sure, AMON discloses continuous threshold adjustment (*i.e.*, machine learning) for identification of the QRS wave. It states, '[d]uring the detection process, the current integrated moving window is compared with the upper threshold. If this threshold is exceeded, and R wave onset is assumed . . . These threshold values are continually adjusted with each new QRS so as to compensate for variations in ECG baseline." ID at 121; RX-419 at 4.

For claim 3, the ID finds that PPG data is not an input into the machine learning algorithm in AMON, and that the machine learning algorithm is not trained to detect arrhythmias, as required by the claim. ID at 118-120. For claim 5, the ID finds that HRV data is not an input into the machine learning algorithm in AMON, and that the machine learning algorithm is not trained to detect arrhythmias, as required by the claim. ID at 120-121. In both cases, the ID improperly focuses on what is literally disclosed in AMON, instead of conducting a proper obviousness inquiry as to the state of the art and what a POSITA would have known at the time. RRB at 62-63; RIB at 99-100. While it is true that AMON does not specifically mention using PPG or HRV as an input to the machine learning algorithm, Dr. Stultz testified that the use of PPG or HRV (rather than ECG as disclosed in AMON) would have been obvious to a POSITA. *See* Tr. (Stultz) at 1136:3-22, 1138:15-24; RDX-3.40-41. Moreover, even though AMON does not expressly mention the use of machine learning for arrhythmia detection, the ID specifically found that arrhythmia detection was inherent from the teachings of AMON. ID at 115-116. Thus, claims 3 and 5 are rendered obvious from AMON alone.

Claims 9 and 10 both focus on different mathematical ways to analyze HRV data, and are both

95

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

In the Matter of

**CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF**

Inv. No. 337-TA-1266

**COMPLAINANT ALIVECOR, INC.'S COMBINED PETITION FOR REVIEW AND CONTINGENT PETITION FOR REVIEW OF THE INITIAL DETERMINATION**

CONFIDENTIAL MATERIAL REDACTED
CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████ CX-0910C

(bracketed clarification and emphasis added).  By mid-2017, Apple had not yet to marketed an ECG-

capable watch of its own, but ████████████████████████████ CX-0909C.

In response, ██████████████████████████████████████████

████████████████████████ *Id.* (emphasis added).  And █████████████

█████████████████████ *Id.*  In February 2018, █████████████████

████████████████████████████████████ RX-0789C. ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ Apple finally released its ECG app and IRN feature on

December 6, 2018.  RX-0047.  Around the same time, Apple █████████████████

████████████████ Tr. (Somayajula) at 199:18-200:20.  After evaluating the changes, AliveCor's ████

███████████████████████████████████████████████████████

████████████████████████ Tr. (Somayajula) at 84:1-84:3.

Apple followed up by ██████████████████████████████████████

████████████████████ Tr. (Albert) at 83:20-84:9.  At the hearing, Apple claimed

██████████████████████████ Tr. (Albert) at 141:11-15.  But Dr. Waydo—Apple's

sole fact witness, and one of the Apple employees ███████████████████████

███████████████████████████████████████████████████████

████████████████ Tr. (Waydo) at 821:22-822:18.  In fact, Dr. Waydo was ███████████

███████████████████████████████████████████████████████



MARCO V. PEREZ, MD

Associate Professor in Cardiovascular Medicine
Director, Inherited Cardiac Arrhythmia Clinic
Cardiac Electrophysiology & Arrhythmia Service
300 Pasteur Dr. , M/C 5773
Stanford, CA 94305-5773
Tel. 650-723-9363
mvperez@stanford.edu

July 27, 2022

**To whomever this may concern:**

I am writing to declare my concerns regarding the negative impact that an exclusion of Apple Watch products would have on health care delivery and innovative research activities in the US. I am a board-certified cardiac electrophysiologist and Associate Professor at the Stanford University School of Medicine. I have been practicing for over 10 years and I am director of the electrocardiography laboratory and the inherited arrhythmia clinic at Stanford. I have also helped lead studies in digital health and monitoring for atrial fibrillation including the Apple Heart Study and the NHLBI-sponsored Women's Health Initiative Silent Atrial Fibrillation monitoring study and now the NHLBI-sponsored REACT-AF study.

In the Apple Heart Study (Perez et al., *New England Journal of Medicine*, 2019), we demonstrated that the Irregular Pulse Notification application on the Apple Watch can effectively identify people with atrial fibrillation who were not previously aware of this condition. This is important because many patients with atrial fibrillation are at risk for stroke; a risk that can be mitigated with blood thinning medications. In my personal experience, as an electrophysiologist who manages patients with atrial fibrillation daily, I can attest that several of my patients have presented to my own clinic, independent of these clinical trials, thanks to Irregular Rhythm or High Heart Rate notifications from the Apple Watch. In fact, many of these patients either did not have symptoms and were therefore unaware of a problem, or did have symptoms such as palpitations, but were previously dismissed or just could not be diagnosed by other means. Many of these patients now have received treatment earlier than they would have otherwise, which has lowered their risk of stroke and has ameliorated their symptoms. By my estimates, based on our finding that 0.5% of Apple Heart Study participants were identified as having atrial fibrillation within less than a year, I estimate that several hundred thousand patients per year in the US could

be affected by an undiagnosed form of atrial fibrillation. The Irregular Pulse Notification app on the Apple Watch is having a significant impact on this group of patients and to limit the use of the Apple Watch in the US would have a significant detrimental effect on the health of these patients.

Traditionally, patients with symptoms were required to go to the hospital to undergo an electrocardiography (ECG). The ECG is used to make a diagnosis of atrial fibrillation and other cardiac arrhythmias. Unfortunately, many patients are unable to make it to the hospital before their symptoms resolve, or simply don't have access to a care provider that can quickly perform the ECG. The introduction of ECG on the Apple Watch has had a meaningful impact on our patients. Now, one can immediately check an ECG using their Apple Watch, which can in turn tell them right away if they have atrial fibrillation or can show their ECG results to their physician to discuss a possible diagnosis and treatment. In my own clinic, I routinely have patients present with their Apple Watch tracings which I then use to either make new diagnoses or to manage existing cardiac conditions. I have treated several patients with medications or with curative catheter-based procedures based exclusively on the ECG app. It has been shown that the specificity of this app is remarkably high (Ford et al., *JACC: Clinical EP*, 2022) and that many are detecting a wide variety of rhythms that are having clinical effect (Kim et al., *J Clin Med*, 2022). Again, these are diagnoses that otherwise would have either been diagnosed much later or missed altogether without an Apple Watch. Many of my cardiology colleagues would attest to the same experiences.

Finally, there has been an overwhelming interest in the medical community to better understand the role of the smartwatch in clinical care. Therefore, there has been a rapid rise in the number of studies using the Apple Watch. In 2021 alone, there were 221 studies published on the smartwatch, most of which were done using the Apple Watch. I am currently one of the lead investigators on the REACT-AF trial which will use the Apple Watch to minimize the amount of time that a patient with atrial fibrillation needs to take blood thinning medications. This has the potential to revolutionize atrial fibrillation management and reduce bleeding complications significantly and improve health care costs. This is a multi-million-dollar study funded by the NIH that will begin this year and enroll over the next few years. On a personal level, our research team and those of other institutions will be adversely impacted if an exclusion of Apple Watches

is in place. Many other high impact studies like ours which involve the use of Apple Watch would simply not be conducted.

In summary, the Apple Watch has proven to be an important tool in the clinician toolbox for diagnosing and managing cardiac disease. Many patients are being diagnosed earlier and receiving highly impactful medical treatments because of the Apple Watch. A growing number of clinically-impactful research studies in the US depend on the use of the Apple Watch to make meaningful discoveries that will improve the health of the population. Exclusion of the Apple Watch form the US would therefore have a devastating impact on clinical care and clinical science.

Sincerely,

Marco V. Perez, MD
Associate Professor, Cardiovascular Medicine, Stanford University

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Cameron R. Elliot**
Administrative Law Judge

| |
|---|
| In the Matter of |
| **CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** |

Inv. No. 337-TA-1266

## DECLARATION OF DR. RICHARD MILANI

1.    My name is Dr. Richard Milani.  I am over 21 years of age, of sound mind, and make this declaration voluntarily and based upon my own personal knowledge.

2.    I received my M.D. from the University of Florida in 1979.  I completed a residency in Internal Medicine at the University of Florida.  I then completed fellowships in Critical Care Medicine at the University of Florida, Preventive Medicine and Clinical Epidemiology at Harvard University (Massachusetts General Hospital), and Cardiovascular Diseases at Ochsner Clinic Foundation.

3.    I am the Chief Clinical Transformation Officer and Vice Chairman of the Department of Cardiology at Ochsner Health System ("Ochsner Health").  Ochsner Health is an integrated healthcare system with a mission to serve, heal, lead, educate, and innovate.  It has more than 34,000 employees, and over 4,500 employed and affiliated physicians in over 90 medical specialities and subspecialties.  Ochsner Health operates 40 hospitals and more than 300 health and urgent care centers across Louisiana, Mississippi and the Gulf South, and also serves many patients around the country and internationally through its digital medicine program.  In 2021, Ochsner Health treated more than 1 million people from every state and 75 countries.

4.    Since 2012, I have held the role of Chief Clinical Transformation Officer.  My responsibilities include developing new methods of healthcare delivery that improve the health of the populations we serve, improve access to care, reduce the cost of care, and reduce the burden on the caregivers of care.  To accomplish our goals, we take advantage of new leading edge capabilities that involve both technology as well as artificial intelligence.

5.    I understand that AliveCor has sued Apple for patent infringement, and that AliveCor is seeking to exclude from importation into the United States several generations of Apple Watch that include the Irregular Rhythm Notification ("IRN"), electrocardiogram ("ECG") App, and High Heart Rate Notification ("HHRN") functionality.

1

(i.e., 24 hours) to monitor and record cardiac activity, or implanting a medical device into a patient's chest through a medical procedure that will record cardiac activity. We expect that the ability to track a patient's cardiac activity daily, by simply having the patient wear an Apple Watch, will revolutionize the way we treat this disease and save many lives.

15. To date, Ochsner has invested approximately $600,000 into building its AFib Management program. This involves a team of cardiologists, advanced practice providers, Epic software developers and engineers as well as app developers.

16. Another area where Apple's products have allowed for significant preventive medical advancements concerns falling. For those aged 65 and older, falling is a major health concern. Within this population, more than one in four people falls each year, and more than 3 million people are treated in emergency rooms for injuries related to their falls. In 2015, the total medical cost related to falls totaled more than $50 billion.[5]

17. In 2021, Ochsner Health launched a pilot program related to fall prevention and management called "Connected Stability". This program relies on Apple Watch and iPhone, and has been a huge success among the approximately 350 patients who participated. The program uses fall detection on Apple Watch to detect when a patient falls. Specifically, Apple Watch can detect if a patient falls, and then offers users a chance to indicate through Apple Watch whether they are okay or if there is an emergency. If Apple Watch cannot detect any movement from the user within about one minute of the fall, it will automatically contact emergency services. In addition to this existing functionality, Ochsner has developed its own program through which a healthcare professional from Ochsner will contact a patient for whom Apple Watch has detected a fall to find out if they need any medical assistance (particularly for patients who have fallen but do not believe they need to go to the hospital).

18. For patients that have participated in the pilot program, we have been able to reduce falls by approximately 50%. We have also received incredible feedback from patients about the program. Patients report a tremendous improvement to their quality of life. They report that they are much less worried about falling, and also feel comfort in knowing that they

---

[5] https://www.cdc.gov/falls/facts.html.

4

will be able to receive medical assistance quickly if they do fall. We have also found that the 65 and older population is more inclined to wear an Apple Watch consistently than other types of personal emergency response systems (such as existing products where the patient essentially wears an emergency button around their neck). This is because Apple Watch is relatively discrete and is a commonly used product, and it is something that they are not embarrassed to wear. Rather, they are excited to wear an Apple Watch and take advantage of its other functionality.

19. Ochsner has invested approximately $3 million into its fall prevention pilot program. As mentioned above, more than 350 patients have participated so far. Ochsner plans to roll out this program nationally within the next year. Ochsner currently has more than 20 healthcare professionals working on this program, and we expect those numbers to grow significantly as the program expands.

20. As the above examples demonstrate, Apple is a leading innovator when it comes to healthcare technology. This technology is revolutionizing how we manage our patients. Preventing importation of Apple Watch would be devastating to the progress that is being made every day in this space.

I declare, under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed on _____July____24_____, 2022 in _____New Orleans, LA_____.

_____
Dr. Richard Milani
Chief Clinical Transformation Officer
Ochsner Health System

5





July 26, 2022

Dear Members of the International Trade Commission:

I am writing as an atrial fibrillation (afib) patient and the Founder/CEO of StopAfib.org, an atrial fibrillation patient advocacy organization and patient-to-patient resource.

Through our website, we provide education and support for people living with atrial fibrillation, both patients and family members. Our mission includes providing patients with the information and answers to empower them to regain control of their lives from afib. Additionally, our mission includes helping people with undiagnosed afib to get diagnosed and treated before they have a stroke.

We became aware that a ruling by the ITC (Ruling 337-1266) will potentially exclude Apple Watches that include irregular rhythm notifications (IRN), electrocardiograms (ECG), and high heart rate notifications (HHRN) from being imported into the United States. Removing this option could have devastating effects on the atrial fibrillation patient community and their family members.

I am writing on behalf of the afib patient community in the United States. We seek to communicate our perspective that excluding such necessary devices would negatively affect us and US public health. It would hinder patient care and critical medical research.

Afib is a complex condition that is difficult to manage and varies with each individual. This irregular heartbeat can be fast (tachycardia), slow (bradycardia), or normal in speed. Digital tools for monitoring and managing afib allow afib patients to proactively manage their care. Patients need these options for managing their condition to ensure they receive the proper care.

We at StopAfib.org have no biases toward any particular products or companies. We simply want afib patients to have the critical life-saving tools to manage their condition.

Consumer digital tools such as the Apple Watch (with ECG, IRN, and HHRN) and the AliveCor KardiaMobile device provide significant benefits to afib patients. They alert them to possible arrhythmias, which are heartbeat abnormalities that can potentially have deadly consequences.

There are currently very few FDA-cleared tools for monitoring afib. Removing this crucial FDA-cleared option from the market dramatically hampers patients' ability to self-manage their afib. Because this capability is so critical for afib patients, it is not unusual for them to use two devices, the Apple Watch ECG and AliveCor KardiaMobile device. This allows them to obtain multiple data points for managing their afib.

**P. O. Box 541, Greenwood, TX 76246 • 940-466-9898**
**www.StopAfib.org • mhills@stopafib.org • www.americanwomenshealth.org**

Appx1389

 

StopAfib.org conducted an online survey from March 30 to April 5, 2021, about digital tool use during the pandemic and received responses from 763 afib patients. Our findings were published in an article, Patient Perspective: Digital Tools Give Afib Patients More Control, in the Cardiovascular Digital Health Journal published by the Heart Rhythm Society. [Hills MT. Patient Perspective: Digital tools give AFib patients more control. *Cardiovasc Digit Health J.* 2021 May 11;2(3):192-194. PMC8890072.] Below are quotes from that article about some of our findings.

*The devices offer tremendous mental comfort because afib can be so unpredictable that patients don't feel like they're in control of their bodies or lives. In addition to peace of mind, convenience and ease of use were most often cited as reasons for choosing a device. One of the most vital benefits was being able to determine when afib was significant enough to go to the hospital. Many also explained that monitors allowed them and their healthcare professionals to determine the effectiveness of medications and whether adjustments were needed.*

*Some respondents also noted that using these digital tools allowed them to exercise with more confidence by providing assurance that their heart rates didn't rise too high. Some valued the benefits of their devices being able to detect afib during sleep.*

*Many emailed their concerning rhythm strips to their healthcare professionals or uploaded that information through patient portals, and some even took detailed spreadsheets of their afib burden to clinician visits. By doing so, these afib patients felt more in control and knew when to consider having an ablation. And after an ablation, digital monitoring tools allowed patients to see whether they were in afib.*

*With consumer digital monitoring devices, there is tremendous potential for patients to gain more control of their lives and improve their quality of life. Also, with data from these consumer devices, there may be the potential for clinicians to gain more insights into their patients' afib. As we come out of the pandemic, we've seen how digital tools have been valuable in telehealth visits, so we know that leveraging insights provided by these devices may increase the potential for empowering patients to improve management of their afib.*

These devices detect afib and other arrhythmias so that people get treated in time to head off deadly and debilitating strokes. We at StopAfib.org are a member of a global coalition of doctors and patients focused on screening and detecting afib worldwide. We believe that early detection of afib saves lives and helps facilitate and support incorporating risk factor management choices into lifestyles.

Removing this capability as an option could have fatal consequences on patients and significantly affect public health and welfare. Limiting choices is not in the best interest of patients and the public. Instead, there should be multiple options in the marketplace to support the needs of afib patients and their loved ones.

**P. O. Box 541, Greenwood, TX  76246  •  940-466-9898**
**www.StopAfib.org  •  mhills@stopafib.org  •  www.americanwomenshealth.org**

Appx1390

 

We are also involved in patient-driven research in the US and globally. All existing tools are needed to support ongoing research studies, many of which are now being conducted as siteless studies because of this technology. I am involved in many studies that would be adversely affected if this ruling is allowed to stand. Removing these tools that have been so valuable for research during the pandemic will render us unable to perform life-saving research and quickly handle new issues.

During the early pandemic, as much as 30%-40% of those presenting at hospitals with COVID-19 were doing so because of arrhythmias. Sometimes, those arrhythmias were detected by Apple Watch ECGs, IRNs, or HHRNs. Without that, many more might have died without seeking care.

And throughout the pandemic, FDA-cleared devices facilitated remote care via telemedicine for millions of US afib and other arrhythmia patients. Unfortunately, there are precious few FDA-cleared devices; removing access to one of the most significant of those may force patients to use devices that are not FDA-cleared. Moreover, non-FDA-cleared devices are often inaccurate and may lead to ill-advised decisions about medications and treatment.

Taking away FDA-cleared devices from patients is not only counterproductive—it is downright cruel! And, because most afib patients are seniors, it risks high costs to Medicare for extensive use of costly remote monitoring devices.

We are all affected by an afib epidemic. The renowned Framingham Heart Study found that after age 55, you have a one-in-three lifetime risk of developing afib, so you or a loved one will have it.

Thus, we ask that you reconsider this decision. Removing these essential tools for detecting and managing afib in seniors will affect individuals and families and damage Medicare by escalating the need for costly Medicare-paid remote monitoring.

Thank you for the opportunity to provide this feedback on behalf of the afib patient community.

Sincerely,

*Mellanie True Hills*

Mellanie True Hills
CEO and Founder

**P. O. Box 541, Greenwood, TX  76246  •  940-466-9898**
**www.StopAfib.org  •  mhills@stopafib.org  •  www.americanwomenshealth.org**

Appx1391

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

| |
|---|
| **In the Matter of**<br><br>CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF |

**Investigation No. 337-TA-1266**

**STATEMENT OF THIRD PARTIES**
**COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION AND NETCHOICE**
**IN RESPONSE TO THE COMMISSION'S JULY 15, 2022,**
**NOTICE OF REQUEST**
**FOR STATEMENTS ON THE PUBLIC INTEREST**

to obtain and utilize a separate EKG device is often an inadequate substitute.[4]  Early detection of atrial fibrillation ("afib") significantly increases treatment success rates, but afib is typically paroxysmal in its early progression.  As a result, even a brief delay to retrieve a user's separate EKG device, open the EKG app on the user's phone, and take an EKG might result in a failure to confirm the diagnosis, much less an obligation on the user to obtain an EKG device which is likely to take multiple days.  Separate devices are thus insufficient to replace the subject devices.

It is undisputed that afib, which the articles can help to identify, is a significant health problem in the United States, affecting 2% of the U.S. population.[5]  Forty percent of those cases are asymptomatic, meaning that approximately 2.5 million people in the U.S. may have afib and be unaware of that fact.[6]  And afib creates a significant increase in the risk of suffering a serious stroke, likely causing up to one third of all such strokes.[7]  Given the seriousness of afib, improved techniques for detecting and diagnosing afib, including those contained within the subject articles, are of significant use in managing this serious health risk.  Exclusion of the subject articles would thus harm the health and welfare of a significant subset of the U.S. public.

## III.     SUBSTITUTE ARTICLES MADE BY COMPLAINANT OR ITS LICENSEES IN THE UNITED STATES

The Commission's notice requests comment on like or competitive articles made in the United States which could replace the subject articles if excluded.  While AliveCor has identified a number of products that allegedly could replace the subject articles, those products do not appear to be made in the United States, as required by this factor.  For example, AliveCor's

---

[4] ITC 337-TA-1266 Hearing Transcript at 292-293.
[5] ITC 337-TA-1266 Hearing Transcript at 50.
[6] *Id.*
[7] *Id.*

2

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

| |
|---|
| In the Matter of<br>**CERTAIN WEARABLE ELECTRONIC**<br>**DEVICES WITH ECG**<br>**FUNCTIONALITY AND COMPONENTS**<br>**THEREOF** |

**Investigation No. 337-TA-1266**

## STATEMENT OF NON-PARTY
## AMERICAN HEART ASSOCIATION
## ON THE PUBLIC INTEREST OF THE RECOMMENDED REMEDIAL ORDERS
## BUT NOT IN SUPPORT OF ANY PARTY

We understand the products subject to the ALJs recommended remedial orders include Apple Watch Series 4 and higher ("Devices At Issue").  These devices play a unique role in research of interest to the AHA and healthcare consumers.  As prevalent consumer devices owned for reasons other than just their cardiac-data-related technologies, the user population is sufficiently large and representative of the subjects researchers seek to recruit, that they allow studies to be fully enrolled cost-effectively, facilitating research the AHA promotes. Additionally, the Devices At Issue and their users allow for types of research to occur that might not otherwise be attempted, or only attempted less frequently or with smaller sample sizes. Notably, they facilitate research into whether cardiac health outcomes can be improved by consumer devices detecting and triggering interventions.  As the novelty of these devices has waned since their introduction, researchers benefit from and, to some extent, rely on the extent of consumer adoption of the Devices At Issue to design and recruit for research studies.

## III.    THE RECOMMENDED REMEDIAL ORDERS JEOPARDIZE CARDIOVASCULAR AND OTHER SCIENTIFIC RESEARCH

The AHA encourages the development and proliferation of reliable consumer healthcare devices that assist patients and healthcare consumers in better understanding and managing their own health and well-being.  We also encourage devices that assist patients and healthcare consumers in communicating with their healthcare providers and participating in valuable and decentralized health research.  Our aim in both of these is to build new types of healthcare insights to improve our understanding of the best ways that technology-based devices and solutions can impact care.

### A.    The Devices At Issue Provide an Important, Enabling Data Acquisition and Reporting Technology for Basic Scientific Research that the AHA Promotes

The AHA currently is collaborating on a research study with the Brigham & Women's Hospital that explores the link between physical activity and heart health.  The study (which is sponsored by Apple) aims to advance understanding of how activity and personal habits can contribute to a healthier heart.  Participants are requested to complete occasional, short surveys and record workouts on their Apple Watch.  The study is evaluating the experience of

2

participants who use certain health features and apps within the Watch such as the Irregular Rhythm Notification (IRN) feature and Electrocardiogram (ECG) app on Apple Watch, related to atrial fibrillation and other heart conditions. Other institutions are involved in similar research. Data available from the website ClinicalTrials.gov indicates there are several clinical trials that are currently active, recruiting, or planned involving the Apple Watch in the United States[1]. These include an ECG study at the Mayo Clinic[2], an Early Atrial Fibrillation ("AF") study apparently sponsored by the pharmaceutical manufacturer Janssen,[3] and a Vanderbilt university study (also related to AF) where the AHA is a collaborator[4]. The AHA also is a collaborator with Tufts University Medical Center on a Heart Failure Study[5] and the University of Washington School of Medicine on a respiratory study[6].

As noted above, the Devices At Issue provide a combination of clinically-interesting technological features and ongoing consumer prevalence *in a single wearable* that makes make them a very attractive research platform. Additionally, an aim of that some of that research is to investigate if consumer health can be improved via data from a consumer-worn device prompting interventions through the device or otherwise. The AHA is not aware of alternative

---

[1] *See* https://clinicaltrials.gov/ct2/results?term=%22Apple+Watch%22+AND+%28%22series%22+OR+%22ECG%22%29&recrs=abdf&map_cntry=US (last visited July 24, 2022).

[2] *See* https://clinicaltrials.gov/ct2/show/NCT05324566?term=%22Apple+Watch%22+AND+%28%22series%22+OR+%22ECG%22%29&recrs=abdf&map_cntry=US&draw=2&rank=1

[3] *See* https://clinicaltrials.gov/ct2/show/NCT04276441?term=%22Apple+Watch%22+AND+%28%22series%22+OR+%22ECG%22%29&recrs=abdf&map_cntry=US&draw=2&rank=5

[4] *See* https://clinicaltrials.gov/ct2/show/NCT04433091?term=%22Apple+Watch%22+AND+%28%22series%22+OR+%22ECG%22%29&recrs=abdf&map_cntry=US&draw=2&rank=8

[5] *See* https://www.tuftsmedicalcenter.org/clinicaltrials/heart-failure-study00000820

[6] *See* https://www.fiercebiotech.com/medtech/apple-university-washington-studying-whether-apple-watch-can-detect-covid-19-early

3

devices available in volume in the United States that provide the same combination of attributes to researchers and consumers in the United States.

**B.      Requiring Researchers Using the Apple Watch in Research to Change Devices Would Jeopardize the Scientific Merit of Ongoing and Past Research and Waste Investments Made in Pursuing Nascent Research**

Clinical and other scientific research requires months or years of planning, including design of research protocols and study objectives, interaction with governing bodies and collaborators, enrolling subjects, and procuring necessary materials. Significant investment of time, money, and other resources have been made in the research involving the Devices At Issue in which the AHA has been involved, and we believe in other research.

For ongoing studies that are recruiting or those that have already been designed involving the Devices At Issue, the recommended remedial orders could jeopardize their scientific merit and cause waste of resources spent for the studies. Of course, the design of research protocols seeks to control for extraneous influences. If Apple Watch data in ongoing research could no longer be obtained because new participants had to use different devices, then questions about comparability of data before and after the device change likely would arise, if it were even possible to continue the study. This risks loss of some or all of the statistical power of gathered data and resulting scientific merit of the study. Studies planned for extended periods (the Janssen study, for example, lists a 3-year time frame) are likely to be negatively impacted by a remedial order requiring switching mid-study from one of the Devices At Issue to another device. Similarly, for studies that have already been designed, and funded, and are recruiting now, or nearly so, switching devices risks required re-design of the study and waste of resources expended to date.

**IV.     THE COMMISSION SHOULD TAILOR ANY REMEDIAL ORDERS TO ALLOW FOR ONGOING RESEARCH AND CONSUMER ACCESS**

The AHA believes that public interest is best served by keeping any current products on the market that contain electrocardiogram, heart rate monitoring, irregular heart rate notification and supporting features combined in some form. The devices currently on the market with

4

verified accuracy are important to consumers, healthcare providers and researchers involved in assessing the impact of those devices to improve patient understanding, health, and outcomes.

From the AHA's perspective, the Devices At Issue are not just a pure technical component used in clinical research. Part of their interest is that they incorporate into a consumer device of wide prevalence technologies reporting data of clinical interest. The former not only helps provide research recruits but also helps investigate if a mass consumer device can be used to intervene to improve health outcomes by acquiring data used to (help) detect them. The AHA does not believe that adopting remedial orders requiring certifications by researchers for devices sought to be imported would adequately protect the interests with which it is concerned. *See* Commission Opinion (Revised) in *Certain Microfluidic Devices*, inv. 337-TA-1068, at 22–48 (January 10, 2020). As explained above, part of the significance of the Devices At Issue is that they are a prevalent consumer device, not just a technical input used by researchers. A limit to any exclusion order requiring researchers to indicate that certain Apple Watches sought to be imported were destined for a particular study or trial by certification would not reflect how those devices are used in the type of research the AHA promotes and wishes to see continue.

For the reasons explained above, the AHA urges the Commission to tailor any remedial orders to ensure the supply of the devices at issue in the United States remain undisturbed over a sufficient time period for ongoing research to complete and for upcoming research to transition to alternative devices that it expects would be brought to market without significant waste of resources on that research or significant delay in undertaking future research. The AHA believes the time period necessary for that transition to be a year or more.

If it would be helpful to the Commission, the AHA would be happy to provide additional details or information regarding the comments made above.

5

**Hugh Calkins, M.D., FACC, FAHA, FHRS**
Catherine Ellen Poindexter Professor of Cardiology
*Professor of Medicine*
The Hugh Calkins, Marvin H. Weiner, and Jacque J.
Bernstein Cardiac Arrhythmia Center
Director, Cardiac Arrhythmia Services
Director, Electrophysiology Laboratory
Director, Heart Station
Director, Johns Hopkins ARVD Program
Member, Miller-Coulson Academy of Clinical
Excellence

**Division of Cardiology**
The Johns Hopkins Hospital
1800 Orleans Street
Sheikh Zayed Tower 7125R
Baltimore, MD 21287 – 0409
(410) 955-7405 T
(410) 367-2148 F
hcalkins@jhmi.edu
www.arvd.com
www.hopkinsarrhythmias.com



July 20, 2022

Hugh Calkins M.D.
Catherine Ellen Poindexter Professor of Cardiology and Director of the Electrophysiology Laboratory and arrhythmia Service
Johns Hopkins University Hospital

Dear Members of the International Trade Commission:

I am a Professor of Cardiology and Director of the Electrophysiology Laboratory and Arrhythmia Service at Johns Hopkins Hospital. I write to you concerning the recent ruling by ITC that will potentially impact the availability of cardiac arrhythmia focused software such as the ECG App, Irregular Rhythm Notification, and High Heart Rate Notifications on Apple Watch.

I am writing to communicate my opinion that reducing the availability of these software programs which help users understand their heart rate and potential issues with their heart health would be a major negative to the public good of patients in the US in regards to arrhythmia care. Technologies such as Apple Watch with ECG, IRN, and HHRN provide a significant benefit to patients by alerting them to possible arrhythmias such as atrial fibrillation, which is a common cardiac arrhythmia affecting millions of people in the US and a common cause of stroke. Moreover, these consumer technologies are being utilized in clinical arrhythmia research and so reducing the availability of this software would be detrimental to the advancement of science in these areas.

Thank you for the consideration of this perspective, as you consider the impact of this ruling on the public good of patient care and research.

Sincerely,

Hugh Calkins, MD

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER*

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

|  |  |
|---|---|
| **In the Matter of**<br><br>**CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** | **Inv. No. 337-TA-1266** |

**RESPONDENT APPLE INC.'S OPENING BRIEF IN RESPONSE TO THE COMMISSION'S REQUEST FOR WRITTEN SUBMISSIONS ON THE ISSUES UNDER REVIEW AND ON REMEDY, THE PUBLIC INTEREST, AND BONDING**

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER*

asserted patent and the [claimed] investment." *Certain Electronic Candle Products*, Inv. No. 337-TA-1195, Comm'n Op., 2021 WL 4205637, at *9 (Sept. 13, 2021); *see also Certain Integrated Circuit Chips*, 2014 WL 12796437, at *22. AliveCor's wholesale failure to address the nexus requirement should have resulted in exclusion of these contractor R&D expenditures from the domestic industry analysis. Instead, the ID placed weight on the fact that Apple's expert "did not opine that any of th[e] expenses ha[d] *no* nexus to the [a]sserted [patents]." ID at 176 (emphasis added). But that argument stands the burden of proof on its head.

Though a nexus may sometimes be "inferred from the complainant's showing of domestic investment in articles that practice the patent," *Certain Integrated Circuit Chips*, 2014 WL 12796437, at *25, that is not the case here. As the ID acknowledged, many of AliveCor's contractor R&D expenditures—including ▮▮▮▮▮ in 2018 and all expenditures in all subsequent years—were "related to ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ ID at 158, 166. Accordingly, this case is poles apart from *Certain Integrated Circuit Chips*, which affirmed that nexus may be inferred "based on evidence that the claimed investment is in the domestic industry article." 2014 WL 12796437, at *23. By contrast, under this rule, if the claimed investment is in a *different*, nonpracticing article, then "no nexus can be imputed." *Id.* at *25. For that reason, these expenditures should have been excluded. *Id.*

Second, the ID misapplied the nexus requirement by requiring only the barest of connections with the asserted patents. The ID found the nexus requirement met because the terse descriptions accompanying each R&D expenditure "*suggest[ed]* a nexus ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ID at 175. But Commission precedent makes clear that the required nexus must exist between AliveCor's "investments and the *patented features* of its [products] specifically." *Certain Electronic Candle Products*, 2021 WL 4205637, at *9 (emphasis added). An investment in R&D therefore flunks the nexus requirement if it relates to the "aesthetic features" (*e.g.*, an article's "color, fragrance, [or] style") but not the "patented features" of an article. *Id.*; *see also Certain Integrated Circuit Chips*, 2014 WL 12796437, at *28 ("[A]n investment in the article is not automatically an investment in the asserted patent."). Yet many of

**CONFIDENTIAL MATERIAL REDACTED**
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

AliveCor's descriptions of its contractor R&D investments explicitly indicate that they were directed at the aesthetics of its products. ████████████████████████████████████████ ████████████████████████████████ The descriptions, then, explicitly "assert[] that the claimed investments relate to aesthetic features," which renders them irrelevant to the domestic industry analysis. *Certain Electronic Candle Products*, 2021 WL 4205637, at *9.

The burden was on AliveCor to supply some explanation for how these expenditures relate to the exploitation of its asserted patents. *Contra* ID at 176. "[T]here has to be an explanation why [textile]-related investment should be credited to the [heart monitoring] patent." *Certain Integrated Circuit Chips*, 2014 WL 12796437, at *29. AliveCor wholly failed to supply any such explanation. *See* ID at 176. It simply declined to "provide[] evidence addressing how [its] investments in aesthetic features of the product … related to the patented technology"—which means that all such investments must be excluded from the domestic industry analysis. *Certain Electronic Candle Products*, 2021 WL 4205637, at *9.

Once these expenditures are excluded, AliveCor is left with ███ in qualifying R&D investment. *See* ID at 176. For that reason alone, AliveCor's investment cannot be substantial.

**Foreign contract labor improperly included.** It is a fundamental requirement of the domestic industry analysis that the investments credited under either § 1337(a)(3)(A), (B), or (C) must occur "in the United States." § 1337(a)(3); *see Lelo*, 786 F.3d at 885 (requiring an "increase of investment or employment in the United States"). Despite this threshold requirement, the ID credited various contractor R&D investments that appeared to be "material amount[s] of foreign payments." ID at 182.

The inclusion of these amounts was error. AliveCor bore the burden to "submit evidence … substantiat[ing] the nature and significance of its domestic activities." *Certain Carburetors*, 2019 WL 5622443, at *13. And as the ID acknowledged, while the record "suggest[s]" that these are foreign investments, the issue went "unaddressed in [AliveCor's] briefing." ID at 182. That alone should have resulted in wholesale exclusion of these amounts.

The ID defended the inclusion of these amounts on the dubious rationale that they add up to "only" ██████ ID at 182. This was good news, the ID concluded, because "[i]f this is the true extent

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

smartwatch. Nor will it benefit domestic production of smartwatches, as Apple is not aware of any full-featured smartwatches that are manufactured in the United States. § II.D.

All the public interest factors are overwhelmingly against the recommended exclusion order.

## A. The Recommended Remedy Will Seriously Harm The Public Health And Welfare.

The recommended remedy will: (1) reduce early detection of AFib, a prevalent and life-threatening disease that often goes undetected until a patient experiences serious or fatal complications, and may reduce detection of other cardiac conditions; (2) irreparably disrupt ongoing research into AFib, depriving the American public of potentially "breakthrough" treatments for this disease and wasting millions of dollars in public and private investment already devoted to medical research using Apple Watch; and (3) deprive consumers of Apple Watch's numerous other invaluable health, wellness, and safety functions and disrupt ongoing research on these unaccused features.

### 1. Excluding the Accused Apple Watches will reduce early detection of AFib and likely other cardiac conditions, risking lives, worsening health outcomes, and increasing healthcare costs.

#### a. *AFib is a life-threatening disease that afflicts millions yet often goes undiagnosed until a major health event.*

AFib is a potentially fatal cardiac condition that afflicts millions of people in the United States. *See Atrial Fibrillation: Facts, Statistics, and You,* Healthline, https://tinyurl.com/mu86att3. The Centers for Disease Control and Prevention estimates that AFib contributes to more than 454,000 hospitalizations and 158,000 deaths each year in the United States. *Atrial Fibrillation,* CDC (July 12, 2022), https://tinyurl.com/2bnkyskr. AFib causes about one in seven strokes, and strokes caused by complications from AFib tend to be more severe than strokes with other underlying causes. *Id.* Unfortunately, AFib is often asymptomatic or only sporadically symptomatic until a major health event, such as a stroke, occurs. *See* EDIS No. 776319 (Stanford School of Medicine); EDIS No. 776391 (Computer & Commc'ns Indus. Ass'n and NetChoice) at 2. That is why it is especially important be able to track a patient's heart rhythms and report any signs of AFib to a doctor before the patient experiences a life-threatening medical event. *See De Novo Classification Request For ECG App,* DEN180044, FDA at 14

40

Appx1462

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

Apple Watch rapidly analyzes the heart's electrical signals to detect whether signs of AFib are present. The ECG waveform and any noted symptoms can be exported into a PDF to share with a healthcare provider. Ex. 1 (Desai Decl.) ¶ 14. As FDA explained in approving ECG app, having this "convenient and readily accessible means to record" an ECG on demand "is especially valuable for users with recurrent, transient but infrequent symptoms, which can be difficult to catch with traditional cardiac monitors." DEN180044, *supra*, at 14. ECG app has a "meaningful impact on" these patients because they "can immediately check an ECG using their Apple Watch, which can in turn tell them right away if they have atrial fibrillation or can show their ECG results to their physician to discuss a possible diagnosis and treatment." EDIS No. 776319 (Stanford School of Medicine). Thus, ECG app "can be helpful to make the medical evaluation more efficient and obviate some unnecessary procedures" and, for users with undiagnosed AFib, "provide early detection of the disease." DEN180044, *supra*, at 14. In addition, FDA has temporarily authorized the use of certain remote monitoring devices, including Apple's ECG app, for telemedicine and virtual care. *See Enforcement Policy for Non-Invasive Remote Monitoring Devices,* FDA (updated Oct. 2020), https://tinyurl.com/3ry84svt; *Expanded use of Apple ECG app for supporting remote heart rhythm evaluation during the COVID-19 pandemic*, Apple, https://tinyurl.com/yc2kunha.

IRN helps save lives in different ways. Once a user activates IRN, it operates in the background, periodically measuring and analyzing the user's pulse rate using PPG sensors located on the back of Apple Watch to identify irregular heart rhythms. Ex. 1 (Desai Decl.) ¶ 10. If IRN identifies and confirms heart rhythms suggestive of AFib, IRN will notify the user and prompt them to "talk to [their] doctor." ID at 136 (quoting IRN notification). FDA explained in authorizing IRN that the feature "is an effective device for identifying abnormal pulse rates that may suggest the presence of [AFib]." DEN180042, *supra*, at 8.

The fact that IRN, once activated, does not require a user to proactively activate an app or otherwise affirmatively initiate an interaction with their watch is "an important public health advantage" of the Apple Watch. Ex. 1 (Desai Decl.) ¶ 10. IRN provides potentially life-saving health information not only to consumers who purchase Apple Watch to monitor their heart health, but also to users who buy Apple Watch for its host of other industry-leading features and are unaware that they may have AFib.

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

Thus, IRN can help Apple Watch wearers identify previously undiagnosed AFib in its early stages, which is extremely important for avoiding serious complications like stroke. *See* EDIS No. 776319 (Stanford School of Medicine) (IRN "can effectively identify people with atrial fibrillation who were not previously aware of this condition. This is important because many patients with atrial fibrillation are at risk for stroke; a risk that can be mitigated with blood thinning medications."). As FDA explained in authorizing IRN, "[s]ince [AFib] is associated with serious potential complications, a device that can provide early detection or improve the efficiency of [AFib] screening is clinically valuable." DEN180042, *supra*, at 9.

### c. Millions of consumers rely on these life-saving features of Apple Watch.

Some Apple customers voluntarily "opt in" to sharing their usage data with Apple. Based on data from those Apple Watch wearers, Apple estimates that there are more than ▮▮▮▮ Apple Watch users in the United States who have activated IRN on their Apple Watch, and a similar number who have activated ECG app. Ex. 1 (Desai Decl.) ¶ 21. Apple estimates that, on a daily basis, about ▮▮▮ individual Apple Watch wearers receive an AFib warning after using ECG app. Apple Watch empowers these people to take an electrocardiogram instantaneously whether or not they are experiencing symptoms—whether they are sitting at home, grocery shopping, or at their child's soccer game—helping them and their doctors detect AFib early, before it leads to a catastrophic event. Separately, Apple estimates that about ▮▮▮ wearers receive IRN notifications each day. *Id.* Each instance represents a person who may otherwise have no reason to suspect they may have AFib but can now seek earlier medical attention.

Offering both features on one constantly-worn, popular consumer device contributes directly and significantly to public health and consumer welfare.[17] While ECG app and IRN operate fully

---

[17] To be clear, it is undisputed that Apple Watch's IRN and HHRN features operate entirely independently from the ECG App. Tr. (Waydo) at 763:17-19, 768:25-769:18 (testifying that Apple never found it useful for any data from the IRN feature to be used in the ECG App), 769:11-15 (HHRN is never used with ECG); Tr. (Picard) at 891:16-24, 892:15-24 (explaining that there is no input from the IRN or HHRN algorithms into the "ECG classification algorithm"), 895:22-896:2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ECG

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

independently of each other, offering one without the other would deprive the public of the full benefits of Apple Watch. For instance, offering ECG app without IRN would mean that many individuals with asymptomatic AFib or who otherwise do not recognize their symptoms as requiring medical attention might not recognize a reason to use ECG app and therefore may not become aware of the condition until they experience more serious or life-threatening complications like a stroke. And offering IRN without ECG app would mean that wearers concerned about their heart health—either because of an IRN alert or because of how they are feeling—would need to go to the hospital or acquire an inconvenient and separate at-home ECG device to accurately detect AFib, by which time their fleeting symptoms may have passed.

> **d.   HHRN offers additional heart-health monitoring capabilities that can lead to the detection of other undiagnosed cardiac conditions.**

Like IRN, HHRN is a feature that works in the background to monitor a user's heart rate using the PPG sensor on the back of Apple Watch. Ex. 1 (Desai Decl.) ¶ 15. Periodically, HHRN will measure the user's heart rate and compare it to the user's perceived activity level. If the user's heart rate has been above a user-defined threshold for more than 10 minutes while the user appears to be relatively stationary, HHRN will notify the user. *Id.* Although HHRN is not an FDA-authorized medical device and cannot itself detect any heart conditions, it provides valuable information to users that can encourage them to seek medical care, which can in turn lead to the identification of a range of cardiac conditions that might otherwise have gone undiagnosed. *Id.*

> **e.   Real-world examples demonstrate that Apple Watch with ECG app, IRN, and HHRN saves lives, improves treatment outcomes, and reduces healthcare costs—profound public health benefits that would be lost if Apple Watch is**

---

app relies solely on its own detection of electrical activity of the heart to make its determination of possible AFib. CX-50 (ECG App Spec.); CX-51 (ECG 2.0 Spec.); Tr. (Picard) at 891:18-892:14; Tr. (Waydo) at 859:18-860:18. The design specifications for ECG App make no mention of IRN or HHRN on Apple Watch. Tr. (Waydo) at 859:18-860:18. Indeed, Apple's separate *de novo* application to FDA for the ECG App made clear that it is a standalone SaMD ███████████████████ RX-48C.1 (ECG App Risk Mgmt. File); Tr. (Picard) at 893:8-894:3. The same is true of IRN. *See* RX-106C.1 (IRN Hazard Analysis) (stating that IRN is a standalone SaMD ████████████████ ██████████████████████████; *see also* Tr. (Waydo) at 779:19-780:20; RX-4C (FDA Approval of IRN).

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER*

wearable device." EDIS No. 776278 (American Heart Association) at 3. Exclusion would severely impair this important research. As the American Heart Association explains, a principal aim of these studies "is to investigate if consumer health can be improved via data from a consumer-worn device prompting interventions through the device or otherwise." *Id.* Accordingly, "part of the significance of the [accused Apple Watches] is that they are a *prevalent* consumer device, not just a technical input used by researchers." *Id.* at 5 (emphasis added). If Apple Watches with ECG app, IRN, and HHRN are excluded from the United States (or were only permitted to be imported specifically for use in research trials), these studies will have little value because the devices they study would no longer be a "mass consumer device" that is actually available to consumers. *See id.* (explaining that "adopting remedial orders requiring certifications by researchers for devices sought to be imported would [not] adequately protect" these research interests). Thus, even if a clinical trial exemption might permit these valuable research studies to go forward, if Apple Watches with ECG app, IRN, and HHRN were no longer available, the findings from those studies will have little or no real-world relevance.[19]

To maintain relevance, researchers would have to attempt to switch mid-study to other companies' smartwatches. But no "devices available in volume in the United States that provide the same combination of attributes to researchers" exist with the same widespread adoption by consumers. *Id.* at 3-4; *see* § II.C. Moreover, overhauling research projects to utilize other devices would be extremely disruptive. "Clinical and other scientific research requires months or years of planning, including design of research protocols and study objectives, interaction with governing bodies and collaborators, enrolling subjects, and procuring necessary materials." EDIS No. 776278 (American Heart Association) at 4. "For ongoing studies that are recruiting or those that have already been designed involving the [accused Apple Watches], the recommended remedial orders could jeopardize their scientific merit and cause waste of resources spent for the studies." *Id.* "If Apple Watch data in ongoing research could no longer be obtained because new participants had to use different devices, then questions about comparability of data before and after the

---

[19] If the Commission does issue a remedy, however, it should include an exception for clinicians, clinical trials, and experimental use. *See* § III.B.2.

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

redress that harm in a commercially reasonable time, because development, regulatory clearance, and production of such a product takes years. § II.C.2.

### 1. There are no available alternatives to Apple Watch that could compensate for the harm to public health, welfare, and consumers.

Where there is "limited availability of non-infringing alternatives," there are "more concerns with respect to the public interest than most Section 337 investigations." *Certain Baseband Processor Chips*, Inv. No. 337-TA-543, Comm'n Determ., 2011 WL 6121182, at *75 (Oct. 1, 2011). If Apple Watch is excluded, only limited and inadequate alternative articles will remain available to U.S. consumers. The only suitable alternatives, for purposes of remedying the harm from exclusion, are wearable devices with both FDA-cleared ECG and IRN functions. There are just two options that meet those criteria currently available in the United States, but neither would ameliorate the harm to public health from an exclusion order.

**a.** A suitable alternative for purposes of remedying the harm from exclusion must: (1) include ECG, IRN, and HHRN features; (2) be a wearable; and (3) be FDA-cleared. First, a device cannot serve as an alternative in this context without having ECG, IRN, and HHRN functions. As discussed above, § II.A.1, these three Apple Watch features provide independent and essential health benefits. ECG app enables consumers to affirmatively check their cardiac activity in real time anytime they want. IRN, which continuously operates passively in the background, broadens the public health reach of Apple Watch by notifying previously unaware consumers to seek out medical attention for life-threatening conditions such as AFib. Without IRN, those consumers could suffer a fatal stroke without ever knowing that they had a treatable condition. And HHRN lets users know when their heartrates appear abnormally high, which can encourage users to seek medical attention, potentially leading to identification of other cardiac conditions. These features thus separately and together provide significant public health benefits, and a device that does not include all three does not deliver the same life-saving capabilities as Apple Watch.

Second, a device must be wearable to be considered a suitable alternative in this context. Only a wearable device can offer the background sensing that contributes to the consumer and public health benefits of IRN. A non-wearable device—such as the products AliveCor currently offers—is far less likely

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

to be immediately on hand when it's most needed: when the user experiences symptoms or has other reason to suspect that she may be in AFib.

Third, only wearable devices with both FDA-cleared ECG and IRN capabilities could possibly serve as suitable alternatives to Apple Watch for purposes of this investigation. That is because FDA's rigorous authorization process for software as a medical device (SaMD) requires high-quality validated sensor inputs that have clinical-level accuracy. Ex. 3 (Picard Decl.) ¶ 14-16; Ex. 2 (Lietzan Decl.) ¶¶ 18-19; *see also* 21 C.F.R. §§ 870.2790, 870.2345. Non-cleared devices that purport to measure cardiac activity through PPG sensors have not been determined to accurately identify potential AFib, and such devices are "often inaccurate and may lead to ill-advised decisions about medications and treatment." EDIS No. 776312 (StopAfib.org) at 3. Most manufacturers have not invested the significant resources required to optimally configure the sensors and develop the sophisticated software necessary to obtain FDA clearance. Ex. 3 (Picard Decl.) ¶¶ 16-17. Indeed, AliveCor has not done so; it has never offered a device with IRN capabilities, whether FDA-cleared or not. Non-FDA approved devices cannot adequately replace the accused Apple Watch for the purposes of providing consumers with high quality, clinical-level data regarding potential AFib, or for the purposes of providing clinical-level accuracy data in research studies.

**b.** Only one other company in the United States currently offers wearable products with HHRN and both an FDA-cleared ECG and IRN feature: Fitbit, maker of the Charge 5 and Sense. But neither Charge 5 nor Sense could sufficiently compensate for the wide-ranging harms to consumer and public health and welfare in the event of exclusion of Apple Watch from the U.S. Even if Fitbit could ramp up manufacturing to fully meet consumer demand in the event of the sudden shortfall that would occur— which it cannot—the Sense and Charge 5 are markedly inferior to Apple Watch in their functionality, breadth of features, and ability to deliver life-saving cardiac and other benefits.

For starters, they fail to deliver the same caliber of cardiac analysis. An independent study recently showed that Fitbit devices are significantly less accurate at estimating heart rate parameters in comparison to Apple Watch. Ex. 3 (Picard Decl.) ¶ 17.

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

There is also a fundamental mismatch in what Apple's and Fitbit's products do and why people buy them. Consumers choose Apple Watch because it does it all: in addition to obtaining health and fitness feedback, users can place and receive phone calls, exchange messages, stream music, and access a wide range of apps such as navigation, mobile banking, and e-commerce. JX-211.1-3, 4-5; Ex. 4 (Schafer Decl.) ¶ 5. The latest offerings from Apple—Series 8 and Ultra—add even more to the package with crash detection and other new features. *See e.g.*, TechCrunch, *supra*. The Charge 5 and Sense lack these features. The Charge 5 is a fitness tracker that includes only minimal non-health features like receiving notifications from the user's smartphone. *Features & Specs*, Charge 5, https://tinyurl.com/4vh93vwe; *see also* Ex. 6 (Davies Decl.) ¶ 49. And while the Sense offers a few "smart" features such as contactless payments, its features pale in comparison to Apple Watch. *See* Christopher Allbritton, *Apple Watch 7 vs. Fitbit Sense: Which Smartwatch is Best For You?*, CNN (June 29, 2022), https://tinyurl.com/y3mamuxs (describing the Sense as a "capable health and fitness tracker with some smartwatch functionality" in contrast to Apple Watch, the "gold-standard smartwatch that also does health and fitness tracking very well"). What is more, a number of the Sense's more advanced features—such as the ability to respond to messages—are both "rudimentary" and only work with Android phones. *See id.*

Many Apple users strongly prefer Apple products and value their integrated nature. Ex. 6 (Davies Decl.) ¶¶ 61-63, 75-76. These individuals choose to buy Apple Watches because they want Apple products. *Id.* Would-be Apple Watch purchasers will not be able to purchase their preferred smartwatch if Apple Watch is excluded, and some will simply forego buying a smartwatch. Inevitably, some of these individuals will have AFib that will not be detected or treated as early as a result.

As a result, the Sense and Charge 5 would fail to compensate for the significant harm to the public health and welfare that exclusion of Apple Watch would cause. Consumers who want a device that also delivers the productivity, connectivity, integration, and convenience benefits of Apple Watch may not purchase a fitness tracker with minimal and rudimentary smart features. Compounding the harm to public health and welfare, Fitbit's products do not include other life-saving features now standard in Apple Watch,

## CONFIDENTIAL MATERIAL REDACTED
### *CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
### *SUBJECT TO PROTECTIVE ORDER*

including like fall detection, SOS calling, and crash detection.  Oliver Haslam, *Apple Watch Car Crash Detection Makes It a Life-Saving Machine*, Lifewire (Sept. 13, 2022), https://tinyurl.com/56x6vryb.[21]

Finally, no other product could take the place of Apple Watch in the groundbreaking research described at § II.A.2.  Apple Watch's prevalence is the actual *subject* of some research, which looks to better understand and measure the public health benefits of a device with such widespread adoption.  *Supra* at 48-49.  Even if prevalence were not an issue, no other product could be used instead of Apple Watch without seriously jeopardizing the scientific merit of ongoing studies and wasting significant resources for studies that have already been planned and funded based on Apple Watch.

AliveCor suggests that their discontinued product, KBS, performs better than a retired version of Apple Watch and could serve as an alternative.  EDIS No. 776493 (AliveCor's Stmt. on the Public Interest) 2-3. ███████████████████████ ID at 167.  Putting aside for now the hurdles AliveCor would face in bringing it back, KBS was designed to work with versions of the Apple Watch OS and the Series 3 Apple Watch that were available more than two years ago, and KBS would undoubtedly need to be modified in order to be compatible with today's Apple Watches.  Ex. 3 (Picard Decl.) ¶ 23.  What is more, the exclusion order sought by AliveCor would appear to preclude their *own* proposed alternative from the United States as well, because the KBS cannot operate independently of Apple Watch.

### 2.    Complainant and third parties cannot meet demand within a commercially reasonable time if Apple Watch is excluded.

Before issuing an exclusion order, the Commission also considers the ability of AliveCor, its licensees, and third parties to satisfy demand for Apple Watch in the event the recommended remedy issues.  19 C.F.R. § 210.8(b)(3); *see Certain Automatic Crankpin Grinders*, Inv. No. 337-TA-60, Comm'n Op., 0079 WL 419349, at *10 (Dec. 17, 1979).  No one, alone or in combination, can substantially replace the sudden supply shortfall that will arise if Apple Watch is excluded.  Given the complexities of engineering new electronic wearables, obtaining FDA clearance, and navigating the fragile and intricate procurement

---

[21] For those consumers who prefer a cellular model of Apple Watch capable of connecting to the internet without a wi-fi network or iPhone nearby, a fitness tracker with no such functionality would be even more inadequate for purposes of this investigation.

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

and manufacturing process, companies necessarily plan product launch and output years in advance. Here, where the massive shortfall would result from an external market shock, those companies would be caught flat-footed, unable to meet the enormous demand gap within a commercially reasonable time frame.

    **a.** Commercialization of a wearable product that includes comparable, FDA-cleared features to ECG app and IRN is complex and time-consuming. First, a company must develop a working prototype. Ex. 2 (Lietzan Decl.) ¶ 20. This requires medical-grade PPG and ECG sensors designed to consistently collect high quality data from a wide range of diverse users in variable conditions. Ex. 3 (Picard Decl.) ¶¶ 15-17. As Dr. Rosalind Picard—widely recognized as one of the world's foremost authorities in wearable design and development—has explained, the complexities of designing a wearable device with these two types of sensors able to run safely and effectively are monumental. *Id.* ¶¶ 29-35; Tr. (Jafari) at 451:24-452:4. Software must then be developed to process that data with clinical-quality accuracy. Ex. 3 (Picard Decl.) ¶¶ 26-33. Meanwhile, these features must be integrated into a prototype alongside a host of additional features and characteristics such as comfort, durability, battery life, app notifications and access, and aesthetics. *Id.* ¶¶ 9-13. Dr. Picard estimates that even under the best circumstances, prototype development for a wearable product with equivalent FDA-clearable features to ECG app and IRN is a years-long process. *Id.* ¶¶ 10, 13 18, 29.

    Once a working prototype capable of obtaining medical-quality heart rate data is in hand, a company can begin the process of seeking regulatory clearance to market its product. That process could take several more years for a product with both IRN and ECG features—a timeline that assumes use of FDA's streamlined 510(k) clearance process. Ex. 2 (Lietzan Decl.) ¶ 10; *see also* Ex. 3 (Picard Decl.) ¶ 47 (providing examples of devices that have taken over three years to obtain clearance under 510(k), which assumes the existence of a previously authorized product that is substantially equivalent).[22] Even this streamlined process will require significant testing for software validation, clinical performance, algorithm verification, and human usability. 21 C.F.R. § 870.2790 (PPG-based applications); Ex. 2 (Lietzan Decl.)

---

[22] If a device does not qualify for the 510(k) pathway, the device would be considered a Class III device, which requires a much more extensive and demanding application process. Ex. 2 (Lietzan Decl.) ¶¶ 17, 23.

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

¶¶ 16-17; 21 C.F.R. § 870.2345 (ECG-based applications). These are not simple hoops to jump through. Software validation could take years. Ex. 3 (Picard Decl.) ¶ 29. Clinical performance testing carries additional regulatory requirements. Ex. 2 (Lietzan Decl.) ¶ 19. And even after an applicant provides FDA with this substantial package of information constituting the 510(k) application, the regulatory process continues. Ex. 2 (Lietzan Decl.) ¶ 22. The average elapsed time from submission of the application (after building a working prototype and performing the required clinical testing) to decision on a successful 510(k) application is over six months. *Id.*

AliveCor would face its own specific challenges in pursuing FDA clearance of the accused features for any newly developed device. For starters, none of AliveCor's currently-marketed products is a smartwatch or even a wearable device. *See* https://store.kardia.com/ (listing only handheld ECG devices). Nor do any of them use PPG sensors or perform anything analogous to IRN. AliveCor has *never* built a fully functioning smartwatch, much less any product including a medical-grade PPG sensor.[23] And with respect to KBS, AliveCor discontinued that product in 2019. Regardless, KBS was designed to work with a long-outdated version of watchOS running on an Apple Watch model released more than three years ago, and it would require modification to be compatible with the most recent, improved products.

AliveCor conceded at the evidentiary hearing in this investigation that it had not even commenced validation testing of any prototype smartwatch with the claimed features. Tr. (Albert) at 157:3-158:24. AliveCor will need to develop a prototype capable of medical-grade PPG measurements before it can even begin the necessary testing to assemble an FDA submission; as of earlier this year, its sensors had yet to achieve even consumer-grade data quality. Ex. 3 (Picard Decl.) ¶¶ 18, 25. Given its state of development, it will likely take at least four years for AliveCor to develop a prototype whose PPG data inputs could possibly pass muster at FDA. *Id.* ¶¶ 18-22. Once AliveCor achieves that, it will need to develop reliable

---

[23] In a press release mock-up prepared in January 2021, AliveCor stated that the ▌▌▌▌ reference smartwatch with ECG capability would be available to consumers in Q1 2021. JX-095C.6. AliveCor still has no commercial smartwatch today, and, as of the hearing in this investigation, had not started any clinical trials, much less submitted a 510(k) application to FDA. Tr. (Somayajula) at 249:13-250:20. As for the ▌▌▌, AliveCor did not have a working prototype of that product at any point in this investigation. AliveCor's documents state that ▌▌▌▌▌▌▌▌▌▌▌▌ and thus it could not fill the void left if Apple Watch is excluded. *See* JX-090C.2; *see also* Tr. (Somayajula) at 253:24-254:8.

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER*

algorithms—a step that cannot proceed until the inputs are in place. *Id.* ¶ 30-33. And only after that step is complete can it begin clinical studies on humans. *Id.* ¶ 28.

**b.** Even if certain products are deemed suitable alternatives to the Accused Products for purposes of assessing the public interest effects of exclusion, and have or could obtain FDA clearance, it would nevertheless be impossible for AliveCor, its licensees, or third parties to ramp up production on the timeframe and in quantities sufficient to replace the dramatic shortfall caused by exclusion of the Accused Products "within a commercially reasonable length of time," *Automatic Crankpin Grinders*, 0079 WL 419349, at *10, in light of the pervasive supply chain issues of late.

Manufacturing wearables is a highly choreographed process under the most normal of circumstances. Like many complex high-end consumer electronics, many of Apple Watch's components are custom-designed, must adhere strictly to Apple's specifications, and ███████████████████ ███████ Ex. 4 (Schafer Decl.) ¶ 5. As a result, ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████

Compounding this complexity, the well-documented global semiconductor shortage, continued COVID-19 lockdowns in China, natural disasters (including severe weather events), and delays in procuring integrated circuits and other necessary components continue to plague manufacturers. *Id.* ¶¶ 17-19, 21, 27, 30; *see also* EDIS No. 776391 (Computer & Comm'ns Indus. Ass'n) at 3-4. The chip shortage is expected to persist for several years: existing companies have already sold their full capacity of silicon wafer production through 2026. *Id.* ¶ 22. The war in Ukraine is further exacerbating the chip shortage; Ukraine has historically supplied 90% of the world's semiconductor-grade neon gas. *Id.* Meanwhile, consumer demand for wearables and industry demand for manufacturing equipment have risen beyond predicted levels. *Id.* ¶¶ 18, 27 & n.30.

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

There is no evidence that supply can be ramped up fast enough to meet the entirety of consumer demand (or close to it) in view of the enormity of the immediate shortfall the exclusion order would create. The already-significant lead time required to manufacture components will only continue to increase. *Id.* ¶ 23 (describing negative feedback loop), ¶ 26 (lead time for chip tool makers currently 30 months). Even where manufacturing capacity exists, lead time for semiconductors ranges from six months to over two years. *Id.* ¶¶ 20, 23. Thousands of other parts and components, like display modules and batteries, would also need to scale up. *Id.* ¶¶ , 27, 38, 42. Given all this, Apple management estimates that a ███████████ ████████████████████████████████████████████████████ Ex. 4 (Schafer Decl. ¶) 8.

The supply constraints faced by Apple are shared by the entire industry. Ex. 6 (Davies Decl.) ¶¶ 16-32. According to data reported by third-party research firm Statista, about 50% of adult smartwatch and fitness tracker users use Apple Watch. Leading competitors include Fitbit, with about 30%, and Samsung with about 20%.[24] Ex. 7 (Statista 2022 Smartwatch Analysis) at 23. In today's environment, it would take years to ramp up production to compensate for exclusion of Apple Watch. Ex. 6 (Davies Decl.) ¶ 46, 53. This is especially true of products with features similar to ECG app and IRN. Looking just at ECG capability, the magnitude of necessary production increases would be staggering. In 2021, U.S. consumers purchased over ██████████████████████████ *Id.* ¶ 50 (relying on data from third-party industry analyst IDC).[25] In contrast, Samsung sold ████████████ with ECG, and Fitbit ████████████ *Id.* ¶¶ 50-51. What is more, none of Samsung's ECG-enabled products also include IRN, and only some of Fitbit's do. At the very minimum, any remedy here should be delayed to allow other companies adequate time to meet this substantial demand. *See Certain Chem. Mech. Planarization Slurries*, Inv. No. 337-TA-1204, Comm'n Op., 2022 WL 100271, at *25 (Jan. 6, 2022) (delaying remedy by one year).

**D. The Recommended Remedy Will Harm Competitive Conditions In The United States**

---

[24] This statement relies on third-party research data about smartwatch sales. Such data vary by product definition and over time. Statista uses its own definition of products and shipments.

[25] Like Statista, IDC uses its own definition of products and shipments, and its data vary by product definition and over time.

CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

# Exhibit 1

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

## DECLARATION OF SUMBUL DESAI, M.D.

1.    My name is Sumbul Desai, M.D.  I am over 21 years of age, of sound mind, and make this declaration voluntarily and based upon my own personal knowledge.

2.    I received my M.D. from the Medical College of Virginia, VCU School of Medicine in 2008.  I completed a residency in Internal Medicine at the Stanford University School of Medicine.  During my residency, I was a Research Fellow in Public Policy at the Kaiser Family Foundation.

3.    Since 2011, I have been on faculty at the Stanford University School of Medicine as a clinical associate professor.  During my full time tenure at Stanford, I served as the Vice Chair, Strategy and Innovation & Stanford Center for Digital Health and Associate Chief Medical Office of Strategy & Innovation at Stanford Healthcare.

4.    I am the Vice President of Health at Apple.  In that role, I work every day to empower users with tools to improve their health.  I oversee health initiatives that include clinical product development, medical research, and innovative clinical partnerships.  I also lead the regulatory and quality teams at Apple.  Across all these efforts, we leverage the latest health science to create innovative technology.  We develop new products and services that give people everywhere actionable paths to healthier lives.  And we bring together teams of experts — including designers, engineers, scientists, clinicians and more — who lend their unique insights on how we can have the greatest positive impact on the world.

5.    Our work today builds on a longstanding commitment to the health space.  For nearly a decade, Apple has devoted significant talent, resources and expertise to designing, developing, and producing products and services aimed at giving users more information about their own health.  We feel called to this work, first and foremost, because one of Apple's core principles is a commitment to improve users' lives by developing the world's best technology.  We also feel a responsibility to do this work because this is an area where Apple passionately believes it is uniquely suited to make a contribution to the world.  We're proud to create products and services that are both innovative and user friendly, and have a history of pioneering products that can change people's lives while fitting seamlessly into their days. When we apply that approach to health, we can play a meaningful role in

1

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

under de novo authorization number DEN180042 after it reviewed the results of Apple's clinical trials for that device.[3]

15.    Apple Watch Series 1 and later also include the HHRN feature.[4]   This is a health feature that is not an FDA-authorized medical device or SaMD, as it does not provide any indication to a user of a suspected irregularity.  Like IRN, HHRN is a feature that works in the background to monitor a user's heart rate using the PPG sensor on the back of Apple Watch.  Periodically, HHRN will measure the user's heart rate and compare it to the user's perceived activity level, i.e., motion.  If there is an inconsistency between the user's heart rate, i.e., a high heart rate, and the user's motion for at least ten consecutive minutes, HHRN will provide a notice to the user that their heart rate rose above a predefined level for more than 10-minutes while the user appeared to be stationary.  Notably, the user can set the heart rate (between 100bpm and 150bpm) that will trigger this notice.

16.    Apple Watch with ECG app and IRN provides a benefit to consumers in proactively alerting them to possible cardiovascular conditions, as well as other possible health conditions from HHRN, low heart rate, fall detection, and other features on Apple Watch (discussed more below).  As described above, IRN and/or ECG app can separately alert users that they may have undiagnosed AFib.  This results from one of two possible pathways.  First, if a user on-boards the IRN feature, that SaMD can monitor a patient's heart rhythms in the background and alert them if the system identified heart rhythms consistent with AFib, advising the user to seek further medical attention and possible diagnosis.  Second, if a user on-boards ECG app, they can take a 30-second ECG measurement anytime they want, including when they are feeling symptoms such as shortness of breath, heart palpitations, or other symptoms.  ECG app on Apple Watch will then classify that 30-second ECG measurement and provide the result to the user on Watch. That result may indicate an ECG consistent with signs of AFib and alert the user to that determination.

---

[3] FDA subsequently authorized an updated version of IRN (IRN 2.0) under the 510K process. *See* K212516.

[4] HHRN was introduced with Apple Watch before ECG app and IRN were introduced.

6

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

17.   Apple has received hundreds of letters and dozens of news reports about how these (and other Apple Watch features) have—according to the users themselves—improved - and in many instances - saved their lives.  For example, as has been reported by media, ██████████████ shared with media that he "firmly believes" Apple Watch helped save his life by detecting atrial fibrillation. While visiting family for the holidays, Roy received a number of notifications on his Apple Watch, which lead to a hospital visit immediately after Thanksgiving dinner.  In the news report on ████████, he describes how doctors admitted him after 30 seconds of viewing his hospital-recorded, 12-lead electrocardiogram, which is a direct result of ████████ getting an IRN alert and going to the hospital as a result. ████████ shared that the AFib alert "hit home" because his father died of a stroke 60 years ago and refers to his Apple Watch as the "greatest item he's ever received."

18.   As another example, ████████████████████████████ shared with media that her Apple Watch alerted her to a high heart rate, which prompted her to seek medical care.   During that care, ████████ learned she had cardiac tamponade, abnormal fluid around the heart. ████████ says her heart was "basically suffering" and Apple Watch had "saved her life."

19.   In ████████████████████████, told media he took an ECG on his Apple Watch after feeling "slow and erratic" heart beats. ████████ shared the ECG PDF with his cardiologist, who immediately admitted him to the hospital.  After undergoing tests, ████████ shared that he was diagnosed with ventricular tachycardia, which can have devastating results if left untreated.   The father of three told media he now has an implantable defibrillator and is "thankful" for Apple Watch that helped "address" his condition before "anything worse happened."

20.   Apple has received hundreds of letters and accounts like these where Apple Watch with the ECG app, as well as other Apple Watch features, have meaningfully improved the lives of users.  Specifically, Apple has received at least 500 letters from users, detailing how Apple Watch "saved their lives," and at least 320 of those are related to one of ECG app, IRN, or HHRN.

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

21.   Based on data from those users that opt-in to sharing data with Apple, Apple estimates that there are more than ██████ Apple Watch users in the United States who have on-boarded the IRN feature on their Apple Watch, and a similar number of Apple Watch users who have on-boarded the ECG app on their Apple Watch.  Significantly, Apple estimates there are about ████████ individual Apple Watch users who receive IRN notifications on a daily basis in the United States.   Separately, Apple estimates there are about ██████ individual Apple Watch users who choose to take an ECG measurement for whatever reason and receive a result showing possible signs of AFib on a daily basis in the United States.  Each of these represents a user who potentially may not have known they had AFib, and may seek earlier medical attention because of these features on Apple Watch.

22.   As these examples show, Apple Watch with ECG app, IRN, and HHRN causes consumers to seek out medical attention earlier and more often, sometimes facilitating earlier detection of AFib and other cardiovascular conditions.   Because these users were alerted to possible health issues early, and sought medical care early, they were able to receive medical care before a catastrophic event, like stroke, could occur.   This not only generally allows for better and faster recovery by the users after receiving medical care from doctors, it has the added benefit of helping to reduce healthcare costs for individual users and the system as a whole.  This is because medical treatment after a catastrophic event, like stroke or heart attack, generally results in longer and more invasive hospital care.  Hospital care is much more expensive than out-patient care, and often results in substantial increases to medical care costs.  As such, by providing tools that help users seek out and obtain earlier care, including preventive care, Apple Watch is helping avoid disease progression, which leads to better overall outcomes and better health for the population.  As an added benefit, Apple Watch provides users and healthcare systems with tools and features that can reduce the costs of healthcare overall.[5]   This point was expressly made in Dr. Richard Milani's submitted statement.   2022-7-24 Milani Letter at page 3 ("Since the launch of HealthKit, Apple has continued to expand the health features that its products track, while software

---

[5] https://www.thebalance.com/preventive-care-how-it-lowers-aca-costs-3306074.

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

ECG app as a consumer device available to U.S. consumers as this "helps investigate if a mass consumer device can be used to intervene to improve health outcomes by acquiring data used to (help) detect them." 2022-7-26 AHA Letter at page 5.

27.   In this way, Apple Watch is helping address one of the biggest obstacles to medical research: recruiting participants.  Apple's large-scale user base is able to easily participate in a wide range of studies if they wish, while maintaining complete control over their own data. In 2017, Apple scientists collaborated in research led by the Stanford University School of Medicine to conduct the Apple Heart Study on AFib detection.  This study evaluated whether irregular pulse data detected via Apple Watch could identify irregular heart rhythms, including AFib and other serious heart conditions.  The unprecedented study enrolled more than 400,000 Apple Watch users from all 50 states in a span of only eight months.  The study was published in the New England Journal of Medicine in 2019.  This first-of-its kind virtual study helped demonstrate the feasibility of conducting a real-world study in an everyday setting to the medical community as they went on to create new virtual studies through the pandemic. The study led Apple to develop and validate the IRN feature on Apple Watch.

28.   Some examples of ongoing or planned studies that involve Apple Watch with its current features include the Johnson & Johnson Heartline Study referenced in the AHA's letter to the Commission.  That is a research study that aims to analyze the impact of an app-based heart health program with Apple Watch on the early detection of irregular heart rhythms consistent with AFib, and the potential to improve heart health outcomes, including reducing the risk of stroke and other cardiovascular conditions.  *Id.*

29.   The Mayo Clinic is conducting a study using Apple Watch with IRN and ECG app to assess cardiovascular health and detect unknown and asymptomatic diseases using Mayo AI-ECG algorithms.  *See, e.g.*, https://www.mayo.edu/research/clinical-trials/cls-20516793. Mayo Clinic has been using single lead ECGs and symptoms data collected by patients using their personal Apple Watch (FDA authorized for AF detection) via a Mayo Clinic app, to allow data to be shared within a dashboard in Epic (a healthcare database), so physicians may have a way to remotely assess cardiovascular health.  *Id.*  This study, which expects to

11

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

enroll 1,000,000 participants, started recruiting participants in April 2022 and is ongoing. https://clinicaltrials.gov/ct2/show/NCT05324566?term=Apple+Watch&draw=2&rank=5.

30.  The AHA and Northwestern University have been awarded approximately $37 million by the National Heart, Lung, and Blood Institute to conduct a study using Apple Watch to determine if treatment of AFib patients with anticoagulants, which are prescribed to reduce the risk of stroke but carry the risk of bleeding, can be improved using Apple Watch.  *See* https://news.northwestern.edu/stories/2022/08/30m-grant-to-study-wearables-stroke-prevention-in-patients-with-atrial-fibrillation/.  Specifically, the study will look to see if Apple Watch's AFib detection algorithms can enable an anticoagulation strategy tailored to individual patients rather than continuing with the one-size-fits-all current standard of care. The seven-year long randomized controlled trial will recruit 5,400 participants and begin in the Spring of 2023.

31.  Other studies are directed to other features available on Apple Watch.  For example, Stanford University is conducting a study to monitor patients' mobility before and after spine surgery using Apple Watch in an effort to improve surgical outcomes and patient satisfaction.  https://clinicaltrials.gov/ct2/show/NCT04379921?term=Apple+Watch&draw=3&rank=2.  Another study being sponsored by the University of Virginia will study the effects of exercise preconditioning measured by Apple Watch before cancer surgery to see if exercise improves outcomes and recovery.  https://clinicaltrials.gov/ct2/show/NCT04923672?term=Apple+Watch&draw=3&rank=32.  And another study being run by the National Institutes of Health (NIH) will collect data from people with cancer using an Apple iPhone alone or together with an Apple Watch in order to assess their symptoms and activity levels.  https://clinicaltrials.gov/ct2/show/NCT04465214?term=Apple+Watch&draw=3&rank=40.

32.  A listing of clinical studies that have received funding and been approved can be found at clinicaltrials.gov.  As can be seen there, nearly 100 studies involving Apple Watch have already been funded and approved, and nearly 20 of those involve ECG app, IRN, and/or HHRN for heart related studies in the United States.  There are many more being planned right now.  These are being run by some of the most respected medical institutions

12

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER*

in the United States (and the world for that matter), including Stanford University, the Mayo Clinic, Yale University, Johns Hopkins University, the Cleveland Clinic, Northwestern University, AHA, NIH, and many others.

33. The Apple Investigator Support Program ([https://www.researchandcare.org/resources/investigator-support-program/](https://www.researchandcare.org/resources/investigator-support-program/)) makes Apple Watch available to researchers around the globe to facilitate discoveries and advancements in health and wellness not previously possible without a reliable wearable device. Currently in the U.S., there are active or pending studies for numerous novel areas including remote monitoring to enhance outcomes in respiratory and cardiac disease, AFib detection and monitoring in high-risk populations, assessment of long-haul COVID symptoms in understudied populations, assessment of health signals in relation to mental health in refugees, identifying predictive signals of chemotherapy failure in understudied populations, identifying predictive signals of operative complications in elderly populations, respiratory monitoring in children and adult recipients of organ transplant, relating activity to various chronic disease (e.g., heart failure) or to therapies (e.g., in vitro fertilization), mobility disorders and interventions, pain, characterization of environmental exposures including noise dosimetry, and more.

34. Removing Apple Watch from the U.S. would severely undercut the extensive research that is already underway, and jeopardize the significant investments in such research, some of which are used to obtain, or support, additional, future FDA authorizations. *See, for example*, https://news.northwestern.edu/stories/2022/08/30m-grant-to-study-wearables-stroke-prevention-in-patients-with-atrial-fibrillation/; https://www.accessdata.fda.gov/cdrh_docs/pdf21/K213519.pdf.

35. As I hope I have conveyed to the Commission, Apple is a leading innovator when it comes to healthcare technology with a strong focus on science, accuracy, and meaningfully improving our users' lives. As a doctor, I have seen how this technology is revolutionizing how we manage our patients. Preventing importation of Apple Watch with all its current features would negatively impact millions of American citizens, removing tools that have the potential to save lives while improving health monitoring and health outcomes. Removing Apple Watch would also be devastating to the progress that is being made every

CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

# Exhibit 2

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

Before the International Trade Commission

| In the Matter of | |
| --- | --- |
| **CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** | **Inv. No. 337-TA-1266** |

## <u>DECLARATION OF ERIKA LIETZAN</u>

1.     My name is Erika Lietzan.  I am over 21 years of age, of sound mind, and make this declaration based upon my experience, training and knowledge, as described below.  I was retained by Apple in this investigation as an expert regarding Food and Drug Administration (FDA) regulation of medical devices.  I submitted opening and rebuttal expert reports on December 22, 2021 and January 17, 2022, respectively.

2.     I am the William H. Pittman Professor of Law and Timothy J. Heinsz Professor Law at University of Missouri School of Law. Before joining the University of Missouri in 2014, I was a partner in the law firm of Covington & Burling LLP.  I was a member of the firm's Food and Drug Group, where my practice focused on regulation of medical devices and biopharmaceuticals.  From August 2002 to April 2005, I served as Assistant General Counsel of the Pharmaceutical Research and Manufacturers of America (PhRMA), the trade association for the research-based pharmaceutical industry.

3.     I received a B.A. in history from the University of North Carolina in 1990 and an M.A. in history from the University of California in 1992. I earned a J.D. from the Duke University School of Law in 1995.  After clerking for the Honorable Gerald Bard Tjoflat on the U.S. Court of Appeals for the Eleventh Circuit, I joined Covington & Burling as an associate in November 1996. After working at PhRMA from 2002 to 2005, I rejoined

1

18. Assuming, however, that it could establish substantial equivalence and thus use the premarket notification pathway, it would need to submit the results of non-clinical and clinical testing in this premarket submission. Specifically, FDA's regulation governing photoplethysmograph analysis software for OTC use, 21 C.F.R. § 870.2790, describes "special controls" that will apply to any company seeking to market another such device. Of particular relevance, this regulation requires certain testing be done *before* that company seeks permission to market: (1) clinical performance testing that demonstrates the performance characteristics of the detection algorithm under anticipated conditions of use; (2) software verification, validation, and hazard analysis that results in characterization of the technical specifications of the software, including the detection algorithm and its inputs and outputs; (3) non-clinical performance testing that demonstrates the ability of the device to detect adequate photoplethysmograph signal quality; and (4) human factors and usability testing that demonstrates (a) the user can correctly use the device based solely on reading the device labeling, and (b) the user can correctly interpret the device output and understand when to seek medical care.

19. FDA's regulation governing electrocardiograph software for OTC use, 21 C.F.R. § 870.2345, similarly identifies special controls including required premarket testing. A company seeking to market such a device must perform: (1) clinical performance testing under anticipated conditions of use that demonstrates (a) the ability to obtain an electrocardiograph of sufficient quality for display and analysis, and (b) the performance characteristics of the detection algorithm as reported by sensitivity and either specificity or positive predictive value; (2) software verification, validation, and hazard analysis that results in characterization of the technical specifications of the software, including the detection algorithm and its inputs and outputs; (3) non-clinical performance testing that validates detection algorithm performance using a previously adjudicated data set; and (4) human factors and usability testing that demonstrates (a) the user can correctly use the device based solely on reading the device labeling, and (b) the user can correctly interpret the device output and understand when to seek medical care.

7

CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

# Exhibit 3

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**


**Before the International Trade Commission**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** | **Inv. No. 337-TA-1266** |


## DECLARATION OF DR. ROSALIND PICARD, Sc.D.

1.   My name is Rosalind Picard.  I am over 21 years of age, of sound mind, and make this declaration based upon my experience, training and knowledge, as described below.

2.   I was retained by Apple as a technical expert in this investigation and testified at the evidentiary hearing in March 2022.  I am the founder and director of the Affective Computing Research Group at the Massachusetts Institute of Technology (MIT) Media Lab and founding faculty chair of MIT's Mind + Hand + Heart Initiative, and a faculty member of the MIT Center for Neurobiological Engineering. The Affective Computing Research Group develops tools, techniques, and devices for sensing, interpreting, and processing physiological signals that drive state-of-the-art systems that respond intelligently to human emotional states. I also co-founded Affectiva, Inc., a company that creates emotion AI technology, and Empatica Inc., a company that creates wearable sensors and analytics to improve health.  Empatica sells the smart watch Embrace2, an FDA-cleared medical device capable of monitoring seizures, and the EmbracePlus, a smart watch used to gather clinical-quality physiological data, currently used in many clinical trials such as for helping patients with heart disease, epilepsy, and other conditions. The technologies that I have developed also include machine learning algorithms applied to monitoring changes in physical and emotional health, including cardiovascular changes such as heart rate and heart rate variability, and automated detection of events such as the arrhythmias that a person's heart can sometimes have.

1

is that their results may vary in quality, may depend on the batch that was manufactured, and can be configured in ways that work poorly or well. Extensive expertise, effort, and experimental validation are needed to ensure that a newly assembled configuration of sensors works as desired. Also, signal processing and machine learning software need to be written and optimized to efficiently and accurately clean and interpret the data, and work reliably across very diverse wearers and diverse recording conditions. This is an area where my team, and others globally, have worked for decades to refine algorithms. This is also an area of ongoing research, to develop newer and better sensor configurations and ways of improving the data processing to get better results in ambulatory data. Before estimating the time this takes, please consider an important principle, well-known in engineering: "Garbage in, garbage out."

15.   "Garbage in, garbage out" applies to this case of designing a smart watch with medical and/or health-related applications, particularly where FDA approval is the goal. If the stream of data going into an algorithm is of poor quality, then what comes out is unlikely to have the needed quality to satisfy the FDA. In this case, if inputs sensed from a PPG are poor quality "Garbage in" and then are fed into an algorithm to detect an arrhythmia, then the output of the arrhythmia detector is also going to be poor quality: "Garbage out". If the PPG heart parameters input are of very high quality, then the output of the algorithm processing them also has a better chance of meeting its quality requirements. For many consumer applications, the precise quality is not critical, as most consumers do not discern quality well. Thus, consumer "heart rate" sensors abound, with a huge variety of accuracy rates. However, for a device designed to analyze continuous human data and indicate the possibility of a medical condition, such as a cardiac arrhythmia, FDA will require a very high, and validated, quality of results. FDA will not tolerate "garbage out."

16.   While most consumer watches on the market have PPG sensors, very few watch makers have put in the effort to optimally configure the sensors physically and electrically, or to develop software to process their data with clinical-quality accuracy. The most sophisticated watches have arranged multiple LED's to sense PPG in configurations that they carefully tweak to give better results for accurately estimating the timing of each pulse waveform of the heart.

6

– one determination may say there is an arrhythmia present in the data and the other may say there is not one present.  They can also both say the same thing, "confirming" each other, and both be wrong.  A smart watch today is not capable of making a diagnosis; it is not able to determinine the medical condition of a person having an arrhythmia, a medical diagnosis that requires an expert human in the loop. Thus, what it indicates to the user about detecting an arrhythmia episode across the two different sensors could be confusing.  How should these complex combinations of determinations from the "confirmation process" – the step (vi) listed earlier (in paragraph 11) –  be presented to the user?  FDA will want to see usability testing and assurances that such "confirmation" results do not present new hazards to the users.

37.  Like in the Apple study that achieved FDA clearance, each episode of an arrhythmia that is found in the user's PPG data will need to be confirmed with a simultaneous, overlapping in time, recording of an ECG made by an FDA-cleared validated measurement system, and read and validated by an expert reader of ECGs.  Tr. 3/31/22 (Picard) at 887:16 – 890:7; 942:7 – 943:10.

38.  Confirming an episode with overlapping labeled data is ordinary engineering practice.  Otherwise, it would not be considered a confirmation. FDA will require at least this ordinary standard when they examine the integrity of AliveCor's application for clearance, as was done in the Apple FDA clearance.  *Id*. at 890:8 – 891:1.

39.  After the two systems output their determination, the smart watch program then needs to execute instructions to examine their determinations, in order to decide if a confirmation took place, i.e., if both sensors identified that a segment of data contains an episode of arrhythmia.

40.  Since Apple obtained its original approvals for its IRN feature, detecting arrhythmia from PPG, I have observed in my own work with FDA that they have raised the bar for the results that must be demonstrated to approve PPG-based medical claims. For example, their December 2021 guidance document[4] for remote data acquisition in clinical investigations now includes "showing consistent measurements  across a range of factors" including "body

---

[4] https://www.fda.gov/media/155022/download

morphology, skin color, variation in sensor placement, movements during sleep, other neurologic or psychiatric conditions or use of medications or psychoactive substances" as all of these can introduce variability into measurements. Showing consistently accurate detection rates in smart watch wearers was hard before adding in the requirement to also show it across all of these factors. Now it is significantly harder as it requires recruiting many more people across all of these attributes and quantifying the results within each type, and showing the results work consistently even when all of these types change. These are new demands that increase the burden of proof today over what it was a few years ago.

41.  I understand also from my FDA experience and from FDA expert Erika Lietzan that any applicant seeking FDA clearance for a PPG-based arrhythmia detection must present (1) clinical performance testing that demonstrates the performance characteristics of the detection algorithm under anticipated conditions of use; (2) software verification, validation, and hazard analysis that results in characterization of the technical specifications of the software, including the detection algorithm and its inputs and outputs; (3) non-clinical performance testing that demonstrates the ability of the device to detect adequate photoplethysmograph signal quality; and (4) human factors and usability testing that demonstrates the user can correctly use the device based solely on reading the device labeling, and the user can correctly interpret the device output and understand when to seek medical care.[5]

42.  Overall, the effort to conduct clinical validity studies with a wearable PPG-based sensor is now significantly more involved and will take longer than it used to take. Apple launched their heart watch study in 2017 with Stanford in a press release that indicated that there were already over 500 researchers and more than three million participants using their study-conducting tools[6]. These tools make it easier for a company like Apple to recruit and enroll participants, and the bar was lower then for how many patients were needed (for FDA's PPG-based approvals, which now have different requirements ).

---

[5] Lietzan Declaration at ¶ 16.
[6] https://www.apple.com/newsroom/2017/11/apple-heart-study-launches-to-identify-irregular-heart-rhythms/

43. In March 2019, Apple and Stanford announced they enrolled over 400,000 patients in a speedy eight months[7]. This rate was truly impressive. There are at least four elements that I believe helped them achieve such impressive speed, none of which are present to help AliveCor: (1) There were already an estimated more than twenty million Apple watch wearers; hence, recruiting 400,000 wearers, whom they already had contact with, was a "small subset."; (2) the Apple watches were more mature products that already had passed tests for having high quality heart parameters, so a high portion of the data they collected was good (this portion is expected to be lower for most any new product, so it will take more people and more time to produce the same amount of good data); (3) Apple already had built, tested and deployed the software infrastructure to enroll remote participants in a clinical trial and securely share their data in a study – in fact it had already been through many iterations with feedback from hundreds of researchers as we saw in the 2017 press release; (4) the FDA standards were not as high even a couple years ago. In my opinion, and based on my recent experiences working with FDA, including related to products for my company, the added FDA requirements in 2021 will cost 3-4 times longer than before, as the extra requirements and complexity raise the bar significantly. Also, study recruitment is much slower for asking hundreds of thousands or more of participants to sign up to obtain and wear an unknown novel device than it is for recruiting a subset of participants who already are happy to wear the well-known Apple Watch.

44. Another part of the process that can delay things is that FDA can change its requirements in the middle of a submission. Many such changes have been happening recently in digital health. When such a change happens during submission, then not only does the applicant have to meet the new requirements, but this may lead to having to restart their submission. An applicant may ask for a resubmission to be assigned to the first committee who is familiar with the applicant's work and had already started their review and analysis, but FDA will not guarantee this. In fact, based on my experience lately, FDA tends to send resubmissions to an entirely new committee. If an application goes to a new committee, it is as if the application is starting from square one. The new committee may disagree with the

---

[7] https://www.apple.com/newsroom/2019/03/stanford-medicine-announces-results-of-unprecedented-apple-heart-study/

CONFIDENTIAL MATERIAL REDACTED

previous committee, and all the work an applicant did for the previous FDA committee, that might have been accepted before, may no longer be accepted, even without any explanation for the change. This can further delay the process, adding, for example, the amount of time that has already passed since the initial submission, which might be several months to possibly even up to 18 months to an applicant's approval process, if FDA even grants clearance. Because a company cannot sell a medical device product, including software as a medical device (SaMD), until it obtains FDA's clearance, avoiding such costly delays is one of the many reasons companies try to keep the medical claims in a submission very focused or singular.

45.    As referenced previously, FDA has recently changed their requirements and started to require data to show acceptable results of usability testing of new medical smart watch products. As the population ages, it is particularly important that older users do not find a device confusing and that they do not use it improperly or in a way that could increase risks of harm. Thus, AliveCor would have to show data indicating that any new product satisfies FDA's (possibly still changing) usability requirements. To satisfy these FDA requirements usually requires human subjects testing with participants who reflect the kinds of patients representative of the product's intended use, e.g. older patients or patients who might experience a cardiac condition. Before these tests can be performed, an applicant must first obtain independent approval of a test protocol by an ethics board before advertising for or recruiting participants for a study. Then, the study must be run and assessed against the things FDA wants to see, and FDA must confirm the results are satisfactory. If FDA's committee is not satisfied, then this process would need to be repeated, iterating on changes to it, until it is satisfactory to the (possibly also changing) FDA committee.

46.    The description above has focused on practical requirements relevant to a team already knowledgable and using off-the-shelf sensors and publicly-available algorithms and having "demo stage" results, the position where I believe AliveCor is presently based on the evidence presented at the hearing in this case, and on how they can move to the endpoint of having medical-quality sensors and algorithms that achieve FDA clearance for go-to-market products. Based on my professional experiences with FDA, their new requirements are extending the time this process takes. Apple's previous ███████ of development to get their

CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

# Exhibit 4

CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the International Trade Commission**

| | |
|---|---|
| **In the Matter of** <br><br> **CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** | **Inv. No. 337-TA-1266** |

## DECLARATION OF AARON SCHAFER

1.   My name is Aaron Schafer.  I am over 21 years of age, of sound mind, and make this declaration voluntarily and based upon my own personal knowledge.

2.   I received my Bachelor of Science degree in Engineering from Michigan State University in 1998.  I received a Masters in Business Administration from DePaul University in 2003.  I began working at Motorola Corporation in May 1998 in procurement and was involved primarily with supply chain operations.  I worked at Motorola until 2010.  In May 2010, I began working at Apple and my current title is Senior Director.  My responsibilities include the procurement and operations of components for Apple products, primarily semiconductors ranging from off-the-shelf components to highly customized products that Apple develops internally or develops with its third-party partners.  By virtue of my responsibilities at Apple, I am familiar with manufacturing and supply chain issues associated with the production of Apple Watch.

3.   I am informed that AliveCor, Inc. has brought an action against Apple for patent infringement, and that AliveCor is seeking to exclude from importation into the United States several generations of Apple Watch that include the Irregular Rhythm Notification ("IRN"), electrocardiogram ("ECG") App, and High Heart Rate Notification ("HHRN") functionality.

4.   Below I address the challenges that would arise in trying to quickly ramp up production of Apple Watch, a product that according to independent reporting agency IDC has

1

CONFIDENTIAL MATERIAL REDACTED
**CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE
ORDER**

avoid excess capacity. While Apple will always do its best to satisfy its customers, our production system is not set up to quickly and easily satisfy a large, unanticipated increase in demand. Other consumer electronics companies follow this same operating model and face the same constraints.

7. Apple's contract manufacturers for Apple Watch are based in ███████████ ████████ Apple's component suppliers for Apple Watch are located ███████████ ████████████████████████ Apple's supply chain, as well as the supply chains of virtually all companies currently manufacturing consumer electronic products, faces many risks, including a well-documented global semiconductor shortage since 2020, COVID-19 lockdowns and other challenges in China and other countries, and delays in procuring integrated circuits and other components necessary to manufacture electronic devices, including as Apple Watch. Because of the current conditions, demand greatly exceeds supply. Apple does its best to mitigate supply chain problems as they arise, though it is not always possible or economical to diversify and mitigate all risks. For example, Apple could ████████ ████████████████████ in a short time period. Moreover, holding capacity open is not economically viable for Apple's suppliers and contract manufacturers, so they are not sitting on excess capacity sufficient to switch a high percentage of Apple's business overnight.

8. My understanding from public sources is that Apple's competitors, including their suppliers and contract manufacturers, are all facing the same problems and risks in the current environment, causing backlogs and delays in meeting demand.[2] In the current environment, I estimate that it would take ████████████████████ in capacity for Apple Watch, for several reasons. First, our suppliers and contract manufacturers would need

---

[2] *See, e.g.*, https://arstechnica.netblogpro.com/gadgets/2021/11/components-shortage-sends-smartphone-market-into-decline/;
https://www.theregister.com/2022/04/14/semiconductor_lead_times/;
https://epicapplications.com/the-chip-shortage-has-gone-from-bad-to-worse/;
https://www.cnbc.com/2022/04/29/semiconductor-shortage-intel-ceo-says-chip-crunch-to-last-into-2024.html; https://asia.nikkei.com/Business/Tech/Semiconductors/Chip-industry-s-expansion-plans-at-risk-as-equipment-delays-grow; https://www.wsj.com/articles/tsmc-warns-of-tight-production-capacity-prolonging-chip-shortage-11649935181.

CONFIDENTIAL MATERIAL REDACTED
**CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER**

to install new equipment, including assembly equipment, robotics equipment, and test equipment, all of which require semiconductors. The global and historic semiconductor shortage would make acquiring such equipment difficult, time-consuming, and expensive. Apple is currently experiencing lead times for new equipment purchases that range anywhere from ███████████████ at our assembly sites.[3] The entire supply chain, including all of the part numbers and components, display modules, batteries, etc., would have to scale up as well. Semiconductor lead times themselves can be 26 weeks or longer, even if the manufacturing capacity exists.[4]   Second, COVID-related shutdowns have led to supply shortages across a number of industries. Third, even without supply chain problems, it still takes time to manufacture components. Many components take weeks, if not months, to manufacture.

9.   These delays kick in at the point Apple knows it needs to increase capacity, but capacity forecasting █████████████. For example, ████████████ ████████████████████████

10.   As mentioned above, the current United States sales of Apple Watch is over █ ████████ a year, and Apple is planning on an increase of ████████████ ███ Given the business model and supply constraints I just described, which are common to the entire industry, and given the substantial and growing U.S. sales of Apple Watch, I estimate that it would take significant effort and time, on the order of at least twelve months or more, for competitors to scale production of existing products to anything near the volume of product needed to replace Apple Watch in the United States upon the type of wholesale exclusion of the Apple Watch contemplated in this action. It very likely would take them even longer to launch entirely new products in comparable volumes, because of the complex supply factors such as component lead time and chip scarcity which I have outlined above that further impact ramping up volume production.



---

[3] *See, e.g.*, APL—ALIVE_00352994; APL-ALIVE_00353005-3034; APL-ALIVE_00353035-3040; APL-ALIVE_00353064-3075; APL-ALIVE_00353077; APL-ALIVE_00353095; APL-ALIVE_00353096; APL-ALIVE_00353097; APL-ALIVE_0000353116; APL-ALIVE_003533118; APL-ALIVE_003533132.
[4] *See, e.g.*, https://www.theregister.com/2022/04/14/semiconductor_lead_times/

Appx1585-2478 REMOVED DUE TO CONFIDENTIAL MATERIAL

CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

# Exhibit 5

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the International Trade Commission**

| |
|---|
| **In the Matter of** |
| **CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** |

**Inv. No. 337-TA-1266**

**<u>DECLARATION OF CHRISTIAN DIPPON, PH.D.</u>**

1.    My name is Christian Dippon. I am over 21 years of age, of sound mind, and make this declaration based upon my experience, training, and knowledge, as described below. Apple Inc. (Apple or Respondent) retained me to examine the ramifications on the statutory public interest factors if the International Trade Commission (ITC) approves AliveCor Inc.'s (AliveCor or Complainant) requested exclusion or cease and desist orders pertaining to the importation of Apple Watches with electrocardiogram (ECG) app, irregular rhythm notification (IRN), and High Heart Rate Notification (HHRN) (Accused Functionalities).[1]

2.    I am an economist and a Managing Director at the Washington, DC, office of NERA Economic Consulting (NERA), where I also serve as Chair of the Global Energy, Environment, Communications, and Infrastructure Practice and a member of its Board of Directors. I have specialized in complex litigation, competition, and regulatory matters in the communications, internet, and high-tech sectors for over 26 years. I hold a Doctor of

---

[1] Respondent Apple's Public Interest Statement, *In the Matter of Certain Wearable Electronic Devices with ECG Functionality and Components Thereof,* Inv. No. 337-TA-1266, July 27, 2022, pp. 1, 3–4.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

### B.    Apple Is a Technology Company that Focuses on Consumer Electronics

10.    Apple is a multinational technology company based in California that "designs, manufactures and markets smartphones, personal computers, tablets, wearables and accessories, and sells a variety of related services."[12] It is a California corporation established in 1977.[13]

11.    Apple offers multiple product lines, including iPhone, iPad, and Apple Watch. At issue in the present matter are certain models of the Apple Watch. Apple is a leading company in wearable watches and fitness trackers. Since the commercial release of the Apple Watch in 2015, the device has "grown to become the world's most popular smartwatch."[14] As shown in Table 1, third-party research indicates that US retailers have imported far more Apple Watches (with and without the Accused Functionalities) than any other smartwatch or fitness tracker brand.

#### Table 1: Smartwatch and Fitness Tracker Shipments in the United States (2015–2021)

| Company | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---------|------|------|------|------|------|------|------|
| | | | | (millions) | | | |
| Apple | 5.0 | 5.4 | 9.5 | 12.9 | 14.0 | 19.7 | 14.4 |
| Fitbit (Google) | 13.9 | 14.6 | 9.1 | 7.4 | 8.4 | 6.8 | 7.2 |
| Samsung | 0.9 | 1.9 | 1.6 | 2.1 | 3.0 | 2.6 | 3.8 |
| Garmin | 2.6 | 2.6 | 2.3 | 1.9 | 2.1 | 2.2 | 2.1 |
| Fossil | 0.0 | 0.6 | 2.3 | 2.0 | 1.6 | 0.8 | 1.1 |
| Zepp | 0.0 | 0.0 | 0.1 | 0.4 | 0.3 | 0.4 | 0.9 |
| Others | 3.7 | 4.6 | 4.4 | 2.0 | 2.8 | 1.7 | 1.7 |

Note: Google acquired Fitbit in January 2021. This data is provided by third party research entity IDC, who quantifies shipments in the "Watch" and "Wrist Band" subcategories of "Basic Wearable" and the "Watch" subcategory of "Smart Wearable," from which this Table is derived. I do not have an opinion on the categories used by IDC to compile this data. "Others" includes all smartwatch OEMs with a share of 2.5 percent of less in 2021. Fitbit (Google) includes shipments for Fitbit from 2015–2021, and for Pebble and Vector from 2015–2017. Fossil includes shipments from the brands Fossil, Michael Kors, Kate Spade, and others. Zepp includes shipments from the brands Zepp and Amazfit.

---

[12] [APL-ALIVE_00354401-770] Apple 10-K, 2020, Part I.

[13] Ibid.

[14] [APL-ALIVE_00354472-4] Lisa Eadiciccio, "Apple says products like the Apple Watch and AirPods are doing so well, its wearables business is as big as a Fortune 200 company," *Insider*, April 30, 2019, https://www.businessinsider.com/apple-q2-2019-earnings-apple-watch-airpods-sales-2019-4.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

difficult for consumers, including businesses, to access these services.[41]

The Commission highlighted "the fast-moving nature of this market and technology," and its objective to "promote innovation and enhance competitive conditions in the United States."[42]

## II.    THE EXCLUSION OF APPLE WATCHES WOULD RESULT IN HARM ON SEVERAL METRICS OF CONSUMER WELFARE

22.    A ban on Apple Watches with ECG app, IRN, and HHRN would inflict harm because US consumers would no longer be able to purchase the Apple Watch Series 8, the Apple Watch Ultra, or any future Apple Watches with these functionalities. They would also likely face higher prices for the smartwatches they ultimately buy. I quantify each of these public interest harms by calculating the approximate consumer surplus losses they would inflict on US consumers.

### A.    Banning the Most Popular Smartwatches Would Harm US Consumers

23.    Granting the recommended remedial orders would result in a diminution of smartwatch choices. Although exclusions necessarily reduce consumer choice sets, banning Apple Watches with ECG app, IRN, and HHRN would not remove just any smartwatch but *the most popular and innovative smartwatches in the United States.*

24.    US retailers acquire far more Apple Watches for sale to consumers than any other smartwatch or fitness tracker. As summarized in Table 3, the most recent data available on smartwatch and fitness tracker shipments reveal that Apple Watches (with and without the Accused Functionalities) represent 46 percent of all shipments into the United States.

---

[41] Ibid.
[42] Ibid, pp. 151–152.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

With approximately one out of four shipments, Fitbit is the second most popular smartwatch/fitness tracker brand. Samsung is the third most popular smartwatch/fitness tracker brand.

### Table 3: US Smartwatch and Fitness Tracker Shipment Shares by OEM (2021)

| Company | 2021 Shares |
|---|---|
| | --(percent)-- |
| Apple | 46.1 |
| Google (Fitbit) | 22.9 |
| Samsung | 12.1 |
| Garmin | 6.9 |
| Fossil | 3.5 |
| Zepp | 2.9 |
| Others | 5.5 |
| **Total** | **100.0** |

Note: Google acquired Fitbit in January 2021. This data is provided by third party research entity IDC, who quantifies shipments in the "Watch" and "Wrist Band" subcategories of "Basic Wearable" and the "Watch" subcategory of "Smart Wearable," from which this Table is derived. "Others" includes all smartwatch OEMs with a share of 2.5 percent or less. Fossil includes shipments from the brands Fossil, Michael Kors, Kate Spade, and others. Zepp includes shipments from the brands Zepp and Amazfit.
Source: [APL-ALIVE_00354600] IDC, "IDC Quarterly Wearable Tracker, 2022 Q1 Final Historical," June 1, 2022, Tab "Historical Data"; [APL-ALIVE_00354215-7] Rick Osterloh, "Google completes Fitbit acquisition," Google, January 14, 2021, https://blog.google/products/devices-services/fitbit-acquisition/.

25.     The recommended Apple Watch ban would result in a substantial immediate reduction of the available smartwatches/fitness trackers in the United States. As shown in Table 4, in 2021, 14.4 million Apple Watches were imported into the United States. Market research data indicate that of these 70.9 percent are Apple Watches containing the Accused Functionalities.[43] Consequently, an exclusion order or a cease and desist order would diminish smartwatch availability by some 10.2 million devices each year.[44]

---

[43] See Appendix E, Tab "2021 Shipments by Watch Type," Cell G9.
[44] 14.4 million x 0.709=10.2 million.

CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

# Exhibit 6

**Before the U.S. International Trade Commission**

| |
|---|
| **In the Matter of**<br><br>**CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** |

Investigation No. 337-TA-1266

**Declaration of Michael A.M. Davies**
**Concerning the Public Interest**
**October 6, 2022**

1

**QUALIFICATIONS**

1.      My name is Michael A.M. Davies. I am over 21 years of age, of sound mind, and make this declaration based upon my expertise, experience, research, and knowledge, as described below. My educational background, including my specialist expertise and relevant experience, is set out in detail in my curriculum vitae, which is attached to this report as Exhibit A.

2.      I hold a Master of Arts degree in computer science, engineering, physics, and mathematics; a Master of Engineering focusing on robotics, cybernetics (artificial intelligence), and microelectronics; and a Masters of Business Administration (with Distinction) with a specialization in technology, innovation, and strategy. I have worked in various roles during my career—as an engineer, an executive, an entrepreneur in technology businesses, and an expert witness.

3.      I currently lead Endeavour Partners, which I founded. Endeavour Partners advises firms on technology, innovation, business strategy, and public policy issues.

4.      For the last 15 years, I also have taught on these and related topics at Massachusetts Institute of Technology (MIT) and London Business School. I am a Senior Lecturer at MIT, and at London Business School I serve as a guest lecturer.

5.      Relevant to this Investigation, I was a co-founder, executive, and board member of Zero-360 from 2012 to 2015. Zero-360 developed next-generation wearable devices with bio-sensing capabilities. Zero-360's platform was designed to integrate with both in-house and third-party wellness programs with the objective of detecting adverse events and capturing valuable health data to drive behavioral changes and motivate improved health outcomes.

6.      Additionally, I am a Co-Founder and was the Chief Technology Officer of EquuSys, an animal instrumentation company whose products provide real-time, real-world data to enhance the evaluation, diagnosis, rehabilitation, training, and conditioning of animals, with a focus on elite horses. As CTO, I led the development of the company's hardware electronics sensor product and the accompanying software

2

curtail manufacturers' ability to increase production in the event of a sudden and catastrophic shortfall resulting from the exclusion of the Accused Products. Based on the latest data available, and my expert opinion, these supply chain bottlenecks are expected to continue at least through 2024.[37,38]

32. These global supply chain constraints have impacted Apple. As detailed below in paragraph 45, Apple has internally published changes to production numbers due to shortages of TSMC silicon that Apple relies upon for current models of the Apple Watch. Apple's expected product shortages are on the order of tens of millions according to these documents.

33. Similar global supply chain constraints have also affected Samsung. In 2021, Business Insider quoted Samsung Electronics CEO Koh Dong-jin saying, "It could be a burden to unveil two flagship models in a year," due to the ongoing shortage of silicon chips that were required for producing Samsung mobile devices. Dong-jin also cited a "serious imbalance in supply and demand of chips in the IT sector globally" as a major issue for Samsung.[39]

**INABILITY TO REPLACE ACCUSED DEVICES**

34. Given current global manufacturing conditions, my expert opinion is that other suppliers could not replace the Accused Devices, were they excluded, in a commercially reasonable time.

35. As an initial matter, the Accused Products are only one of two smartwatch providers that offer both ECG app and IRN on a single device—the other being certain Fitbit models. These two features on the Accused Products are the first two "software as a medical device" (SaMD) features to receive FDA approval for use on a single smartwatch. Indeed, as I understand it, these two features resulted

---

[37] APL-ALIVE_00353509

[38] APL-ALIVE_00353262

[39] APL-ALIVE_00353201

in the FDA establishing two new categories of medical devices, one for ECG app and the other for IRN.[40] Having both an ECG app and IRN on a single device provides two separate, independent medical devices on Apple Watch that allow users to monitor their cardiac activity for atrial fibrillation (AFib), the most common heart arrhythmia that can result in stroke, heart attack, and possibly death. Indeed, as I explain further below, the Accused Products are crucial to public health; they have been credited with saving many lives through these and other health features.

36.     The Accused Devices are heavily in demand in the United States. In 2021 alone, U.S. consumers bought more than 14 million of the Accused Apple Watches. And when U.S. consumers who own or intend to own a smartwatch are asked which functions are "must-haves," over 70% cite one or more of the following: call emergency services, list emergency contacts, count steps, detect an irregular heart rhythm, and call for help in the event of a fall.[41] Notably, most of these relate to the "life-saving" features of the Accused Devices.

37.     The Accused Devices represent a very substantial portion of the smartwatch and wearable categories. According to data reported by third-party market research firm IDC, the Accused Devices represent a total of more than 10 million ECG-enabled units shipped by Apple in 2021.[42]

38.     The only other company that offers devices with similar FDA-authorized SaMDs ECG App and IRN functionality is Fitbit. But Fitbit could not replace the gap left if the Accused Devices were excluded. In fact, Fitbit shipped fewer than half a

---

[40] Declaration of Erika Lietzan, October 5, 2022, ¶9.

[41] APL-ALIVE_00356474, at – 88.

[42] APL-ALIVE_00356473; IDC reports this as 10,230,566. This declaration relies on third-party research data about sales of smartwatches. Such data vary both by product definitions and by time periods. IDC uses its own definition of products and shipments. I did not undertake any analysis that would be relevant to market concentration, market definition, or any antitrust considerations.

million ECG watches in 2021.[43] Thus, for Fitbit to make up the gap left if the Accused Devices were excluded, the company would have to increase its output of ECG watches many times over. More specific calculations on this are provided below. Suffice it to say, it is highly unlikely that Fitbit or any other vendor could accomplish such a significant increase in a commercially reasonable time due to design challenges and the ongoing supply chain crisis.

39.     Smartwatches are extraordinarily complex products with highly integral designs, containing many components and inter-dependencies.[44] It is industry practice these days for components to be custom-designed and produced for a specific device. As a result, even under normal market conditions, it would be extraordinarily challenging for wearable and smartwatch vendors to quickly replace the sudden exclusion of millions of Apple Watches in the United States.

40.     The availability of smartwatches (and all electronic devices for that matter) depends on a highly complex global supply chain. These are complex, state-of-the-art, highly integrated devices in which a combination of computing power, touch screen interaction, RF connectivity, and sophisticated sensors must all be assembled within an extremely small and mechanically robust package.

41.     Production of the Apple Watch demonstrates this; it requires a significant number of custom parts and advanced manufacturing technologies to achieve the required combination of functionality, battery life, and sensing capabilities. Apple faces and addresses these complexities on an enormous scale. Any vendor competing in the smartwatch space will have to do the same.

---

[43] APL-ALIVE_00356473; IDC reports this as 352,310 units. This declaration relies on third-party research data about sales of smartwatches. Such data vary both by product definitions and by time periods. IDC uses its own definition of products and shipments. I did not undertake any analysis that would be relevant to market concentration, market definition, or any antitrust considerations.

[44] Karl Ulrich, "The Role of Product Architecture in the Manufacturing Firm," Massachusetts Institute of Technology, October 1992, p. 5.

in the FDA establishing two new categories of medical devices, one for ECG app and the other for IRN.[40] Having both an ECG app and IRN on a single device provides two separate, independent medical devices on Apple Watch that allow users to monitor their cardiac activity for atrial fibrillation (AFib), the most common heart arrhythmia that can result in stroke, heart attack, and possibly death. Indeed, as I explain further below, the Accused Products are crucial to public health; they have been credited with saving many lives through these and other health features.

36.   The Accused Devices are heavily in demand in the United States. In 2021 alone, U.S. consumers bought more than 14 million of the Accused Apple Watches. And when U.S. consumers who own or intend to own a smartwatch are asked which functions are "must-haves," over 70% cite one or more of the following: call emergency services, list emergency contacts, count steps, detect an irregular heart rhythm, and call for help in the event of a fall.[41] Notably, most of these relate to the "life-saving" features of the Accused Devices.

37.   The Accused Devices represent a very substantial portion of the smartwatch and wearable categories. According to data reported by third-party market research firm IDC, the Accused Devices represent a total of more than 10 million ECG-enabled units shipped by Apple in 2021.[42]

38.   The only other company that offers devices with similar FDA-authorized SaMDs ECG App and IRN functionality is Fitbit. But Fitbit could not replace the gap left if the Accused Devices were excluded. In fact, Fitbit shipped fewer than half a

---

[40] Declaration of Erika Lietzan, October 5, 2022, ¶9.

[41] APL-ALIVE_00356474, at – 88.

[42] APL-ALIVE_00356473; IDC reports this as 10,230,566. This declaration relies on third-party research data about sales of smartwatches. Such data vary both by product definitions and by time periods. IDC uses its own definition of products and shipments. I did not undertake any analysis that would be relevant to market concentration, market definition, or any antitrust considerations.

like and IRN-like SaMDs, that could take another two years (or longer).[51]  In addition to Apple Watch, only Fitbit's Sense and Charge 5 have obtained these clearances for a product that contains both FDA-authorized ECG and IRN-like features.[52]

49.    Even if the obstacles I have detailed above were non-existent and sufficient numbers of comparable smartwatches appeared immediately upon the enactment of the Recommended Remedies, I believe those remedies would still not be in the public interest. They would have a significant negative impact on public health, welfare, and consumers in the United States.

50.    Indeed, Fitbit—the only other device that offers similar FDA-authorized features—is based on a different operating system than Apple Watch and does not have the host of other features available on the Accused Apple Watches.

51.    To illustrate the point, just relating to the ECG app feature, in 2021, Apple Watches that also include ECG capability led that category of smartwatch sales in the United States, selling more than ten million units (10,230,566). The next largest vendor, Samsung, sold fewer than four million units (3,707,730), according to data from industry analyst IDC.[53]  If the Recommended Remedies were enacted and all new ECG-enabled Apple Watches were forced from the U.S., Samsung would need to produce nearly 14 million (13,938,296) ECG-enabled smartwatches—an increase of more than ten million units, representing a 375% increase in production—to make up for the sudden shortfall in supply.[54] And those numbers

---

[51] Declaration of Erika Lietzan, October 5, 2022, ¶10, ¶25.

[52] Declaration of Erika Lietzan, October 5, 2022, ¶21.

[53] APL-ALIVE_00356473. This report relies on third-party research data about sales of smartwatches. Such data vary both by product definitions and by time periods. IDC uses its own definition of products and shipments. I did not undertake any analysis that would be relevant to market concentration, market definition, or any antitrust considerations.

[54] APL-ALIVE_00356473. This report relies on third-party research data about sales of smartwatches. Such data vary both by product definitions and by time periods. IDC uses its own definition of products and shipments. I did not undertake any analysis that would be relevant to market concentration, market definition, or any antitrust considerations.

do not factor in the likely increase in demand that looms in the future, as these products continue to add new and improved features. In addition, Samsung does not offer *any* product that also includes IRN-like capabilities.

52.     In 2021, Fitbit shipped fewer than half a million devices with ECG capability, according to IDC.[55] By comparison, the Accused Apple Watches, which have ECG functionality, shipped more than ten million in the same period.[56] If the Recommended Remedies were enacted, Fitbit would have to increase production more than twenty-fold to address the sudden void created by removing the Accused Apple Watches from the U.S. And not all ECG-enabled Fitbit devices also include an IRN-like feature.

53.     Given the volume of Accused Devices sold annually, millions of prospective U.S. buyers would be denied a product that provides potentially life-saving features. As noted above, statements from experts Dr. Rosalind Picard and Professor Erika Lietzan indicate manufacturers would take years to develop prototypes capable of being tested by the FDA.[57] The Recommended Remedies, therefore, would result in a massive, immediate, and long-lasting shortfall of these devices.

54.     In addition, vendors would be unable to manufacture and sell enough devices— either immediately or over the next two years—to replace the Accused Devices because the existing global supply chain constraints they face are insurmountable.

55.     In the event of an exclusion order, there is no realistic prospect that manufacturing and supply of alternative smartwatches—on the scale and in the timeframe required by the impact of the Recommended Remedies—could expand sufficiently within a commercially reasonable time to address the effect of the massive, immediate, and long-lasting shortfall in supply.

---

[55] 352,310 units, *ibid.*

[56] 10,230,566 units, *ibid.*

[57] Declaration of Erika Lietzan, October 5, 2022, ¶10.

56. Further, few if any components that would otherwise have gone into the Accused Devices that would have been distributed in the United States would become available to other smartwatch vendors. This is due to the extremely custom and integral nature of the components of the Accused Devices.

57. These obstacles make it nearly impossible for others to replace, in a commercially reasonable time, the gap left upon the sudden and complete exclusion of Apple Watch with ECG app and IRN from the United States resulting from an exclusion order.

### THE ACCUSED DEVICES PROVIDE IMPORTANT HEALTH AND FITNESS BENEFITS THAT MANY AMERICANS RELY ON

58. While smartwatches offer many tools for everyday living, which can contribute to their desirability, an overwhelming majority of users also rely on their wearable devices to monitor and improve their health and fitness.[58,59]

59. Smartwatches offer several health benefits. Some can monitor a wide variety of bodily functions, such as blood pressure, sleep apnea, heartrate, glucose levels, and fertility cycles. By recording their posture and breathing, users can learn to deepen their meditation practice. The National Institutes of Health (NIH) has identified the health benefits of smartwatches, noting:

---

[58] APL-ALIVE_00356474, at – 88 (users responding to research questionnaire collectively listed seven categories of "must-have" features to consider when purchasing a smartwatch: productivity, messaging, notifications, health, wellness, connectivity, and guidance features.").

[59] APL-ALIVE_00353847. In a commissioned survey carried out by Qualtrics in March 2022, 92% of those respondents who regularly wear a smartwatch or fitness tracker reported that they do so for health reasons or to track their fitness.

> They offer a convenient way to monitor, store, and share health information in real-time... provide feedback to users to make appropriate changes to their daily routines or behavior... facilitate remote patient monitoring and provide proactive and faster data access to physicians, resulting in improved health outcomes and reduced number of physician visits... [Smartwatches are] particularly useful for patients with chronic conditions, patients with cardiovascular risks, and elderly populations.[60]

60.  The NIH concludes that wearable devices can significantly improve healthcare delivery and reduce costs.[61]

61.  Improving lives is an enormous win for consumers. Saving lives is a benefit of a whole other magnitude. The Accused Devices have many potentially lifesaving features that would largely be denied to U.S. consumers in the event of an exclusion order. The proprietary, FDA-authorized ECG app and IRN features referenced above and discussed in more detail below were developed entirely in-house at Apple over many years of work.[62] ECG app and IRN allow users to monitor their heart health. IRN monitors a user's heart rhythm and will notify the user of irregular heartbeats suggestive of anomalies such as AFib, which often goes undetected because of the lack of clear symptoms. Apple's IRN warnings have undoubtedly saved many lives: IRN runs in the background, so by simply wearing one of the Accused Devices a user might be alerted to a heart problem they would otherwise not know they had. In a study carried out by Stanford, IRN on Apple Watch alerted thousands of the 400,000 participants that they were experiencing an irregular heart rhythm. Those participants were able to seek medical attention they would not have sought otherwise.[63] Accused Devices have brought these life-saving, health-monitoring applications to millions of consumers

---

[60] APL-ALIVE_00353429

[61] APL-ALIVE_00353429

[62] Tr. (Waydo) at 738:6-746:2

[63] APL-ALIVE_00353233; APL-ALIVE_00353502

who would not have used a stand-alone product, or otherwise actively monitored—or in some cases even been aware of—their conditions.

62. Similarly, ECG app has also undoubtedly saved many lives. ECG app allows a user to take a single-lead ECG on demand, at any time the user wants. Some may do so when they are feeling symptoms such as a rapid or skipped heartbeat, or simply out of general concerns about their health.[64] Indeed, Apple has received hundreds of accounts and tracked dozens of news reports regarding how Apple Watch's various health-monitoring features have saved lives, including from ECG app and separately from IRN.[65]

63. The Accused Devices have additional lifesaving capabilities. In an emergency, users can access lifesaving services by calling for help and providing location tracking. In one instance, a man was swept far out to sea while paddle-boarding. He used his Apple Watch's SOS feature to call emergency services and was rescued.[66] When caught in a cold, flooding river, a woman's foot became trapped between rocks; she was saved by making the same Apple Watch SOS call.[67] Indeed, the latest generations of Apple Watch (Series 8 and Ultra) have an additional lifesaving feature called crash detection, which initiates a phone call to emergency services 20 seconds after impact, unless canceled. The watches of unresponsive owners will inform emergency services and provide the watch owner's latitudinal and longitudinal coordinates, along with essential information about their health such as blood type, allergies, and current medications through Apple's Medical ID.[68]

---

[64] APL-ALIVE_00353162

[65] Declaration of Sumbul Desai, October 5, 2022, ¶20.

[66] APL-ALIVE_00353247

[67] APL-ALIVE_00353338

[68] APL-ALIVE_00353161

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER*

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| In the Matter of | |
|---|---|
| **CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** | Inv. No. 337-TA-1266 |

**RESPONDENT APPLE INC.'S REPLY BRIEF
TO ALIVECOR AND OUII'S RESPONSE TO THE COMMISSION'S REQUEST FOR
WRITTEN SUBMISSIONS ON THE ISSUES UNDER REVIEW AND ON REMEDY,
THE PUBLIC INTEREST, AND BONDING**

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

many non-accused features of Apple Watch such as crash detection, fall detection, and SOS calling. Consequently, there will be consumers who will suffer serious complications—including failure to detect AFib, and potential stroke and death—if they cannot choose the accused Apple Watches.

AliverCor waves off this incredible risk of death as irrelevant by alleging that other products "offer functionalities that are comparable to every aspect" of the Accused Products, "[a]lone or in combination." CIS at 47. But these other products must "serve as viable substitutes" for the excluded products *with respect to their effect* on the public interest. *Certain Pers. Data Devices*, Inv. No. 337-TA-710, Comm'n Op., 2011 WL 12488979, at *39 (Dec. 29, 2011). None of the products AliveCor identifies could counteract the negative impacts of exclusion on consumers and public health.[18] And no product, existing or under development, could prevent that harm given the time required to develop and produce sufficient units to replace the millions of accused Apple Watches.

### 1. The products cited as alternatives by AliveCor and Staff are unsuitable as alternatives for purposes of addressing the public health harms.

A suitable alternative for purposes of remedying the harm from exclusion would: (1) be a wearable device; (2) include ECG, IRN, and HHRN features; and (3) be FDA-cleared for both ECG and IRN. RIS at 54-55. These features separately and together provide significant public health benefits, and a product without all three cannot avert the substantial harm that will be caused by exclusion of Apple Watch. Only a consistently worn device offering the combination of high-quality cardiac features with clinical-level accuracy delivers life-saving heart health benefits. And any alternative device must actually be available in the U.S.—if not now, within a commercially reasonable time frame. Almost all of the alternative products held up by AliveCor fall short of one or more of these criteria.

---

[18] AliveCor and Staff dismiss Apple's public interest arguments, including the lack of suitable alternatives for public interest purposes, as "speculative" and "unsupported." SIS at 15, 18; CIS at 50, 61 n.49. That misplaced criticism shows neither has seriously considered the real public interest harms posed by an exclusion order. Because the Commission declined to delegate consideration of the public interest to the ALJ in this Investigation (notably, AliveCor opposed Apple's delegation request, *see* EDIS No. 741952 at 5), the public interest record is only now being developed. The absence of suitable alternatives, and the impossibility of sufficient increases in production of actual or hypothetical alternatives, has now been definitively established by Apple. RIS at 53-61.

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

**a.** Many of the products AliveCor and Staff point to as alternatives have ECG capability but not IRN. FDA-cleared versions of both of these independent yet complementary features on a single device are necessary to prevent harm to the public interest. This is so because while ECG app offers health benefits to individuals who are already aware that they may suffer from AFib, or who experience symptoms causing them to suspect a heart condition and take an ECG, IRN can be life-saving for an entirely different set of users: those entirely unaware of a serious underlying heart condition.

For this reason, no Samsung product cited by AliveCor is a suitable alternative for public interest purposes. Despite AliveCor's misleading claims that the Galaxy Watch 3-5 and Active 2 "provide continuous heartrate monitoring" with PPG "that detects and keeps track of heart rate and heart rate changes in the background," CIS at 45, and "allows users to monitor for abnormal or irregular heart rhythm," SIS at 13, not a single Samsung product is FDA-cleared to continuously monitor for irregular heart rhythms suggesting potential AFib. The PPG-based monitoring referenced by AliveCor is simply a heart rate display typical of the most basic fitness trackers, plus a feature somewhat comparable to HHRN that notifies users of abnormally high or low heart rate. *See Monitor your heart rate on your Samsung smart watch*, Samsung, https://tinyurl.com/mr297knn. Its heart rate variability capabilities are limited to informing its stress tracking tool. Angela Moscaritolo, *Samsung Galaxy Watch 5 Review*, PC Mag (Aug. 17, 2022), https://tinyurl.com/2skmpxh8. That is a far cry from IRN, an FDA-cleared SaMD that, in the background, monitors the degree and pattern of variability of the user's heart rate and classifies it as either irregular or not. *See* RX-177C; Tr. (Waydo) at 756:7-759:7. If enough of those readings are irregular within a certain time window, IRN announces that their "heart has shown signs of an irregular rhythm suggestive of atrial fibrillation" and suggests they "talk to [a] doctor" if they have not been previous diagnosed with AFib. Tr. (Waydo) at 763:10-16; RX-177C.23. A simple high heart rate notification—a non-FDA-cleared feature—does not inform the user of the potential for AFib or instruct them to seek further medical care.[19]

---

[19] Samsung's smartwatches are especially unattractive to many consumers because optimizing their health features requires pairing with a Samsung Galaxy phone. Kaitlyn Cimino, *The Samsung Galaxy Watch 4 has a few limitations you should know about*, Android Authority (Feb. 19, 2022), https://tinyurl.com/3d3ryccx.

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

Google's just-announced Pixel Watch also falls short. While the Pixel has an ECG feature, it lacks both IRN *and* HHRN features—along with other health and wellness features such as fall detection, blood oxygen monitoring, and temperature sensing. And its ECG feature has failed to impress: One reviewer noted that it returned inconclusive results up to half the time. Kaitlyn Cimino, *Google Pixel Watch Fitbit features: What's there and what's missing*, Android Authority (Oct. 12, 2022), https://tinyurl.com/4pvewnhu. Another found even its basic heart rate readings inaccurate when directly compared with Apple Watch. Brian X. Chen, *The Google Watch is Here. But You'd Better Love Android.*, N.Y. Times (Oct. 12, 2022), https://tinyurl.com/5b5wcce9.

The Withings ScanWatch and Prevention circul+ also cannot avert the public interest harms. Prevention's circul+, which fits around the finger like a ring and has ECG but not IRN functionality, is too bulky to be worn continuously and has such limited functionality that it does not even display the time.[20] *See* Taylor Fischetto & Nicol Natale, *Introducing the NEW Prevention circul+ Ring*, Prevention (Oct. 19, 2021), https://tinyurl.com/3nsr9x4u (listing features); Michael Sawh, *Prevention Circul+ smart ring review*, Wareable (May 6, 2022), https://tinyurl.com/2p9fchhb (criticizing circul+ as "chunky"); Matthew Miller, *Prevention Circul Plus review*, ZD Net (Mar. 16, 2022), https://tinyurl.com/ydhuksee (cannot bend finger while wearing circul+). And the Withings ScanWatch has a prescription-only ECG feature integrated into an analog watch face. *ScanWatch*, Withings, https://tinyurl.com/mwmrcbxw. This niche, French-made product targets users who want a wearable ECG reader without any smartwatch trappings, lacks IRN and HHRN, and shipped only 1,621 units to the U.S. in 2021. *Id*; RIS Ex. 5 (Dippon Decl.) ¶ 57 & n.80.

Nor can AliveCor's handheld standalone ECG products serve as suitable alternatives for the public interest. Beyond lacking any sort of IRN-like feature, AliveCor's KardiaMobile and KardiaMobile Card are not smartwatches or even wearable devices, hindering their ability to supply an ECG reading when a user may need it the most—while on the go. The limited utility of these products is reflected in limited

---

[20] Staff also highlight the OuraRing as an alternative. SIS at 14. While more likely than the circul+ to be worn continuously, the OuraRing is not FDA-cleared for either ECG *or* IRN, and provides users with no notifications, just simple heart rate and heart rate variability information on a paired smartphone app. *See* Michael Kummer, *Oura Ring vs. WHOOP hands-on review and comparison*, MK Media Group (Aug. 5, 2022), https://tinyurl.com/2p9aufcd.

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER*

demand: AliveCor sold just ███████ KardiaMobile and KardiaMobile 6L units in 2020, the most recent year for which data is available.  RIS Ex. 5 (Dippon Decl.) ¶ 59.  In contrast, Apple imported ███████ Apple Watches in 2021, of which ███████ are estimated to have the Accused Features.  *Id.* ¶ 25.

**b.**  A number of the proposed alternatives suffer from the inverse flaw: they offer an FDA-cleared IRN feature but not the ability to take an ECG.  These products are also unsuitable as alternatives to the Accused Products for the purpose of assessing public interest impacts.  Those users who are alerted to the possibility of AFib by IRN or have other reason to be concerned about their heart health would be unable to use the same device to take an ECG reading when they experience symptoms or otherwise feel the desire to check their heart rhythm.  Instead, they would be left wondering if they are out of rhythm, or be forced to purchase an additional product capable of taking an ECG.

Most Fitbit products fall into this category.  Fitbit's Versa, Luxe, and Inspire product lines offer an FDA-cleared version of IRN, but not ECG.  *See How to get these features*, Fitbit, https://tinyurl.com/3nbsj9ca.  Inspire and Luxe are simple fitness trackers without the "smart" features of Apple Watch.  *See Trackers*, Fitbit, https://tinyurl.com/mr3nv2jw.  The most sophisticated Versa model, Versa 4, has only limited ability to receive notifications and only limited ability to take calls and respond to messages, with no access to third-party apps.  *See* Colin Jenkins, *Fitbit Versa 4 review: the good, the bad, and the ugly*, Connect the Watts (Oct. 3, 2022), https://tinyurl.com/3ppdpe3r.

Apple Watch SE, described as a "bare-bones entry level smartwatch targeting those less interested in the health side" of wearables, lacks ECG app along with other important health and wellness features standard in the Accused Products, such as blood oxygen monitoring and temperature sensing.  Patrick O'Rourke, *Apple Watch SE (2022) is a modest upgrade to the budget smartwatch*, MobileSyrup (Sept. 16, 2022), https://tinyurl.com/yc8hr398.  Because Apple Watch SE lacks ECG app, it cannot stand in as a replacement device for accused Apple Watches with respect to counteracting the impact to public health.  Users who suspect they have AFib or experience symptoms would be unable to take an ECG using the SE, forcing them to purchase a separate device, take a trip to the emergency room (at which point symptoms may have subsided) or, worse, ignore their symptoms.  Indeed, Apple has received many letters

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

from users explaining that ECG app alone, or ECG app with IRN and/or HHRN, saved their lives. *See* RIS Ex. 8. Furthermore, only the accused Apple Watches, not SE, have received FDA emergency use authorization for telemedicine. *See* RIS Ex. 1 (Desai Decl.) ¶ 23.[21] And, contrary to AliveCor's blithe insinuations, CIS at 44, 46-47, the SE cannot simply be reprogrammed to pair with the long-defunct KardiaBand System. KBS, which was discontinued in 2019, was operating then with the Apple Watch Series 3 watchOS versions available at that time. Any effort to pair the defunct KBS with a current Apple Watch SE would very likely require substantial modifications in view of hardware and software differences. RIS Ex. 3 (Picard Decl.) ¶ 23.

**c.** A final category of products fail as suitable alternatives with respect to the public interest for the simple reason that they do not currently exist, nor is there evidence that they could exist in time to avert the public health impact of the exclusion of the accused Apple Watches.[22]

AliveCor asserts that Fossil "will be imminently releasing" an "ECG measurement and arrhythmia detection product[]." CIS at 51. As evidence, AliveCor points to Fossil's website, *see id.* n.25, which is devoid of any mention of any product, existing or hypothetical, that includes either ECG or IRN features. Fossil faces significant headwinds in bringing any ECG-enabled smartwatch to market. The product AliveCor links to and later references as a price comparison, *id.* at 68, the Fossil Hybrid HR, includes only a simple heart rate monitor allowing users to view their current, resting, and max heart rates. *Hybrid HR*, Fossil, https://tinyurl.com/4rknp328. Even that simple feature has been described as "inconsistent" and "unreliable." Jimmy Westenberg, *Fossil Hybrid HR review: Beautfui'y Flawed*, Android Authority (June 27, 2022), https://tinyurl.com/mph9yex7. And any future product ███████████████████████

---

[21] For these reasons, AliveCor's critique of Dr. Milani's and StopAfib.org's public comments as allegedly "belie[ving] that all Apple Watches containing one of the IRN, HHRN, or ECG features are slated to be excluded by the Commission," CIS at 53-55, is unfounded. These commenters understood that Apple Watches with no ECG functionality would not be excluded. *See* EDIS No. 776317 (Ochsner) ¶ 5; EDIS No. 776312 (StopAfib.org) at 1. They simply recognized that the continued availability of these products cannot compensate for the public health and welfare harms caused by excluding the Accused Products with two FDA-cleared SaMDs.

[22] What is more, none of these non-existent products has, or is predicted to have, both FDA-cleared ECG and IRN features—rendering them unsuitable alternatives on additional grounds.

**CONFIDENTIAL MATERIAL REDACTED**
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

███████ is speculative and almost certainly several years away from commercialization. ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

Garmin, a maker of high-end fitness and adventure-focused smartwatches, has conducted clinical testing on an ECG feature, *see* SIS at 13, but there is no indication that it has submitted application materials to FDA for an ECG SaMD, or that it has any IRN-type feature under development. *Contra* CIS at 51 n.25 (citing Garmin website devoid of mention of ECG). Garmin has not published the results of its clinical study, *see Electrocardiogram Clinical Validation Stu'y*, ClinicalTrials.gov, https://tinyurl.com/3fzraekc, and any future device Garmin might offer with FDA-cleared cardiac features is purely speculative. This future Garmin product with FDA-cleared features, which would need to be brought across the finish line to FDA clearance, may be years away. RIS at 58; RIS Ex. 2 (Lietzan Decl.) ¶ 10; RIS Ex. 3 (Picard Decl.) ¶ 47.

Oppo Watch, CIS at 46, a Chinese-made smartwatch with an ECG feature, is not offered in the U.S., nor is there any indication that Oppo intends to offer its Watch in the U.S. in the future. *See* Andy Boxall, *The O'po Watch is ve'y good, but it also makes me ve'y an.g'y*, Digital Trends (Dec. 9, 2020), https://tinyurl.com/2p8rwxa7.

Last, AliveCor points to its own and Apple's legacy products that have been discontinued—in most cases for several years—as alternatives capable of picking up the slack were the Accused Products to be excluded. There is no evidence indicating that an Apple Watch Series 3 paired with an AliveCor KardiaBand would be comparable to Apple's newer Watches. Yet AliveCor, CIS at 48, and Staff, SIS at 17, continue to argue that Apple's arrhythmia detection technology is inferior to AliveCor's. AliveCor relies on a statement by Dr. Topol that fails to identify the studies on which he based his opinion. EDIS

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

No. 776377 (Scripps) at 2. Staff point to an outdated study that compared the accuracy of ECG readings between the now-discontinued KBS and a previous version of ECG app on Apple Watch 4, which was discontinued in 2019. *See* Christopher Ford et al., *Comparison of 2 Smart Watch Algorithms for Detection of Atrial Fibrillation and the Benefit of Clinician Interpretation*, 8 J. Am. Coll. Cardiol. 782 (June 2022); Lisa Eadicicco, *Apple discontinued last year's Apple Watch Series 4*, Insider (Sept. 18, 2019), https://tinyurl.com/3z3y56p4. That is not a useful comparison. The study authors noted that the Apple Watch algorithm they tested was "still in its first generation" and posited that companies' algorithms improve the longer they are on the market. Ford, *supra*, at 789. Apple's ECG app has been available in the U.S. for over four years now, *see Apple Watch Series 4*, Apple Insider, https://tinyurl.com/4czye8sm, and since the study was conducted, Apple developed and launched ECG 2.0, which was FDA-cleared in October 2020, *Letter to Apple re: K201525*, FDA (Oct. 8, 2020), https://tinyurl.com/8m6sb6n9. KBS was only on the market from 2017 to 2019. Jonah Comstock, *AliveCor launches ECG-sensing Apple Watch strap, SmartRhythm app*, MobiHealthNews (Nov. 30, 2017), https://tinyurl.com/575z78ty; Dave Muoio, *AliveCor ends sales of KardiaBand, its ECG accessory for Apple Watches*, MobiHealthNews (Aug. 19, 2019), https://tinyurl.com/yjmck2h5.

Beyond that, Apple discontinued Watch Series 1 in 2018, Watch Series 2 in 2017, and Watch Series 3 in 2022. Given the prevalence of custom components, current supply chain constraints, and the logistical complexity of manufacturing smartwatches, Apple could not simply flip a switch to turn on a factory and start producing any of these products. *See* RIS Ex. 4 (Schafer Decl.) ¶¶ 5-8 (explaining manufacturing constraints and scaling). Nor could Apple repurpose existing production to produce Series 1-3 Watches, which require different components and may require modification to run the current version of watchOS. *See* Hartley Charlton, *Don't buy an Apple Watch Series 3 right now: It's about to be discontinued*, MacRumors (Sept. 1, 2022), https://tinyurl.com/a2hhv327 (watchOS 9 unsupported on Series 3); Zac Hall, *Apple Watch Series 1 and Series 3 will not update to watchOS7*, 9to5Mac (June 22, 2020), https://tinyurl.com/27b68pv3 (Series 1 and 2 run on unsupported watchOS 6).

Nor can AliveCor simply revive the KBS, which was discontinued three years ago. Putting aside

CONFIDENTIAL MATERIAL REDACTED
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER*

the software changes necessary to operate on current versions of the Apple Watch, it strains credulity to suggest that AliveCor could suddenly produce over ████ KBS units per year.  *See* CIS at 47.  AliveCor's only support for this outlandish statement is a citation to the general website for the logistics company ████ which lists the full business-to-business fulfillment capacity at its facility as ████ units per day. ██████████████████████████ There is no reason to believe that PCH could devote its entire production capacity to the KBS, nor that it could commence *any* production of the KBS within a commercially reasonable time frame.  The same supply chain constraints that continue to plague other electronics producers will impede manufacturing the KBS at sufficient volume to fill the gap left by the accused Apple Watches.  *See* RIS Ex. 6 (Davies Decl.) ¶¶ 16-33; RIS Ex. 4 (Schafer Decl.) ¶¶ 7-8.

### 2. The two products that offer comparable FDA-cleared cardiac features to the Accused Products in a wearable device cannot remedy the public health and welfare harms caused by exclusion.

Only two wearable devices available in the United States include HHRN and both FDA-cleared ECG and IRN capabilities: Fitbit's Charge 5 and Sense 2.  Nevertheless, these products cannot sufficiently compensate for the wide-ranging harms to the public interest that would ensue upon issuance of the requested remedy.  Putting aside that Fitbit could not increase production quickly enough address the sudden and significant shortfall that would occur, the Sense 2 and Charge 5 offer inferior cardiac and other wellness benefits compared to Apple Watch.[23]  More fundamentally, some purchasers who want to buy an Apple Watch will simply forego buying a smartwatch at all if the accused Apple Watches are excluded.  Inevitably, some of these individuals will have AFib that will not be detected or treated as early as a result.

The Charge 5 and Sense 2 lack multiple "smart" features.  Fitbit advertises the Charge 5 as a fitness tracker.  *See Trackers*, Fitbit, https://tinyurl.com/mr3nv2jw.  It is purchased for its ability to track sleep and exercise in a simple and budget-friendly package.  The newly-released Sense 2, while nominally a

---

[23] The Sense 2 and Charge 5 do not come close to the quality of Apple's cardiac features.  According to a recent independent study, Fitbit's devices are significantly less accurate than Apple Watch at estimating heart rate parameters.  RIS Ex. 3 (Picard Decl.) ¶ 17.  They also lack fall detection, crash detection, and SOS calling.  Andy Walker, *Which Fitbit wearables have fall detection features?*, Android Authority (Aug. 15, 2022), https://tinyurl.com/jdawehp8.

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

smartwatch, has been labeled unworthy of the name by the media.  Victoria Song, *Fitbit Sense 2 review: it doesn't make much sense*, The Verge (Oct. 8, 2022), https://tinyurl.com/muhwzxuw (deeming Sense 2 "a fitness tracker masquerading as [a smartwatch]" and "[not] really a smartwatch by 2022 standards").  The Sense 2 has decreased "smart" functionality from its predecessor's "already paltry" options:  It no longer has offline music storage or allows use of Google assistant or any third-party apps.  *Id.*  These changes suggest Fitbit is moving away from the "smart" features to "narrow its focus to fitness."  *Id.*

As summarized in the below chart, none of AliveCor's or Staff's proposed alternatives are suitable alternatives to the accused Apple Watches for purposes of preventing the harm from an exclusion order:

| | Apple Watch Series 8 | Apple Watch SE | Samsung Galaxy Watch 5 | Google Pixel Watch | Fitbit Versa 4 | Fitbit Sense 2 | Fitbit Charge 5 | Withings ScanWatch | Fossil Hybrid HR | Garmin Venu 2 Plus | Oura Ring | Prevention circul+ | KardiaMobile |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wrist-based wearable | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✗ | ✗ |
| FDA-cleared ECG | ✓ | ✗ | ✓ | ✗ | ✗ | ✓ | ✗ | ✓* | ✗ | ✗ | ✗ | ✓ | ✓ |
| FDA-cleared IRN (runs in background) | ✓ | ✓ | ✗ | ✗ | ✓ | ✓ | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ |
| HHRN | ✓ | ✓ | ✓ | ✗ | ✓ | ✓ | ✓ | ✗ | ✗ | ✓ | ✗ | ✗ | ✗ |
| Blood oxygen level | ✓ | ✗ | ✓ | ✗** | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ | ✓ | ✗ | ✗ |
| Fall detection | ✓ | ✓ | ✓ | ✗** | ✗ | ✗ | ✗ | ✗ | ✗ | ✓ | ✗ | ✗ | ✗ |
| Crash detection | ✓ | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✓ | ✗ | ✗ | ✗ |
| Temperature sensing | ✓ | ✗ | ✗** | ✗ | ✗ | ✓ | ✗ | ✗ | ✗ | ✗ | ✓ | ✓ | ✗ |
| "Smart" Features: Access to 3rd-party apps | ✓ | ✓ | ✓ | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ |
| "Smart" Features: 2-way calling & messaging | ✓ | ✓ | ✓ | ✓ | ✗** | ✗** | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ |
| Pairs with iPhone | ✓ | ✓ | ✗ | ✗ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

*Rx-only  **Reported to be planned for release; timing TBD

**3.  Alternative products—existing or under development—cannot fill the massive shortfall resulting from exclusion within a commercially reasonable time frame.**

Apple has shown that it would take years for new smartwatches with FDA-cleared clinical features to be developed and reach consumers.  RIS at 57-61.  Even a hypothetical product that has already made significant process—say, a working prototype of a smartwatch that is currently undergoing clinical trials—would not be able to serve as an alternative to Apple Watch and avert the public health harms within a commercially reasonable time frame given the complexities of the engineering and regulatory processes.

And any product—under development or existing—can only ameliorate the public interest harms caused by exclusion if it can be produced in sufficient volume to satisfy the massive and sudden demand

CONFIDENTIAL MATERIAL REDACTED
CONTAINS CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

gap that would also ensue.  The two companies whose products are ███████████████ with U.S. consumers, Fitbit and Samsung, would need to increase their production of ECG-enabled devices by ███████████ respectively.  RIS Ex. 6 (Davies Decl.) ¶¶ 37, 51-52; RIS Ex. 5 (Dippon Decl.) ¶ 24. Given the continued chaos and cascading delays of the global supply chain—which promise to persist into 2024—such dramatic production ramp up is unrealistic.  *See* RIS Ex. 4 (Schafer Decl.) ¶ 8; RIS Ex. 6 (Davies Decl.) ¶¶ 18, 20, 23-24, 37-38, 51-52.  Notably, the "major companies with established supply chains" that AliveCor references (CIS at 47) are all currently experiencing significant supply chain disruptions, *see* RIS Ex. 6 (Davies Decl.) ¶ 33 (quoting Samsung CEO explaining that the ongoing shortage of silicon chips was a major issue for the company); RIS Ex. 4 (Schafer Decl.) ¶ 8 (Apple's competitors also experiencing delays in meeting demand).[24]  Therefore, even if suitable replacement wearables existed (they do not) or could be developed and FDA-cleared within a reasonable time frame (they cannot), they could not be produced quickly enough and in large enough quantities to avert the public interest harms resulting from exclusion.  No exclusion order should issue "because inadequate supply within the United States … mean[s] that an exclusion order would deprive the public of products necessary for some important health or welfare need."  *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1360 (Fed. Cir. 2010).

**B.  The Recommended Remedy Will Seriously Harm The Public Health And Welfare.**

**1.  Excluding the accused Apple Watches will risk lives, worsen health and wellness, and increase healthcare costs.**

Excluding the accused Apple Watches will cause grave harm to the public health and welfare by reducing early detection of AFib—a life-threatening disease that often goes undetected.  *See* RIS at 38-46. As evidenced by the well over 300 unprompted letters that users submitted to Apple attesting to the life-saving benefits of Apple Watch with ECG app, IRN, and HHRN, *see* RIS Ex. 8, these features have already

---

[24] AliveCor cites Apple's successful annual new product releases as evidence that "alleged component shortages and shipping issues" are an illusory concern.  CIS at 65-66 & n.51.  As Apple Senior Director for procurement and operations of components Aaron Schafer explained, Apple often plans product launches and forecasts demand two to three years in advance.  RIS Ex. 4 (Schafer Decl.) ¶ 9.  And surely AliveCor does not believe that Apple's practice of announcing its new products days before they launch is evidence that Apple did not carefully plan those products' development and production levels long before their formal announcement.

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

amount of time that a patient with AFib needs to take blood thinning medications, RIS at 47; a Mayo Clinic study using Apple Watch with ECG app and IRN to assess cardiovascular health and detect unknown and asymptomatic diseases, which recently begin enrollment and expects to enroll 1,000,000 participants, RIS Ex. 1 (Desai Decl.) ¶ 29; and the Johnson & Johnson Heartline Study, a three-year research trial that aims to analyze the impact of an app-based heart health program with Apple Watch with ECG app and IRN on the early detection of irregular heart rhythms consistent with AFib, *id.* ¶¶ 26, 28. If an exclusion order issues, these and other ongoing studies will be "severely undercut," "jeopardiz[ing] the significant investments in such research," and depriving the public of their valuable medical advances. RIS Ex. 1 (Desai Decl.) ¶ 34; *see* EDIS No. 776278 (AHA) at 4-5.

AliveCor's and Staff's reasons for discounting the significant harm to research that will be caused by an exclusion order lack merit. For instance, AliveCor posits (without evidence) that the REACT-AF trial "could be performed identically well using the IRN feature on an unaccused Apple Watch, coupled with a mobile ECG monitor such as AliveCor's Kardia Mobile." CIS at 52. But that cannot be squared with the public statements of one of the lead investigators of the REACT-AF trial, who stated that the study "*will* be adversely impacted if an exclusion of Apple Watches is in place," and that an exclusion order will cause "devastating impact[s] on clinical care and clinical science." EDIS No. 776319 (Stanford) at 2-3 (emphasis added). Indeed, the REACT-AF study "will look to see if Apple Watch's AFib detection algorithms can enable an anticoagulation strategy tailored to individual patients." RIS Ex. 1 (Desai Decl.) ¶ 30. AliveCor offers nothing to suggest these same study aims could be accomplished using a different product that utilizes different algorithms. Even if retooling the REACT-AF study were possible, redesigning the $37 million *government funded* study will entail an enormous "waste of resources expended to date." EDIS No. 776278 (AHA) at 4.

AliveCor is also wrong to suggest that ongoing and planned studies will not be affected by an exclusion order because they "have been ongoing for upwards of 1-2 years and have already amassed significant participants." CIS at 56. The REACT-AF study, for instance, will recruit over 5,000 participants and is not set to begin until Spring 2023. RIS Ex. 1 (Desai Decl.) ¶ 30. The Mayo Clinic study—which

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER*

will enroll 1,000,000 participants—just started recruitment in April 2022 "and is ongoing." *Id.* ¶ 29. And, contrary to AliveCor's misleading statement (CIS at 56), the J&J Heartline Study has only stopped enrolling participants "who already own an Apple Watch"; it is still accepting participants who do not own Apple Watches. *See Frequently Asked Questions*, Heartline, https://tinyurl.com/ycxu6xr7.

AliveCor's other arguments are equally misguided. It argues that there are clinical studies "with similar aims" using other products, CIS at 55, 58, but that says nothing about the harms of an exclusion order to research relying on Apple Watch, and it ignores that research involving Apple Watch is particularly valuable from a clinical perspective because Apple Watch is by far the most popular smartwatch in the United States. *See* EDIS No. 776278 (AHA) at 3-4 ("The AHA is not aware of alternative devices available in volume in the United States that provide the same combination of attributes to researchers and consumers in the United States.").

Separately, Staff argue that Apple and public commenters have not provided sufficient "evidence regarding the potential impact of the proposed remedial orders on any" studies involving Apple Watch. SIS at 15. Staff seek to contrast the record evidence here with that in *Certain Microfluidic Devices*, Inv. No. 337-TA-1068, Comm'n Op., 2020 WL 225020 (Jan. 10, 2020), *see* SIS at 15 n.3, but the evidence is strikingly similar. There, the evidence showed that an exclusion order "would disrupt important medical research, result in research studies that have questionable conclusions, and result in loss of data and wasted time, money, and effort," and cause some research to "never be performed." 2020 WL 225020, at *23. The same is true here. *E.g.*, EDIS No. 776278 (AHA) at 4-5 (explaining that an exclusion order "would jeopardize the scientific merit of ongoing and past research and waste investments made in pursuing nascent research," "risk[] loss of some or all of the statistical power of gathered data and resulting scientific merit" of ongoing studies, "negatively impact[]" long-term studies that are forced to "switch[] mid-study," and force wasteful re-design of planned studies); *see also* EDIS No. 776319 (Stanford School of Medicine); EDIS No. 776318 (Johns Hopkins); RIS Ex. 1 (Desai Decl.) ¶¶ 26-34; RIS Ex. 6 (Davies Decl.) ¶¶ 72-76.

CHAIRMAN



## UNITED STATES INTERNATIONAL TRADE COMMISSION

Washington, D.C. 20436

December 22, 2022

The President
The White House
Washington, D.C. 20500

Dear Mr. President:

In accordance with subsection (j) of section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337) ("Section 337"), and the July 21, 2005 Memorandum for the United States Trade Representative (70 *Fed. Reg.* 43251), I am transmitting to you and the United States Trade Representative copies of the Commission's limited exclusion order and cease and desist order, as described below, and the record upon which the Commission based its determination.

On December 22, 2022, the United States International Trade Commission issued a limited exclusion order and a cease and desist order pursuant to Section 337 in USITC Investigation No. 337-TA-1266, *Certain Wearable Electronic Devices with ECG Functionality and Components Thereof.*

The limited exclusion order prohibits Respondent Apple Inc., of Cupertino, California ("Apple") from importing into the United States wearable electronic devices with ECG functionality and components thereof that infringe one or more of claims 12, 13, and 19-23 of U.S. Patent No. 10,638,941; and claims 1, 3, 5, 8-10, 12, 15, and 16 of U.S. Patent No. 10,595,731 ("covered products"), except under license of the patent owner or as provided by law, and except for articles or components imported for use in servicing, repairing, or replacing covered articles that were imported prior to the effective date of this Order pursuant to existing service and warranty contracts. The cease and desist order prohibits Apple from further importing, selling, or distributing covered products in the United States.

The Commission concluded that the statutory public interest factors enumerated in subsections (d)(1) and (f)(1) of Section 337 do not preclude the issuance of this remedy. The Commission determined that, during the period of Presidential review, the products described

The President
December 22, 2022
page 2

above, manufactured abroad or imported by, for, or on behalf of Apple, may be imported and sold in the United States with the posting a bond in the amount of $2 per unit imported.

The Commission, however, has determined to suspend enforcement of the orders, including the bond provision, pending final resolution of the U.S. Patent and Trademark Office, Patent Trial and Appeal Board's Final Written Decisions finding the asserted patent claims unpatentable. *See Apple, Inc. v. AliveCor, Inc.*, IPR2021-00971, Patent 10,595,731, Final Written Decision Determining All Challenged Claims Unpatentable (Dec. 6, 2022); *Apple, Inc. v. AliveCor, Inc.*, IPR2021-00972, Patent 10,638,941, Final Written Decision Determining All Challenged Claims Unpatentable (Dec. 6, 2022).

Sincerely,

David S. Johanson
Chairman

Enclosures

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** | Inv. No. 337-TA-1266 |

**COMPLAINANT ALIVECOR, INC.'S REPLY SUBMISSION IN RESPONSE TO THE COMMISSION'S SEPTEMBER 22, 2022 NOTICE OF A COMMISSION DETERMINATION TO REVIEW IN PART**

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

The second contention is waived because Apple did not raise independent development in its post-hearing briefing. *See* Apple Post-HB at 76-86; Apple Reply Post-HB at 76-86; *see also Kinik Co v. Int'l Trade Comm'n*, 362 F.3d 1359, 1367 (Fed. Cir. 2004) (affirming the Commission's dismissal of validity arguments on the basis of waiver). Apple's contention also fails on the merits. Apple did not, as it claims, independently invent the claimed inventions. The evidence was sufficient to support both copying and industry praise, which outweighs any showing that the claims might have been obvious.

### 1. The evidence shows that Apple copied AliveCor's patented technology.

Copying evidence is not, as Apple claims "a weak secondary consideration." Apple Br. at 5. While copying requires more than showing similarities between a product and the claimed invention, *In re GPAC*, 57 F.3d 1573, 1580 (Fed. Cir. 1995), the evidence shows Apple did far more than that. It actively met with AliveCor for years, examined AliveCor's products numerous times, and changed its design strategy after AliveCor announced the release of SmartRhythm. AliveCor Br. at 10-14. The ID correctly found that the "probative" evidence of copying supported the conclusion that the claimed inventions would not have been obvious. ID at 96.

Apple contends that because some of the copying evidence—including meetings between Apple and AliveCor—is related to AliveCor's other products, such as the iPhone ECG and KardiaMobile devices, it cannot be considered as part of the *Graham* analysis here. Apple Br. at 7-12. While evidence specifically relating to the ECG-only devices that AliveCor pioneered may not be as probative as the evidence showing that Apple specifically copied the patented features, it is still relevant to the copying analysis. At the very least, it constitutes evidence that Apple intentionally monitored AliveCor's products over the years and then modeled its own design choices on AliveCor's, including AliveCor's inventions embodied in its DI products.[4] In *Liqwd, Inc. v. L'Oreal USA, Inc.*, for

---

[4] For similar reasons, Apple's FDA submissions identifying the KBS as the product "most similar" to its own products, its FOIA requests seeking AliveCor's FDA submissions, and Apple's internal

CONFIDENTIAL MATERIAL REDACTED

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

instance, the Federal Circuit explained that past copying cases emphasized the need for more than showing the patent owner and accused infringer's products were similar, but explained that the "primary concern" in each of the cases applying that principle was "to avoid treating mere infringement as copying simply because the claims of a patent arguably read on a competitor product." 941 F.3d 1133, 1138 (Fed. Cir. 2019).

Next, Apple contends that its internal documents do not show copying. Apple Resp. at 8-9. But as AliveCor explained in its response, ███████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████. AliveCor Resp. at 13 (citing RX-0790C.4). AliveCor's breakthrough achievement, and the technical details revealed in the blog post, showed Apple that using PPG sensing as a ████████████ would increase the likelihood that users could confirm the presence of arrhythmias with ECG recordings. AliveCor Br. at 13. Apple's contention that "no one ██████ had access to any technical details of the implementation or prior knowledge of how the KardiaBand System worked" (Apple Br. at 8) is contradicted by that same evidence itself, which discusses technical and specific details about AliveCor's patented technology. RX-0790C.4 (explaining that ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████ and that ████ ██████████████████████████████████████████████████████████ █████

Apple was not merely "analyzing another product," as it now claims. Apple Br. at 8. It was also considering how to improve its own products by piggybacking off AliveCor's inventions. As

---

research studies provide further circumstantial evidence of copying. *See* AliveCor Resp. to Apple Pet. at 70.

CONFIDENTIAL MATERIAL REDACTED

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

AliveCor discussed in its response, Apple took steps to employ the IRN as a trigger for the ECG app, which could "confirm" users' detected arrhythmias in the same way that AliveCor had used SmartRhythm as a trigger for its equivalent ECG functionality. AliveCor Br. at 13. Soon after, Apple began ████████████████████████████████ after it found out about SmartRhythm, CX-370C.21; and prepared a presentation stating that ████████████ ████████████████████████████████████████████████████ ████████ CX-370C.21 (bracketed clarification added). One slide in that presentation also proposed ████████████████████████████████ CX-370C.14. And soon before Apple released the IRN and ECG, it updated its presentations to reflect that ████████████ ████████████████ CX-0914C.9. This evidence shows that ████████████████ ████████████████████████████ when it discovered how AliveCor used SmartRhythm in the KBS and decided to link the two features.

Apple further argues that it simultaneously and independently developed the claimed inventions. Apple Br. at 12-13. As an initial matter, Apple waived this defense by failing to raise it in its post-hearing briefing. *See* Apple Post-HB at 76-86; Apple Reply Post-HB at 76-86; *see also Kinik Co v. Int'l Trade Comm'n*, 362 F.3d at 1367 (validity arguments that were omitted from the prehearing briefs and joint narrative statement of issues for the hearing were waived). Even if the argument was not waived, it still fails on its merits. Apple argues that it began developing the ECG sensor for the Apple Watch in ████ Apple Br. at 6. But Apple ████████████████████████████████ ████████████████ JX-0219C (Klaassen) at 45:14-20. Apple attempts to explain away this evidence by suggesting that ████████████████████████████████████████ ████████████████████ *See* Apple Br. 12-13. Apple's claim is contradicted by testimony from its own witnesses. Dr. Waydo admitted, for example, ████████████████ ████████████████████████████████

CONFIDENTIAL MATERIAL REDACTED

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

█████ Tr. (Waydo) at 790:11-20; *see also* RX-0832C.11. He further testified that it took Apple ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████ Tr. (Waydo) at 810:12-23. Apple's expert, Dr. Stultz, testified that he had no reason to

dispute that testimony. Tr. (Stultz) at 1151:4-1152:9.

And even if, as Apple claims, it was technically simple to incorporate this technology into the

Apple Watch, Apple's claim ████████████████████████████████████

████████████████████████ defies the evidence and common sense. Apple started

incorporating ECG functionality into the Apple Watch in █████ (RX-785C) but did not release the

ECG app until 2018 (RX-047). This ██████████ in releasing the ECG functionality shows that Apple

did not believe it was worth doing so until it saw AliveCor blaze a trail in wearable and mobile health

technologies. Recall that when the Apple Watch was first released in 2015, Apple marketed it as a

fashion accessory—not a health device. CX-0028 ("Apple's new smartwatch was designed to be a

fashion accessory."); *see also* JX-0236C (Caldbeck Tr.) at 118:22-119:24 (testifying that Apple ████

████████████████████████████████████████████████████████████████

██████████). The development timeline of the Apple Watch's ECG functionality does not weigh

against copying; it supports it. *See, e.g.,* Tr. (Waydo) at 812:12-815:3.

Indeed, the relatively short time Apple took to overcome these regulatory challenges further

suggests that it was AliveCor's products that drove Apple to release the Accused Features when it did.

Dr. Waydo testified, for example, that the ECG app was not released along with the HHRN in

September 2017—at this point, ████████ after Apple started working on the feature—because the

ECG hardware was ████████████████ that Apple was ████████████████████

███████ and that Apple would still ████████████████████████████████

████████████████████████ Tr. (Waydo) at 745:6-15. Apple then released the ECG app

CONFIDENTIAL MATERIAL REDACTED

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

in December 2018. *Id.* at 745:24-2. If incorporating ECG technology into the Apple Watch was so technically simple, and Apple was able to obtain regulatory clearance in such a short period of time, it should not have taken the world's most valuable company ██ years to complete this process.

### 2.      The evidence shows that the KBS received significant industry praise.

Apple contends that the evidence of industry praise lacks a nexus—and, therefore, should be discounted—to the KBS because "it was directed to a single feature of the device that represents only one limitation, and not to other recited features or to the claimed invention as a whole." Apple Br. at 13. That is false.

First, the research paper published in the Journal of the American College of Cardiology (CX-0472) focuses on the KBS's ECG functionality, but as the ID explained, "the mere fact that a peer-reviewed medical journal published in a laudatory article on the product is impressive, even if the article's specific focus was on only one of its functions." *Id.* The ID correctly concluded that the paper also "praises the 'KardiaBand' as implemented on the Apple Watch, that is, the KBS." ID at 94. The paper thus praises the KBS, and its strong praise of the KBS weighs in favor of nonobviousness. *See Henry Penry,* 938 F.3d 1324, 1334 (Fed. Cir. 2019) (industry awards supported finding of nonobviousness).

Apple also claims that the praise in each article "focuses solely on the KardiaBand System's ECG sensor." Apple Br. at 16. Apple's claim rests on a selective reading of the evidence. The Fast Company article, for example, does more than simply praise the KBS's ECG sensor. CX-0471. It also quotes Dr. Eric Topol, who stated that the "prompting function" offered by SmartRhythm "is important to doctors taking care of heart patients at risk of atrial fibrillation." CX-0471.4. According to Dr. Topol, "[a] lot of [his] patients already use the credit card sensor (AliveCor's earlier smartphone-connected Kardia Mobile EKG reader), but they don't know when to take an EKG; so they just do it when they feel light headed or dizzy." *Id.* This is clear praise for the KBS's PPG and motion sensing

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

already in the stream of commerce—could be paired with relevant accessories, like AliveCor's KBS, to add functionalities. If Apple would stop its anticompetitive actions and restore access to the raw PPG data and APIs, AliveCor could make updated versions of KBS for the unaccused Apple Watches.

**B.      There Are Numerous Additional Substitutes for the Infringing Devices.**

There are also smartwatches from other companies that would not be subject to exclusion and are currently in use and available to consumers, and would equally be available for use in clinical studies and research. For example, the Fitbit Sense, and Samsung Galaxy Watch 3 and 5 all have FDA clearance for their ECG functionality.[11] *See* Ex. A, Cragg Decl., Tbl. 1 (copied below). A comparison reveals that there are numerous reasonable substitute smartwatches available:

**TABLE 1: SELECTED SMARTWATCH FEATURES PROMOTED BY DEVICE MANUFACTURERS**

| | Apple | | Competitors | | | | |
|---|---|---|---|---|---|---|---|
| | Apple Watch (Series 8) [A] | Apple Watch (SE 2nd Gen) [B] | Samsung Galaxy (Watch 5) [C] | Fitbit (Sense2) [D] | Fossil (Gen 6) [E] | Garmin (Venu 2 Plus) [F] | Zepp (Amazfit GTS4) [G] |
| GPS | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Emergency SOS Capability | ✓ | ✓ | ✓ | ✗ | ✗ | ✓ | ✗ |
| Water Resistant | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Speaker and Microphone | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| iOS Compatibility | ✓ | ✓ | ✗ | ✓ | ✓ | ✓ | ✓ |
| Cellular Connectivity | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Personalizable Design | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Health Function:** | | | | | | | |
| ECG | ✓ | ✗ | ✓ | ✓ | ✗ | ✗ | ✗ |
| HRGN | ✓ | ✓ | ✓ | ✓ | - | ✓ | ✓ |
| IRN | ✓ | ✓ | ✓ | ✓ | - | ✓ | ✓ |
| Low Cardio Fitness Notifications | ✓ | ✓ | - | ✓ | ✓ | ✓ | ✓ |
| Blood Oxygen | ✓ | ✗ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Fall Detection | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ | ✗ |
| Crash Detection | ✓ | ✓ | ✓ | ✗ | ✗ | ✓ | ✗ |
| Wrist Temperature | ✓ | ✗ | ✓ | ✓ | ✗ | ✗ | ✗ |
| Sleep Monitoring | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

Apple also ignores other portable or wearable ECG devices that could be used in combination with unaccused smartwatches (*e.g.*, Apple Watch SE, Series 3, Fossil Gen 6, Garmin Venu 2 Plus, and Zepp Amazfit GTS4), such as AliveCor's KardiaMobile and KardiaMobile Card products, Oura Ring Gen 3, and Prevention Circul+. *See* Ex. A, Cragg Decl. ¶¶ 21-22, 29-30; AliveCor Br. at 44-46. Many of these devices can be easily paired with a smartwatch. AliveCor's KardiaMobile Card, for example,

---

[11]    https://www.fitbit.com/global/us/technology/ecg;    https://news.samsung.com/global/fda-cleared-electrocardiogram-monitor-app-is-available-in-theus-starting-today-on-galaxy-watch3-and-galaxy-watch-active2

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

is an FDA-cleared, credit-card-sized ECG reader, which fits in a wallet.[12] A consumer with an unaccused Apple Watch SE who receives an IRN notification could reach into her wallet and take an immediate ECG. Staff identified devices that allow cardiac monitoring from a ring worn on the finger,[13] and recognized the "wide availability of alternatives" available to consumers. Staff Br. at 14.

Apple, however, addresses only the Fitbit wearables. Apple Br. at 55. According to Apple, "only wearable devices with both FDA-cleared ECG and IRN capabilities could possibly serve as suitable alternatives to Apple Watch for purposes of this investigation." *Id.* And according to Apple, only Fitbit falls into this gerrymandered category. *Id.* But Apple provides no justification for divorcing the scope of reasonable substitutes from the scope of products available to consumers. "Commission precedent supports consideration of other non-infringing alternatives in the market, even when those alternatives are not exactly the same as the accused products." *Certain Tobacco Heating Articles and Components Thereof*, Inv. No. 337-TA-1199, ID at 119 (May 14, 2021) (collecting cases). This is because the "protected interest . . . is the public's ability to purchase [products] with [a particular] functionality, not the ability to purchase [products] with a specific feature set that is unrelated to the efficacy of the . . . functionality" at issue. *Certain Table Saws Incorporating Active Inj. Mitigation Tech. & Components Thereof*, Inv. No. 337-TA-965, Comm'n Op., 2017 WL 1476193, at *5 (Feb. 1, 2017). Apple makes no argument that taking an ECG on its infringing smartwatch is more effective than taking an ECG on a credit-card-sized ECG reader that fits in the consumer's wallet, and in fact, AliveCor's ECG technology is better than Apple's.[14]

The argument Apple does make is that "[n]on-[FDA-]cleared devices that purport to measure cardiac activity through PPG sensors have not been determined to accurately identify potential AFib."

---

[12]  https://store.kardia.com/products/kardiamobile-card

[13]  https://ouraring.com/product/heritage-gold

[14]  Ford et al., *Smart Watch for Detection of Atrial Fibrillation*, 8 J Am Coll Cardiol EP 782 (June 2022).

Apple Br. at 55. This claim does nothing to justify the position that all of the functionalities must be included in a single device. Nor does it account for Samsung's wearables with FDA clearance for the ECG technology.[15] Nor is it backed up by any actual evidence that devices without FDA clearance are less accurate than devices with FDA clearance—or in any event so much less accurate that they do not serve as reasonable substitutes. To the contrary, the study Dr. Picard cited, ostensibly to show the quality of Apple's device, concluded that the "different wearables [in the study] are all reasonably accurate at resting and prolonged elevated heart rate."[16] One of the tested devices was, moreover, the Fitbit Charge 2. Apple admits that Fitbit "currently offers wearable products with HHRN and both an FDA-cleared ECG and IRN feature." Apple Br. at 55. And according to one estimate, Fitbit's annual device sales from 2015 through 2021 have ranged from 10.6 to 25.4 million devices, with the low end of the range coming in 2021.[17] This estimate indicates that Fitbit alone—without even considering Samsung and Apple itself—may have capacity to replace ██ of Apple's excluded products. *See* Apple Br., Ex. 6 (Davies Decl.) ¶ 37 (estimating ████ shipped infringing devices in 2021); Ex. 5 (Dippon Decl.) ¶ 25.

For those reasons, Apple's arguments—and un-cross-examined declarations—that speculate about the time other companies may need to gain FDA clearance are irrelevant. Fitbit's substitutes are already cleared. Apple Br. at 55. Apple's IRN function is available on unaccused SE watches and is already cleared.[18] AliveCor's portable ECG devices are already cleared.[19] Samsung's ECG technology

---

[15]     https://www.mobihealthnews.com/news/samsung-says-it-has-received-fda-clearance-smartwatch-ecg-tracking

[16]     *See* Bent, B., Goldstein, B. A., Kibbe, W. A., & Dunn, J. P. (2020). *Investigating sources of inaccuracy in wearable optical heart rate sensors.* NPJ digital medicine, 3(1), 1-9, available at https://www.nature.com/articles/s41746-020-0226-6; Apple Br. Ex. 3, Picard Decl. ¶ 17.

[17]     https://www.businessofapps.com/data/fitbit-statistics/

[18]     https://www.accessdata.fda.gov/cdrh_docs/pdf21/K212516.pdf

[19]     https://store.kardia.com/products/kardiamobile-card

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

is already cleared.[20] Even if Apple had some evidence that devices without clearance were not reasonable substitutes—it cited none—there is no shortage of substitute products that have already received their FDA clearance. There is no need for these companies to wait for clearance, and there is no reason to think these companies, which have already successfully obtained clearances, will be unable to clear future versions of their products.

Apple's arguments about ***its own*** supply chain delays are likewise irrelevant to the ability of ***other suppliers*** to provide substitutes. Even if Apple is right when speculating that "[t]he supply constraints faced by Apple are shared by the entire industry," Apple Br. at 61, that would be no reason to allow Apple to use scare components in infringing products.

Indeed, Apple's decision to ignore the numerous substitutes recognized by AliveCor and Staff renders many of its public interest arguments unreliable and unsupported. Dr. Dippon's claims about the price effects of remedial orders, for example, are unrealistic for myriad reasons discussed by Dr. Cragg. *See* Ex. A, Cragg Decl. §§ III-VI. And because there are available substitutes with clearance, Apple ultimately reduces its argument to a mere plea that it wants consumers to keep buying Apple products. Apple claims that "[c]onsumers choose Apple Watch because it does it all" and that "[m]any Apple users strongly prefer Apple products and value their integrated nature." Apple Br. at 56. But Apple's market share is not a public interest issue, especially when that market share is being propped up by infringement of AliveCor's patents. "One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Certain Movable Barrier Operator Sys. & Components Thereof*, Inv. No. 337-TA-1209, Comm'n Op., 2022 WL 1553776, at *14 (May 13, 2022) (quoting *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1306 (Fed. Cir. 2012)). Rather, Apple's claims about its products "doing it all" raise exactly what

---

[20]     https://news.samsung.com/global/fda-cleared-electrocardiogram-monitor-app-is-available-in-the-us-starting-today-on-galaxy-watch3-and-galaxy-watch-active2

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

the Commission held is ***not*** a public interest concern in *Certain Table Saws*. "The protected interest . . . is . . . not the ability to purchase [products] with a specific feature set that is unrelated to the efficacy of the . . . functionality" at issue. *Certain Table Saws*, Inv. No. 337-TA-965, Comm'n Op., 2017 WL 1476193, at *5. When consumers are able to purchase products with the functionality at issue in the investigation, there are reasonable substitutes. *See id.* As the Commission recognized when Apple was a complainant seeking to impose remedial order, "[t]he right to exclude under a patent, 35 U.S.C. § 154, is the right to exclude a competitor's products; such exclusion necessarily affects consumer choice. Accordingly, the mere constriction of choice cannot be a sufficient basis for denying the issuance of an exclusion order." *Certain Personal Data & Mobile Comic 'ns & Related Software,* Inv. No. 337-TA-710, Comm'n Op., 2012 WL 11861755, at *44 (Jun. 2012). Here, Apple admits that members of the public who want to purchase products with irregular heartrate notifications, high heartrate notifications, and ECG readers will be able to buy Fitbit products. Apple Br. at 55. And those functionalities are also available through wearables and portable products sold by Samsung, AliveCor, AliveCor's licensees, Apple itself, and others. AliveCor Br. at 44-46.

Accordingly, Apple's argument that excluding Apple Watches will harm consumers by reducing their access to Apple Watch's other numerous industry-leading health, wellness, and safety features unrelated to the Asserted Patents, is simply false. *See* Apple Br. pp. 49-52. Likewise, Apple's assertion that exclusion would also disrupt studies related to these additional features is also false.

### C.    The Proposed Remedial Orders Do Not Affect Ongoing Studies.

Apple's doomsday arguments that exclusion of certain Apple Watches would have a devastating impact on AFib research, exaggerates the importance of the Apple Watch to ongoing and planned research/clinical trials, and ignores the available devices that could readily be used in place of the Accused Products, including unaccused Apple Watches. Apple Br. at 47-49. The requested remedial

# Exhibit 1

Declaration of Collin Stultz

83.    A person of ordinary skill in the art would have understood that in the '941 patent, the claims first require identifying the "possibility of an arrhythmia" based on the determination a discordance between the activity level and the claimed "heart rate parameter." In the context of claim 12, that heart rate parameter is obtained by a PPG sensor.

84.    Further, based on a reading of the claims, a person of ordinary skill in the art would have understood that after the claimed method and system determine the possibility of "an arrhythmia," the claims require obtaining ECG data "to confirm the presence of the arrhythmia." In other words, like in the '731 patent, the ECG data is used to verify the same arrhythmia that was detected using the discordance. To verify it is the same arrhythmia, a person of skill in the art would have understood that the system compares the results of the ECG sensor to the discordance determination performed previously as required by the claims.

85.    The specification of the '941 specifically discloses this comparison. Specifically, at column 13, line 60 through column 14, line 18, the '941 patent's specification describes that:

> In some embodiments, a machine learning algorithm causes the devices, systems, and methods described herein to more accurately identify or predict the presence of an arrhythmia in a given individual. For example, in some embodiments, sensed electrocardiogram data may be compared back to parameter values such as, for example, sensed heart rates and activity levels that triggered the sensing of said electrocardiograms. When, for example, sensed electrocardiograms confirm the presence of an arrhythmia, the presence of which was indicated by, for example, a discordance between other parameter values, the machine algorithm causes the device or system described herein to learn from that data. Similarly, when, for example, sensed electrocardiograms do not confirm the presence of an arrhythmia, the presence of which was indicated by, for example, a discordance between other parameter values, the machine algorithm causes the device or system described herein to learn from that data as well. . . . The presence or absence of an arrhythmia on the electrocardiogram either respectively reinforces the correlation of an arrhythmia with the discordance that caused the electrocardiogram to be sensed or contradicts the presence of a correlation of an arrhythmia with the discordance.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

In the Matter of

**CERTAIN WEARABLE ELECTRONIC**
**DEVICES WITH ECG FUNCTIONALITY**
**AND COMPONENTS THEREOF**

Inv. No. 337-TA-1266

**COMPLAINANT ALIVECOR, INC.'S SUBMISSION IN RESPONSE TO THE**
**COMMISSION'S SEPTEMBER 22, 2022 NOTICE OF A COMMISSION**
**DETERMINATION TO REVIEW IN PART**

CONFIDENTIAL MATERIAL REDACTED

combined with evidence of "further planned work to be undertaken in order to bring [an] industry to fruition within the foreseeable future" is sufficient. *Id.* at 44. And here, the record shows that AliveCor made substantial past research and development investments—and has planned substantial future research and development investments—in products for which "practice of [the asserted patent] claims . . . is 'in the process of being established.'" ID at 60.

At the hearing, Mr. Somayajula discussed his teams' work has resulted in prototype for ███ and versions of the ███ that are running the Kardia App. Tr. (Somayajula) at 207:21-208:18, 216:21-217:2. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████

Future work has been planned. ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

The testimony was corroborated by the documentary evidence. ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

CONFIDENTIAL MATERIAL REDACTED

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████

████████████████████████

In fact, AliveCor has been implementing these plans for years. ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████ Apple, for its part, has repeatedly alleged that the post-2018 investments AliveCor asserted in its domestic industry case relate solely to ██████ and ██████ *Compare, e.g.,* Apple Post-HB at 141 *with id.* at 157.

The development work performed by AliveCor's contractors is an important part of the implementation of these plans and has contributed to the development of the ██████ and ██████ AliveCor's ledger includes ████████████████████████████████████

███████████████████████████████████████████████

██████████ AliveCor's development work on those projects and future plans demonstrates "necessary tangible steps to establish an industry" and a "significant likelihood that the industry requirement will be satisfied in the future" with respect to articles for which the ID found practice of the Asserted Patents was in the process of being established. *Certain Stringed Musical Instruments,* Inv. No. 337-TA-586, Comm'n Op., at 13 (May 16, 2008) (quotation marks omitted). That is a separate reason to credit AliveCor's investments in the ██████ and ██████ products toward satisfaction of the domestic industry requirement under subsection (C).

Regardless of whether AliveCor has an existing industry or an industry in the process of being established, its investments have a nexus to the patented technology. "[A] complainant's evidence of its investment in a protected article that practices the patent ordinarily also can support the inference

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

plainly favoring entry of an exclusion order in all but the rarest of cases. Apple cannot meet that threshold here, for any of the four factors.

### 1.    There are Numerous Substitutes for the Infringing Devices

As a threshold matter, the Commission has withheld a remedy for public interest reasons in only three cases, and never when an exclusion order would apply to consumer products with readily available substitutes for the excluded products. *See Certain Automatic Crankpin Grinders*, Inv. No. 337-TA-60, USITC Pub. 1022 (Dec. 1, 1979) (infringing energy efficient automobiles were necessary to alleviate public panic during the energy crisis of 1979); *Certain Inclined-Field Acceleration Tubes and Components Thereof*, Inv. No. 337-TA-67, USITC Pub. 1119 (Dec. 1980) (infringing accelerator tubes were required to study nuclear structures during the Cold War and the Soviet Union's invasion of Afghanistan); *Certain Fluidized Supporting Apparatus and Components Thereof*, Inv. No. 337-TA-182/188 (Oct. 1984) (infringing hospital beds for burn patients were unavailable elsewhere and had no comparable substitute). Here, numerous major electronic suppliers market reasonable substitutes for Apple's infringing functionalities. Apple itself sells and markets the Apple Watch SE series, which, although it provides IRN and HHRN, does not contain an ECG sensor and therefore has not been accused. Those unaccused Apple Watches can, moreover, be combined with the KBS to provide ECG functionality. All Apple needs to do is reverse its anticompetitive changes to watchOS that prevent SmartRhythm from working. Third parties, such as Samsung and Fitbit, offer reasonable substitutes as well. The Commission's consistent exclusion of infringing products when substitute products are available serves the public interest by protecting intellectual property, which strengthens the U.S. economy and technology leadership. For that reason, issuing an exclusion order here would promote the public interest.

***Samsung Products***. Samsung offers numerous FDA-cleared products that provide both PPG-based and ECG-based detection technologies for heart monitoring. These include the Galaxy

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

Watch 5,[7] Galaxy Watch 4,[8] Galaxy Watch 3,[9] and Galaxy Watch Active 2.[10] Each of these substitute Samsung watches provides the capability of an on-demand 30-second ECG that can detect the presence of Afib. These watches also provide continuous heartrate monitoring using an optical heart rate sensor (*i.e.*, PPG) that detects and keeps track of heart rate and heart rate changes in the background. Recent statistics show that Samsung saw a 46% year-over-year growth in smartwatch shipments from Q1 2021 to Q1 2022, placing it second on the list of global smartwatch suppliers behind Apple.[11] In Q2 2022 alone, Samsung shipped 2.8 Million smartwatch units worldwide.[12]

***Fitbit Products***. Fitbit offers numerous products, cleared by the FDA, that provide AFib detection capabilities using an ECG app[13] and a PPG-based background detection algorithm.[14] Fitbit's products offering the PPG-based AFib detection capability include the Fitbit Sense, the Fitbit Versa, the Fitbit Versa Lite, the Fitbit Charge 4, and the Fitbit Inspire 2. The substitute Fitbit devices are also capable of tracking elevated heart rates (similar to Apple's HHRN) as well as tracking heart rate variability ("HRV"), which is a measure of the time variances in between heartbeats that can indicate whether the heart is beating irregularly.[15]

---

[7] https://www.samsung.com/us/watches/galaxy-watch5/

[8] https://www.samsung.com/us/watches/galaxy-watch4/buy/

[9] https://www.samsung.com/uk/watches/galaxy-watch/galaxy-watch3-45mm-mystic-black-lte-sm-r845fzkaeua/

[10] https://www.samsung.com/us/mobile/wearables/smartwatches/galaxy-watch-active2-44mm-aqua-black-bluetooth-sm-r820nzkaxar/

[11] https://www.counterpointresearch.com/smartwatch-market-grows-13-yoy-q1-2022-apple-stays-first-samsung-solidifies-second-place/

[12] https://9to5google.com/2022/09/12/galaxy-watch-q2-2022-shipments/

[13] https://help.fitbit.com/articles/en_US/Help_article/2457.htm (describing Fitbit ECG App).

[14] https://www.zdnet.com/article/fitbits-afib-detection-algorithm-gets-fda-approval/

[15] https://help.fitbit.com/articles/en_US/Help_article/1565.htm (detailing Fitbit heartrate notification features and HRV tracking feature)

CONFIDENTIAL MATERIAL REDACTED
CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

Samsung and Fitbit are both among the largest wearable device suppliers in the world.[16]

***Other Products.*** There are numerous other wearable smartwatches on the market that have received FDA clearance and have heart-rate monitoring capabilities. One example is the Oppowatch, which contains an optical heartrate sensor and monitors the user's heartrate.[17] Another such device is the Withings Scanwatch, which not only uses ECG and PPG for Afib detection, but specifically highlights those detection capabilities to consumers on its website.[18] Consumers also can purchase portable ECG readers, like AliveCor's KardiaMobile[19] and KardiaMobile Card[20] products, to pair with smartwatches that do not have ECG functionality. ██████████████████

████████████████████████████████████████

Apple itself offers substitutes. The infringing Apple Watches that would be subject to the recommended exclusion order comprise only a subset of Apple's watch offerings; those products that include both **(1)** PPG-based arrhythmia detection features (*i.e.*, the Irregular Rhythm Notification feature ("IRN") and the High Heart Rate Notification ("HHRN"); feature) and **(2)** the ECG App. Apple offers numerous unaccused Apple Watch products that lack ECG hardware (and thus do not accommodate the ECG App), but which nevertheless offer both the IRN and HHRN features. These unaccused models would not be subject to the recommended exclusion order, and they include Apple Watch series 1-3, and Apple Watch SE, which Apple recently updated and re-released at the September

---

[16] https://www.verifiedmarketresearch.com/blog/top-wearable-device-companies/

[17] https://www.oppo.com/en/accessories/watch-free/specs/

[18] *See* https://support.withings.com/hc/en-us/articles/360012123158-ScanWatch-What-is-Atrial-Fibrillation-AFib-; https://support.withings.com/hc/en-us/articles/360009956537-ScanWatch-How-does-ScanWatch-detect-Atrial-Fibrillation-AFib-

[19] https://www.alivecor.com/kardiamobile

[20] https://store.kardia.com/products/kardiamobile-card

# EXHIBIT A

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

| |
|---|
| **In the Matter of** |
| **CERTAIN WEARABLE ELECTRONIC DEVICES WITH ECG FUNCTIONALITY AND COMPONENTS THEREOF** |

**Inv. No. 337-TA-1266**

## DECLARATION OF DR. MICHAEL I. CRAGG

1. My name is Michael I. Cragg. I am over 21 years of age, of sound mind, and make this declaration based upon my experience, training and knowledge, as described below. I have been retained by Complainant, AliveCor, Inc. ("AliveCor"), to provide economic analysis and opinion in reply to arguments advanced by Respondent, Apple Inc. ("Apple"), and its experts—including but not limited to the opinions expressed by Dr. Christian Dippon—regarding the effects on the statutory public interest factors of a proposed limited exclusion order against certain Apple devices.[1]

2. I am a Principal and the former Chairman of The Brattle Group, a global economic consulting firm headquartered in Boston, Massachusetts with additional offices in Beijing, Brussels, Chicago, London, Madrid, New York, Rome, San Francisco, Shanghai, Sydney, Toronto, and Washington, D.C. I have a Ph.D. in economics from Stanford University, an M.A. in economics from the University of British Columbia, and a B.S.E. from Princeton University.

3. I have been researching, studying, and publishing on competition economics and industrial organization matters for over 30 years. Recently, my co-authored article "Understanding the

---

[1] Respondent Apple Inc.'s Opening Brief in Response to the Commission's Request for Written Submissions on the Issues under Review and on Remedy, the Public Interest, and Bonding, October 6, 2022 ("Apple Opening Brief"); Declaration of Christian Dippon, Ph.D., October 6, 2022, Apple Opening Brief, Exhibit 5 ("Dippon Declaration"); [Proposed] Limited Exclusion Order, Brief of the Office of Unfair Import Investigations on the Issues Under Review and on Remedy, the Public Interest, and Bonding, October 6, 2022 ("OUII Brief"), Exhibit A ("Proposed Exclusion Order").

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

**TABLE 1: SELECTED SMARTWATCH FEATURES PROMOTED BY DEVICE MANUFACTURERS**

| | Apple | | Competitors | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Apple Watch (Series 8) [A] | Apple Watch (SE 2nd Gen) [B] | Samsung Galaxy (Watch 5) [C] | Fitbit (Sense2) [D] | Fossil (Gen 6) [E] | Garmin (Venu 2 Plus) [F] | Zepp (Amazfit GTS4) [G] |
| GPS | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Emergency SOS Capability | ✓ | ✓ | ✓ | ✗ | ✗ | ✓ | ✗ |
| Water Resistant | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Speaker and Microphone | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| 24+ Hour Battery Life | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| iOS Compatablity | ✓ | ✓ | ✗ | ✓ | ✓ | ✓ | ✓ |
| Cellular Connectivity | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Personalizable Design | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Health Functions** | | | | | | | |
| ECG | ✓ | ✗ | ✓ | ✓ | ✗ | ✗ | ✗ |
| HHRN | ✓ | ✓ | ✓ | ✓ | - | ✓ | ✓ |
| IRN | ✓ | ✓ | - | ✓ | - | ✓ | ✓ |
| Low Cardio Fitness Notifications | ✓ | ✓ | - | ✓ | - | ✓ | ✓ |
| Blood Oxygen | ✓ | ✗ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Fall Detection | ✓ | ✓ | ✓ | ✗ | ✗ | ✓ | ✓ |
| Crash Detection | ✓ | ✓ | ✓ | ✗ | ✗ | ✓ | ✓ |
| Wrist Temperature | ✓ | ✗ | ✓ | ✓ | ✗ | ✗ | ✗ |
| Sleep Monitoring | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

Sources and Notes:

[A]: *See,* Dippon Report, Table 2. *See also,* APL-ALIVE_00354302.

[B]: *See,* Dippon Report, Table 2. *See also,* APL-ALIVE_00354395.

[C]: *See,* APL-ALIVE_00354239. *See also,* "Monitor your heart rate on your Samsung smart watch," Samsung, accessed October 13, 2022,

https://www.samsung.com/us/support/answer/ANS00083511/#:~:text=Galaxy%20Watch%20models%3A%20On%20your,tracker%2C%20and%20then%20tap%20Measure.

[D]: *See,* APL-ALIVE_00354375. *See also,* "Does Fitbit have SOS or emergency features?" Android Authority, accessed October 13, 2022, https://www.androidauthority.com/sos-emergency-fitbit-3152047/. *See also,* "Which Fitbit wearables have fall detection features?" Android Authority, accessed October 13, 2022, https://www.androidauthority.com/fall-detection-fitbit-3152567/.

[E]: APL-ALIVE_00354225.

[F]: *See,* APL-ALIVE_00354334. *See also,* "Wearables and Body Temperature Monitoring - current products and what to expect for the future," MyHealthyApple.com, accessed October 13, 2022, https://www.myhealthyapple.com/wearables-and-body-temperature-monitoring-current-products-and-what-to-expect-in-the-future/.

[G]: *See,* "Amazfit GTS 4," Amazfit, accessed October13, 2022, https://www.amazfit.com/en/amazfit-gts-4. *See also,* "Amazfit GTR4 and GTS4 go official with AMOLED screens, fall detection, and Bluetooth calling," GSMArena, accessed October 13, 2022, https://www.gsmarena.com/amazfit_gtr_4_gts_4_specs_price_sale_date-news-55650.php. *See also,* "Amazfit GTS4 vs Amazfit GTS 4 Mini," Versus, accessed October 13, 2022, https://versus.com/en/amazfit-gts-4-vs-amazfit-gts-4-mini.

Dashes indicate that it could not be conclusively determined whether a model had a given feature.

[Table is reproduced in Appendix C, "Table 1. Selected Smartwatch Features.xlsx".]

21. As shown in Table 1 above, only two of the five competing models that Dr. Dippon includes in his analysis even offer an ECG feature. And the competing models that do offer an ECG feature—the Samsung Galaxy Watch 5 and the Fitbit Sense2—are the "flagship" models for

CONFIDENTIAL MATERIAL REDACTED
CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

their respective brands.[16] In 2021, while most (98 percent) of Samsung's smartwatch shipments were ECG-capable, 82 percent of Google's smartwatch shipments were *not* ECG-capable.[17]

22. Moreover, even among the narrower set of eight features that Dr. Dippon identifies as "Apple Watch Health Functionalities,"[18] five—high and low heart rate notification, irregular rhythm notification, cardio fitness notification, fall detection, and crash detection—are included in Apple Watch models that are not subject to the Proposed Exclusion Order.[19]

23. More specifically, as shown in Table 1 above, the Apple Watch SE 2nd Generation does not include ECG features, and Dr. Dippon finds that ███████ of Apple Watches imported into the U.S. in 2021 did not include ECG functionality.[20] And multiple Apple Watch customer testimonials produced in this matter by Apple, in which customers praise certain Apple Watch features, do not mention ECG functionality at all, but instead express appreciation for features such as high heart rate notifications,[21] irregular rhythm notifications,[22] emergency calling,[23] "activity" and "health" apps,[24] and oxygen monitoring.[25] An Apple Watch with these features

---

[16] *See,* Table 1; *See also,* Dippon Declaration at p. 65.

[17] Table 4.

[18] Dippon Declaration at Table 2.

[19] APL-ALIVE_00354350 at 352, 353; Proposed Exclusion Order at p. 2.

[20] Dr. Dippon reports that 70.9 percent of the Apple Watches imported into the U.S. in 2021 were "Apple Watches containing the Accused Functionalities." Dippon Declaration at ¶ 25. A more accurate description of these devices is ECG-capable Apple Watches (which is equivalent to Infringing Devices as defined above), as I now explain. Dr. Dippon defines the "Accused Functionalities" as "electrocardiogram (ECG) app, irregular rhythm notification (IRN), and High Heart Rate Notification (HHRN)." Dippon Declaration at ¶ 1. As discussed above, the Proposed Exclusion Order pertains to the ECG feature only. Proposed Exclusion Order at p. 2. I understand that Apple Watches without the ECG feature but with the IRN and HHRN features, such as the Apple Watch SE (*see,* Dippon Declaration at Table 2), are not accused devices. Dr. Dippon in fact obtains the 70.9 percent statistic by filtering U.S. sales on one criterion: ECG functionality. Dippon Declaration, Appendix E.xlsx, "2021 Shipments by Watch Type" tab. The presence of IRN and HHRN features on those devices is only incidental, since all Apple Watches with ECG functionality also include IRN and HHRN features, although the reverse is not true. Dippon Declaration at Table 2.

[21] APL-ALIVE_00355378 at 379.

[22] APL-ALIVE_0355396.

[23] APL-ALIVE_00355401 at 401.

[24] APL-ALIVE-00355405 at 406.

[25] APL-ALIVE-00355765.

---

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

mentioned in these testimonials would not be subject to the Proposed Exclusion Order if it did not also include ECG functionality.[26]

24. Apple's promotional materials indicate that the company does not recognize ECG as a primary feature of the Apple Watch experience, even for its health-related functionalities. In a September 7, 2022 press release announcing the introduction of the Apple Watch Series 8 and the new Apple Watch SE, Apple stated that "the redesigned Apple Watch SE delivers the core Apple Watch experience, including Activity tracking, high and low heart rate notifications, and Emergency SOS, as well as the new Crash Detection feature … all at a more affordable price."[27] The press release also touts the fact that the Apple Watch SE, like the Apple Watch Series 8, is "powered by watchOS 9," which is "[t]he latest software bring[ing] new features" including international roaming; AFib History; a "completely redesigned Compass app"; a Workout app with "new in-session views," "advanced workout experiences, including Heart Rate Zones, Custom Workouts, Pacer," "autodetection to easily switch between workouts," and "new running form metrics"; sleep tracking; and a new Medications experience.[28] In the roughly 3,000-word press release, the word "ECG" appears only once.[29]

25. Not only do Apple's promotional materials suggest that ECG functionality (as opposed to health monitoring and analysis) is not part of the core Apple Watch experience, Apple's advertising acknowledges that some consumers do not want to buy an ECG-enabled Apple Watch. For example, Apple's website presents ECG- and non-ECG enabled watches side-by-side under the heading, "Which Apple Watch is right for you?"—implying that an ECG-enabled Apple Watch is not "right" for many of the company's target customers.[30] The non-ECG-enabled models include five of the other seven "Apple Watch Health Functionalities" that Dr. Dippon identifies.[31]

---

[26]   Proposed Exclusion Order at p. 2.
[27]   APL-ALIVE_00354302 at 303.
[28]   APL-ALIVE_00354302 at 303, 306-307.
[29]   APL-ALIVE_00354302.
[30]   APL-ALIVE_00354483.
[31]   Dippon Declaration at Table 2.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

26. Moreover, there is significant evidence that Apple Watches without ECG capabilities, like the Apple Watch SE, are better substitutes for other Apple Watches than non-Apple Watches are. Trade press reviews consistently recommend that consumers interested in smartwatches purchase any watch as long as it is from the Apple brand. Any suggestion of particular Apple Watch model remains secondary, if mentioned at all, suggesting the close substitutability of Apple Watch models. Below is a sample of recent trade press reviews highlighting the close substitutability among Apple Watch models.

- ***The Best Smartwatches, Wired (October 7, 2022)[32]***

  > The Apple Watch is the best smartwatch money can buy. It has the best operating system, WatchOS, which is slick, with plenty of apps to help reduce the number of times you need to pull out your phone.
  >
  > The second-generation Apple Watch SE … is likely all you need.

- ***The Apple Watch is the Best Smartwatch for iPhone Owners, New York Times (September 19, 2022)[33]***

  > If you have an iPhone and you want a smartwatch, there's no reason to choose anything but an Apple Watch—and this year, most people should choose the Apple Watch Series 7. It's the best way to keep up with notifications, track fitness, get directions, and use apps without having to constantly reach for your phone. It's not leaps and bounds better than the Apple Watch SE, our budget pick,

---

[32] "The Best Smartwatches," Wired, accessed October 13, 2022, https://www.wired.com/gallery/best-smartwatches/.

[33] "The Apple Watch is the Best Smartwatch for iPhone Owners," New York Times, accessed October 13, 2022, https://www.nytimes.com/wirecutter/reviews/best-smartwatch-iphone/.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

but we think the small improvements stack up to make it worth the higher price if you can spend the extra money.

- ***Smartwatch Buying Guide, Consumer Reports (April 15, 2022)[34]***

  Compatibility: Above all, make sure the smartwatch will be compatible with your existing smartphone. If you have an iPhone, you may want an Apple Watch, which allows you to use some of the same apps you use on your phone.

- ***Best Smartwatch for 2022, CNET (September 30, 2022)[35]***

  One of the ways to narrow down your search is to remember that you have to find a smartwatch that's compatible with your smartphone. Some smartwatches only work with iPhones, while others only work with Android.

27. In spite of ample evidence available to Dr. Dippon that ECG functionality is not the primary—let alone the exclusive—driver of consumer demand for smartwatches, Dr. Dippon's "Werden-Froeb" model (implicitly) assumes that the demand for an Apple Watch is derived entirely from the demand for the ECG feature. That is, he assumes that every consumer who currently purchases an ECG-enabled Apple Watch would switch to a competitor's watch if Apple lost the ECG function—even if the competitor's watch also lacked ECG functionality.[36] Illogically, he assumes that none of Apple's lost sales of ECG-enabled watches would be recaptured through additional Apple Watch SE sales if Apple stopped marketing its ECG-enabled models.

---

[34] "Smartwatch Buying Guide," Consumer Reports, accessed October 13, 2022, https://www.consumerreports.org/electronics-computers/smartwatch/buying-guide/.

[35] "Best Smartwatch for 2022," CNET, accessed October 13, 2022, https://www.cnet.com/tech/mobile/best-smartwatch/.

[36] Replication of Dr. Dippon's smartwatch market share calculations indicates that he includes both ECG-enabled and non-ECG-enabled watches produced by Apple and the five named rivals. *See,* Dippon Declaration at Table 3. *See also,* Appendix C, "Table 4. Proportion of 2021 Smartwatch Sales with ECG Capability.xlsx."

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

28. Dr. Dippon's model ignores several key market realities, including (i) some consumers choose a smartwatch based on features other than ECG, including the seven other "Apple Watch Health Functionalities" that Dr. Dippon identifies; (ii) significant shares of smartwatch and Apple Watch buyers choose a non-ECG-enabled device; (iii) Apple itself promotes the non-ECG-enabled (and unaccused) Apple Watch SE as an alternative to the infringing Apple Watch Series 8 that delivers the "core Apple Watch experience"; and (iv) many consumers prefer Apple smartwatches because they are part of a broader ecosystem of integrated Apple devices utilized by the consumer.

### 2.     Dr. Dippon ignores relevant alternatives to the Infringing Devices

29. In addition to mischaracterizing the nature of consumer demand for smartwatches, Dr. Dippon's analysis ignores other portable or wearable ECG devices, in combination with an unaccused smartwatch such as an Apple Watch SE, as an alternative to Apple's Infringing Devices. These alternative products include AliveCor's KardiaMobile and KardiaMobile Card products,[37] as well as the Oura Ring Gen 3 and Prevention Circul+.[38]

30. AliveCor's mobile devices (*e.g.*, KardiaMobile 6L) are compatible with iPhones, and its KardiaBand is compatible with Apple Watches.[39] In fact, one physician-authored review of "heart rhythm detection devices for remote patient monitoring," which included discussions of the Apple Watch and Fitbit, noted that the KardiaMobile 6L, is "likely the least expensive of the options for consumers interested in tracking their own ECG."[40] And the OUII Brief notes the praise that AliveCor's ECG devices have received, including the following: "The Kardia app is the best Apple Watch App we've used."[41]

---

[37] *See,* "Check your heart at breakfast," AliveCor, accessed October 12, 2022, https://www.alivecor.com/kardiamobile. *See also,* "KardiaMobile® Card," AliveCor, accessed October 12, 2022, https://store.kardia.com/products/kardiamobile-card.

[38] OUII Brief at p. 14.

[39] APL-ALIVE_00354501 at 501, 502, 507.

[40] APL-ALIVE_00354193 at 194.

[41] OUII Brief at p. 2.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

31.  As discussed above, Dr. Dippon's "Werden-Froeb" model implicitly assumes that the demand for an Apple Watch is derived entirely from the demand for the ECG feature. Yet Dr. Dippon's analysis fails to consider alternative devices that third parties have declared to be exceptional on price and performance dimensions, and which offer similar heart health-related functionalities without the ECG feature.[42]

### B.   DR. DIPPON MISCHARACTERIZES THE MARKET THAT WOULD EXIST AFTER AN EXCLUSION ORDER

#### 1.   Dr. Dippon assumes an irrational response by Apple

32.  Dr. Dippon purports to quantify the effects of the Proposed Exclusion Order on prices, consumer welfare, and smartwatch production and shares.[43] His analysis of price and consumer welfare effects is based on a merger simulation model whose starting assumption is that Apple would withdraw its *entire* smartwatch production—including the nonaccused Apple Watch SE—from the market until 2036, when the last AliveCor patent expires.[44] I discuss the numerous, consequential deficiencies of this model in Section IV below. Dr. Dippon's analysis of smartwatch production and shares is based on a rudimentary thought experiment that purports to show the effects of reallocating Apple's U.S. sales of the Infringing Devices, approximately 71 percent of Apple's U.S. smartwatch sales,[45] to other manufacturers.[46]

33.  In other words, Dr. Dippon's analysis is based on the assumption that, in response to the Proposed Exclusion Order, Apple would effectively abandon the smartwatch market for over 13

---

[42]  Table 1.

[43]  *See, e.g.*, Dippon Declaration at Table 7, Table 8, Section II.B, Section II.C.

[44]  Dippon Declaration at Section II.B, Section II.C. As I discuss in Section IV below, in some instances, Dr. Dippon performs ad-hoc adjustments to his model's outputs that purport to account for the ongoing presence of the Apple Watch SE in the market. However, as I explain in Section IV below, his purported price effects and product substitutions (*i.e.*, elasticities) remain entirely based on the assumption that Apple withdraws from the market altogether, which also contaminates his purportedly adjusted consumer welfare effects and renders them unreliable.

[45]  Dippon Declaration at ¶ 25.

[46]  Dippon Declaration at Table 7, Table 8.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

years. The passive response that Dr. Dippon assumes is inconsistent with his own arguments, as well as other evidence, regarding Apple's incentives and ability to continue to supply the market.

> a.    *There is strong consumer demand for Apple Watch features unrelated to ECG features*

34.    Dr. Dippon notes that Apple Watch models are the "preferred choices of smartwatch for a significant portion of US consumers."[47] Furthermore, Dr. Dippon touts the value to consumers of Apple Watch features such as location tracking, crash detection, fall detection, blood oxygen measurements, and temperature sensing,[48] none of which require ECG functionality. Dr. Dippon's analysis suggests that many consumers would prefer an Apple Watch over alternative smartwatches for reasons unrelated to ECG functionality. Indeed, in a September 2022 review of the Fitbit Sense, PCMag noted numerous dimensions on which the Apple Watch was superior: the Apple Watch measures oxygen levels more quickly;[49] the Apple Watch "offers far superior call and text features";[50] and the Sense is expensive, "especially in light of the new Apple Watch SE, which starts at $50 less."[51]

35.    Dr. Dippon also notes that smartwatches that run on operating systems other than Apple's Watch OS and Google's Android Wear OS, such as "Fitbit OS, Garmin OS, Zepp OS and others … lack access to services, like maps," and "generally have limited numbers of third-party apps."[52] Dr. Dippon's observation points to a key driver of demand for the Apple Watch: "The reason why Watch OS is so popular is that it is integrated really well into the whole Apple Ecosystem. Apple Watch [w]orks flawlessly with iPhones and other Apple devices, which makes it an ideal option for iPhone [u]sers."[53] The aforementioned PCMag review of the Fitbit Sense

---

[47]    *See,* Dippon Declaration at ¶ 66. *See also,* APL-ALIVE_00354218 at 219 (The Apple Watch is "the most popular smartwatch in the world, with a 55% market share that dwarfs competitors like Google."). *See also,* APL-ALIVE_00355343 at 343 (noting that Apple was the market leader in smartwatches, "while a far second place was credited to Samsung.").

[48]    Dippon Declaration at ¶ 54.

[49]    APL-ALIVE_00354198 at 208.

[50]    APL-ALIVE_00354198 at 210.

[51]    APL-ALIVE_00354198 at 211.

[52]    Dippon Declaration at ¶ 58.

[53]    *See,* APL-ALIVE_00355330 at 332. *See also,* trade reviews in Section III.A.1 at pp. 10-11.